**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CARL REED, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) **Case No.** |
| v. | ) |
| | ) |
| RICHARD ZULEY, TIMOTHY | ) |
| THOMPSON, the CITY OF CHICAGO, | ) |
| COOK COUNTY STATE'S | ) |
| ATTORNEY NANCY GALASSINI | ) |
| ADDUCI, and COOK COUNTY. | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

**COMPLAINT**

Plaintiff Carl Reed, by and through his attorneys, Loevy & Loevy, complains of

Defendants Richard Zuley, Timothy Thompson, Nancy Galassini Adduci, the City of Chicago,

and Cook County, and as-yet unknown employees of the City of Chicago and Cook County, and

states as follows:

**INTRODUCTION**

1.      Plaintiff Carl Reed spent nineteen years in a cage for a crime he did not commit.

2.      Mr. Reed's wrongful conviction was the direct result of Defendants' misconduct.

Defendants coerced his false confession after shackling him to a wall on a bare, metal bench for

55 hours—denying him diabetes medication, physically beating him, and psychologically

torturing him until he signed a prewritten confession that he could not even read.

3.      Mr. Reed was particularly vulnerable to this mistreatment. He has profound

cognitive difficulties and learning disabilities.

1

4.      One of the lead interrogators was Richard Zuley, an infamous Chicago Police Detective with a truly disturbing track record of procuring false confessions.

5.      Mr. Reed files this civil rights complaint to hold all of the Defendants accountable for the years of injustice they inflicted on him.

## JURISDICTION AND VENUE

6.      This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress Defendants' tortious conduct and the deprivation of Plaintiff's rights secured by the United States Constitution.

7.      This court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over his state-law claims pursuant to 28 U.S.C. § 1367.

8.      Venue is proper under 28 U.S.C. § 1391(b). The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's conviction.

## PARTIES

9.      Plaintiff Carl Reed is a resident of Illinois. He spent nineteen years in prison for a crime he did not commit.

10.     At all relevant times to the events described in this complaint, Richard Zuley, Timothy Thompson, and other unknown law enforcement officers were police officers employed by the Chicago Police Department.

11.     Defendants Richard Zuley, Timothy Thompson, and other unknown law enforcement officers are referred to collectively as "Defendant Officers."

12.     At all relevant times, Defendant Nancy Galassini Adduci was an Assistant Cook County State's Attorney. She is sued for actions she undertook, in conspiracy with the Defendant Officers, in her non-immune capacity as an investigator.

13.     Defendant City of Chicago is a municipal corporation that is or was the employer of the above-named Defendants Officers. Each of the Defendant Officers acted during their investigation as agents or employees of the City of Chicago. The City of Chicago is liable based on its policies and practices, as well as *respondeat superior* for the acts of the Defendant Officers.

14.     Defendant Cook County is a government entity within the State of Illinois, which provides funding for the Cook County State's Attorney's Office and was at all relevant times the employer of Defendant Nancy Gallasini Adduci.

15.     Defendant Cook County is responsible for paying any judgment entered upon Defendant Nancy Galassini Adduci.

16.     Each of the individually named Defendants acted under color of law and within the scope of their employment at all times relevant to this lawsuit. Each individual Defendant is sued in his or her individual capacity.

**The Murder of Kim Van Vo**

17.     On July 19, 2001, the body of Kim Van Vo was discovered in his home by the building manager of his assisted living facility on Chicago's North side.

18.     Van Vo's body was on the floor of his apartment in an advanced state of decomposition. He had been stabbed 11 times. Chicago police responding to the scene found a five-inch steel blade that had been broken off from its handle under his body. The Medical

Examiner recovered several hairs from his right hand. There was no sign of forced entry and no eyewitnesses to the crime.

**Zuley and Thompson Manipulate Delong Reed**

19.     With no eyewitnesses to the crime, Defendants Zuley and Thompson questioned Delong Reed, Van Vo's next door neighbor. Delong's apartment was connected to Van Vo's through a shared bathroom. Delong originally called building staff to report a smell coming from the victim's apartment. He denied any knowledge of the crime.

20.     Defendants proceeded to lie to Delong, telling him that Mr. Reed had implicated him in the murder. In response to this false information, Delong claimed he saw Mr. Reed take items from the victim's apartment before the body was discovered. But police did not find any of the victim's items in Mr. Reed's apartment. They tested multiple items in Mr. Reed's apartment for blood but found nothing.

21.     Defendants Zuley and Thompson also questioned the building's property manager, who told Defendants that Ricardo Burns visited the building looking for Mr. Reed allegedly regarding the victim's car. But the car was not in Mr. Reed's possession. Police found the victim's apartment and car keys in Van Vo's apartment.

**Fifty-Five Hours**

22.     On July 20, 2001, police took Mr. Reed into custody for interrogation. Over 55 hours, Defendants Zuley and Thompson used brutal and inappropriate tactics to force Mr. Reed to falsely confess to a crime he did not commit.

23.     For three days, Mr. Reed was seated on a small, steel bench in an 8x15 room with no bed, blanket, or pillow and handcuffed to a ring on the wall. Defendants physically abused and psychologically threatened him. They lied and told him fingerprints were found in Van Vo's

4

apartment. Defendants even brought Delong into the interrogation room to confront Mr. Reed with his false, induced claim that Delong saw Mr. Reed remove items from Van Vo's apartment.

24.     Because he was innocent, Mr. Reed consistently denied any knowledge or involvement with Van Vo's murder. He denied Delong's lies. He denied Ricardo Burn's claim that he offered to sell Burns Van Vo's car. He even consented to a search of his apartment in a show of good faith.

25.     Mr. Reed was particularly vulnerable to the Defendants' interrogation tactics, which Defendants exploited.

26.     Specifically, Mr. Reed was illiterate and had a history of severe psychiatric and cognitive disabilities. He misspelled his own name on the consent form to search his apartment, writing "REEb."

27.     Mr. Reed was also a diabetic and required regular insulin to control his blood sugar. Defendants deprived him of his medication, feeding him foods which cause blood sugar fluctuations. Blood sugar fluctuations impact brain function, impair memory, and cause confusion. Mr. Reed's blood sugar was so uncontrolled during his interrogation that he required emergency medical attention at the Cook County Jail immediately after his interrogation.

28.     After three days of interrogation and as a result of Defendants' misconduct, Mr. Reed signed a purported "confession" written by Defendant Nancy Galassini Adduci, a confession that he could not read and that directly contradicted the physical evidence at the scene.

29.     The false confession was the product of improper coercion by the Defendants, who tortiously overcame Mr. Reed's will through inappropriate interrogation tactics, including those described above.

30.     According to the resulting "confession," Mr. Reed stabbed Van Vo three times with a knife with no handle that he found on the floor of Van Vo's apartment. But Mr. Reed had no blood on his clothing, no blood traces in his apartment, and no injuries on his hands. An attacker gripping that blade with no handle would have injuries and/or blood on themselves.

31.     Significantly, Mr. Reed was so vulnerable and unsophisticated that he believed he was signing release papers when he signed the prewritten "confession." While receiving emergency medical attention at the Cook County Jail for his blood sugar, he expressed that he did not know why he was incarcerated.

**The Evidence**

32.     The Illinois State Police ("ISP") Forensic Lab tested several items recovered from the murder scene and Mr. Reed's apartment. Nothing connected Mr. Reed to the murder.

33.     ISP extracted DNA from hairs recovered from the scene, Mr. Reed was not a match for any of the hairs.

34.     ISP tested a pair of gym shoes and three pairs of shorts recovered from Mr. Reed's apartment for blood. No blood was found.

35.     ISP identified blood on the knife blade, but it did not pursue DNA testing because Mr. Reed had already confessed.

**Mr. Reed's Conviction and Exoneration**

36.     Instead, Mr. Reed was prosecuted based largely on his "confession." His motion to suppress its admission was denied as a direct result of Defendants' misconduct. Facing the threat of the death penalty, and believing he had no other choice, Mr. Reed accepted a plea deal and pled guilty. On December 5, 2005, Mr. Reed received a 27-year sentence in the Illinois Department of Corrections after already spending 4.5 years at the Cook County Jail.

37. Following his conviction, Mr. Reed sought forensic testing on several items from the crime scene. Mr. Reed was excluded from each item, including the knife blade, a towel covering the victim's face, and the hairs in the victim's hands.

38. Post-conviction investigation further unearthed a troubling pattern and practice of misconduct by Defendant Detectives that included the same tactics used against Mr. Reed.

39. On April 10, 2020, Governor Pritzker commuted Mr. Reed's sentence following a compassionate release request. Mr. Reed was thereafter placed on mandatory supervised release for three years and required to register in the Illinois State Police Murderer and Violent Offender Against Youth Database.

40. On March 18, 2022, Mr. Reed filed a post-conviction petition detailing, *inter alia*, his actual innocence, the pattern and practice of misconduct by Defendant Detectives, *Brady* violations, and other due process violations.

41. Based on their review of the petition and their own investigation into the case, the Cook County State's Attorney's Office agreed to Mr. Reed's petition and asked the court to vacate his conviction. In doing so, the court expressed hope that the true perpetrator would be apprehended. The State then dismissed all charges against Mr. Reed on May 26, 2023 in a manner indicative of his innocence.

## Policy and Practice

42. The City of Chicago and the Chicago Police Department's official policies caused Mr. Reed's wrongful conviction.

43. Since 1986, at least 150 cases have come to light where Chicago police officers fabricated or suppressed evidence, resulting in the wrongful conviction of innocent persons.

44.     Chicago police officers in these cases used many of the same tactics employed by Defendant Officers in Mr. Reed's case to arrest, prosecute, and convict innocent persons, including fabricating evidence, manipulating witness testimony, physically and psychologically abusing suspects and witnesses.

45.     The City of Chicago and the Chicago Police Department routinely used illegal tactics, including torture, physical coercion, and psychological coercion, to extract involuntary and false confessions and statements from suspects and witnesses. There are well over 250 documented cases of Chicago police officers using torture and coercion to illegally obtain confessions in homicide cases. The City had notice of this widespread practice of procuring false and coerced confessions long before the events at issue in this case.

46.     Before and during the period in which Mr. Reed was falsely charged with and convicted of the Van Vo murder, the City of Chicago operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. As a result, Chicago police detectives and their supervisors engaged in rampant misconduct with impunity.

47.     The City of Chicago and its police department also failed in the years prior to Mr. Reed's conviction to provide adequate training to Chicago police detectives and other officers on refraining from physical and psychological abuse and manipulating or coercing witnesses and suspects. This failure caused Mr. Reed's wrongful conviction.

48.     Further, the Chicago Police Department failed to appropriately supervise its officers. The United States Department of Justice recently issued a report finding that there were

"engrained deficiencies in the systems CPD uses to provide officers with supervision and training." In particular, the DOJ concluded that the "CPD's inattention to training needs, including a longstanding failure to invest in the resources, facilities, staffing, and planning required to train a department of approximately 12,000 members, leaves officers underprepared to police effectively and lawfully. Officer errors and misconceptions that result from lack of training are not corrected in the field, because CPD has neither structured supervision in a way that will adequately support officers, nor invested in programs and systems that will detect when officers are in need of help or exhibiting behavior that must be corrected. Officers' ability to stay safe, protect public safety, and police within constitutional standards suffers as a result."

49.     The DOJ concluded that "[i]nstead of encouraging the chain of command to instill proper policing tactics and respect for constitutional policing in CPD officers, CPD provides little incentive, or even opportunity, for supervisors to meaningfully guide and direct CPD officers. CPD provides even less incentive for supervisors to hold officers accountable when they deviate from CPD policy and the law. The City has long known that CPD's direct supervision of officers is inadequate, including through the fact that multiple reports in the last two decades have highlighted deficiencies in CPD's supervisory practices. Yet, City and CPD leadership have not made the necessary reforms to CPD's supervision structure and processes, and community and officer safety suffer as a result."

50.     In addition, the DOJ "confirmed that CPD's accountability systems are broadly ineffective at deterring or detecting misconduct, and at holding officers accountable when they violate the law or CPD policy." In particular, the DOJ found that the City failed to investigate nearly half of misconduct complaints; where investigations did occur, there were "consistent

patterns of egregious investigative deficiencies"; and where misconduct complaints were sustained, discipline was inconsistent and unpredictable.

51.     Similarly, the Chicago Police Accountability Task Force reported in April 2016 that "[g]oing back years, and continuing to the present day, CPD has missed opportunities to make accountability an organizational priority." Between 2004 and 2016, the City recommended disciplinary action in fewer than 4% of cases in which it paid settlements to plaintiffs alleging violation of their civil rights and did not conduct any disciplinary investigations in over half of those cases.

52.     Before Mr. Reed's arrest and for years afterward, municipal policymakers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department. Officers refused to report and lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

53.     Defendant Officers believed that they could violate Mr. Reed's civil rights without consequences because of the City of Chicago's established practices, including failing to track and identify police officers who were repeatedly accused of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department.

54.     The City of Chicago and Chicago Police Department's policies and practices are so established that they impacted the Cook County State's Attorney's Office Felony Review Unit ("FRU"). Members of the FRU as a matter of widespread custom and practice, routinely facilitate and cooperate in fabricating and coercing confessions from suspects in the custody of the Chicago Police Department.

55.     The City's failure to train, supervise, and discipline its officers, including Defendants Richard Zuley and Timothy Thompson, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Mr. Reed in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto polices, as alleged above.

56.     Likewise, Defendant Zuley's name is synonymous with brutal interrogations. From Chicago to Guantanamo Bay, he was sought out by law enforcement officials to extract confessions—by any means necessary. He shackled, beat, and threatened suspects and their families, all while denying them food, water, and their prescribed medication. Defendant Zuley's misconduct includes:

    a.  Zuley fabricated witness testimony and coerced Benita Johnson into falsely implicating her and her ex-boyfriend, Andre Griggs, in a homicide. To extract her confession, Zuley handcuffed her to a wall for over twenty-four hours and told her she would be put to death and never see her children again. Zuley gave her a prewritten statement, which she signed without reading. Zuley used an unreliable informant, Eugene Hawes, to corroborate her confession.

    b.  Zuley fabricated witness testimony and coerced Andre Griggs into falsely confessing to a homicide. Zuley handcuffed Griggs to the wall for approximately thirty hours. At the time, Griggs was addicted to heroin and subjected to debilitating withdrawal symptoms while in custody. After almost thirty hours in custody, Griggs signed a prewritten confession. Zuley used an unreliable informant, Eugene Hawes, to corroborate his confession.

c. Zuley fabricated witness testimony and coerced Lee Harris into falsely implicating himself in a homicide. Zuley, alongside other officers, coerced around twenty different statements from Harris in an attempt to fit their narrative of the homicide to his fabricated statements. Ultimately, their pressure forced Harris to implicate himself in the crime.

d. Zuley fabricated witness testimony and coerced Lathierial Boyd into falsely confessing to a homicide. Boyd was shackled for five to six hours. During the interrogation, Zuley called Boyd racial slurs. He was placed in a lineup, where the eyewitness was repeatedly pressured to pick him even though Boyd did not match the eyewitness's description of the shooter.

e. Zuley coerced a false confession from then-17 year-old David Wright. He entered Wright's home without a warrant while he slept. Zuley put a gun to Wright's head and took him to the station for interrogation. Zuley, along with other officers, threatened Wright's family, deprived him of sleep, and coerced him into signing a confession he could not read.

f. Zuley used a discredited informant during the Brown's Chicken murders investigation. As a result, he was kicked off the investigative task force. He leaked confidential investigation information to the media, lied to his superiors about doing so, and was suspended as a result.

g. Zuley is known internationally as the mastermind behind the physical and psychological torture of detainees at Guantanamo Bay. He subjected Mohamedou Slahi to sexual assaults, sensory deprivation, physical and psychological abuse,

and made violent rape threats against his mother. His interrogation tactics

extracted a false confession from Slahi, which was determined to be worthless.

h. New Misconduct cases involving Zuley continue to surface, including for

example, Anthony Garrett.

57. Defendant Officers gave false statements to Defendant Galassini Adduci, who actively participated in Reed's interrogation and prosecution.

58. The City of Chicago and Chicago Police Department did not remedy the patterns of abuse described in the preceding paragraphs despite actual knowledge of these patterns of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Mr. Reed's ongoing injuries.

59. The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violation of constitutional rights described herein.

**Mr. Reed's Damages**

60. Mr. Reed spent 19 years in a cage for a crime he did not commit. During that time, he was threatened by guards and other prisoners, suffered physical injuries, and constantly feared for his life.

61. Because of Defendants' misconduct, Mr. Reed lost time with his family and friends that he will never get back. He was robbed of the opportunity to live a free life where he could pursue his passions and interests. He was deprived of the basic pleasures of a free life. He was taken from a community that care about him. That community had to fundamentally change to adapt to him no longer being there. Mr. Reed lost 19 years with his son and missed the births of three grandchildren.

13

62.     Mr. Reed received woefully inadequate healthcare while incarcerated, leaving him in kidney failure and receiving dialysis treatment three days per week. Prior to his release, his dialysis treatment was cut down to two days per week, which nearly killed him.

63.     Mr. Reed also suffered significant vision loss due to deficient healthcare in prison.

64.     Mr. Reed continued to suffer upon his release from prison and served 3 years on mandatory supervised release, labeled a murderer and forced to pay fees and register with the publicly-accessible Illinois State Police Murderer and Violent Offender Against Youth Database despite his innocence.

65.     Mr. Reed suffered in a cage, not knowing if he would ever be exonerated. He had to live with being known as a murderer. To this day, he suffers from profound emotional and psychological effects.

## COUNT I
## 42 U.S.C. § 1983 – Due Process

66.     Mr. Reed incorporates each paragraph of this complaint as if fully restated here.

67.     As described in detail above, the Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Mr. Reed of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

68.     Defendants fabricated evidence and statements falsely implicating Mr. Reed in the crime. Defendants knew this evidence was false. Defendants obtained Mr. Reed's conviction using this false evidence.

69.     Defendants also withheld exculpatory evidence, and otherwise violated his constitutional rights guaranteed by *Brady v. Maryland.*

14

70.     The Defendants' misconduct resulted in the unjust and wrongful criminal prosecution and conviction of Mr. Reed and the deprivation of Mr. Reed's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, Mr. Reed could not have and would not have been prosecuted.

71.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Mr. Reed's clear innocence.

72.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT II
### 42 U.S.C. § 1983 – Coerced and False Confession

73.     Mr. Reed incorporates each paragraph of this complaint as if fully restated here.

74.     Defendants, acting as investigators and without probable cause to suspect Mr. Reed of any crime, individually, jointly, and in conspiracy with one another, and others unknown, as well as under color of law and within the scope of their employment, forced Mr. Reed to make false statements involuntarily and against his will, which incriminated him and which were used against him in criminal proceedings, in violation of his rights secured by the Fifth and Fourteenth Amendments.

75.     In addition, Defendants, acting as investigators and without probable cause to suspect Mr. Reed of any crime, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used extreme psychological coercion in order to force Mr. Reed to incriminate himself falsely and against his will in a crime he had not committed, in violation of his constitutional right to due process. This misconduct

was so severe as to shock the conscience, it was designed to injure Mr. Reed, and it was not supported by any conceivable governmental interest.

76.     In addition, the Defendants, acting as investigators and without probable cause to suspect Mr. Reed of any crime, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, fabricated false statements, each of which was attributed to Mr. Reed and used against him in his criminal proceedings, in violation of his right to a fair trial.

77.     Specifically, Defendants conducted, participated in, encouraged, advised, and ordered an unconstitutional interrogation of Mr. Reed, using psychological coercion, which overbore his will and resulted in him making involuntary statements implicating himself in the murder of Van Vo.

78.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Mr. Reed's clear innocence.

79.     The misconduct described in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT III**
**42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Detention**

80.     Mr. Reed incorporates each paragraph of this complaint as if fully restated here.

81.     Defendants, acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Mr. Reed of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against him without any probable cause for doing so and in spite of the fact that they knew he was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

16

82.     In so doing, these Defendants maliciously prosecuted Mr. Reed and caused him to be deprived of his liberty without probable cause and to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

83.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Mr. Reed's clear innocence.

84.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT IV**
**42 U.S.C. § 1983 – Failure to Intervene**

85.     Mr. Reed incorporates each paragraph of this complaint as if fully restated here.

86.     During the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Mr. Reed's constitutional rights, even though they had the duty and the opportunity to do so.

87.     These Defendants had ample, reasonable opportunities as well as the duty to prevent this harm but failed to do so.

88.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Mr. Reed's clear innocence.

89.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

### COUNT V
### 42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights

90.     Mr. Reed incorporates each paragraph of this complaint as if fully restated here.

91.     Defendants, acting in concert with one another and other co-conspirators, known and unknown, reached an agreement among themselves to fabricate evidence and to detain, prosecute, and convict Mr. Reed for Van Vo's murder, regardless of his guilt or innocence, and thereby to deprive him of his constitutional rights.

92.     In so doing, these co-conspirators agreed to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Mr. Reed of these rights.

93.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

94.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Mr. Reed's clear innocence.

95.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

### COUNT VI
### 42 U.S.C. § 1983 – Policy and Practice Claim against the City of Chicago

96.     Mr. Reed incorporates each paragraph of this complaint as if fully restated here.

97.     The City of Chicago is liable for the violation of Mr. Reed's constitutional rights because his injuries were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

98.     At all relevant times, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: the conduct of interrogations and questioning of criminal suspects; the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings. In addition, or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago.

99.     These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Defendants.

100.    At all relevant times, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Plaintiff, were routinely deprived of their right to due process.

101.    At all relevant times, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to one or more of the following: (1) unreasonably long and uninterrupted interrogations; (2) actual and threatened physical or psychological violence; (3) interrogations without regard to an individual's right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards

necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

102.    These widespread practices, individually and together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Mr. Reed.

103.    The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, individually and together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

104.    In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Mr. Reed were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

## COUNT VII
## State Law Claim – Malicious Prosecution

105.    Mr. Reed incorporates each paragraph of this complaint as if fully restated here.

106.    In the manner described above, Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as within the scope of their employment,

accused Mr. Reed of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against him without any probable cause for doing so.

107.    In so doing, the Defendants caused Mr. Reed to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

108.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of Mr. Reed's clear innocence.

## COUNT VIII
### State Law Claim – Intentional Infliction of Emotional Distress

109.    Mr. Reed incorporates each paragraph of this complaint as if fully restated here.

110.    The actions, omissions, and conduct of the Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause or were in reckless disregard of the probability that their conduct would cause severe emotional distress to Mr. Reed, as is more fully alleged above.

111.    As a result of the Defendants' misconduct described in this Count, Mr. Reed suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX
### State Law Claim – Willful and Wanton Conduct / Aggravated Negligence

112.    Mr. Reed incorporates each paragraph of this complaint as if fully restated here.

113.    At all times relevant to this complaint the Defendants had a duty to refrain from willful and wanton conduct in connection with the Van Vo murder investigation.

114.    The Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Mr. Reed's rights.

21

## COUNT X
## State Law Claim – Civil Conspiracy

115.     Mr. Reed incorporates each paragraph of this complaint as if fully restated here.

116.     As described more fully in the preceding paragraphs, the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Mr. Reed for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Mr. Reed of these rights.

117.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

118.     The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Mr. Reed and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

119.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Mr. Reed's clear innocence.

## COUNT XI
## State Law Claim – *Respondeat Superior*

120.     Mr. Reed incorporates each paragraph of this complaint as if fully restated here.

121.     While committing the misconduct alleged in the preceding paragraphs, the Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

122.     Defendant City of Chicago is liable as principal for all torts by its agents.

## COUNT XII
## State Law Claim – Indemnification

123. Mr. Reed incorporates each paragraph of this complaint as if fully restated here.

124. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment.

125. The Defendant Officers were employees, members, and agents of Defendant City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

126. Defendant City of Chicago is responsible to pay any judgment entered against the Defendant Officers.

127. Defendant Galassini Adduci was an employee, member, and/or agent of Defendant Cook County, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

128. Defendant Cook County is responsible for paying any judgment entered against Defendant Galassini Adduci.

WHEREFORE, Plaintiff CARL REED respectfully requests that this Court enter a judgment in his favor and against Defendants RICHARD ZULEY, TIMOTHY THOMPSON, the CITY OF CHICAGO, NANCY GALASSINI ADDUCI, and COOK COUNTY, awarding compensatory damages, attorneys' fees, and costs against each Defendant, punitive damages against each of the Individual Defendants, and any other relief that this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, CARL REED, hereby demands a trial by jury pursuant to Federal Rule of Civil

Procedure 38(b) on all issues so triable.

BY:   <u>/s/ Megan Porter</u>
*One of Plaintiff's Attorneys*

Jon Loevy
Megan Porter
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
(312) 243-5900