STATE OF ILLINOIS )
)
COUNTY OF COOK )

IN THE CIRCUIT COURT OF THE COOK JUDICIAL CIRCUIT
COOK COUNTY, ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff,

vs.

CARL REED, Defendant.

) Indictment No. 01 CR 20237
) Charge: Murder

REPORT OF PROCEEDINGS

REPORT OF PROCEEDINGS of the Partial Motion before Honorable MARJORIE LAWS, Judge of said Court, on the 13th day of October, A.D. 2005.

APPEARANCES:

HONORABLE RICHARD A. DEVINE,
State's Attorney of Cook County, by
MR. GEORGE CANELLIS,
Assistant State's Attorney,
for the People of the State of Illinois;

HONORABLE EDWIN A. BURNETTE,
Public Defender of Cook County, by
MS. MARIJANE PLACEK and MS. RUTH McBETH,
Assistant Public Defenders,
for the Defendant.

Elaine M. Besbekos, CSR
Official Court Reporter
2650 South California
Chicago, Illinois 60608
Lic. No. 084-002574

# I N D E X

Date of Hearing: October 13, 2005

Page Numbers: 1 through 78

## PROCEEDINGS


| LIST OF WITNESSES | DX | CX | RDX | RCX |
|---|---|---|---|---|
| Pamela Reed | 4 | 14 | 30 | 36 |
| Kevin Reed | 42 | 49 | 66 | |

Petitioner Rests ---------------------------------- Pg. 66

Closing Arguments

by Ms. McBeth -------------------------------- Pg. 67

by Mr. Canellis ------------------------------ Pg. 71

Motion Commenced and Continued to October 20, 2005

for Ruling ---------------------------------- Pg. 77

THE CLERK: Carl Reed.

THE COURT: Okay. How are you doing, Mr. Reed?

Are you tired?

MR. REED: Yes.

THE COURT: You can go forth on your motion?

MR. REED: Yes.

THE COURT: Okay. I had denied the movant's motion for a directed finding on a motion to suppress statements. We are at the stage now where we are in the movant's case.

MS. PLACEK: That's correct.

MS. MCBETH: Yes.

THE COURT: You have not presented any witnesses, is that correct?

MS. PLACEK: Not yet, no, Judge.

THE COURT: Are you ready to present any witnesses today?

MS. PLACEK: Yes.

MS. MCBETH: We would ask leave to have Pamela Reed come to the stand.

THE COURT: All right.

Is there a motion to exclude, then?

MS. PLACEK: There is, Judge.

THE CLERK: Raise your right hand.

(Witness sworn.)

THE CLERK: You may be seated. Keep your voice up.

MS. REED: Okay.

THE COURT: Go right ahead.

MS. MCBETH: Thank you.

PAMELA REED,

called as a witness on behalf of the Defendant/Petitioner herein, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. MCBETH:

Q Miss Reed, could you please introduce yourself to Judge Laws.

A Okay. I am Pamela Reed, Carl's oldest sister.

Q Now, you say that you are Carl Reed's oldest sister.

Is that Carl Reed here in the courtroom with us today?

A Yes.

Q Can you point to him, and describe what he is wearing.

A Sitting over here to the left of me in the tan suit, top and bottom, the gym shoes, T-shirt, (indicating).

MS. MCBETH: Indicating for the record the Defendant, the Petitioner on this motion.

THE COURT: All right.

MS. MCBETH: Thank you.
BY MS. MCBETH:
Q Now, you said Carl is your older brother?
A Younger brother.
Q Younger, and how old are you, ma'am?
A I am forty-eight.
Q And how old is Carl?
A I think that he is around forty-five.
Q And did you grow up together?
A Yes.
Q When I say "together," you and Carl and your other siblings?
A Right, correct.
Q Is your mother still alive?
A Yes, she is.
Q Is your father deceased?
A Yes, he is.
Q Were you a close family growing up?
A Close family.
Q And you were in Carl's life and in the household the whole time that you were growing up together, is that correct?
A Yes.
Q You grew up in the same household?

A Yes.

Q Did you graduate school and get a job, ma'am?

A Yes.

Q What do you do for a living?

A I am a stationary engineer for the water department.

Q That's for the City of Chicago?

A Yes.

Q Did Carl go to school, if you know?

A Yes.

Q Okay. And did there come a time when Carl was a young man that he was the victim of a head accident?

A Yes, he was.

Q How do you know about that, ma'am?

A I was at home the day that he came home hurt.

Q Okay. When you say "home," you mean at your house, your mother's house on the South Side?

A At my mother's house.

Q Was that also Carl's house at that time?

A Yes, it was.

Q Okay. And he was in his early 20s, is that correct?

A I think so.

Q Okay. And you say that you were home when he came

home hurt.

Can you describe to Judge Laws what happened that day when you say that Carl came home hurt?

A We were out on the porch. Well, my Mom and a couple more of my sisters and brothers were out on the porch, and he was coming down the street. My Mom said she didn't like the way that he was walking, and as he got close to her, she began hollering --

Q That's your mother began hollering?

A Yes.

Q And what happened?

A And I run out on the porch, and he didn't have a shirt on. He had took his shirt off, and he had it wrapped around his head. He was holding his head, and blood was just gushing out of, you know, between his fingers and his shirt and stuff.

Q That's Carl that you are describing?

A Yes.

Q Did you learn what had happened to Carl to cause that head injury?

A Yes.

Q What had happened to Carl?

A He said that he had got jumped on.

Q And what did that mean to you?

A Well, he described it as some guys jumped on him, and they were hitting him with big wrenches. I am trying to think of the correct name for it, but it's a wrench, like a plumber's helper or something like that, and some other stuff that they were, you know, fighting with and was hitting him with, but he just kept saying that he wouldn't fall down. He said if he fell down, they would have just killed him. No matter what, he just kept, you know, fighting them off.

He said that he just was determined not to drop to the ground because he knew that would have been it.

Q And you learned that from your brother Carl as he was standing there bleeding there on the street holding his head?

A As we were, a little bit, as we were getting him to get him out of there, and as we were going to the hospital.

Q Did you actually take him to a hospital?

A Yes.

Q Did anybody else accompany you and Carl to the hospital?

A Yes, my sister Kim.

Q Is she here today as well?

A Yes.

Q And you drove him to the hospital?

A Yes.

Q Who drove?

A I did.

Q Okay. Which hospital did you go to?

A Roseland Hospital.

Q And what happened there at Roseland Hospital to your brother Carl?

A We dropped him off in front of the door, and my sister got out. It was no where to park, so my sister got out and got him out, and they went inside. So I drove around, and I found a parking spot. I parked and was getting out of the car when my sister went to holler to get back in the car. I was like, "What? What did you say?" She said, "Get back in the car."

So I got back in the car, and she said, "Come on." So I drove up to meet them, and she said, "We got to take him somewhere else." I said, "What?" She said, "They told me to fill out a form and wait." She said, "His head is busted open, and blood is coming out of it," like that.

She said, "They are talking about filling out a form and waiting." So then the next nearest hospital we went to.

Q Were you actually able to see blood coming from Carl's head when your sister was describing that?

A Yes, I could see blood and tissue, like.

Q And you were able to take him to another hospital?
A Uh-huh.
Q Is that a yes, ma'am?
A Yes.
Q Okay. And which hospital was that?
A Little Company of Mary.
Q Was he treated at Little Company of Mary?
A Yes. When we came through the door with him, they took him straight to the back and started working on him.
Q Did they keep him there?
A Yes.
Q Okay. And they treated him there at Little Company of Mary Hospital?
A Yes.
Q Did you come back and take your brother home some time later?
A Not that day.
Q No. That's what I am asking.
Was it some time later that you did?
A Yes.
Q And how much later was it?
A I am not quite sure, but it looked like he was in there at least about -- I am not sure. Maybe anywhere from three to four days or maybe a week. I am really not sure. I

don't remember.

Q After that incident where your brother was jumped on and sustained a head injury, did you notice any changes in your brother Carl's behavior?

A He would have headaches a lot. He would say that he was okay, but you could tell by the look in his eyes that, you know, he was strained. He just, you know, I guess he was just trying to be strong. He said that he was okay.

MR. CANELLIS: Objection.

THE COURT: Sustained as to what he was trying to be.

MS. MCBETH: I understand.

BY MS. MCBETH:

Q Did he eventually go on social security disability because of that injury and other injuries?

A Yes.

Q Okay. And the social security disability was for mental disabilities?

A Yes.

Q Okay. And that was some time later, is that correct?

A Yes.

Q Do you know who if anyone in your family is the payee for Carl's social security benefits?

A Yes. My sister Kim.

Q Who?
A My sister Kim.
Q Why is she the payee for his benefits?
A Because the Doctor was telling them that that's what they needed to do, and he was not going to be able to handle getting the stuff on his own. I don't really quite know all of that part.
Q Okay.
A But the Doctor suggested it to him.
Q And that was Carl's Doctor that was treating him?
A Yes.
Q You also told us that you went to school and graduated, and Carl went to school.
Do you know whether your brother Carl can read and write English?
A No, he can't.
Q How do you know that he cannot read and write English?
A Because I lived with him, and we would do things for him.
Q And when you say "we would do things for him," what do you mean?
A Like fill out applications or something like that for him.

Q You mean other family members?
A Uh-huh.
Q Is that a yes, ma'am?
A Oh, yes.
Q Okay.
A Okay.
Q To your knowledge does Carl tell outsiders or people who are not in the family that he cannot read and write?
A No.
Q And why is that, ma'am?
MR. CANELLIS: Objection.
BY MS. MCBETH:
Q If you know.
A If I know?
THE COURT: Overruled.
THE WITNESS: Because -- does that mean that I can talk?
THE COURT: Yes.
MS. MCBETH: Yes.
THE WITNESS: Because of embarrassment.
BY MS. MCBETH:
Q Do you know how far Carl went in school?
A He did a little time in his freshman year.
Q When you say "freshman year," you mean freshman

year of high school?

A 9th Grade, high school.

Q Prior to the 9th Grade when he was in elementary school, do you know whether he was in any special classes?

A No, he wasn't.

Q Did you go to the same high school that your brother Carl went to?

A No.

MS. MCBETH: If I could have a minute, your Honor?

THE COURT: Yes.

(Brief pause.)

MS. MCBETH: I have no further questions of Miss Reed. I will tender her for cross.

THE COURT: Mr. Canellis?

CROSS EXAMINATION

BY MS. CANELLIS:

Q So, he never had any problems before he got beat up, right?

A When you say "problems," what do you mean?

Q Mental problems.

A Mental problems, no.

Q Now, you stated that he got beat up in his early 20s?

A It was around his 20s or something. I am not

exactly sure what year that it was.

Q Could have been in his 30s?

A All I know is that it was in his -- it was in the late '80s or the early '90s.

Q And when was Carl born?

A I couldn't tell you that exactly. His date was June 27th. The year, I can't exactly tell you what year.

Q Does 1960 sound right?

A Might be. I have got a lot of sisters and brothers. I don't know.

Q But you guys are a close family, right?

A Yes, but I don't know the years. I can't tell you the years.

Q How much older is Carl from you?

A I think that I am somewhere between three to four years older than Carl.

Q And if you don't mind me asking, how old are you?

A Forty-eight.

MS. MCBETH: Objection; asked and answered.

THE COURT: She can answer it.

THE WITNESS: Forty-eight.

THE COURT: How old are you, I'm sorry?

THE WITNESS: Forty-eight.

BY MR. CANELLIS:

Q So, you were born in approximately '57?
A I was born in '57.
Q And you stated that you believed that it was either the late '80s or the early '90s when Carl got beat up, correct?
A Uh-huh.
THE COURT: Yes or no?
THE WITNESS: Yes.
BY MR. CANELLIS:
Q Yes?
A I'm sorry. Yes.
THE COURT: Answer it out loud for the court reporter, please.
THE WITNESS: Yes, yes,
BY MR. CANELLIS:
Q Now, how long did you live with your brother?
A Until I was sixteen, and then I left home, and then I came back.
Q When did you go back?
A I guess when I was about maybe around twenty-two. Twenty or twenty-two; something like that.
Q And then how long did you live with your brother?
A Until the early '90s.
Q 1991 or so?

A No. Maybe about 1993 or '94; something like that.
Q And did you move out, or did he move out?
A I moved out.
Q And eventually he moved out as well, correct?
MS. PLACEK: Objection.
THE COURT: If she knows. Overruled.
THE WITNESS: Yes. He didn't live at home, but I moved out first.
BY MR. CANELLIS:
Q Do you recall when he moved out?
A No.
Q And, I'm sorry, did you say that your family lived on the South Side?
A Yes.
Q Your brother actually moved to the North Side, correct?
A Yes.
Q 4946 North Sheridan?
A I never went up North. I don't know.
Q You never went to your brother's apartment at all?
A No.
Q Did you ever see your brother when you moved out of the house?
A Yes.

Q Your brother lived by himself up North, correct?
A As far as I know.
Q Your brother was able to take care of himself, correct?
A Well, I think that he worked, but I don't know how, what you would call it, a SRO room. It wasn't like he was paying rent at a big place where you had big bills to pay or an apartment of your own.
Q But he had bills to pay, right?
A I guess so. I guess so.
Q He lived in a place by himself, right?
A Not as far as I know. I didn't go up there.
MS. PLACEK: Asked and answered.
THE COURT: Miss Placek, you know the rules in my courtroom. If this is your witness, then you would be the only one to object.
MS. PLACEK: I apologize.
MS. MCBETH: I apologize, your Honor.
THE COURT: This is Miss McBeth's witness.
MS. MCBETH: I understand.
BY MR. CANELLIS:
Q So far as you know, he lived by himself?
MS. MCBETH: Objection, your Honor. Asked and answered.
THE WITNESS: Yes.

THE COURT: Your answer may stand.

BY MR. CANELLIS:

Q You stated that he had a job?

A Yes. He said that he worked in the kitchen and stuff like that.

Q So, he was able to carry a job, correct?

A Yes.

Q And this was after he was beat up, correct?

A Yes.

Q He was able to support himself, correct?

A Well, I guess so because we weren't supporting him.

Q He was able to feed himself, correct?

A Yes.

Q He was able to clean himself, correct?

A Yes.

Q He was able to live a normal everyday life, correct?

MS. MCBETH: Objection, your Honor.

THE COURT: She can answer it.

THE WITNESS: Depending on what you mean. I don't know. As far as I know, yes, but what you are talking about exactly, I don't know.

BY MR. CANELLIS:

Q You didn't have to take care of the Defendant,

correct?

A No.

Q Your family didn't have to take care of the Defendant, correct?

A No.

Q When you saw the Defendant after he had been beat up, you stated that you took him to Roseland Hospital?

A Yes.

Q And they wouldn't admit him, correct?

A No. It was not that they wouldn't admit him. They said for him and for my sister to fill out a form, and then have a seat.

Q And the forms were never filled out, correct?

A No, because the blood was gushing out of his head. She expected them to do something about it, and they were packed and crowded. That's what they did. That's what they told her to do.

Q Well, there were nurses and Doctors around, correct?

A No. At the front desk, it's whoever is doing the paperwork.

Q Oh, there were people that saw your brother, correct?

A At the front desk, yes. There is people there, but

they are not nurses and Doctors.

Q Those people did not take your brother back immediately to see a Doctor, correct?

MS. MCBETH: Objection, your Honor.

THE WITNESS: The people that was doing the paperwork, no. They told her to fill out the forms and have a seat.

THE COURT: Hold on.

When they make an objection, let me rule on the objection. Stop talking, okay?

THE WITNESS: Okay.

THE COURT: I am going to sustain the objection.

BY MR. CANELLIS:

Q Do you know whether or not the people that saw your brother took him in the back to see a Doctor or nurse immediately?

MS. MCBETH: Objection, your Honor.

THE COURT: If she has knowledge. Overruled.

THE WITNESS: No, I don't know because I was in the car parking the car.

BY MR. CANELLIS:

Q But you do know that your sister then brought your brother out to the car?

A Yes.

Q You stated that a Doctor told your family that the

payments from SSI needed to go to a family member instead of your brother?

Is that what you said earlier?

A Say that again?

Q You previously stated on Direct Examination that a Doctor told your family that your brother's SSI payments had to go to another family member, correct?

A Yes, that's what my sister was told. I wasn't there.

Q When did he say this?

A After he got finished with his treatment, during the time when he was going back, you know, like for checkups after he had gotten out of the hospital.

Q What is his Doctor's name?

A I don't remember.

Q You don't remember the exact day?

A No, I don't remember the exact day.

Q You stated that at the time that the Defendant was in high school, he couldn't read or write, correct?

A Yes.

Q Did you make attempts to try to teach him how to read and write?

A Yes. We helped.

Q What times were those?

A Trying to help him with his homework.
Q Did the Defendant work with you?
A I'm sorry? I didn't hear you.
Q Did the Defendant work with you?
A He tried, but he just couldn't get it.
Q Well, did you make attempts to help him in school after that?
A We would help each other. Whoever could do whatever homework, we helped each other. You know, everybody helped. If you knew how to do something better than the other one, you did it.
Q Did you continue to work with him then?
A While he was in school?
Q First while he was in school, yes.
A Yes.
Q How about after he was in school?
A No, not that I remember.
Q You were still living with him then, right?
A Maybe so. Maybe so.
Q You don't remember?
A It depends on when you are talking about.
Q Well, how about when he dropped out in the 9th Grade.
A Oh, no.

Q You weren't working with him then?
A Uhn-uhn.
Q Is that a no?
A No. I'm sorry.
Q Did you make any attempts to try to get him back into school?
A Well, yes. We talked to him about going back, but we understood that he wasn't grasping it.
Q Well, you also understood that it's important to go through life knowing how to read, correct?
MS. MCBETH: Objection.
THE WITNESS: Yes.
MS. MCBETH: Objection, your Honor.
THE COURT: Her answer may stand.
THE WITNESS: Yes.
BY MR. CANELLIS:
Q Yet you felt it was more important because he couldn't grasp it that it would be okay --
MS. MCBETH: Objection, your Honor.
MR. CANELLIS:
Q -- not to know how to read?
MS. MCBETH: Objection.
THE WITNESS: Yes.
THE COURT: Sustained.

Let me rule before you answer, okay?

THE WITNESS: Sorry.

BY MR. CANELLIS:

Q But yet you made no additional attempts to help him learn how to read and write?

MS. MCBETH: Objection; argumentative.

THE COURT: You can answer that.

THE WITNESS: I don't remember doing anything to help him learn how to read and write other than helping him fill out applications or something like that.

BY MR. CANELLIS:

Q Well, your brother not knowing how to read and write is pretty important, correct?

A Yes.

MS. MCBETH: Objection, your Honor.

THE COURT: Hold on. Let's take one minute here.

Can you read the last question?

(Record read.)

THE COURT: Her answer can stand.

BY MR. CANELLIS:

Q And because that's important, you wanted to work with your brother to make sure that he could learn how to read and write, correct?

MS. MCBETH: Objection, your Honor.

THE COURT: She can answer it.

THE WITNESS: Yes, yes.

BY MR. CANELLIS:

Q But yet you don't remember if you worked with him?

MS. MCBETH: Objection.

BY MR. CANELLIS:

Q Is that what you are saying?

MS. MCBETH: Argumentative.

THE COURT: She can answer it.

THE WITNESS: I know -- I don't know if I can say it. Well, I can put it like this.

I have helped him, you know, during school with the reading and the writing. I have also had another brother that couldn't read and write, and my father couldn't read and write.

So, as far as trying to help them learn and know that they couldn't have gotten the point, that they couldn't get it any further, that's all that I can tell you.

BY MR. CANELLIS:

Q So, when you helped him, when you tried to help him learn how to read and write, that was, what, in grade school?

A Uh-huh.

Q Is that a yes?

A Yes. I'm sorry.

Q Some approximately thirty years ago?
A I guess so.
Q And you never helped him after that?
A No, not that I can remember.
Q You stated that you did help him fill out job applications, though, correct?
A Yes. If it was something that he had to fill out, we filled it out.
Q He was able to get jobs, correct?
A Well, if he got any. Yes, he had a couple of jobs.
Q Did your brother drive?
A No.
Q Do you know if your brother ever drove?
A He didn't have a license.
Q How do you know that?
A I don't remember him taking a test and getting a license.
Q Well, were you with your brother every day?
MS. MCBETH: Objection, your Honor.
THE WITNESS: No.
MS. MCBETH: It's argumentative.
THE COURT: No. Overruled. It's cross examination. Overruled.
BY MR.C CANELLIS:

Q Were you with your brother every day?
A No.
Q Let me ask you this.
How often would you see your brother in 2000?
MS. MCBETH: Objection.
THE COURT: Overruled.
THE WITNESS: Does that mean that I can answer it?
THE COURT: You can answer it.
THE WITNESS: I can't say how often that I had seen him. We were in the same house, and I saw him.
BY MR. CANELLIS:
Q Well, previously you stated that you moved out and he moved out, correct?
A Yes, and it depends on when. I moved out first. I moved back home after my divorce.
Q Well, I am talking about in 2000, presumably you had moved out a second time?
A Okay.
MS. MCBETH: Objection as to "presumably."
THE COURT: Sustained.
BY MR. CANELLIS:
Q You stated that you moved out a second time, correct?
A Yes, I did.

Q And in 2000 you were moved out, correct?
A I am not sure if it was exactly 2000 that I moved out, but I know that I moved out.
Q Well, in 2000 he had moved out, correct?
A Yes, I guess so. I don't know. I am not good on remembering what year that you are talking about.
When I think about it now, in 2000, no, I wasn't at home, and he wasn't at home.
Q So, how often would you see him then?
A We used to run into each other over at my Mom's.
Q How often was that?
A I can't tell you.
Q Once a year?
A No. It was more than once a year.
Q Once a month?
A But exactly --
Q Once a month?
A I can't say if it was once a month, but --
Q Once every couple of months?
A It could have been once a month. It could have been once every two months. I don't know.
Q Did you talk to your brother?
A When we ran into each other, yes. I would talk to him when I saw him.

Q What would you talk about?

A Anything.

MS. MCBETH: Objection, your Honor.

THE COURT: Sustained.

BY MR. CANELLIS:

Q You never made any attempts to visit your brother up North, did you?

A No.

MR. CANELLIS: I have no further questions, Judge.

MS. MCBETH: I have a few questions, your Honor.

REDIRECT EXAMINATION

BY MS. MCBETH:

Q Now, you stated that you stayed in contact with your brother Carl, and you would see him at your Mom's house, at the family house, is that right?

A Yes.

Q And you know that the place that he moved into up on the North Side was subsidized housing, right?

A Yes. That's what I guess that it's called.

Q It's a special building, and they have social workers and people who help the residents find jobs if they are able to?

A Yes.

MR. CANELLIS: Objection, Judge, as to the leading.

THE COURT: Don't lead the witness. She is still your witness. Don't lead.

BY MS. MCBETH:

Q Now, you say the job that Carl had was in a kitchen as a cook or washing dishes, is that correct?

A Right, right.

Q And then the State's Attorney asked you if the family was supporting Carl, and you said no.

Actually, the Government was supporting Carl, isn't that correct?

MR. CANELLIS: Objection.

THE WITNESS: I understood that he was supposed to be getting a check.

THE COURT: Hold on.

She is still your witness. Don't lead her.

BY MS. MCBETH:

Q Did he have any, if you know, did Carl have any means of support from the Government?

A Yes. He was getting a check.

Q And that was a check frm whom?

A I think that it's SSI.

Q So, social security income?

A Uh-huh.

THE COURT: Yes?

THE WITNESS: Yes.

THE COURT: Okay. It's important for the court reporter.

THE WITNESS: Oh, I'm sorry.

BY MS. MCBETH:

Q And if I understand your testimony correctly, even though you hadn't been to the house, the place on the North Side, the descriptions were that it was like a SRO or a single room.

Was that your testimony?

A Correct, correct.

MR. CANELLIS: Objection.

THE COURT: I will allow it.

BY MS. MCBETH:

Q To your knowledge did Carl ever go out on the rental market, the regular rental market, not subsidized, and rent himself an apartment?

A No.

Q To your knowledge did Carl ever go out and put a key in the ignition and drive a car?

A Not that I know of.

Q To your knowledge did Carl ever manage to get a job, any kind of a job, big or little, without somebody else's help?

A No.

Q You said that in your family everybody helped with the homework if they were better at something.
They would help another brother and sister with the homework?
A Yes.
Q Okay. And you also said that you know from that that Carl could not read because he couldn't grasp it.
Is that your understanding?
A Yes.
Q Did you also say that there are other members of your family who throughout their life could not read?
A Yes.
Q And who are they?
A My brother Rico, just right under me by a year or so, older than Carl, and my father, Robert Reed.
Q And your father Robert Reed, was he also Carl's father?
A Yes, he was.
Q Now, the prosecutor asked you some questions about the hospital where you didn't stay and get Carl admitted, but you did get him admitted into another hospital, is that right?
A Yes.
Q Do you know yourself as you sit here today whether

those records still exist from Little Company of Mary Hospital?

A I don't know. I haven't been there. I heard that they don't keep them but a certain amount of time, but no, I didn't go to try to get the records.

MR. CANELLIS: Objection.

THE COURT: Could you read that back, please.

(Record read.)

THE COURT: Overruled.

BY MS. MCBETH:

Q Did you know Mr. Peterson who is working on this case with your brother tried to get those records?

A Yes.

Q And what did you learn about Mr. Peterson's efforts to get those records?

MR. CANELLIS: Objection; foundation.

THE WITNESS: That they didn't.

THE COURT: Sustained as to foundation.

BY MS. MCBETH:

Q When did you learn from Mr. Peterson that he tried to get the records?

A I had learned, I guess, about maybe about a month and a half ago.

Q When you were talking to Mr. Peterson, was that at

your house, at your Mom's house, on the phone, where was that at?

A It was here.

Q Here in court?

A Yes.

Q And what did you learn about Mr. Peterson's attempts to get the Little Company of Mary Hospital records on your brother?

A That they said that they didn't have them any more.

I asked him maybe they didn't have the film, but shouldn't they have kept the medical records, the transcription or something, and put it on a smaller microfilm or something, because I used to work at St. Bernard's Hospital, and they used to get rid of the x-rays at a certain point, but they still had medical stuff in another department, the written medical stuff.

Q Did you learn from Mr. Peterson if he was able to get any of that from the Little Company of Mary Hospital?

A He told me that the only thing that they could tell him is that --

MR. CANELLIS: Objection; foundation.

BY MS. MCBETH:

Q Was this the same conversation a month ago in court that Mr. Peterson told you this?

A Yes.

Q What did he tell you?

A He told me that all they could tell him is when he would have been there, that he was there, but what his treatment was and the records, they didn't have anything on it.

MS. MCBETH: Nothing further, your Honor.

THE COURT: Recross?

RECROSS EXAMINATION

BY MR. CANELLIS:

Q Have you ever tried to read anything with the Defendant in the last couple of years?

A No.

Q In terms of your conversations with Mr. Peterson, when did you tell Mr. Peterson about this prior hospital stay that your brother had?

A He always knew about it since he has been working with the case.

Q How long is that?

A I don't know. When, I don't know exactly, what date that Mr. Peterson started doing his part.

I guess the attorneys let him know. I don't know. We have let him know.

Q Did you ever tell the attorney?

A No. My Mom has.

MS. MCBETH: Objection, your Honor.

THE COURT: Ask another question.

BY MR. CANELLIS:

Q Did you ever tell anybody about this prior hospital stay?

A Anybody like who?

You are talking about Mr. Peterson? Who are you talking about?

Q Anybody relating to your brother's case.

MS. MCBETH: Objection; vague.

THE WITNESS: If they asked.

THE COURT: Overruled. Go ahead.

THE WITNESS: When we were talking about the head injury, yes, we talked about it then.

BY MR. CANELLIS:

Q When did you talk about the head injury?

A Probably from the beginning. I don't remember exactly what days or when.

BY MR. CANELLIS:

Q When was the beginning?

A Whenever we first talked to his attorney.

Q When was that?

A In the beginning of, whenever it happened. How

many years ago was that? Three, four years ago.

In the beginning. That's all that I can tell you.

Q When was the first time that you met with John Peterson?

A I don't know. I would have to say around, about, maybe a year ago.

Q So a year from now?

A Maybe about October of '04.

MS. MCBETH: Objection.

THE COURT: Overruled.

THE WITNESS: Maybe. I am just saying maybe a year ago.

BY MR. CANELLIS:

Q How many times did you meet with him?

MS. MCBETH: Objection. I will object on the basis of relevance. This is very far, very far-afield for re-direct or re-cross.

THE COURT: All right. Sustained.

BY MR. CANELLIS:

Q So, you first told Mr. Peterson about this hospital stay in October of '04?

MS. MCBETH: Objection, your Honor. Asked and answered.

THE COURT: Sustained. She said maybe. She didn't know. About a year ago. Sustained.

BY MR. CANELLIS:

Q It could have been before a year?

MS. MCBETH: Objection, your Honor.

THE COURT: Sustained.

BY MR. CANELLIS:

Q What exactly did you tell Mr. Peterson regarding his hospital stay?

MS. MCBETH: Objection, your Honor.

THE COURT: Overruled.

You can answer.

THE WITNESS: I can answer?

Mr. Peterson, all he wanted was he asked me was I the one that took him to the hospital, and I said yes. He asked me what happened, and I explained to him what happened.

BY MR. CANELLIS:

Q Was your sister with you when you talked to Mr. Peterson?

MS. MCBETH: Objection, your Honor.

THE COURT: Overruled.

THE WITNESS: I don't know. She might have been there once. I don't know. I can't remember.

BY MR. CANELLIS:

Q Did you say maybe once?

A Maybe. If she was sitting out there, we talked about certain things maybe a month and a half ago out when we were here.

So, she could have heard what we were talking about.

Q Did she ever play an active role in the conversation between you and Mr. Peterson?

MS. MCBETH: Objection, your Honor.

THE COURT: Sustained.

BY MR. CANELLIS:

Q In the last year how many times did you meet with Mr. Peterson?

MS. MCBETH: Objection, your Honor. This is not relevant to anything.

THE COURT: Overruled. Go ahead.

THE WITNESS: I am really not sure. I want to say maybe three or four times.

BY MR. CANELLIS:

Q Do you remember when in the last year those three or four times were?

A When we came here. Can I answer that?

THE COURT: They didn't object. Go ahead.

THE WITNESS: When we came here for trial, while we were waiting for his case to come up, and once before that.

BY MR. CANELLIS:

Q Once before what?

A You said how many times. I said three or four times. One time when we weren't here, and the rest of them when we were here.

Q Where were you when you weren't here?

MS. MCBETH: Objection, your Honor.

THE COURT: How is this relevant, Mr. Canellis?

MR. CANELLIS: Judge, she has talked about different conversations she had has with John Peterson regarding medical records based upon information that she gave him.

Some of Miss Reed's answers have been, "I don't know. I don't recall." I am just trying to --

THE WITNESS: The years, I don't know and don't recall.

MS. MCBETH: Judge --

THE COURT: I am going to sustain the objection.

MR. CANELLIS: I have no further questions.

THE COURT: Anything else?

MS. MCBETH: Nothing based on that, your Honor.

THE COURT: All right. Thank you, Miss Reed. You may step down.

THE WITNESS: Okay.

(Witness excused.)

MS. MCBETH: Your Honor, we are going to ask to call Kim

Reed next, and may this young lady stay in the courtroom while she is testifying?

THE COURT: Mr. Canellis?

MR. CANELLIS: Judge, I would object. There is a motion to exclude.

MS. MCBETH: That's fine. We will put her across the hall.

THE COURT: All right.

MS. PLACEK: We see no reason to do that. She is not going to be called again, Judge.

THE COURT: All right, but if there is a motion to exclude and if either side would object to the witness remaining in the courtroom, I have to enforce the motion to exclude. She has to go across the hall.

(WHEREUPON, Pamela Reed leaves the open courtroom and gallery herein.)

THE COURT: Step right up here, ma'am.

(Witness sworn.)

THE CLERK: You may be seated. Keep your voice up.

KIM REED,

called as a witness on behalf of the Defendant/Petitioner herein, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. MCBETH:

Q Kim, could you introduce yourself to Judge Laws.

A Judge Laws, hi.

THE COURT: Hi.

THE WITNESS: I am Kim Reed, Carl's sister, (indicating).

THE COURT: Okay.

BY MS. MCBETH:

Q Miss Reed, I see that you pointed at someone.

Who is that person that you were pointing at?

A My brother, (indicating).

MS. MCBETH: Indicating for the record the Defendant in this matter.

THE COURT: All right.

BY MS. MCBETH:

Q How old are you, ma'am?

A Forty-four.

Q And how old is your brother Carl?

A Forty-five.

Q So, he is your older brother by one year, one year older?

A Yes, he is older than me, a year older than me.

Q Are you working, ma'am?

A Yes.

Q Where do you work?
A Wilson Care; psycho-social technician.
Q You take care of people in a nursing home?
A It's supposed to be a halfway house.
Q A halfway house?
A Yes.
Q And your brother Carl, did you and he grow up together?
A Yes.
Q You grew up in the family home with all of your brothers and sisters?
A Yes.
Q And your Mom and Dad?
A Yes.
Q Did there come a time after Carl was grown when he was a young man that he sustained a head injury?
A Yes.
Q Did you play any part in getting him help for that head injury?
A Yes.
Q Can you tell Judge Laws about that?
A He came to the house badly beaten in the head with a T-shirt wrapped around his head. I went to the bathroom and got a thicker bath towel. My sister Pam went and got the

car. We rushed him to Roseland Hospital.

I asked them how long it would take for them to wait on him. They told me they took the most severely first. By his head being busted open, I thought that it was severe. They didn't think so. They had us wait. We waited maybe twenty minutes, not long.

Then I told my sister to go get the car, and we would take him somewhere else.

Q Did you take him somewhere else?

A Yes.

Q Where did you take him?

A Little Company of Mary.

Q Did they treat him there?

A Yes.

Q Did they keep him overnight or longer than that?

A Yes.

Q After Carl had sustained that head injury and he got treated at Little Company of Mary, when he went home from the hospital, did he go back to the Doctor for care after that?

A Yes.

Q And did that go on for some period of time?

A Yes.

Q After that did there come a time where Carl applied

for social security benefits?

A Yes.

Q Do you know if he got social security benefits?

A Yes, he did.

Q How do you know that?

A Because I was his payee.

Q When you say that you were his payee, what does it mean to be somebody's payee for social security?

A Carl was not mentally able to, how do I say it, he needed someone to help him pay his bills, cash his check. He needed supervision.

Q Okay. And how is a decision arrived at that he needed help with the paying of his bills and the cashing of his check and supervision?

Did you decide that? Did the Government decide that? Did someone else decide that?

How does that work?

A The Doctors suggested that I take him. He goes to social security, and when he went there, there were papers and stuff that you need to fill out. He said that Carl would never be the same after the head injuries.

There were papers that we had to fill out because Carl didn't read or write anything but his name. So, while we were at the social security, I had to read off stuff

to Carl. They were wondering why I was doing it. So I explained it to them. So, that's how I became the payee.

Q Why is it that you were filling out his papers when you took him to social security to apply?

A Because he couldn't. He doesn't know how to read or write.

Q How do you know that?

A Because I grew up with him. We are a year apart, and he was a grade above me. I did a little in helping him with his homework and doing it for him, stuff like that.

Q Now, you said that you agreed to act as his payee, and you did indeed, you were his payee before he got arrested in this case?

A Uh-huh.

Q Is that a yes, ma'am?

A Yes.

Q And what would you do for Carl when you were his payee?

A He couldn't cash his check without me. I had the check come to my house, and we would go to the currency exchange. He would sign his name. He would be right there with me, and I cashed the check and make his money orders out for whatever bills that he had, and to make sure that they got mailed.

Q Did you do all of that at the currency exchange?
A Yes.
Q The day that you took him there with the check?
A Yes.
Q Did this continue during the time that Carl was living in the subsidized housing on the North Side?
A Mom was the payee for a while, and Mom took sick. That's how I switched over.
I am not sure. I am not sure if I was or Mom was then.
Q How did you get word to Carl that he should come over, and then you would go and help him cash the check and write the money orders for him?
Did it always come on the same day, or was it planned?
A Yes. He always knew when his check was supposed to come.
Q At that time you were not living in the same household, is that right?
A No.
Q So, you would see Carl at least every time that there was a check to be cashed, is that right?
A For sure. Yes, for sure once a month.
Q And that's how often the checks come?

A Right.

Q Were there other times that you would see him other than the check day?

A Yes.

Q And where would that be?

A Just visiting, coming over to my Mom's house because I had a house down the street from my mother, and so he would come down to Mom's house or my house and visit.

MS. MCBETH: Nothing further, your Honor.

THE COURT: Cross.

CROSS EXAMINATION

BY MR. CANELLIS:

Q Ma'am, you stated that when Carl got the injury, he went to Roseland Hospital, correct?

A Yes.

Q And you actually went with your other sister?

A Yes.

Q She drove you?

A Yes.

Q Do you recall when this was?

A Late '80s, early '90s. Not the exact date, no.

Q You saw him walking down the street, and that's when you knew that there was a problem, right?

A No. We were in the house, and he came up on the

porch. The door was a screen door, and the door was locked. We opened the door, and he tilted over. We seen blood all over his T-shirt, and from there we --

Q So, everybody was inside of the house when he came home?

A Yes.

Q At that point you and your sister put him in the car and drove him to Roseland, correct?

A Yes.

Q All three of you then went into Roseland Hospital?

A Pam parked the car. I took Carl and put him in a wheelchair, and wheeled him in.

Q She came into the hospital after she parked the car?

A Yes.

Q You sat there for twenty minutes, you said?

A Or less.

Q Fifteen, twenty minutes or so?

A Yes.

Q Then after that, that was you, your sister, and your brother, correct?

A Right. I told my sister to go get the car.

Q That was after fifteen to twenty minutes in the hospital, right?

A Yes.

Q Now, you stated that the people at the hospital stated that they were taking only the most severe patients at that time, is that right?

A First they would take the most severe first. That's how they did it.

Q They seen your brother and took him?

A They seen him with all of the blood, and they just told us that they wouldn't take him immediately.

MS. MCBETH; Objection, your Honor.

THE WITNESS: Yes.

THE COURT: Overruled.

BY MR. CANELLIS:

Q Now, you stated that you were the payee for Carl on his checks?

A Yes.

Q And how long were you the payee?

A I am not sure. Probably some years. I am not sure.

Q Now, maybe I misunderstood this a little bit, but were you a payee, and then your Mom was a payee, and then you became the payee again?

A My Mom was the payee first.

Q Then you became the payee?

A Yes. Mom got ill and couldn't go, so I had to take over.

Q How long was your Mom the payee for?

A From the beginning until, oh, maybe two years.

Q And how long have you been the payee since?

A I was the payee from that point on, up until he came to jail.

Q How long has that been, would you say?

A He came here in '01. From the '90s until now, I guess; until '01.

Q When you say the '90s, would it be the late '90s?

A Late '90s.

Q '98, '99?

A I think so.

Q Okay.

A I am not sure about the dates.

Q Now, up until that point he had been going to your Mother's to get his check, correct?

A Right.

Q And he had actually been living away from your Mother for some time?

A No. He had been staying with Mom for a while until he got his own place.

Q And he moved up North, correct?

A Yes.
Q And that was on Sheridan Road?
A Yes.
Q How long had he been living up North?
A I am not sure.
Q A couple of years?
A Maybe a year. It hadn't been long.
Q Did you ever go to his place up there?
A I dropped him off before, yes.
Q Did you ever visit him up there?
A No. I don't know the North Side. I don't drive the expressways or anything like that, no.
Q When your brother lived there, he lived alone, correct?
A Yes.
Q And would you see him approximately one, maybe two times a month?
A No. Maybe five times a month because, like I said, he would visit us. He had come from his house back to the South Side.
Q So, he was able to come from the North Side to the South Side, correct?
A Correct.
Q And he would do that on a regular basis, correct?

A Correct.
Q Would he drive?
A No.
Q He would take public transportation?
A Yes.
Q So, he knew enough to ride the public transportation to come South, correct?
A He knew his way home.
Q He knew enough to get home from the North Side, though, correct?
A Yes.
Q Where on the South Side did you guys live?
A 102nd and Union.
Q And he lived way up about 4500 North Sheridan Road, correct?
A Right.
Q Do you know what he would take, the El, when he came home?
A I don't know how he got home. He just took public transportation. I don't know the routes that he took.
Q Now, he also worked, correct?
A Years ago. Years ago, yes.
Q Well, he had different jobs, correct?
A I don't know about different. I remember one job

that he had.

Q What job was that?

A He worked at a -- it was, I think, called Sheen or some kind of a warehouse company for hair stuff.

Q Did you ever remember him being a cook?

A No. I can't recall a cook.

Q Do you know what your brother would do during the day since he wasn't working?

A You are asking me before the accident or after?

Q This is after.

A After the accident?

MS. MCBETH: I would object, your Honor.

THE COURT: Overruled.

THE WITNESS: After the accident, is that what you are saying? After the accident?

MR. CANELLIS: Yes, ma'am.

THE WITNESS: No. I don't know what he was doing in the daytime, no.

BY MR. CANELLIS:

Q Do you know what he was doing during the night time?

MS. MCBETH: Objection, your Honor.

THE COURT: If she knows.

THE WITNESS: Visiting. I mean, just visiting family.

We are a close family. So like I would say that he was visiting.

BY MR. CANELLIS:

Q You said you saw him maybe five times a month, is that correct?

A About a month.

Q How about the other twenty-five days, do you know what he was doing?

MS. MCBETH: Objection, your Honor.

THE WITNESS: No, I don't.

THE COURT; Okay. Sustained.

BY MR. CANELLIS:

Q So, you don't know what your brother did when he wasn't with you, correct?

MS. MCBETH; Objection, your Honor.

THE COURT: Okay. Sustained.

BY MR. CANELLIS:

Q You stated that your brother didn't know how to read?

A Yes.

Q Did you ever work with him?

A What do you mean "work"? A job with him?

Q No.

Work on learning how to read.

A Oh, yes.

Q When did you do that?

A We were in grammar school.

Q How far did your brother go in school?

A He graduated 8th Grade and went to high school for a year and stopped.

Q Did you ever encourage him to go back to school?

A Yes.

Q Did he go back to school?

A No.

MS. MCBETH: Objection, your Honor.

THE COURT: Her answer may stand.

BY MR. CANELLIS:

Q Did you continue to work with him on learning how to read?

A Yes.

Q What did you do?

A Reading.

Q What sort of reading?

A My baby sister had little bitty books. We would start from scratch and just practice reading little words.

Q When would you do this?

A At home. After we did our homework, after I did my homework, I would try to help my brother.

Q How often would you do this?

A Maybe twice a week.

Q How receptive was your brother to doing this?

MS. MCBETH: Objection as to "receptive," your Honor.

THE COURT: Sustained.

BY MR. CANELLIS:

Q How would you characterize your brother when you attempted to teach him how to read?

MS. MCBETH: Objection, your Honor.

THE WITNESS: Willing to learn.

THE COURT: Overruled.

BY MR. CANELLIS:

Q Did you continue working with him?

A No, I didn't continue. I had my own work to do. I didn't do it on a regular basis. I did it when I could.

Q Well, how often was that?

A I don't know. Maybe twice a week.

Q For how long?

A I am not sure.

Q A month?

A We were in grammar school. I mean, I am not sure.

Q Well, did anybody else in your family work with him?

A My Mom did.

MS. MCBETH: Objection, your Honor.
THE COURT: Hold on. Let me rule.
Overruled. Go ahead.
THE WITNESS: When did she help him?
MR. CANELLIS: Yes.
THE WITNESS: Well, when she got through with dinner.
BY MR. CANELLIS:
Q I'm sorry?
A When she got finished cooking dinner.
Q How often would she work with him?
A Maybe four nights a week.
Q And that was four nights in addition to your two nights?
A Oh, if I didn't, she did.
Q So, at least four nights a week you or your Mom were helping him?
A Right, trying to.
Q How long would you help him?
A How many hours a day?
Q Yes.
A Maybe two. Not long because we had to do our baths and get ready for bed. Maybe two hours.
Q And anybody else besides you and your Mother ever try to help him learn how to read?

A My other sister did. She is a year younger than me. She would a couple of times.

Q Is that your sister that is here in court?

A No. That's my older sister.

Q Your younger sister, how often did she attempt to teach him how to read?

A Whenever she was doing her homework, she would sit him down and show him different words, like that. We didn't have --

Q How often was that?

A We didn't have a scheduled time for him.

Q But you did or you didn't?

A We didn't have a scheduled time. If we wanted to work with him, we would just say, "Carl, come on. Let's practice this" while we were doing our homework or whatever.

Q Well, how many times did your younger sister help you and your Mother, would you say?

MS. MCBETH: Objection.

THE COURT: She can answer.

BY MR. CANELLIS:

Q You or your mother worked with him four days.

How many times did your younger sister work with him?

A Not much. She is not my younger sister, the sister

under me, but she didn't do it much. She did it a couple of times. It wasn't a regular thing for her like it was for me and my Mom because we were close in age.

Q How about your older sister, did she ever try to teach him how to read?

A No.

Q And that was your sister that just testified?

A Not that I can remember.

Q That was your sister that just testified?

A Yes.

Q You guys all lived in the same house, though?

A Yes, but she got married young and left early. She got married at 16.

Q But you never saw her try to teach him?

MS. MCBETH: Objection, your Honor.

THE WITNESS: No.

THE COURT: Her answer may stand.

BY MR. CANELLIS:

Q Just so I am clear, was the Defendant living on the North Side or the South Side before the beating?

A South Side.

Q Was he living at home back then?

A I believe so.

Q Well, are you sure if he was?

A No, I am not sure, but I believe that he was.

Q What makes you think that he might not have been living there?

MS. MCBETH: Objection, your Honor.

THE COURT: Sustained.

THE WITNESS: I don't remember.

THE COURT: Sustained. You don't have to answer.

THE WITNESS: Oh, okay.

BY MR. CANELLIS:

Q When you would see your brother, he was always clean, correct?

MS. MCBETH: Objection, your Honor. Foundation. When?

THE COURT: Lay a better foundation.

BY MR. CANELLIS:

Q When you would see your brother when he would visit you, was he clean?

MS. MCBETH: Objection, your Honor.

THE WITNESS: He was decent.

THE COURT: All right. When? Sustained.

BY MR. CANELLIS:

Q Okay. Well, let's go back to the time when he first moved out of the house.

When did he start visiting you five times a month?

MS. MCBETH: Objection, your Honor.
THE WITNESS: When did he start?
THE COURT: She said on or about, okay? You can ask questions along that fine line.
I will sustain that.
BY MR. CANELLIS:
Q Just so I am clear, approximately when did the Defendant move out and live up North?
A I am not sure when he moved out.
Q You said it was about a year?
MS. MCBETH: Objection.
THE WITNESS: I didn't say when he moved out.
MS. MCBETH: She said she wasn't sure.
THE COURT: Sustained.
BY MR. CANELLIS:
Q How long had he been moved out of the house before he was charged with murder?
MS. MCBETH: Objection.
THE WITNESS: I am not sure.
THE COURT: Her answer may stand. She said she was not sure.
BY MR. CANELLIS:
Q How long were you the payee before he was charged with murder?

A Oh, maybe two or three years, I guess.

Q For those two or three years was he living with you?

A No, he wasn't living with me.

Q Where was he living?

A I am thinking that he was staying at Mom's house. I wasn't at home. I was in my own place.

Q For those two or three years that you were the payee, you stated that you would see him, correct?

A Yes.

Q And you would see him at least once a month, correct?

A Yes.

Q Up to maybe approximately five times a month, correct?

A Yes, or more. I mean, we were in the same neighborhood.

Q Those times that you saw him, did he appear to be clean and well kept?

A He was decent.

Q Did he appear to be fed?

A Yes. I fed him sometimes, too.

Q He wasn't starving, was he?

MS. MCBETH: Objection, your Honor.

THE WITNESS: No.

THE COURT: Sustained.

BY MR. CANELLIS:

Q Did the Defendant ever tell you that he wasn't getting enough food?

MS. MCBETH: Objection, your Honor.

THE COURT: She can answer that.

THE WITNESS: Yes.

BY MR. CANELLIS:

Q He did?

A Yes.

Q When?

A I don't know exactly when, but I have fed my brother.

Q When did he tell you that he wasn't getting enough food?

A He didn't say it like that. He would say, "I'm hungry."

Q My question is did the Defendant ever tell you that he wasn't getting enough food?

A No.

MR. CANELLIS: I have no further questions.

MS. MCBETH: Just briefly.

REDIRECT EXAMINATION

BY MS. MCBETH:

Q Miss Reed, all of these questions the Prosecutor was asking you about, you and your family practicing with Carl with the little bitty kid books to try to teach him how to read, all of this practicing was going on before he had that head injury?

A Yes.

MR. CANELLIS: Objection.

THE WITNESS: Yes.

BY MS. MCBETH:

Q That's correct, ma'am?

A Yes.

MR. CANELLIS: Objection.

THE COURT: Her answer may stand.

MS. MCBETH: Nothing further.

THE COURT: Recross?

MR. CANELLIS: No, Judge.

THE COURT: Thank you. You may step down.

THE WITNESS: Thank you.

(Witness excused.)

MS. PLACEK: We would rest on the motion, Judge.

MS. MCBETH: Thank you.

THE COURT: Any rebuttal?

MR. CANELLIS: No, Judge.

THE COURT: Are you ready to argue?

MR. CANELLIS: State is ready.

MS. MCBETH: May I proceed, your Honor?

THE COURT: Yes.

MS. MCBETH: Judge --

THE COURT: Well -

MS. PLACEK: It's their burden.

MR. CANELLIS: State would waive, Judge.

THE COURT: All right. Go right ahead.

MS. MCBETH: I guess I must have thought that I heard him say that he waived.

Judge, their burden on this motion is to show you by clear and convincing evidence that the statements that Mr. Reed gave in custody were the product of his free will and a knowing understanding of his waiver of his Miranda Warnings.

You heard testimony from the officers and the State's Attorneys that encountered him at the police station. It was an extended stay there and numerous interrogations over a long period of time.

During the pendency of this motion the Appellate Court case of Willis which laid down the hard and fast 48-hour rule was reversed by the Supreme Court's

decision of Willis who was adopting instead the totality of the circumstances test.

It did not change the fact that the State has the burden of persuading you that the statements were freely and voluntarily given. It did not change the fact that the State still has the burden of proving that Mr. Carl Reed knowingly and intelligently waived his Miranda Warnings, his Miranda Rights.

Those burdens remain on the State as a matter of Constitutional law.

Judge, we brought you two people whom I am sure the State, one, is saying is biased because they love their brother. They are a close-knit family. They do, however, Judge, corroborate each other on the important details here. They remember that incident back in the late '80s when Carl was injured and had a head injury. They remember their attempts to get him treatment. They remember that there was follow-up Doctor care, and they remember after that he went to apply for and was granted social security disability payments based on that disability, too.

There also is a history in his family of not only Carl, but two other males in the household growing to adulthood and never learning to read.

That is Carl Reed's problem. It's one of his

problems. The second problem is that he never fully recovered from those head injuries and has to have at least according to the Social Security Administration someone else to have his check mailed to them so that they can take care of that. He can get it properly cashed. That he can use it to pay his bills.

These are the kinds of things that the State's Attorney who came in at the end of the interrogation did not know, and apparently did not care to find out about.

Those are the kinds of things that the officers certainly did not know and did not care to find out about because their focus was completely different as to what their cause was on.

If we can get this guy to give a statement, this will help the Prosecution of this case.

Judge, I think that it would be laughable were it not so serious to have someone else fill out a piece of paper, to have an illiterate grown man, and then say, sign here, and then say this is proof that he can read and write were they to have let him write it, but, you know, they never do. Maybe we would have something different on here.

We have Carl Reed signing off just like he does every month when he goes to his Mom's house or goes to his sister's house. He signs off on that Government check,

and that certainly is far and away from this. That is not something that the State can argue is a knowingly and intelligent waiver of his rights.

A person who can find his way home from Sheridan Road to the South Side to the place that he grew up in does not necessarily understand what it means to say anything that you say can and will be used against you in a court of law. You have the right to remain silent.

Those are much more complex ideas than how do I get home.

You know, even a dog that gets lost and strays into another neighborhood can find its way home.

Judge, we offer this to you, because it tells the full picture of Carl Reed from two people who love him and, yes, they are very biased because they love their brother. It's a close-knit family, but that also cuts the other way, which is who better than the sisters would know. They corroborate each other in great detail. I suppose Mr. Canellis may make something of one of them remembering being on the porch when he came up with his head all covered with blood, and the other one being inside.

I would suggest to you that that event happened; that compassionate event was a turning point in Carl Reed's life.

That after that any reasonable, compassionate person would say that this man needs help in attending to his affairs.

In fact, our Federal Government said that. This is somebody that cannot waive his right at a police station, and we would ask that you grant the motion.

THE COURT: Mr. Canellis?

MR. CANELLIS: Judge, counsel talks about a couple of different things which she anticipates a couple of different arguments that I may make. I applaud counsel because I will make exactly those arguments.

When you talk about the witnesses that testified, the greatest thing that you can look at is their bias. They are the Defendant's sisters. You saw them testify, Judge. You heard them testify.

Counsel talks about, I am going to make a big deal about the inconsistencies in their details. Well, absolutely, Judge. Absolutely. They want to sit there and take the stand, and they want to remember certain things, but then when I asked them questions on cross examination, well, they don't want to remember specific details about anything that I want to know, but they remember other details.

Unfortunately for the Defense, the details that they remember about these different issues are different

than what each one is saying.

You talk about whether they saw the Defendant coming down, or was he in the hospital, or was the other sister in the hospital, or was she still in the car. Judge, they are all over the place.

I submit to you they are here to help their brother. They talk about being a close-knit family. Well, with all due respect, I mean, yes, they are a close-knit family in terms of the fact that they see their brother charged with murder, and they are going to come in after the fact and try to help him.

Oh, yes, we tried to work with him. Come on. Do you believe for a second what the last witness just said in terms of all of the times that they spent with the Defendant while he is a freshman in high school trying to read? It's nonsense.

They didn't spend their time with him. I am not saying that that shows that the Defendant does not know how to read or never had the opportunity to learn, but that goes to show her bias in trying to help him today.

All of the times that she is saying that she, her mother, her sister, but not her other sister that testified, even though she would have you believe that she, too, spent several hours, several days, several years working

with the Defendant in terms of learning how to read.

Judge, all of their bias was oozing off of that stand, trying to help him now.

Think about back then, though, Judge. Think about a couple of things that they did say in terms of them being a close-knit family. They never went to his house. They never hung out with him there. They never visited him there. This --

MS. MCBETH; Objection, your Honor. It's not a house, your Honor.

MR. CANELLIS: This is a SRO.

They never stayed with him there.

When you talk about the Defendant, they want you to believe, I guess, that he is a imbecile because he can't read or write, but yet he is living alone. Nobody knows, or at least the last witness doesn't know what he is doing the other twenty-five days out of the month because she states he is not working. Whereas, the other sister states that he is working.

MS. MCBETH: Objection, your Honor. It misstates the testimony.

THE COURT: All right. It's arguments. I have heard the testimony.

MR. CANELLIS: They are all over the place, Judge.

You heard the credible testimony from the Detectives in this case, from the Assistant State's Attorney.

In terms of the Assistant State's Attorney Asemi saying, sign this statement, not true. It is a misstatement by the Defense.

I point to Page No. 107 of the transcript dated April 27th, 2005, the testimony of Assistant State's Attorney Gail Asemi. "Then after the entire statement was done, I then changed to the other side of the table so I was sitting next to Mr. Reed, and I sat next to Mr. Reed, and I asked him to read the first paragraph. Not the Miranda, but my handwritten first paragraph out loud to me so that I know he could, one, read in my handwriting, and two, read. He did that."

ASA Gail Asemi, what is her motive to lie? Oh, I guess to make the case strong against the Defendant. Come on.

It doesn't make sense, Judge.

In terms of the motion in this case, Judge, there are certain allegations. However, counsel chose not to argue most of them.

In terms of Miranda, we dealt with that where he was Mirandized seven separate times. In terms of food and drink, he was well fed. He was given various drinks to

drink. He was allowed to use the bathroom.

The material misrepresentations, there were none. It's a boiler-plate motion. There were no specific allegations of anything.

First it was the Willis issue. Then once that didn't fly, all of a sudden it became, well, maybe it was diabetes. What happened with that? There was no evidence --

MS. MCBETH: Objection. This is not rebuttal argument.

THE COURT: Go ahead.

MR. CANELLIS: There was no evidence of that to support that motion. All of the evidence about the Defendant being a diabetic shows that there was no issue of it whatsoever.

In terms of the Defendant, oh, now it's he can't read and write. Judge, you heard the testimony. The testimony is clear.

We would ask that you deny the Defendant's motion.

THE COURT: All right. I am looking at the motion.

The issue is whether he understood Miranda or not?

MS. PLACEK: Yes, Judge.

THE COURT: Is that it?

MS. PLACEK: And whether he could at the time, yes, Judge.

THE COURT: At the time?

MS. PLACEK: Yes.

THE COURT: All right. I will go back and look at the transcripts. There is transcripts that Mr. Canellis referred to.

When are you all picking the next jury?

MS. PLACEK: Monday.

MS. MCBETH: Monday.

THE COURT: Where?

MS. PLACEK: Judge Kazmierski.

THE COURT: Can you come back here on Monday morning?

MS. PLACEK: No. We are doing motions in Judge Palmer's courtroom in the morning.

Can we come back here tomorrow?

THE COURT: I am all right.

MS. PLACEK: How about this. Since I am kind of in a negotiating mood, how about on the 24th?

THE COURT: In the morning.

MS. PLACEK: 9:00 o'clock.

THE COURT: Motion commenced and continued to 10/24.

Thank you very much.

9:30 or 10:00?

MS. PLACEK: 9:30.

THE COURT: Make a note that it is at 9:30.

MS. PLACEK: Thank you.
MS. MCBETH: Thank you, your Honor.
MS. PLACEK: Could you put it on the 20th?
THE COURT; Yes.
MS. MCBETH: That's fine, too.
THE COURT: Motion commenced and continued to 10/20.
I will see you in a week.
MR. CANELLIS: Did you still want it at 9:30?
MS. PLACEK: Yes. We will be on trial that day.
MS. MCBETH: We will still be doing the jury.
THE COURT: Okay.

(WHEREUPON, the above-entitled Motion was commenced and continued to October 20, 2005 for Ruling.)

STATE OF ILLINOIS )
)
COUNTY OF C O O K )

I, Elaine M. Besbekos, an Official Court Reporter of the Circuit Court of Cook County, County Department, Criminal Division, do hereby certify that I reported in shorthand the proceedings had in the above-entitled cause; that I thereafter caused the foregoing to be transcribed into typewriting, which I hereby certify to be a true and accurate transcript of the proceedings had before said Honorable Judge of said Court herein.

Elaine M. Besbekos

Elaine M. Besbekos, CSR
Official Court Reporter
License No. 084-002574