FORTZ Legal

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CARL REED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | 2023 CV 17186 |
| RICHARD ZULEY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

The videotaped videoconference deposition of RUTH McBETH, called by the Defendant for examination, pursuant to Notice, and pursuant to the Rules of Civil Procedure for the United States District Courts, taken before Renee E. Brass, CSR, RPR, on August 4, 2025, at the hour of 10:32 a.m.

**Premier Litigation Support Solutions**

- Court Reporting
- Process Service
- eDiscovery
- Document Solutions
- Trial Support

production@fortzlegal.com
844.730.4066

FULL SERVICE FORTZ Legal LITIGATION SUPPORT

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CARL REED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | 2023 CV 17186 |
| RICHARD ZULEY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

The videotaped videoconference deposition of RUTH McBETH, called by the Defendant for examination, pursuant to Notice, and pursuant to the Rules of Civil Procedure for the United States District Courts, taken before Renee E. Brass, CSR, RPR, on August 4, 2025, at the hour of 10:32 a.m.

PRESENT:

LOEVY & LOEVY
BY: JON LOEVY, ESQ.
jon@loevy.com
311 North Aberdeen Street, Third Floor
Chicago, IL 60607
312.243.5900

on behalf of the Plaintiff;

BORKAN & SCAHILL, LTD.
BY: MISHA ITCHHAPORIA, ESQ.
mitchhaporia@borkanscahill.com
20 South Clark Street, Suite 1700
Chicago, IL 60603
312.580.1030

on behalf of Defendant Zuley;

O'CONNOR BATTLE
BY: TERRIE C. SULLIVAN, ESQ.
tsullivan@mokblaw.com
111 W. Jackson Blvd., Suite 1700
Chicago, IL 60604
312.786.4600

on behalf of Defendant Adducci;

BURNS NOLAND
BY: ELIZABETH EKL, ESQ.
eekl@burnsnoland.com
311 S. Wacker Drive, Suite 5200
Chicago, IL 60606
312.872.8930

on behalf of Defendant City of Chicago.

ALSO PRESENT:

Rob Jacques, videographer



I N D E X


| EXAMINATION OF RUTH McBETH | PAGE |
|---|---|
| MS. EKL | 5 |
| MS. ITCHHAPORIA | 93 |
| MR. LOEVY | 99 |


E X H I B I T S
(Attached to Transcript)


| McBETH DEPOSITION EXHIBIT | | PAGE |
|---|---|---|
| 1 | Photograph | 7 |
| 2 | Transcript - December 5, 2005 | 12 |
| 3 | Transcript - October 20, 2025 | 17 |




THE VIDEOGRAPHER: Good morning. We are now on the record.
The time is 10:32 a.m., on August 4, 2025. This begins the videotaped deposition of Ruth McBeth taken in the matter of Carl Reed versus Richard Zuley, et al, case No. 2023 CV 17186.
My name is Rob Jacques. I'm your remote videographer for today representing Fortz Legal Support.
As a courtesy, will everyone who is not speaking please mute your audio and then just remember to unmute your audio when you're ready to speak.
Counsel, will you please state your name and whom you represent, after which the court reporter will swear in the witness.
MR. LOEVY: Jon Loevy for the plaintiff.
MS. EKL: Good morning. Elizabeth Ekl on behalf of the City of Chicago.
MS. ITCHHAPORIA: Good morning. Misha Itchhaporia on behalf of the individual Chicago police defendant officers.
MS. SULLIVAN: And Terrie Sullivan for defendant Nancy Adducci.
MS. EKL: Ms. McBeth --



(Witness duly sworn.)
THE WITNESS: I have a question for the videographer.
Do you want me to mute while they're questioning or just the other lawyers?
THE VIDEOGRAPHER: Oh, no. If you could please stay unmuted, that would be great. Thank you. It was just for the other lawyers. Thank you.
THE WITNESS: Sure.

RUTH McBETH,
having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. EKL:
Q. Good morning. Could you please state your first and your last name and spell your last name for the court reporter.
**A. Ruth McBeth, M-c-b-e-t-h.**
MS. EKL: And just for the record, this deposition is being taken pursuant to the Federal Rules of Civil Procedure, as well as the local rules in the Northern District of Illinois.
BY MS. EKL:
Q. Ms. McBeth, have you ever given any depositions in the past?

Page 6

**A. I don't believe so. I don't recall ever being deposed.**
Q. Okay. I know you've been a lawyer for a long time and you have put on a lot of witnesses, I'm sure, during that time, but I'm just going to go over a couple ground rules for the deposition to keep in mind because it's a lot different being on the witness side of things than it is when you're the attorney questioning. Okay?
**A. Okay.**
Q. And, also, being over Zoom some of these things are even more important to keep in mind.
First of all, sometimes there can be a lag in the Zoom, so I would just ask that you make sure that I have completed my question before you answer so that we have a complete record. Is that fair?
**A. Yes.**
Q. And obviously you know to say yes or no versus uh-huh or uh-uh.
If at any point in time you want a break, let me know. We can certainly accommodate you. I don't think we will go very long today, but we may go long enough that you may want a break. I'll try to stop a little bit after an hour or so just to

Page 7

give everyone a couple minutes to stretch their legs if they need to. Okay?
**A. Okay.**
Q. Great. You understand that you're here today to talk about a person who you represented in the past by the name of Carl Reed; is that correct?
**A. Yes.**
Q. Do you recall Carl Reed just generally?
**A. Very little.**
Q. Okay. I'm going to -- just before we start, I'm going to go ahead and pop up on the screen a photograph and see if -- do you recall as you sit here today what he looks like?
**A. I do not.**
Q. Okay. Let me show you a photograph just so we can maybe help refresh your memory upfront.
Sorry. Using a different computer. All right.
Are you able to see the photograph that I've put up on the screen?
**A. I am.**
Q. Okay. And I'll mark this as Deposition Exhibit No. 1. Looking at this photograph, does this help refresh your memory about what -- I'll represent to you this is Carl Reed. Does -- do you

Page 8

recall this person?
**A. Not from seeing that photograph, no.**
Q. Okay.
**A. I mean, I'll take your word for it.**
Q. Okay. Do you remember anything at all about the charges that Carl Reed was facing when you represented him?
**A. Yes.**
Q. And what do you -- what charges do you recall him facing when you represented him?
**A. He was charged with murder and he was charged with some accompanying felony offenses.**
Q. At the time that you represented Carl Reed, were you aware that he was also -- he also had a pending drug charge?
**A. No. Well, as I sit here today, I do not remember if I knew that about him then. I know that now.**
Q. Okay. And how is it that you know that now?
**A. Because I called the public defender's office, spoke to the person who keeps their files and turns over the files in situations like this and was told that the drug file was turned over to somebody.**

Page 9

Q. Okay. Who was it that you talked to over at the public defender's office about the file?
**A. Her name is Emily, and I think her last name starts with an M, but I had never met her before. She was not -- we did not overlap with the public defender's office.**
Q. Okay. Was that Emily Maller, M-a-l-l-e-r? Does that sound right?
**A. Yes.**
Q. Okay. Do you recall who it is that she told you, if anyone, that she turned the file over to?
**A. She didn't tell me.**
Q. Okay. She -- was this a recent phone call that you had with her?
**A. Yes.**
Q. When did you talk to her?
**A. Last week.**
Q. Okay. When you talked to her, did she indicate one way or another whether or not it's shown on the file that you represented him in the drug charge as well as the murder case?
**A. No. We didn't -- she didn't tell me that.**
MS. EKL: Okay. Can we go off the record just

Page 10

a minute.
I -- counsel, I think -- I just want to have a quick discussion about this file that I don't believe that we have.
THE VIDEOGRAPHER: Okay. We're going off the record at 10:39 a.m.
(Discussion off the record.)
THE VIDEOGRAPHER: Okay. We are back on the record at 10:42 a.m.
MS. EKL: Okay. Just for the record we had a brief conversation off the record. There has been another file requested from the public defender's office.
Based on the witness's statement, I believe that may be what -- the file that was recently requested, and all of the parties have agreed that once we get that file, assuming we get it, if there are additional questions that need to be asked of Ms. McBeth, that she will come back for the limited purpose of asking questions related to that file rather than canceling the deposition at this point and completely reconvening at a different date.
BY MS. EKL:
Q. Is that okay with you, Ms. McBeth, and

Page 11

you agree to come back, if need be?
**A. It is okay, and I agree to come back if need be.**
Q. Great. Thank you.
What -- during what years did you represent Carl Reed?
**A. I don't know. I looked it up to find out who his counsel was when I got the subpoena, and I learned that this happened about 25 years ago, but I do not know what year I was assigned the case or for how long I represented him.**
Q. Okay. I'm going to show you a document to see if it kind of -- or a couple documents to try to bookend some of this. Again, give me just a moment here.
I will represent to you that Carl Reed was arrested in 2001. Is it your recollection that you would have begun representing him shortly after his arrest?
**A. Possibly. I don't know for sure.**
Q. Okay. I'll show you -- I'm not a fan of Zoom. Sorry. This is why.
Here we go. I'm showing you a transcript right now that is from People versus Carl Reed. It was from the time that he changed his plea and plead

Page 12

guilty, December 5th of 2005. And this lists on here as one of his attorneys, it says Ms. Ruth McBeth and Ms. Marijane Placek. Does that refresh your recollection at least as to kind of the -- at least part of the time that you represented him?
**A. That does state the date that that plea happened according to Rochi, the court reporter. I do not have an independent memory of that, though.**
Q. Okay. Fair enough.
Do you remember having co-counsel when you represented Mr. Reed?
**A. I don't have any memory of that.**
Q. Okay. Do you remember Ms. Marijane Placek?
**A. Yes.**
Q. And were there times when you were in the public defender's office when she was your co-counsel?
**A. Yes.**
Q. Okay. And at least according to that one date on that one record, if it's accurate, does it reflect that you -- both you and Ms. Placek represented Mr. Reed at the time of his change of plea?
**A. That's what the title page of the**

Page 13

**transcript reflects.**
Q. Okay. When did you first learn of Carl Reed's civil case?
**A. I would guess sometime in the last five years. I mean, you stated -- I think the videographer stated the case number, so it says it was filed in 2023, so it had to be since then.**
Q. Okay. And how was it that you learned of his civil case?
**A. A process server served me with a subpoena for this dep, for a deposition that we moved to this date.**
Q. Okay. So before you received that deposition subpoena, did you have any knowledge that Carl Reed had filed a civil case?
**A. No.**
Q. What did -- what, if anything, did you do to prepare for today's deposition?
**A. I sent a message to the last person that I knew to be his attorney, who is Lauren Myerscough-Mueller, found out that Mr. Loevy is his current attorney. Sent a message, called his office and left a message there. Talked to the person we were discussing, Emily, at the public defender's office, find out what the procedure is at the public**

Page 14

**defender, how the public defender handles these things. That's about it.**
Q. When you spoke to Emily at the public defender's office, did she mention one way or the other whether or not she had any records related to the murder case?
**A. She had the records showing that someone had requested that drug file that we talked about. She didn't have any information that someone had requested the -- as I understood, she didn't have any information that someone had requested the murder file.**
Q. Okay. And you mentioned that you sent a message to one of Carl Reed's attorney -- other attorneys, Lauren Myerscough-Mueller. Was that an attorney in your knowledge that she -- that he had after you but before Mr. Loevy?
**A. Yes.**
Q. And during what stage of his criminal proceedings did Ms. Myerscough-Mueller represent him, if you know?
**A. I'm not sure if they're technically criminal. I think they're technically civil in nature. They're post-conviction proceedings, I think -- well, yes, and then whatever category**

Page 15

**petitions for clemency would fall under.**
Q. Okay. Do you remember what year it was that you first learned that Ms. Myerscough-Mueller was representing Carl Reed?
**A. That's probably in the last five years.**
Q. Okay. And how was it that it came to be that you spoke to her about Carl Reed and her representation?
**A. She was also questioning me or discussing with me another person who had been my client that was then -- had then become her client.**
Q. Okay. And did the name Carl Reed come up in the course of that conversation?
**A. Yes.**
Q. And what, if anything, did the two of you discuss about Carl Reed at that time?
**A. She told me that he had been given clemency, that he had been exonerated, that he was not capable of waiving his Miranda rights, that -- that the signed statement that he signed had misspelled his name.**
Q. And when she was talking to you, did you remember Carl Reed?
**A. I remembered an incident about the case.**
Q. And what was that? What was the incident

Page 16

that you recalled?
**A. It was a death penalty case and I remember meeting the person that our office had retained, one of the people we had retained to do mitigation.**
**Mitigation is the information that you present in a death penalty hearing after the person has been convicted for the jury or the judge to decide if they should be sentenced to death or not sentenced to death.**
**And I had a plan to meet with that mitigator at Mr. Reed's family's home, and he had arranged to have multiple members of the family there so they could talk to me to get their questions answered. I could talk to them to get my questions answered. He could be assured that he was gathering the mitigation in a proper way, and I remember that meeting.**
Q. Okay. You remember being present at the meeting at his house?
**A. Well, with his mother's house, yeah.**
Q. Okay. Do you recall that it's -- although the case may have initially been categorized as a death penalty case, that it was determined that the state was not going to pursue

Page 17

the death penalty at some point?
**A. Well, I know he plead to a term a year, so that either happened or the judge decided it wasn't a death penalty case. I don't remember which one.**
Q. Okay. I'm going to show you another transcript and see if this helps refresh your recollection. Give me just a second here.
All right. I'm going to show you -- we'll mark this as Deposition Exhibit No. 3. This is a transcript from People versus Carl Reed, 01 CR 20237, and it's from a date of October 20, 2005, and, again, it purports that you and Ms. Placek are assistant public defenders appearing on behalf of Mr. Reed. Do you see that on the first page there?
**A. I see that.**
Q. Okay. I'm going to show --
MR. LOEVY: Can you email the exhibits we have used so far?
MS. EKL: I will at the conclusion. Let me just go ahead and put this on the record too.
This is Bates-stamped plaintiff 1611 through 1619, and if I show the other ones, I'll put the pages on too so we've got them. All right.
Sorry if I'm hurting anyone's eyes.

Page 18

BY MS. EKL:
Q. I'm looking at page 7.
MR. LOEVY: Beth, instead of sending them at the conclusion, can you send them now so I can look along too?
MS. EKL: Can you pull them up? I don't -- I honestly don't think I can send them from this -- I'm on like a -- I'm on a different computer. I don't know if I can send them from this computer right now is my only issue.
We can go off.
MR. LOEVY: All right. Let's see --
MS. EKL: But --
MR. LOEVY: Let's see how it goes.
MS. EKL: I can go off each one, yeah.
MR. LOEVY: Let's see.
MS. EKL: That's why I'm showing them on the screen so you can see it.
Hold on a second here. All right.
BY MS. EKL:
Q. Looking -- I'll start at the top of page 7. Do you see where it says -- there's a line 2, Ms. Placek says: Your Honor, I think we already have a trial date set. And then the Court says December 1st, jury trial. Do you see that?

Page 19

**A. I see that. I do not see that it's page 7. You got that cut off on my screen.**
Q. You see it right now, the page above it is page 6?
**A. Yes.**
Q. Okay. And that the next thing she says is: Jury trial. Judge, I believe it's been de-death, so, therefore, is that correct, Mr. State's Attorney? And then Mr. Canellis says: It is.
So I guess my first question is do you recall George Canellis, C-a-n-e-l-l-i-s, to be the state's attorney who was one of the prosecutors in Mr. Reed's case?
**A. No.**
Q. Based on this transcript, does it reflect that Mr. Canellis was one of the prosecutors in Mr. Reed's case?
**A. It does.**
Q. What does it mean to de-death a case?
**A. In this context it means that Ms. Placek is telling Judge Laws that the state has determined that they're no longer seeking the death penalty and that it won't be an issue at any subsequent proceedings.**

Page 20

Q. Okay. And so at least would you agree with me that in relation to this transcript that at least as late as December 5th of 2005 that the state was no longer seeking the death penalty against Mr. Reed?
**A. My memory was that when you showed me the first page, this is an October transcript. Did I get it wrong?**
Q. No. You are correct. I have the wrong date at the top.
So at least as late as October 20th of 2005, the state was no longer seeking death against Mr. Reed; is that correct?
**A. That's what the transcript reflects.**
Q. Okay. That's what the transcript reflects the State was relaying to the Court and to counsel, correct?
**A. Right, at Ms. Placek's urging.**
Q. Okay. And does this as a public defender, I mean in your experience, reflect that if his sentencing hearing took place after this October of 2005 date, that the death penalty was not at issue, the State was not seeking the death penalty and that was not a consideration for the Court at that -- any subsequent sentencing hearing?

Page 21

**A. Correct.**
Q. You mentioned that Ms. Myerscough-Mueller told you that Carl Reed was not capable of waiving his Miranda. What did she say specifically about that issue?
**A. I don't recall, but that's -- that was my summary of what I remember her telling me.**
Q. Okay.
**A. It was --**
Q. Sorry. Didn't mean to cut you off. Go ahead.
**A. You know, a discussion of his intellectual deficits.**
Q. Did Ms. Myerscough-Mueller share with you the post-conviction petition that she filed on Carl Reed's behalf?
**A. No.**
Q. Are you aware that she claimed ineffective assistance of trial counsel in that petition?
**A. No.**
Q. Are you aware specifically that she alleged that you and Ms. Placek were ineffective in your representation of Carl Reed?
**A. No.**

Page 22

Q. All right. You mentioned that you also called Loevy & Loevy. Did you speak to anyone at Loevy & Loevy when you -- after you received your subpoena for this deposition?
**A. Yes. The person who answers the phone.**
Q. Okay. Did you speak to any attorneys at Loevy & Loevy?
**A. I spoke to Mr. Loevy who is present with us through Zoom.**
Q. Okay. How many times have you spoken to Mr. Loevy about Carl Reed or Carl Reed's criminal case or his civil case?
**A. Speaking with voice, once, and with emails, a number of times.**
Q. Okay. Let's start with the time that you spoke with him over -- was it over the telephone then or was it over like a Zoom?
**A. Phone call.**
Q. Okay. When did you speak with him?
**A. This morning.**
Q. What did Mr. Loevy tell you about -- what did Mr. Loevy talk to you about?
**A. That you have to answer the questions truthfully, that you only have to answer the questions that you're asked, that there were a**

Page 23

**number of other cases involving Detective Zuley. We didn't get into the specifics, but there were a number of cases alleging misconduct by detective -- former Detective Zuley. I'm not sure if he's still on the force.**
Q. Did he tell you information that you were not otherwise aware of before you talked to him?
**A. No.**
Q. So were you aware through your experience in the public defender's office that there have been other allegations made against Mr. Zuley before that, before John Loevy told that to you?
**A. Yes.**
Q. When did you first become aware that there had been other allegations made against Richard Zuley?
**A. Some time in the '90s.**
Q. Do you remember in what context you learned about other allegations against Richard Zuley?
**A. It was a case -- yes.**
Q. What was that?
**A. It was a case involving a lawyer from my office who tried it, and it was rather notorious at the time because the victim was young and vulnerable**

Page 24

**and quite innocent.**
**She was using a cash station machine, which they were newer back then, and she was accosted and I think kidnapped and killed, and I think Detective Zuley was involved in the apprehension, arrest and interrogation of the person who stood trial.**
**I don't remember the defendant's name. I believe the victim's name was Dana Feitler.**
Q. If I said the name Lee Harris, does that sound familiar to you?
**A. That might be the case.**
Q. Okay. And do you recall that the attorney who was representing the offender, whether it was Lee Harris or someone else, that he looked into Mr. Zuley's background at the time that that case was proceeding through the criminal process?
**A. She did, yes.**
Q. Okay. She did. Who was the attorney?
**A. Andrea Lyon.**
Q. Okay. And what do you remember that she found out back at the time that she was pros -- or that she was defending the person in the Feitler case?
**A. That he had been involved in**

Page 25

**interrogations overseas and had trained people in interrogation methods who were effective in extracting statements from them.**
Q. Do you remember when you learned this information other than generally in the 1990s?
**A. No.**
Q. This would have been some time before you represented Carl Reed, though, correct?
**A. I can't say for sure when the Dana Feitler case occurred or when it was in controversy.**
Q. Ms. Lyon, she was in the murder task force in the Cook County public defender's office, correct?
**A. She was.**
Q. And were you in the murder task force at the same time that she was?
**A. No.**
Q. Okay. Did you later become part of the murder task force?
**A. Yes.**
Q. Okay. When she was representing this individual in relation to the Dana Feitler case, where were you assigned to the office at that time?
**A. I don't recall.**
Q. Do you remember how it was that you came

Page 26

to have a conversation with her about Mr. Zuley in relation to what she was finding out about him?

**A. No. It was just -- I think we just ran into each other.**

Q. Okay. Could you explain to all of us what the murder task force is, if it still exists or what it was back in the 1990s and 2000s?

**A. Okay. It was formed before then. It was formed in the 1970s when there were a lot of constitutional challenges to the death penalty, specifically the ones that came out of Georgia were the ones that were decided by the U.S. Supreme Court, and there was an abeyance, a stopping, of the death penalty nationwide for a while.**

**And then four years later, in 1976, there was a case that the Supreme Court said if you follow certain procedures, the state may have -- may constitutionally have the death penalty.**

**So the public defender's office knew that Illinois was and had been a death penalty state, was in abeyance, could see that the -- they were going to reinstate it and get up running, and so they formed a special division of the most serious -- most serious -- the most experienced attorneys and tried to work on special training because it was**

Page 27

**kind of a new thing at that time to try death penalty cases in compliance with the rules of the United States Supreme Court and save your client's life or not get them sentenced to death or not get them sentenced to death at all.**

Q. Okay. What types of cases did the murder task force take? Obviously murder cases, but were they -- were they all -- did it take all homicides or what was the -- kind of the criteria?

**A. It took most homicides. Yeah. There are some cases when multiple people are charged with homicides and you need to have separate lawyers from separate parts of the office to avoid conflicts of interest.**

Q. Okay. At the time that you were representing Carl Reed, during that time, were you part of the murder task force?

**A. Yes.**

Q. And do you recall as you sit here how long you had -- well, let me ask you this: When did you become a part of the murder task force?

**A. 1998.**

Q. So if the murder task force took the most experienced attorneys in the office, is it fair to say at least by 1989 that you were a fairly

Page 28

experienced public defender?

**A. 1999.**

Q. I'm sorry. 1998.

**A. Yes.**

Q. Okay. How many murder cases approximately had you tried by the time you joined the murder task force in 1998?

**A. I don't remember.**

Q. But can you estimate approximately?

**A. More than 20.**

Q. And other than cases that went to trial, approximately how many murder cases had you handled, meaning through either just the discovery phase or discovery through plea, before you became a member of the murder task force?

**A. I don't remember that either.**

Q. Are you able to estimate once you became part of the murder task force how many murder cases you tried each year?

**A. It varied, so maybe between one and six or more than one a month would be a very rapid pace.**

Q. Okay. Fair to say that by 2005 you were not only an experienced public defender, but you were experienced in trying murder cases or handling murder cases; is that fair to say?

Page 29

**A. Yes.**

Q. Back in the early 2000s, is it fair to say that the Cook County public defender's office handled a large number of murders in general?

**A. Yes.**

Q. And would you agree with the statement that the Cook County public defender's office was more experienced than all or most criminal defense attorneys in Cook County during that time period?

**A. Well, there were a number of people in private practice who had been on the homicide task force, so they would be as experienced as us.**

Q. Fair enough. So excluding the people that -- in general, I mean I say -- I should say including people who were on the homicide task force as -- before they went into private practice, would you say that in general people who went through the homicide task force were the most experienced defense attorneys in handling homicides in Cook County?

**A. Yeah. I wouldn't say that in all cases, but in many cases.**

Q. Okay. Did you consider yourself to be one of those people that was more experienced than most defense attorneys in handling homicide cases by

Page 30

2005?
A. **Yes.**
Q. Was there anything else that you spoke to Mr. Loevy about when you were talking to him this morning?
**A. No.**
Q. You said that you also shared several emails with Mr. Loevy. What was the subject matter of those emails?
**A. The fact that the date that I had been subpoenaed for the deposition was not convenient with my schedule and that I was requesting that it be changed.**
Q. Okay. Were you aware that counsel for the defendants in this case, for the officer defendants, attempted to reach out to you about scheduling your deposition?
**A. No.**
Q. Fair to say that you did not reach out to the individuals who were identified on the subpoena as having requested your deposition here today, correct?
**A. Correct.**
Q. Did Mr. Loevy, in addition to talking about Richard Zuley, tell you anything about -- talk

Page 31

to you about plaintiff's case being vacated?
**A. I don't recall him saying that.**
Q. Okay. Did he tell you anything about Mr. Reed's unsuccessful recent certificate of innocence proceeding?
**A. He did not.**
Q. So he didn't tell you that his certificate of innocence was recently denied by the court?
**A. Did not.**
Q. Were you provided any documents by Mr. Loevy or anyone else to review in preparation for your deposition here today?
**A. I was not provided any documents by him or by anybody else.**
Q. Do you have in your personal possession any of the documents related to the time that you represented Mr. Reed that are specific to his case? I'm not talking about in general.
**A. No.**
Q. Did you ask the public defender's office if they had documents to provide you to help refresh your memory about the case?
**A. I talked to this person named Emily that we've referred to and then I listened to while you**

Page 32

**were off the record about what happened to the public defender file, so I now believe that I was mistaken what I was understanding Emily saying.**
**She was not saying that nobody ever requested Carl Reed's file. It was that it was never produced, and it sounds like it was destroyed as a routine practice by the public defender's office of destroying old files that where there's no appeal pending, there is no reason to save it. It was not going to have a subsequent trial that we would need the information in there, so it's a little complicated for me to say whether she thought I was requesting it.**
**I was calling to find out if there was a procedure that the public defender's office followed in these cases.**
Q. Understood. So basically whether or not you needed counsel or if there was a procedure in terms of who reaches out to counsel --
**A. Right. If they --**
Q. -- those types of things?
**A. -- needed to be notified that this was occurring, if they wanted to be present, that kind of thing.**
Q. Okay. And you were just talking about

Page 33

the office's retention policy. Do you know or basically was it your -- is it your understanding that they don't keep or at least back a certain period of time they didn't always keep files forever?
**A. I don't know what their current retention policy is, but I did -- I was told when I worked there what the policy was, and that's the conclusion I'm drawing from your colloquy that you had off the record.**
Q. You don't have any -- sorry. I didn't mean to cut you off.
**A. Must have been destroyed as part of the retention policy.**
Q. Do you have any personal knowledge as to what happened to this file after Carl Reed plead guilty?
**A. I do not.**
Q. Do you know whether or not Lauren Myerscough ever received a copy of -- Muller ever -- Myerscough-Mueller ever received a copy of the file?
**A. I do not know.**
Q. And is it fair to say or for me to assume you don't know whether or not Loevy & Loevy ever received a copy of the public defender file?

Page 34

**A. That's also fair.**
Q. When was the last time that you saw that file?
**A. I don't know because I don't have any recollection of it, but I don't know.**
Q. Let me go back just a little bit. Just get a little bit of background from you. Where did you go to undergrad?
**A. University of Michigan.**
Q. And what was your major at the University of Michigan?
**A. Economics.**
Q. What were the years that you attended University of Michigan?
**A. 1978 to 1981.**
Q. And then did you go directly into law school?
**A. I worked for a year in Ann Arbor. I worked in the university library system.**
Q. And after that where did you attend law school?
**A. Washington University in St. Louis.**
Q. And so that would have been 1982 to -- did you graduate in 1985?
**A. Yes.**

Page 35

Q. And did you take the bar exam in 1985?
**A. I did.**
Q. Is that the year that you passed?
**A. Yes.**
Q. When did you first start working at the Cook County public defender's office?
**A. I believe it was September of 1986.**
Q. Are you still employed by the Cook County public defender's office or are you now retired?
**A. Retired.**
Q. When did you retire?
**A. June of 2017.**
Q. And congratulations.
How many years were you there before you retired?
**A. So '86 to 2017 I think is 31 years.**
Q. Have you worked anywhere since your retirement from the public defender's office?
**A. No.**
Q. I don't blame you.
When you started at the Cook County public defender's office -- I'm not going to go through all 31 years -- but could you just generally tell me your path until you got -- we get to about 2001 when you would have been representing Carl

Page 36

Reed, so just kind of generally how you moved through the office.
**A. I was placed in the appellate division when I began and I worked there for about two and a half years. I worked in Maywood, which is one of the suburban courthouses. Then I came to 26th Street, and I was in the felony trial division, and I worked there until 2008 when I interviewed and was promoted to the homicide task force.**
Q. And how many years in total did you -- were you a member of the homicide task force?
**A. '98 to -- is that 21 years? From 1998 to 2017. No. It's --**
Q. I think it's about 19 years. My math might be off.
**A. 19 years.**
Q. When you left in June 2017 then, the homicide task force still existed, correct?
**A. Correct.**
Q. And to your knowledge, does it still exist to this day?
**A. Yes.**
Q. While you were in the homicide task force, did you receive training specific to how to handle homicide cases?

Page 37

**A. Yes.**
Q. And did that training occur as kind of part -- partly on the job and also some -- include some formal training?
**A. Yes.**
Q. Can you describe to the best you can the formal training that you received while you were in the homicide task force?
**A. During the time that there was another moratorium on capital punishment, this is the modern era, in the recent part of the modern era in Illinois before we abolished it, the Supreme Court decided to create a capital litigation trial bar, which means to make sure that there were additional credentials that people had to acquire before they could try capital cases, because there was a lot of concern about why innocent people were being sentenced to death row in Illinois.**
**And so we received that training, all of us, and some of us actually provided the training as well as receiving it.**
**We would do parts of the seminar and then we would attend other parts of the seminar both in Chicago and in other places in Illinois.**
**And then I don't recall when, but in --**

Page 38

**since I became a lawyer, there's also been a requirement from the Supreme Court that every lawyer has to do continuing legal education, and I got a lot of that provided through the office.**

**We were sent to seminars on topics that would be directly related to trying criminal cases or just related to trying cases or just related to the law.**

Q. And so when you were discussing these times when you go to -- when you could go to training and sometimes some people would actually do some, put on some of the training and then attend other parts, did that include you, meaning did you also train less experienced or just other public defenders?

**A. Yes.**

Q. And how many times were you involved in training other public defenders in how to handle murder cases?

**A. I don't think I spoke specifically on murders. I spoke just on general trial practice and aspects of that, and probably between five and ten.**

Q. And was training that you taught, did that include any of the discovery process?

**A. I don't think so.**

Page 39

Q. Fair to say that you attended training at different points in time in how to properly work up the -- a case during the discovery process, correct?

**A. Yes.**

Q. Did you also learn from other public defenders about different things that you should do as part of your job to work up a case for trial?

**A. Yes.**

Q. Between 2001 and 2005, on average in a given year how many or at any point in time how many assistant public defenders were in the Cook County public defender's office, if you know?

**A. In the hundreds.**

Q. Did the office also have investigators that were specifically employed within the public defender's office to assist you in investigating murder cases?

**A. Yes.**

Q. And those investigators, did they also work on other types of cases as well as murders?

**A. Generally not at the same time, but yes. They would be in different divisions in the office.**

Q. What are some of the things that as a public defender you could request or have the investigators do on your behalf to help work up the

Page 40

case?

**A. You could ask them to locate individuals and interview them or you could ask them to accompany you when I would go out to locate witnesses and interview them or you could ask them to go to meet with the client or somebody and explain something that had happened in an investigation.**

Q. Back in -- we talked a little bit about Marijane Placek. And just for the record, that's M-a-r-i-j-a-n-e, and last name, P-l-a-c-e-k. Do you recall when you first met Marijane Placek?

**A. No.**

Q. Am I pronouncing it correctly? Sorry. Is it Placek or Placek?

**A. It's Placek.**

Q. Placek. Okay. Do you remember when you met her?

**A. No, I do not.**

Q. Was she someone that was -- had more experience than you did or was she junior to you?

**A. She had more experience.**

Q. Do you know approximately how many years she had been in the office before you got into the office?

Page 41

**A. More than ten.**

Q. Was she someone that you were regular trial partners with or was it -- let me just ask you that question. Were you regular trial partners at any time?

**A. Not regular trial practice -- partners.**

Q. How were murder cases assigned in the office?

**A. The administrator would get word that someone who has been arrested for a murder was coming to bond court. They would have the clerical staff make up a file and then you would get the file, and if you were on trial, somebody else would step up for you at the bond hearing, but basically you get the case very early on the homicide task force.**

Q. I'm familiar with the way the state's attorney's office works where they have first chairs, second chairs and third chairs. Is there a similar structure within the public defender's office or something --

**A. No. The attorneys that are assigned to the courtroom are equals, on equal footing. They are treated as equals and there's nobody who makes the decisions or follows the decisions.**

Page 42

**They could work that out among themselves if they were -- one person was assigned a case and she could say to her partner, I'd like you to do this and this, but not this, and they could agree that person would have a smaller role, but it's the individual's client and -- well, it's the public defender's client, but it's an individual's right to determine that.**

Q. In a case like this one -- and I'll just represent to you that we've seen a number of transcripts that have both your name on it and Ms. Placek's name as both representing Carl Reed. How was that -- was there a common way in which assignments or work on a case would be split up?

**A. I'm not understanding what -- how those two parts of the question relate. You seen both names on the transcript and you want to know how the work was split up?**

Q. I'm just saying I -- that there's two -- there were two of you working the case, so in this particular case, even if you don't have specific memory of it, I have seen that two of you were working the case at the same time, so let me ask you this first question. Was that something that was common, to have more than one public defender

Page 43

assigned to a case at any given time?

**A. Yes.**

Q. Okay. And if there were two public defenders assigned and you said that you were equal, was there a division of labor, like I'll do all the written discovery and you do the investigation or was it -- did you both just work together to work up a case?

**A. Depended on the case.**

Q. Okay. In this particular case, do you remember anything about doing any specific work to prepare Carl Reed's case potentially for trial?

**A. No.**

Q. What are some of the steps that you would take -- well, let me ask you this, a different question.

In the course of getting ready to try a case, you would obtain discovery from the state, correct?

**A. Correct.**

Q. Is it fair to say that in addition to obtaining discovery from the state, you would also conduct your own investigation and try to investigate whether there were any other things that would help you in assisting defense, correct?

Page 44

**A. Correct.**

Q. Were you ever able -- I'm sorry.

Were you ever allowed to view the state's attorney's file to make sure that everything that they gave you was contained in your file that they had in their file?

**A. Are you asking about this case or in any case?**

Q. In general --

**A. Occasionally.**

Q. -- any. And then specifically in this case do you recall if that was done here?

**A. I do not.**

Q. You don't recall one way or the other?

**A. I don't recall one way or the other.**

Q. If the state's attorney office notes in their file for this particular case references that the defense attorney was allowed to go through the entire state's attorney file and copy any missing documents, do you have any reason to doubt that that happened?

**A. No.**

Q. Were there occasions where in addition to the documents you received from the state's attorney office, you would also subpoena additional documents

Page 45

on your own?

**A. In this case or in all cases?**

Q. In all cases.

**A. Yes.**

Q. I'm sorry. I couldn't hear you.

**A. Yes.**

Q. Okay. And do you recall whether you did that here?

**A. No.**

Q. You discussed earlier with your -- about how with your investigators sometimes you would have them track down witnesses and sometimes they would talk to people and sometimes you would go with them, correct?

**A. Correct.**

Q. Would those people that -- those witnesses include on occasion -- and I'm talking about in general -- witnesses that were on the state's witness list, their disclosure?

**A. Yes.**

Q. But would you also look for other witnesses that may assist in the defense?

**A. Yes.**

Q. In this particular case, do you have a recollection one way or the other of what -- of

Page 46

interviewing any witnesses?
**A. No.**
Q. Would it have been your practice to have interviewed key witnesses in the case that you expected the state to call at trial?
**A. No.**
Q. Would you have attempted to interview those witnesses?
**A. I don't recall what I did in this case, but it varies case -- case to case.**
Q. Okay. In general, would you attempt to interview witnesses before they testified at trial?
**A. Depends on the case and the witness.**
Q. In this particular case, is it fair to say you don't know one way or the other if any particular witnesses were willing or unwilling to talk to you, correct?
**A. I don't recall.**
Q. Were there occasions -- and again, I'm asking generally -- when you would conduct an investigation into the veracity of witnesses that you expected the state to call at trial?
**A. They were many occasions.**
Q. Okay. Can you describe some of the steps that you would take to investigate the veracity

Page 47

of -- and, again, in general -- of witnesses that you expected the state to call at trial?
**A. You can subpoena from law enforcement the record of the criminal arrests and convictions. Convictions are often admissible to impeach their credibility. That would be before you even think about whether you want to knock on their door, try to talk to them. You want to find out if they have been convicted of a crime. You want to get all the statements that they made to law enforcement and anybody else, see if there are inconsistencies in those.**
**You're asking the steps that I would take to interview them?**
Q. Just in general, the different things that you in general would do to try to conduct an investigation into the veracity of witnesses.
**A. Yeah. And you want to find -- well, you want to find out their reputation in the community for truthfulness or for untruthfulness. In homicide cases it can be a defense if the person was acting in self-defense. They had to fight for their life, so you want to find out if that person -- this is not really veracity, it's more a habit -- evidence of being a violent person. You want to find out if**

Page 48

**they were violent in the past, if they've attacked people, shot people, stabbed people. Want to know that.**
Q. And you said one of the ways is you would request from the police department basically their rap sheet, correct?
**A. Correct.**
Q. How else would you try to determine their reputation in the community for truthfulness?
**A. You go to the community and you ask around.**
Q. Okay. So those are all steps in any given case that you took in -- depending on whether or not it was appropriate in that case, correct?
**A. Correct.**
Q. And you would make a decision based on your experience as to whether or not the case merited you go out -- you going out and talking to a particular witness; is that fair to say?
**A. Yes.**
Q. Would one of the other things -- well, let me ask you this: What else would you do in general to prepare for trial other than looking into the veracity of witnesses and reviewing documents received from the state's attorney's office? What

Page 49

are some of the general steps that you would take?
**A. It's best to think about what you want to say to the trier of fact to persuade them. It's best to think about your closing argument first and then go backwards and think about what law you would need to support that, what jury instructions you would need based on that law, what evidence you would need based on those jury instructions and the law and what you want to present to the jury, and that involves going out and finding witnesses and thinking about how you want to cross-examine witnesses who contradict your theory of what happened.**
Q. Okay. Is one of the things that you would do in the course of that would be to talk to your own client, correct?
**A. Correct.**
Q. The fact that a particular client was incarcerated in the Cook County jail, would that prevent you from talking to them?
**A. No.**
Q. Is that step of talking to your client, is that something that you did in every single case at some point in time during your preparation?
**A. Yes.**

Page 50

Q. And, in fact, would you rely on certain things that they said to assist you in perhaps coming up with a defense or locating witnesses?
**A. Sometimes.**
Q. How would you go about talking to a client who was in the Cook County jail, say, between the years 2001 and 2005? What steps would you have to take?
**A. Well, to save a little time, to make sure they haven't been moved to a different division since the last time you talked to them, you should check on the list.**
**And I believe at that time the list was like a big printout, came every couple of days, and it said in alphabetical order everybody that they held, and you look up the inmate number and go down the row and see which division they're in.**
Q. Are you able to estimate approximately how often or how frequently you would talk to your clients in preparation of their cases, say, in a murder case?
**A. It depended on the case and the client.**
Q. Were there times when clients would refuse to talk to you?
**A. Yes.**

Page 51

Q. In this particular case, do you recall ever having meetings with Carl Reed in the Cook County jail?
**A. I do not.**
Q. Okay. Do you have any reason to believe that you never met with him?
**A. No, I have no reason to believe that.**
Q. Okay. In fact, do you believe that you did meet with Carl Reed?
**A. I have no recollection of it, but I believe I did.**
Q. Okay. Because that was part of your regular practice, correct?
**A. Yes.**
Q. You mentioned earlier that one of the specific recollections you had in this case is going to what you believe was a family member's home, correct?
**A. Yes.**
Q. Do you know where you received the information about who it was that he was related to that led you to that family member's home?
**A. No.**
Q. That information could have come from Carl Reed, correct?

Page 52

**A. Correct.**
Q. Do you remember who it was you met with out of Carl Reed's family?
**A. The matriarch whom I believe was his mother, and I think that the other people there were one or two generations below her.**
**I believe that there were at least two people who would have been nieces to Carl, and I think there were sisters there as well, and there were some males, but I don't recall how many.**
Q. What if -- what do you recall about his mother?
**A. She was beloved by that group of people. She was deferred to. I was treated with respect because I deferred to her too.**
**She was someone who handled grief and pain by also remembering something good about that family member.**
**I think we were discussing how Carl had been beaten by a bat when he was walking home from school and had endured all the head trauma.**
**I was interested in the head trauma of course, but you can't just go to somebody's house and say tell me all about the head trauma. And she would say oh, yes. That was a sad day, and she**

Page 53

**would look at the pictures on the mantel, and she would say, but he had such a nice smile and he has a smile just like, you know, and she would refer to another relative, so she had always a way of bringing it around to family, so I remember that about the meeting.**
Q. And just based on what you said, is it fair to say one of the other things you remember about Carl Reed is that at some point in time he received a head injury?
**A. Correct.**
Q. What do you remember knowing about his head injury in terms of how he received it and what resulted?
**A. I picture it as he was walking home from school or from being dropped off on the bu's stop. I don't know if Chicago did that then, but that was what I was picturing in my mind. Going to that house where I had met the mother and fed upon by a group of people, and I don't know the motive or anything like that, but he was beaten with an object, which I think was like a stick or a baseball bath, beaten unconscious and had to have medical treatment for that.**
Q. Did you believe that at least perhaps

Page 54

this head injury might be something that might be useful in your defense of Carl Reed?

**A. Yes.**

Q. And in what way was that, did you think that it might be useful?

**A. Well, it can be mitigating and it can lead to mitigation.**

Q. Can you describe that a little bit more? So when you say it can be mitigating, in what ways can it be mitigating?

**A. Someone who was always peaceful and obedient and law abiding until an episode where they were attacked and sustained head injury and then became volatile and violent, it is arguable they are not in complete control or they are not in as much control of their behavior as you and I would be not having sustained a head injury, if that is indeed true.**

**I don't know that it was true in this case because I don't have any memory of that, but also if the person has a prolonged period of being unproductive, not working, that tends to explain they are not lazy. They're not just looking to get by in a criminal element. They're not just, you know, out standing on a corner selling drugs to --**

Page 55

**in front of the neighborhood children.**

**They're somebody who can't work because they were so badly victimized and they barely survived, so it can be mitigating in that way as well.**

Q. And you said you don't remember as you sit here whether or not that was something that for -- the impulse control portion of it, whether that was something that you learned in relation to Carl Reed. Did I hear you correctly?

**A. Right.**

Q. Okay. If you had learned, for instance, that he had impulse control problems, would that have been a possible defense that you could have utilized in his case?

**A. Probably not a defense. Probably would only have been relevant in the sentencing.**

Q. Okay. Are there other things about Carl's background that stand out to you other than the fact that he had this head injury?

**A. You mean as I sit here now, what I know from having talked to various people, are there things that stand out to me about the case?**

Q. Well, I guess that's a good question from you.

Page 56

So my question was really asking you about what you knew at the time, so let me just kind of make sure that we're kind of working from a clearer field here.

Are there things that you have learned more recently from talking to other people including his other attorneys that you didn't specifically remember knowing at the time?

**A. I don't recall having heard what his IQ score was and I've heard that recently and it was very low. It was several standard deviations below the norm, and it was in the range that would clearly make him ineligible for the death penalty.**

**That may be why Mr. Canellis, if he did indeed decide not to seek death, was doing it. Maybe we gave him records on Carl's IQ. I don't know.**

Q. You don't recall one way or the other?

**A. No.**

Q. Okay. If, for instance, you were aware that Carl Reed had a low enough IQ that it would make him ineligible for the death penalty, that would be something that as an experienced public defender, you would have pursued and presented, correct?

Page 57

**A. Correct.**

Q. Did you -- do you recall in this case whether or not you had Carl medically examined by anyone?

**A. I don't recall that.**

Q. Okay. What does it mean for someone to be fit for trial?

**A. In most cases you're talking about their mental capacity and you're talking about whether they understand the nature of the proceedings, can assist counsel and understand their options, that they can plead not guilty, assert their innocence, be defended, have counsel in their defense, have a trial in which the witnesses are compelled to appear and that they have to appear in person, that they have a right to have counsel cross-examine them in open court, so somebody who is not laboring under the misapprehension about who the people are in the courtroom and not -- is not unable to understand how proceedings would go.**

Q. In your experience, can someone be fit for trial, meaning they understand the proceedings and they are able to assist in their defense and they are able to make decisions about their defense but yet still have a low IQ? Excuse me. I'm sorry.

Page 58

**A. Yes.**
Q. If at any point in time you believed that there was even a chance that Carl Reed was unfit for trial, are there certain steps that you would take to make sure that he was, in fact, fit and able to appreciate the charges and participate in his defense?
MR. LOEVY: Let me object. It's not clear at what stage of the proceeding.
But you can answer, Ms. McBeth. I just raise the objections because there's no judge and then you get to answer.
MS. EKL: And just to address that objection, I would say any stage in the criminal proceedings from when you first get the case until either trial or plea.
**THE WITNESS: Yes.**
BY MS. EKL:
Q. And what are those steps that you could take?
**A. You could ask the Court to sign an order that the forensic clinical services doctors examine your client on the question of fitness to stand trial or on the question of fitness and other mental capacity questions.**

Page 59

Q. And would you take that step of asking the Court to have someone from forensic services look at your client if you were in your experience in talking to them believed that it's possible that they were unfit?
**A. I think I would ask the office to retain a private doctor to do it instead.**
Q. Okay. Were -- so were there occasions when you would have a private doctor review clients to ensure that they were fit for trial?
**A. Yes.**
Q. Okay. In this case do you recall whether or not you did that with -- in regard to Carl Reed?
**A. I don't.**
Q. Do you recall rendering -- or I'm sorry.
Do you recall having an opinion one way or the other as to whether or not he was fit for trial?
**A. I don't.**
Q. I'm going to show you another exhibit. Give me one second here.
MS. EKL: Did I mark the motion to suppress Exhibit No. 2, does anyone know?
MR. LOEVY: I thought your last exhibit was 3, Beth. Oh, but that might not have been your last

Page 60

exhibit.
MS. EKL: Actually, I think the last one was the change of plea. I'm sorry. I should be keeping track of this. I'm not. Just trying to find a page number. Hold on.
So just so that it's clear for the record, it's BS Reed 5663 through 5679.
BY MS. EKL:
Q. Showing you, again, the transcript from December 5 of 2005, I think this was Exhibit No. 2, which was from the change of plea, I'm going to take you down to page 11 looking at the numbers at the bottom in the middle.
**A. Yes, I see the numbers.**
Q. Okay. First, do you see where you speak starting on line 11?
**A. Yes.**
Q. And you specifically state there's quite a bit of mitigation on Mr. Reed's life, correct?
**A. That's what the transcript reflects.**
Q. Okay. Looking down at the end of page -- line 15 and the beginning of 16, do you see where you say: He has had -- and this might be a typo, but he has had any reading difficulties throughout his life since a child and has had head injuries

Page 61

which caused additional mental problems for him. Do you see that?
**A. He says he has had reading difficulties, yes, but otherwise, I see the part that you recited.**
Q. Okay. Do you recall as you sit here today what you meant by stating that Carl Reed has had reading difficulties?
**A. I don't.**
Q. What does that mean to you reading that that he has had reading difficulties?
**A. It means a number of things. I'm not sure what it meant in this context.**
Q. And if it helps you to take a minute to read more, let me know. I can, you know, give you whatever time you need.
**A. All right. Can we continue to page 12.**
Q. Sure.
MS. ITCHHAPORIA: Real quick for the record, Beth, I think Exhibit 2 was the transcript from October 2005, so this would be 3.
MS. EKL: Okay. Let me -- thank you for that.
**THE WITNESS: All right. So the question is what does it mean to say he had difficulty reading in this context?**

Page 62

BY MS. EKL:
Q. Right. What did you mean by that?
**A. I think it means that the head injury problems persisted throughout his life, but I -- am I getting the order correct? There was a head injury and then the reading problems?**
Q. Well, I can't answer for you, but I guess what I am getting at -- let me ask you a more specific question. Do you see a difference between using the terminology that he has reading difficulties versus someone who is illiterate or is unable to read? Is there a difference to you in those two things?
**A. Reading difficulties is a bigger circle. It includes people who can't read.**
Q. Okay. Do you recall as you sit here today whether or not Carl Reed was able to read but just was slow in reading or if he could not read at all?
**A. I do not.**
Q. If it was your understanding and belief back in 2005 that Carl Reed had no ability to read, would that have impacted the way in which you defended the case?
**A. I don't remember the year in which the**

Page 63

**case came down from the United States Supreme Court that said we will not allow executions of people who are -- who have mental retardation. Call them people with mental retardation now, but the definition of that is an IQ score below -- I think it was 70 and deficits in adaptive functioning in at least two areas and onset after the age of 18, so reading difficulties or not being able to read would be a deficit in adaptive functioning and area.**
**You can live a good life without reading, but it does cause problems in the modern world to not be able to read, so you could -- I argue that it's a deficit.**
**If this case was -- if Mr. Reed's case was proceeding before that ruling, and I would not have known that Supreme Court was going to rule that when they did. If it happened after that, I would have known the rule, and it would have been, you know, something where I could file a motion to bar the death penalty on the basis of that.**
Q. And that would be in regard to the death penalty. Was there any way in which it would impact your defense of his case in relation to his confession, for instance?
**A. Yes. I mean, if you go to trial and the**

Page 64

**person can't read and they signed a written confession, there's something fishy going on because why is the state's attorney saying she read it out loud to him and he read along and initialed wherever she made a correction. What's going on there?**
Q. Do you recall as you sit here today that that was the testimony that was given by the state's attorney in relation --
**A. No, I don't recall that specifically from this case, but that's what they always say in the handwritten cases.**
Q. Okay. Certainly you were aware based on this transcript that he had an IQ level of 65, correct?
**A. Well, this transcript reflects me saying that, so if the transcript is accurate, then I said that.**
Q. Okay.
**A. I don't have any recollection of saying that.**
Q. I think I got myself a little off track here.
Going back to investigating cases in general -- or actually, let me ask you this: In terms of Carl Reed specifically, you mentioned that

Page 65

you have a recollection of persons other than his mother being present for that meeting. Do you remember that -- anything that any of other individuals said in the course of that meeting about Carl other than his -- what you talked about with his mother?
**A. One of the nieces turned to me and she said you're nice or you're very nice. I wish I could interpret it is that I was treating the grandmother kindly and not rushing her and not taking over the floor, letting her hold court in her own house.**
Q. Okay. Basically you were listening to her, correct?
**A. That's what I interpreted that person to be saying.**
Q. Okay. Do you remember as you sit here anything about any jobs that Carl had?
**A. Well, you just recited that I put into the record that he worked somewhere, was well liked by his co -- other people that worked there.**
Q. Other than what you just read in that transcript, do you have any independent recollection of anything about where Carl worked?
**A. I do not.**

Page 66

Q. And did that help refresh your memory about anything?
**A. It did not.**
Q. Okay. Do you have any recollection about Carl's relationship with family members other than again what you said about the comments made by his mother, anything else that you recall about his relationship with any of his family members?
**A. I think that -- I think that he was not living in that home in which I visited the mother at the time of the homicide in this case or the time he was arrested. I think he was living on his own in some sort of a low income housing situation, maybe with some structure and assistance, and I think that the family was -- had been pleased that he was able to find a place to be on his own as an adult, and I think they were pretty devastated when he was arrested.**
Q. Do you have any recollection of any knowledge about his familiarity with the victim, Mr. Van Vo?
**A. I do not.**
Q. Did you ever become aware of any alibi that Carl Reed possessed in relation to the murder of Mr. Van Vo?

Page 67

**A. I don't recall.**
MR. LOEVY: Let me just insert an objection belatedly. I mean, there's no foundation that she was asked or that it came up or that she remembers anything about such conversation.
BY MS. EKL:
Q. Okay. And I'm not asking about a conversation. I just was asking in general.
Before I ask any more questions, I just noticed that it's 11:53. Do you need to take a break? Want to take five minutes or do you want to take longer?
**A. Can you ask your other co-counsel how much they have?**
Q. Sure.
MS. EKL: Counsel --
MR. LOEVY: Are we getting to the end?
MS. EKL: Fairly close. I mean, I probably have another 20 minutes. I think I probably have knocked through most of what I have, you know. I'll take five minutes to look at whatever I asked, which is not -- I don't normally follow the outline, so I've probably asked most of it.
**THE WITNESS: What about the other interrogators, how much do they have?**

Page 68

MR. LOEVY: They are not interrogators or you would have to confess, but...
MS. ITCHHAPORIA: I should -- I'll have a little bit of follow up, but not very long.
**THE WITNESS: All right. I --**
MS. EKL: How about you, John, how much do you have?
MR. LOEVY: Less than 2 minutes based on what's happened so far.
**THE WITNESS: And no judge to hold you to it.**
MR. LOEVY: What happened to Terrie? There she is.
MS. SULLIVAN: I probably need a few minutes.
MS. EKL: Okay. Probably we are talking we'll wrap up within the hour.
**THE WITNESS: I will leave it to the court reporter then if we take a break.**
MS. EKL: Let's take five minutes anyway. That way I can clean up my -- and streamline what I have left.
Let's take five minutes and then we'll -- and then as long as no one wants any -- if we want something longer, we can always decide that in the next hour if for some reason we go off track. Sound good?

Page 69

MR. LOEVY: Yeah. That sounds good for me.
MS. EKL: All right.
THE VIDEOGRAPHER: We're going off the record at 11:55 a.m.
(A recess was had.)
THE VIDEOGRAPHER: We are back on the record at 12:04 p.m.
BY MS. EKL:
Q. As you sit here today, do you have any specific recollection of any conversations you had with Carl Reed?
**A. No.**
Q. So do you recall one way or the other -- and I apologize if I asked you this -- whether or not you discussed if he had an alibi for the night or the day of Mr. Van Vo's murder?
**A. I don't recall.**
Q. Kind of going back to the questions about things you would do to prepare a case in general, is one of the routine things you would do, not just in murder cases but in all cases, is to file appropriate pretrial motions?
**A. Yes.**
Q. And if an individual had confessed to murder, was it pretty routine that you file a motion

Page 70

to suppress statements?
**A. No.**
Q. It wasn't routine?
**A. No.**
Q. How did you determine if you were going to file a motion to suppress statements or not?
**A. You have to have grounds to file a statement.**
Q. Okay. And where did those grounds come from?
**A. Mostly they come from the United States Supreme Court.**
Q. I guess what I'm getting at, in a particular case, is that based on a conversation with your client?
**A. That would be one of the factors.**
Q. Okay. So, for instance, the United States Supreme Court says that individuals have to be read their Miranda rights before they're accused of a crime, correct? And I'm summarizing obviously.
**A. Well, it's more than read them. They have to hear them and understand them and knowingly and intelligently waive them.**
Q. Correct. And so if in talking to your client, you had any reason to believe that one of

Page 71

those factors wasn't present, then that might be a basis to file a motion, correct?
**A. Correct.**
Q. Okay. Do you remember filing a motion to suppress in the situation involving Carl Reed?
**A. I do not recall that.**
Q. Even though you don't recall it, do you have any reason to believe that you would not have included any possible legitimate basis that you became aware of in your motion while you were -- when you were trying to get the statement suppressed?
**A. Recitation of facts in mitigation that you read, that transcript says that I said, I said that Mr. Peterson discovered that school records were missing, so that would be a case in which -- missing or destroyed -- that would be a case in which I would not have presented that to the Court because the records have been destroyed.**
Q. You would not have presented what?
**A. School records to establish his low IQ that -- to further the inference that he could not waive his Miranda rights.**
Q. Got it. But you would have presented any other evidence that you became aware of that

Page 72

supported that theory, correct?
**A. I had to present enough evidence to win the motion. It's a tactical decision what you would save for trial.**
Q. Fair enough. Is it fair to say that as an assistant public defender, you had the ability to ask for additional forensic testing in a murder case other than just what was done by the police?
**A. Correct.**
Q. So based on your experience, if tactically or if you believed that in your professional judgment the case merited it, for instance, you could ask for, say, additional fingerprint testing?
**A. Yes.**
Q. You could ask for other types of forensic testing to be conducted as well, correct?
**A. What you're confined to by the time somebody gets to court and they get an attorney to represent them, you're confined to having your expert, if you have an expert in fingerprints, examine the prints that were taken and see if they come to the same conclusion that the state's expert comes to.**
**You don't really have the opportunity to**

Page 73

**gather more prints because the crime scene would be back to being just a place that people go through that didn't know there was a crime there, so it would not be intact for the purposes of taking samples.**
Q. Another example would be, for instance, back in 2011 DNA existed at that time, correct?
**A. It's existed for a long time. You mean the testing? Yes.**
Q. Yes. So that's another type of forensic testing that if you felt it was appropriate given the standards that were available at that time you could have sought forensic DNA testing, correct?
**A. That would have been dependent on whether the state analysts -- excuse me -- consumed the whole sample when they did the test.**
**If they consumed the sample, all you could do is read their lab notes and see if their methodology comports with what the standard is in the field. Can't actually do your own independent DNA testing if all the DNA is gone.**
Q. And if it's not gone, that's another possible avenue of investigation that you could pursue, correct?
**A. Correct.**

Page 74

Q. Do you recall one way or the other if you pursued any type of forensic testing in Carl Reed's case?
**A. I don't.**
Q. Do you agree that you had a duty as a public defender to conduct a reasonable investigation, interview witnesses and develop a defense?
**A. Yes.**
Q. Do you believe that you did that in relation to Carl Reed?
**A. I have no memory of what I did with respect to that question, but I believe that I would have.**
Q. Do you have any reason to believe that you wouldn't have conducted a reasonable investigation?
**A. No.**
Q. Do you have any reason to believe that you would not have interviewed witnesses?
**A. That's a tactical decision, and I don't recall what tactical considerations we had or what tactical decisions I made.**
Q. If you didn't interview witnesses, is it fair to say that that would have been a tactical

Page 75

decision?
**A. That's one. Possibility could be that they can't be located. It could be they're located and decline to answer questions.**
Q. Do you agree with plaintiff's claim, meaning Carl Reed's claim, in his post conviction, that you conducted no investigation?
**A. I have no memory of the investigation.**
Q. Do you think it's possible that you conducted no investigation in a murder case that started out as a death penalty case?
**A. No.**
Q. Do you agree with Carl Reed's allegation in his post-conviction petition that you failed to develop any defense?
**A. No.**
Q. Are you aware that Carl Reed through his counsel claimed that you did not prepare for the motion to suppress hearing?
**A. No.**
Q. Do you think that that's an accurate statement, that you did not prepare for the motion to suppress hearing?
**A. No.**
Q. Other than the head injury that we talked

Page 76

about earlier, are you aware of any other medical condition that Carl suffered back in 2001?
MR. LOEVY: Let me just raise a foundation objection because she said she doesn't remember, but...
MS. EKL: That's the question. I'm just asking if she recalls.
**THE WITNESS: From you reading that portion of the transcript, I asserted in court that he is a person with mental retardation, at least I intimated that by reciting his IQ score. You need onset before age 18 and you need deficits in adaptive functioning in two areas, but I think we could have established that, of the fact that he couldn't read.**
BY MS. EKL:
Q. Do you recall having any information about Carl Reed being a diabetic?
**A. You read that into the record. You read me reading that into the record a few minutes ago.**
Q. You're referring to the change of plea transcript you saw where that was referenced?
**A. Correct.**
Q. Okay. And so from reading the transcript, does that refresh your recollection that at least that was something that was known, that he

Page 77

was diabetic back in 2001?
**A. No, it doesn't refresh my recollection.**
Q. Okay. If you were aware that he was either suffering from diabetic shock or had diabetes that somehow caused him to falsely confess, is that something that you would have expected that you would have presented at his motion to suppress?
**A. I don't know.**
Q. Well, if the diabetes -- if he suffered from diabetes that caused him to be unable to knowingly understand Miranda or waive Miranda, is that something that you would expect that you would have presented at the motion to suppress?
**A. It depends on --**
MR. LOEVY: It -- I'm sorry. I'm going to assert an objection. Asked and answered because it was the same question.
But you can continue to answer. Sorry.
**THE WITNESS: It depends on what else you have. It's kind of a tactical decision what to present in the motion and what to save for trial.**
BY MS. EKL:
Q. Do you remember as you sit here today what -- and you might have already seen it in one of the transcripts I showed, but what sentencing

parameters Carl Reed was facing at the time of his plea?
**A. I can't tell because you didn't read me those pages, but it depends if he plead just to the murder or if he plead to the felony.**
**The felony sometimes would require consecutive sentencing, and they carry their own range of sentencing.**
**Murder at that time was generally 20 to 60. Can be extended to 100 years in prison for 12 or 15 aggravating factors in the statute. I can't think if any of them applied here.**
**The decedent in this case was killed in his home under -- they may have charged home invasion on this, which would be 6 to 30 years in the penitentiary consecutive, so the answer is I don't recall what the sentencing range is. It depends on a lot of factors that I've forgotten.**
Q. Okay. That's fair.
Would you agree that the judge had a duty at the time of the plea agreement to accurately advise Carl Reed of what the sentencing parameters were?
**A. Yes, she did.**
Q. And if you were standing there listening



to the plea as an experienced public defender and you heard her relay a sentencing parameter that was incorrect, would you have had a duty to speak up and say something to the Court?
**A. Yes.**
Q. I'm going to show you again what we marked as Exhibit No. 3, which is the transcript from the plea from -- transcript from the plea. This is going to be page 3 on to page 4. If you could take a minute to read and let me know when I should scroll, starting at page -- I'm sorry, starting at page 3 on line 16 on to the next page until we get to line 6 and let me know -- actually, I can probably put them both up at the same time. Let me know when you have had a chance to read that to yourself.
**A. 20 to 60. Okay. So I'm down to the next -- uh-huh. Yes. Okay.**
Q. So based on this transcript and the manner in which the Court admonished Carl before his -- before his plea of guilty, does this refresh your recollection as to what sentencing parameters he was looking at?
**A. It doesn't, but this is the part that says where the judge says the sentencing parameters.**



Q. Okay. And what were the parameters that the Court read to Carl Reed?
**A. According to this transcript, it's between 20 years, but no more than 60 years.**
Q. Do you have a recollection of urging Carl Reed to plead guilty in this case?
**A. I do not.**
Q. Is that something that you think is an accurate statement, that you urged Carl Reed to plead guilty?
**A. I don't recall.**
Q. Based on the earlier statement or the earlier transcript reflecting that the death penalty was off the table, would it be fair to say you did not encourage him to plead guilty to avoid death?
**A. After the death penalty was off the table, I would not have encouraged him to avoid -- to plead guilty in order to avoid the death penalty because the death penalty was off the table at that time.**
Q. I'm going to look at page 7 of the same transcript. I'm sorry. Bottom of page 6, starting at line 18 on to -- going through page 8, and I'll just represent to you that the state presented to the Court a factual basis for the plea. Is that



something that in your experience was required and routine whenever someone plead guilty, that the state would present facts that they believed they would be able to present at trial in support of a factual basis for the charge that was being plead to?
**A. Yes. You want me to read this?**
Q. Yeah. Well, you know, actually, never mind. I'll just strike what I was -- or not ask you the next question I was going to ask you.
On page 9, I'm scrolling down to that page. The Court found that the plea was knowing, voluntary and intelligent. We talked a little bit about that before. This is at the bottom of page 9 where it says at line -- starting at line 19: I find you are represented by your attorneys in open court today. I find that you understand that you are charged with -- what you were charged with and the possible penalties for your offense. I also find that you knowingly, voluntarily and intelligently are pleading guilty. Do you see where that -- where it says that? This is line 19 through line 24.
**A. Yes.**
Q. Okay. Do you have any reason to believe

Page 82

that Carl Reed's plea was not knowing?
MR. LOEVY: Objection, foundation. Foundation being specifically you are asking a witness who said she has no memory of it.
BY MS. EKL:
Q. Do you have any reason to believe that Carl Reed's statement or Carl Reed's plea was not provided knowingly?
MR. LOEVY: Same objection.
**THE WITNESS: Am I supposed to answer that?**
BY MS. EKL:
Q. Yes.
**A. Yeah, I do, because the Court -- I don't know if it was the judge or the state's attorney vacated this and dismissed it after he got clemency from the governor.**
Q. So your opinion today is based on things that you were told by either Mr. Loevy or by Lauren Myerscough, correct?
**A. Yeah, I mean, I think they had more information today or the day that they made those decisions than I had and that Judge Laws had on the day of this plea.**
Q. Do you know why Carl Reed's case was vacated?

Page 83

**A. I thought there was more evidence of his low IQ and that there were changes in the science of the DNA testing and they found more evidence.**
Q. You don't know one way or the other. You are guessing, correct?
**A. No. I'm reciting what I remember hearing.**
Q. Okay. Are you aware of cases where under the administration of Kim Fox they were dismissed without the Court being presented with any additional evidence that was based on the agreement of the state's attorney's office?
**A. Yes, the prosecuting body.**
Q. Okay. Do you know whether this is one of those cases?
**A. I don't.**
Q. Would that change your opinion if you learned that Kim Fox agreed to release Carl Reed, but that there had been no actual finding that he had not unknowingly plead guilty?
MR. LOEVY: I object. Of course, there was no finding. It was a pre-adjudication.
MS. EKL: Now your objection is improper. If you object to the form, that's fine.
MR. LOEVY: Let me object. I don't understand

Page 84

the question. It doesn't make any sense.
But you can answer.
**THE WITNESS: The question is does it make a difference to me that Kim Fox was the prosecutor?**
BY MS. EKL:
Q. That if you learned that Kim Fox just agreed to dismiss the charges without there being any kind of hearing by a Court to determine that Carl Reed had not knowingly, voluntarily, intelligently plead guilty, does that change your opinion as to whether or not his plea was, in fact, knowingly, voluntarily and intelligently made?
**A. Doesn't change my opinion.**
Q. Okay. Do you believe that at the time of his -- Carl's plea in 2005 that he was pressured by anyone into pleading guilty?
MR. LOEVY: Objection, foundation, lack of memory.
After I object, you can answer, Ms. McBeth.
**THE WITNESS: I don't believe that I or Ms. Placek pressured him. I feel -- I now wonder if he was pressured, and I didn't understand the limitations he was operating under and that I didn't recognize that that's what was happening.**

Page 85

BY MS. EKL:
Q. And your questioning of whether or not he was pressured, is that all coming from information that you were provided by Mr. Loevy?
**A. Or Ms. Myerscough-Mueller.**
Q. Okay. Do you believe that Carl Reed understood that when he plead guilty, it was going to cause him to serve a term of years in the Department of Corrections?
**A. I can't say. I can't say what he understood at the time.**
Q. At the time that he plead guilty, when you were in court with him and you were representing him as an experienced public defender, at that time did you believe that he understood his plea?
**A. I don't have any memory.**
MR. LOEVY: Same -- I was going to object to foundation. Sorry I interrupted you.
BY MS. EKL:
Q. Can you ever think of a circumstance where you've allowed one of your clients to plead guilty without saying something where you didn't think they understood what they were pleading to?
**A. No, no.**
Q. If you made a representation to the Court

Page 86

that your client was fit for trial, what does that mean, if you're making that representation?

**A. In -- I don't know what I meant in this case, if I said it in this case. What that would suggest to me in general is the judge -- if this is an agreed sentence, the state is recommending 27 and we are acknowledging that the client is willing to plead guilty in exchange for that recommendation, we want the judge to go along with it and not sentence him higher.**

**She can go up to 60, even on the promise that the state, that they're recommending 27, and so we would want to say this is all laid out for you, Judge. There's nothing you have to worry about. You don't have to worry about anyone coming back and saying he wasn't fit when this happened. We've already addressed all of that, anything like that that's been addressed, and so to keep it calm, to keep it more likely that the judge will go along with the recommendation, I think that would be the reason to put that in there.**

Q. Do you remember what the recommendation was of the state in this particular case?

**A. I'm assuming it was 27. It doesn't say. You have the transcript. I haven't seen the**

Page 87

**transcript, so I don't know what they say.**

Q. Let's take a look at the transcript. And I apologize. I'm going to have to flip for a second because I don't remember exactly where it is, so I believe -- hold on. Yeah.

Starting at the bottom of page 12, line 21 on to the top of page 13, line 3, you could read first from Mr. Weiner's statement to the Court to yourself, and then let me know if that refreshes your recollection as to the state's recommendation in relation to Carl Reed's sentence.

**A. This is -- I read it and it does -- this is an example of why I shouldn't be guessing or surmising why I was doing something 20 years ago because the -- this part of the transcript is contradicting what I just said.**

**It looks like, if this transcript is correct, it was a blind plea, meaning the state was recommending something in the range between 28 and 60. They weren't recommending anything. We were asking for 26 or 27, and then the judge landed on 27.**

Q. What does it mean to have a blind plea?

**A. The person who is blind is going in blind -- well, everybody is going in blind, except**

Page 88

**for the judge who knows what she's going to do.**

**Presumably she's keeping an open mind for what she hears, doesn't decide until after that, but it means that he would not be entitled to file a motion to vacant the plea, to take it back, to say I want to plead not guilty, I want a trial simply because it's more time than he thought he was going to get. He's getting something in that range.**

**If he gets outside of that range, it's not fair because he wasn't told about it, but if he gets 60 years, too bad for him. That's not -- I had no memory of what happened, but that's not what I was surmising happened. I assumed that the state was recommending 27.**

Q. So based on reading this, what does it tell you about what the state was recommending?

**A. Between 20 and 60 years.**

Q. And specifically looking at lines 1 through 3 on page 13 -- and I'll read it out loud. It says the range is 20 to 60 years. This is Mr. Weiner, and it is a blind plea and we are asking for a high end sentence within that range. Correct?

**A. That's what the transcript reflects.**

Q. Okay. So the state was asking for something on the high end, which would be closer to

Page 89

60 years than 20 years, correct?

**A. Correct.**

Q. And Ms. Placek on Carl Reed's behalf recommended 26 to 27 years; is that fair?

**A. I don't know if it's fair, but that's what the transcript reflects.**

Q. Okay. And just to make sure that we're all on the page, there was -- based on reading this transcript, at least, there was no agreement at all as to where -- what Carl's sentence would be within the applicable sentencing range of 20 to 60, correct?

**A. This transcript reflects that it was a blind plea and that the minimum he could get would be 20. The maximum he could get would be 60.**

Q. Okay. Do you recall as you sit here what criminal convictions Carl Reed had at the time of his sentencing for this murder case?

**A. I do not.**

Q. I'm going to show you the same transcript at page 11, and this is directing your attention to line 4 through line 8, which would be the aggravation portion provided by Mr. Weiner on behalf of the state. Do you see where he advises the Court of prior criminal convictions by Carl Reed?

**A. Yes.**
Q. And Mr. Weiner, would you agree with me, told the Court that Carl Reed had been convicted of possession of a controlled substance in 1999, possession of a controlled substance in 1984, possession of a stolen motor vehicle in 1983 and had a burglary conviction from 1979. That's what Mr. Weiner advised the Court, correct?
**A. At that place in the transcript, yes.**
Q. Okay. And do you have any recollection of those being the convictions that Carl Reed had before this date in 2005?
**A. When I talked to that woman named Emily who takes care of records request at the public defender's office, I learned there was a possession of a drug substance case that Mr. Reed had that our office represented him on. I didn't know it was a conviction, but I knew about that charge.**
Q. Okay. And the charge that you are talking about could be another charge that isn't even listed here on -- by Mr. Weiner, correct? That might be something that was pending; is that fair?
**A. I'm not going to speculate because I've been getting stuff wrong and speculating when you show me the transcript, so I don't know.**



Q. Okay. Given the fact that you were present when this statement was made, if Mr. Weiner had inaccurately set forth Carl Reed's prior criminal convictions, would you have had a duty as his attorney to speak up and correct the record?
**A. I would have a duty as an officer of the court. It's against the client's interest sometimes to add one in that they have missed, but it's a duty of the profession.**
Q. Fair enough. So you would have had a duty to advise the Court if there was an additional one that was left out, as well as if they had misstated and added one that you believed was inaccurate, correct?
**A. Correct.**
Q. Do you have any reason to believe as you sit here today that Carl Reed was framed for any of those convictions?
MR. LOEVY: Objection to foundation.
**THE WITNESS: I have no knowledge.**
BY MS. EKL:
Q. Do you believe as you sit here today when you represented Carl Reed back in approximately 2001 to 2005 as an experienced Cook County public defender that you represented him to the best of



your ability?
**A. Do I believe that?**
Q. Yes.
**A. Yes.**
MS. EKL: Okay. I don't have anything further.
MR. LOEVY: Misha.
MS. ITCHHAPORIA: Yes. I just have a few follow-up questions --
MS. EKL: Oh, here. Let me take this down sorry.
MS. ITCHHAPORIA: -- based on that.
**THE WITNESS: Ma'am, could I see your screen? I'm kind of a lip reader.**
MS. ITCHHAPORIA: Yeah. Can you not see me? Can you see me now?
**THE WITNESS: No. I have got John Loevy, Elizabeth Ekl, attorney Terrie Sullivan, Renee Brass, Rob Jacques.**
MS. ITCHHAPORIA: John, can you see me on your screen or Terrie?
MR. LOEVY: I can.
**THE WITNESS: Found you. You're at the bottom.**
MS. ITCHHAPORIA: There I am. Okay. All



right.

EXAMINATION

BY MS. ITCHHAPORIA:
Q. Earlier you testified when you were asked some questions about what years did you represent Carl Reed, you said you looked it up or you attempted to look it up. What did you look up?
**A. I looked up the name Carl Reed on Google.**
Q. Okay. And what did you read on Google?
**A. I read a biopsy of his procedural history of his cases from an -- I think it's called the innocence -- the Exoneration Project or something like that. It's a list of exonerees and little blurbs about their cases.**
Q. When did you -- when did you do that?
**A. Some time between the time that I was served by the process server, which I think was like a week before the 24th, so maybe the 17th.**
Q. Okay. Did you look up anything else besides on the Exoneration Project's website about Carl Reed's case?
**A. I think -- you know, I don't have access to whatever the computer program is from the Northern District. I think I might have looked up to see if there was some link that said who his**

Page 94

**current counsel was.**
Q. Okay. And then just going back to your conversation that you had with Emily Maller from the PD's office, was there a discussion with Emily Maller about the PD's file as it relates to the murder that Carl Reed was charged and convicted of?
**A. Yes.**
Q. And what did she say?
**A. She -- okay. She spoke and used some computer terms that I was not familiar with. Some data that we retrieved a certain way ten years ago, they have a different format or name for.**
**She said it wasn't -- something like she couldn't find it on E Defender or there wasn't any record in E Defender.**
**I don't know what E Defender is. I haven't been trained on it, so I don't know.**
Q. Okay. Got it.
**A. That's the reason that I concluded that no one had ever requested the file instead of now that I am -- I now believe that the file was destroyed in the ordinary course of record-keeping procedures.**
Q. Okay. Was there a discussion with Emily Maller about what happened to Carl Reed's file as it

Page 95

relates to his murder conviction?
**A. Yeah. I said are you checking under the fingerprint number or are you checking on which was his IR number in Chicago, are you checking under alias spellings?**
**There's different ways you can spell Carl. There's different ways you can spell Reed.**
**If she's checking on a computer source that's very literal, it won't pick up those alternate spellings, so I asked her about that, and then, again, she answered saying that she looked on this E Defender site and some other site which didn't have any meaning to me because I don't know what those databases contain or how you access them or how you do searches on them.**
Q. Okay. So separate and apart from the E Defender, did she have any discussion with you about what happened to the PD's file as it relates to Carl Reed's conviction for murder?
**A. No, she didn't.**
Q. Okay. Did you only have the one conversation with Laura -- Lauren Myerscough-Mueller about Carl Reed's case?
**A. The one a few years ago when we happened to be talking about another client and it was a**

Page 96

**former client of mine that she represented and then the text exchange where I got John Loevy's contact information.**
Q. Okay. On the text exchange with Lauren Myerscough, was there any other further information that she relayed to you about Carl Reed's case?
**A. She wanted to know if I wanted Mr. Loevy's phone number or his email, and that was the extent of it.**
Q. Okay.
**A. Yeah. I'm sorry. And she said that she didn't represent Carl Reed on this case. She represented him on the COI, which I had to think for a minute and decided must have been certificate of innocence.**
Q. But any further discussions on the COI?
**A. No.**
Q. You indicated earlier that you heard recently that Carl Reed's IQ is low, below the standard deviation. Where did you hear that?
**A. I think maybe it was from that blurb from the exoneration -- list of exonerees.**
Q. Okay. As you sit here today, are you able to tell us what discovery you got in this case from the state?

Page 97

**A. I'm not.**
Q. Are you able to tell us what entities or individuals you subpoenaed for records, if any?
**A. No.**
Q. Did you make any attempts to get Carl Reed's school records?
**A. The transcript reflects that I engaged somebody to perform services that included that and that we did make those attempts.**
Q. Okay. I think were you referring to the plea transcript that you were shown earlier?
**A. Yes.**
Q. Okay. I'm just going to show you what was marked as Exhibit 3. And I think you might be referring to this part here where it says Social Security records were destroyed. Do you see that?
**A. Oh, okay. All right. Yes. It says he also had and then it continues on page 12.**
Q. Had an IQ level tested by doctors.
**A. Okay. So you're correcting me that I did say Social Security as to school records. I'm assuming that in the '90s -- if he was 45 on the day of the plea, I don't know how old he is in the '90s. I don't see that it says school records.**
Q. Okay. So do you know if you made any

Page 98

attempts or if Ms. Placek made any attempts to get Mr. Reed's school records?
**A. I don't have a recollection of that. That would be something we would want in this case.**
Q. Would that be part of your routine practice back then in 2001 when representing a client on a murder case to obtain the client's school records?
**A. Certainly in a death penalty case, yes.**
Q. Okay. As you sit here today, do you have a recollection of understanding of how far Carl Reed went in school? Like when I say went, like how many grades he completed?
**A. Do not recall.**
Q. Okay. Did you make any attempts or ask the mitigator to obtain any documentation regarding Carl Reed's employment?
**A. I don't recall.**
Q. Okay. Do you recall anything about Carl Reed's employment prior to his arrest for the murder?
**A. I recall your -- Ms. Ekl reading from the transcript about his employment, that I recited that at the sentencing.**
Q. Okay. Anything apart from that?

Page 99

**A. Nothing apart from that.**
MS. ITCHHAPORIA: Okay. All right. I have nothing further. Thank you.
MR. LOEVY: Terrie, anything?
MS. SULLIVAN: You can go ahead.
MR. LOEVY: I can go last after the defense is done.
MS. SULLIVAN: I don't have any questions.
MR. LOEVY: Thank you. I just have a few.
EXAMINATION
BY MR. LOEVY:
Q. Ms. McBeth, you were asked some questions by Ms. Ekl about some notes that may have been memorialized in the prosecutor's file about giving you the right to review documents. Do you remember Ms. Ekl asking you those questions?
**A. I do.**
Q. Do you have any -- did you contemporaneously have access to any notes written by the prosecutor in her personal file?
**A. You mean as we're sitting in court and she is at counsel table and I'm at counsel table, could I walk over and see what she was writing down?**
Q. Sort of what I am getting at. What I am suggesting or asking is if the prosecutor wrote in

Page 100

her notes that she, you know, did or didn't do certain things, do you have any foundation to know whether they're true or not?
**A. Not unless I was present when those actions were or were not happening.**
Q. You were also asked by Ms. Ekl if you rely on your client to help with the defense in one way or the other. Was there a difference in the ability of some of your clients' ability to assist with your defense?
**A. Yes.**
Q. What were some of the variables that made you more or less reliant on the client to assist in the defense?
**A. Just a personality. If they have -- or the experience that has influenced them in ways -- whether they are reactive or whether they're planners, because all of us who are having this discussion today are planners.**
**We're taught in school and we were awarded for learning in school, and we make plans and hope to have them work out the way we want them.**
**A lot of my clients are reactive. There's no room and there's no resources to plan. If you plan, something bad is going to happen before**

Page 101

**that. You need to be prepared to react. They are very hypervigilant, and so someone like that, it's more calming them down than it is what do you think we should do.**
Q. How about cognitive limitations, retardation, did that interfere to some extent in an ability to rely on a client?
**A. Great extent, yes.**
Q. You were also asked about you're -- why you would or wouldn't include things in motions to suppress and diabetes and such and you said tactical decisions and sometimes you would save it for trial. What did you mean by save it for trial?
**A. Prior to the time that the general assembly passed a law that said all homicide interrogations have to be recorded, the entirety of the interrogation, not just the point in which they want to waive their rights and confess, prior to that time those hearings were almost always credibility contests. And the judge might choose to believe the state's attorney's witnesses over your witnesses, and so if you go to trial and you are fighting the confession and the state already knows how your client looks on the stand, how he testified, what kind of little things you can ask**

Page 102

**him that will annoy him, set him off, they like -- we like to try to poke people verbally and show how they get angry because it helps them prove their case with the jury, so you want to save -- sometimes you want to save that if you're not sure that the motions will be granted.**

**It's so much easier to litigate motion to suppress statements now that we have to videotape everything because it's really good for the defense if the police are misbehaving. It's really good for the state if the person is voluntarily describing what he's done, so this is from -- I believe from the era before it was videotaped.**

Q. Oh, most certainly.

MR. LOEVY: Well, I don't have any other questions.

MS. EKL: I don't have any follow up based on that. Thank you.

MS. SULLIVAN: No follow up.

**THE WITNESS: Do you have a determination if you are going to recall me to ask me about the drug case?**

MR. LOEVY: It sounds like that's going to not be -- it's going to be moot, I think, if there's no file.

Page 103

THE VIDEOGRAPHER: Okay. If --

MS. EKL: I guess --

THE VIDEOGRAPHER: -- no further questions -- oh. I'm sorry.

MS. EKL: No. That's okay. Go -- we can go off the record.

THE VIDEOGRAPHER: Okay. Yes.

With no further questions, then this concludes today's deposition. We are now off the record at 12:47 p.m. Thank you.

(The following was had off video record.)

THE STENOGRAPHER: Are you ordering this?

MS. EKL: Not at this time I'm not. I don't know if anyone else wants it right away.

THE STENOGRAPHER: Any takers? Going once, going twice, gone.

FURTHER DEPONENT SAITH NOT at 12:47 p.m.

Page 104

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CARL REED, )
)
Plaintiff, )
)
vs. ) Case No.
) 2023 CV 17186
RICHARD ZULEY, et al., )
)
Defendants. )

This is to certify that I have read the transcript of my deposition taken by Renee E. Brass, C.S.R., on August 4, 2025, and that the foregoing transcript accurately states the questions asked and the answers given by me, with the changes made on the errata sheets, if any, attached hereto.

Number of errata sheets submitted:________

______________________
RUTH McBETH

SUBSCRIBED AND SWORN TO
before me this ______ day
of ___________, 2025.

Notary Public

Page 105

STATE OF ILLINOIS )
) SS:
COUNTY OF KANE )

I, Renee E. Brass, Certified Shorthand Reporter of the State of Illinois, CSR No. 084-004119, do hereby certify that said witness was duly sworn by me to testify the truth; that the testimony given by said witness was reduced to writing by means of shorthand and thereafter transcribed into typewritten form; and that the foregoing is a true, correct, and complete transcript of my shorthand notes so taken as aforesaid.

I further certify the signature of the witness to the foregoing deposition was not waived by agreement of counsel; and that I am not counsel for nor in any way related to any of the parties to this suit, nor am I in any way interested in the outcome thereof.

IN WITNESS WHEREOF, I have hereunto set my hand this 15th day of August 2025.

*Renee Brass*

CSR No. 084-004119 - Expiration Date: May 31, 2027

**Exhibits**

**Exhibit 1** 3:7 7:23
**Exhibit 2** 3:8 59:23 60:10 61:19
**Exhibit 3** 3:9 17:10 79:7 97:14

**0**

**01** 17:11

**1**

**1** 7:23 88:18
**100** 78:10
**10:32** 4:3
**10:39** 10:6
**10:42** 10:9
**11** 60:12,16 89:21
**11:53** 67:10
**11:55** 69:4
**12** 61:16 78:10 87:6 97:18
**12:04** 69:7
**12:47** 103:10,17
**13** 87:7 88:19
**15** 60:22 78:11
**16** 60:22 79:12
**1611** 17:22
**1619** 17:23
**17186** 4:6
**17th** 93:18
**18** 63:7 76:12 80:23
**19** 36:14,16 81:15,22
**1970s** 26:9
**1976** 26:15
**1978** 34:15
**1979** 90:7
**1981** 34:15
**1982** 34:23
**1983** 90:6
**1984** 90:5
**1985** 34:24 35:1
**1986** 35:7
**1989** 27:25
**1990s** 25:5 26:7
**1998** 27:22 28:3,7 36:12
**1999** 28:2 90:4
**1st** 18:25

**2**

**2** 18:23 59:23 60:10 61:19 68:8
**20** 17:12 28:10 67:19 78:9 79:17 80:4 87:14 88:17,20 89:1,11,15
**2000s** 26:7 29:2
**2001** 11:17 35:25 39:9 50:7 76:2 77:1 91:23 98:6
**2005** 12:1 17:12 20:3,12,22 28:22 30:1 39:9 50:7 60:10 61:20 62:22 84:15 90:12 91:24
**2008** 36:8
**2011** 73:7
**2017** 35:12,16 36:13,17
**2023** 4:6 13:7
**20237** 17:12
**2025** 4:4
**20th** 20:11
**21** 36:12 87:7
**24** 81:23
**24th** 93:18
**25** 11:9
**26** 87:21 89:4
**26th** 36:6
**27** 86:6,12,24 87:21,22 88:14 89:4
**28** 87:19

**3**

**3** 17:10 59:24 61:20 79:7,9,12 87:7 88:19 97:14
**30** 78:15
**31** 35:16,23

**4**

**4** 4:3 79:9 89:22
**45** 97:22

**5**

**5** 60:10
**5663** 60:7
**5679** 60:7
**5th** 12:1 20:3

**6**

**6** 19:4 78:15 79:13 80:22
**60** 78:10 79:17 80:4 86:11 87:20 88:11,17,20 89:1,11,15
**65** 64:13

**7**

**7** 18:2,22 19:2 80:21
**70** 63:6

**8**

**8** 80:23 89:22
**86** 35:16

**9**

**9** 81:11,14
**90s** 23:17 97:22,23
**98** 36:12

## A

**a.m.** 4:3 10:6,9 69:4

**abeyance** 26:13,21

**abiding** 54:12

**ability** 62:22 72:6 92:1 100:9 101:7

**able** 7:19 28:17 44:2 50:18 57:23,24 58:5 62:17 63:8,12 66:15 81:4 96:24 97:2

**abolished** 37:12

**about** 7:5,24 8:6,17 9:2 10:3 11:9 14:2,8 15:7,16,24 21:4 22:11,21,22 23:19 26:1,2 30:4,16,25 31:1,3,19,23 32:1,25 35:24 36:4,14 37:17 39:6 40:9 43:11 44:7 45:10,18 47:7 49:2,4,5,11 50:5 51:21 52:11,17,24 53:6,9,12 55:18,23 56:2 57:8,9,18,24 65:4,5,18,24 66:2,4,6,7,20 67:5,7,24 68:6 69:18 76:1,17 81:14 86:14,15 88:10,16 90:18,20 93:5,14,20 94:5,25 95:10,17,23,25 96:6 98:19,23 99:13,14 101:5,9 102:21

**above** 19:3

**access** 93:22 95:14 99:19

**accommodate** 6:22

**accompany** 40:4

**accompanying** 8:12

**according** 12:7,20 80:3

**accosted** 24:4

**accurate** 12:21 64:16 75:21 80:9

**accurately** 78:21

**accused** 70:19

**acknowledging** 86:7

**acquire** 37:15

**acting** 47:21

**actions** 100:5

**actual** 83:19

**actually** 37:20 38:11 60:2 64:24 73:20 79:13 81:8

**adaptive** 63:6,9 76:12

**add** 91:8

**added** 91:13

**addition** 30:24 43:21 44:23

**additional** 10:18 37:14 44:25 61:1 72:7,13 83:11 91:11

**address** 58:13

**addressed** 86:17,18

**Adducci** 4:24

**administration** 83:9

**administrator** 41:9

**admissible** 47:5

**admonished** 79:20

**adult** 66:16

**advise** 78:22 91:11

**advised** 90:8

**advises** 89:24

**after** 4:15 6:25 11:18 14:17 16:7 20:21 22:3 33:16 34:20 63:7,17 80:16 82:15 84:19 88:3 99:6

**again** 11:14 17:13 46:19 47:1 60:9 66:6 79:6 95:11

**against** 20:4,12 23:11,15,19 91:7

**age** 63:7 76:12

**aggravating** 78:11

**aggravation** 89:23

**ago** 11:9 76:19 87:14 94:11 95:24

**agree** 11:1,2 20:1 29:6 42:4 74:5 75:5,13 78:20 90:2

**agreed** 10:17 83:18 84:7 86:6

**agreement** 78:21 83:11 89:9

**ahead** 7:11 17:21 21:11 99:5

**alias** 95:5

**alibi** 66:23 69:15

**allegation** 75:13

**allegations** 23:11,15,19

**alleged** 21:23

**alleging** 23:3

**allow** 63:2

**allowed** 44:3,18 85:21

**almost** 101:19

**along** 18:5 64:4 86:9,19

**alphabetical** 50:15

**already** 18:24 77:24 86:17 101:23

**also** 6:11 8:14 15:9 22:1 30:7 34:1 37:3 38:1,14 39:5,14,19 43:22 44:25 45:21 52:17 54:21 81:19 97:18 100:6 101:9

**alternate** 95:10

**although** 16:23

**always** 33:4 53:4 54:11 64:10 68:23 101:19

**am** 7:21 40:14 62:4,8 82:10 92:25 94:21 99:24

**among** 42:1

**analysts** 73:15

**Andrea** 24:20

**angry** 102:3

**Ann** 34:18

**annoy** 102:1

**another** 9:20 10:12 15:10 17:6 37:9 53:4 59:20 67:19 73:6,10,22 90:20 95:25

**answer** 6:16 22:23,24 58:10,12 62:7 75:4 77:18 78:16 82:10 84:2,19

**answered** 16:15,16 77:16 95:11

**answers** 22:5

**any** 5:24 6:21 12:12 13:14 14:5,9,11 19:24 20:25 22:6 31:11,14,17 33:11,15 34:4 38:24 39:10 41:5 43:1,11,24 44:7,11,19,20 46:1,15 48:12 51:5 54:20 58:2,14 60:24 63:22 64:19 65:3,18,23 66:4,8,19,23 67:9 68:22 69:9,10 70:25 71:8,9,24 74:2,15,19 75:15 76:1,16 78:12 81:25 82:6 83:10 84:1,8 85:16 90:10 91:16,17 94:14 95:13,17 96:5,16 97:3,5,25 98:1,

15,16 99:8,18,19 100:2 102:15,17 103:15

**anybody** 31:15 47:11

**anyone** 9:11 22:2 31:12 57:4 59:23 84:16 86:15 103:14

**anyone's** 17:25

**anything** 8:5 13:17 15:15 30:3, 25 31:3 43:11 53:21 65:3,18,24 66:2,7 67:5 86:17 87:20 92:5 93:19 98:19,25 99:4

**anyway** 68:18

**anywhere** 35:17

**apart** 95:16 98:25 99:1

**apologize** 69:14 87:3

**appeal** 32:9

**appear** 57:14,15

**appearing** 17:14

**appellate** 36:3

**applicable** 89:11

**applied** 78:12

**appreciate** 58:6

**apprehension** 24:6

**appropriate** 48:14 69:22 73:11

**approximately** 28:6,9,12 40:23 50:18 91:23

**Arbor** 34:18

**area** 63:9

**areas** 63:7 76:13

**arguable** 54:14

**argue** 63:12

**argument** 49:4

**around** 48:11 53:5

**arranged** 16:13

**arrest** 11:19 24:6 98:20

**arrested** 11:17 41:10 66:12,18

**arrests** 47:4

**ask** 6:14 27:20 31:21 40:2,3,5 41:3 42:23 43:15 48:10,22 58:21 59:6 62:8 64:24 67:9,13 72:7,13, 16 81:9,10 98:15 101:25 102:21

**asked** 10:19 22:25 67:4,21,23 69:14 77:16 93:4 95:10 99:12 100:6 101:9

**asking** 10:20 44:7 46:20 47:13 56:1 59:1 67:7,8 76:7 82:3 87:21 88:21,24 99:16,25

**aspects** 38:22

**assembly** 101:15

**assert** 57:12 77:16

**asserted** 76:9

**assigned** 11:10 25:23 41:7,22 42:2 43:1,4

**assignments** 42:14

**assist** 39:16 45:22 50:2 57:11,23 100:9,13

**assistance** 21:19 66:14

**assistant** 17:14 39:11 72:6

**assisting** 43:25

**assume** 33:23

**assumed** 88:13

**assuming** 10:17 86:24 97:22

**assured** 16:16

**attacked** 48:1 54:13

**attempt** 46:11

**attempted** 30:16 46:7 93:7

**attempts** 97:5,9 98:1,15

**attend** 34:20 37:23 38:12

**attended** 34:13 39:1

**attention** 89:21

**attorney** 6:9 13:20,22 14:14,16 19:9,13 24:14,19 44:16,18,19,24 64:3,8 72:19 82:14 91:5 92:18

**attorney's** 41:18 44:4 48:25 83:12 101:21

**attorneys** 12:2 14:15 22:6 26:24 27:24 29:9,19,25 41:22 56:7 81:16

**audio** 4:11,12

**August** 4:3

**available** 73:12

**avenue** 73:23

**average** 39:9

**avoid** 27:13 80:15,17,18

**awarded** 100:21

**aware** 8:14 21:18,22 23:7,9,14 30:14 56:20 64:12 66:23 71:10,25 75:17 76:1 77:3 83:8

**away** 103:14

B

**back** 10:8,19 11:1,2 24:3,22 26:7 29:2 33:3 34:6 40:9 62:22 64:23 69:6,18 73:2,7 76:2 77:1 86:15 88:5 91:23 94:2 98:6

**background** 24:16 34:7 55:19

**backwards** 49:5

**bad** 88:11 100:25

**badly** 55:3

**bar** 35:1 37:13 63:19

**barely** 55:3

**baseball** 53:22

**based** 10:14 19:16 48:16 49:7,8 53:7 64:12 68:8 70:14 72:10 79:19 80:12 82:17 83:11 88:15 89:8 92:12 102:17

**basically** 32:17 33:2 41:14 48:5 65:13

**basis** 63:20 71:2,9 80:25 81:5

**bat** 52:20

**Bates-stamped** 17:22

**bath** 53:23

**beaten** 52:20 53:21,23

**became** 28:14,17 38:1 54:14 71:10,25

**because** 6:7 8:21 23:25 26:25 34:4 37:16 51:12 52:15 54:20 55:2 58:11 64:2 71:19 73:1 76:4

77:16 78:3 80:19 82:13 87:4,15 88:7,10 90:23 95:13 100:18 102:3,9

**become** 15:11 23:14 25:18 27:21 66:23

**been** 5:11 6:3 10:11 15:10,17,18 16:8,23 19:7 23:10,15 24:25 25:7 26:20 29:11 30:10 33:13 34:23 35:25 38:1 40:24 41:10 46:3 47:9 50:10 52:8,20 55:14,17 59:25 63:18 66:15 71:19 73:14 74:25 83:19 86:18 90:3,24 94:17 96:14 99:13

**before** 6:15 7:10 9:5 13:13 14:17 23:7,11,12 25:7 26:8 28:14 29:16 35:14 37:12,15 40:24 46:12 47:6 63:15 67:9 70:19 76:12 79:20,21 81:14 90:12 93:18 100:25 102:13

**began** 36:4

**beginning** 60:22

**begins** 4:4

**begun** 11:18

**behalf** 4:19,21 17:14 21:16 39:25 89:3,23

**behavior** 54:16

**being** 5:20 6:2,7,11 16:19 31:1 37:17 47:25 53:16 54:21 63:8 65:2 73:2 76:17 81:5 82:3 83:10 84:7 90:11

**belatedly** 67:3

**belief** 62:21

**believe** 6:1 10:4,15 19:7 24:9 32:2 35:7 50:13 51:5,7,8,11,17 52:4,7 53:25 70:25 71:8 74:10,13, 15,19 81:25 82:6 84:14,20 85:6, 15 87:5 91:16,22 92:2 94:21 101:21 102:12

**believed** 58:2 59:4 72:11 81:3 91:13

**beloved** 52:13

**below** 52:6 56:11 63:5 96:19

**besides** 93:20

**best** 37:6 49:2,4 91:25

**Beth** 18:3 59:25 61:19

**between** 28:20 38:22 39:9 50:6 62:9 80:4 87:19 88:17 93:16

**big** 50:14

**bigger** 62:14

**biopsy** 93:10

**bit** 6:25 34:6,7 40:9 54:8 60:19 68:4 81:13

**blame** 35:20

**blind** 87:18,23,24,25 88:21 89:14

**blurb** 96:21

**blurbs** 93:14

**body** 83:13

**bond** 41:11,14

**bookend** 11:14

**both** 12:22 37:23 42:11,12,16 43:7 79:14

**bottom** 60:13 80:22 81:14 87:6 92:24

**Brass** 92:19

**break** 6:21,24 67:11 68:17

**brief** 10:11

**bringing** 53:5

**BS** 60:7

**bu's** 53:16

**burglary** 90:7

## C

**C-A-N-E-L-L-I-S** 19:12

**call** 9:15 22:18 46:5,22 47:2 63:3

**called** 8:21 13:22 22:2 93:11

**calling** 32:14

**calm** 86:18

**calming** 101:3

**came** 15:6 25:25 26:11 36:6 50:14 63:1 67:4

**can** 6:13,22 7:16 9:25 17:18 18:4, 6,7,9,11,15,18 28:9 37:6 46:24 47:3,21 54:6,8,9,10 55:4 57:10, 12,21 58:10 61:14,16 63:10 67:13 68:19,23 77:18 78:10 79:14 84:2, 19 85:20 86:11 92:15,16,20,22 95:6,7 99:5,6 101:25 103:5

**can't** 25:9 52:23 55:2 62:7,15 64:1 73:20 75:3 78:3,11 85:10

**canceling** 10:21

**Canellis** 19:9,12,17 56:14

**capable** 15:19 21:3

**capacity** 57:9 58:25

**capital** 37:10,13,16

**care** 90:14

**Carl** 4:5 7:6,8,25 8:6,13 11:6,16, 24 13:2,15 14:14 15:4,7,12,16,23 17:11 21:3,15,24 22:11 25:8 27:16 32:5 33:16 35:25 42:12 43:12 51:2,9,25 52:3,8,19 53:9 54:2 55:10 56:21 57:3 58:3 59:13 61:6 62:17,22 64:25 65:5,18,24 66:24 69:11 71:5 74:2,11 75:6,13, 17 76:2,17 78:1,22 79:20 80:2,5,9 82:1,7,24 83:18 84:9 85:6 87:11 89:3,17,25 90:3,11 91:3,17,23 93:6,8,21 94:6,25 95:7,18,23 96:6,12,19 97:5 98:11,17,19

**Carl's** 55:19 56:16 66:5 84:15 89:10

**carry** 78:7

**case** 4:6 9:22 11:10 13:3,6,9,15 14:6 15:24 16:2,23,24 17:4 19:14, 18,20 22:12 23:21,23 24:12,17,24 25:10,22 26:16 30:15 31:1,18,23 39:3,7 40:1 41:15 42:2,9,14,20, 21,23 43:1,8,9,10,12,18 44:7,8, 12,17 45:2,24 46:4,9,10,13,14 48:13,14,17 49:23 50:21,22 51:1, 16 54:20 55:15,23 57:2 58:15 59:12 62:24 63:1,14,23 64:10 66:11 69:19 70:14 71:16,17 72:7, 12 74:3 75:10,11 78:13 80:6 82:24 86:4,23 89:18 90:16 93:21 95:23 96:6,12,24 98:4,7,9 102:4, 22

**cases** 23:1,3 27:2,6,7,11 28:5,11, 12,18,24,25 29:21,22,25 32:16 36:25 37:16 38:6,7,19 39:17,20 41:7 45:2,3 47:21 50:20 57:8 64:11,23 69:21 83:8,15 93:11,14

**cash** 24:2
**categorized** 16:24
**category** 14:25
**cause** 63:11 85:8
**caused** 61:1 77:5,10
**certain** 26:17 33:3 50:1 58:4 94:11 100:2
**certainly** 6:22 64:12 98:9 102:14
**certificate** 31:4,8 96:14
**chairs** 41:19
**challenges** 26:10
**chance** 58:3 79:15
**change** 12:23 60:3,11 76:20 83:17 84:10,13
**changed** 11:25 30:13
**changes** 83:2
**charge** 8:15 9:22 81:5 90:18,19, 20
**charged** 8:11,12 27:11 78:14 81:18 94:6
**charges** 8:6,9 58:6 84:7
**check** 50:12
**checking** 95:2,3,4,8
**Chicago** 4:19,21 37:24 53:17 95:4
**child** 60:25
**children** 55:1
**choose** 101:20
**circle** 62:14
**circumstance** 85:20
**City** 4:19
**civil** 5:21 13:3,9,15 14:23 22:12
**claim** 75:5,6
**claimed** 21:18 75:18
**clean** 68:19
**clear** 58:8 60:6
**clearer** 56:4
**clearly** 56:12
**clemency** 15:1,18 82:15
**clerical** 41:11
**client** 15:10,11 40:6 42:6,7 49:16, 18,22 50:6,22 58:23 59:3 70:15, 25 86:1,7 95:25 96:1 98:7 100:7, 13 101:7,24
**client's** 27:3 91:7 98:7
**clients** 50:20,23 59:9 85:21 100:23
**clients'** 100:9
**clinical** 58:22
**close** 67:18
**closer** 88:25
**closing** 49:4
**co** 65:21
**co-counsel** 12:10,18 67:13
**cognitive** 101:5
**COI** 96:13,16
**colloquy** 33:9
**come** 10:19 11:1,2 15:12 51:24 70:9,11 72:23
**comes** 72:24
**coming** 41:11 50:3 85:3 86:15
**comments** 66:6
**common** 42:13,25
**community** 47:19 48:9,10
**compelled** 57:14
**complete** 6:16 54:15
**completed** 6:15 98:13
**completely** 10:22
**compliance** 27:2
**complicated** 32:12
**comports** 73:19
**computer** 7:17 18:8,9 93:23 94:10 95:8
**concern** 37:17
**concluded** 94:19
**concludes** 103:9
**conclusion** 17:20 18:4 33:8 72:23
**condition** 76:2
**conduct** 43:23 46:20 47:16 74:6
**conducted** 72:17 74:16 75:7,10
**confess** 68:2 77:5 101:18
**confessed** 69:24
**confession** 63:24 64:2 101:23
**confined** 72:18,20
**conflicts** 27:13
**congratulations** 35:13
**consecutive** 78:7,16
**consider** 29:23
**consideration** 20:24
**considerations** 74:22
**constitutional** 26:10
**constitutionally** 26:18
**consumed** 73:15,17
**contact** 96:2
**contain** 95:14
**contained** 44:5
**contemporaneously** 99:19
**contests** 101:20
**context** 19:21 23:18 61:12,24
**continue** 61:16 77:18
**continues** 97:18
**continuing** 38:3
**contradict** 49:12
**contradicting** 87:16
**control** 54:15,16 55:8,13
**controlled** 90:4,5
**controversy** 25:10
**convenient** 30:11
**conversation** 10:11 15:13 26:1

67:5,8 70:14 94:3 95:22

**conversations** 69:10

**convicted** 16:8 47:9 90:3 94:6

**conviction** 75:6 90:7,18 95:1,19

**convictions** 47:4,5 89:17,25 90:11 91:4,18

**Cook** 25:12 29:3,7,9,19 35:6,8,21 39:11 49:19 50:6 51:2 91:24

**copy** 33:20,21,25 44:19

**corner** 54:25

**correct** 7:6 19:8 20:9,13,17 21:1 25:8,13 30:22,23 36:18,19 39:3 43:19,20,25 44:1 45:14,15 46:17 48:6,7,14,15 49:16,17 51:13,18, 25 52:1 53:11 56:25 57:1 60:19 62:5 64:14 65:14 70:20,24 71:2,3 72:1,9,17 73:7,13,24,25 76:22 82:19 83:5 87:18 88:22 89:1,2,12 90:8,21 91:5,14,15

**correcting** 97:20

**correction** 64:5

**Corrections** 85:9

**correctly** 40:14 55:10

**could** 5:6,15 16:14,15,16 26:5,21 35:23 37:16 38:10 39:24 40:2,3,5 42:1,3,4 51:24 55:14 58:19,21 62:18 63:12,19 65:9 71:22 72:13, 16 73:13,18,23 75:2,3 76:13 79:10 87:7 89:14,15 90:20 92:13 99:23

**couldn't** 45:5 76:14 94:14

**counsel** 4:14 10:2 11:8 20:17 21:19 30:14 32:18,19 57:11,13,16 67:16 75:18 94:1 99:22

**County** 25:12 29:3,7,9,20 35:6,8, 21 39:11 49:19 50:6 51:3 91:24

**couple** 6:6 7:1 11:13 50:14

**course** 15:13 43:17 49:15 52:23 65:4 83:21 94:22

**court** 4:15 5:17 12:7 18:24 20:16, 24 26:13,16 27:3 31:9 37:12 38:2 41:11 57:17 58:21 59:2 63:1,16 65:11 68:16 70:12,18 71:18 72:19 76:9 79:4,20 80:2,25 81:12,17 82:13 83:10 84:8 85:13,25 87:8 89:24 90:3,8 91:7,11 99:21

**courtesy** 4:10

**courthouses** 36:6

**courtroom** 41:23 57:19

**CR** 17:11

**create** 37:13

**credentials** 37:15

**credibility** 47:6 101:20

**crime** 47:9 70:20 73:1,3

**criminal** 14:19,23 22:11 24:17 29:8 38:6 47:4 54:24 58:14 89:17, 25 91:4

**criteria** 27:9

**cross-examine** 49:11 57:16

**current** 13:22 33:6 94:1

**cut** 19:2 21:10 33:12

**CV** 4:6

**D**

**Dana** 24:9 25:9,22

**data** 94:11

**databases** 95:14

**date** 10:23 12:6,21 13:12 17:12 18:24 20:10,22 30:10 90:12

**day** 36:21 52:25 69:16 82:21,23 97:22

**days** 50:14

**de-death** 19:8,20

**death** 16:2,7,9,10,24 17:1,4 19:23 20:4,12,22,23 26:10,14,18, 20 27:1,4,5 37:18 56:13,15,22 63:20,21 75:11 80:13,15,16,18,19 98:9

**decedent** 78:13

**December** 12:1 18:25 20:3 60:10

**decide** 16:9 56:15 68:23 88:3

**decided** 17:3 26:12 37:13 96:14

**decision** 48:16 72:3 74:21 75:1 77:20

**decisions** 41:25 57:24 74:23 82:22 101:12

**decline** 75:4

**defendant** 4:22,24

**defendant's** 24:8

**defendants** 30:15,16

**defended** 57:13 62:24

**defender** 14:1 20:20 28:1,23 32:2 33:25 39:24 42:25 56:24 72:6 74:6 79:1 85:14 91:25 94:14, 15,16 95:12,17

**defender's** 8:21 9:2,6 10:12 12:17 13:24 14:4 23:10 25:12 26:19 29:3,7 31:21 32:7,15 35:6, 9,18,22 39:12,16 41:20 42:7 90:15

**defenders** 17:14 38:15,18 39:6, 11 43:4

**defending** 24:23

**defense** 29:8,19,25 43:25 44:18 45:22 47:21 50:3 54:2 55:14,16 57:13,23,24 58:7 63:23 74:8 75:15 99:6 100:7,10,14 102:9

**deferred** 52:14,15

**deficit** 63:9,13

**deficits** 21:13 63:6 76:12

**definition** 63:5

**denied** 31:8

**dep** 13:11

**department** 48:5 85:9

**depended** 43:9 50:22

**dependent** 73:14

**depending** 48:13

**depends** 46:13 77:14,19 78:4,18

**DEPONENT** 103:17

**deposed** 6:2

**deposition** 4:4 5:20 6:6 7:22 10:21 13:11,14,18 17:10 22:4 30:11,17,21 31:13 103:9

**depositions** 5:25

**describe** 37:6 46:24 54:8

**describing** 102:11

**destroyed** 32:6 33:13 71:17,19 94:22 97:16

**destroying** 32:8

**detective** 23:1,3,4 24:5

**determination** 102:20

**determine** 42:8 48:8 70:5 84:8

**determined** 16:25 19:22

**devastated** 66:17

**develop** 74:7 75:15

**deviation** 96:20

**deviations** 56:11

**diabetes** 77:4,9,10 101:11

**diabetic** 76:17 77:1,4

**did** 9:5,17,19 11:5 13:2,14,17 14:4,20 15:12,15,22 20:7 21:4,14 22:2,6,19,21,22 23:6,14 24:18,19 25:18 27:6,8,20 29:23 30:19,24 31:3,6,10,21 33:7 34:7,16,20,24 35:1,2,5,11 36:10,24 37:2 38:13, 23 39:5,14,19 40:21 43:7 45:7 46:9 49:23 51:9,11 53:17,25 54:4 55:10 56:14 57:2 59:13,22 62:2 63:17 66:1,3,23 70:5,9 73:16 74:10,12 75:18,22 78:24 80:14 85:15 93:5,7,9,15,19 94:8 95:17, 21 96:20 97:5,9,20 98:15 99:18 100:1 101:6,13

**didn't** 9:13,23 14:9,10 21:10 23:2 31:7 33:4,11 56:7 73:3 74:24 78:3 84:22,23 85:22 90:17 95:13,20 96:12 100:1

**difference** 62:9,12 84:4 100:8

**different** 6:7 7:17 10:22 18:8 39:2,6,22 43:15 47:15 50:10 94:12 95:6,7

**difficulties** 60:24 61:3,7,10 62:11,14 63:8

**difficulty** 61:23

**directing** 89:21

**directly** 34:16 38:6

**disclosure** 45:19

**discovered** 71:15

**discovery** 28:13,14 38:24 39:3 43:6,18,22 96:24

**discuss** 15:16

**discussed** 45:10 69:15

**discussing** 13:24 15:9 38:9 52:19

**discussion** 10:3,7 21:12 94:4,24 95:17 100:19

**discussions** 96:16

**dismiss** 84:7

**dismissed** 82:15 83:9

**District** 5:22 93:24

**division** 26:23 36:3,7 43:5 50:10, 17

**divisions** 39:22

**DNA** 73:7,13,21 83:3

**doctor** 59:7,9

**doctors** 58:22 97:19

**document** 11:12

**documentation** 98:16

**documents** 11:13 31:11,14,17, 22 44:20,24,25 48:24 99:15

**does** 7:23,25 9:8 12:3,6,21 19:16, 19,20 20:19 24:10 36:20 57:6 59:23 61:9,23 63:11 76:24 79:21 84:3,10 86:1 87:12,23 88:15

**doesn't** 76:4 77:2 79:24 84:1,13 86:24 88:3

**doing** 43:11 56:15 87:14

**don't** 6:1,23 10:3 11:7,20 12:12 17:4 18:6,7,9 21:6 24:8 25:24 28:8,16 31:2 33:3,6,11,24 34:4,5 35:20 37:25 38:20,25 42:21 44:14,15 46:9,15,18 52:10 53:17, 20 54:19,20 55:6 56:9,16,18 57:5 59:14,19 61:8 62:25 64:9,19 67:1, 22 69:17 71:7 72:25 74:4,21 77:8 78:17 80:11 82:13 83:4,16,25 84:20 85:16 86:3,15 87:1,4 89:5 90:25 92:5 93:22 94:16,17 95:13 97:23,24 98:3,18 99:8 102:15,17 103:13

**done** 44:12 72:8 99:7 102:12

**door** 47:7

**doubt** 44:20

**down** 45:12 50:16 60:12,21 63:1 79:17 81:11 92:10 99:23 101:3

**drawing** 33:9

**dropped** 53:16

**drug** 8:15,24 9:22 14:8 90:16 102:21

**drugs** 54:25

**duly** 5:1,11

**during** 6:5 11:5 14:19 27:16 29:9 37:9 39:3 49:24

**duty** 74:5 78:20 79:3 91:4,6,8,11

### E

**each** 18:15 26:4 28:19

**earlier** 45:10 51:15 76:1 80:12,13 93:4 96:18 97:11

**early** 29:2 41:15

**easier** 102:7

**Economics** 34:12

**education** 38:3

**effective** 25:2

**either** 17:3 28:13,16 58:15 77:4 82:18

**Ekl** 4:18,25 5:14,19,23 9:25 10:10,24 17:20 18:1,6,13,15,17, 20 58:13,18 59:22 60:2,8 61:21 62:1 67:6,16,18 68:6,14,18 69:2,8 76:6,15 77:22 82:5,11 83:23 84:5 85:1,19 91:21 92:5,10,18 98:22 99:13,16 100:6 102:17 103:2,5,13

**element** 54:24

**Elizabeth** 4:18 92:18

**else** 24:15 30:3 31:12,15 41:13 47:11 48:8,22 66:7 77:19 93:19 103:14

**email** 17:18 96:8

**emails** 22:14 30:8,9

**Emily** 9:3,7 13:24 14:3 31:24 32:3 90:13 94:3,4,24

**employed** 35:8 39:15

**employment** 98:17,20,23

**encourage** 80:15

**encouraged** 80:17

**end** 60:21 67:17 88:22,25

**endured** 52:21

**enforcement** 47:3,10

**engaged** 97:7

**enough** 6:24 12:9 29:13 56:21 72:2,5 91:10

**ensure** 59:10

**entire** 44:19

**entirety** 101:16

**entities** 97:2

**entitled** 88:4

**episode** 54:12

**equal** 41:23 43:4

**equals** 41:23,24

**era** 37:11 102:13

**establish** 71:21

**established** 76:14

**estimate** 28:9,17 50:18

**et al** 4:6

**even** 6:12 42:21 47:6 58:3 71:7 86:11 90:21

**ever** 5:24 6:1 32:4 33:20,21,24 44:2,3 51:2 66:23 85:20 94:20

**every** 38:2 49:23 50:14

**everybody** 50:15 87:25

**everyone** 4:10 7:1

**everything** 44:4 102:9

**evidence** 47:24 49:7 71:25 72:2 83:1,3,11

**exactly** 87:4

**exam** 35:1

**EXAMINATION** 5:13 93:2 99:10

**examine** 58:22 72:22

**examined** 5:11 57:3

**example** 73:6 87:13

**except** 87:25

**exchange** 86:8 96:2,4

**excluding** 29:13

**excuse** 57:25 73:15

**executions** 63:2

**exhibit** 7:23 17:10 59:20,23,24 60:1,10 61:19 79:7 97:14

**exhibits** 17:18

**exist** 36:21

**existed** 36:18 73:7,8

**exists** 26:6

**exonerated** 15:18

**exoneration** 93:12,20 96:22

**exonerees** 93:13 96:22

**expect** 77:12

**expected** 46:5,22 47:2 77:6

**experience** 20:20 23:9 40:21,22 48:17 57:21 59:3 72:10 81:1 100:16

**experienced** 26:24 27:24 28:1,23,24 29:8,12,18,24 38:14 56:23 79:1 85:14 91:24

**expert** 72:21,23

**explain** 26:5 40:7 54:22

**extended** 78:10

**extent** 96:9 101:6,8

**extracting** 25:3

**eyes** 17:25

**F**

**facing** 8:6,10 78:1

**fact** 30:10 49:3,18 50:1 51:8 55:20 58:5 76:14 84:11 91:1

**factors** 70:16 71:1 78:11,18

**facts** 71:13 81:3

**factual** 80:25 81:5

**failed** 75:14

**fair** 6:17 12:9 27:24 28:22,25 29:2,13 30:19 33:23 34:1 39:1 43:21 46:14 48:19 53:8 72:5 74:25 78:19 80:14 88:10 89:4,5 90:22 91:10

**fairly** 27:25 67:18

**fall** 15:1

**falsely** 77:5

**familiar** 24:11 41:17 94:10

**familiarity** 66:20

**family** 16:13 51:17,22 52:3,18 53:5 66:5,8,15

**family's** 16:12

**fan** 11:21

**far** 17:19 68:9 98:11

**fed** 53:19

**Federal** 5:20

**feel** 84:21

**Feitler** 24:9,23 25:10,22

**felony** 8:12 36:7 78:5,6

**felt** 73:11

**few** 68:13 76:19 92:8 95:24 99:9

**field** 56:4 73:20

**fight** 47:22

**fighting** 101:23

**file** 8:24 9:2,11,21 10:3,12,15,17,21 14:8,12 32:2,5 33:16,21,25 34:3 41:12,13 44:4,5,6,17,19 63:19 69:21,25 70:6,7 71:2 88:4 94:5,20,21,25 95:18 99:14,20 102:25

**filed** 13:7,15 21:15

**files** 8:22,23 32:8 33:4

**filing** 71:4

**find** 11:7 13:25 32:14 47:8,18,19, 23,25 60:4 66:16 81:16,17,20 94:14

**finding** 26:2 49:10 83:19,22

**fine** 83:24

**fingerprint** 72:14 95:3

**fingerprints** 72:21

**first** 5:11,16 6:13 13:2 15:3 17:15 19:11 20:7 23:14 35:5 40:12 41:18 42:24 49:4 58:15 60:15 87:8

**fishy** 64:2

**fit** 57:7,21 58:5 59:10,17 86:1,16

**fitness** 58:23,24

**five** 13:4 15:5 38:22 67:11,21 68:18,21

**flip** 87:3

**floor** 65:11

**follow** 26:16 67:22 68:4 102:17, 19

**follow-up** 92:9

**followed** 32:15

**following** 103:11

**follows** 5:12 41:25

**footing** 41:23

**force** 23:5 25:12,15,19 26:6 27:7, 17,21,23 28:7,15,18 29:12,15,18 36:9,11,18,24 37:8 41:16

**forensic** 58:22 59:2 72:7,16 73:10,13 74:2

**forever** 33:5

**forgotten** 78:18

**form** 83:24

**formal** 37:4,7

**format** 94:12

**formed** 26:8,9,23

**former** 23:4 96:1

**forth** 91:3

**Fortz** 4:8

**found** 13:21 24:22 81:12 83:3 92:23

**foundation** 67:3 76:3 82:2 84:17 85:18 91:19 100:2

**four** 26:15

**Fox** 83:9,18 84:4,6

**framed** 91:17

**frequently** 50:19

**from** 8:2 10:12 11:24,25 17:11,12 18:7,9 23:23 25:3 27:12 33:9 34:7 35:18 36:12 38:2 39:5 43:18,22 44:24 47:3 48:5,25 49:20 51:24 52:20 53:15,16 55:22,24 56:3,6 58:15 59:2 60:9,11 61:19 63:1 64:9 70:10,11 76:8,23 77:4,10 79:8 82:16 85:3 87:8 90:7 93:11, 23 94:3 95:16 96:21,25 98:22,25 99:1 102:12

**front** 55:1

**functioning** 63:6,9 76:13

**further** 71:22 92:6 96:5,16 99:3 103:3,8,17

**G**

**gather** 73:1

**gathering** 16:17

**gave** 44:5 56:16

**general** 29:4,14,17 31:19 38:21 44:9 45:18 46:11 47:1,15,16 48:23 49:1 64:24 67:8 69:19 86:5 101:14

**generally** 7:8 25:5 35:23 36:1 39:21 46:20 78:9

**generations** 52:6

**George** 19:12

**Georgia** 26:11

**get all** 47:9

**gets** 72:19 88:9,11

**getting** 43:17 62:5,8 67:17 70:13 88:8 90:24 99:24

**give** 7:1 11:14 17:8 59:21 61:14

**given** 5:24 15:17 39:10 43:1 48:13 64:7 73:11 91:1

**giving** 99:14

**go** 6:5,23,24 7:11 9:25 11:23 17:21 18:11,15 21:10 34:6,8,16 35:22 38:10 40:4,6 44:18 45:13 48:10,18 49:5 50:5,16 52:23 57:20 63:25 68:24 73:2 86:9,11, 19 99:5,6 101:22 103:5

**goes** 18:14

**going** 6:5 7:10,11 10:5 11:12 16:25 17:6,9,17 26:21 32:10 35:22 48:18 49:10 51:16 53:18 59:20 60:11 63:16 64:2,5,23 69:3, 18 70:5 77:15 79:6,9 80:21,23 81:10 85:7,17 87:3,24,25 88:1,7 89:20 90:23 94:2 97:13 100:25 102:21,23,24 103:15,16

**gone** 73:21,22 103:16

**good** 4:1,18,20 5:15 52:17 55:24 63:10 68:25 69:1 102:9,10

**Google** 93:8,9

**got** 11:8 17:24 19:2 35:24 38:3 40:24 64:21 71:24 82:15 92:17 94:18 96:2,24

**governor** 82:16

**grades** 98:13

**graduate** 34:24

**grandmother** 65:10

**granted** 102:6

**great** 5:7 7:4 11:4 101:8

**grief** 52:16

**ground** 6:6

**grounds** 70:7,9

**group** 52:13 53:20

**guess** 13:4 19:11 55:24 62:7 70:13 103:2

**guessing** 83:5 87:13

**guilty** 12:1 33:17 57:12 79:21 80:6,10,15,18 81:2,21 83:20 84:10,16 85:7,12,22 86:8 88:6

H

**habit** 47:24

**had** 8:14 9:4,15 10:10 13:7,15 14:5,7,8,9,11,16 15:10,11,17,18, 20 16:3,4,11,12 23:15 24:25 25:1 26:20 27:20 28:6,12 29:11 30:10 31:22 33:9 37:15 40:7,20,22,24 44:6 47:22 51:16 52:19,21 53:2,4, 19,23 55:12,13,20 56:21 57:3 60:23,24,25 61:3,7,10,23 62:22 64:13 65:18 66:15 69:5,10,15,24 70:25 72:2,6 74:5,22 77:4 78:20 79:3,15 82:20,22 83:19,20 84:9 88:11 89:17 90:3,6,11,16 91:3,4, 10,12 94:3,20 96:13 97:18,19 103:11

**half** 36:5

**handle** 36:25 38:18

**handled** 28:12 29:4 52:16

**handles** 14:1

**handling** 28:24 29:19,25

**handwritten** 64:11

**happen** 100:25

**happened** 11:9 12:7 17:3 32:1 33:16 40:7 44:21 49:13 63:17 68:9,11 86:16 88:12,13 94:25 95:18,24

**happening** 84:24 100:5

**Harris** 24:10,15

**has** 10:11 16:8 19:22 38:3 41:10 53:2 54:21 60:23,24,25 61:3,6,10 62:10 82:4 100:16

**have** 5:2,24 6:4,15,16 10:3,4,16 11:18 12:8,12 13:14 14:9,10 16:13,23 17:18 18:24 20:9 22:10, 23,24 23:10 25:7 26:1,17,18 27:12 31:16 32:10 33:11,13,15 34:4,23 35:17,25 39:14,24 41:11, 18 42:5,11,21,22,25 44:20 45:11, 24 46:3,7 47:8 50:7 51:5,7,10,24 52:8 53:23 54:20 55:14,17 56:5, 24 57:13,15,16,25 59:2,9,25 62:23 63:3,16,18 64:19 65:1,23 66:4,19 67:14,19,20,25 68:2,3,7, 20 69:9 70:7,18,22 71:8,18,19,20, 24 72:21,25 73:13,14 74:12,14, 15,16,19,20,25 75:8 76:13 77:6,7, 13,20,24 78:14 79:3,15 80:5,17 81:25 82:6 85:16 86:14,15,25 87:3,23 90:10 91:4,6,8,10,16,20 92:5,8,17 93:22,24 94:12 95:13, 17,21 96:14 98:3,10 99:2,8,9,13, 18,19 100:2,15,22 101:16 102:8, 15,17,20

**haven't** 50:10 86:25 94:17

**having** 5:11 12:10 30:21 51:2 54:17 55:22 56:9 59:16 72:20 76:16 100:18

**he's** 23:4 88:8 102:12

**head** 52:21,22,24 53:10,13 54:1, 13,17 55:20 60:25 62:3,5 75:25

**hear** 45:5 55:10 70:22 96:20

**heard** 56:9,10 79:2 96:18

**hearing** 16:7 20:21,25 41:14 75:19,23 83:7 84:8

**hearings** 101:19

**hears** 88:3

**held** 50:16

**help** 7:16,24 31:22 39:25 43:25 66:1 100:7

**helps** 17:7 61:13 102:3

**here** 7:4,13 8:16 11:15,23 12:2 17:8 18:19 27:19 30:21 31:13 44:12 45:8 55:7,21 56:4 59:21 61:5 62:16 64:6,22 65:17 69:9 77:23 78:12 89:16 90:21 91:17,22 92:10 96:23 97:15 98:10

**high** 88:22,25

**higher** 86:10

**history** 93:10

**hold** 18:19 60:5 65:11 68:10 87:5

**home** 16:12 51:17,22 52:20 53:15 66:10 78:14

**homicide** 29:11,15,18,25 36:9, 11,18,23,25 37:8 41:15 47:20 66:11 101:15

**homicides** 27:8,10,12 29:19

**honestly** 18:7

**Honor** 18:23

**hope** 100:22

**hour** 6:25 68:15,24

**house** 16:20,21 52:23 53:19 65:12

**housing** 66:13

**how** 8:19 11:11 13:8 14:1 15:6 18:14 22:10 25:25 27:19 28:5,12, 18 35:14 36:1,10,24 38:17,18 39:2,10 40:23 41:7 42:13,15,17 45:11 48:8 49:11 50:5,19 52:10, 19 53:13 57:19 67:13,25 68:6 70:5 95:14,15 97:23 98:11,12 101:5,24 102:2

**hundreds** 39:13

**hurting** 17:25

**hypervigilant** 101:2

I

**I'D** 42:3

**I'LL** 6:24 7:22,24 8:4 11:21 17:23 18:21 42:9 43:5 67:20 68:3 80:23 81:9 88:19

**I'M** 4:7 6:5 7:10,11 11:12,21,23 14:22 17:6,9,17,25 18:2,8,17 23:4 28:3 31:19 33:9 35:22 41:17 42:15,19 44:2 45:5,17 46:19 57:25 59:15,20 60:3,4,11 61:11 67:7 70:13,20 76:6 77:15 79:6,11, 17 80:21,22 81:11 83:6 86:24 87:3 89:20 90:23 92:14 96:11 97:1,13,21 99:22 103:4,13

**I'VE** 7:20 56:10 67:23 78:18 90:23

**identified** 30:20

**Illinois** 5:22 26:20 37:12,18,24

**illiterate** 62:11

**impact** 63:22

**impacted** 62:23

**impeach** 47:5

**important** 6:12

**improper** 83:23

**impulse** 55:8,13

**inaccurate** 91:14

**inaccurately** 91:3

**incarcerated** 49:19

**incident** 15:24,25

**include** 37:3 38:13,24 45:17 101:10

**included** 71:9 97:8

**includes** 62:15

**including** 29:15 56:6

**income** 66:13

**inconsistencies** 47:11

**incorrect** 79:3

**indeed** 54:17 56:15

**independent** 12:8 65:23 73:20

**indicate** 9:20

**indicated** 96:18

**individual** 4:21 25:22 69:24

**individual's** 42:6,7

**individuals** 30:20 40:2 65:4 70:18 97:3

**ineffective** 21:19,23

**ineligible** 56:13,22

**inference** 71:22

**influenced** 100:16

**information** 14:9,11 16:6 23:6 25:5 32:11 51:21,24 76:16 82:21 85:3 96:3,5

**initialed** 64:4

**initially** 16:23

**injuries** 60:25

**injury** 53:10,13 54:1,13,17 55:20 62:3,6 75:25

**inmate** 50:16

**innocence** 31:5,8 57:12 93:12 96:15

**innocent** 24:1 37:17

**insert** 67:2

**instance** 55:12 56:20 63:24 70:17 72:13 73:6

**instead** 18:3 59:7 94:20

**instructions** 49:6,8

**intact** 73:4

**intellectual** 21:13

**intelligent** 81:13

**intelligently** 70:23 81:21 84:10, 12

**interest** 27:14 91:7

**interested** 52:22

**interfere** 101:6

**interpret** 65:9

**interpreted** 65:15

**interrogation** 24:6 25:2 101:17

**interrogations** 25:1 101:16

**interrogators** 67:25 68:1

**interrupted** 85:18

**interview** 40:3,5 46:7,12 47:14 74:7,24

**interviewed** 36:8 46:4 74:20

**interviewing** 46:1

**intimated** 76:10

**invasion** 78:15

**investigate** 43:24 46:25

**investigating** 39:16 64:23

**investigation** 40:8 43:6,23 46:21 47:17 73:23 74:7,17 75:7,8, 10

**investigators** 39:14,19,25 45:11

**involved** 24:5,25 38:17

**involves** 49:10

**involving** 23:1,23 71:5

**IQ** 56:9,16,21 57:25 63:5 64:13 71:21 76:11 83:2 96:19 97:19

**IR** 95:4

**isn't** 90:20

**issue** 18:10 19:24 20:23 21:5

**it's** 6:7 9:20 12:21 16:22 17:12 19:1,7 32:11 36:13,14 40:16 42:5, 6,7 47:24 49:2,3 58:8 59:4 60:6,7 63:13 67:10 70:21 72:3 73:8,22 75:9 77:20 80:3 88:7,9 89:5 91:7, 8 93:11,13 101:2 102:7,9,10,24

**Itchhaporia** 4:20,21 61:18 68:3 92:8,12,15,20,25 93:3 99:2

J

**Jacques** 4:7 92:19

**jail** 49:19 50:6 51:3

**job** 37:3 39:7

**jobs** 65:18

**John** 23:12 68:6 92:17,20 96:2

**joined** 28:6

**Jon** 4:17

**judge** 16:8 17:3 19:7,22 58:11 68:10 78:20 79:25 82:14,22 86:5, 9,14,19 87:21 88:1 101:20

**judgment** 72:12

**June** 35:12 36:17

**junior** 40:21

**jury** 16:8 18:25 19:7 49:6,8,9 102:4

**just** 4:11 5:5,8,19 6:5,14,25 7:8, 10,15 9:25 10:2,10 11:14 17:8,21 26:3 28:13 32:25 34:6 35:23 36:1 38:7,14,21 40:10 41:3 42:9,19 43:7 47:15 52:23 53:3,7 54:23,24 56:2 58:10,13 60:4,6 62:18 65:19, 22 67:2,8,9 69:20 72:8 73:2 76:3, 6 78:4 80:24 81:9 84:6 87:16 89:7 92:8 94:2 97:13 99:9 100:15 101:17

K

**keep** 6:7,12 33:3,4 86:18,19

**keeping** 60:3 88:2

**keeps** 8:22

**key** 46:4

**kidnapped** 24:4

**killed** 24:4 78:13

**Kim** 83:9,18 84:4,6

**kind** 11:13 12:4 27:1,9 32:23 36:1 37:2 56:2,3 69:18 77:20 84:8 92:14 101:25

**kindly** 65:10

**knew** 8:17 13:20 26:19 56:2 90:18

**knock** 47:7

**knocked** 67:20

**know** 6:3,19,22 8:17,19 11:7,10, 20 14:21 17:2 18:9 21:12 33:1,6, 19,22,24 34:4,5 39:12 40:23 42:17 46:15 48:2 51:20 53:3,17, 20 54:19,25 55:21 56:17 59:23 61:14 63:19 67:20 73:3 77:8 79:10,13,15 81:8 82:14,24 83:4, 14 86:3 87:1,9 89:5 90:17,25 93:22 94:16,17 95:13 96:7 97:23, 25 100:1,2 103:14

**knowing** 53:12 56:8 81:12 82:1

**knowingly** 70:22 77:11 81:20 82:8 84:9,12

**knowledge** 13:14 14:16 33:15 36:20 66:20 91:20

**known** 63:16,18 76:25

**knows** 88:1 101:23

**L**

**lab** 73:18

**labor** 43:5

**laboring** 57:17

**lack** 84:17

**lag** 6:14

**laid** 86:13

**landed** 87:21

**large** 29:4

**last** 5:16 9:3,18 13:4,19 15:5 34:2 40:11 50:11 59:24,25 60:2 99:6

**late** 20:3,11

**later** 25:18 26:15

**Laura** 95:22

**Lauren** 13:20 14:15 33:19 82:18 95:22 96:4

**law** 34:16,20 38:8 47:3,10 49:5,7, 9 54:12 101:15

**Laws** 19:22 82:22

**lawyer** 6:3 23:23 38:1,2

**lawyers** 5:5,8 27:12

**lazy** 54:23

**lead** 54:7

**learn** 13:2 39:5

**learned** 11:9 13:8 15:3 23:19 25:4 55:9,12 56:5 83:18 84:6 90:15

**learning** 100:21

**least** 12:4,5,20 20:1,3,11 27:25 33:3 52:7 53:25 63:7 76:10,25 89:9

**leave** 68:16

**led** 51:22

**Lee** 24:10,15

**left** 13:23 36:17 68:20 91:12

**legal** 4:8 38:3

**legitimate** 71:9

**legs** 7:1

**less** 38:14 68:8 100:13

**let** 6:22 7:15 17:20 27:20 34:6 41:3 42:23 43:15 48:22 56:2 58:8 61:14,21 62:8 64:24 67:2 76:3 79:10,13,15 83:25 87:9 92:10

**Let's** 18:12,14,16 22:15 68:18,21 87:2

**letting** 65:11

**level** 64:13 97:19

**library** 34:19

**life** 27:4 47:22 60:19,25 62:4 63:10

**like** 7:13 8:23 18:8 22:17 32:6 42:3,9 43:5 50:14 53:3,21,22 86:17 87:17 93:13,17 94:13 98:12 101:2 102:1,2,23

**liked** 65:20

**likely** 86:19

**limitations** 84:23 101:5

**limited** 10:20

**line** 18:23 60:16,22 79:12,13 80:23 81:15,22,23 87:7 89:22

**lines** 88:18

**link** 93:25

**lip** 92:14

**list** 45:19 50:12,13 93:13 96:22

**listed** 90:21

**listened** 31:25

**listening** 65:13 78:25

**lists** 12:1

**literal** 95:9

**litigate** 102:7

**litigation** 37:13

**little** 6:25 7:9 32:12 34:6,7 40:9 50:9 54:8 64:21 68:4 81:13 93:13 101:25

**live** 63:10

**living** 66:10,12

**local** 5:21

**locate** 40:2,4

**located** 75:3

**locating** 50:3

**Loevy** 4:17 13:21 14:17 17:18 18:3,12,14,16 22:2,3,7,8,11,21,22 23:12 30:4,8,24 31:12 33:24 58:8 59:24 67:2,17 68:1,8,11 69:1 76:3 77:15 82:2,9,18 83:21,25 84:17 85:4,17 91:19 92:7,17,22 99:4,6, 9,11 102:15,23

**Loevy's** 96:2,8

**long** 6:4,23,24 11:11 27:20 68:4, 22 73:8

**longer** 19:23 20:4,12 67:12 68:23

**look** 18:4 45:21 50:16 53:1 59:3 67:21 80:21 87:2 93:7,19

**looked** 11:7 24:15 93:6,8,24 95:11

**looking** 7:23 18:2,21 48:23 54:23 60:12,21 79:23 88:18

**looks** 7:13 87:17 101:24

**lot** 6:4,7 26:9 37:16 38:4 78:18 100:23

**loud** 64:4 88:19

**Louis** 34:22

**low** 56:11,21 57:25 66:13 71:21 83:2 96:19

**Lyon** 24:20 25:11

**M**

**M-A-L-L-E-R** 9:8

**M-A-R-I-J-A-N-E** 40:11

**M-C-B-E-T-H** 5:18

**Ma'am** 92:13

**machine** 24:2

**made** 23:11,15 47:10 64:5 66:6 74:23 82:21 84:12 85:25 91:2 97:25 98:1 100:12

**major** 34:10

**make** 6:14 37:14 41:12 44:4 48:16 50:9 56:3,13,22 57:24 58:5 84:1,3 89:7 97:5,9 98:15 100:21

**makes** 41:24

**making** 86:2

**males** 52:10

**Maller** 9:7 94:3,5,25

**manner** 79:20

**mantel** 53:1

**many** 22:10 28:5,12,18 29:22 35:14 36:10 38:17 39:10 40:23 46:23 52:10 98:12

**Marijane** 12:3,13 40:10,12

**mark** 7:22 17:10 59:22

**marked** 79:7 97:14

**math** 36:14

**matriarch** 52:4

**matter** 4:5 30:8

**maximum** 89:15

**may** 6:23,24 10:15 16:23 26:17 45:22 56:14 78:14 99:13

**maybe** 7:16 28:20 56:16 66:13 93:18 96:21

**Maywood** 36:5

**Mcbeth** 4:5,25 5:10,18,24 10:19, 25 12:3 58:10 84:19 99:12

**mean** 8:4 13:5 19:20 20:20 21:10 29:14 33:12 55:21 57:6 61:9,23 62:2 63:25 67:3,18 73:8 82:20 86:2 87:23 99:21 101:13

**meaning** 28:13 38:13 57:22 75:6 87:18 95:13

**means** 19:21 37:14 61:11 62:3 88:4

**meant** 61:6,12 86:3

**medical** 53:23 76:1

**medically** 57:3

**meet** 16:11 40:6 51:9

**meeting** 16:3,18,20 53:6 65:2,4

**meetings** 51:2

**member** 28:14 36:11 52:18

**member's** 51:17,22

**members** 16:13 66:5,8

**memorialized** 99:14

**memory** 7:16,24 12:8,12 20:6 31:23 42:22 54:20 66:1 74:12 75:8 82:4 84:18 85:16 88:12

**mental** 57:9 58:24 61:1 63:3,4 76:10

**mention** 14:4

**mentioned** 14:13 21:2 22:1 51:15 64:25

**merited** 48:18 72:12

**message** 13:19,22,23 14:14

**met** 9:4 40:12,18 51:6 52:2 53:19

**methodology** 73:19

**methods** 25:2

**Michigan** 34:9,11,14

**middle** 60:13

**might** 24:12 36:15 54:1,5 59:25 60:23 71:1 77:24 90:22 93:24 97:14 101:20

**mind** 6:7,12 53:18 81:9 88:2

**mine** 96:1

**minimum** 89:14

**minute** 10:1 61:13 79:10 96:14

**minutes** 7:1 67:11,19,21 68:8,13, 18,21 76:19

**Miranda** 15:19 21:4 70:19 71:23 77:11

**misapprehension** 57:18

**misbehaving** 102:10

**misconduct** 23:3

**Misha** 4:20 92:7

**missed** 91:8

**missing** 44:19 71:16,17

**misspelled** 15:21

**misstated** 91:13

**mistaken** 32:3

**mitigating** 54:6,9,10 55:4

**mitigation** 16:5,6,17 54:7 60:19 71:13

**mitigator** 16:12 98:16

**modern** 37:10,11 63:11

**moment** 11:15

**month** 28:21

**moot** 102:24

**moratorium** 37:10

**more** 6:12 28:10,21 29:8,24 40:20,22 41:1 42:25 47:24 54:8

56:6 61:14 62:8 67:9 70:21 73:1 80:4 82:20 83:1,3 86:19 88:7 100:13 101:3

**morning** 4:1,18,20 5:15 22:20 30:5

**most** 26:23,24 27:10,23 29:8,18, 25 57:8 67:20,23 102:14

**Mostly** 70:11

**mother** 52:5,12 53:19 65:2,6 66:7,10

**mother's** 16:21

**motion** 59:22 63:19 69:25 70:6 71:2,4,10 72:3 75:19,22 77:7,13, 21 88:5 102:7

**motions** 69:22 101:10 102:6

**motive** 53:20

**motor** 90:6

**moved** 13:12 36:1 50:10

**Mr** 4:17 12:11,23 13:21 14:17 16:12 17:15,18 18:3,12,14,16 19:9,14,17 20:4,13 22:8,11,21,22 23:11 24:16 26:1 30:4,8,24 31:4, 12,18 56:14 58:8 59:24 60:19 63:14 66:21,25 67:2,17 68:1,8,11 69:1,16 71:15 76:3 77:15 82:2,9, 18 83:21,25 84:17 85:4,17 87:8 88:21 89:23 90:2,8,16,21 91:2,19 92:7,22 96:8 98:2 99:4,6,9,11 102:15,23

**Ms** 4:18,20,23,25 5:14,19,23,24 9:25 10:10,19,24,25 12:2,3,13,22 14:20 15:3 17:13,20 18:1,6,13,15, 17,20,23 19:21 20:18 21:2,14,23 25:11 42:12 58:10,13,18 59:22 60:2,8 61:18,21 62:1 67:6,16,18 68:3,6,13,14,18 69:2,8 76:6,15 77:22 82:5,11 83:23 84:5,19,21 85:1,5,19 89:3 91:21 92:5,8,10, 12,15,20,25 93:3 98:1,22 99:2,5, 8,12,13,16 100:6 102:17,19 103:2,5,13

**much** 54:15 67:14,25 68:6 102:7

**Muller** 33:20

**multiple** 16:13 27:11

**murder** 8:11 9:22 14:6,12 25:11, 15,19 26:6 27:6,7,17,21,23 28:5, 7,12,15,18,24,25 38:19 39:17 41:7,10 50:21 66:24 69:16,21,25 72:7 75:10 78:5,9 89:18 94:6 95:1,19 98:7,21

**murders** 29:4 38:21 39:20

**must** 33:13 96:14

**mute** 4:11 5:4

**my** 4:7 6:15 15:10 16:15 18:10 19:2,11 20:6 21:6 23:23 30:12 36:14 53:18 56:1 68:19 77:2 84:13 100:23

**Myerscough** 33:20 82:19 96:5

**Myerscough-mueller** 13:21 14:15,20 15:3 21:2,14 33:21 85:5 95:22

**myself** 64:21

**N**

**name** 4:7,14 5:16,17 7:6 9:3,4 15:12,21 24:8,9,10 40:11 42:11, 12 93:8 94:12

**named** 31:24 90:13

**names** 42:17

**Nancy** 4:24

**nationwide** 26:14

**nature** 14:24 57:10

**need** 7:2 10:18 11:1,3 27:12 32:11 49:6,7,8 61:15 67:10 68:13 76:11,12 101:1

**needed** 32:18,22

**neighborhood** 55:1

**never** 9:4 32:6 51:6 81:8

**new** 27:1

**newer** 24:3

**next** 19:6 68:24 79:12,18 81:10

**nice** 53:2 65:8

**nieces** 52:8 65:7

**night** 69:15

**no** 4:6 5:6 6:19 7:23 8:2,16 9:23 13:16 17:10 19:15,23 20:4,9,12 21:17,21,25 23:8 25:6,17 26:3 30:6,18 31:20 32:8,9 35:19 36:13 40:13,19 41:22 43:13 44:22 45:9 46:2,6 49:21 51:7,10,23 56:19 58:11 59:23 60:10 62:22 64:9 67:3 68:10,22 69:12 70:2,4 74:12, 18 75:7,8,10,12,16,20,24 77:2 79:7 80:4 82:4 83:6,19,21 85:24 88:12 89:9 91:20 92:17 94:20 95:20 96:17 97:4 100:24 102:19, 24 103:3,5,8

**nobody** 32:4 41:24

**norm** 56:12

**normally** 67:22

**Northern** 5:22 93:24

**notes** 44:16 73:18 99:13,19 100:1

**nothing** 86:14 99:1,3

**noticed** 67:10

**notified** 32:22

**notorious** 23:24

**number** 13:6 22:14 23:1,3 29:4, 10 42:10 50:16 60:5 61:11 95:3,4 96:8

**numbers** 60:12,14

**O**

**obedient** 54:12

**object** 53:22 58:8 83:21,24,25 84:19 85:17

**objection** 58:13 67:2 76:4 77:16 82:2,9 83:23 84:17 91:19

**objections** 58:11

**obtain** 43:18 98:7,16

**obtaining** 43:22

**obviously** 6:19 27:7 70:20

**occasion** 45:17

**Occasionally** 44:10

**occasions** 44:23 46:19,23 59:8

**occur** 37:2

**occurred** 25:10

**occurring** 32:23

**October** 17:12 20:7,11,21 61:20

**off** 9:25 10:5,7,11 18:11,15 19:2 21:10 32:1 33:9,12 36:15 53:16 64:21 68:24 69:3 80:14,16,19 102:1 103:6,9,11

**offender** 24:14

**offense** 81:19

**offenses** 8:12

**office** 8:22 9:2,6 10:13 12:17 13:22,25 14:4 16:3 23:10,24 25:12,23 26:19 27:13,24 29:3,7 31:21 32:8,15 35:6,9,18,22 36:2 38:4 39:12,14,16,22 40:24,25 41:8,18,21 44:16,25 48:25 59:6 83:12 90:15,17 94:4

**office's** 33:1

**officer** 30:15 91:6

**officers** 4:22

**often** 47:5 50:19

**oh** 5:6 52:25 59:25 92:10 97:17 102:14 103:4

**okay** 6:3,9,10 7:2,3,10,15,22 8:3, 5,19 9:1,7,10,14,19,25 10:5,8,10, 25 11:2,12,21 12:9,13,20 13:2,8, 13 14:13 15:2,6,12 16:19,22 17:6, 17 19:6 20:1,15,19 21:8 22:6,10, 15,19 24:13,19,21 25:18,21 26:5, 8 27:6,15 28:5,22 29:23 30:14 31:3 32:25 40:17 43:3,10 45:7 46:11,24 48:12 49:14 51:5,8,12 55:12,18 56:20 57:6 59:8,12 60:15,21 61:5,21 62:16 64:12,18 65:13,17 66:4 67:7 68:14 70:9,17 71:4 76:23 77:3 78:19 79:17,18 80:1 81:25 83:8,14 84:14 85:6 88:24 89:7,16 90:10,19 91:1 92:5, 25 93:9,19 94:2,9,18,24 95:16,21 96:4,10,23 97:10,13,17,20,25 98:10,15,19,25 99:2 103:1,5,7

**old** 32:8 97:23

**once** 10:17 22:13 28:17 103:15

**one** 9:20 12:2,20,21 14:4,14 16:4 17:5 18:15 19:13,17 28:20,21 29:24 36:5 42:2,9,25 44:14,15 45:25 46:15 48:4,21 49:14 51:15 52:6 53:8 56:18 59:16,21 60:2 65:7 68:22 69:13,20 70:16,25 74:1 75:2 77:24 83:4,14 85:21 91:8,12,13 94:20 95:21,24 100:7

**ones** 17:23 26:11,12

**only** 18:10 22:24 28:23 55:17 95:21

**onset** 63:7 76:11

**open** 57:17 81:16 88:2

**operating** 84:23

**opinion** 59:16 82:17 83:17 84:11, 13

**opportunity** 72:25

**options** 57:11

**order** 50:15 58:21 62:5 80:18

**ordering** 103:12

**ordinary** 94:22

**other** 5:5,8 14:5,14 17:23 23:1, 11,15,19 25:5 26:4 28:11 37:23, 24 38:13,14,18 39:5,20 43:24 44:14,15 45:21,25 46:15 48:21,23 52:5 53:8 55:18,19 56:6,7,18 58:24 59:17 65:1,3,5,21,22 66:5 67:13,24 69:13 71:25 72:8,16 74:1 75:25 76:1 83:4 95:12 96:5 100:8 102:15

**otherwise** 23:7 61:4

**outline** 67:22

**outside** 88:9

**over** 6:6,11 8:23,24 9:1,11 22:16, 17 65:11 99:23 101:21

**overlap** 9:5

**overseas** 25:1

**own** 43:23 45:1 49:16 65:12 66:12,16 73:20 78:7

**P**

**P-L-A-C-E-K** 40:11

**p.m.** 69:7 103:10,17

**pace** 28:21

**page** 12:25 17:15 18:2,22 19:2,3, 4 20:7 60:4,12,21 61:16 79:9,11, 12 80:21,22,23 81:11,12,14 87:6, 7 88:19 89:8,21 97:18

**pages** 17:24 78:4

**pain** 52:17

**parameter** 79:2

**parameters** 78:1,22 79:22,25 80:1

**part** 12:5 25:18 27:17,21 28:18 33:13 37:3,11 39:7 51:12 61:4 79:24 87:15 97:15 98:5

**participate** 58:6

**particular** 42:21 43:10 44:17 45:24 46:14,16 48:19 49:18 51:1 70:14 86:23

**parties** 10:16

**partly** 37:3

**partner** 42:3

**partners** 41:3,4,6

**parts** 27:13 37:22,23 38:13 42:16

**passed** 35:3 101:15

**past** 5:25 7:6 48:1

**path** 35:24

**PD's** 94:4,5 95:18

**peaceful** 54:11

**penalties** 81:19

**penalty** 16:2,7,24 17:1,4 19:23 20:4,22,23 26:10,14,18,20 27:2 56:13,22 63:20,22 75:11 80:13, 16,18,19 98:9

**pending** 8:15 32:9 90:22

**penitentiary** 78:16

**people** 11:24 16:4 17:11 25:1 27:11 29:10,13,15,17,24 37:15,17 38:11 45:13,16 48:2 52:5,8,13 53:20 55:22 56:6 57:18 62:15 63:2,4 65:21 73:2 102:2

**perform** 97:8

**perhaps** 50:2 53:25

**period** 29:9 33:4 54:21

**persisted** 62:4
**person** 7:5 8:1,22 13:19,23 15:10 16:3,7 22:5 24:6,23 31:24 42:2,5 47:21,23,25 54:21 57:15 64:1 65:15 76:10 87:24 102:11
**personal** 31:16 33:15 99:20
**personality** 100:15
**persons** 65:1
**persuade** 49:3
**Peterson** 71:15
**petition** 21:15,20 75:14
**petitions** 15:1
**phase** 28:13
**phone** 9:14 22:5,18 96:8
**photograph** 7:12,15,19,23 8:2
**pick** 95:9
**picture** 53:15
**pictures** 53:1
**picturing** 53:18
**place** 20:21 66:16 73:2 90:9
**placed** 36:3
**Placek** 12:3,14,22 17:13 18:23 19:21 21:23 40:10,12,15,16,17 84:21 89:3 98:1
**Placek's** 20:18 42:12
**places** 37:24
**plaintiff** 4:17 17:22
**plaintiff's** 31:1 75:5
**plan** 16:11 100:24,25
**planners** 100:18,19
**plans** 100:21
**plea** 11:25 12:6,24 28:14 58:16 60:3,11 76:20 78:2,21 79:1,8,21 80:25 81:12 82:1,7,23 84:11,15 85:15 87:18,23 88:5,21 89:14 97:11,23
**plead** 11:25 17:2 33:16 57:12 78:4,5 80:6,10,15,18 81:2,5 83:20 84:10 85:7,12,21 86:8 88:6
**pleading** 81:21 84:16 85:23
**please** 4:11,14 5:7,15
**pleased** 66:15
**point** 6:21 10:22 17:1 39:10 49:24 53:9 58:2 101:17
**points** 39:2
**poke** 102:2
**police** 4:22 48:5 72:8 102:10
**policy** 33:1,7,8,14
**pop** 7:11
**portion** 55:8 76:8 89:23
**possessed** 66:24
**possession** 31:16 90:4,5,6,15
**Possibility** 75:2
**possible** 55:14 59:4 71:9 73:23 75:9 81:19
**Possibly** 11:20
**post** 75:6
**post-conviction** 14:24 21:15 75:14
**potentially** 43:12
**practice** 29:11,16 32:7 38:21 41:6 46:3 51:13 98:6
**pre-adjudication** 83:22
**preparation** 31:12 49:24 50:20
**prepare** 13:18 43:12 48:23 69:19 75:18,22
**prepared** 101:1
**present** 16:7,19 22:8 32:23 49:9 65:2 71:1 72:2 77:21 81:3,4 91:2 100:4
**presented** 56:24 71:18,20,24 77:7,13 80:24 83:10
**pressured** 84:15,21,22 85:3
**Presumably** 88:2
**pretrial** 69:22
**pretty** 66:17 69:25
**prevent** 49:20
**printout** 50:14
**prints** 72:22 73:1
**prior** 89:25 91:3 98:20 101:14,18
**prison** 78:10
**private** 29:11,16 59:7,9
**probably** 15:5 38:22 55:16 67:18,19,23 68:13,14 79:14
**problems** 55:13 61:1 62:4,6 63:11
**procedural** 93:10
**procedure** 5:21 13:25 32:15,18
**procedures** 26:17 94:23
**proceeding** 24:17 31:5 58:9 63:15
**proceedings** 14:20,24 19:25 57:10,20,22 58:14
**process** 13:10 24:17 38:24 39:3 93:17
**produced** 32:6
**profession** 91:9
**professional** 72:12
**program** 93:23
**Project** 93:12
**Project's** 93:20
**prolonged** 54:21
**promise** 86:11
**promoted** 36:9
**pronouncing** 40:14
**proper** 16:17
**properly** 39:2
**pros** 24:22
**prosecuting** 83:13
**prosecutor** 84:4 99:20,25
**prosecutor's** 99:14
**prosecutors** 19:13,17
**prove** 102:3
**provide** 31:22

**provided** 31:11,14 37:20 38:4 82:8 85:4 89:23

**public** 8:21 9:2,6 10:12 12:17 13:24,25 14:1,3 17:14 20:19 23:10 25:12 26:19 28:1,23 29:3,7 31:21 32:2,7,15 33:25 35:6,9,18, 22 38:14,18 39:5,11,12,15,24 41:20 42:6,25 43:3 56:23 72:6 74:6 79:1 85:14 90:14 91:24

**pull** 18:6

**punishment** 37:10

**purports** 17:13

**purpose** 10:20

**purposes** 73:4

**pursuant** 5:20

**pursue** 16:25 73:24

**pursued** 56:24 74:2

**put** 6:4 7:20 17:21,23 38:12 65:19 79:14 86:21

**Q**

**question** 5:2 6:15 19:11 41:4 42:16,24 43:16 55:24 56:1 58:23, 24 61:22 62:9 74:13 76:6 77:17 81:10 84:1,3

**questioning** 5:5 6:9 15:9 85:2

**questions** 10:18,20 16:15,16 22:23,25 58:25 67:9 69:18 75:4 92:9 93:5 99:8,12,16 102:16 103:3,8

**quick** 10:3 61:18

**quite** 24:1 60:18

**R**

**raise** 58:11 76:3

**ran** 26:3

**range** 56:12 78:8,17 87:19 88:8, 9,20,22 89:11

**rap** 48:6

**rapid** 28:21

**rather** 10:21 23:24

**reach** 30:16,19

**reaches** 32:19

**react** 101:1

**reactive** 100:17,23

**read** 61:14 62:12,15,17,18,22 63:8,12 64:1,3,4 65:22 70:19,21 71:14 73:18 76:14,18 78:3 79:10, 15 80:2 81:7 87:8,12 88:19 93:9, 10

**reader** 92:14

**reading** 60:24 61:3,7,9,10,23 62:6,10,14,18 63:8,10 76:8,19,23 88:15 89:8 98:22

**ready** 4:12 43:17

**Real** 61:18

**really** 47:24 56:1 72:25 102:9,10

**reason** 32:9 44:20 51:5,7 68:24 70:25 71:8 74:15,19 81:25 82:6 86:21 91:16 94:19

**reasonable** 74:6,16

**recall** 6:1 7:8,12 8:1,10 9:10 16:22 19:12 21:6 24:13 25:24 27:19 31:2 37:25 40:12 44:12,14, 15 45:7 46:9,18 51:1 52:10,11 56:9,18 57:2,5 59:12,15,16 61:5 62:16 64:6,9 66:7 67:1 69:13,17 71:6,7 74:1,22 76:16 78:17 80:11 89:16 98:14,18,19,22 102:21

**recalled** 16:1

**recalls** 76:7

**receive** 36:24

**received** 13:13 22:3 33:20,21,25 37:7,19 44:24 48:25 51:20 53:10, 13

**receiving** 37:21

**recent** 9:14 31:4 37:11

**recently** 10:16 31:8 56:6,10 96:19

**recess** 69:5

**Recitation** 71:13

**recited** 61:4 65:19 98:23

**reciting** 76:11 83:6

**recognize** 84:24

**recollection** 11:17 12:4 17:8 34:5 45:25 51:10 64:19 65:1,23 66:4,19 69:10 76:24 77:2 79:22 80:5 87:10 90:10 98:3,11

**recollections** 51:16

**recommendation** 86:8,20,22 87:10

**recommended** 89:4

**recommending** 86:6,12 87:19, 20 88:14,16

**reconvening** 10:22

**record** 4:2 5:19 6:16 9:25 10:6,7, 9,10,11 12:21 17:21 32:1 33:10 40:10 47:4 60:7 61:18 65:20 69:3, 6 76:18,19 91:5 94:15 103:6,10, 11

**record-keeping** 94:22

**recorded** 101:16

**records** 14:5,7 56:16 71:15,19, 21 90:14 97:3,6,16,21,24 98:2,8

**Reed** 4:5 7:6,8,25 8:6,14 11:6,16, 24 12:11,23 13:15 15:4,7,12,16, 23 17:11,15 20:5,13 21:3,24 22:11 25:8 27:16 31:18 33:16 36:1 42:12 51:2,9,25 53:9 54:2 55:10 56:21 58:3 59:13 60:7 61:6 62:17,22 64:25 66:24 69:11 71:5 74:11 75:17 76:17 78:1,22 80:2,6, 9 83:18 84:9 85:6 89:17,25 90:3, 11,16 91:17,23 93:6,8 94:6 95:7 96:12 98:11

**Reed's** 13:3 14:14 16:12 19:14, 18 21:16 22:11 31:4 32:5 43:12 52:3 60:19 63:14 74:2 75:6,13 82:1,7,24 87:11 89:3 91:3 93:21 94:25 95:19,23 96:6,19 97:6 98:2, 17,20

**refer** 53:3

**referenced** 76:21

**references** 44:17

**referred** 31:25

**referring** 76:20 97:10,15

**reflect** 12:22 19:16 20:20

**reflecting** 80:13

**reflects** 13:1 20:14,16 60:20 64:15 88:23 89:6,13 97:7

**refresh** 7:16,24 12:3 17:7 31:22 66:1 76:24 77:2 79:21

**refreshes** 87:9

**refuse** 50:24

**regard** 59:13 63:21

**regarding** 98:16

**regular** 41:2,4,6 51:13

**reinstate** 26:22

**relate** 42:16

**related** 10:20 14:5 31:17 38:6,7 51:21

**relates** 94:5 95:1,18

**relation** 20:2 25:22 26:2 55:9 63:23 64:8 66:24 74:11 87:11

**relationship** 66:5,8

**relative** 53:4

**relay** 79:2

**relayed** 96:6

**relaying** 20:16

**release** 83:18

**relevant** 55:17

**reliant** 100:13

**rely** 50:1 100:7 101:7

**remember** 4:12 8:5,17 12:10,13 15:2,23 16:3,18,19 17:4 21:7 23:18 24:8,21 25:4,25 28:8,16 40:17 43:11 52:2 53:5,8,12 55:6 56:8 62:25 65:3,17 71:4 76:4 77:23 83:6 86:22 87:4 99:15

**remembered** 15:24

**remembering** 52:17

**remembers** 67:4

**remote** 4:7

**rendering** 59:15

**Renee** 92:18

**reporter** 4:16 5:17 12:7 68:17

**represent** 4:15 7:25 11:6,16 14:20 42:10 72:20 80:24 93:5 96:12

**representation** 15:8 21:24 85:25 86:2

**represented** 7:5 8:7,10,13 9:21 11:11 12:5,11,23 25:8 31:18 81:16 90:17 91:23,25 96:1,13

**representing** 4:8 11:18 15:4 24:14 25:21 27:16 35:25 42:12 85:13 98:6

**reputation** 47:19 48:9

**request** 39:24 48:5 90:14

**requested** 10:12,16 14:8,10,11 30:21 32:5 94:20

**requesting** 30:12 32:13

**require** 78:6

**required** 81:1

**requirement** 38:2

**resources** 100:24

**respect** 52:14 74:13

**resulted** 53:14

**retain** 59:6

**retained** 16:4

**retardation** 63:3,4 76:10 101:6

**retention** 33:1,6,14

**retire** 35:11

**retired** 35:9,10,15

**retirement** 35:18

**retrieved** 94:11

**review** 31:12 59:9 99:15

**reviewing** 48:24

**Richard** 4:6 23:16,19 30:25

**right** 7:18 9:8 11:24 17:9,24 18:10,12,19 19:3 20:18 22:1 32:20 42:7 55:11 57:16 61:16,22 62:2 68:5 69:2 93:1 97:17 99:2,15 103:14

**rights** 15:19 70:19 71:23 101:18

**Rob** 4:7 92:19

**Rochi** 12:7

**role** 42:5

**room** 100:24

**routine** 32:7 69:20,25 70:3 81:2 98:5

**row** 37:18 50:17

**rule** 63:16,18

**rules** 5:21 6:6 27:2

**ruling** 63:15

**running** 26:22

**rushing** 65:10

**Ruth** 4:4 5:10,18 12:2

## S

**sad** 52:25

**said** 24:10 26:16 30:7 43:4 48:4 50:2,15 53:7 55:6 63:2 64:16 65:4,8 66:6 71:14 76:4 82:3 86:4 87:16 93:6,25 94:13 95:2 96:11 101:11,15

**SAITH** 103:17

**same** 25:16 39:21 42:23 72:23 77:17 79:14 80:21 82:9 85:17 89:20

**sample** 73:16,17

**samples** 73:5

**save** 27:3 32:9 50:9 72:4 77:21 101:12,13 102:4,5

**saw** 34:2 76:21

**say** 6:19 21:4 25:9 27:25 28:22, 25 29:3,14,17,21 30:19 32:12 33:23 39:1 42:3 43:21 46:15 48:19 49:3 50:6,20 52:24,25 53:2, 8 54:9 58:14 60:23 61:23 64:10 72:5,13 74:25 79:4 80:14 85:10 86:13,24 87:1 88:5 94:8 97:21 98:12

**saying** 31:2 32:3,4 42:19 64:3, 15,19 65:16 85:22 86:16 95:11

**says** 12:2 13:6 18:22,23,25 19:6, 9 61:3 70:18 71:14 79:25 81:15, 22 88:20 97:15,17,24

**scene** 73:1

**schedule** 30:12

**scheduling** 30:17

**school** 34:17,21 52:21 53:16 71:15,21 97:6,21,24 98:2,8,12 100:20,21

**science** 83:2

**score** 56:10 63:5 76:11

**screen** 7:12,20 18:18 19:2 92:13, 21

**scroll** 79:11

**scrolling** 81:11

**searches** 95:15

**second** 17:8 18:19 41:19 59:21 87:3

**Security** 97:16,21

**see** 7:12,19 11:13 17:7,15,16 18:12,14,16,18,22,25 19:1,3 26:21 47:11 50:17 60:14,15,22 61:2,4 62:9 72:22 73:18 81:21 89:24 92:13,15,16,20 93:25 97:16,24 99:23

**seeing** 8:2

**seek** 56:15

**seeking** 19:23 20:4,12,23

**seen** 42:10,16,22 77:24 86:25

**self-defense** 47:22

**selling** 54:25

**seminar** 37:22,23

**seminars** 38:5

**send** 18:4,7,9

**sending** 18:3

**sense** 84:1

**sent** 13:19,22 14:13 38:5

**sentence** 86:6,9 87:11 88:22 89:10

**sentenced** 16:9,10 27:4,5 37:18

**sentencing** 20:21,25 55:17 77:25 78:7,8,17,22 79:2,22,25 89:11,18 98:24

**separate** 27:12,13 95:16

**September** 35:7

**serious** 26:23,24

**serve** 85:8

**served** 13:10 93:17

**server** 13:10 93:17

**services** 58:22 59:2 97:8

**set** 18:24 91:3 102:1

**several** 30:7 56:11

**share** 21:14

**shared** 30:7

**she** 9:5,10,11,13,14,19,23 10:19 12:17 14:4,5,7,9,10,16 15:9,17,22 19:6 21:4,15,18,22 24:2,3,18,19, 21,22,23 25:11,14,16,21 26:2 32:4,12 40:20,21,22,24 41:2 42:3 52:13,14,16,24,25 53:1,3,4 64:3,5 65:7 67:3,4 68:12 76:4,7 78:24 82:4 86:11 88:3 94:8,9,13 95:11, 17,20 96:1,6,7,11,12 99:22,23 100:1

**she's** 88:1,2 95:8

**sheet** 48:6

**shock** 77:4

**shortly** 11:18

**shot** 48:2

**should** 16:9 29:14 39:6 50:11 60:3 68:3 79:11 101:4

**shouldn't** 87:13

**show** 7:15 11:12,21 17:6,9,17,23 59:20 79:6 89:20 90:25 97:13 102:2

**showed** 20:6 77:25

**showing** 11:23 14:7 18:17 60:9

**shown** 9:21 97:11

**side** 6:8

**sign** 58:21

**signed** 15:20 64:1

**similar** 41:20

**simply** 88:6

**since** 13:7 35:17 38:1 50:11 60:25

**single** 49:23

**sisters** 52:9

**sit** 7:13 8:16 27:19 55:7,21 61:5 62:16 64:6 65:17 69:9 77:23 89:16 91:17,22 96:23 98:10

**site** 95:12

**sitting** 99:21

**situation** 66:13 71:5

**situations** 8:23

**six** 28:20

**slow** 62:18

**smaller** 42:5

**smile** 53:2,3

**so** 6:1,14,16,25 7:16 13:6,7,13 16:14 17:3,19,24 18:4,18 19:8,11 20:1,11 23:9 26:19,22 27:23 28:20 29:12,13 31:7 32:2,11,17 34:23 35:16 36:1 37:19 38:9,25 42:20,23 47:23 48:12 53:4,5 54:9 55:3,4 56:1,2 57:17 59:8 60:6 61:20,22 63:7,12 64:16 67:22 68:9 69:13 70:17,24 71:16 72:10 73:3,10 76:23 78:16 79:17,19 82:17 86:12,18 87:1,4 88:15,24 90:25 91:10 93:18 94:17 95:10,16 97:20,25 101:2,22 102:4,7,12

**Social** 97:15,21

**some** 6:11 8:12 11:14 17:1 23:17 25:7 27:11 37:3,4,20 38:11,12 39:23 43:14 46:24 49:1,24 52:10 53:9 66:13,14 68:24 93:5,16,25 94:9,10 95:12 99:12,13 100:9,12 101:6

**somebody** 8:25 40:6 41:13 55:2 57:17 72:19 97:8

**somebody's** 52:23

**somehow** 77:5

**someone** 14:7,9,11 24:15 40:20 41:2,10 52:16 54:11 57:6,21 59:2 62:11 81:2 101:2

**something** 40:7 41:21 42:24 49:23 52:17 54:1 55:7,9 56:23 63:19 64:2 68:23 76:25 77:6,12 79:4 80:8 81:1 85:22 87:14,19 88:8,25 90:22 93:12 94:13 98:4 100:25

**sometime** 13:4

**sometimes** 6:13 38:11 45:11,12, 13 50:4 78:6 91:7 101:12 102:4

**somewhere** 65:20

**sorry** 7:17 11:22 17:25 21:10 28:3 33:11 40:14 44:2 45:5 57:25 59:15 60:3 77:15,18 79:11 80:22 85:18 92:11 96:11 103:4

**sort** 66:13 99:24

**sought** 73:13

**sound** 9:8 24:11 68:24

**sounds** 32:6 69:1 102:23

**source** 95:8

**speak** 4:13 22:2,6,19 60:15 79:3 91:5

**speaking** 4:11 22:13

**special** 26:23,25

**specific** 31:18 36:24 42:21 43:11 51:16 62:9 69:10

**specifically** 21:4,22 26:11 38:20 39:15 44:11 56:7 60:18 64:9,25 82:3 88:18

**specifics** 23:2

**speculate** 90:23

**speculating** 90:24

**spell** 5:16 95:6,7

**spellings** 95:5,10

**split** 42:14,18

**spoke** 8:22 14:3 15:7 22:8,16 30:3 38:20,21 94:9

**spoken** 22:10

**St** 34:22

**stabbed** 48:2

**staff** 41:12

**stage** 14:19 58:9,14

**stand** 55:19,23 58:23 101:24

**standard** 56:11 73:19 96:20

**standards** 73:12

**standing** 54:25 78:25

**start** 7:11 18:21 22:15 35:5

**started** 35:21 75:11

**starting** 60:16 79:11,12 80:22 81:15 87:6

**starts** 9:4

**state** 4:14 5:15 12:6 16:25 19:22 20:3,12,16,23 26:17,20 43:18,22 46:5,22 47:2 60:18 73:15 80:24 81:3 86:6,12,23 87:18 88:13,16, 24 89:24 96:25 101:23 102:11

**state's** 19:9,13 41:17 44:3,16,19, 24 45:19 48:25 64:3,7 72:23 82:14 83:12 87:10 101:21

**stated** 13:5,6

**statement** 10:14 15:20 29:6 70:8 71:11 75:22 80:9,12 82:7 87:8 91:2

**statements** 25:3 47:10 70:1,6 102:8

**States** 27:3 63:1 70:11,18

**stating** 61:6

**station** 24:2

**statute** 78:11

**stay** 5:7

**STENOGRAPHER** 103:12,15

**step** 41:14 49:22 59:1

**steps** 43:14 46:24 47:13 48:12 49:1 50:7 58:4,19

**stick** 53:22

**still** 23:4 26:6 35:8 36:18,20 57:25

**stolen** 90:6

**stood** 24:7

**stop** 6:25 53:16

**stopping** 26:13

**streamline** 68:19

**Street** 36:7

**stretch** 7:1

**strike** 81:9

**structure** 41:20 66:14

**stuff** 90:24

**subject** 30:8

**subpoena** 11:8 13:11,14 22:4 30:20 44:25 47:3

**subpoenaed** 30:11 97:3

**subsequent** 19:24 20:25 32:10

**substance** 90:4,5,16

**suburban** 36:6

**such** 53:2 67:5 101:11

**suffered** 76:2 77:9

**suffering** 77:4

**suggest** 86:5

**suggesting** 99:25

**Sullivan** 4:23 68:13 92:18 99:5,8 102:19

**summarizing** 70:20

**summary** 21:7

**support** 4:9 49:6 81:4

**supported** 72:1

**supposed** 82:10

**suppress** 59:22 70:1,6 71:5 75:19,23 77:7,13 101:11 102:8

**suppressed** 71:12

**Supreme** 26:12,16 27:3 37:12 38:2 63:1,16 70:12,18

**sure** 5:9 6:5,15 11:20 14:22 23:4 25:9 37:14 44:4 50:9 56:3 58:5 61:12,17 67:15 89:7 102:5

**surmising** 87:14 88:13

**survived** 55:4

**sustained** 54:13,17

**swear** 4:16

**sworn** 5:1,11

**system** 34:19

**T**

**table** 80:14,17,19 99:22

**tactical** 72:3 74:21,22,23,25 77:20 101:11

**tactically** 72:11

**take** 8:4 27:7,8 35:1 43:15 46:25 47:13 49:1 50:8 58:4,20 59:1 60:11 61:13 67:10,11,12,21 68:17,18,21 79:10 87:2 88:5 92:10

**taken** 4:5 5:20 72:22

**takers** 103:15

**takes** 90:14

**taking** 65:11 73:4

**talk** 7:5 9:17 16:14,15 22:22 30:25 45:13 46:17 47:8 49:15 50:19,24

**talked** 9:1,19 13:23 14:8 23:7 31:24 40:9 50:11 55:22 65:5 75:25 81:13 90:13

**talking** 15:22 30:4,24 31:19 32:25 45:17 48:18 49:20,22 50:5 56:6 57:8,9 59:4 68:14 70:24 90:20 95:25

**task** 25:11,15,19 26:6 27:7,17,21,23 28:7,15,18 29:11,15,18 36:9,11,18,23 37:8 41:15

**taught** 38:23 100:20

**technically** 14:22,23

**telephone** 22:16

**tell** 9:13,23 22:21 23:6 30:25 31:3,7 35:24 52:24 78:3 88:16 96:24 97:2

**telling** 19:22 21:7

**ten** 38:22 41:1 94:11

**tends** 54:22

**term** 17:2 85:8

**terminology** 62:10

**terms** 32:19 53:13 64:25 94:10

**Terrie** 4:23 68:11 92:18,21 99:4

**test** 73:16

**tested** 97:19

**testified** 5:12 46:12 93:4 101:25

**testimony** 64:7

**testing** 72:7,14,17 73:9,11,13,21 74:2 83:3

**text** 96:2,4

**than** 6:8 10:21 25:5 28:10,11,21 29:8,24 40:21 41:1 42:25 48:23 55:19 65:1,5,22 66:5 68:8 70:21 72:8 75:25 80:4 82:22 88:7 89:1 101:3

**thank** 5:7,8 11:4 61:21 99:3,9 102:18 103:10

**that** 5:7 6:5,14,15,16,24 7:4,6,19 8:2,6,13,14,17,19,24 9:1,7,8,10,11,15,21,24 10:3,4,15,17,18,19,21,25 11:9,16,17,24,25 12:3,5,6,8,12,20,21,22 13:8,11,13,14,19,21 14:7,8,9,11,13,15,16 15:3,6,7,10,13,16,17,18,19,20,25 16:1,3,6,11,16,18,22,24,25 17:3,13,15,16 18:25 19:1,2,6,8,17,21,22,23,24 20:2,3,6,13,20,22,24,25 21:2,3,5,6,15,18,19,22,23 22:1,15,23,24,25 23:6,10,12,14,22 24:10,12,13,15,16,21,22,23,25 25:16,23,25 26:11,12,16,19,21 27:1,15,16,25 28:11,16,22,25 29:3,7,9,14,17,21,24 30:3,7,10,12,14,19 31:2,7,17,18,24 32:2,4,5,8,10,15,22,23 33:3,9 34:2,13,20,23 35:3 36:12 37:2,7,9,14,15,19 38:2,4,5,13,22,23,24 39:1,6,15,23 40:7,20 41:2,4,9,22 42:1,5,8,10,11,13,19,22,24 43:4,14,21,24 44:4,5,12,17,20 45:8,16,18,22 46:4,21,25 47:1,6,10,13,16,23 48:3,13,14,19 49:1,6,7,10,14,15,18,19,22,23 50:2,13,15 51:6,7,8,12,15,21,22,24 52:5,7,13,17,25 53:5,9,17,18,21,24,25 54:1,4,5,8,17,19,20,22 55:4,7,9,13,14,19,20,23 56:3,5,7,10,12,14,21,22,23 57:5,11,15 58:2,3,4,5,13,19,22 59:1,4,10,13,25 60:6 61:2,4,6,9,10,21 62:2,3,10,22,23 63:2,5,12,15,16,17,20,21 64:6,7,9,13,16,17,20,25 65:2,3,4,9,15,18,19,20,21,22 66:1,7,9,10,14,15,24 67:3,4,10 68:19,23 69:1,25 70:14,16,18,25 71:1,6,8,9,13,14,15,16,17,18,22,25 72:1,5,11,22,23 73:2,3,7,11,12,14,23 74:5,10,13,15,19,25 75:2,7,9,10,14,17,18,21,22,25 76:2,8,9,11,14,18,19,21,24,25 77:3,5,6,10,12 78:9,18,20 79:2,15,24 80:1,8,9,13,19,24,25 81:1,2,3,5,11,12,14,17,20,22 82:1,6,10,18,21,22 83:2,11,17,18,19 84:4,6,8,10,14,15,20,23,24 85:3,4,6,7,12,14,15 86:1,2,4,7,8,12,17,19,20,21 87:9 88:3,4,8,9,13,22 89:4,7,13,14 90:3,9,11,13,16,18,19,20,21,22 91:1,8,12,13,17,25 92:2,12 93:13,15,16,25 94:3,6,10,11,19,21 95:10,11 96:1,6,8,11,18,19,20,21 97:7,8,9,11,16,20,22,24 98:3,4,5,23,25 99:1,13 100:1,12,16 101:1,2,6,14,15,19 102:1,5,8,18

**that's** 12:25 14:2 15:5 18:17 20:14,15 21:6 33:8 34:1 40:10 55:24 60:20 64:10 65:15 73:10,22 74:21 75:2,21 76:6 78:19 83:24 84:24 86:18 88:11,12,23 89:5 90:7 94:19 95:9 102:23 103:5

**their** 7:1 8:22 16:14 33:6 44:6,17 45:19 47:5,7,19,22 48:5,8 50:20 54:16 57:8,11,12,13,23,24 70:19 73:18 78:7 93:14 101:18 102:3

**them** 16:15 17:24 18:3,4,6,7,9,17 25:3 27:4,5 40:2,3,5 45:12,13 47:8,14 49:3,20 50:11 57:16 59:4 63:3 70:21,22,23 72:20 78:12 79:14 95:14,15 100:16,22 101:3 102:3

**themselves** 42:1

**then** 4:11 8:17 13:7 14:25 15:11 18:24 19:9 22:17 24:3 26:8,15 31:25 34:16 36:6,17 37:22,25 38:12 41:12 44:11 49:5 53:17 54:13 58:12 62:6 64:16 68:17,21,22 71:1 87:9,21 94:2 95:11 96:1

97:18 98:6 103:8

**theory** 49:12 72:1

**there** 6:13 10:11,18 12:16 13:23 16:14 17:15 22:25 23:2,10,15 26:9,13,15 27:10 29:10 30:3 32:9, 11,14,18 33:8 35:14 36:4,8 37:9, 14,16 41:19 42:13,20 43:3,5,24 44:23 46:19 47:11 50:23 52:5,7,9 55:18,22 56:5 58:3,4 59:8 62:5,12 63:22 64:5 65:21 68:11 73:3 78:25 83:1,2,19,21 84:7 86:21 89:8,9 90:15 91:11 92:25 93:25 94:4,14,24 96:5 100:8

**there's** 18:22 32:8 38:1 41:24 42:19 58:11 60:18 64:2 67:3 86:14 95:6,7 100:24 102:24

**therefore** 19:8

**these** 6:11 14:1 32:16 38:9

**they** 7:2 16:9,14 24:3 26:21,22 27:8 29:12,16 31:22 32:20,23 33:3,4 37:15 39:19,22 41:11,18, 23 42:1,2,4 44:5 45:12 46:12,23 47:8,10,22 48:1 50:2,10,15 54:12, 14,15,23 55:3 57:10,12,15,22,23, 24 59:5,10 63:17 64:1,10 66:17 67:14,25 68:1 70:11,21 72:19,22 73:16,17 75:3 78:7,14 81:3 82:20, 21 83:3,9 85:23 87:1,20 91:8,12 94:12 100:15,17 101:1,17 102:1,3

**they're** 5:4 14:22,23,24 19:23 50:17 54:23,24 55:2 70:19 75:3 86:12 100:3,17

**they've** 48:1

**thing** 19:6 27:1 32:24

**things** 6:8,12 14:2 32:21 39:6,23 43:24 47:15 48:21 49:14 50:2 53:8 55:18,23 56:5 61:11 62:13 69:19,20 82:17 100:2 101:10,25

**think** 6:23 9:3 10:2 13:5 14:23,25 18:7,23 24:4,5 26:3 35:16 36:14 38:20,25 47:6 49:2,4,5 52:5,9,19 53:22 54:4 59:6 60:2,10 61:19 62:3 63:5 64:21 66:9,12,14,17 67:19 75:9,21 76:13 78:12 80:8 82:20 85:20,23 86:20 93:11,17, 22,24 96:13,21 97:10,14 101:3 102:24

**thinking** 49:11

**third** 41:19

**this** 4:4 5:19 7:22,23,24,25 8:1,23 9:14 10:3,22 11:9,14,22 12:1 13:11,12 17:7,10,21,22 18:7,9 19:16,21 20:2,7,19,21 22:4,20 25:4,7,21 27:20 30:4,15 31:24 32:22 33:16 36:21 37:10 42:4,9, 20,24 43:10,15 44:7,11,17 45:2, 24 46:9,14 47:23 48:22 51:1,16 54:1,19 55:20 57:2 59:12 60:4,10, 23 61:12,20,24 63:14 64:10,13, 15,24 66:11 69:14 78:13,15 79:9, 19,21,24 80:3,6 81:7,14,22 82:15, 23 83:14 86:3,4,5,13,16,23 87:12, 15,17 88:15,20 89:8,13,18,21 90:12 91:2 92:10 95:12 96:12,24 97:15 98:4 100:18 102:12 103:8, 12,13

**those** 29:24 30:9 32:21 39:19 42:15 45:16 46:8 47:12 48:12 49:8 58:19 62:13 70:9 71:1 78:4 82:21 83:15 90:11 91:18 95:9,14 97:9 99:16 100:4 101:19

**though** 12:8 25:8 71:7

**thought** 32:12 59:24 83:1 88:7

**through** 17:23 22:9 23:9 24:17 28:13,14 29:17 35:23 36:2 38:4 44:18 60:7 67:20 73:2 75:17 80:23 81:22 88:19 89:22

**throughout** 60:24 62:4

**time** 4:3 6:4,5,21 8:13 11:25 12:5, 23 15:16 22:15 23:17,25 24:16,22 25:7,16,23 27:1,15,16 28:6 29:9 31:17 33:4 34:2 37:9 39:2,10,21 41:5 42:23 43:1 49:24 50:9,11,13 53:9 56:2,8 58:2 61:15 66:11 72:18 73:7,8,12 78:1,9,21 79:14 80:20 84:14 85:11,12,14 88:7 89:17 93:16 101:14,19 103:13

**times** 12:16 22:10,14 38:10,17 50:23

**title** 12:25

**today** 4:8 6:23 7:5,13 8:16 30:21 31:13 61:6 62:17 64:6 69:9 77:23 81:17 82:17,21 91:17,22 96:23 98:10 100:19

**today's** 13:18 103:9

**together** 43:7

**told** 8:24 9:11 15:17 21:3 23:12 33:7 82:18 88:10 90:3

**took** 20:21 27:10,23 48:13

**top** 18:21 20:10 87:7

**topics** 38:5

**total** 36:10

**track** 45:12 60:4 64:21 68:24

**train** 38:14

**trained** 25:1 94:17

**training** 26:25 36:24 37:2,4,7,19, 20 38:11,12,18,23 39:1

**transcript** 11:23 13:1 17:7,11 19:16 20:2,7,14,15 42:17 60:9,20 61:19 64:13,15,16 65:23 71:14 76:9,21,24 79:7,8,19 80:3,13,22 86:25 87:1,2,15,17 88:23 89:6,9, 13,20 90:9,25 97:7,11 98:23

**transcripts** 42:11 77:25

**trauma** 52:21,22,24

**treated** 41:24 52:14

**treating** 65:9

**treatment** 53:24

**trial** 18:24,25 19:7 21:19 24:7 28:11 32:10 36:7 37:13 38:21 39:7 41:3,4,6,13 43:12 46:5,12,22 47:2 48:23 57:7,14,22 58:4,15,24 59:10,18 63:25 72:4 77:21 81:4 86:1 88:6 101:12,13,22

**tried** 23:24 26:25 28:6,19

**trier** 49:3

**true** 54:18,19 100:3

**truthfully** 22:24

**truthfulness** 47:20 48:9

**try** 6:24 11:13 27:1 37:16 43:17, 23 47:7,16 48:8 102:2

**trying** 28:24 38:6,7 60:4 71:11

**turned** 8:24 9:11 65:7

**turns** 8:23

**twice** 103:16

**two** 15:15 36:4 42:16,19,20,22 43:3 52:6,7 62:13 63:7 76:13

**type** 73:10 74:2

**types** 27:6 32:21 39:20 72:16

**typo** 60:23

**U**

**U.S.** 26:12

**uh-huh** 6:20 79:18

**uh-uh** 6:20

**unable** 57:19 62:12 77:10

**unconscious** 53:23

**under** 15:1 57:17 78:14 83:8 84:23 95:2,4

**undergrad** 34:8

**understand** 7:4 57:10,11,19,22 70:22 77:11 81:17 83:25 84:22

**understanding** 32:3 33:2 42:15 62:21 98:11

**understood** 14:10 32:17 85:7, 11,15,23

**unfit** 58:3 59:5

**United** 27:3 63:1 70:11,17

**university** 34:9,10,14,19,22

**unknowingly** 83:20

**unless** 100:4

**unmute** 4:12

**unmuted** 5:7

**unproductive** 54:22

**unsuccessful** 31:4

**until** 35:24 36:8 54:12 58:15 79:13 88:3

**untruthfulness** 47:20

**unwilling** 46:16

**up** 7:11,20 11:7 15:12 18:6 26:22 39:2,7,25 41:12,14 42:14,18 43:7 50:3,16 67:4 68:4,15,19 79:3,14 86:11 91:5 93:6,7,8,19,24 95:9 102:17,19

**upfront** 7:16

**upon** 53:19

**urged** 80:9

**urging** 20:18 80:5

**us** 22:9 26:5 29:12 37:20 96:24 97:2 100:18

**used** 17:19 94:9

**useful** 54:2,5

**using** 7:17 24:2 62:10

**utilized** 55:15

**V**

**vacant** 88:5

**vacated** 31:1 82:15,25

**Van** 66:21,25 69:16

**variables** 100:12

**varied** 28:20

**varies** 46:10

**various** 55:22

**vehicle** 90:6

**veracity** 46:21,25 47:17,24 48:24

**verbally** 102:2

**versus** 4:5 6:20 11:24 17:11 62:11

**very** 6:23 7:9 28:21 41:15 56:11 65:8 68:4 95:9 101:2

**victim** 23:25 66:20

**victim's** 24:9

**victimized** 55:3

**video** 103:11

**videographer** 4:1,8 5:3,6 10:5,8 13:6 69:3,6 103:1,3,7

**videotape** 102:8

**videotaped** 4:4 102:13

**view** 44:3

**violent** 47:25 48:1 54:14

**visited** 66:10

**Vo** 66:21,25

**Vo's** 69:16

**voice** 22:13

**volatile** 54:14

**voluntarily** 81:20 84:9,12 102:11

**voluntary** 81:13

**vulnerable** 23:25

**W**

**waive** 70:23 71:23 77:11 101:18

**waiving** 15:19 21:3

**walk** 99:23

**walking** 52:20 53:15

**want** 5:4 6:21,24 10:2 42:17 47:7, 8,9,18,19,23,25 48:2 49:2,9,11 67:11 68:22 81:7 86:9,13 88:6 98:4 100:22 101:18 102:4,5

**wanted** 32:23 96:7

**wants** 68:22 103:14

**was** 5:8,11 8:6,11,14,24 9:1,5,7, 14 10:15 11:8,10,17,25 12:17 13:7,8 14:15 15:2,4,6,9,11,18,22, 25 16:2,16,24,25 19:13,17 20:4,6, 12,16,22,23,24 21:3,6,9 22:16,17 23:21,22,23,24,25 24:2,3,5,9,14, 15,17,19,22,23 25:10,11,14,16, 21,25 26:2,3,7,8,13,16,20,25 27:9 29:7,24 30:3,8,11,12 31:8,14 32:2,3,4,5,6,10,13,14,18,22 33:2, 7,8 34:2,10 35:7 36:3,7,8 37:9,16 38:23 40:20,21 41:2,3,10 42:2,13, 18,24 43:5,7 44:5,12,18 47:21 48:14 49:18 50:6,13 51:12,17,21 52:2,4,13,14,16,20,22,25 53:15, 17,18,21,22 54:4,11,19 55:7,9 56:1,10,11,12,15 58:3,5 59:17,24 60:2,10,11 61:19 62:5,17,18,21 63:6,14,15,16,22 64:7 65:9,20 66:9,12,15,17 67:4,8 69:5,25 72:8 73:3,11 76:21,25 77:1,3,17 78:1, 9,13 79:2,23 80:14,16,19 81:1,5, 9,10,12 82:1,7,14,24 83:1,11,21, 22 84:4,11,15,22,23,24 85:3,7,17 86:1,23,24 87:14,18 88:7,13,14,

16,24 89:8,9,13 90:15,17,22 91:2, 11,12,13,17 93:16,17,25 94:1,4,6, 10,21,24 95:3,25 96:5,8,21 97:14, 22 99:23 100:4,8 102:13 103:11

**Washington** 34:22

**wasn't** 17:4 70:3 71:1 86:16 88:10 94:13,14

**way** 9:20 14:4 16:17 41:17 42:13 44:14,15 45:25 46:15 53:4 54:4 55:4 56:18 59:16 62:23 63:22 68:19 69:13 74:1 83:4 94:11 100:8,22

**ways** 48:4 54:9 95:6,7 100:16

**we'll** 17:10 68:14,21

**we're** 10:5 56:3 69:3 89:7 99:21 100:20

**we've** 17:24 31:25 42:10 86:16

**website** 93:20

**week** 9:18 93:18

**Weiner** 88:21 89:23 90:2,8,21 91:2

**Weiner's** 87:8

**well** 5:21 8:16 9:22 14:25 16:21 17:2 27:20 29:10 37:21 39:20 42:6 43:15 47:18 48:21 50:9 52:9 54:6 55:5,24 62:7 64:15 65:19,20 70:21 72:17 77:9 81:8 87:25 91:12 102:15

**went** 28:11 29:16,17 98:12

**were** 8:14 12:16 13:24 21:23 22:25 23:2,6,9 24:3 25:2,15,23 26:9,11,12,21 27:7,8,15,16,25 28:22,24 29:10,15,18 30:4,14,20 31:11 32:1,25 34:13 35:14 36:11, 23 37:7,14,17 38:5,9,17 39:11,15 41:2,4,7,13 42:2,20,22 43:3,4,24 44:2,3,23 45:18 46:16,19,23 48:1 50:23 52:5,7,9,10,19 54:13 55:3 56:20 59:3,5,8,10 64:12 65:13 66:17 70:5 71:10,11,16 72:22 73:12 77:3 78:23,25 80:1 81:18 82:18 83:2,9 85:4,13,23 87:20 91:1 93:4 97:10,11,16 99:12 100:5,6,12,20 101:9,19

**weren't** 87:20

**what** 7:13,24 8:9 10:15 11:5,10 12:25 13:17,25 14:19 15:2,15,25 19:20 20:14,15 21:4,7 22:21 23:18,22 24:21 26:2,6,7 27:6,9 30:8 32:1,3 33:6,8,16 34:10,13 39:23 42:15 43:14 45:25 46:9 48:22,25 49:2,5,6,7,9,12 50:7 51:17 52:11 53:7,12,13,18 54:4,9 55:21 56:2,9 57:6 58:9,19 60:20 61:6,9,12,23 62:2,8 64:10 65:5, 15,22 66:6 67:20,24 68:11,19 70:13 71:20 72:3,8,18 73:19 74:12,22 77:19,20,21,24,25 78:17,22 79:6,22 80:1 81:9,18 83:6 84:24 85:10,23 86:1,3,4,22 87:1,16,23 88:1,3,12,15,16,23 89:6,10,16 90:7 93:5,7,9 94:8,16, 25 95:14,18 96:24 97:2,13 99:23, 24 100:12 101:3,13,25 102:12

**what's** 64:5 68:9

**whatever** 14:25 61:15 67:21 93:23

**when** 4:12 6:8 8:6,10 9:17,19 11:8 12:10,16,17 13:2 14:3 15:22 20:6 22:3,19 23:14 25:4,9,10,21 26:9 27:11,20 30:4 33:7 34:2 35:5,11,21,25 36:4,8,17 37:25 38:9,10 40:4,12,17 46:20 50:23 52:20 54:9 58:15 59:9 63:17 66:17 71:11 73:16 79:10,15 85:7, 12 86:16 90:13,24 91:2,22 93:4, 15 95:24 98:6,12 100:4

**whenever** 81:2

**where** 18:22 25:23 32:8 34:7,20 41:18 44:23 51:20 53:19 54:12 60:15,22 63:19 65:24 70:9 76:21 79:25 81:15,21,22 83:8 85:21,22 87:4 89:10,24 96:2,20 97:15

**wherever** 64:4

**whether** 9:20 14:5 24:14 32:12, 17 33:19,24 43:24 45:7 47:7 48:13,17 55:7,8 57:3,9 59:12,17 62:17 69:14 73:14 83:14 84:11 85:2 100:3,17

**which** 4:15 17:4 24:3 36:5 37:14 42:13 50:17 53:22 57:14 60:11 61:1 62:23,25 63:22 66:10 67:21 71:16,18 78:15 79:7,20 88:25 89:22 93:17 95:3,12 96:13 101:17

**while** 5:4 26:14 31:25 36:23 37:7 71:10

**who** 4:10 7:5 8:22 9:1,10 11:8 13:20 15:10 19:13 22:5,8 23:24 24:7,14,19 25:2 29:11,15,17 30:20 32:19 41:10,24 49:12 50:6 51:21 52:2,8,16 54:11 55:2 57:17, 18 62:11,15 63:2,3 82:3 87:24 88:1 90:14 93:25 100:18

**whole** 73:16

**whom** 4:15 52:4

**why** 11:22 18:17 37:17 56:14 64:3 82:24 87:13,14 101:9

**willing** 46:16 86:7

**win** 72:2

**wish** 65:8

**within** 39:15 41:20 68:15 88:22 89:10

**without** 63:10 83:10 84:7 85:22

**witness** 4:16 5:1,2,9 6:8 45:19 46:13 48:19 58:17 61:22 67:24 68:5,10,16 76:8 77:19 82:3,10 84:3,20 91:20 92:13,17,23 102:20

**witness's** 10:14

**witnesses** 6:4 40:5 45:12,17,18, 22 46:1,4,8,12,16,21 47:1,17 48:24 49:10,12 50:3 57:14 74:7, 20,24 101:21,22

**woman** 90:13

**won't** 19:24 95:9

**wonder** 84:21

**word** 8:4 41:9

**work** 26:25 39:2,7,20,25 42:1,14, 18 43:7,11 55:2 100:22

**worked** 33:7 34:18,19 35:17 36:4,5,8 65:20,21,24

**working** 35:5 42:20,23 54:22 56:3

**works** 41:18

**world** 63:11

**worry** 86:14,15

**would** 5:7 6:14 11:18 13:4 15:1

20:1 25:7 28:21 29:6,12,16 32:11 34:23 35:25 37:22,23 38:6,11 39:22 40:4 41:9,11,12,13 42:5,14 43:14,18,22,25 44:25 45:11,12, 13,16,21 46:3,7,11,20,25 47:6,13, 16 48:4,8,16,21,22 49:1,5,7,8,15, 19 50:1,5,7,19,23 52:8,25 53:1,2, 3 54:16 55:13,16 56:12,21,23,24 57:20 58:4,14 59:1,6,9 61:20 62:23 63:8,15,17,18,21,22 68:2 69:19,20 70:16 71:8,16,17,18,20, 24 72:3 73:1,4,6,14 74:13,20,25 77:6,7,12 78:6,15,20 79:3 80:14, 17 81:3,4 83:17 86:4,13,20 88:4, 25 89:10,14,15,22 90:2 91:4,6,10 98:4,5 101:10,12

**wouldn't** 29:21 74:16 101:10

**wrap** 68:15

**writing** 99:23

**written** 43:6 64:1 99:19

**wrong** 20:8,9 90:24

**wrote** 99:25

**Y**

**yeah** 16:21 18:15 27:10 29:21 47:18 69:1 81:8 82:13,20 87:5 92:15 95:2 96:11

**year** 11:10 15:2 17:2 28:19 34:18 35:3 39:10 62:25

**years** 11:5,9 13:5 15:5 26:15 34:13 35:14,16,23 36:5,10,12,14, 16 40:23 50:7 78:10,15 80:4 85:8 87:14 88:11,17,20 89:1,4 93:5 94:11 95:24

**yes** 6:18,19 7:7 8:8 9:9,16 12:15, 19 14:18,25 15:14 19:5 22:5 23:13,21 24:18 25:20 27:18 28:4 29:1,5 30:2 34:25 35:4 36:22 37:1,5 38:16 39:4,8,18,21 43:2 45:4,6,20,23 48:20 49:25 50:25 51:14,19 52:25 54:3 58:1,17 59:11 60:14,17 61:4 63:25 69:23 72:15 73:9,10 74:9 78:24 79:5,18 81:7,24 82:12 83:13 90:1,9 92:3, 4,8 94:7 97:12,17 98:9 100:11 101:8 103:7

**yet** 57:25

**you're** 4:12 6:8 7:4 22:25 47:13 57:8,9 65:8 72:18,20 76:20 86:2 92:23 97:20 101:9 102:5

**you've** 6:3 85:21

**young** 23:25

**your** 4:7,11,12,14 5:16 7:16,24 8:4 11:17 12:4,17 14:16 17:7 18:23 20:20 21:24 22:3 23:9 27:3 30:17,21 31:13,16,23 33:2,9 34:10 35:17,24 36:20 39:7,25 42:11 43:23 44:5 45:1,10,11 46:3 48:17 49:4,12,16,22,24 50:19 51:12 54:2 57:21 58:23 59:3,24, 25 62:21 63:23 66:1 67:13 70:15, 24 71:10 72:10,11,20 73:20 76:24 79:22 81:1,16,19 82:17 83:17,23 84:10 85:2,21 86:1 87:10 89:21 92:1,13,20 94:2 98:5,22 100:7,9, 10 101:21,24

**yourself** 29:23 79:16 87:9

**Z**

**Zoom** 6:11,14 11:22 22:9,17

**Zuley** 4:6 23:1,4,11,16,20 24:5 26:1 30:25

**Zuley's** 24:16