IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
JUDGE JOHN F. KNESS
MAGISTRATE JUDGE HEATHER K. MCSHAIN
CASE NO. 23 C 17186

CARL REED,
Plaintiff

V.

RICHARD ZULEY, TIMOTHY
THOMPSON, the CITY OF CHICAGO,
COOK COUNTY STATE'S ATTORNEY
NANCY GALASSINI ADDUCI, and COOK COUNTY,
Defendants

DEPONENT: MAUREEN GAINER
DATE: FEBRUARY 25, 2025
REPORTER: JESSICA AUBREY GJERDE

Page 2

APPEARANCES

ON BEHALF OF THE PLAINTIFF, CARL REED:
Israa Alzamli, Esquire
Loevy & Loevy
311 North Aberdeen
Third Floor
Chicago, Illinois 60607
Telephone No.: (312) 243-5900
E-mail: israa@loevy.com
(Appeared via videoconference)

ON BEHALF OF THE DEFENDANT, RICHARD ZULEY:
Andrea Checkai, Esquire
Borkan & Scahill, Ltd.
20 South Clark Street
Suite 1700
Chicago, Illinois 60603
Telephone No.: (312) 447-6259
E-mail: acheckai@borkanscahill.com
(Appeared via videoconference)

Page 3

APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:
Dhaviella N. Harris, Esquire
Burns Noland, LLP
311 South Wacker Drive
Suite 5200
Chicago, Illinois 60606
Telephone No.: (312) 872-8930
E-mail: dharris@burnsnoland.com
(Appeared via videoconference)

ON BEHALF OF THE DEFENDANT, COOK COUNTY STATE'S ATTORNEY NANCY GALASSINI ADDUCI:
Terrie Sullivan, Esquire
O'Connor & Battle
111 West Jackson Boulevard
Suite 1700
Chicago, Illinois 60604
Telephone No.: (312) 786-4612
E-mail: tsullivan@mokblaw.com
(Appeared via videoconference)

Page 4

INDEX


| | Page |
|---|---|
| PROCEEDINGS | 6 |
| DIRECT EXAMINATION BY MS. ALZAMLI | 7 |
| CROSS-EXAMINATION BY MS. CHECKAI | 43 |
| EXAMINATION BY MS. SULLIVAN | 49 |
| REDIRECT EXAMINATION BY MS. ALZAMLI | 54 |


EXHIBITS


| Exhibit | Page |
|---|---|
| Exhibit 1 - Lakefront SRO Desk Security Log | 26 |
| Exhibit 2 - Chicago Police Department Case Supplementary Report | 39 |


Page 5

STIPULATION

The deposition of MAUREEN GARNER was taken at KENTUCKIANA COURT REPORTERS, 110 NORTH WACKER DRIVE, SUITE 2500, CHICAGO, ILLINOIS 60606, via videoconference in which all participants attended remotely, on TUESDAY the 25TH day of FEBRUARY 2025 at 1:03 p.m. (CT); said deposition was taken pursuant to the FEDERAL Rules of Civil Procedure. The oath in the matter was administered remotely as permitted by Illinois Supreme Court Order No. 30370 which amended Civil Rule 206(h).

It is agreed that JESSICA AUBREY GJERDE, being a Notary Public and Digital Reporter for the State of ILLINOIS, may swear the witness.

Page 6

PROCEEDINGS

THE REPORTER: We are now on the record. The time is 1:03 p.m. CT. Will all parties, except for the witness, please state your appearance, how you are attending, and your location?
MS. ALZAMLI: Israa Alzamli for plaintiff, Carl Reed, attending from my home in Chicago, Illinois.
MS. CHECKAI: Good afternoon. Andrea Checkai, on behalf of defendant, Richard Zuley, attending remotely in Chicago, Illinois.
MS. HARRIS: Dhaviella Harris on behalf of the City of Chicago, attending remotely from the City of Chicago.
MS. SULLIVAN: Terrie Sullivan for defendant, Nancy Adduci, from my home in Chicago, Illinois.
THE REPORTER: Thank you. And Ms. Gainer, will you please state your full name for the record?
THE WITNESS: Yep. Maureen Gainer Reilly.
THE REPORTER: Ms. Gainer, will you please hold your ID up to the camera? Perfect. You can set that aside. Do all parties agree that the witness is in fact Ms. Maureen Gainer?
MS. ALZAMLI: Plaintiff's counsel agrees.
MS. SULLIVAN: Yes. Yes.

Page 7

THE REPORTER: All right. Ms. Gainer, will you please raise your right hand with me? Do you solemnly swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?
THE WITNESS: I do.
THE REPORTER: Great. Counsel, you may begin.
MS. ALZAMLI: Thank you so much.

DIRECT EXAMINATION

BY MS. ALZAMLI:
Q. Hi, Ms. Gainer. Thank you so much for taking the time to sit for your deposition today. Have you ever been deposed before?
A. I think -- hold on one second. Somebody just got home. I think there was -- oh God, I'm trying to remember way back when. But not in 20 years, I think.
Q. Okay. So I'll just go over some quick ground rules, so that it goes as smoothly as possible. I know we're over Zoom, so sometimes, it's hard to tell when we finish talking. But I'll do my best not to speak over you, and you try to do your best to let me finish my questions. You want to try to give verbal answers, instead of head shakes or nods, so that the record is clear. So always try to say like a yes or no or I don't know, instead of saying uh-huh or huh. And if you don't

Page 8

understand a question that I've asked, just let me know, and I can rephrase it. If you answer our question, I'll just assume that you understood what I was asking.
And just so you're clear about, like, why we're all here today, we're here for the matter of Carl Reed v. Richard Zuley and the City of Chicago and Defendant Adduci. I represent Carl Reed, who's the plaintiff in this case. And it's pretty much it. And then we can -- we'll just start with the questions. Okay. So thanks so much for being here. Could you just spell your name for the record?
A. Yes. M-A-U-R-E-E-N, Gainer is G-A-I-N-E-R, Reilly is R-E-I-L-L-Y.
Q. Okay. Thank you so much. Are you from Chicago?
A. Yes, from the Beverly area.
Q. Okay. And you grew up here?
A. Yes.
Q. Okay. What year were you born?
A. 1975.
Q. Okay. And did you go to -- did you graduate from high school?
A. Yes.
Q. And you went to high school in the city?
A. Yes, Mother McAuley.

Page 9

Q. Okay. And when did you become a property manager at 4946 North Sheridan Road?
A. I believe -- and I am happy to be here and be helpful if I can, but I am going to be one of those people. This was a long time ago. I came back from New York, and I moved into New York for four years. So it would've been like 2000 -- 2001 to maybe 2003, roughly.
Q. Got it. And it's no problem if you don't remember anything. I know this was a long time ago, so it's -- if you don't remember something, it's totally okay. So do you know if you were a property manager of 4946 the summer of 2001?
A. The summer of 2001, yes, I would've been there then. Yes, because I'm thinking of 9/11 as orienting me. Yes.
Q. Okay. And were you the only property manager? Or were there other people who had your same title?
A. So it was called Lakefront SRO at the time. And they had a number of buildings, but there was a designated property manager for each building. And I went between two buildings, what was called the Harold Washington at the time, which is the address you're speaking of, and then, the Belray, which was on Belmont and Racine. So I was the property manager of those two. And then there were maybe three other women who were at

Page 10

other ones in the area.
Q. Okay. But for the Harold Washington building, which is the 4946 address --
A. Yes.
Q. -- you were the only property manager at that time?
A. Yes.
Q. Got it. Okay. And as a property manager, did you have a typical schedule or working hours?
A. At the -- yes. I remember, at the time -- so remember, Lakefront SRO was an umbrella nonprofit that owned a number of buildings in that area, that were single room occupancies for lower income individuals from a number of backgrounds. And so, it was a roughly 9:00 to 5:00-ish job. And then like I said, I went between those two buildings, so I would split my time depending on who needed what with those two buildings.
Q. Got it. And then that summer of 2001, you -- that would've also been -- you would've been working a 9:00 to 5:00?
A. Yes. Yeah. It wasn't an evenings/weekends thing.
Q. Okay. Were you ever there over the evenings?
A. I'm sure. I was young and worked a lot. I'm sure, sometimes, I was or if there was -- if I worked

Page 11

late or was getting stuff done. But it wouldn't have been a rare -- it would've been a rare thing. It was mainly 9:00 to 5:00, but there were always front desk managers at every property.
Q. Okay. And those front desk managers, are those the -- are those individuals who would be sitting at the front desk to sign people in or do --
A. Yeah --
Q. Okay.
A. -- buzzing people in -- yeah, my -- in my recollection, sometimes, they -- sometimes, they lived -- they were, like, residents of the various buildings. Sometimes, it was just someone with an outside job. But there was -- all those buildings were 24-hour desk places.
Q. And was it your responsibility to train the front desk people? Or were you responsible for -- were you like responsible for them in any way?
A. For training them? I definitely would have been senior to them and looked over things, but that, I -- I can't remember if I was like their direct boss.
Q. Like, for example, when they were hired, would there be a situation where you would train them on how to fill out like a security log or train them how to fill out a -- like a visitor log? Is that something

Page 12

that you did?
A. I don't think that would've been my responsibility. I think -- I don't remember doing -- I -- I -- I could have done that, but I don't recall being the trainer of the front desk managers.
Q. Okay. Do you know whose job that might've been, if you know, or --
A. I don't remember who that would've been at the time.
Q. No worries. Could you tell me a little bit more about what your duties were as a property manager?
A. Yes, if I remember. So you would -- there were definitely overseeing people moving in, people moving out, problems. A lot of sort of maintenance issues in the building's regular performative maintenance, you would oversee. Painters coming in, people going out, definitely occupancy, so interviewing new residents to move in. And I remember going up in the halls and, you know, picking the pest guy up to do his thing. It was sort of a preventative, regular maintenance, and then, working on keeping the buildings occupied. And then just little stuff that came up day to day, snow removal, you know, that type of thing, leaks in the roof. You know, not doing any of that work, but overseeing all of that. And it wasn't, like I

Page 13

said, super -- so intensive of a job that that -- you know, that's why I was between two different whole buildings.
Q. Yes, that makes sense. And when you were working as a property manager in the Harold Washington building that was at 4946, did you have an office? Or did you sit in the lobby? Was there a place --
A. Yes.
Q. -- that you set up?
A. We -- there was a little -- so the Harold Washington was also the main location of Lakefront SRO's sort of nonprofit residence. So it was a different building in a way, because some -- the other places were just truly residences with maybe one or two offices, but the whole offices of like the executive director and the marketing people and HR, all of that was in the back of the Harold Washington. And so, we had offices back there. So I wouldn't be in the lobby or the front desk area.
Q. Okay. Do you ever remember sitting at the front desk or working the front desk while you were at the Harold Washington building?
A. I don't remember, but it would've been -- you -- I would've been up there a lot talking to people or waiting for a contractor to come. So I would've been

Page 14

around there a lot, but I don't think I ever worked the front desk. Maybe if somebody needed to go to the bathroom or something, I would've covered, but I don't - - I would never be working the front desk. But I would be up there a lot.
Q. Got it. Do you have any memories of ever signing in visitors and checking their IDs or anything like that?
A. I would've done that. If I was up there and somebody came, like I said, if somebody had stepped away, that would've been likely that could have happened.
Q. Okay. And for -- when you were filling out visitor logs at the SRO, was it typical practice to check some -- to get a physical ID from someone? Or was it just typically they would sign their name?
A. That, I don't remember. I don't remember. I would assume we asked for ID if someone wasn't a resident, but I don't remember that.
Q. Okay. Got it. And so, these offices that you were in --
A. Yeah.
Q. -- you said they were in the back of the building. Was it in like a separate building? Or was it in the same building, but it was just in the back?

Page 15

A. What's funny, I remember it now, so we -- we were like in the -- there would've been a little room you could have accessed through the front desk. So there was a slew of offices sort of on the side and then, a bunch in the back. So it was not a separate building. You didn't go out any doors, but they were definitely separate.
Q. Okay. Got it. And was there -- like -- was there a typical split that you had between the two buildings that you were a manager of? Or was it -- was it random?
A. I always -- I always tried to do like two and two, you know, like Monday, Wednesday, Tuesday, Thursday, I'm sure, at the time. But I remember stuff would just come up. You'd have a painter somewhere, you'd have something. So I'm sure I tried to organize my time, but I wouldn't recall what those days were. But it would be try to -- and then, yeah, it would just depend on what -- who had what going on.
Q. Okay. So do you remember any of the front desk people that worked at the Harold Washington building at the time that you were there?
A. I don't -- like I wonder, if you said a name, if it would pop up, but I don't remember that.
Q. Do you know anyone by the name of Dorothy

Page 16

Soukup?
A. That does sound familiar, but I'm so sorry, I don't remember. But that does sound familiar.
Q. No, that's okay. That's totally okay. So as the property manager, did -- would you say that you were familiar with the residents who lived there? Did you know them by name?
A. Yeah. Some -- yeah. Not all of them, but a lot of kind of the older residents might hang out in the lobby or some, you know, people with more kind of special needs or weren't -- had stuff going on. There - - there was, like, definitely a lobby crew that hung out at both buildings. But then, there were a number of people who came and went, and you would never know them. So I probably knew, you know, a handful of people. And then there were, like, the chronic, you know, complainers you would probably remember, that everything was always happening. So you would know a number of people, but not -- definitely not everybody.
Q. Do you remember anyone by the name of Lester Garner?
A. I do remember that name. I remember him being sort of a -- like sort of a player in the building, like he would be around -- I remember -- I remember that name. I can sort of picture him. I do remember that

Page 17

name.
Q. What do you remember -- do you remember anything about him?
A. No. I remember he knew a lot of the residents and he -- he was -- he would've been one of the people who would've asked for stuff, not complained, but sort of know -- he would know the staff. I -- you know, there would -- wouldn't be people that I remember, unless they sort of interacted with us. So I do remember him. And I remember this situation obviously happening, so I don't -- I don't want to, like, make stuff up in my brain. Maybe he was friends with Carl Reed. Like, I remember that name from around this time.
Q. Yeah. Do you remember if you ever spoke to Lester Garner about the homicide that happened?
A. (Inaudible) but I definitely, when it happened, it was a traumatic thing in the building, obviously. And the person, you know, who -- who was killed was a very sweet, sweet person. So everyone was talking about it. If he would've been in the lobby, it would've been likely I would've been chatting with people.
Q. Yeah. I'm sorry, your audio cut off at the -- just the very beginning of your answer.
A. Yeah. I said, that could be likely. I don't

remember it, but it would be likely. Because everyone in the building was obviously talking about the situation and what happened. Because it was a kind of very sweet beloved man who it happened to. And so, people were definitely talking about it. So that would -- if he was there, that could be likely.

Q. Okay. And do you have any -- so I want to, like really specifically, ask you about kind of, like, your independent memories or your recollections and kind of --

A. Yeah.

Q. -- I can try to separate that from, like, what might have happened or what might be likelier.

A. Yeah.

Q. Just because I know it happened so long ago. So let's first just start by like thinking through, do you have any, like, independent memories of actually speaking to Lester Garner about the homicide?

A. No. No.

Q. Okay. And do you have any independent memories of speaking to any of the residents about the homicide?

A. Not -- no. I have no independent memories of that, no.

Q. Do you have any independent memories of



speaking to the police officers who came by?

A. Yes. What I remember of, I was trying to remember today, of this situation is I remember, when this happened, a couple of police officers came. And I remember, this is the part, vividly, I remember that I brought them up to the room, because somebody had reported something or, you know, there was smells and reporting. That part, I -- I'm not clear on. But I remember bringing probably two officers up to the room. And I remember them putting caps and things on. And I remember letting them into the room and it being really overwhelming, smell-wise.

And I remember I didn't go in with them but having them in there and showing them in there and obviously figuring out -- you know, seeing what happened and all everything. So that, I remember vividly. And then the only other independent memory I really have is there being this sort of information that Carl Reed was driving Mr. Vo's car and that leading to some kind of arrest. Like that's sort of my independent memories around this whole thing.

Q. Yeah. So let's start with your memory of taking the police up to the room.

A. Yeah.

Q. So that was like the first time that the body



was discovered; is that correct?

A. I believe so. Or did somebody -- they were there to do that. So did somebody see it through -- these were buildings where there would be two rooms, and the bathroom adjoined them. So did somebody figure it out from the bathroom and report it? Or did somebody report the smell? I don't remember that part, but I remember bringing them up, and it was not surprising to them what was in there. So something must have been reported before that.

Q. Okay. I guess, let me clarify my question. Before you had brought -- taken those police officers up to that room, were you -- was the body still in that room?

A. Yes.

Q. Was -- okay. So was that the first time that police had been to the building to recover the body?

A. I believe so. I believe so.

Q. Okay. And you -- do you remember the names of the officers who you --

A. (Inaudible).

Q. Sorry, I -- your audio clicked again?

A. Yeah. Weird. I do not remember the officers.

Q. Okay. No problem. And then so that time when the officers came to recover the body and you taking



them upstairs, was that your only interaction with police officers in this case?

A. I don't know, because would they have come back when they were investigating? That, I do not remember.

Q. Okay. So you don't have any independent memories one way or the other of whether you spoke to them again?

A. No. I don't know if they would've been investigating, if they would've been around after. That would make sense, but do I remember it specifically? No.

Q. Okay. And do you remember giving any sort of statement to the police about what happened?

A. About what happened?

Q. Or -- let me --

A. Yeah.

Q. -- let me rephrase that.

A. Yeah.

Q. Do you remember giving any statement to the police related to anything with the investigation?

A. Yeah, I remember talking to them. I probably would've given them information about who lived in the rooms, you know, had I seen -- had I -- you know, Mr. Vo, when we had seen him last. I remember talking

to them definitely, so I probably would've given some kind of information. But I don't remember exactly what it would've been.
Q. And do you remember talking to them that day that you took them up to the room? Is that what you're -- when you say you remember talking to them, are you thinking about that day?
A. No. I just remember that you know -- you know those kind of embodied things you remember? That, I remember of bringing them up to the room and there being the smell and, you know, obviously, a dead person. I remember that. But we weren't like -- I -- I think I let them in there, and they were in there for quite a while. So I don't remember talking to them then. They either would've come down or come back another day probably, but I don't -- yeah, we didn't like chat then. They did their -- kind of did their business.
Q. Okay. And how did you come to learn that --
A. But again, I'm trying like -- no, sorry. I'm -- feel like I should remember this kind of thing. So I feel bad that I'm not remembering more, but I --
Q. No, no, that's totally understand.
A. -- I should stop guessing. Yeah.
Q. Yeah. And I do want to clarify. You should be really careful not to try to come up with an



answer --
A. Yes.
Q. -- if you don't remember one, because it's --
A. Yeah.
Q. -- it's very -- you know, it's happened a long time ago. And it's better that we know that this is your independent recollection versus your trying to --
A. Yes.
Q. -- come to a memory. So --
A. Speculate what would've happened. Yeah.
Q. Yes.
A. So no, I don't remember talking to them. Yes.
Q. Okay. So do you remember how you came to learn that Carl Reed, as you said, was driving around the car?
A. I don't recall who told us, but I remember there being, like, a gossip in the building that Carl Reed was driving, I -- I know that -- this is the one thing I remember, was driving his car, Mr. Vo's car, but I don't know who would've told -- who -- where we got that information.
Q. Okay.
A. But I remember it being a big deal.
Q. And it -- and when you say it was gossip at -- do you mean like the residents were talking about it or



the desk --
A. Yes. Residents, staff. I mean, this type of thing never happened in those buildings, so it was obviously a big thing at the time.
Q. Okay. And when you heard that gossip, how did you feel -- like did you have a reaction to it?
A. I think people were scared and sad that it would've been another -- could -- that another resident could have been connected to this awful situation. I remember scared and sad, but I don't think I remember, like, it proved anything. It was just very alarming.
Q. Okay. And did you know Carl Reed?
A. I -- I remember him probably from all of this, but I just remember him as a sort of quiet, bigger, sort of gentle guy. I -- I remember -- I do remember him -- I don't know if I remember because this happened or I would've remembered him, but yeah, sort of a quiet -- a quiet guy.
Q. Do you have any memories one way or another on if he was one of the people who tended to hang out in the lobby or was, you know, social in that way?
A. Yeah, he -- he was around. I -- I remember him coming and going. He would've been one not like hanging out in the lobby all the time, but I remember -- I remembered him coming and going a little bit. He



would be one that, yeah, was around the building.
Q. And were you surprised to hear at all about the rumors about him driving the car?
A. Oh yeah. Yes. No, I remember being surprised. Yes.
Q. Okay. And why -- like, can you elaborate more on why you were surprised or what your -- what your feelings were about that?
A. Yeah. Surprised that -- like oh my gosh, did he have something to do with this? Does this mean he did? Does this mean he didn't? Did they go through -- if he didn't, did they go through the -- some person's room and take their stuff? Like, I remember just, you know, it being -- it being not great news.
Q. Yeah. Yeah. Obviously, when you work somewhere and --
A. Yes.
Q. -- a horrible incident has occurred, it -- it's not fair, right?
A. Yes.
Q. Okay. Did you know anyone by the name of Delong Reed?
A. Sounds -- was it his brother?
Q. As far as I know, they're not related, but --
A. Okay.

Q. -- yeah.
A. That name rings a bell, but I don't remember. But I definitely -- that name rings some kind of bell.
Q. Okay. Does it --
A. But I do not remember.
Q. Does it bring back any independent memories about DeLong Reed for -- if I tell you that he was a resident at the Harold Washington building?
A. Yeah. Not independent memories, but that name strikes a chord. I -- I would -- he would've been probably one of the people I recognized by name or face.
Q. Okay. Did you know anyone by the name of Ricardo Burns?
A. That is not ringing a bell.
Q. Okay.
A. Again, at the time, I probably knew all of them, but I just don't remember now.
Q. Okay. So I want to go back a little bit to the, like, front desk staff and a little bit of their responsibilities. I'm going to show you now a document that I'm going to designate it as Exhibit 1 of your deposition.
(Exhibit 1 was marked for identification.)
A. Sure.
BY MS. ALZAMLI:



Q. So I'll just share my screen here. Sorry. Sometimes, my computer becomes really slow when I overwhelm it with too many things. Okay. Can you see the document that I'm sharing?
A. Yes.
Q. Okay. And this is a document Bates Stamped City Reed 48. And I'm going to designate it as Exhibit 1 to your deposition.
A. Right.
Q. See at the top where it says, Lakefront SRO Desk Security --
A. Yeah.
Q. -- Security Log? Okay. Are you familiar with this document?
A. Oh, I remember these, now that you show it to me. Yeah.
Q. Could you tell me --
A. This document, no, but yeah.
Q. Oh, yeah. Like maybe not this specific document, but are you familiar with this form?
A. Yes. I remember logs. Yes, now that I look back. It seems ancient now, but yes.
Q. Do you know what was the purpose of these logs?
A. I don't -- I don't remember. Just people



coming and going or if there were anything of note. I don't know.
Q. Okay. Were you ever responsible for filling out a log like this?
A. I don't remember.
Q. Okay. So do you remember if you ever received training on how to fill out a log like this or if you ever trained anybody on how to fill out a log like this?
A. Yeah, it could be, but I don't have an independent memory of that.
Q. Okay. And is this log different than the log that you would log visitors on?
A. I feel like there used to be a thing of just names of coming in and out. When it says security log, may -- you know, I'm just making stuff up now. I shouldn't say that. I do -- I thought there was a list of, like, names of people coming and going.
Q. Yeah. No. If you don't remember, that's totally okay.
A. Yeah.
Q. But on this document, and you can read it, if you'd like, there are no names of people coming and going. So I don't know if you do -- if that refreshes your memory about whether or not there was a separate sign-in log for people, or if it doesn't, that's okay.



But you can just let me know.
A. Yeah. I -- I don't -- yeah, I don't remember.
Q. Okay. I'm going to go ahead and remove this document now.
A. Sure.
Q. Oh my God. Sorry. Okay. Is the document off your screen?
A. Yes.
Q. Okay, great. Okay. So do you have any memory of how many desk clerks might have worked at the building at that time, like if it was maybe less than five or just two? Or do you have any memory of that?
A. I don't remember.
Q. Okay. And I just want to quickly ask you about the building, specifically 4946. And I know it was the kind of building where there were two units and there was a connected bathroom. And my understanding is that there were locks that locked from the --
A. Right.
Q. -- apartment unit side. Or could you -- if you remember, could you explain exactly how the locks worked?
A. It -- well, how -- how they work doesn't mean -- you know, we'd always have tenants being like, they're coming in on me, or this people would forget to

lock their doors sometimes. So it would be like a situation where you could obviously be in your room and be secure. They couldn't come into your room from the bathroom, from the other side. And also, when you were in the bathroom, you could lock both of them, so no one could come in on you in the bathroom.
As you can imagine, in a shared situation, you know, there were always -- there were sometimes tenant issues. You know, they're in the bathroom too long, whatnot, but -- but yeah, it would -- it would be secure when you were in the bathroom and then, secure when you were out of the bathroom, if you had a unit. Someone -- just because you had a shared suite doesn't mean they had access to your unit, unless you left it open.
Q. So can you explain -- so just to clarify that, there are locks on both the inside and the outside of each bathroom door, so that you can lock it from the inside of the bathroom and you can lock it from the outside of the bathroom?
A. At -- that I remember, yes.
Q. Okay. And what did you mean when you said like, oh, like residents would complain that people were walking in on them? Like, what was the --
A. Well, if you left -- someone sometimes would complain someone was in the bathroom too long, I



remember. Because at the Belray, they didn't share bathrooms. You could -- you know, in any shared situation like that, you could leave your door unlocked on accident. You could leave the other one locked when the -- you left, and they couldn't get into the bathroom. I do have memories of people having conflicts with their bathrooms. I don't know -- not those particular people, but I remember that.
Q. Okay. And were they -- if you know, were they like sliding locks? Were they like --
A. Oh, I don't remember that.
Q. -- turnkey locks? You don't know? Okay. Is it the kind of thing where if you left the door unlocked, would it be ajar? Or would the doors stay shut?
A. I don't remember.
Q. Okay. Do you know if it was common at all for people to keep their bathroom doors open or anything like that?
A. I -- (Inaudible).
Q. I -- sorry, I think you said, I don't remember, but your audio just --
A. Yeah. I don't remember. Yes, I don't remember that.
Q. Okay. Thank you. And did you know Kim Van



Vo?
A. Not know him. He came and went and was very friendly, so he would be one of the people that I would recognize and say hello to.
Q. Did you know anything about any -- did you know any rumors about him that were -- did you know of any rumors that were floating around about him in the SRO building?
A. (Inaudible).
Q. I'm sorry, I -- we lost your audio again.
A. Oh, I don't know what's going on.
Q. Yeah. I'm not sure either, but it's not -- it's not too bad. But --
A. Yeah. Turn my Bluetooth off, just in case. I do not remember that.
Q. Okay. You don't -- sorry, let me clarify my question. It actually wasn't that great. To your knowledge, were there any rumors going around about him in the SRO?
A. (Inaudible) don't remember that.
Q. Okay. And again, the front of your answer just cut out slightly, so I might ask --
A. Yeah. Sorry. I -- I don't remember that.
Q. Okay. And sorry, I -- again, I'm just going to clarify. You don't remember whether there were or



there were not rumors or you don't -- or you -- there were not rumors?
A. I do not remember that there were rumors at the time. There could have been, and I could have been in the mix then, but nothing that I would recall now.
Q. Okay. Got it. Okay.
MS. ALZAMLI: Okay, I'm going to take a very, very short break, like just maybe five minutes, if that's okay. And we can come back.
THE WITNESS: Okay.
MS. ALZAMLI: And I don't think I'm going to have a lot more, but then, we can kind of wrap up.
THE WITNESS: I know. I feel like I have zero information for you, but --
BY MS. ALZAMLI:
Q. No, it's totally okay. And actually, because I wasn't super clear about what it means to have independent recollection, maybe before we go on a break, I'll just very quickly -- we'll recap some of the stuff that we talked about, to make sure that it's very clear --
A. Yes.
Q. -- if your testimony is independent recollection or if you're trying to remember or trying to guess what would've happened. Does that make sense?

Page 34

A. Yes. Yes.
Q. Okay. So let's go through just kind of the basic that we talked about earlier. And I'm going to like specifically just asking you what your independent recollection is.
A. Yes.
Q. And -- okay. So it's your independent recollection that the day that the body was recovered by the police, you took them up to Kim Van Vo's room; is that correct?
A. (Inaudible).
Q. Sorry, your audio --
MS. ALZAMLI: Is anyone else hearing the audio? Is it just me where the audio's clipping?
THE REPORTER: It's clipping for me, too.
MS. ALZAMLI: Okay.
THE WITNESS: Oh.
BY MS. ALZAMLI:
Q. Okay. It's okay. So why don't you answer that just one more time?
A. Yes, I remember bringing them up to the room that day. Yes.
Q. Okay. And is it your independent recollection that you did not go into the room with the officers and that's it?

Page 35

A. Yes, I --
MS. CHECKAI: Objection.
THE WITNESS: -- I remember letting them in and seeing the situation but not going in with them. But I saw it. Yeah.
BY MS. ALZAMLI:
Q. Okay. And you don't have any independent recollection of speaking to police officers, other than when you took them up to that room that day?
MS. CHECKAI: Objection. Form.
BY MS. ALZAMLI:
Q. Oh, sorry. When there's an objection, you can still answer the question.
A. Okay. I'm -- I -- I'm having a memory of talking to them. I have a memory of them being around the front desk and talking to them. I don't remember if that's maybe after they came down or on another day, but I remember talking to them. I remember talking to police, but I don't remember if it's when I brought them up or if there would've been a -- a revisit. That, I don't remember, but I do remember officers being around the building, yes.
Q. Okay. And do you remember what you spoke to them about?
A. No. I don't remember.

Page 36

Q. Do you --
A. No.
Q. -- do you remember if it was about Carl Reed?
A. I don't -- that's the thing. I'm going to conjecture, like well, if he would've known. So no, I don't remember. Yeah.
Q. Okay. Do you remember if you gave the police any names of people at the building who you thought might have been involved?
A. (Inaudible).
Q. I'm so sorry. I'm going to ask you to repeat it, because the audio clipped.
A. Yeah. I do not remember that.
Q. And just to clarify, when you say you do not remember, does that mean that you did not give them names of people that you think were involved or that you can't remember either --
A. No. Now, I'm like, oh my God, would I have done that? I do not have a memory of that whole time. I don't remember if I gave them names at all.
Q. Okay. Thank you. Okay. Let's take a -- just a very short break. We can come back at 1:45, and then, I'll probably wrap up.
A. Okay, great.
Q. Thank you.

Page 37

THE REPORTER: All right. We are off the record. The time is 1:39 p.m.
(A recess was taken.)
THE REPORTER: We are back on the record. The time is 1:46 p.m.
MS. ALZAMLI: Thank you.
BY MS. ALZAMLI:
Q. Okay. Ms. Gainer, thank you so much for your time. I'm almost done. I just want to go through the things that you do remember, so that we can make sure we have -- you know, everything that you remember in the record's clear. So I want to start with the car. You said that you do have an independent memory of rumors that Carl Reed was driving around the victim's car; is that correct?
A. Yes, I do remember that. Yes.
Q. Okay. Do you remember how you heard that rumor?
A. I do not.
Q. Okay. And did you ever see him driving around the car?
A. No.
Q. Would you --
A. I -- I -- personally, no, I remember hearing it.

Page 38

Q. Okay. Do you know what the car looked like?
A. I'm remembering it was like a white old school, I don't know the make or model, but like a big old white car.
Q. And how did you know what the car looked like?
A. I wonder -- in my memory, I remember seeing Mr. Vo driving it before this occurrence.
Q. Okay. Is that an independent memory, like you have that memory in your head?
A. Yeah.
Q. Okay. And for the conversation that you had with the police, is it your recollection that it was one conversation?
A. I'm remembering that -- I remember talking to them. Was it the same day? I don't know. But I do have memories of interacting with the police. I remember going to the room and I remember being around the front desk area talking to them, but I don't have clear memories on that one.
Q. Okay. And do you have any -- do you have any memories of how many police officers were there when you were talking to them by the front desk?
A. In my memory, it's two, but not super clear.
Q. Okay. And do you know what they looked like?
A. I remember one was a little bit of an older

Page 39

white guy. I remember that, but I don't remember anything else.
Q. Okay. And do you remember any of the questions that they asked you?
A. I could guess, but no, I do not remember.
Q. Okay. And do you have any memory of what you said to them?
A. I do not.
Q. Okay. Do you remember how long you spoke to them?
A. (Inaudible).
Q. Sorry. I know that you -- that I heard you mouth --
A. Yes --
Q. -- I do not, but --
A. -- I do not. Yeah, sorry, I do not.
Q. Okay. Thank you. Okay. I'm now going to designate Exhibit 2 of your deposition.
(Exhibit 2 was marked for identification.)
A. Okay.
BY MS. ALZAMLI:
Q. And this is a supplementary report, which is a -- it's like a type of police report by the Chicago Police Department. And just let me know if you can see it on your screen once it's up there. And for the

Page 40

record, I'm showing City Reed 119, which is Page 10 of 19 of the supplementary report in this case. And have you seen this page before?
A. Not that I remember.
Q. Okay. And did any -- did you review any documents before your deposition today?
A. No, I don't have any.
Q. No. Okay. And were you sent any documents by any of the attorneys in this case?
A. (Inaudible).
Q. I'm so sorry. Your audio clipped. One more time?
A. Oh, yes. No, not that I have received, no.
Q. Okay. Thank you so much. Okay. So I'm going to just -- you can read the entire page if you'd like to. And you can just let me know when you've read it, but I'm just going to ask you about this section right here, which is the fourth paragraph on the page, which is where your name appears. So if you want to read that section, and then, we can talk about it.
A. Okay. I read that.
Q. Okay. Does reading this paragraph refresh your memory about if you told the police about somebody named Ricardo Burns? I'm sorry, I don't -- I'm not sure if you're speaking or not, because your --

Page 41

A. No, I'm not. I'm trying to -- yeah, no, I mean, when I read it, kind of remember sort of these names. I remember, like I told you, that I remember the car being central to a lot of this, but now that I see this, you know, I'm sure that is what happened or that. But I don't really remember it.
Q. Okay. And I just want to be very -- I just want to make sure that you -- like when we're -- when I'm asking you, like, do you have an independent memory --
A. Yes.
Q. -- I'm very specifically asking, do you remember this happening? And like, do you remember having this conversation?
A. (Inaudible).
Q. Okay. I'm sorry. Your audio clipped again, but I saw --
A. Sorry. Oh, gosh. No, I do not have an independent memory of this.
Q. Okay. And reading this paragraph, does that bring back -- it doesn't -- it doesn't bring back any other memories?
A. It doesn't bring back independent memories. You know, as I read it, I'm trying to remember back to those days. I remember Jeania Davis was a woman who

Page 42

worked there, and it says the sign-in roster. So I -- that must have existed, but I don't remember any -- I don't have any specific memories of all this.

Q. Okay. That's totally fine. You said that you're remembering the names. When you say you're remembering the names, are you remembering the names Ricardo Burns, Lester Garner, and Carl Reed?

A. I remembered Carl Reed. I remember the name -- I remember the name Lester Garner. That stuck out to me. I don't remember a Ricardo Burns.

Q. Okay.

A. That's not as much of a memory.

Q. Okay. I'm going to go ahead and take this exhibit off your screen.

A. I feel like I'm being like someone in a show who isn't knowing anything, but it's really -- I don't remember. I remember it being such a big deal, but I don't remember all these things.

Q. Yes. And that's totally okay. And I don't want to make you feel at all that, when we ask you questions, that means you need to provide an answer. It's a completely appropriate answer and -- in a deposition to say that you don't remember. So that's completely appropriate and it's not -- please don't feel inclined to try to come up with a memory if you don't

Page 43

have --

A. Yes.

MS. ALZAMLI: Okay. So those are all the questions that I have for now. The other attorneys now can ask their questions, and then, I'm allowed to do a follow-up after that if I have any. So I will save my time. And if anybody else has any questions, they can feel free to jump in.

MS. CHECKAI: I was waiting to see if other co-counsel wanted to go ahead, but I will go ahead then.

CROSS-EXAMINATION

BY MS. CHECKAI:

Q. Miss -- do you prefer Gainer or Reilly or both?

A. It doesn't matter. Gainer is my maiden name, so it doesn't matter at all.

Q. Okay. Well, Ms. Reilly, earlier, I introduced myself. My name is Andrea Checkai, and I am -- I represent one of the defendants in this case, Richard Zuley. I really appreciate your time. I just have a few quick questions. And I understand that, you know, this was some time ago. So if you don't remember something, as counsel said earlier, that is totally fine. To start off with -- counsel earlier asked you if

Page 44

you had reviewed any documents in preparation for today, and you testified that you had not reviewed documents, that's -- is that right?

A. Yes.

Q. Did you review anything to prepare for today's deposition? Sorry?

A. No, like what would I -- yeah, so I'm not sure what I would review.

Q. Just in general. Yes, it's just --

A. Yes, no.

Q. Okay. Thank you. Did you meet with any investigators prior to today's deposition?

A. No.

Q. Okay. And prior to today's deposition, have you met with any attorneys?

A. No.

Q. Have you -- prior to today's deposition, have you spoken with any attorneys?

A. No.

Q. Okay.

MS. ALZAMLI: And sorry, I just want to clarify the question. Like if we've spoken on the phone for scheduling or things like -- you can -- you should -- like you can talk about those things and --

THE WITNESS: Oh, scheduling the deposition

Page 45

with you?

MS. ALZAMLI: Yeah. Like when -- like, if we've talked about that, like that is, like, responsive to the question and you can bring that up.

THE WITNESS: Oh, yes. So before this deposition, I received something in the mail that I thought was a mistake, because I didn't really remember it. I have a -- long story. I have a cousin with my same name, whose husband is a police officer, so I thought it was for her. So I -- I called the number on it, which was Israa. And she explained, no, that it was me and this case. So she said, would you be willing to talk and do a deposition?

I had said, yes. I had told her like, you know, I will do my best. I don't really remember anything. And so, then, we went back and forth a couple times on the scheduling of today.

BY MS. CHECKAI:

Q. Okay. And when you say that you received something in the mail, what did you receive in the mail?

A. I received, and I can't even believe I didn't save it, I received something that said that, like, you are named in -- you have come up as a witness on a case.

Page 46

Call this number. I didn't even save it. And I remember thinking that it was for my cousin, because her husband does a lot of undercover and had a bunch of cases recently that were high profile.
Q. Understood.
A. So I called her. Yeah. And she didn't know. So I called the number, and that's how this started.
Q. Okay. Was there anything else in that packet?
A. I do not recall. I don't think so. I -- I didn't even keep it.
Q. That's all right. And how many times did you meet with plaintiff's counsel?
A. Talked on the phone.
Q. Okay. How many times did you --
A. We had scheduled -- yes, so we never did Zoom or a meeting. We talked on the phone. And I believe Israa -- because we had scheduled one that then I had to cancel. So I believe there may have been up to, I don't know, three or four exchanges to schedule today.
Q. Okay. And how long in general were those conversations?
A. Some may have even been texts. Let me take a quick look. They were brief. And yes, I believe we're going -- we went back and forth on text a number of times for the scheduling.

Page 47

Q. Okay. So would you say it was -- and -- well, strike that. Was it mostly text messages?
A. Yes.
Q. Okay.
A. Yes.
Q. But there were phone calls as well?
A. The initial first phone call, yes, when I called the number.
Q. Okay. And prior to today's deposition, have you spoken to anyone else in general about your deposition?
A. No.
Q. Okay.
A. I don't really even remember anyone from those back -- those days. Yeah.
Q. Sure. Yeah. Understood. Have you spoken to anyone about this case in general?
A. No.
Q. And earlier, you testified that you gave a deposition about 20 years ago. Do you remember?
A. Yes. I remember now, because I remember being in a room, I was working as a PA for a woman who was a lawyer, and I went to the deposition with her. I almost brought that back up. I'm like, oh my God, I remember. So I was working for her, like doing stuff, but I was

Page 48

not deposed ever before this.
Q. Okay.
A. Yeah.
Q. Okay. Understood. So --
A. But I read that whole thing as very vivid, like downtown huge office, like ten people on the other side. So I remember that. And then I was like, what was that? But it was when I was working for this woman.
Q. Okay. So you've attended a deposition, but this --
A. Yes, I have never been deposed, yes.
Q. Okay. And let me -- give me one --
A. Sure.
Q. -- second, just to review my notes on this. So earlier, we spoke about -- well, strike that. Earlier, counsel showed you the supplementary report.
A. Yes.
Q. And you stated that you do not specifically recall that statement; is that correct?
A. Yes.
Q. Okay. You were truthful when you spoke with the officers on that day; is that correct?
A. Yes. I -- I would've provided anything I knew, and I would've -- I would've told them whatever I had known at the time, yes. Those details have been

Page 49

lost to me, but yes, I would've told them.
Q. So in general, it's easier to remember events, you know, more clearly closer to when they happened; would you agree?
A. Yes. Yes. Yes.
Q. So with that in mind -- well, just based on the supplementary report, do you have any reason to believe -- well, strike that. Is there any reason to believe that the statement you made to the officers wasn't, in some way, truthful or accurate to the best of your knowledge?
A. No.
MS. CHECKAI: For the time being, I don't have any additional questions, so I will pass it off to whoever wants to go next. Thank you.

EXAMINATION

BY MS. SULLIVAN:
Q. Hello, Ms. Reilly.
A. Hello.
Q. My name is Terrie -- hi. My name is Terrie Sullivan. I represent one of the defendants in this matter. I just have a few questions for you.
A. Sure.
Q. Earlier, you stated that some of your duties as the property manager was to conduct occupancy

interviews; is that correct?
A. Yes.
Q. Do you have any recollection of conducting an occupancy interview with Carl Reed?
A. No. A lot of the people would've lived there when I got there. I only worked there for about two years, I believe. So a lot of the residents were just already there, but -- so if apartment came up, you would interview someone new. But I have no recollection of interviewing him.
Q. And can you tell me a bit more about the interview process for the SRO housing?
A. Yeah. Mainly, it was a nonprofit that had certain regulatory -- certain regulatory people that lived there usually came. We had different contracts, I remember, with maybe the Department of Homeless Services or the department -- or the City. You had to -- people who lived there had to meet some criteria from an income point of view. We had to make sure they were appropriate for the contracts we held as a nonprofit, because the -- it was a mission-based housing operation. So you couldn't just move in someone who made, you know, 70 grand and wanted a cheap apartment.
So you would interview people, you would go over their pay stubs and documents to make sure they fit



the income profile. And usually, you would have an interview with them. You know, where did you live before? How did that go? I mean, it was -- that's all I really remember at the time, but the main thing would've been verifying they met the requirements of the nonprofit, of the SRO.
Q. Thank you for that. And do you have any memory of what would have disqualified an applicant from receiving an apartment?
A. I don't at Lakefront. I worked at CHA. I left -- I left lakefront for CHA, and I worked at a housing -- I was a property manager in New York for four years. So I don't want to mix up any of the requirements. If somebody had evictions or other -- evictions or felonies, that didn't necessarily put you out, because it was the type of housing we were providing. But you would always get some background or some type of, you know, how would this not happen now? So I don't remember what would disqualify somebody, but definitely income and eligibility in the housing sphere would've been the main thing.
Q. Okay. And I assume that the applicants, that they -- if they were selected, they would sign a lease agreement?
A. Yes.



Q. Okay. And how would that process go? Were they given a printed lease agreement? And did they sign it there in your presence? Or how -- what was the process?
A. I'm not -- I don't remember specifically, but everybody had a lease, and everybody would have a copy of their own lease. It was like a normal apartment, you know, situation with leasing and rent payment and whatnot. So everyone, yes, signed a lease. And as the property manager, you would do lease signings and all of that. But I remember you would only be moving one, two, three people in, you know, now and again, because most people were, -- you know, when I took the job, the building -- all our buildings were always usually near occupancy.
Q. Okay. Did you ever encounter a tenant that was, you know, selected to live in the building, whatever building it is, who was illiterate and could not read a lease agreement that was provided to them?
A. Not that I recall.
Q. So I guess you're --
A. Well --
Q. And I just want to clarify.
A. -- yes.
Q. Oh, go ahead.



A. Not that I recall. And when we did lease signings both at Lakefront and any of the places I worked, you would go through each section, because a lot of people were coming from various backgrounds and had had challenges. So if you did not read, you were brought through each section, so you could very easily cover that, if you could sign your name.
Q. Okay. And the application for an apartment through the organization, how was that generally received?
A. Everything would've been paper at the time. So they would -- they could have taken that and filled it out somewhere and brought it back to you.
Q. And was there any deposits that were required from the tenant, a security deposit of some sort?
A. Again, I don't remember the specifics of the -- of Lakefront's policies.
Q. Okay.
A. I don't remember at the time. Yeah.
Q. Another question. Do you have any recollection of observing Mr. Reed interact with Mr. Van Vo?
A. I do not.
Q. That was all my questions. Thank you.
MS. HARRIS: I don't have any questions based

on that. Thanks.
MS. ALZAMLI: I just have a very short follow up.

REDIRECT EXAMINATION

BY MS. ALZAMLI:
Q. Okay. Ms. Gainer, Ms. Checkai asked you a series of questions about the statement that you gave to police, and she asked you whether or not you would have been honest when you were speaking to the police. Do you remember that line of questioning?
A. Yes.
Q. Okay. When you spoke to the police near the front desk, did they prepare that typed report that I showed you earlier as Exhibit 2 of your deposition? Did they type that in front of you?
MS. CHECKAI: Objection. Form.
THE WITNESS: I don't know how they would've been able to do that, so no.
BY MS. ALZAMLI:
Q. Okay. Do you have any memories of them taking any notes while they were speaking to you?
A. I do not.
MS. CHECKAI: Objection. Well, sorry, delayed objection. Form.
BY MS. ALZAMLI:



Q. And when you say that you don't have any memory, just to clarify, is it your memory that they did not take any notes while they were speaking to you?
A. No, it's not that they didn't take notes. I just don't remember the exchange in that level of detail.
Q. Okay. And sorry, so do you have any memories -- okay. So -- sorry, strike that. So just to clarify, you did not see them type up this report in front of you, that we just showed you as Exhibit 2; is that correct?
MS. CHECKAI: Objection. Form.
THE WITNESS: No memory of that.
BY MS. ALZAMLI:
Q. And you have no memory of them taking handwritten notes while they were speaking to you; is that correct?
MS. CHECKAI: Objection. Form.
THE WITNESS: Again, I don't remember how in -- how they did their process. I don't remember the exchange in that level of detail. They could have taken notes or not taken notes. I don't remember that.
BY MS. ALZAMLI:
Q. Okay. And at any point during this



investigation, did police officers come back and show you this typed report?
A. I don't remember.
MS. CHECKAI: Objection. Form.
BY MS. ALZAMLI:
Q. Do you have any reason to believe that you saw this report at any point, other than seeing it today for the first time?
MS. CHECKAI: Objection. Form.
THE WITNESS: I don't remember.
MS. ALZAMLI: Okay. Those are all my questions. Thank you.
MS. CHECKAI: I have no further --
MS. HARRIS: Can go back in time. Go ahead.
MS. CHECKAI: Oh, I have no further questions. I --
MS. HARRIS: Oh, I thought you said, I had one more question.
MS. CHECKAI: I think you said something while I -- we talked over each other, which is easy to do.
MS. HARRIS: No, all good.
THE REPORTER: Any further question from any counsel? No? All right. Could someone explain the signature for Ms. Gainer?
MS. ALZAMLI: Yes. So basically, Ms. Jessica



Gjerde, I hope I pronounced that correctly, is a court reporter who was typing everything while we were speaking. So essentially, now, what happens is you can either choose to waive your signature, which means that you don't want to read over the transcript and make sure that she typed everything correct. It doesn't mean that you can change an answer. It just means that you're trusting that she --
THE WITNESS: Yeah, I trust that. I'll waive that. Yeah.
MS. ALZAMLI: Okay. So then, you can waive her signature.
THE REPORTER: All right. We waiving it. And Ms. Alzamli, would you like to order a transcript?
MS. ALZAMLI: Not at this time. Thank you so much.
THE REPORTER: Ms. Sullivan, would you like to order a transcript?
MS. SULLIVAN: No thank you.
THE REPORTER: And Ms. Harris, would you like to order a transcript?
MS. HARRIS: Not at this time.
THE REPORTER: And then finally, Ms. Checkai, would you like to order a transcript?

MS. CHECKAI: Not at this time. Thank you.
THE REPORTER: All right. We are now off the record. The time is 2:11 p.m.
(Deposition concluded at 2:11 p.m. CT)



CERTIFICATE OF DIGITAL REPORTER
STATE OF ILLINOIS

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Title page here of by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded digitally by me and then reduced to typewritten form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skill and ability. I certify that I am not a relative or employee of either counsel, and that I am in no way interested financially, directly or indirectly, in this action.

JESSICA AUBREY GJERDE,
DIGITAL REPORTER/NOTARY
COMMISSION EXPIRES ON: 09/16/2028
SUBMITTED ON: 07/25/2025

**&**

**&** 2:5,15 3:16

**0**

**07/25/2025** 59:25
**09/16/2028** 59:24

**1**

**1** 4:12 26:21,23 27:8
**10** 40:1
**110** 5:4
**111** 3:17
**119** 40:1
**1700** 2:17 3:18
**17186** 1:6
**19** 40:2
**1975** 8:20
**1:03** 5:7 6:4
**1:39** 37:2
**1:45** 36:22
**1:46** 37:5

**2**

**2** 4:14 39:18,19 54:14 55:10
**20** 2:16 7:16 47:20
**2000** 9:7
**2001** 9:7,12,13 10:18
**2003** 9:7
**2025** 1:24 5:7
**206** 5:11
**23** 1:6
**24** 11:14
**243-5900** 2:9
**25** 1:24
**2500** 5:5
**25th** 5:7
**26** 4:13
**2:11** 58:3,4

**3**

**30370** 5:11
**311** 2:6 3:6
**312** 2:9,19 3:9 3:20
**36221** 59:20
**39** 4:15

**4**

**43** 4:5
**447-6259** 2:19
**48** 27:7
**49** 4:6
**4946** 9:2,12 10:3 13:6 29:15

**5**

**5200** 3:7
**54** 4:7
**5:00** 10:15,20 11:3

**6**

**6** 4:3
**60603** 2:18
**60604** 3:19
**60606** 3:8 5:5
**60607** 2:8

**7**

**7** 4:4
**70** 50:23
**786-4612** 3:20

**8**

**872-8930** 3:9

**9**

**9/11** 9:14
**9:00** 10:15,20 11:3

**a**

**aberdeen** 2:6
**ability** 59:12
**able** 54:18
**access** 30:14
**accessed** 15:3
**accident** 31:4
**accurate** 49:10
**acheckai** 2:20
**action** 59:15
**actually** 18:17 32:17 33:16
**additional** 49:14
**address** 9:22 10:3
**adduci** 1:16 3:14 6:16 8:7
**adjoined** 20:5
**administered** 5:10
**affirm** 7:3
**afternoon** 6:9
**ago** 9:5,9 18:15 23:6 43:23 47:20
**agree** 6:22 49:4
**agreed** 5:13
**agreement** 51:24 52:2,19
**agrees** 6:24
**ahead** 29:3 42:13 43:10,10 52:25 56:14
**ajar** 31:14
**alarming** 24:11
**allowed** 43:5
**alzamli** 2:4 4:4 4:7 6:7,7,24 7:8,10 26:25 33:7,11,15 34:13,16,18 35:6,11 37:6,7 39:21 43:3 44:21 45:2 54:2,5,19,25 55:14,24 56:5 56:11,25 57:12 57:15,16

Case: 1:23-cv-17186 Document #: 201-14 Filed: 10/05/26 Page 18 of 38 PageID #:3682



**amended** 5:11
**ancient** 27:22
**andrea** 2:14 6:9 43:19
**answer** 8:2 17:24 23:1 32:21 34:19 35:13 42:21,22 57:8
**answers** 7:22
**anybody** 28:8 43:7
**apartment** 29:20 50:8,23 51:9 52:7 53:8
**appearance** 6:5
**appearances** 2:1 3:1
**appeared** 2:11 2:21 3:11,22
**appears** 40:19
**applicant** 51:8
**applicants** 51:22
**application** 53:8
**appreciate** 43:21
**appropriate** 42:22,24 50:20
**area** 8:16 10:1 10:12 13:19 38:18
**arrest** 19:20
**aside** 6:22
**asked** 8:1 14:18 17:6 39:4 43:25 54:6,8
**asking** 8:3 34:4 41:9,12
**assume** 8:3 14:18 51:22
**attended** 5:6 48:9
**attending** 6:6,8 6:10,13
**attorney** 1:15 3:14
**attorneys** 40:9 43:4 44:15,18
**aubrey** 1:25 5:13 59:22
**audio** 17:23 20:22 31:22 32:10 34:12,13 36:12 40:11 41:16
**audio's** 34:14
**awful** 24:9

**b**

**back** 7:16 9:5 13:16,17 14:23 14:25 15:5 21:4 22:15 26:6,18 27:22 33:9 36:22 37:4 41:21,21 41:23,24 45:18 46:24 47:15,24 53:13 56:1,14
**background** 51:17
**backgrounds** 10:14 53:4
**bad** 22:21 32:13
**based** 49:6 50:21 53:25
**basic** 34:3
**basically** 56:25
**bates** 27:6
**bathroom** 14:3 20:5,6 29:17 30:4,5,6,9,11 30:12,17,18,19 30:25 31:6,18
**bathrooms** 31:2,7
**battle** 3:16
**beginning** 17:24
**behalf** 2:3,13 3:3,13 6:10,12
**believe** 9:3 20:2 20:18,18 45:23 46:16,18,23 49:8,9 50:7 56:6
**bell** 26:2,3,14
**belmont** 9:23
**beloved** 18:4
**belray** 9:23 31:1
**best** 7:20,21 45:17 49:10 59:11
**better** 23:6
**beverly** 8:16
**big** 23:23 24:4 38:3 42:17
**bigger** 24:14
**bit** 12:10 24:25 26:18,19 38:25 50:11
**bluetooth** 32:14
**body** 19:25 20:13,17,25 34:8
**borkan** 2:15
**borkanscahill...** 2:20
**born** 8:19
**boss** 11:21
**boulevard** 3:17
**brain** 17:12
**break** 33:8,18 36:22
**brief** 46:23
**bring** 26:6 41:21,21,23 45:4

**bringing** 19:9 20:8 22:10 34:21
**brother** 25:23
**brought** 19:6 20:12 35:19 47:24 53:6,13
**building** 9:20 10:2 13:6,13 13:22 14:24,24 14:25 15:6,22 16:23 17:17 18:2 20:17 23:17 25:1 26:8 29:11,15 29:16 32:8 35:22 36:8 52:14,17,18
**building's** 12:15
**buildings** 9:19 9:21 10:12,16 10:17 11:12,14 12:21 13:3 15:10 16:13 20:4 24:3 52:14
**bunch** 15:5 46:3
**burns** 3:5 26:13 40:24 42:7,10
**burnsnoland....** 3:10
**business** 22:17
**buzzing** 11:10

**c**

**c** 1:6
**call** 46:1 47:7
**called** 9:18,21 45:12 46:6,7 47:8
**calls** 47:6
**camera** 6:21
**cancel** 46:18
**caps** 19:10
**car** 19:19 23:15 23:19,19 25:3 37:12,14,21 38:1,4,5 41:4
**careful** 22:25
**carl** 1:8 2:3 6:7 8:5,7 17:12 19:18 23:14,17 24:12 36:3 37:14 42:7,8 50:4
**case** 1:6 4:15 8:8 21:2 32:14 40:2,9 43:20 45:13,25 47:17
**cases** 46:4
**central** 41:4
**certain** 50:14 50:14
**certificate** 59:1
**certify** 59:4,12
**cha** 51:10,11
**challenges** 53:5
**change** 57:7
**chat** 22:16
**chatting** 17:21
**cheap** 50:23
**check** 14:15
**checkai** 2:14 4:5 6:9,9 35:2 35:10 43:9,13 43:19 45:20 49:13 54:6,16 54:23 55:12,18 56:4,9,13,15,19 57:24 58:1
**checking** 14:7
**chicago** 1:14 2:8,18 3:3,8,19 4:14 5:5 6:8,11 6:13,14,16 8:6 8:15 39:23
**choose** 57:4
**chord** 26:10
**chronic** 16:16
**city** 1:14 3:3 6:13,13 8:6,24 27:7 40:1 50:17
**civil** 5:9,11
**clarify** 20:11 22:24 30:15 32:16,25 36:14 44:21 52:23 55:2,8
**clark** 2:16
**clear** 7:24 8:4 19:8 33:17,21 37:12 38:19,23
**clearly** 49:3
**clerks** 29:10
**clicked** 20:22
**clipped** 36:12 40:11 41:16
**clipping** 34:14 34:15
**closer** 49:3
**come** 13:25 15:15 21:3 22:15,15,18,25 23:9 30:3,6 33:9 36:22 42:25 45:25 56:1
**coming** 12:16 24:23,25 28:1 28:14,17,22 29:25 53:4
**commission** 59:24
**common** 31:17
**complain** 30:22 30:25
**complained** 17:6
**complainers** 16:17

**completely** 42:22,24
**computer** 27:2
**concluded** 58:4
**conduct** 49:25
**conducting** 50:3
**conflicts** 31:6
**conjecture** 36:5
**connected** 24:9 29:17
**constitutes** 59:10
**continued** 3:1
**contractor** 13:25
**contracts** 50:15 50:20
**conversation** 38:11,13 41:14
**conversations** 46:21
**cook** 1:15,16 3:13
**copy** 52:6
**correct** 20:1 34:10 37:15 48:19,22 50:1 55:11,17 57:7
**correctly** 57:1
**counsel** 6:24 7:7 43:10,24 43:25 46:12 48:16 56:23
59:13
**county** 1:15,16 3:13
**couple** 19:4 45:19
**court** 1:1 5:4 5:11 57:2
**cousin** 45:10 46:2
**cover** 53:7
**covered** 14:3
**crew** 16:12
**criteria** 50:18
**cross** 4:5 43:12
**ct** 5:7 6:4 58:4
**cut** 17:23 32:22

**d**

**date** 1:24 59:5
**davis** 41:25
**day** 5:7 12:22 12:23 22:4,7 22:15 34:8,22 35:9,17 38:15 48:22
**days** 15:17 41:25 47:15
**dead** 22:11
**deal** 23:23 42:17
**defendant** 2:13 3:3,13 6:10,15 8:7
**defendants** 1:17 43:20 49:21
**definitely** 11:19 12:13,17 15:7 16:12,19 17:16 18:5 22:1 26:3 51:20
**delayed** 54:23
**delong** 25:22 26:7
**department** 4:14 39:24 50:16,17
**depend** 15:19
**depending** 10:17
**deponent** 1:23
**deposed** 7:13 48:1,11
**deposit** 53:15
**deposition** 5:3 5:8 7:12 26:22 27:8 39:18 40:6 42:23 44:6,12,14,17 44:25 45:7,15 47:9,11,20,23 48:9 54:14 58:4
**deposits** 53:14
**designate** 26:21 27:7 39:18
**designated** 9:20
**desk** 4:12 11:3 11:5,7,14,17 12:5 13:18,21 13:21 14:2,4 15:3,21 24:1 26:19 27:11 29:10 35:16 38:18,22 54:13
**detail** 55:6,21
**details** 48:25
**dharris** 3:10
**dhaviella** 3:4 6:12
**different** 13:2 13:12 28:11 50:15
**digital** 5:14 59:1,23
**digitally** 59:9
**direct** 4:4 7:9 11:21
**direction** 59:10
**directly** 59:14
**director** 13:15
**discovered** 20:1
**disqualified** 51:8
**disqualify** 51:19
**district** 1:1,2

**division** 1:3
**document** 26:20 27:4,6 27:14,18,20 28:21 29:4,6
**documents** 40:6,8 44:1,2 50:25
**doing** 12:3,24 47:25
**door** 30:17 31:3,13
**doors** 15:6 30:1 31:14,18
**dorothy** 15:25
**downtown** 48:6
**drive** 3:6 5:4
**driving** 19:19 23:14,18,19 25:3 37:14,20 38:7
**duly** 59:7
**duties** 12:11 49:24

**e**

**e** 2:10,20 3:10 3:21 8:12,12 8:12,13
**earlier** 34:3 43:18,24,25 47:19 48:15,15 49:24 54:14
**easier** 49:2
**easily** 53:6
**eastern** 1:3
**easy** 56:20
**either** 22:15 32:12 36:17 57:4 59:13
**elaborate** 25:6
**eligibility** 51:20
**embodied** 22:9
**employee** 59:13
**encounter** 52:16
**entire** 40:15
**esquire** 2:4,14 3:4,15
**essentially** 57:3
**evenings** 10:21 10:23
**events** 49:2
**everybody** 16:19 52:6,6
**evictions** 51:14 51:15
**exactly** 22:2 29:21
**examination** 4:4,5,6,7 7:9 43:12 49:16 54:4
**example** 11:22
**except** 6:4
**exchange** 55:5 55:21
**exchanges** 46:19
**executive** 13:15
**exhibit** 4:11,12 4:14 26:21,23 27:7 39:18,19 42:14 54:14 55:10
**exhibits** 4:10
**existed** 42:2
**expires** 59:24
**explain** 29:21 30:15 56:23
**explained** 45:13

**f**

**f** 1:4
**face** 26:11
**fact** 6:23
**fair** 25:19
**familiar** 16:2,3 16:6 27:13,20
**far** 25:24
**february** 1:24 5:7
**federal** 5:8
**feel** 22:20,21 24:6 28:13 33:13 42:15,20 42:24 43:8
**feelings** 25:8
**felonies** 51:15
**figure** 20:5
**figuring** 19:15
**fill** 11:24,25 28:7,8
**filled** 53:12
**filling** 14:13 28:3
**finally** 57:24
**financially** 59:14
**fine** 42:4 43:25
**finish** 7:20,21
**first** 18:16 19:25 20:16 47:7 56:8 59:7
**fit** 50:25
**five** 29:12 33:8
**floating** 32:7
**floor** 2:7
**follow** 43:6 54:2
**foregoing** 59:4
**forget** 29:25
**form** 27:20 35:10 54:16,24 55:12,18 56:4 56:9 59:10
**forth** 45:18 46:24
**four** 9:6 46:19 51:12
**fourth** 40:18
**free** 43:8

**friendly** 32:3
**friends** 17:12
**front** 11:3,5,7 11:17 12:5 13:18,21,21 14:2,4 15:3,20 26:19 32:21 35:16 38:18,22 54:13,15 55:9
**full** 6:18
**funny** 15:1
**further** 56:13 56:15,22

**g**

**g** 8:12
**gainer** 1:23 6:17,19,20,23 7:1,11 8:12 37:8 43:14,16 54:6 56:24
**galassini** 1:16 3:14
**garner** 5:3 16:21 17:15 18:18 42:7,9
**general** 44:9 46:20 47:10,17 49:2
**generally** 53:9
**gentle** 24:15
**getting** 11:1
**give** 7:4,22 36:15 48:12
**given** 21:23 22:1 52:2
**giving** 21:13,20
**gjerde** 1:25 5:13 57:1 59:22
**go** 7:17 8:21 14:2 15:6 19:13 25:11,12 26:18 29:3 33:18 34:2,24 37:9 42:13 43:10,10 49:15 50:24 51:3 52:1,25 53:3 56:14,14
**god** 7:15 29:6 36:18 47:24
**goes** 7:18
**going** 9:4 12:17 12:18 15:19 16:11 24:23,25 26:20,21 27:7 28:1,17,23 29:3 32:11,18 32:24 33:7,11 34:3 35:4 36:4 36:11 38:17 39:17 40:14,17 42:13 46:24
**good** 6:9 56:21
**gosh** 25:9 41:18
**gossip** 23:17,24 24:5
**graduate** 8:21
**grand** 50:23
**great** 7:7 25:14 29:9 32:17 36:24
**grew** 8:17
**ground** 7:17
**guess** 20:11 33:25 39:5 52:21
**guessing** 22:23
**guy** 12:19 24:15,18 39:1

**h**

**h** 5:11
**halls** 12:19
**hand** 7:2
**handful** 16:15
**handwritten** 55:16
**hang** 16:9 24:20
**hanging** 24:24
**happen** 51:18
**happened** 14:12 17:15,17 18:3,4,13,15 19:4,15 21:14 21:15 23:5,10 24:3,16 33:25 41:5 49:3
**happening** 16:18 17:11 41:13
**happens** 57:3
**happy** 9:3
**hard** 7:19
**harold** 9:21 10:2 13:5,10 13:17,22 15:21 26:8
**harris** 3:4 6:12 6:12 53:25 56:14,17,21 57:21,23
**head** 7:23 38:9
**hear** 25:2
**heard** 24:5 37:17 39:12
**hearing** 34:13 37:24
**heather** 1:5
**held** 50:20
**hello** 32:4 49:18,19
**helpful** 9:4
**hi** 7:11 49:20
**high** 8:22,24 46:4
**hired** 11:22
**hold** 6:20 7:14
**home** 6:8,16 7:15
**homeless** 50:16
**homicide** 17:15 18:18,22

**honest** 54:9
**hope** 57:1
**horrible** 25:18
**hour** 11:14
**hours** 10:9
**housing** 50:12 50:21 51:12,16 51:20
**hr** 13:16
**huge** 48:6
**huh** 7:25,25
**hung** 16:12
**husband** 45:10 46:3

**i**

**identification** 26:23 39:19
**ids** 14:7
**illinois** 1:2 2:8 2:18 3:8,19 5:5 5:10,14 6:8,11 6:16 59:2
**illiterate** 52:18
**imagine** 30:7
**inaudible** 17:16 20:21 31:20 32:9,20 34:11 36:10 39:11 40:10 41:15
**incident** 25:18
**inclined** 42:25
**income** 10:13 50:18 51:1,20
**independent** 18:9,17,20,23 18:25 19:17,20 21:6 23:7 26:6 26:9 28:10 33:18,23 34:4 34:7,23 35:7 37:13 38:8 41:9,19,23
**index** 4:1
**indirectly** 59:14
**individuals** 10:13 11:6
**information** 19:18 21:23 22:2 23:21 33:14
**initial** 47:7
**inside** 30:16,18
**intensive** 13:1
**interact** 53:21
**interacted** 17:9
**interacting** 38:16
**interaction** 21:1
**interested** 59:14
**interview** 50:4 50:9,12,24 51:2
**interviewing** 12:17 50:10
**interviews** 50:1
**introduced** 43:18
**investigating** 21:4,10
**investigation** 21:21 56:1
**investigators** 44:12
**involved** 36:9 36:16
**ish** 10:15
**israa** 2:4,10 6:7 45:12 46:17
**issues** 12:15 30:9

**j**

**jackson** 3:17
**jeania** 41:25
**jessica** 1:25 5:13 56:25 59:22
**job** 10:15 11:13 12:6 13:1 52:13
**john** 1:4
**judge** 1:4,5
**jump** 43:8

**k**

**k** 1:5
**keep** 31:18 46:10
**keeping** 12:21
**kentuckiana** 5:4
**killed** 17:19
**kim** 31:25 34:9
**kind** 16:9,10 18:3,8,9 19:19 22:2,9,17,20 26:3 29:16 31:13 33:12 34:2 41:2
**kness** 1:4
**knew** 16:15 17:4 26:16 48:24
**know** 7:18,25 8:1 9:9,11 12:6 12:7,19,23,24 13:2 15:13,25 16:7,10,14,15 16:16,18 17:7 17:7,7,18 18:15 19:7,15 21:3,9,24,24 22:8,8,11 23:5 23:6,18,20 24:12,16,21 25:14,21,24 26:12 27:23 28:2,15,23 29:1,15,24 30:8,9 31:2,7,9 31:12,17,25 32:2,5,6,6,11

Case: 1:23-cv-17186 Document #: 201-14 Filed: 10/05/26 Page 24 of 38 PageID #:3688



33:13 37:11 38:1,3,5,15,24 39:12,24 40:16 41:5,24 43:22 45:17 46:6,19 49:3 50:22 51:2,18 52:8 52:12,13,17 54:17
**knowing** 42:16
**knowledge** 32:18 49:11
**known** 36:5 48:25

**l**

**l** 8:13,13
**lakefront** 4:12 9:18 10:11 13:11 27:10 51:10,11 53:2
**lakefront's** 53:17
**late** 11:1
**lawyer** 47:23
**leading** 19:19
**leaks** 12:24
**learn** 22:18 23:14
**lease** 51:23 52:2,6,7,9,10 52:19 53:1
**leasing** 52:8
**leave** 31:3,4
**left** 30:14,24 31:5,13 51:11 51:11
**lester** 16:20 17:15 18:18 42:7,9
**letting** 19:11 35:3
**level** 55:5,21
**likelier** 18:13
**likely** 14:11 17:21,25 18:1 18:6
**line** 54:10
**list** 28:16
**little** 12:10,22 13:10 15:2 24:25 26:18,19 38:25
**live** 51:2 52:17
**lived** 11:11 16:6 21:23 50:5,15,18
**llp** 3:5
**lobby** 13:7,18 16:10,12 17:20 24:21,24
**location** 6:6 13:11
**lock** 30:1,5,17 30:18
**locked** 29:18 31:4
**locks** 29:18,21 30:16 31:10,12
**loevy** 2:5,5
**loevy.com** 2:10
**log** 4:13 11:24 11:25 27:13 28:4,7,8,11,11 28:12,14,25
**logs** 14:14 27:21,24
**long** 9:5,9 18:15 23:5 30:9,25 39:9 45:9 46:20
**look** 27:21 46:23
**looked** 11:20 38:1,5,24
**lost** 32:10 49:1
**lot** 10:24 12:14 13:24 14:1,5 16:9 17:4 33:12 41:4 46:3 50:5,7 53:3
**lower** 10:13

**m**

**m** 8:12
**made** 49:9 50:22
**magistrate** 1:5
**maiden** 43:16
**mail** 2:10,20 3:10,21 45:7 45:22,22
**main** 13:11 51:4,21
**maintenance** 12:14,16,21
**make** 17:11 21:11 33:20,25 37:10 38:3 41:8 42:20 50:19,25 57:6
**makes** 13:4
**making** 28:15
**man** 18:4
**manager** 9:2,11 9:16,20,24 10:5,8 12:11 13:5 15:10 16:5 49:25 51:12 52:10
**managers** 11:4 11:5 12:5
**marked** 26:23 39:19
**marketing** 13:16
**matter** 5:9 8:5 43:16,17 49:22 59:9
**maureen** 1:23 5:3 6:19,23
**mcauley** 8:25

**mcshain** 1:5
**mean** 23:25 24:2 25:10,11 29:23 30:13,21 36:15 41:2 51:3 57:7
**means** 33:17 42:21 57:5,8
**meet** 44:11 46:12 50:18
**meeting** 46:16
**memories** 14:6 18:9,17,21,23 18:25 19:20 21:7 24:19 26:6,9 31:6 38:16,19,21 41:22,23 42:3 54:20 55:7
**memory** 19:17 19:22 23:9 28:10,24 29:9 29:12 35:14,15 36:19 37:13 38:6,8,9,23 39:6 40:23 41:10,19 42:12 42:25 51:8 55:2,2,13,15
**messages** 47:2
**met** 44:15 51:5
**might've** 12:6
**mind** 49:6
**minutes** 33:8
**mission** 50:21
**mistake** 45:8
**mix** 33:5 51:13
**model** 38:3
**mokblaw.com** 3:21
**monday** 15:13
**mother** 8:25
**mouth** 39:13
**move** 12:18 50:22
**moved** 9:6
**moving** 12:13 12:14 52:11

**n**

**n** 3:4 8:12,12
**name** 6:18 8:11 14:16 15:23,25 16:7,20,22,25 17:1,13 25:21 26:2,3,9,11,12 40:19 42:8,9 43:16,19 45:10 49:20,20 53:7
**named** 40:24 45:25
**names** 20:19 28:14,17,22 36:8,16,20 41:3 42:5,6,6
**nancy** 1:16 3:14 6:16
**near** 52:14 54:12
**necessarily** 51:15
**need** 42:21
**needed** 10:17 14:2
**needs** 16:11
**never** 14:4 16:14 24:3 46:15 48:11
**new** 9:5,6 12:18 50:9 51:12
**news** 25:14
**nods** 7:23
**noland** 3:5
**nonprofit** 10:11 13:12 50:13,20 51:6
**normal** 52:7
**north** 2:6 5:4 9:2
**northern** 1:2
**notary** 5:13 59:23
**note** 28:1
**notes** 48:14 54:21 55:3,4 55:16,22,22
**number** 9:19 10:12,14 16:13 16:18 45:12 46:1,7,24 47:8

**o**

**o'connor** 3:16
**oath** 5:9
**objection** 35:2 35:10,12 54:16 54:23,24 55:12 55:18 56:4,9
**observing** 53:21
**obviously** 17:10,18 18:2 19:15 22:11 24:4 25:15 30:2
**occupancies** 10:13
**occupancy** 12:17 49:25 50:4 52:15
**occupied** 12:22
**occurred** 25:18
**occurrence** 38:7
**office** 13:6 48:6
**officer** 45:11
**officers** 19:1,4 19:9 20:12,20 20:23,25 21:2 34:24 35:8,21 38:21 48:22 49:9 56:1
**offices** 13:14,15 13:17 14:20

15:4
**oh** 7:15 25:4,9 27:15,19 29:6 30:22 31:11 32:11 34:17 35:12 36:18 40:13 41:18 44:25 45:6 47:24 52:25 56:15,17
**okay** 7:17 8:10 8:14,17,19,21 9:1,11,16 10:2 10:8,23 11:5,9 12:6 13:20 14:13,20 15:8 15:20 16:4,4 18:7,20 20:11 20:16,19,24 21:6,13 22:18 23:13,22 24:5 24:12 25:6,21 25:25 26:4,12 26:15,18 27:3 27:6,13 28:3,6 28:11,19,25 29:3,6,9,9,14 30:21 31:9,12 31:17,25 32:16 32:21,24 33:6 33:6,7,9,10,16 34:2,7,16,19,19 34:23 35:7,14 35:23 36:7,21 36:21,24 37:8 37:17,20 38:1 38:8,11,20,24 39:3,6,9,17,17 39:20 40:5,8 40:14,14,21,22 41:7,16,20 42:4,11,13,19 43:3,18 44:11 44:14,20 45:21 46:8,14,20 47:1,4,9,13 48:2,4,9,12,21 51:22 52:1,16 53:8,18 54:6 54:12,20 55:7 55:8,25 56:11 57:12
**old** 38:2,4
**older** 16:9 38:25
**once** 39:25
**ones** 10:1
**open** 30:14 31:18
**operation** 50:21
**order** 5:11 57:15,19,22,25
**organization** 53:9
**organize** 15:16
**orienting** 9:14
**outside** 11:13 30:16,19
**oversee** 12:16
**overseeing** 12:13,25
**overwhelm** 27:3
**overwhelming** 19:12
**own** 52:7
**owned** 10:12

**p**

**p.m.** 5:7 6:4 37:2,5 58:3,4
**pa** 47:22
**packet** 46:8
**page** 4:2,11 40:1,3,15,18 59:6
**painter** 15:15
**painters** 12:16
**paper** 53:11
**paragraph** 40:18,22 41:20
**part** 19:5,8 20:7
**participants** 5:6
**particular** 31:8
**parties** 6:4,22
**pass** 49:14
**pay** 50:25
**payment** 52:8
**people** 9:5,17 11:7,10,17 12:13,13,17 13:16,24 15:21 16:10,14,15,19 17:5,8,22 18:5 24:7,20 26:11 27:25 28:17,22 28:25 29:25 30:22 31:6,8 31:18 32:3 36:8,16 48:6 50:5,14,17,24 52:12,13 53:4
**perfect** 6:21
**performative** 12:15
**permitted** 5:10
**person** 17:18 17:19 22:11
**person's** 25:12
**personally** 37:24
**pest** 12:19
**phone** 44:22 46:13,16 47:6 47:7
**physical** 14:15
**picking** 12:19
**picture** 16:25
**place** 13:7 59:6
**places** 11:15 13:13 53:2

**plaintiff** 1:9 2:3 6:7 8:8
**plaintiff's** 6:24 46:12
**player** 16:23
**please** 6:5,18 6:20 7:2 42:24
**point** 50:19 55:25 56:7
**police** 4:14 19:1 19:4,23 20:12 20:17 21:2,14 21:21 34:9 35:8,19 36:7 38:12,16,21 39:23,24 40:23 45:10 54:8,9 54:12 56:1
**policies** 53:17
**pop** 15:24
**possible** 7:18
**practice** 14:14
**prefer** 43:14
**preparation** 44:1
**prepare** 44:5 54:13
**presence** 52:3
**pretty** 8:8
**preventative** 12:20
**printed** 52:2
**prior** 44:12,14 44:17 47:9
**probably** 16:15 16:17 19:9 21:22 22:1,16 24:13 26:11,16 36:23
**problem** 9:8 20:24
**problems** 12:14
**procedure** 5:9
**proceedings** 4:3 6:1
**process** 50:12 52:1,4 55:20
**profile** 46:4 51:1
**pronounced** 57:1
**property** 9:1,11 9:16,20,24 10:5,8 11:4 12:11 13:5 16:5 49:25 51:12 52:10
**proved** 24:11
**provide** 42:21
**provided** 48:23 52:19
**providing** 51:17
**public** 5:14
**purpose** 27:23
**pursuant** 5:8
**put** 51:15
**putting** 19:10

**q**

**question** 8:1,2 20:11 32:17 35:13 44:22 45:4 53:20 56:18,22
**questioning** 54:10
**questions** 7:22 8:9 39:4 42:21 43:4,5,8,22 49:14,22 53:24 53:25 54:7 56:12,15
**quick** 7:17 43:22 46:23
**quickly** 29:14 33:19
**quiet** 24:14,17 24:18
**quite** 22:13

**r**

**r** 8:12,12,13
**racine** 9:24
**raise** 7:2
**random** 15:11
**rare** 11:2,2
**reaction** 24:6
**read** 28:21 40:15,16,19,21 41:2,24 48:5 52:19 53:5 57:5
**reading** 40:22 41:20
**really** 18:8 19:11,17 22:25 27:2 41:6 42:16 43:21 45:8,17 47:14 51:4
**reason** 49:7,8 56:6
**recall** 12:4 15:17 23:16 33:5 46:9 48:19 52:20 53:1
**recap** 33:19
**receive** 45:22
**received** 28:6 40:13 45:7,21 45:23,24 53:10
**receiving** 51:9
**recently** 46:4
**recess** 37:3
**recognize** 32:4
**recognized** 26:11
**recollection** 11:11 23:7 33:18,24 34:5 34:8,23 35:8 38:12 50:3,9 53:21

**recollections** 18:9
**record** 6:3,18 7:23 8:11 37:2 37:4 40:1 58:3 59:11
**record's** 37:12
**recorded** 59:9
**recover** 20:17 20:25
**recovered** 34:8
**redirect** 4:7 54:4
**reduced** 59:9
**reed** 1:8 2:3 6:8 8:6,7 17:13 19:18 23:14,18 24:12 25:22 26:7 27:7 36:3 37:14 40:1 42:7,8 50:4 53:21
**refresh** 40:22
**refreshes** 28:23
**regular** 12:15 12:20
**regulatory** 50:14,14
**reilly** 6:19 8:13 43:14,18 49:18
**related** 21:21 25:24
**relative** 59:13
**remember** 7:16 9:9,10 10:10 10:11 11:21 12:3,8,12,18 13:20,23 14:17 14:17,19 15:1 15:14,20,24 16:3,17,20,22 16:22,24,24,25 17:2,2,4,8,10 17:10,13,14 18:1 19:2,3,3,5 19:5,9,10,11,13 19:16 20:7,8 20:19,23 21:5 21:11,13,20,22 21:25 22:2,4,6 22:8,9,10,12,14 22:20 23:3,12 23:13,16,19,23 24:10,10,13,14 24:15,15,16,22 24:24 25:4,13 26:2,5,17 27:15,21,25 28:5,6,18 29:2 29:13,21 30:20 31:1,8,11,16,22 31:23,24 32:15 32:20,23,25 33:3,24 34:21 35:3,16,18,18 35:19,21,21,23 35:25 36:3,6,7 36:13,15,17,20 37:10,11,16,17 37:24 38:6,14 38:17,17,25 39:1,1,3,5,9 40:4 41:2,3,3,6 41:13,13,24,25 42:2,8,9,10,17 42:17,18,23 43:23 45:9,17 46:2 47:14,20 47:21,21,24 48:7 49:2 50:16 51:4,19 52:5,11 53:16 53:19 54:10 55:5,19,20,22 56:3,10
**remembered** 24:17,25 42:8
**remembering** 22:21 38:2,14 42:5,6,6
**remotely** 5:6,10 6:11,13
**removal** 12:23
**remove** 29:3
**rent** 52:8
**repeat** 36:11
**rephrase** 8:2 21:18
**report** 4:15 20:6,7 39:22 39:23 40:2 48:16 49:7 54:13 55:9 56:2,7
**reported** 19:7 20:10
**reporter** 1:25 5:14 6:3,17,20 7:1,7 34:15 37:1,4 56:22 57:2,14,18,21 57:24 58:2 59:1,23
**reporters** 5:4
**reporting** 19:8
**represent** 8:7 43:20 49:21
**required** 53:14
**requirements** 51:5,14
**residence** 13:12
**residences** 13:14
**resident** 14:19 24:8 26:8
**residents** 11:12 12:18 16:6,9 17:4 18:21 23:25 24:2 30:22 50:7
**responsibilities** 26:20
**responsibility** 11:16 12:3

**responsible** 11:17,18 28:3
**responsive** 45:4
**review** 40:5 44:5,8 48:14
**reviewed** 44:1 44:2
**revisit** 35:20
**ricardo** 26:13 40:24 42:7,10
**richard** 1:13 2:13 6:10 8:6 43:20
**right** 7:1,2 25:19 27:9 29:19 37:1 40:17 44:3 46:11 56:23 57:14 58:2
**ringing** 26:14
**rings** 26:2,3
**road** 9:2
**roof** 12:24
**room** 10:13 15:2 19:6,9,11 19:23 20:13,14 22:5,10 25:13 30:2,3 34:9,21 34:24 35:9 38:17 47:22
**rooms** 20:4 21:24
**roster** 42:1
**roughly** 9:7 10:14
**rule** 5:11
**rules** 5:8 7:18
**rumor** 37:18
**rumors** 25:3 32:6,7,18 33:1 33:2,3 37:13

**s**

**sad** 24:7,10
**save** 43:7 45:24 46:1
**saw** 35:5 41:17 56:6
**saying** 7:25
**says** 27:10 28:14 42:1
**scahill** 2:15
**scared** 24:7,10
**schedule** 10:9 46:19
**scheduled** 46:15,17
**scheduling** 44:23,25 45:19 46:25
**school** 8:22,24 38:3
**screen** 27:1 29:7 39:25 42:14
**second** 7:14 48:14
**section** 40:17 40:20 53:3,6
**secure** 30:3,10 30:11
**security** 4:13 11:24 27:11,13 28:14 53:15
**see** 20:3 27:3 27:10 37:20 39:24 41:4 43:9 55:9
**seeing** 19:15 35:4 38:6 56:7
**seems** 27:22
**seen** 21:24,25 40:3
**selected** 51:23 52:17
**senior** 11:20
**sense** 13:4 21:11 33:25
**sent** 40:8
**separate** 14:24 15:5,7 18:12 28:24
**series** 54:7
**services** 50:16
**set** 6:21 13:9 59:6
**shakes** 7:23
**share** 27:1 31:1
**shared** 30:7,13 31:2
**sharing** 27:4
**sheridan** 9:2
**short** 33:8 36:22 54:2
**show** 26:20 27:15 42:15 56:1
**showed** 48:16 54:14 55:10
**showing** 19:14 40:1
**shut** 31:15
**side** 15:4 29:20 30:4 48:7
**sign** 11:7 14:16 28:25 42:1 51:23 52:2 53:7
**signature** 56:24 57:4,13 59:20
**signed** 52:9
**signing** 14:7
**signings** 52:10 53:2
**single** 10:13
**sit** 7:12 13:7
**sitting** 11:6 13:20
**situation** 11:23 17:10 18:3 19:3 24:9 30:2 30:7 31:3 35:4 52:8

**skill** 59:12
**slew** 15:4
**sliding** 31:10
**slightly** 32:22
**slow** 27:2
**smell** 19:12 20:7 22:11
**smells** 19:7
**smoothly** 7:18
**snow** 12:23
**social** 24:21
**solemnly** 7:3
**somebody** 7:14 14:2,10,10 19:6 20:2,3,5,6 40:23 51:14,19
**sorry** 16:2 17:23 20:22 22:19 27:1 29:6 31:21 32:10,16,23,24 34:12 35:12 36:11 39:12,16 40:11,24 41:16 41:18 44:6,21 54:23 55:7,8
**sort** 12:14,20 13:12 15:4 16:23,23,25 17:6,9 19:18 19:20 21:13 24:14,14,17 41:2 53:15
**soukup** 16:1
**sound** 16:2,3
**sounds** 25:23
**south** 2:16 3:6
**speak** 7:20
**speaking** 9:23 18:18,21 19:1 35:8 40:25 54:9,21 55:3 55:16 57:3
**special** 16:11
**specific** 27:19 42:3
**specifically** 18:8 21:11 29:15 34:4 41:12 48:18 52:5
**specifics** 53:16
**speculate** 23:10
**spell** 8:11
**sphere** 51:20
**split** 10:16 15:9
**spoke** 17:14 21:7 35:23 39:9 48:15,21 54:12
**spoken** 44:18 44:22 47:10,16
**sro** 4:12 9:18 10:11 14:14 27:10 32:8,19 50:12 51:6
**sro's** 13:11
**staff** 17:7 24:2 26:19
**stamped** 27:6
**start** 8:9 18:16 19:22 37:12 43:25
**started** 46:7
**state** 5:14 6:5 6:18 59:2
**state's** 1:15 3:13
**stated** 48:18 49:24
**statement** 21:14,20 48:19 49:9 54:7
**states** 1:1
**stay** 31:14
**stepped** 14:10
**stipulation** 5:1
**stop** 22:23
**story** 45:9
**street** 2:16
**strike** 47:2 48:15 49:8 55:8
**strikes** 26:10
**stubs** 50:25
**stuck** 42:9
**stuff** 11:1 12:22 15:14 16:11 17:6,12 25:13 28:15 33:19 47:25
**submitted** 59:25
**suite** 2:17 3:7 3:18 5:5 30:13
**sullivan** 3:15 4:6 6:15,15,25 49:17,21 57:18 57:20
**summer** 9:12 9:13 10:18
**super** 13:1 33:17 38:23
**supplementary** 4:15 39:22 40:2 48:16 49:7
**supreme** 5:10
**sure** 10:24,25 15:14,16 26:24 29:5 32:12 33:20 37:10 40:24 41:5,8 44:7 47:16 48:13 49:23 50:19,25 57:6
**surprised** 25:2 25:5,7,9
**surprising** 20:8
**swear** 5:15 7:3
**sweet** 17:19,19 18:4
**sworn** 59:7

### t

**take** 25:13 33:7 36:21 42:13 46:22 55:3,4
**taken** 5:3,8 20:12 37:3 53:12 55:22,22 59:5,11
**talk** 40:20 44:24 45:14
**talked** 33:20 34:3 45:3 46:13,16 56:20
**talking** 7:20 13:24 17:20 18:2,5 21:22 21:25 22:4,6 22:14 23:12,25 35:15,16,18,18 38:14,18,22
**telephone** 2:9 2:19 3:9,20
**tell** 7:19 12:10 26:7 27:17 50:11
**ten** 48:6
**tenant** 30:8 52:16 53:15
**tenants** 29:24
**tended** 24:20
**terrie** 3:15 6:15 49:20,20
**testified** 44:2 47:19
**testify** 59:7
**testimony** 7:3 33:23
**text** 46:24 47:2
**texts** 46:22
**thank** 6:17 7:8 7:11 8:14 31:25 36:21,25 37:6,8 39:17 40:14 44:11 49:15 51:7 53:24 56:12 57:16,20 58:1
**thanks** 8:10 54:1
**thing** 10:22 11:2 12:20,23 17:17 19:21 22:20 23:19 24:3,4 28:13 31:13 36:4 48:5 51:4,21
**things** 11:20 19:10 22:9 27:3 37:10 42:18 44:23,24
**think** 7:14,15 7:16 12:2,3 14:1 22:12 24:7,10 31:21 33:11 36:16 46:9 56:19
**thinking** 9:14 18:16 22:7 46:2
**third** 2:7
**thompson** 1:14
**thought** 28:16 36:8 45:8,11 56:17
**three** 9:25 46:19 52:12
**thursday** 15:14
**time** 6:4 7:12 9:5,9,18,22 10:6,10,16 12:9 15:14,17 15:22 17:13 19:25 20:16,24 23:6 24:4,24 26:16 29:11 33:4 34:20 36:19 37:2,5,9 40:12 43:7,21 43:23 48:25 49:13 51:4 53:11,19 56:8 56:14 57:16,23 58:1,3 59:5
**times** 45:19 46:11,14,25
**timothy** 1:13
**title** 9:17 59:6
**today** 7:12 8:5 19:3 40:6 44:1 45:19 46:19 56:7
**today's** 44:5,12 44:14,17 47:9
**told** 23:16,20 40:23 41:3 45:16 48:24 49:1
**took** 22:5 34:9 35:9 52:13
**top** 27:10
**totally** 9:10 16:4 22:22 28:19 33:16 42:4,19 43:24
**train** 11:16,23 11:24
**trained** 28:8
**trainer** 12:5
**training** 11:19 28:7
**transcript** 57:6 57:15,19,22,25 59:5,11
**traumatic** 17:17
**tried** 15:12,16
**true** 59:11
**truly** 13:14
**trust** 57:10
**trusting** 57:8
**truth** 7:4,4,5 59:7,8,8
**truthful** 48:21 49:10

**try** 7:21,22,24 15:18 18:12 22:25 42:25
**trying** 7:15 19:2 22:19 23:7 33:24,24 41:1,24
**tsullivan** 3:21
**tuesday** 5:6 15:13
**turn** 32:14
**turnkey** 31:12
**two** 9:21,24 10:16,17 13:2 13:14 15:9,12 15:13 19:9 20:4 29:12,16 38:23 50:6 52:11
**type** 12:23 24:2 39:23 51:16,18 54:15 55:9
**typed** 54:13 56:2 57:6
**typewritten** 59:10
**typical** 10:9 14:14 15:9
**typically** 14:16
**typing** 57:2

**u**

**u** 8:12
**uh** 7:25
**umbrella** 10:11
**under** 59:10
**undercover** 46:3
**understand** 8:1 22:22 43:22
**understanding** 29:17
**understood** 8:3 46:5 47:16 48:4
**unit** 29:20 30:12,14
**united** 1:1
**units** 29:16
**unlocked** 31:3 31:14
**upstairs** 21:1
**used** 28:13
**usually** 50:15 51:1 52:14

**v**

**v** 1:11 8:6
**van** 31:25 34:9 53:21
**various** 11:12 53:4
**verbal** 7:22
**verifying** 51:5
**versus** 23:7
**victim's** 37:14
**videoconfere...** 2:11,21 3:11 3:22 5:5
**view** 50:19
**visitor** 11:25 14:14
**visitors** 14:7 28:12
**vivid** 48:5
**vividly** 19:5,16
**vo** 21:25 32:1 38:7 53:22
**vo's** 19:19 23:19 34:9

**w**

**wacker** 3:6 5:4
**waiting** 13:25 43:9
**waive** 57:4,10 57:12
**waiving** 57:14
**walking** 30:23
**want** 7:22 17:11 18:7 22:24 26:18 29:14 37:9,12 40:19 41:7,8 42:20 44:21 51:13 52:23 57:5
**wanted** 43:10 50:23
**wants** 49:15
**washington** 9:22 10:2 13:5 13:11,17,22 15:21 26:8
**way** 7:16 11:18 13:13 21:7 24:19,21 49:10 59:14
**we've** 44:22 45:3
**wednesday** 15:13
**weekends** 10:21
**weird** 20:23
**went** 8:24 9:21 10:15 16:14 32:2 45:18 46:24 47:23
**west** 3:17
**whatnot** 30:10 52:9
**white** 38:2,4 39:1
**willing** 45:14
**wise** 19:12
**witness** 5:15 6:5,19,22 7:6 33:10,13 34:17 35:3 44:25 45:6,25 54:17 55:13,19 56:10 57:10 59:4

**woman** 41:25 47:22 48:8
**women** 9:25
**wonder** 15:23 38:6
**work** 12:25 25:15 29:23
**worked** 10:24 10:25 14:1 15:21 29:10,22 42:1 50:6 51:10,11 53:3
**working** 10:9 10:19 12:21 13:5,21 14:4 47:22,25 48:8
**worries** 12:10
**would've** 9:7 9:13 10:19,19 11:2 12:2,8 13:23,24,25 14:3,9,11 15:2 17:5,6,20,21,21 21:9,10,23 22:1,3,15 23:10,20 24:8 24:17,23 26:10 33:25 35:20 36:5 48:23,24 48:24 49:1 50:5 51:5,21 53:11 54:17
**wrap** 33:12 36:23

**y**

**y** 8:13
**yeah** 10:21 11:8,10 14:22 15:18 16:8,8 17:14,23,25 18:11,14 19:22 19:24 20:23 21:17,19,22 22:16,23,24 23:4,10 24:17 24:22 25:1,4,9 25:15,15 26:1 26:9 27:12,16 27:18,19 28:9 28:18,20 29:2 29:2 30:10 31:23 32:12,14 32:23 35:5 36:6,13 38:10 39:16 41:1 44:7 45:2 46:6 47:15,16 48:3 50:13 53:19 57:10,11
**year** 8:19
**years** 7:16 9:6 47:20 50:7 51:13
**yep** 6:19
**york** 9:6,6 51:12
**young** 10:24

**z**

**zero** 33:13
**zoom** 7:19 46:15
**zuley** 1:13 2:13 6:10 8:6 43:21

Illinois Code of Civil Procedure

Article II, Part E

Rule 207, Signing and Filing Depositions

**Signing and Filing Depositions**

(a) Submission to Deponent; Changes; Signing. Unless signature is waived by the deponent, the officer shall instruct the deponent that if the testimony is transcribed the deponent will be afforded an opportunity to examine the deposition at the office of the officer or reporter, or elsewhere, by reasonable arrangement at the deponent's expense, and that corrections based on errors in reporting or transcription which the deponent desires to make will be entered upon the deposition with a statement by the deponent that the reporter erred in reporting or transcribing the answer or answers involved. The deponent may not otherwise change either the form or substance of his or her answers. The deponent shall provide the officer with an electronic or physical address to which notice is to be sent when the transcript is available for examination and signing. When the deposition is fully transcribed, the officer shall deliver to the deponent, at the address supplied,

notice that it is available and may be examined at a stated place at stated times, or pursuant to arrangement. After the deponent has examined the deposition, the officer shall enter upon it any changes the deponent desires to make, with the reasons the deponent gives for making them. If the deponent does not appear at the place specified in the notice within 28 days after the mailing of the notice, or within the same 28 days make other arrangements for examination of the deposition, or after examining the deposition refuses to sign it, or after it has been made available to the deponent by arrangement it remains unsigned for 28 days, the officer's certificate shall state the reason for the omission of the signature, including any reason given by the deponent for a refusal to sign. The deposition may then be used as fully as though signed, unless on a motion to suppress under Rule 211(d) the court holds that the reasons given by the deponent for a refusal to sign require rejection of the deposition in whole or in part.

(b) Certification, Filing, and Notice of Filing.

(1) If the testimony is transcribed, the officer

shall certify within the deposition transcript that the deponent was duly sworn by the officer and that the deposition is a true record of the testimony given by the deponent. A deposition so certified requires no further proof of authenticity

(2) Deposition transcripts shall not be filed with the clerk of the court as a matter of course. The party filing a deposition shall promptly serve notice thereof on the other parties and shall file the transcript and any exhibits in the form and manner specified by local rule.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.