Royal
REPORTING SERVICES, INC.

# Transcript of the Deposition of
# **DeLong Reed**

**Case:** Carl Reed v. Richard Zuley, et al.
**Taken On:** July 17, 2025

Royal Reporting Services, Inc.
Phone:312.361.8851
Email:info@royalreportingservices.com
Website: www.royalreportingservices.com

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CARL REED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 23 C 7186 |
| | ) | |
| RICHARD ZULEY; TIMOTHY THOMPSON; the CITY OF CHICAGO; COOK COUNTY STATE'S ATTORNEY; NANCY GALASSINI ADDUCI; and COOK COUNTY, | ) | |
| | ) | |
| Defendants. | ) | |

The videotaped deposition of DeLONG REED, called by the Defendant for examination, taken pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken at the offices of Burns Noland LLP, 311 South Wacker Drive, Suite 5200, Chicago, Illinois before Kari Wiedenhaupt, Certified Shorthand Reporter commencing at 10:25 a.m. on July 17, 2025.

APPEARANCES:

LOEVY + LOEVY
MR. JONATHAN I. LOEVY
311 North Aberdeen
3rd Floor
Chicago, Illinois 60607
Phone: 312.243.5900
E-mail: jon@loevy.com

On behalf of the Plaintiff;

BORKAN & SCAHILL, LTD.
MS. MISHA ITCHHAPORIA (via videoconference)
20 South Clark Street
Suite 1700
Chicago, Illinois 60603
Phone: 312.580.1030
E-mail: mitchhaporia@borkanscahill.com

On behalf of the Defendants Richard Zuley and Geri Yanow as the Special Representative for the Estate of Timothy Thompson;

BURNS NOLAND LLP
MS. ELIZABETH A. EKL
311 South Wacker Drive
Suite 5200
Chicago, Illinois 60606
Phone: 312.982.0090
E-mail: eekl@burnsnoland.com

On behalf of the Defendant City of Chicago;

O'CONNOR & BATTLE LLP
MS. TERRIE C. SULLIVAN (via videoconference)
111 West Jackson Boulevard
Suite 1700
Chicago, Illinois 60604
Phone: 312.786.4600
E-mail: tsullivan@mokblaw.com

On behalf of the Defendant Nancy Galassini.

ALSO PRESENT:

Milo Savich, Videographer

Summer Interns with LOEVY + LOEVY:
(Via videoconference)
David Seaman, Marshan Allen, Morgan Hall, Dhara Singh, Ellen Bart, Caroline Casey, William Boatman

Summer Intern with Burns Noland LLP
Jack Tegart

* * * * * *

I N D E X


| WITNESS | PAGE |
| --- | --- |
| DeLONG REED | |
| Examination by Mr. Loevy | 8 |


E X H I B I T S


| NUMBER | MARKED FOR ID |
| --- | --- |
| Reed Deposition Exhibit | |
| No. 1 | 122 |

THE VIDEOGRAPHER: Good morning. We are now on the record. This is the videotaped deposition of DeLong Reed, being taken on July 17th, 2025. The time is now 10:25 a.m., as indicated on the video monitor.

Excuse me, Mr. Loevy, please don't put the papers in the microphone. I can hear it.

MR. LOEVY: Sorry about that.

THE VIDEOGRAPHER: The time is now 10:25 a.m., as indicated on the video screen. We are located at Burns Noland, 311 South Wacker Drive, Suite 5200, Chicago, Illinois 60606.

This deposition is being taken on behalf of the plaintiff in the matter of Carl Reed versus Richard Zuley, et al. The case number is 23 C 7186 and this case is filed in the United States District Court, Northern District of Illinois, Eastern Division.

My name is Milo Savich, and I am a certified legal videographer, representing Royal Reporting Services with offices at 161 North Clark Street, Suite 3050, Chicago, Illinois 60601. The court reporter today is



Kari Wiedenhaupt of -- also of Royal Reporting Services.

Will counsel at this time please voice-identify yourselves for the record and then the court reporter will swear in the witness?

MR. LOEVY: I'm Jon Loevy for the plaintiff, Carl Reed.

MS. EKL: Can you go ahead and, you know, put on the record the names of the other people that are attending for your firm?

MR. LOEVY: I really can't. There's a number of summer associates whose names I'm not really sure who's here and who's not, but there's summer associates from our office attending by Zoom.

MS. EKL: Okay. I think we should put their names on the record.

THE VIDEOGRAPHER: They should -- They should just announce themselves.

MS. EKL: Right. That's fine. That's fine.

Can the people that are attending from Loevy + Loevy please announce yourselves for the record?



MR. SEAMAN: David Seaman.

MS. CASEY: Caroline Casey -- Oh.

Caroline Casey, summer intern with Loevy + Loevy.

MR. SEAMAN: David Seaman, summer intern with Loevy + Loevy.

MR. BOATMAN: William Boatman, summer intern with Loevy + Loevy.

MS. HALL: Morgan Hall, summer intern with Loevy + Loevy.

MR. ALLEN: Marshan Allen, summer intern for Loevy + Loevy.

MS. SINGH: Dhara Singh, summer intern with Loevy + Loevy.

MS. BART: Ellen Bart, summer intern with Loevy + Loevy.

MS. EKL: My name is Elizabeth Ekl. I represent the City of Chicago. I also have an intern present here today.

Jack Tegart?

MR. TEGART: Yep.

MR. LOEVY: Let's swear the witness.

MS. EKL: Oh, well, there's still two other attorneys.



(Simultaneous speakers.)

MS. ITCHHAPORIA: Good morning.

Misha Itchhaporia on behalf of the individual defendant officers.

MS. SULLIVAN: And Terrie Sullivan on behalf of Defendant Nancy Adduci.

MR. LOEVY: All right. Now, we're swearing the witness.

(Whereupon, the witness was duly sworn.)

THE COURT REPORTER: Thank you.

MS. EKL: You can put your hand down.

THE WITNESS: Okay.

MS. EKL: Thank you.

DeLONG REED,

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. LOEVY:

**Q. All right. If you'd state and spell your name for the record?**

**State and spell --**

A. Pardon?

**Q. State and spell your name for the**

Page 9

**record, please.**
A. Oh. My -- My first name is DeLong. That's D-e-L-O-N-G. Last name, Reed, R-E-E-D.
**Q. And what do you do for a living?**
A. I don't work. I'm disabled.
**Q. How old are you, sir?**
A. I'm -- I'm 59.
**Q. And what did you do before you were disabled?**
A. I did professional cleaning and main- -- and maintenance, floor maintenance.
**Q. What is your disability?**
A. Low vision and schizoaffective bipolar.
**Q. What does that mean, schizoaffective?**
A. It -- It means that -- So I'm skittish [sic].
**Q. Schizophrenia [sic]?**
A. Yeah.
**Q. When were you diagnosed with schizophrenia?**
A. Oh, I'm not sure. I can't remember. Probably in '94, '96. I'm not sure.
**Q. How does it affect your life to suffer from schizophrenia?**

Page 10

A. How does it affect my life?
**Q. Yes.**
A. It -- You know, really, my schizoaffective more relies on my bipolar side where I'm real manic. I can overtalk sometimes, and -- you know, and just don't stop talking, get it -- excited, and then other times I'm -- I'm feeling real low, not in control of my emotions.
**Q. How does the bipolar affect your life?**
A. In the -- in the same way. In much the same way.
**Q. Have you had -- Did you graduate from high school?**
A. No.
**Q. Have you had jobs at -- for your life?**
A. Have I had a job?
**Q. Have you had jobs for periods of your life?**
A. Yes.
**Q. Who are some of your employers?**
A. Oh. I worked for We Care Cleaning in Marietta, Georgia, in Cobb County, Georgia. I worked for Tommy Nobis Center. I worked here

Page 11

in -- That was in Georgia.
I worked here in -- in Illinois at the -- An- -- at the Anixter Center. It -- I'm not sure if it used to be on the Northwest Side. At the Anixter Center, it's a place where you -- We did packaging for stores and stuff, you know, packaging goods and putting together products, assembling products and packing goods, like, for stores like Nordstrom, Dollar Stores, or whatever.
**Q. When is the last time you've worked?**
A. Oh, Lord. I can't -- I can't remember. Like, I can't remember the dates real good.
**Q. Did you work in this century?**
A. Did I work where?
**Q. In this century, in the 2000s or 2- -- 2010s or 2020s?**
A. I -- I worked in -- Wait a minute. Let me narrow down about the last time I worked. It was probably in 2008.
**Q. All right. You were at one point a witness against Carl Reed, correct?**
A. Yes.
**Q. Did you at the time suffer from drug**

Page 12

**addiction?**
A. Yes, I did.
**Q. What was your drug addiction?**
A. Crack cocaine, marijuana.
**Q. How long were you addicted to crack cocaine?**
A. Well, for a long time.
**Q. Give us a -- Walk us through that approximately.**
A. For a long time. I don't -- I don't -- I don't remember years like that and dates and stuff. That's something that you rather forget, and you put it out your head.
**Q. How did you get addicted to crack cocaine?**
A. Selling it. I was -- I was a dealer, then became the user. It's a classic story.
**Q. How old were you when you first got --**
A. Hmm?
**Q. How old were you when you first got involved with it?**
A. When I first got involved? Oh, Lord, I was probably about 25 years old.
**Q. Were you a crack addict at the time of**

Page 13

**this murder that we're here to talk about?**
A. Yes.
**Q. How did you feed your addiction?**
A. How did I beat it?
**Q. Feed it.**
**How did you pay for the crack cocaine?**
A. With -- with -- with monies that I can come up with.
**Q. How would you come up with --**
A. I wouldn't --
**Q. -- money?**
A. I wouldn't -- I wouldn't steal.
**Q. But how did you come up with money to feed your crack cocaine addiction around --**
A. I'd do --
**Q. -- the time --**
A. -- odd jobs.
**Q. -- of this murder?**
A. I'd do odd jobs, will paint for somebody, help somebody move. I'll, like -- Well, I'll say, I would go over to my grandmother-in-law house and clean the -- the kitchen, you know, clean the bathroom. She had custody of her -- some of her grandkids. I

Page 14

would, you know, make the beds, you know, stuff like that, go to the store for her. She would pay me.
**Q. How much would you spend on crack cocaine during the time period of this murder?**
A. I can't remember. I can't remember.
**Q. Well, just approximately.**
A. I -- I -- I can't say approximately. That -- that was years ago.
**Q. At your worst with this crack addiction, how much would you spend a day?**
A. Woah. I don't know. I can't -- I can't think back like that.
**Q. Well --**
A. That's -- You know, when you -- when you have -- To tell you the truth, when people have things they'd rather forget or get out their head, they don't keep dates and times of it. I don't. So --
**Q. Your -- Your memory is very much at issue for this deposition today. So --**
A. Huh?
**Q. Your memory is very much at issue for the deposition. So I'm wondering if you**

Page 15

**remember during the worst of your crack addiction --**
A. I can't --
**Q. -- how much --**
A. -- remember.
**Q. -- you would spend?**
A. I don't remember that. I don't remember dates and times. I don't remember a -- A lot about this -- this deposition that I'm supposed to remember about, I don't remember. You know, it -- it -- it's something you want to forget.
**Q. You did meet with Beth Ekl before the deposition, right, yesterday?**
A. Yes.
**Q. How long did you meet for?**
A. How long did I meet with her?
**Q. Yes.**
A. Oh, probably for about ten minutes.
**Q. Where were you?**
A. At my apartment.
**Q. Was she there, too?**
A. Pardon?
**Q. Was she there, too?**

Page 16

A. Yeah. That's -- You -- You asked how long I met with her, right?
**Q. All right. There's different kinds of meetings now, Zoom meetings and --**
A. Pardon me?
**Q. -- such. There's different kinds of meetings.**
**So was she there for a Zoom meeting or --**
A. No, no.
**Q. -- in person?**
A. She was there to drop off a packet.
**Q. What did she drop off?**
A. She dropped off a packet of the -- the deposition that was given before, probably in 2000, 2001. I'm not sure.
**Q. Why did you need that?**
MS. EKL: Objection, form --
THE WITNESS: I don't --
MS. EKL: -- assumes --
THE WITNESS: -- know.
MS. EKL: -- facts not in evidence.
BY THE WITNESS:
A. I don't know.

Page 17

BY MR. LOEVY:
**Q. Did you --**
A. I'm not the professional here.
**Q. Did you ask to see your prior testimony?**
A. No -- No, I didn't.
**Q. What did you say when she gave it to you?**
A. I said, "Cool. I'll look this over."
**Q. Did you read it to prepare for the deposition today?**
A. No.
**Q. Was it read to you?**
A. It was read to me.
**Q. Okay. Why did you want to go over your testimony from 25 --**
A. I didn't say I --
**Q. -- years ago?**
A. -- wanted to go --
MS. EKL: Objection, form --
THE WITNESS: -- over it.
THE COURT REPORTER: Sorry?
MS. EKL: -- assumes facts not in evidence.

Page 18

BY THE WITNESS:
A. I didn't say I wanted to go over it.
BY MR. LOEVY:
**Q. Well, why did you go over it?**
A. Because I was curious to -- to see what -- to see what was said back then. And when I did go over of -- it, a lot of the packet I didn't even agree with.
**Q. You mean, the things you said you didn't agree with anymore?**
A. I didn't agree with it.
**Q. Okay.**
A. Because I didn't remember.
**Q. Well, there's -- When you read the testimony that Ms. Ekl gave you, you can either agree that it was true --**
A. No. I -- I don't agree with it. I don't agree with it, because I -- because I don't remember it. You're talking about 25 years ago.
**Q. That's fair.**
**Have you ever been convicted of a crime?**
A. Yes.

Page 19

**Q. What crimes have you been convicted of?**
A. Selling drugs.
**Q. How many times have you been convicted of selling drugs?**
A. Once.
**Q. When was that?**
A. That was in 1990. '91 or '90, something like that.
**Q. That's before this -- Mr. Van Vo was murdered?**
A. Yes.
**Q. What would -- Tell me about what you remember about your conviction.**
A. I remember that I was -- I went to the county jail. I was convicted. I was given five -- five years to serve in the Department of Corrections.
**Q. Did you spend time in prison in the '90s?**
A. No.
**Q. How did you --**
A. No, just station adjustments or --
THE COURT REPORTER: Sorry?
THE WITNESS: -- going to the county jail.

Page 20

THE COURT REPORTER: Could you repeat that?
MR. LOEVY: Station adjustments.
THE WITNESS: Pardon?
BY THE WITNESS:
A. Just station adjustments, police station adjustments, or time -- or a little time at the county jail. I didn't spend time in prison in the '90s.
BY MR. LOEVY:
**Q. But you were convicted?**
A. I was convicted in the '90s one time, and I -- and I -- and I was -- did five years in the Department of Corrections.
**Q. But I thought you just said you didn't go --**
A. Oh.
**Q. -- to --**
A. Oh.
**Q. -- prison?**
A. When you -- when you said the '90s, I was thinking about before the '90s. I was thinking about the '80s. But that was my -- that was my first and -- and con- -- and -- and only conviction.

Page 21

**Q. So when you said you didn't spend time in prison, that was inaccurate?**
**You did spend time in prison?**
MS. EKL: Objection, form.
You can answer. Sometimes I'm going to make objections.
THE WITNESS: That'd be cool.
MS. EKL: There's no judge here. So -- so it's for a judge to look at later. So if I make an objection, just --
THE WITNESS: Ah, that'll be cool.
MS. EKL: -- just let me --
THE WITNESS: I'd make a lot of objections, because he's trying to get me on the hook here, you know.
MS. EKL: Well, just --
THE WITNESS: So -- And I -- I --
MS. EKL: -- hold up.
THE WITNESS: -- don't agree with that. I don't agree with his tactics of questioning me. I -- I don't agree with that.
MS. EKL: So I --
THE WITNESS: You can't bring something from 25 years ago and -- and -- and think a person's

Page 22

gonna remember dates and times and what was said, especially when it was something as traumatic as -- as this case is or it was, you know. You -- you -- you can't -- you -- It's no way, you know.
BY MR. LOEVY:
**Q. Sure.**
A. Like a joke I -- I -- I -- I sprung on Beth last night: You -- you -- you -- you can't, you know, squeeze liquor out a walnut. It's not gonna happen. It's not gonna happen. This 25 years ago, man.
**Q. All right. We've got to do question/answer, though. I think Beth's point is --**
A. Okay. Come on.
**Q. All right. What -- What joke did you tell Beth about squeezing liquor out a walnut?**
A. I told her that it -- You know, the -- I'm not gonna -- It's the things I'm not going to remember. If I look at a deposition for things that I -- that I had said 25 years ago and I don't agree with it, a lot of it, you -- like, date -- the dates in it. I see the -- At

Page 23

one time, I see the -- the date of the 12th on it. At another time, it's a date of the 13th on it. Then it's a date of the 19th on it.
And I don't think that -- In that time span, I don't think that time span is correct for the happenings, you know, for what a -- you know, had occurred.
**Q. Are you saying Beth showed you documents with dates --**
A. No, no.
**Q. -- on them?**
**And where did these dates come --**
A. She dropped --
**Q. -- from?**
A. -- me a packet off --
**Q. Okay.**
A. -- and my wife read it to me, and I had to tell her, "Hold on, hold on. I don't agree with a lot of that because I don't remember a lot of that."
**Q. All right.**
A. I -- What I think it -- What I do think is -- is that it's unfair to bring somebody up from 25 years ago and think that they're going

Page 24

to remember something or that they -- or they have an obligation -- some type of obligation to remember something.
**Q. Did you explain that to Ms. Ekl?**
A. Over and over again.
**Q. All right. What was she trying to help you remember that you couldn't remember?**
A. She wasn't trying --
MS. EKL: Objection.
THE WITNESS: -- to help me --
MS. EKL: Wait.
THE WITNESS: -- remember anything.
MS. EKL: I'm sorry. I'm sorry. What --
THE COURT REPORTER: Could -- I --
MS. EKL: It's okay. It's fine.
BY THE WITNESS:
A. She didn't -- She didn't -- She didn't try to help me remember anything. I was the one complaining, telling her that -- You know, when the -- when I -- when I first met her, the -- and she told me that I was going to have to do a deposition, I immediately called her the next day and said, "I'm not doing it."
I -- Yeah. "I'm not doing it and you

Page 25

just can't make me."
And she said, "You gotta to do it. The judge, you know, is giving you a court order. You gotta do it."
And if it was up to me, I wouldn't had nothing to do with this. It -- This is preposterous that you think somebody is going to remember all the happenings from 25 years ago. It -- it was something that I would rather not remember. So I did a lot of the psychologically getting it out of my mind.
BY MR. LOEVY:
**Q. When did you first meet Beth?**
A. When did I first meet who?
**Q. Beth, Beth Ekl, the attorney for the police officers.**
A. Ah, I can't -- I can't remember. I can't remember that, but it was a -- a few weeks ago, some weeks ago.
**Q. How did you meet --**
A. Probably --
**Q. -- her?**
A. How did I meet her? She -- They -- One of her workers, paralegals or whatever, came --

Page 26

came to my apartment and knocked on the door and -- and introduced theyself.
And they say, "And are you familiar with Carl Reed?"
And I was like, "Oh, Lord. Here we go again."
**Q. And then what happened?**
A. And she -- Pardon?
**Q. Then what happened?**
A. Then, I -- I let her in, and she say, "You -- what" -- We be talking about Carl Reed and she did say he got out of jail.
And I was like, "He got out of jail?" I was like, "Okay. Well, his sentence is probably up or something," let's say.
"No." She said, "No. They let him out of jail." Yeah. It was COVID time or something like that, and they say -- they trying to -- I was thinking that they was trying to put him back in jail and that I had to give a deposition all over again.
**Q. Did anybody tell you that he'd been let out of jail for being innocent, that he un- --**
A. No.

Page 27

MS. EKL: Objection, form.
BY MR. LOEVY:
**Q. -- that his conviction --**
A. No.
**Q. -- was overturned?**
A. No. Nobody ever told me that. You told me earlier today.
**Q. When I -- And by the way, let me interrupt you there.**
**You and I met around 10:00 this morning before --**
A. Right.
**Q. -- the deposition?**
A. Exactly.
**Q. When I came to take the deposition, you, I, and Ms. Ekl -- Ekl had a chance to speak for a few minutes?**
A. Do -- Pardon?
**Q. This morning at 10:00 --**
A. Uh-huh.
**Q. -- when I arrived, you were in a room with Ms. Ekl.**
**Was that true?**
A. Yeah.

Page 28

**Q. And then I came in, too --**
A. Mm-hmm.
**Q. -- and we all spoke for a few minutes before the --**
A. Exactly.
**Q. -- deposition?**
**And that's the first time you learned that Carl Reed's conviction had been overturned?**
A. That was the first time I ever learned that, that -- You know...
**Q. All right. When you -- Back up when -- A few weeks ago when you met Ms. Ekl -- How many times have you met Ms. Ekl?**
A. Just -- Just twice. Just initially and then yesterday when she brought the deposition.
**Q. And then today again before the deposition?**
A. Yes, three times.
**Q. All right. When -- When you told Ms. Ekl that you weren't doing it, you weren't going to give this deposition, what -- what did the --**
A. She told me --
**Q. -- attorneys say?**

Page 29

A. -- I had to.
**Q. Did you explain that you didn't remember --**
A. Or I'd --
**Q. -- this stuff?**
A. -- be in trouble. I was feeling that I -- I -- You know, that -- you know, it's like my duty and I have to because the judge is saying I gotta do it. I don't think it's fair, I swear. I really don't. I -- I -- I'm -- You know, I'm -- I'm under a lot of, um, duress with dealing with this, and I don't -- I don't think it's fair.
**Q. Did you explain to the attorneys for the police officers that you didn't want to give this deposition?**
A. Yes, I did.
**Q. Did you feel you were being told you would be in trouble if you didn't?**
A. Yes, I did.
**Q. Is it hard for you to remember things that happened 20- --**
A. It's -- It's -- It's -- It's so hard. I -- I -- I'm on a lot of medication. You know,

Page 30

I've been on a lot of medication for a lot of years and --
**Q. What didn't you agree with in the packet of documents that the attorney for the police officers gave you?**
A. I -- I can't remember what my wife read, but I did bring the packet with me.
**Q. All right. Why don't you pull it out, if you got it.**
A. Okay.
THE WITNESS: Is my mic still on?
THE VIDEOGRAPHER: Yeah, yeah.
THE WITNESS: Okay. Thank you.
This is it?
MS. EKL: Yep. I can pass it to him.
MR. LOEVY: Thank you.
THE WITNESS: I can't see it. So is this part of it, too?
MR. LOEVY: Yeah, it looks like it.
THE WITNESS: This is the opening part, right?
MS. EKL: I don't know what this is. Oh, yeah. Here.
MR. LOEVY: Thanks, Beth.

Page 31

BY MR. LOEVY:
**Q. All right. It looks like there's a business card for Beth Ekl and a -- a note?**
A. Okay.
**Q. And how did you get these things?**
A. I got them from Beth Ekl.
**Q. And it looks like there's a copy of a statement that you gave a long time ago and some testimony that you gave --**
A. Yeah.
**Q. -- to the Grand Jury?**
A. Right.
**Q. All right.**
A. And I guess that -- To me, that's the most important part.
**Q. Why did --**
A. That's why I asked my wife to read it to me.
**Q. Why did you do that?**
A. Why did I ask my wife to read it to me?
**Q. Yeah.**
A. Because I -- I was curious as -- as to, you know, what was said before. And to -- And to be honest with you, I did have in mind that,

Page 32

you know, it -- it might be something in there I might need to remember.
**Q. What --**
A. But when she started reading it, I -- I told her that -- After a -- After -- When she started reading it after about five minutes, I was like, "Stop, stop, stop, because I don't remember that and" --
**Q. What -- What did you not agree with in your testimony from back then?**
A. I -- I -- I don't -- I don't remember exactly which part, but -- but you could read it to me, and I will tell you straight up what I don't remember about the packet.
**Q. How did it -- How did it come up, squeezing liquor from a walnut? Explain to me again --**
A. Pardon me?
**Q. You -- You used the phrase that you told Beth you can't "squeeze liquor from a walnut."**
**What did you mean?**
A. What I -- What I mean by that is that you -- you -- you -- you can't. You can't make

somebody remember something that they don't remember.
**Q. All right.**
A. You can't. And I -- And I consider myself to be pretty honest, you know. And I -- I -- If it's something I don't remember, I'm -- I'm not gonna -- If it's something I don't remember, I'm not gonna agree to it just because somebody else wants me to agree to it. I'm not gonna do it. It -- It is just not going to happen.
**Q. All right. Let me ask you some other questions.**
**Do you have any children?**
A. Yes.
**Q. How many children?**
A. I have two.
**Q. How old are they?**
A. My son is 38, and my daughter is 40.
**Q. Are you married?**
A. No.
Yes. I am married. I'm sorry. My wife's out there. Don't let her hear that.
MS. EKL: I won't tell her.



BY MR. LOEVY:
**Q. How many times have you been married?**
A. Once.
**Q. Is it -- she the mother of your children?**
A. No, she's not.
**Q. Have you ever given a deposition before like we're doing today?**
A. It -- I think I did, yeah, and in front of the grand jury.
**Q. All right. You testified -- we'll talk about that -- in front of the grand jury about this murder case, right?**
A. Right.
**Q. And that was a long time ago, maybe 25 years ago?**
A. Yeah.
**Q. Do you remember how you got to that grand jury testimony?**
A. Yeah. I was -- I was -- I was -- I -- From what I think, I was at the -- a pol- -- like a police station, and I -- I was talking to the -- the officers. I did -- did -- I did a lie detector test, and after the -- the lie



detector test, the policeman took me in the room and it was people sitting in the room -- Well, no.
Yeah. People was sitting in the room, and they asked me some of the same questions that the police asked, and I answered them and then that was it.
**Q. Did you pass the lie detector test or fail the --**
A. Yes, I did.
THE COURT REPORTER: Sorry --
BY MR. LOEVY:
**Q. Let me ask --**
A. I believe --
**Q. -- the question.**
A. -- I did.
THE COURT REPORTER: Sorry --
BY MR. LOEVY:
**Q. Did you pass the lie detector test or fail the lie detector test?**
A. I believe I did.
**Q. Why do you --**
A. I passed.
**Q. Why do you believe you passed?**



A. Because they -- They told me that I passed. They -- You know, he told me that I passed. He told me that the -- The person that was giving it told me that -- told the officer, you know, that -- that came in after I was -- took the test, like, "He's telling the truth. He -- He's, you know..."
**Q. All right.**
A. "No deception" --
**Q. We'll get to that in a minute.**
A. -- like that.
**Q. How did you get to the deposition today?**
A. In a cab.
**Q. Who paid for the cab?**
A. Me and my wife paid for the cab.
**Q. And did you review anything else other than what you showed us in the packet there?**
A. Did I review anything?
**Q. Yeah. Any other documents?**
A. No. I didn't even review the documents that's in this packet. I -- You know, but I -- The only thing we ever looked at was just the first opening to that deposition that's written

there.
**Q. Yeah.**
A. And -- And that was yesterday, and I -- and I've had these papers for some time.
**Q. All right. Let me ask you this: Let's back up.**
**Where were you born?**
A. I was born in Chicago, Illinois.
**Q. And then did -- When did you go to Georgia?**
A. Oh, probably the first time was like in the end of '98, and then I left from Georgia in -- in 2000 and came back to Chicago, and I was living at a shelter on the West Side, and they found an apartment at -- me at Harold Washington Apartments, SRO, single-room occupancy. It wasn't really an apartment, but it was a -- like, a little kitchenette apartment, and that was in 2000.
**Q. All right. What year were you born?**
A. I was born -- I was born in 1965.
**Q. And what did you do at -- at -- Well, you'd said you didn't graduate from high school.**
**But what did you do after high school?**



A. Oh. After high school, I -- I did what poor teens do. I ran the streets and -- and I worked some jobs, you know, fast food jobs, grocery stores and -- and did -- did a lot of miscellaneous stuff, yeah.
**Q. And then why did you go to Georgia?**
A. I went to Georgia to -- to try to get my life on track, try to get them -- try to -- again, that -- to stay off the drugs.
**Q. And then you came back from Georgia?**
A. When I came back from Georgia?
**Q. Why did you come back from Georgia?**
**How about that?**
A. Because I was doing a little better. I was doing a little better. I had started working. I got off the drugs for a while, and then, you know, I -- I -- I came back to Chicago a number of times from -- between Georgia and Chicago, and most of the time -- every time I came back to Chicago, I relapsed. I even relapsed in Georgia before, but, you know, you -- And, like I said, you keep on trying, you get better at -- at a certain thing.
**Q. How are you defining "relapse"?**



A. "Relapse" means using drugs again.
**Q. All right. The building that you were living in at the time of this murder, what was the address over there?**
A. I don't remember.
**Q. Was that the SRO you're describing, the Harold Washington?**
A. Yes.
**Q. How long had you been living there?**
**How long did you live there?**
A. I don't -- I don't remember. It -- it might have been less than a year. It might have been a matter of months.
**Q. How long did you live there all told?**
A. All total, I don't know. I don't remember.
**Q. Where did you live --**
A. I just told --
**Q. -- before --**
A. -- you that.
**Q. -- that?**
A. Before that, I was at a shelter on the West Side of Chicago.
**Q. How about before that?**



A. Before that, I was on the street.
**Q. How about after the SRO building, where did you live?**
A. After the SRO building, I -- I went back to Georgia. I went to my -- I went back to my grandmother-in-law's house and stayed with her and -- until the 1st of the month came. When the 1st of the month came, I got on the Greyhound and went back to Atlanta, Georgia.
**Q. How long did you stay there?**
A. Some years. It was some years. I don't -- I don't remember how long.
**Q. So you don't remember if you lived in the SRO building just for a few months or a --**
A. I don't --
**Q. -- few years?**
A. I don't remember that. I don't remember that. That a -- That's -- that's somewhere I lived 25 years ago. I lived in -- in a lot of different places. I had -- I had apartments of my own. I lived on the -- the streets at times. My life has been difficult.
**Q. I understand. I'm just trying to establish, though, that you don't remember if**

Page 41

**you lived in the SRO for a few months or longer or shorter?**
A. Well, no. I -- I stayed in there probably -- I could tell you this: It was between six -- six months to -- Probably like six to eight months or something like that.
**Q. Can you name any friends you had in the building?**
A. I know Carl Reed. I know a -- an older man named Willie. I know Mr. Van Vo. I don't know a lot of people last names. Some people first names. I don't -- I don't remember -- You know, I mean, I don't remember the staff too clearly, but I remember doing some things with the staff, you -- you know, like, going downtown, the lobby -- I mean, going down to Springfield -- the lobby, for some calls or something like that. I --
**Q. But I'm asking about people.**
**What people do you remember? Do you remember anybody else? Any other names?**
A. I remember an old guy named Willie, but --
**Q. Any other names?**

Page 42

A. Huh?
**Q. Any other names?**
A. No.
**Q. Is the only reason you remember Carl Reed because we're talking about --**
A. That's --
**Q. -- Carl Reed?**
A. -- right. Carl Reed -- Carl Reed became a -- a -- a -- a figure in my life, became a -- he was -- became a part of my life after this incident. That's -- that's -- It was -- I was traumatized from that. You know, I -- I remember Carl Reed. It even -- You -- Well, I remember Carl Reed real good. He lived on my floor, and then we had the same last name, Reed.
You know, he was like, "My name Reed, too."
I was like, "Oh, okay." You know, but --
**Q. Right.**
A. -- I -- I never really hung out with him long periods of time. I never -- I never hung with him outside of the building.

Page 43

**Q. So he's just another guy in the building?**
MS. EKL: Objection --
THE WITNESS: He --
MS. EKL: -- form.
BY THE WITNESS:
A. He was another guy in the building that I -- that I knew.
BY MR. LOEVY:
**Q. All right. If -- But -- If it hadn't been for this traumatic thing where you're having this murder and this -- all the deposition about Carl Reed, would you have remembered Carl Reed any more than anybody else?**
MS. EKL: Objection --
THE WITNESS: If he --
MS. EKL: -- form --
THE WITNESS: -- wouldn't --
MS. EKL: -- calls for speculation.
THE WITNESS: The -- Right.
MS. EKL: When I make an objection, you just have to let --
THE WITNESS: It's --
MS. EKL: -- me --

Page 44

THE WITNESS: It's okay.
MS. EKL: -- finish the --
THE WITNESS: Okay.
MS. EKL: -- objection --
THE WITNESS: I'm sorry.
MS. EKL: -- before you answer.
THE WITNESS: I'm sorry.
MS. EKL: You're fine.
THE WITNESS: Oh, I was finna to answer him.
THE COURT REPORTER: It's for me, if that's okay.
THE WITNESS: Okay.
MS. EKL: She --
MS. ITCHHAPORIA: Join the objection.
MS. EKL: She's trying --
MS. ITCHHAPORIA: This is Misha.
MS. EKL: She's trying --
THE WITNESS: Okay.
MS. EKL: -- to take down everything all of us say. So if we talk at the same time --
THE WITNESS: Right.
MS. EKL: -- she can't get it down. So --
THE WITNESS: Yeah, it's cool.
MS. EKL: So if you -- If I object, if you

Page 45

could just wait a second, let me finish --
THE WITNESS: Okay.
MS. EKL: -- and then -- and then you can answer. Sorry.
THE WITNESS: Okay.
MS. EKL: Go ahead.
BY MR. LOEVY:
**Q. So is the only reason you remember Carl Reed because of all this stuff we're talking about here?**
MS. EKL: Objection, form.
BY THE WITNESS:
A. Yeah, it was -- it -- it -- it -- it -- This -- This case became in certain parts a -- a part of my DNA. You don't forget -- I -- You don't forget a name like Carl Reed when -- you know, when that's your neighbor and -- and you -- you come home one weekend and your life is different, you're going to be booted out of the building where you live, and -- and -- and have to live somewhere else and -- and have to go all the way back down to Georgia. That -- that -- Yeah, that -- Yeah, I remember his name --

Page 46

BY MR. LOEVY:
**Q. All right.**
A. -- very good.
**Q. Is there any -- And you don't remember anybody else's names?**
A. I remember Mr. Van Vo's name.
**Q. Because he was murdered, right?**
A. That's right.
**Q. And you remember a guy named Willie?**
A. And a guy named Willie, the -- when he -- he told me, "Hey, you need to go talk to the property manager right now."
**Q. Why did he say that?**
A. Because I -- I told him that, "Hey, no- -- nobody's seen Mr. Van Vo, and Carl Reed got keys to his apartment, and he got the keys to his car. He'd been taking stuff out there."
And he say -- Well, I said, "Whoaf, What I do?"
He's like, "You need to go talk to Maureen."
**Q. Got it. All right. We'll talk about that in a little bit.**
A. Mm-hmm.

Page 47

**Q. Were you friends with Carl Reed before all this happened?**
A. Just neighborly friends.
**Q. The same way you were with everybody --**
A. We didn't hang out --
THE COURT REPORTER: Sorry?
BY MR. LOEVY:
**Q. -- else in the --**
A. We didn't hang out drinking beers or anything. He caught me by surprise when I came home that night. It -- ah...
**Q. Well, I -- We're not having -- just having a conversation. Just try to answer --**
MS. EKL: Well, let -- let --
BY MR. LOEVY:
**Q. -- the question.**
THE COURT REPORTER: Sorry --
THE WITNESS: I have to --
MS. EKL: Let him --
THE WITNESS: -- have a --
THE COURT REPORTER: Sorry --
MS. EKL: Let him --
BY THE WITNESS:
A. -- conversation, because that's the way

Page 48

I express myself.
MS. EKL: Let him finish --
BY MR. LOEVY:
**Q. What we're doing here today, though, is question/answer.**
**So if you could, try to focus on the question, and answer the question instead of just --**
A. Okay.
**Q. -- telling stories.**
MS. EKL: But --
THE WITNESS: Okay.
MS. EKL: But, Jon, I --
THE WITNESS: I --
MS. EKL: I --
THE WITNESS: I'm gonna try. I'm gonna try.
MR. LOEVY: Understood.
THE WITNESS: I'm -- I'm gonna try better. I'm gonna try harder.
MR. LOEVY: Beth wants a turn, too.
MS. EKL: And I just want to say, let -- if -- Please let him finish his answer. I understand you're objecting to his answer and -- But let him finish it before you object. I

Page 49

don't think that's fair for you to cut him off either.
MR. LOEVY: So we're all going in circles here because --
MS. SULLIVAN: Oh --
MR. LOEVY: -- I'm --
MS. SULLIVAN: -- I'm going to --
MR. LOEVY: -- I'm trying to --
MS. SULLIVAN: I'm going to join -- I'm going to join in Beth's objection.
THE COURT REPORTER: And that is -- Sorry?
MR. LOEVY: That's --
MS. EKL: Terrie Sullivan.
BY MR. LOEVY:
**Q. So, sir, where I think we're going off the track is, the format today is question, answer. You get to answer the questions I ask. Maybe Beth will ask you different questions. Maybe the people on the phone will ask you different questions, but it'll -- The format is supposed to be ans- -- ask the question --**
A. Right. And --
**Q. -- and answer the question.**
A. And I know it -- Right. It -- That's

Page 50

all I'm doing --
**Q. That's fair.**
A. -- is answering questions.
**Q. All right.**
**Was Carl Reed someone you hung out with before any of this happened?**
A. No.
**Q. You and he have the same last name, right?**
A. Yes.
**Q. No relation?**
A. No.
**Q. If any of this wouldn't have happened with Mr. Van Vo being murdered, would you even remember Carl Reed?**
MS. EKL: Objection, form, calls for speculation.
MS. ITCHHAPORIA: Join.
THE WITNESS: Probably --
THE COURT REPORTER: Sorry? Who objected?
BY THE WITNESS:
A. -- probably not.
BY MR. LOEVY:
**Q. Why do you say that?**

Page 51

THE COURT REPORTER: Which attorney said "join"?
BY THE WITNESS:
A. Because a lot of people in that --
THE COURT REPORTER: I'm sorry --
BY THE WITNESS:
A. Most of the people in that building, I don't -- I don't remember.
BY MR. LOEVY:
**Q. All right.**
A. I was only there a matter of months.
**Q. All right. Now, let's pause, because somebody objected, and the court reporter missed who was objecting.**
MS. ITCHHAPORIA: That -- That was me. It's Misha.
And, Jon, just -- just so I don't have to do keep doing that, an objection made by any defense counsel, I'll -- I'll just join so I don't have to keep saying it.
MR. LOEVY: That's fine.
MS. ITCHHAPORIA: Is that fair?
MR. LOEVY: Of course. That's fine.
MS. ITCHHAPORIA: Okay.

Page 52

MR. LOEVY: Okay.
MS. ITCHHAPORIA: Thank you.
BY MR. LOEVY:
**Q. Were you socializing with people in the building back then?**
A. A little -- a bit, a bit.
**Q. Did you have friends outside the building, too?**
A. Yeah.
**Q. Who were your friends outside the building?**
A. Whooh... the friends I grew up with around 63rd, in-laws, you know, people that I know from Chicago. I was born in Chicago.
**Q. So the guy who got murdered, what was his name?**
A. Mr. Van Vo.
**Q. How old was Mr. Van Vo?**
A. I don't know. I don't know.
**Q. Was --**
A. He was very old, prob- -- probably in his 80s. I --
**Q. What do you recall about him?**
A. That he smoked a lot of cigarettes

and -- and that he was short of breath. Like, he was very short of breath when he'd talk because of the cigarettes.

**Q. Do you remember him being a friendly guy?**

A. Yeah.

**Q. Tell me about that.**

A. He was -- he was -- he was really friendly. He was cool. He -- he was -- he was friendly. He -- he -- friendly.

"Hey, how you doing?" You know, he -- he was a nice old man.

**Q. He didn't leave the building very often?**

A. Pardon me?

**Q. Did he leave the building very often?**

A. Yeah. He would -- he would -- he would leave every now and then. He had a car, a white car.

**Q. Do you remember in -- telling the police ever that he rarely left the building?**

A. No.

**Q. Do you remember telling the police whether he ever had visitors from outside the**



**building?**

A. His son came to visit.

**Q. Were you friends with Mr. Van Vo?**

A. I would consider, yes.

**Q. You and him had neighbor apartments? You were next door?**

A. Yes.

**Q. All right. Did you have anything to do with the murder of Mr. Van Vo?**

A. No.

**Q. Did you participate in killing him?**

A. No.

**Q. Would you have killed him?**

A. No.

**Q. Have you ever killed anybody?**

A. No.

**Q. Do you have any --**

A. No.

**Q. -- personal or direct knowledge of the murder itself?**

A. No.

**Q. You didn't see anybody kill him?**

A. No.

**Q. And leaving aside speculation or other**



**things --**

A. Spec- --

**Q. -- you --**

A. I speculated --

**Q. Leaving aside your speculation, do you have any actual knowledge --**

A. No.

**Q. -- of who killed him?**

A. No.

**Q. Did you talk to anybody about who might have murdered Mr. Van Vo?**

A. Over the years, yeah.

**Q. Who did you talk to about who might have murdered Van -- Mr. Van Vo?**

A. Family members, you know, just -- You know, after, you know, all this had started, you know, coming to rest, just family members, friends, and -- and explaining to people why -- back in Georgia, you know, how I lost my place and --

**Q. Now, Mr. Reed --**

A. -- gen- -- generally --

**Q. -- got convicted of this murder.**

**Were there any other people you thought**



**might have been involved?**

A. No.

**Q. Any other suspects or theories?**

A. Pardon me?

**Q. Any other theories on who would have wanted to kill him?**

A. Wanted to kill him? I don't know anybody that would want to kill him.

**Q. All right. Did the police ever treat you as a suspect in this murder?**

A. Yeah. They gave me a lie detector test. That's -- that's it.

**Q. Well, how did you know that the police were treating you as a suspect?**

A. Because they gave me a lie detector test.

**Q. Tell --**

A. They had asked me questions.

**Q. Tell me what you remember about the treat- -- police treating you as a suspect.**

A. They asked me w- -- what was I -- You know, well, I told them that I left Wednesday. I -- I came back Saturday or Sunday night, and I -- and I -- You know, I -- I -- I seen my

neighbor coming out of Mr. Van Vo house with his -- with his keys and going in and out, you know, but that -- that's all they -- you know, they asked me about and -- but they didn't --
**Q. Well --**
A. -- they didn't -- they didn't treat me with a lot of scrutiny.
**Q. That's what I'm asking about is, what made you think they were treating you as a suspect?**
A. Because they -- I had to take a lie detector test.
**Q. All right. Would -- Were there any reasons why you might be a suspect in this murder?**
MS. EKL: Objection, form.
BY THE WITNESS:
A. No.
BY MR. LOEVY:
**Q. Can you think of any reasons at all why you would be a suspect in this murder?**
A. No.
**Q. Well, your apartment and his apartment shared a bathroom, right?**



A. Okay.
**Q. That's true, right?**
A. Yes.
**Q. Okay. Why might that have made you a suspect?**
MS. EKL: Objection, form, foundation.
BY THE WITNESS:
A. Why would that make me a suspect?
BY MR. LOEVY:
**Q. Well, that's what I'm asking you.**
A. That's what I'm asking you.
**Q. But I'm asking the questions. You've got to answer.**
**Can you think of any reason why that would have --**
A. I can't think --
**Q. -- made you a suspect?**
A. -- of any reason.
**Q. For example, you had access to Mr. Van Vo's apartment, correct?**
A. No, I didn't.
**Q. The bathroom that you shared -- Both of your apartments opened into the same bathroom?**
A. But he got a lock on his -- his



bathroom door like he got a lock on his front door.
**Q. Remember the question-and-answer format.**
**The question was, both -- Your apartment and Mr. Van Vo's apartment both used the same bathroom, right?**
A. Okay.
**Q. That's true?**
A. Yes.
**Q. And each of your apartments had a door that led into the bathroom, right?**
A. Yes.
**Q. And a lot of times Mr. Van Vo would leave his door open, correct?**
A. No.
**Q. Never left his door open?**
A. Yes.
**Q. Yes, he never did or, yes --**
A. Yes, yes. He would leave his door open but not a lot of times.
**Q. All right. So sometimes he would leave the door to his bathroom --**
A. Sometimes we would --



**Q. -- open?**
A. -- leave our doors open, you know, while, you know, I'm sitting on the bed watching TV. He would have his door open playing his music just to -- because it was so small --
**Q. Right.**
A. -- in there, but not often and all the time. He, you know, would have his door closed and locked, and I would have my door closed and locked.
**Q. Okay. Do you remember giving a statement to the police on the 23rd of July at 1:00 in the morning where DeLong stated that Mr. Van Vo always kept the bathroom door open?**
**Do you remember putting that in your statement?**
A. No.
**Q. Is it --**
A. No.
**Q. -- true?**
A. No.
**Q. Do you know why it would have been in your statement if it wasn't true?**
MS. EKL: Objection, form.

Page 61

BY THE WITNESS:
A. I don't remember saying that.
BY MR. LOEVY:
**Q. All right. Take a look at the statement that -- It's on the top of the pile among the papers that Ms. Ekl gave you.**
MS. EKL: I -- I don't think he's able to read --
BY THE WITNESS:
A. But I don't think that's a fair assumption of -- of -- of the statement. If I say we -- you know, we -- we -- we kept the bathroom door open a lot, that -- that don't mean that it was all the time.
BY MR. LOEVY:
**Q. All right. If you could take the statement, it's on the top of the pile there, the handwritten paper.**
MS. EKL: Jon, I don't think he can read it. His --
MR. LOEVY: Well, let's take it one --
MS. EKL: -- due to his vision.
MR. LOEVY: -- step at a time. One step at a time.

Page 62

BY MR. LOEVY:
**Q. If you can't read it, then you'll tell me. It's actually the first piece of type- -- of paper -- The other paper, sir. That. Not the card. That's it.**
A. This?
**Q. Yes, sir. If you just turn that upsidedown, are you able to see anything on that page?**
A. I can't read it. It's blurry.
**Q. It's blurry.**
**Are you able to see anything on the page?**
A. I see the words on it, but it -- You know, it's -- it's blur- -- it's all a blur.
THE VIDEOGRAPHER: Excuse me, Mr. Loevy. Please put your mic on. Okay?
MR. LOEVY: I was going to walk over there and show him a --
THE VIDEOGRAPHER: Okay. If you finger the microphone, I hear everything.
MR. LOEVY: Got it.
BY THE WITNESS:
A. That's not going to help me see it.

Page 63

BY MR. LOEVY:
**Q. All right. Are you able to make out any letters --**
A. No.
**Q. -- on the page?**
**You can't make out any --**
A. No.
**Q. -- letters?**
**Okay. I'll read you -- On the second page, it says --**
A. Okay.
**Q. -- this is --**
MS. EKL: Hold on a second.
BY MR. LOEVY:
**Q. -- is a statement of DeLong Reed --**
MS. EKL: Jon, can you -- can you hold on just a second?
Are you marking this as an exhibit?
MR. LOEVY: Not yet, no.
MS. EKL: Okay.
BY MR. LOEVY:
**Q. A statement of DeLong Reed taken at 2452 West Belmont on 23rd of July at 1:00 a.m., and it starts out, After being advised and**

Page 64

**stating that he understood that the state's attorney was a lawyer and not your lawyer, he agreed to give the following statement in summary and not word for word.**
**Do you remember any of that?**
A. No.
**Q. Remember that happening?**
**Do you remember saying, in part, that Mr. Van Vo and DeLong shared a bathroom and DeLong states that Mr. Van Vo always kept the bathroom door open?**
**Do you remember saying that?**
A. No.
**Q. Why did you sign the statement if it had it in there and it wasn't true?**
A. I -- I don't --
MS. EKL: Objection to form.
BY THE WITNESS:
A. Because I don't -- I don't -- I don't -- I don't remember s- -- making that statement like that because that's not a true statement. He didn't always have his bathroom door open. Occasionally maybe, like, on the weekend, you know, or maybe, like, it -- Out

of -- out of -- out of three days, he might have his bathroom door open and I might have mine open, you know, just so --
BY MR. LOEVY:
**Q. But --**
A. -- we -- it wouldn't be so small in the areas.
**Q. But I'm asking -- A different question is, why did --**
A. And I -- I answered you already.
**Q. Okay. Well, I'll try --**
A. So --
**Q. -- it again.**
A. But you can't, like, keep asking me the same question. I answered you already.
**Q. Here's the question --**
A. I don't remember.
**Q. -- you've now explained that he didn't leave it all the -- open all the time?**
A. Right.
**Q. And the statement said that he did.**
A. So?
**Q. My next question is, why did you sign your name to the statement if it wasn't true?**



MS. EKL: Objection, form.
BY THE WITNESS:
A. What?
BY MR. LOEVY:
**Q. The question was, you signed your name at the end of the statement, and you said that it had been read to you and it was all true.**
A. But nobody --
**Q. If it wasn't true -- Let me ask the question.**
**If it wasn't true, why did you sign your name?**
MS. EKL: Objection, form.
BY THE WITNESS:
A. I didn't read it.
BY MR. LOEVY:
**Q. All right.**
A. I didn't read it.
**Q. That's -- That's fair.**
A. It -- It was one of them human things that somebody do where they say, "Okay. Well, sign here".
And I signed there.
**Q. I got you.**



A. I didn't read it, the -- the packet.
**Q. Did they -- Back then in 2001, did they read it to you?**
A. No.
**Q. All right.**
A. Nobody did. I don't remember anyone doing it.
**Q. If you -- they had read it to you and he [sic] said, "Hey, he always leaves the door open," would you have signed it if you knew that's what it said?**
MS. EKL: Objection, form, calls for speculation.
BY MR. LOEVY:
**Q. Do you remember the question?**
A. She just objected.
**Q. Yeah. There's no judge --**
MS. EKL: You can still --
BY MR. LOEVY:
**Q. -- here. So she's making the objection for later, but then you have to answer the question.**
A. Oh, oh. Just -- So just keep going.
**Q. Yeah.**



A. Okay. Now, what was the question?
**Q. The question was, back then if they had read it to you and --**
A. Right.
**Q. -- it was false, how did --**
A. I believe I probably --
**Q. Let me ask the question. Okay?**
A. -- would have said --
**Q. So let's say back then in 2001, they read you the statement. You hear them say, "Oh. He always left the bathroom door open," but that's not true, would you have signed your name anyways?**
MS. EKL: Objection, form, calls for speculation.
BY THE WITNESS:
A. Probably not.
BY MR. LOEVY:
**Q. What would you have done?**
A. Oh, probably say I don't -- I don't agree with that because that -- You know, I would say that, you know, he didn't leave it open all the time.
**Q. Okay.**

A. Like, day and night open all the time, his bathroom door was open like that all the time.
**Q. All right. Returning then to reasons that the police might have suspected you, he's found dead in his apartment at some point, right?**
A. Right.
**Q. And he'd been stabbed a bunch of times?**
A. I don't know.
**Q. All right. And his door was locked. The door to get into his apartment was locked from the inside.**
**Did you know that?**
A. His door?
**Q. The door that people could go in and out of his apartment, the front door --**
A. Uh-huh.
**Q. -- was locked -- double locked from the inside.**
**Did you know that?**
A. No. How would I know that?
**Q. I'm just asking if you knew.**
A. No.



**Q. All right. You could enter his apartment through the bathroom door sometimes if the door was open, right?**
A. If it was open.
**Q. And then you could also leave through the bathroom door if it was open?**
A. I could leave his apartment and go back in my --
**Q. Yes.**
A. -- apartment, through my apartment.
**Q. All right. Did the police say to you, "Hey, you're a suspect" --**
A. No, they didn't.
**Q. All right. Let me ask the question.**
**Did the police say to you, "You're a suspect, because this guy is found stabbed in his apartment. His door is locked, and your apartment is acc- -- can access his through the bathroom"?**
A. No.
**Q. Did the police explain that to you?**
A. No.
**Q. That didn't come up at all?**
A. No.



**Q. Did you ever enter his apartment through the bathroom door?**
A. No.
**Q. Why not?**
A. I -- I stood in the doorway before talking to him, but, no, I wouldn't -- Why -- why would I -- His apartment ain't big as mine. What would he have in his apartment that I ain't got in my apartment?
**Q. Well, maybe he had things you could sell or things that --**
A. Nah. Ain't nothing in there I could sell.
**Q. How do you know?**
A. Ain't nothing in there I want to sell. I had things of my own.
**Q. Well, you could --**
A. I -- I had -- I had a TV in my apartment. I had stereos in my apartment, clothing. If I wanted to sell something, I would've just -- take something of my own and go sell it.
**Q. All right. Were the police treating you like a suspect because you had access to his**



**apartment?**
MS. EKL: Objection --
THE WITNESS: No.
MS. EKL: -- form --
THE WITNESS: I don't believe so.
MS. EKL: -- foundation.
BY THE WITNESS:
A. I don't believe so.
BY MR. LOEVY:
**Q. All right. You believe you were not home when he was murdered.**
**Is that true?**
A. I know I was not home. I don't -- I don't -- I don't -- I -- I -- I -- I wasn't there. I couldn't have been there.
**Q. That's something --**
A. I was in another community.
**Q. That's something you remember to this day?**
A. That -- I remember that.
**Q. Did you tell the police that when this murder happened, you were not in -- you were in a different community?**
A. Yes, I did.

**Q. When's the last time you saw Mr. Van Vo alive?**
A. Oh, I -- I can't say what day. It -- it -- Ah, it might have been Tuesday. It -- You know, it might have been the Wednesday that I left. I -- I don't, you know, remember the dates or time, but, you know -- Yeah.
**Q. And do you remember when you came back, the door to the bathroom was closed?**
A. Yeah.
**Q. And that was unusual, right?**
A. No.
**Q. Do you remember testifying before the grand jury in this case on August the 17th, 2001?**
A. Yeah.
**Q. And do you remember giving this testimony? And since you can't read it, I will -- I will read it to you.**
A. Okay.
MS. EKL: Can you give a page number --
MR. LOEVY: This is -- I'm about to.
MS. EKL: -- and line?



BY MR. LOEVY:
**Q. This is page 3, line 21 through page 4, line 1.**
**You said -- In line 19, you said:**
**"And did you share anything between the apartments?"**
**"Answer: We had a community bathroom that we shared between Mr. Van Vo."**
**"Question:" --**
MS. EKL: I'm -- I'm -- I think you misread it, just so it's clear.
BY MR. LOEVY:
**Q. "We had a community bathroom that we shared between me and Mr. Van Vo"?**
MS. EKL: Right. You missed a word.
MR. LOEVY: Which word did I miss?
MS. EKL: "Me."
BY MR. LOEVY:
**Q. Ah, thank you.**
**"Question: And how were the doors of the apartments' bathrooms" -- I'm sorry.**
**"And how were the doors of the apartments and the bathrooms normally**



**kept?"**
**"Answer: Open."**
**Did you remember giving those answers?**
A. No.
**Q. Is that truthful testimony?**
A. No. I wouldn't -- I would say no, no.
**Q. Why did you testify untruthfully to the grand jury?**
A. I prob- -- I was -- I didn't know what I was doing, you know, or probably un- -- unfair -- That wasn't -- That's not something I'm used to, just testifying before a court or before a jury.
**Q. Okay. When you saw that the door --**
A. It --
**Q. -- was closed and you got back --**
MS. EKL: Did -- Did you finish your answer? I think he was about to say --
THE WITNESS: No.
MS. EKL: -- something else.
BY THE WITNESS:
A. What I'm saying is that when -- when -- when -- when -- when I -- when I say that the doors is normally kept open, I think it may have



been something that they took out of context --
BY MR. LOEVY:
**Q. Who is "they"?**
A. -- of what I meant.
A grand jury or the -- the stenographer at the time or whoever was copying what I was saying. It -- I think that's taken out of context to say that the door was open all the time.
**Q. And do you remember if the police were pushing you to say that?**
MS. EKL: Objection, form, foundation.
BY THE WITNESS:
A. No, no.
BY MR. LOEVY:
**Q. Do you know how you happened to say that?**
A. No.
**Q. All right. On the day you came back, do you remember there was a smell?**
A. On the day I came back?
**Q. Yes.**
A. Yeah, like, the next morning.
**Q. Do you remember telling the police**

Page 77

**that, that there was a bad smell?**
A. Yeah.
**Q. And did you -- What did you do about it?**
A. I went and told the property manager.
**Q. Did you first knock on the door and --**
A. No.
**Q. All right. You just went and told the property manager what?**
A. I told the property manager that I haven't seen my neighbor, my nearest neighbor that I share the bathroom with, that I haven't seen him, and I also told her that -- Because I -- I -- I suspected, you know, what I suspect and --
**Q. But how did you know --**
A. Yeah.
**Q. -- that there'd been anything wrong yet?**
MS. EKL: Objection, form.
BY THE WITNESS:
A. Listen, if I see a -- one of my neighbors coming out of someone's door late at night with their keys and then taking stuff in

Page 78

and out their house, I have to assume that something is wrong there.
BY MR. LOEVY:
**Q. All right.**
A. Mr. Van Vo wasn't the type of man that is going to give somebody his keys and say, "Here. You can have the keys -- You can keep the keys to my car and the keys to my apartment and I'm okaying you to take stuff in and out of my house."
**Q. But this is -- On your first day back, you didn't even know anything had happened to Mr. Van Vo according to you, right?**
A. No, I didn't.
**Q. So you went and complained to the property manager before you knew --**
A. That's right. I --
**Q. -- before you knew something had --**
A. -- before I --
**Q. -- had happened to Mr. Van Vo?**
A. Because I was assuming.
THE COURT REPORTER: Sorry --
BY MR. LOEVY:
**Q. Yeah. Well, you've got to let me**

Page 79

**finish, and then you go.**
**So the -- If I understand your testimony, you went and complained to the property manager before --**
A. Yes.
**Q. -- you even knew there was something wrong with Mr. Van Vo?**
A. Yes.
**Q. All right. And then the smell, did it get worse over time?**
A. It -- Yeah, yeah.
**Q. Was it terrible?**
A. Yeah.
**Q. Did it smell like a dead body?**
A. Yeah.
MS. EKL: Objection, foundation.
BY MR. LOEVY:
**Q. All right. What did you do the next day?**
A. That -- That was the next day, when I told the property manager.
**Q. All right. In fact, a week went by, right?**
A. No, no.

Page 80

**Q. How many days between you got back and you told the property manager?**
A. If I'm correct, probably two, just -- just two days.
**Q. Were you looking for Mr. Van Vo?**
A. I -- I -- I asked the -- the front desk had -- had they seen him, and they said how they hadn't seen him, and I asked the -- a neighbor in the building, Willie, "Had you seen Mr. Van Vo? Had you seen him in -- this weekend?"
And he was like, "No, no."
And that's -- You know, I was like, "Well, I seen Carl Reed with his keys." I made the assum- --
**Q. How did you know he was gone --**
A. I made the assumption because I had -- I had to.
**Q. But how did you know Mr. Van Vo was missing?**
A. Because I didn't see him. I'm used to seeing him.
**Q. Well --**
A. Everybody in the building used to

Page 81

seeing him.
**Q. I mean, maybe just a day went by and you didn't see him?**
MS. EKL: Objection, form.
BY THE WITNESS:
A. Nah. It -- it didn't happen like that.
BY MR. LOEVY:
**Q. I mean, but how did you know he was missing? I'm trying to understand that. If, like, you got back --**
A. Because he wasn't there. I didn't even knock -- I didn't even have to knock on his door.
**Q. But you got back. His door is closed. How did you know he was missing?**
A. Because he -- Because I didn't see him. He was miss- -- Listen, Carl Reed told me that -- "Mr. Van Vo is gone. And I have the keys. See, he let me hold the keys to his apartment."
This is 10:00, 11:00 at night. So if he is not there and you got his keys to his car and his apartment, something is wrong with that picture because he's not that type of neighbor.

Page 82

**Q. All right. Why --**
THE WITNESS: Excuse me.
MR. LOEVY: Sure.
THE WITNESS: Can I take a break to use the restroom?
MR. LOEVY: Let's do that.
MS. EKL: Of course.
MR. LOEVY: Let's do that.
MS. EKL: Of course.
THE VIDEOGRAPHER: Okay. The time is 11- --
THE WITNESS: I -- I need to use the restroom.
THE VIDEOGRAPHER: -- -25 a.m. This is the end of the Media Unit 1.
And we're going off the video record.
(Whereupon, a short break was taken.)
THE WITNESS: The time is 11:32 a.m. This is the beginning of Media Unit 2.
And we're back on the video record.
BY MR. LOEVY:
**Q. All right. Sir, did the police come and question you about the murder at some point?**
A. They -- they came to my -- to my

Page 83

in-laws' house and -- and -- and picked me up.
**Q. Well, why weren't you at home?**
A. Because the property manager wouldn't allow me to live in the building.
**Q. What do you mean?**
A. Well, when -- when all of this happened, that very same day, the property manager, Ms. Maureen -- I can't remember her last name -- she brought me in the office and asked me was there any place that I could go stay.
And I said, you -- And I was thinking just for a time being, you know.
**Q. So she kicked you out, you're saying?**
A. Yeah. They kicked me out.
**Q. Did they think you killed him?**
MS. EKL: Objection --
THE WITNESS: No.
MS. EKL: -- form, foundation.
BY THE WITNESS:
A. I -- No. She -- she was -- she -- The -- Her reasoning was that -- that somebody in the neighborhood might want to come do me harm or -- you know, because of what happened or

Page 84

something. That was her reasoning and I -- I really -- At first, I didn't agree with it. I was like, why did I have to leave -- lose my apartment, you know?
And she -- You know, I was like, "Can I go" -- Because -- because they owned a number of buildings in it -- in the -- in the community.
And I would say, "Can I go live at one of the other buildings?"
She's like, "No. You gotta, you know" --
BY MR. LOEVY:
**Q. Okay. So you get kicked --**
A. -- "find somewhere to stay." That's why I went to Georgia.
**Q. All right. So the -- You get kicked out of the building.**
**And the police find you where? At your --**
A. At my in-laws'.
**Q. Where was that?**
A. It was on the South Side of Chicago. It was somewhere, like, I think, 56th or 57th Street, I think. I'm -- I'm not sure on --

and Michigan on the South Side of Chicago.
**Q. By the way, you're saying your in-laws', but you weren't married at the time, were you?**
A. Well, they -- they was still my in-laws. They is still my in-laws. I have kids by her --
**Q. I see.**
A. -- granddaughter.
**Q. Okay. What day did the police come talk to you?**
A. Ah, I don't remember --
**Q. How long --**
A. -- really --
**Q. -- after the murder was it?**
A. Oh, probably about -- I don't know. I -- I'm -- If I could guess, probably about three weeks. I -- I don't -- I'm not sure.
**Q. What do you recall about the police officers who came to talk to you?**
A. They came and -- and -- and -- and picked me up there, and they brought me back to the North Side to the -- I'm not sure if it was a police precinct or if it was a court, but they



put me in a room and questioned me about what happened, and I told them.
And they say, "Would you take a lie detector test?"
And I said, "Yeah" --
**Q. All right. Let me ask --**
A. -- "I take one."
**Q. Well, you're jumping ahead. Let me ask you -- The question is --**
A. Hmm?
**Q. I was really asking, what do you remember about the police officers? Do you remember what they looked like?**
A. Oh. Not really. It's two white guys. I think one of them might have had a mustache and heavy-set, but I'm not sure.
**Q. Did you get a choice if you wanted to come with them?**
A. Did I get a choice?
**Q. Yeah. When they said, "Hey, you're coming with us," did you say, "No thanks"?**
**Could you have said, "No Thanks"?**
A. No. I didn't --
MS. EKL: Objection, form.



BY THE WITNESS:
A. I didn't know. I didn't think so.
BY MR. LOEVY:
**Q. You didn't think what?**
A. That I had a choice.
**Q. All right. And they -- So they picked you up at your in-laws' and made you believe that you had to come --**
A. Mm-hmm.
**Q. -- with them?**
A. Right.
MS. EKL: Objection, form, foundation.
BY MR. LOEVY:
**Q. Did they read you your rights?**
A. No.
**Q. You have a right to remain silent?**
A. No. No Mirandized. I wasn't Mirandized.
**Q. All right. Did -- Were you willing to talk to the police?**
A. Yes.
**Q. And I think you said you -- They treated you like a suspect.**
**Did you say that?**



MS. EKL: Objection, form, foundation.
BY THE WITNESS:
A. I felt like a suspect when I had to take a lie detector test.
BY MR. LOEVY:
**Q. Tell me how it came to be that you had to take a lie detector test.**
A. They -- they came and picked me up and -- and they questioned me about the -- was I -- how long was I there, when -- when did I leave, you know, seeing if I was saying the same thing that I told them the day of the -- the incident, the -- And they asked me would I take a -- a lie detector test. That's how it came about.
**Q. Were they asking you about the bathroom and sharing a door with --**
A. No.
**Q. They didn't ask you about --**
A. No.
**Q. -- that?**
**All right. You said a second ago the same questions you answered on the day of the incident. This is -- And I -- I skipped that**

**part.**
**So did you talk to the police back during the day of the incident?**
A. Not much.
**Q. What do you remember about talking to the police the day of the incident?**
A. Not much. Just telling them I left Wednesday and I came back in Saturday or Sunday and -- But, you know, Monday I came when the staff came back, and that's -- that's what I remember --
**Q. And the day of the incident --**
A. -- not much.
**Q. -- was when the body was found and everybody found out it was a murder, right?**
MS. EKL: Objection, form, foundation.
BY MR. LOEVY:
**Q. Is that what you mean by the "day of the incident"?**
A. Yeah, we -- found, yeah.
**Q. All right.**
A. Mm-hmm, yes.
**Q. That -- You didn't mention Carl Reed to the police at that time, correct?**



A. No, just to my property manager.
**Q. Why didn't you tell the police about Carl Reed?**
A. I'm not sure. I'm not sure.
**Q. All right.**
A. I'm not sure what -- what -- what I -- I might have mentioned his name. I -- I'm not sure what happened exactly.
**Q. Well, you did mention Carl Reed to the police or you didn't mention Carl Reed to the police?**
A. I'm not sure. It -- it -- it -- what was first and what was last of the -- you know.
**Q. Okay. But you believe you did mention it to the property manager?**
A. I -- Yes.
**Q. All right. When the police -- Did they ask you to take a lie detector test or they told you you were taking a lie detector test?**
A. They asked me.
**Q. What did you say?**
A. I said, "Yeah, sure."
**Q. Why?**
A. Because I -- I knew I was just



telling -- I knew I was telling the truth.
**Q. Do you remember what time it was?**
A. No.
**Q. Do you remember the questions that the lie detector asked you?**
A. No.
**Q. Did they hook you up to the lie detector machine with the blood pressure cuff?**
A. Yeah.
**Q. Tell me what you remember about being hooked up to the machine.**
A. Not much, not much, just being hooked to the thing and asked -- asked -- being asked questions. That's all.
**Q. How does it work to give a lie detector test?**
A. Huh?
**Q. Have you ever given a lie detector test before that or after that? Ever since or before?**
A. I think in 1987 at White Water Theme Park in -- in Marietta, Georgia.
**Q. So this is the second time you've given a lie detector test?**



A. Mm-hmm.
**Q. What happened the first time?**
A. The first time, it -- I was -- I -- I was saving money from a -- a summer job that I had had at a theme park, at White Water Theme Park. And I had the money that I was saving with me, and the manager said that it's a policy that the -- we as workers shouldn't have more than $5 at work.
So they was thinking that I might have stole the money, and so I said, "No. This is my money that I earned since I've been working here."
And they said, "Would you take a lie detector test?"
And I said, "Sure."
**Q. All right. Shooting forward to the second time you took a lie detector test in connection with this murder --**
A. Mm-hmm.
**Q. -- tell me what you remember about how the test -- how -- how it works when you give a test. You get -- you get hooked up or your fingerprints [sic], or what do you remember?**

A. Fingers, I think. It was my fingers.
**Q. What do you remember?**
A. I don't remember much about it, just asking these general questions: "What's your name?"
You -- you know, "DeLong Reed."
"And where you live?"
"And do you -- When -- When did you -- When did you leave the property?"
I told them, "Wednesday morning."
And this -- "And when did you return to the property?"
And I told them -- I don't remember if it was Saturday or a Sunday, but I told them when I had returned to the property and just general questions.
**Q. Did you tell them you were taking antidepressants?**
A. Yes.
**Q. Did you tell them you were addicted to crack cocaine?**
A. No.
**Q. What did you tell them about that, about the --**



A. I -- I did tell them that me and Carl had -- had smoked some crack.
**Q. Did you tell them you had been clean for two and a half years?**
A. Did I tell them I had been clean for two and a half years?
**Q. Yes.**
A. No, no. I don't remember telling them that.
**Q. Have you seen the polygraph documents before your deposition today?**
A. No.
**Q. Did you tell them about Hadrion? Is there a drug called Hadrium [sic] where you're --**
A. Huh?
**Q. Do you know a drug named Hadrion, H-A-D-R-I-O-N?**
A. Habrium [sic]?
**Q. Yeah. What does that --**
A. No.
**Q. -- mean?**
**Do you know what that is?**
A. I never heard of it.



**Q. Me neither. Okay. Maybe I'm reading it wrong.**
A. Is it Haldol?
**Q. It could be Haldol.**
**I mean, were you on Haldol?**
A. Yes.
**Q. Did you tell the police you were on Haldol?**
A. Yeah.
**Q. What is Haldol?**
A. Haldol is an antidepressant. It's a psych med.
**Q. Were you on psych meds at the time that you got interrogated about this --**
A. Yeah, yeah.
**Q. -- murder?**
MS. EKL: Objection, form.
BY THE WITNESS:
A. I was taking -- I was taking my meds, yeah.
BY MR. LOEVY:
**Q. What psych meds were you on at the time of the interrogation of the Van Vo murder?**
MS. EKL: Objection, form, to the phrase --



THE WITNESS: I'm not sure.
MS. EKL: -- "interrogation."
BY THE WITNESS:
A. I'm not sure.
BY MR. LOEVY:
**Q. All right. Did they ask you if you were in Van Vo's apartment at any time this happened?**
A. No, not that I remember.
**Q. Did they ask you if you did anything to cause the death?**
A. No, not that I remember.
**Q. Did they ask you, did you get anything from the apartment?**
A. Not that I remember. I -- I don't remember any of that.
**Q. And do you deny it, or you just don't remember it either way?**
A. Deny what? What? Deny what?
**Q. That during the lie detector test one of the questions was, did you do anything to cause --**
A. I just don't remember either way. I just don't remember.

Page 97

**Q. Would it help refresh your recollection if I showed you the documents?**
A. I doubt if I'd be able to see it. You -- You -- You just told me what it said, yeah. I --
**Q. Well, if I'm representing to you --**
A. But listen --
**Q. -- that's what it says --**
A. Listen. No.
**Q. -- does that refresh your --**
A. Listen, listen, listen, listen.
**Q. -- recollection?**
A. You -- you're -- you're -- you're making me feel like I'm suspect and that I may need a lawyer, and -- and -- and -- and I don't think it's -- it's fair to say that I'm coming here to do -- you know, before a grand jury for -- to give a deposition and then put me on trial here without a lawyer. You -- You making me feel that -- like I'm -- I'm suspect be -- for your client, you know, like, I --
**Q. But my client is not prosecuting anybody. He's just a guy.**
A. Pardon me?

Page 98

**Q. My client can't prosecute anybody. He's just a guy. I don't know, you know, if the police officers treat this as an unsolved murder or --**
A. You understood --
MS. EKL: Objection.
THE WITNESS: -- what I just said.
MS. ITCHHAPORIA: This is Misha. Object to form.
BY THE WITNESS:
A. You -- you understood what I just said.
BY MR. LOEVY:
**Q. I think you don't like my questions.**
A. I -- I don't -- I don't like your questioning because you're putting me on trial.
**Q. Well, let me ask you a different question.**
**Back then when the police officers were asking you, did you do anything to cause the death, did you feel that the police officers were c- -- putting you on trial?**
MS. EKL: Objection, form.
THE WITNESS: No.
MS. EKL: He has already said he doesn't recall the questions they were asking him.

Page 99

BY THE WITNESS:
A. I -- I -- I -- Right.
BY MR. LOEVY:
**Q. If the --**
A. I don't --
**Q. If --**
A. I --
**Q. -- the --**
A. I don't re- -- recall it, but -- And -- and -- and I would have said no. I don't recall the questioning at -- on -- on the lie detector test.
**Q. If the lie detector guy --**
A. But if --
**Q. -- would have been saying to you, "Did you do anything to cause the death," would that have made you feel like a suspect?**
MS. EKL: Objection, form, calls for speculation.
BY THE WITNESS:
A. Yes.
BY MR. LOEVY:
**Q. Did you feel at the time that the police were trying to make you feel like a suspect?**

Page 100

MS. EKL: Objection, form, foundation.
BY THE WITNESS:
A. Somewhat, somewhat, but, you know, not -- not really. I was pretty comfortable.
BY MR. LOEVY:
**Q. Well, isn't it true that you didn't mention the Carl Reed business until after they started asking you on a lie detector test if you killed Van Vo?**
**That's true, isn't it?**
MS. EKL: Objection --
THE WITNESS: No.
MS. EKL: -- form.
BY THE WITNESS:
A. That's not true.
BY MR. LOEVY:
**Q. You told the police before the lie detector test?**
A. No. I told my property manager before I -- before I had to -- had to tell the police.
**Q. All right.**
A. So that's --

Page 101

**Q. But my question was --**
A. Right. So your questioning -- Well, I'm trying to answer your question.
**Q. Well, let me ask it again.**
MS. EKL: No. He -- He's trying to answer --
THE WITNESS: No. I'm trying to answer --
MS. EKL: -- your question.
THE WITNESS: -- your question.
MR. LOEVY: Let's read it back.
THE WITNESS: I -- I heard clearly what you just said.
MR. LOEVY: We're going to read it back.
MS. EKL: There's no reason to --
MR. LOEVY: The court reporter --
MS. EKL: -- read it back.
MR. LOEVY: That --
MS. EKL: He heard you. He's trying to --
THE WITNESS: I heard --
MS. EKL: -- answer.
THE WITNESS: -- you. And I'm --
MS. EKL: Can you let him --
THE WITNESS: -- trying to answer you.
MS. EKL: -- finish --
MR. LOEVY: All right. Now --

Page 102

MS. EKL: -- his answer?
MR. LOEVY: All right. Now, I'm going to ask the court reporter to read it back, and listen carefully. Thank you.
MS. EKL: No. And I'm going to say, let him finish what he wants to say. If you --
MR. LOEVY: Beth --
MS. EKL: -- want to have her read it back again after that --
MR. LOEVY: Beth --
MS. EKL: You're cutting off his answer.
MR. LOEVY: He -- He will have a chance to read -- answer whatever he wants. Let's just make sure we're asking him the right question.
Can you please read back the question?
MS. EKL: I'm objecting to your form of asking this question in the middle of his answer.
MR. LOEVY: Thank you.
(Whereupon, the record was read as requested.)
BY MR. LOEVY:
**Q. That's the question.**
**You told the police before the lie**

Page 103

**detector test about Carl?**
MS. EKL: Objection, asked and answered.
You can answer it again, Mr. -- Mr. Reed, if you understand it.
BY THE WITNESS:
A. I -- I would -- I would think I -- I probably had did, yeah.
BY MR. LOEVY:
**Q. Isn't it true, sir, that you didn't tell the police that you had a suspect, Carl Reed, until after the police made you think that you were the suspect?**
A. No --
MS. EKL: Objection, asked and answered.
BY THE WITNESS:
A. -- that's not true. That's not true.
BY MR. LOEVY:
**Q. All right. Do you remember giving the statement that the reason you didn't tell the police earlier is because you didn't want to be a snitch?**
MS. EKL: Objection, form, foundation.
BY THE WITNESS:
A. No. I don't remember that.

Page 104

BY MR. LOEVY:
**Q. All right. I'm going to read from [sic] you from your statement from July 23rd on page 5.**
MS. EKL: What statement are you looking at?
BY MR. LOEVY:
**Q. The handwritten statement that we talked about earlier that you gave where you say -- that you read -- I'll read you the following: "DeLong states that he didn't report Carl to the police because he didn't want to be a snitch." Did you give -- Let me ask a question.**
**Did you say that to the state's attorneys?**
A. I don't remember saying that.
**Q. Was it true that you didn't report Carl to the police because you didn't want to be a snitch?**
**Was that true?**
MS. EKL: Objection, foundation --
THE WITNESS: No.
MS. EKL: -- as to what time period you're talking about.

Page 105

BY THE WITNESS:
A. No. That's not true.
BY MR. LOEVY:
**Q. Did you also say in your statement that you didn't report Carl to the police because you weren't sure what --**
A. Because --
**Q. -- happened --**
A. -- I had already --
**Q. Let me ask the question.**
A. No. Let me answer --
**Q. Let me ask the question.**
A. -- the question.
**Q. You've [sic] got to finish -- You've got to let --**
A. I reported --
**Q. -- me finish --**
A. -- Carl --
**Q. Mr. DeLong --**
A. I reported Carl --
**Q. Mr. Reed --**
A. -- Reed to the property manager.
**Q. Mr. Reed --**
A. It -- like I was supposed to do.

Page 106

**Q. -- you've got to wait for --**
A. So I didn't have --
**Q. -- the question.**
A. -- to call the police.
THE COURT REPORTER: Sorry, sorry, sorry --
BY MR. LOEVY:
**Q. You've got to --**
A. The property manager --
**Q. -- wait for --**
A. -- called the police.
**Q. -- the question. You've got to wait for the question, and then it'll be your turn.**
**The question is, did you also tell the state's attorneys that you didn't report Carl to the police because you weren't sure what happened?**
MS. EKL: Objection, found- --
BY MR. LOEVY:
**Q. Did you make that statement?**
MS. EKL: Objection, foundation as to what time --
BY THE WITNESS:
A. I don't remember any --
MS. EKL: -- period you -- It's unfair for you to read a statement out of -- a part of his statement out of context, and so I object to the form of the question.

Page 107

BY MR. LOEVY:
**Q. Did you make that statement?**
A. I don't remember.
**Q. All right. And then to answer Beth's objection, you know what statement we're talking about because we talked about it earlier, right, the statement you gave to the state's attorneys on the 23rd of July at 1:00 a.m. at 2452 West Belmont? That's the statement I'm talking about.**
**Does that change your answer?**
MS. EKL: And my objection stays the same. It's not a que- -- My objection is not to what the date is on this entire statement. My objection is to the fact that you're taking one sentence out of this multi-page statement and asking him about that particular part of the statement out of context.
BY MR. LOEVY:
**Q. Okay. Does that change your answer?**
**Do you know what statement I'm talking about?**

Page 108

A. I don't remember.
**Q. All right. Was it true that you didn't report Carl to the police until later?**
MS. EKL: Objection --
BY THE WITNESS:
A. I'm not sure.
MS. EKL: -- form.
BY MR. LOEVY:
**Q. Did you not want to be a snitch?**
MS. EKL: Objection, form, foundation.
BY THE WITNESS:
A. I don't think I had a problem with -- with telling. I -- I told the property manager.
BY MR. LOEVY:
**Q. Okay. Did you have a problem being a snitch?**
MS. EKL: Objection, form, foundation.
BY THE WITNESS:
A. No. I -- I didn't have a problem with -- with telling.
BY MR. LOEVY:
**Q. All right. Then why --**
A. I told it to the property manager.

Page 109

**Q. Why did you tell the state's attorneys when you gave your formal statement -- Why did you tell them that you didn't tell the police because you didn't want to be a snitch?**
A. I'm not sure. I might have had too much hot dog.
**Q. All right. The next part of the statement I want to ask you about --**
A. This --
MS. EKL: It's okay.
THE WITNESS: This is so --
MS. EKL: Just listen to the question.
THE WITNESS: -- unfair. This is so unfair --
BY MR. LOEVY:
**Q. What --**
A. -- like this.
**Q. What is unfair, sir? What's unfair about the situation?**
A. To -- to -- to -- to -- to bring this up all over again to me. It -- like this and think I'm going to remember all of this. And it -- it -- it -- it is -- It make me -- it made me feel like I'm being scrutinized.

Page 110

**Q. Are you claiming to --**
A. And I don't --
**Q. -- remember --**
A. I don't like it. It's -- It's so unfair.
**Q. Are you claiming to remember Carl in the victim's apartment?**
A. Pardon?
**Q. Are you claiming to remember Carl was in the victim's apartment, or you can't remember?**
A. I remember that.
**Q. All right. Well, then, I want to ask you about your memory.**
**You also in the same statement -- "DeLong states that he didn't tell the police about Carl in Mr. Van Vo's apartment because he thought Mr. Van Vo died of natural causes and Carl was just taking advantage of an opportunity" --**
A. Mm-mm.
**Q. -- right?**
A. No. I don't remember that.
**Q. All right. My first --**

Page 111

A. No.
**Q. -- question to you is, when you were giving a statement to the state's attorneys, did you say that?**
A. I don't remember that. I don't remember how it went down.
**Q. Do you deny saying that?**
A. I -- I don't remember how it -- how it went down.
**Q. Do you deny saying that?**
A. I can't --
MS. EKL: Asked and answered.
BY THE WITNESS:
A. -- deny. I can't -- I can't agree, nor can I deny because I don't remember how it went down.
BY MR. LOEVY:
**Q. When they read it to you after they were finished taking it from you, would you have signed it if it said, "DeLong states he didn't tell the police about Carl in Mr. Van Vo's apartment because he thought Mr. Van Vo died of natural causes, and Carl was just taking advantage of an opportunity" --**

Page 112

A. Again --
MS. EKL: Objection, form.
THE WITNESS: Again --
MS. EKL: Let me --
THE WITNESS: Again --
MS. EKL: Let me --
BY THE WITNESS:
A. -- I can't agree or -- nor deny because I don't remember how it all went down.
BY MR. LOEVY:
**Q. What --**
MS. EKL: So let me put my objection on the record. My objection is that it includes facts not in evidence, and it also calls for speculation.
BY MR. LOEVY:
**Q. All right. At the end of the statement, it says that you were given soda and allowed to smoke cigarettes. Treated --**
A. No.
**Q. -- well by the police.**
A. I don't remember that.
**Q. Did that happen?**
A. No, I don't think -- No.

Page 113

**Q. It says, "DeLong can read the -- English and demonstrated it by reading it out loud."**
**Did that happen?**
A. Pardon me?
**Q. It says, "DeLong states he can read English and demonstrated it by reading out loud."**
**Do you remember if that happened?**
A. No, no. I don't remember nothing like that.
**Q. It says, "DeLong states he has read all seven pages of this handwritten statement and is" --**
A. No, no. That didn't happen.
**Q. Well, let me finish --**
A. I --
**Q. -- reading it.**
A. Well, I could tell you why that didn't happen, because I -- Not only can I not see there, that -- that's -- and it's been since 2004, but never -- In my whole life, I never been able to read cur- -- cursive writing ever.
**Q. All right. I --**

Page 114

A. So I -- I didn't read this.
**Q. I'm going to read what it says here.**
A. Mm-hmm.
**Q. "DeLong states he has read all seven pages of this handwritten statement and had a chance to make any additions, corrections, or changes that he wanted."**
**Did that happen?**
A. No. I doubt it.
**Q. Then it says, "DeLong says ASA Gala-" -- Galassini?**
MR. LOEVY: Do you know how to say that, Beth?
BY MS. EKL: Galassini.
MR. LOEVY: Thank you.
BY MR. LOEVY:
**Q. Then it says, "DeLong states that ASA Galassini read each of these seven-page statements out loud and he followed along, and it is true and accurate."**
**Did that happen?**
A. No.
**Q. All right.**
A. I just -- They just says --

Page 115

MS. EKL: I --
THE WITNESS: -- "Okay. Sign."
MS. EKL: I -- I just --
THE WITNESS: And I signed it.
MS. EKL: I need to -- I need to correct, because I think you misread what this says. My -- I read it to say, "DeLong states ASA Galassini read each of the seven-page statements out loud and he" -- meaning DeLong -- "followed along, and it is true and accurate."
This does not state that DeLong --
THE WITNESS: Oh, somebody read it --
MS. EKL: -- read the statement --
BY THE WITNESS:
A. -- to me? That's what -- Is that what it says?
BY MR. LOEVY:
**Q. Yeah. It says --**
A. Somebody al- -- Somebody probably did read it to me, because I didn't read this. I can't read cursive writing even when I had my vision.
**Q. Did somebody read it out loud to you and you had a chance to make any --**

Page 116

A. Maybe so. I'm not --
**Q. All right.**
A. -- sure. I'm not totally sure, but it -- That sounds like it might be more accurate --
**Q. If it was Reed --**
A. -- a reason for me to sign, you know. And -- and -- and -- and then, again, you know, I might have been in a -- in a thing where I just wanted to move it along.
**Q. Right. So if somebody would have read it out loud to you and it contained things that were false, would you have signed it anyways?**
A. No.
MS. SULLIVAN: Objection, form.
BY THE WITNESS:
A. Absolutely not.
BY MR. LOEVY:
**Q. All right. It says in this statement on page 6, "DeLong didn't want to tell on Carl because DeLong smoked crack with Carl, because of Mr. Van Vo's speakers, and DeLong felt guilty because Mr. Van Vo was his friend."**
**Is that true?**

A. I'm not sure.
**Q. What -- Explain to me what you meant --**
A. I -- I can't -- Let me -- Let me explain to you then. As far as me smoking crack, I -- I told that to the police and to my property managers. I -- I -- You know, that -- that ain't something that you hide, you know, that -- "Oh, we -- we -- we -- we smoked a rock." You know, that ain't something you hide when somebody gets killed.
**Q. All right. But as far as not telling -- not wanting to tell on Carl because of Mr. Van Vo's speakers and DeLong felt guilty because Mr. Van Vo was his friend, can you explain what you meant?**
MS. EKL: Objection, form, foundation.
BY THE WITNESS:
A. I don't -- I don't -- I don't -- I don't remember that. It's so much of this I don't remember. I'm sorry.
BY MR. LOEVY:
**Q. But in 2001 when you gave this statement, you were saying that you didn't tell the police on Carl, right?**



A. I don't know.
**Q. I mean, I just read it to you.**
A. I don't -- So that don't mean it is true.
**Q. Your memory is that you did tell the police on Carl?**
MS. EKL: Objection, form, foundation.
BY THE WITNESS:
A. I -- I told them what the -- the transpired -- what transpired, the -- you know, since I -- I was there.
BY MR. LOEVY:
**Q. According --**
A. That he -- that he was coming out of -- coming out of the house. I didn't -- I never told the police, "Hey, he killed him. He did it."
I told the police that I -- I seen him coming out of his house with his car keys and -- and -- and his door keys at -- at -- late at night, and I seen him bringing stuff in and out of his house.
**Q. But you didn't tell the police that when you first talked to them or before the lie detector test, correct?**



MS. EKL: Objection, asked and answered.
BY THE WITNESS:
A. I -- Um, I'm not sure what came first --
BY MR. LOEVY:
**Q. Isn't it --**
A. -- the chicken or the egg.
**Q. Isn't it true that you didn't tell the police this story about Carl going in and out of the apartment until after they asked you to take a lie detector test and they asked you if you --**
A. I'm not sure --
**Q. -- told them --**
A. -- what --
MS. EKL: Objection, form.
THE WITNESS: I'm not sure --
MS. ITCHHAPORIA: Objection.
BY THE WITNESS:
A. I just told you, I don't know which happened first or last when it come to the lie detector test or the day of the -- of the arrest or the date of the event or whatever.
THE COURT REPORTER: Who was the objection?



MS. EKL: Misha.
BY MR. LOEVY:
**Q. When they were interrogating you in the police station, did they read you your rights?**
MS. EKL: Objection, form --
THE WITNESS: No --
MS. EKL: -- to the --
THE WITNESS: -- not that I --
MS. EKL: -- to the use of "interrogation."
BY THE WITNESS:
A. -- remember.
BY MR. LOEVY:
**Q. Did they interrogate you, sir?**
A. I'm not sure. I mean, I -- I'm not sure. I think that they just -- they asked me what went down, when did I -- when did I leave? When did I come home? What happened when I came home, and would you take a lie detector test?
**Q. And before that, you didn't mention anything about Carl Reed, correct?**
MS. EKL: Objection, form, foundation.
BY THE WITNESS:
A. I'm not sure if I mentioned something about Carl Reed on the day of --

Page 121

BY MR. LOEVY:
**Q. Would it refresh --**
A. -- the incident.
**Q. -- your recollection if you looked at the police reports to see that you didn't mention Carl Reed on the day of?**
MS. EKL: Objection, form.
BY MR. LOEVY:
**Q. Would it refresh your recollection to look at the police reports?**
A. You could read it to me. I'm not -- I'm -- I'm -- I can't see that.
**Q. All right. I will read you a sentence on page 15 of a 19 -- the 19-page closing supp report, and I guess it won't help to have you read it. So I'll read it out loud. DeLong -- because of your eyesight.**
**You can read --**
A. Mm-hmm.
**Q. -- if you could see, right?**
A. If I could see it, yeah. I could -- I could read. I could read.
That's print? That's in print?
**Q. Can you read it now in print?**

Page 122

A. No, I doubt it.
**Q. Maybe?**
A. How large is it?
**Q. How -- That's not going to help you.**
A. Right. Yeah --
**Q. Let me -- I'm going to put it in front of you. We'll mark this --**
MS. EKL: You have it connected to your --
THE VIDEOGRAPHER: Your microphone --
MR. LOEVY: I'll mark this as Exhibit 1.
(Whereupon, Reed Deposition Exhibit No. 1 was marked for identification.)
THE VIDEOGRAPHER: Please don't throw the microphone.
MR. LOEVY: Sorry about that.
BY THE WITNESS:
A. No. I can't see this.
BY MR. LOEVY:
**Q. Look --**
A. I can't see this.
**Q. -- in the middle pages.**
A. Okay. No. I can't --
**Q. So --**

Page 123

A. -- read any of this. It's -- Sir, I have a blind spot that -- that's -- make this -- It is blurry.
**Q. Got it.**
**When did you lose your vision? At what age?**
A. In -- In the end of 2003.
**Q. Was there --**
A. 2004, 2003.
**Q. Was there an -- an injury or it just degenerated?**
A. It -- It degenerated from sickle-cell anemia and -- and too much aspirin in my bloodstream.
**Q. Could you see things in 2001 when you were being in- -- interviewed by the police?**
A. Yeah.
**Q. All right. The police report says, "DeLong Reed was" --**
A. They never showed me that. I never seen it. I never seen it.
**Q. The statement that we went through?**
A. Nope. I never seen the -- This. I never seen the police report and anything. And

Page 124

I'm going to tell you -- You ask me again, I'm going to tell you the same thing. I never seen the police report.
**Q. All right. It says in the police report --**
A. I never had a copy of it or anything.
**Q. Well, Ms. Ekl gave you a copy, right, before the deposition?**
A. I didn't read it. I couldn't read it.
**Q. All right. It says in the --**
A. I --
**Q. -- police report on page 15, "DeLong Reed was advised of his constitutional rights. He said he understood those rights and waived them."**
**Do you remember -- Does that refresh your recollection?**
MS. EKL: Where --
THE WITNESS: I don't --
MS. EKL: Where are you reading this from?
THE WITNESS: -- know. I don't --
MR. LOEVY: This is on page --
THE WITNESS: -- know.
MR. LOEVY: -- 15, the second paragraph.

Page 125

BY THE WITNESS:
A. I don't know. I'm not sure.
BY MR. LOEVY:
**Q. All right. Do you -- Would you disagree or you're saying it didn't happen, or you don't remember either way?**
A. I don't remember either way.
**Q. If the police told you you have a right to remain silent, anything you use -- you say could be used against you, would that have made you scared about this murder investigation?**
A. No.
MS. EKL: Ob- -- Objection, form. Calls for speculation.
THE WITNESS: No.
MS. EKL: I don't -- Can you point me to where you're reading?
THE WITNESS: No.
MS. EKL: I don't see this in --
MR. LOEVY: "DeLong Reed was advised of his" --
THE WITNESS: It'll give me --
MS. ITCHHAPORIA: It's on page -- It's on page 14, not 15.

Page 126

THE WITNESS: It'll give me cause --
MR. LOEVY: Mine says 15.
THE COURT REPORTER: Who was that?
THE WITNESS: It'll give me cause for concern, but --
MS. EKL: Hold on.
THE WITNESS: -- no. It wouldn't --
MS. EKL: Hold on one second.
THE WITNESS: -- make me scared.
MS. EKL: Hold on one second.
THE WITNESS: Mm-hmm.
MS. EKL: Looking at the page numbers on the top, 25 is on the bottom of all these.
Are you --
MR. LOEVY: I must have a different version. Mine says 15 of 9.
But Misha says it's -- 14 or 16, Misha?
MS. EKL: She said 14.
MR. LOEVY: All right. 14.
MS. ITCHHAPORIA: 14, 14.
BY MR. LOEVY:
**Q. All right. Now, back to the question. All right.**
**If the police are saying to you,**

Page 127

**"Mr. Reed, you have a right to remain silent. Anything you say can be used against you. We're going to ask you questions about this murder," wouldn't that have made you nervous?**
MS. EKL: Objection, form, calls for speculation.
BY THE WITNESS:
A. Not necessarily it didn't, because I had didn't -- I didn't do anything wrong. So I wouldn't -- I wouldn't feel nervous, um, you know.
BY MR. LOEVY:
**Q. All right. And according to this document --**
A. I know you make me nervous.
**Q. Are you scared that even today you might get in --**
A. Yeah.
**Q. -- accused of this?**
A. The way you putting it.
**Q. Are you scared that if you don't give the right answers, that you could be prosecuted for this murder?**
A. Yeah, of course. That's crazy.

Page 128

**Q. You don't want to be prosecuted for --**
A. No.
**Q. -- this murder?**
A. That's crazy.
**Q. Does that make you think you better stick to the story that the police want you --**
A. I don't --
MS. EKL: Objection --
BY MR. LOEVY:
**Q. -- to tell?**
MS. EKL: -- form.
THE WITNESS: I don't know.
MS. EKL: Assumes facts not in evidence.
BY THE WITNESS:
A. It -- But I know I didn't do anything wrong.
BY MR. LOEVY:
**Q. All right. Do you have a fear that unless you stick to the story, you could get in trouble?**
MS. EKL: Objection, form, assumes facts not in evidence.
BY THE WITNESS:
A. It's not fair. It's not fair. You're

Page 129

not fair. That's --
BY MR. LOEVY:
**Q. Are you concerned --**
A. -- not fair.
**Q. Are you --**
MS. EKL: We need to take a -- We need to -- take a break.
MR. LOEVY: No --
MS. EKL: -- take a break.
MR. LOEVY: -- no. Let me just finish the line of inquiry.
BY THE WITNESS:
A. That's not fair. That's not fair. I wouldn't do nothing to nobody ever.
BY MR. LOEVY:
**Q. Are you concerned that if you don't keep saying that Carl Reed was in the apartment, that you could be accused of the crime?**
MS. EKL: Objection, form.
THE WITNESS: No.
MS. EKL: Now you're harassing the witness.
BY THE WITNESS:
A. No.
MS. SULLIVAN: I'm going to join in that objection.

Page 130

BY MR. LOEVY:
**Q. Are you concerned --**
MS. SULLIVAN: This is -- this is harrassatory.
And this is Terrie Sullivan.
BY MR. LOEVY:
**Q. Are you concerned that the lawyers for the police officers could cause problems for you if you don't keep telling the story that Carl Reed was in the apartment?**
MS. EKL: Objection --
THE WITNESS: No.
UNIDENTIFIED SPEAKER: Objection, form.
BY THE WITNESS:
A. No. I'm just going to tell the truth.
BY MR. LOEVY:
**Q. All right.**
MS. SULLIVAN: Also misstate -- misstates the witness's prior testimony and -- that he said he's scared of Mr. --
MR. LOEVY: Hey --
MS. SULLIVAN: -- Loevy.
MR. LOEVY: -- we're not supposed to give speeches or lectures on -- you know --

Page 131

THE COURT REPORTER: Was that Ms. Sullivan?
MR. LOEVY: -- on the record.
That was Ms. Sullivan.
BY MR. LOEVY:
**Q. And, for the record, I don't represent the police. I can't prosecute you or get you in trouble.**
MS. EKL: Objection, form, to the -- to the extent that that assumes that the police officers' lawyers in the civil litigation have any ability to prosecute anyone either.
BY MR. LOEVY:
**Q. All right. Sir, this police report reflects that the first time you talked to the police on the 22nd of July before the lie detector test, you didn't mention anything about Carl Reed coming in and out of the apartment.**
**Does that refresh your recollection that you didn't mention anything about Carl Reed until after --**
A. You know, I -- I don't remember.
**Q. -- they accused you?**
A. I probably said it before.
UNIDENTIFIED SPEAKER: Objection, form.

Page 132

BY THE WITNESS:
A. Because that's what -- You know, that's what I -- I've seen. That's what I told my property manager.
BY MR. LOEVY:
**Q. Any reason you wouldn't have told the police if it was true?**
MS. EKL: Objection, form --
THE WITNESS: Because I already told --
MS. EKL: -- assumes facts --
THE WITNESS: -- the property --
MS. EKL: -- not in evidence.
BY THE WITNESS:
A. -- manager.
BY MR. LOEVY:
**Q. All right.**
A. I wouldn't need to tell the police. I -- I tell the property manager, and I let the property manager handle it. I don't -- I don't -- You know, but I had an option. I'm glad I did have an option. I could -- I could call the police and tell them I -- "Hey, I suspect that" -- You know, but I'm like, Why would I even have to go that far? It's Monday

morning. Let me go in the property manager's office and let her handle it.
**Q. Why are you telling Ms. Ekl?**
MS. EKL: Objection. He's --
BY THE WITNESS:
A. Pardon me?
BY MR. LOEVY:
**Q. Why were you looking at Ms. Ekl when you're telling that?**
A. Because that -- I'm -- I -- I could be looking at him and doing the same thing. It's -- She is -- Talking to her -- You know, her -- I trust her more than I trust you.
**Q. Why do you trust the attorney for the police?**
A. Pardon me?
**Q. Why do you trust the attorney for the police more than Mr. Reed?**
A. Because I believe that Carl Reed killed Mr. Van Vo --
**Q. Who --**
A. -- and -- and I have reason to believe that he killed Mr. Van Vo because of the circumstances that -- that I was facing, seeing



him coming out that man house with his -- with his keys --
**Q. Now, let's --**
A. -- at -- at -- at 10:00, 11:00 at night, and this is a little old man that's sure to be asleep at this time, you know.
**Q. Well, Mr. Reed, here's the question --**
MS. EKL: You -- Let him finish --
BY MR. LOEVY:
**Q. -- why --**
MS. EKL: -- his answer.
MR. LOEVY: He can't just do narratives, Beth.
BY MR. LOEVY:
**Q. Here's the question --**
MS. EKL: No, no, no.
MR. LOEVY: All right.
MS. EKL: You asked him -- Wait, wait, wait.
MR. LOEVY: So let me --
MS. EKL: You asked him --
MR. LOEVY: -- finish, Beth.
MS. EKL: -- why he trusts me, and he said --
THE WITNESS: He's badgering me.
MR. LOEVY: Yeah. I asked him why --



MS. EKL: Let --
MR. LOEVY: -- he trusts you, and he is telling us a story about keys and doors and that's not responsive.
THE WITNESS: Ye- --
MS. EKL: You didn't --
BY MR. LOEVY:
**Q. But here's the question --**
MS. EKL: You didn't --
BY THE WITNESS:
A. Yeah. Yes, it is. Yes, it is.
BY MR. LOEVY:
**Q. All right. Mr. Reed, why didn't you tell the police on July 22nd, 2001 -- Let me finish the question.**
**Why didn't you tell the police on July 22nd, 2001, that you had seen Mr. Reed coming in and out with keys?**
MS. EKL: Objection.
THE WITNESS: I'm --
MS. EKL: Asked and answered about ten times.
BY THE WITNESS:
A. Because I -- because I -- I may have felt I didn't have to tell the police that



because I already told the property manager that, and the property manager related to the police what I said.
BY MR. LOEVY:
**Q. But when you were in the room, and they told you, you have a right to remain silent --**
A. When I was in my -- in my -- in my room?
**Q. No, no. In the room at the police station --**
A. Oh, okay.
**Q. -- they tell you, you have a right to remain silent, and they're asking you questions about it, why was it in your mind, Well, I told the property manager about Carl Reed coming in and out with his keys. I don't have to tell the police?**
**Why does that make sense?**
MS. EKL: Objection --
THE WITNESS: No.
MS. EKL: -- form. Assumes --
THE WITNESS: No. When I --
MS. EKL: -- facts --
THE WITNESS: -- was in --

MS. EKL: -- not in evidence.
THE WITNESS: -- in the --
MS. EKL: Misstates --
BY THE WITNESS:
A. When I was in the room with the police at the -- at the police station or -- or whatever, I -- I did tell them that same thing, "Hey, I seen him coming in and out of the" -- I did tell them that then.
BY MR. LOEVY:
**Q. So you're --**
A. I'm not sure if I told them that the day of the incident.
**Q. Well, I'll represent to you that we have the notes in the police report from July 22nd.**
A. Excuse me.
**Q. We have the notes of the police reports from your interview on July 22nd --**
A. Mm-hmm.
**Q. -- starting at 11:15 in the morning, and those notes don't say that you told the police that you saw Carl Reed going in and out of the victim's apartment with the keys.**



**Do you dispute that?**
MS. EKL: Objection, form.
BY THE WITNESS:
A. I'm not sure. I don't remember. I'm sorry.
BY MR. LOEVY:
**Q. Well, are you saying you told the police and they didn't write it down, or you didn't -- didn't tell --**
A. Oh, I --
**Q. -- the police?**
A. It would be crazy for them not to have that because I would tell them that.
**Q. All right.**
A. If I'm at the police station, yeah, I'm gonna -- I'm gonna tell them. They're gonna ask me. I'm -- I'm gonna tell them.
**Q. If it --**
A. My story is pretty much simple wh- -- to tell the police. So I -- Why wouldn't it be in the report? I don't understand.
**Q. If it was true that you really saw Carl Reed going in and out with the victim's keys, there would have been no reason not to tell the police, right?**



A. Right.
**Q. And you said a minute ago, well, you wouldn't have told the police because you told the property manager. That doesn't --**
A. No, no --
**Q. -- make sense?**
A. -- no, no, no. I'm -- I'm -- I'm sorry. You -- I'm -- I might have took you off track.
There's -- There's two instances with the police: The day of, and then you have, like, almost a month later when they came and picked me up, took me to the police station.
**Q. Right.**
A. Now, the day of, I -- I -- I wouldn't have felt like I had -- The police didn't really ask me much. I had already told the property manager, you know, about Carl Reed.
Now, when the police came and picked me up at my -- at my in-laws' house and took me to the police station and put me in the room, that's when I told them about Carl Reed, but --
**Q. All right. Let's focus on --**



A. If they would have asked, I don't know. I don't even remember if they read me my rights. I don't know.
**Q. Let's focus on the first time --**
A. Mm-hmm.
**Q. -- you talked to the police.**
A. Mm-hmm.
**Q. After they find this dead body and the police are investigating this murder, they did talk to you, right? The first time?**
A. Yeah, I think so.
**Q. All right. And if you truly had seen Carl Reed going in and out of the victim's apartment --**
A. Mm-hmm.
**Q. -- with the victim's keys, you would have told the police that --**
MS. EKL: Objection, form, s- -- argumentative.
BY MR. LOEVY:
**Q. -- right?**
MS. EKL: Asked and answered.
BY THE WITNESS:
A. Probably, yes.

Page 141

BY MR. LOEVY:
**Q. All right. So why didn't you tell the police that?**
MS. EKL: Objection --
THE WITNESS: I don't know --
MS. EKL: -- form, argumentative.
BY THE WITNESS:
A. -- if I did or if I did it.
BY MR. LOEVY:
**Q. Any good reason you wouldn't have told them if it was true?**
MS. EKL: Objection, form --
THE WITNESS: Any good --
MS. EKL: -- argumentative.
BY THE WITNESS:
A. -- reason it's important?
BY MR. LOEVY:
**Q. No.**
**Any good reason why you wouldn't have told them if, in fact, it happened --**
A. It's no -- no good reason.
**Q. All right. Now, let's fast-forward --**
A. It's --
**Q. -- to --**

Page 142

A. -- what --
**Q. -- the second time you talked to the police weeks later.**
**You're arrested -- Or I'm sorry.**
**You're -- You're picked up and you're interviewed. Sometime around 11:15 in the morning is when you start talking in the police station.**
**Does that refresh your recollection --**
MS. EKL: Objection --
MR. LOEVY: -- of the time?
MS. EKL: -- foundation as to date.
BY THE WITNESS:
A. Not the time or none of that.
BY MR. LOEVY:
**Q. What do you remember the time being when they picked you up that day?**
A. I don't know what time it was. I don't remember the time from 25 years ago. That's not important to me. None --
**Q. How many --**
A. -- of this ever been important to me un- -- until now.
**Q. Did you stay in the police station**

Page 143

**voluntarily from the time you got there until you gave the statement later that night?**
A. Late -- Later that -- Later -- Wait a minute.
**Q. You got picked up --**
A. Later what --
**Q. -- at your --**
A. -- night?
**Q. You got picked up at your in-laws' that morning, right?**
A. Right.
**Q. And then at some point, you give a statement to the state's attorneys?**
A. In the -- That morning.
**Q. You thought it was --**
A. It was still morning.
**Q. -- the same morning?**
A. It was morning. When they got me back, it was still day -- When they got me back home, it was still daytime.
**Q. So how long do you remember being in the police custody?**
A. Oh, probably about an hour and a half to two hours.

Page 144

MS. EKL: And I'm going to object to -- I didn't want to cut him off because he'd already started answering, but my objection is that your question assumes facts not in evidence.
BY MR. LOEVY:
**Q. All right. So let's just make sure we're saying the same thing.**
A. Mm-hmm.
**Q. You're sitting at your in-laws' house, and the police come by and say, "We wanna talk to you" --**
A. Mmm.
**Q. -- right?**
A. Mm-hmm.
**Q. And you didn't necessarily want to go, but you didn't feel like you had a choice?**
A. Nah. That's not what happened.
**Q. All right. Tell me what happened.**
A. What happened is -- is that they -- they -- they -- they -- they knew where I was and they -- they said that in the future, they might have to come and get me and -- and talk to me over again at the station. And then after some -- some weeks passed, they came, picked me

up.
**Q. That's what I want to ask you about --**
A. They came --
**Q. -- when they picked you up.**
A. When they picked me up, they -- they took me back on the North Side to the police precinct. They took me in the room. They -- They didn't Mirandize me. I know that, but they did ask me questions again about what happened and that. And then -- then they say, "Would you take a lie detector test?"
And I say, "Yes."
**Q. Okay. What time do you remember them picking you up?**
MS. EKL: Objection --
THE WITNESS: I don't remember --
MS. EKL: -- asked and answered.
BY THE WITNESS:
A. -- what time it was or day it was, but I know it was morning. It was, you know, some early p.m. --
BY MR. LOEVY:
**Q. All right.**
A. -- late a.m.



**Q. This is the time when you said you didn't feel like you had a choice to go with them?**
**Did I get that accurately?**
MS. EKL: Object- -- Objection, form, foundation.
THE WITNESS: Pardon me?
BY MR. LOEVY:
**Q. Is this --**
MS. EKL: Misstates his testimony.
BY MR. LOEVY:
**Q. When you testified you didn't feel like you had a choice to come with the police earlier, is this the time we're talking about?**
A. Did I say that?
**Q. The court reporter is writing it down.**
**Did you say that?**
A. Did I say that?
MR. LOEVY: She's not --
THE WITNESS: Did I answer --
MR. LOEVY: -- allowed to answer you.
THE WITNESS: -- I didn't feel like I had a choice?



BY MR. LOEVY:
**Q. Let me ask the question.**
**Did you feel like you had a choice?**
A. No, not really. I was supposed to do what I -- Yeah. The police was wanting to talk to me and I need to go talk to the police. I can't just say, "I don't want to talk to you-all."
**Q. All right. At some point, you gave a handwritten statement to the state's attorneys that we've been talking about.**
**Do you remember doing that?**
A. I -- I wrote a statement out?
**Q. No. This is the statement we went through earlier. They wrote it out, and then they said --**
A. Uh-huh.
**Q. -- they treated you well, and they read it to you, and then you signed it.**
**Do you remember doing any of that?**
A. I -- I don't -- I prob- -- I -- Not really. I don't remember how that went down, but I -- I believe that that could be accurate.
**Q. Do you -- Did it happen, or it didn't**



**happen, or you don't remember?**
A. I don't remember. I don't remember, you know --
**Q. How long --**
A. -- a lot of things.
**Q. -- were you in the police custody until you gave a statement and signed it?**
MS. EKL: Objection to -- to the phrase "custody," form.
BY THE WITNESS:
A. Probably about a -- an hour and a half, two hours. I -- It may have been three hours. It -- You know, it wasn't long.
BY MR. LOEVY:
**Q. Were you free to leave?**
MS. EKL: Objection, form, foundation.
BY THE WITNESS:
A. I'm not sure.
BY MR. LOEVY:
**Q. I mean, could you have -- Is it your understanding you could have said, "Guys, I don't" --**
A. No, nah. I wasn't free to leave. I, you know, had to do what I had to do.

Page 149

**Q. How long --**
A. When the police -- When the police is asking you questions, you need to an- -- you know, answer the questions. It -- You know, why would I leave? Why would I want to leave from the police, you know, if I did -- I ain't did nothing wrong?
**Q. All right. The -- the report says that you fist got interviewed by a Detective Thompson on the 22nd of July at 11:15 in the morning. That's what it says.**
**Do you dispute that, or you're going to have to defer to that?**
A. I'm not sure. That -- that -- that -- Okay. I'm not sure. I don't remember --
**Q. All right.**
A. -- when that happened.
**Q. If you don't remember, you don't remember.**
A. Right.
**Q. How many hours went by until you first -- Well, let me strike that.**
A. Mm-hmm.
**Q. The police were asking you, "Hey, did**

Page 150

**you do it," right?**
MS. EKL: Objection, foundation, as to when that question --
THE WITNESS: They --
MS. EKL: -- allegedly took place.
BY THE WITNESS:
A. I don't think they ever did ask me that.
BY MR. LOEVY:
**Q. They were asking you where you were during the murder?**
A. Right.
**Q. And they asked you to take a lie detector test?**
A. Right.
**Q. And at the lie detector test, they asked you, "Did you kill Mr. Van Vo," right?**
A. Yeah.
**Q. All right. How many hours after you first got to the police station until you first said, "Oh, I think Carl Reed might have had something to do with it"?**
A. I don't know.
MS. EKL: Objection, form, assumes facts --

Page 151

BY THE WITNESS:
A. I don't know.
MS. EKL: -- not in evidence.
BY MR. LOEVY:
**Q. Did you say it right away?**
MS. EKL: Objection, form, assumes facts --
THE WITNESS: I'm not sure.
MS. EKL: -- facts not in evidence.
BY THE WITNESS:
A. A lot of that seems irrelevant.
BY MR. LOEVY:
**Q. How many hours do you think went by til you first mentioned this thing about Carl Reed supposedly being in the apartment?**
MS. EKL: Objection, form.
BY THE WITNESS:
A. I'm not sure.
BY MR. LOEVY:
**Q. Would you have mentioned it right away?**
A. I'm not --
MS. EKL: Objection, form.
THE WITNESS: -- sure.
MS. EKL: Calls for speculation.

Page 152

BY THE WITNESS:
A. I'm not sure.
BY MR. LOEVY:
**Q. Any reason you would have held back that you supposedly saw Carl Reed --**
A. No.
**Q. -- going in and out --**
A. No reason.
**Q. -- of the apartment?**
A. No reason.
**Q. All right. If you first started talking to the police at 11:15, do you have any idea why it was you didn't give a statement describing Carl Reed going in and out of the apartment until 1:00 a.m. the next morning?**
MS. EKL: Objection, form, misstates --
THE WITNESS: 1:00 a.m. --
MS. EKL: -- misstates the evidence.
THE WITNESS: -- the next morning?
BY MR. LOEVY:
**Q. 1:00 a.m. the next morning.**
MS. EKL: Misstates the evidence.
BY THE WITNESS:
A. That's -- That can't be right.

BY MR. LOEVY:
**Q. Well --**
A. That can't be right. I never talked to no police at no 1:00 a.m. in the morning.
**Q. Well, I can't show it to you because you can't read it, but -- because of your eyes.**
A. Right. That -- That -- That's crazy.
**Q. It says, "DeLong" --**
A. I don't even remember being with the police that late.
THE COURT REPORTER: Sorry? Could you repeat that?
THE WITNESS: Huh?
BY MR. LOEVY:
**Q. You said, "That's crazy. I don't remember being with the police that late?"**
A. I don't remember being at [sic] there with no 1:00 a.m. in the morning.
**Q. All right. The statement of DeLong Reed that has this business about --**
A. Right.
**Q. -- Carl Reed going --**
A. I --
**Q. Listen, let me --**



A. I don't -- denying that --
**Q. -- ask the question.**
THE COURT REPORTER: Sorry?
BY MR. LOEVY:
**Q. Let me ask it.**
A. Mm-hmm.
**Q. This statement that has this business about Carl Reed going in and out with the -- of the apartment --**
A. Mm-hmm.
**Q. -- of the victim, it is dated July the 23rd at 1:00 a.m.?**
A. Right. That's --
**Q. 1:00 in the morning --**
A. -- a shocker --
**Q. -- about --**
A. -- to me.
**Q. All right. Let me just ask the question.**
A. Mm-hmm.
**Q. 1:00 in the morning, about 14 hours after you first started talking to the police.**
**Do -- do you dispute that?**
MS. EKL: Objection, form.



BY THE WITNESS:
A. I don't know.
BY MR. LOEVY:
**Q. Why would it have taken 14 hours til you're ready to give that statement?**
MS. EKL: Objection, form. It misstates the evidence, argumentative.
BY THE WITNESS:
A. I gave that statement already to my property manager.
BY MR. LOEVY:
**Q. All right. Well, why did it take 14 hours, to your knowledge --**
A. A lot was going on, I guess.
**Q. Were you ready to give that statement immediately when you first got taken to the --**
A. Sure.
**Q. -- station?**
**So then why did 14 hours go --**
A. I don't --
MS. EKL: Objection --
BY MR. LOEVY:
**Q. -- by?**
MS. EKL: -- form.



THE WITNESS: I'm not sure.
MS. EKL: Assumes --
THE WITNESS: Because there's --
MS. EKL: Misstates the --
THE WITNESS: That's -- that's probably --
MS. EKL: -- evidence.
BY THE WITNESS:
A. It probably took them 14 hours to ask me -- to ask.
BY MR. LOEVY:
**Q. Did you --**
A. It probably took them 14 hours to ask. It didn't take me 14 hours to go running off at the mouth.
**Q. During that 14 hours, did you feel that you -- maybe you were going to get in trouble if you didn't tell them something?**
A. I probably did feel I was a little durrested [sic], yeah, because --
**Q. You felt --**
A. -- of the situation.
**Q. -- like, you --**
A. I probably did feel a little, you know, shaken up.

Page 157

**Q. Did you feel like you'd been arrested?**
A. No. I said durrested.
**Q. Oh. Durrest?**
A. Yeah.
**Q. As a verb, okay.**
**Because you had the business where you and the victim did share the same bathroom and had access to the --**
A. Right.
**Q. And they were --**
A. Right.
**Q. -- asking you --**
A. Right. I had to clear myself. I'm like, "Hey, I ain't do nothing," you know.
**Q. So then you started telling them, "Hey, Carl Reed was the guy in his apartment," right?**
A. That --
MS. EKL: Objection, form.
BY THE WITNESS:
A. That -- Carl Reed was the guy in the apartment, yes.
BY MR. LOEVY:
**Q. Did they ask you if they could search your apartment?**

Page 158

A. No.
**Q. All right. Have you reviewed as part of your preparation for the deposition a consent to search form?**
A. No. I don't remember that, but I -- I -- I was -- I -- You know, really, you know, when -- when the property manager told me I had to leave, I -- I felt that, okay. They gonna search my apartment.
**Q. Do you remember signing for the police --**
A. No.
**Q. -- permission to search --**
A. No.
**Q. -- your apartment?**
A. No.
**Q. Any reason why you would have --**
A. I don't --
**Q. Let me --**
A. I wouldn't --
**Q. -- ask the --**
A. I don't --
**Q. -- question.**
A. I don't remember.

Page 159

**Q. You've got to let me ask the question.**
A. Mm-hmm.
**Q. Any reason why the police would have wanted to search your apartment?**
MS. EKL: Objection, form, foundation.
BY THE WITNESS:
A. Probably because I -- I could have did it and because, like you said earlier, I live next door to him and we share a bathroom, you know. Probably that.
BY MR. LOEVY:
**Q. Were -- Do you --**
A. For that reason.
**Q. Were the police making you feel like maybe you were going to get in trouble?**
MS. EKL: Objection to form, asked and answered.
BY THE WITNESS:
A. No.
BY MR. LOEVY:
**Q. No. They weren't making you feel like that?**
A. No.
**Q. You thought you were just a witness?**

Page 160

A. Right.
**Q. All right. But did you think you had to give them something?**
A. No.
**Q. Did you think if you couldn't help them at all, they might look at you as a --**
A. No.
**Q. -- suspect?**
**That didn't even cross your mind?**
A. They was pretty nice.
**Q. It -- Did it even cross your mind that unless you gave them something that might help their investigation --**
A. Nah.
**Q. -- they might start looking at you?**
A. Maybe once or twice that may have crossed my mind, but I didn't feel like they was coming hard on me or anything. They was like -- You know, they was -- They was pretty cool, the police.
**Q. They told you about Carl and the car.**
**Did you tell me and Ms. Ekl before the deposition started that the police told you about Carl and the car and the drug dealers?**

Page 161

MS. EKL: Objection, form.
BY THE WITNESS:
A. No, no, no. The -- the -- the po- -- What the police did tell me was that they had talked to the drug dealers already and -- and they -- and they -- and they was -- had to go before a grand jury, I think.
BY MR. LOEVY:
**Q. About the car?**
A. Yeah, about the car and what did they -- who did they get it from --
**Q. So --**
A. -- or something like that.
**Q. So the police were telling you that they had this theory that the drug dealer was saying Carl had stolen the car or something like that?**
MS. EKL: Objection, form.
BY THE WITNESS:
A. No. That -- You know, that -- that he was -- That he was gonna let them use it for drugs.
BY MR. LOEVY:
**Q. That who was gonna?**

Page 162

A. Carl.
**Q. So the police told you that Carl was gonna let the drug dealers use the victim's car for drugs?**
A. Yeah. I think that that's how that came about, and that they was -- You know, I was saying, "Did you-all got some more witnesses?" And I -- You know, it was like that.
**Q. And you told me and Ms. Ekl that before the deposition in that room over there, right?**
A. Yeah, I think so.
**Q. All right.**
A. I don't remember how everything went, though.
**Q. Which --**
A. That's why I say this is so crazy.
**Q. Which police officers --**
A. This is crazy.
**Q. Just crazy.**
A. This --
**Q. Which police officers told you that Carl might have had the --**
A. I don't know.
**Q. -- victim's car?**

Page 163

A. I'm not sure.
**Q. Why were --**
A. I'm not sure.
**Q. -- the police telling you that -- that Carl Reed might have had the victim's --**
A. Because I asked --
THE COURT REPORTER: Sorry --
BY THE WITNESS:
A. I asked, did -- did -- did they talk to the -- to -- to the -- the little guys in the neighborhood that he was getting drugs from.
BY MR. LOEVY:
**Q. Who was getting drugs from?**
A. Carl.
**Q. I see.**
**And the police told you that the car -- that they had a reason to think Carl had the victim's car?**
A. Yeah.
**Q. All right. Did that make you think that the police were suspecting Carl?**
A. Yeah.
**Q. All right. Did you say, "Hey, good news. I saw Carl in the apartment"?**

Page 164

A. I don't know which came first, the chicken or -- I just told you that. I don't know, you know, what I said first, what I said second, or I said third, you know.
**Q. So it's possible that you didn't tell the police, "Hey, I saw Carl in the apartment" until after the police told you, "Hey" -- the drug dealers and the car and Carl Reed? That might --**
A. It --
**Q. -- have happened?**
A. -- might, maybe.
**Q. All right. Did you think that unless you cooperated with the police, you were going to be in trouble?**
A. Sure. That -- that's -- that's -- that's how the law goes usually.
**Q. All right. Do you have any memory of just sitting waiting, you know, during the time you were in the police station?**
A. I sat on the side of my bed. They had told me to sit in -- in -- in my apartment while they was in Mr. Van Vo's apartment. And that lasted for probably like 20 minutes, and then

Page 165

they told me that I could leave. I went downstairs to talk to the property manager. And that's when she told me that I had to -- to find somewhere to be, and that's when I was, like, crying. Like, "Why do I got to leave, you know, because somebody did something to somebody?"

They was like, "We don't want, you know, trouble in the building, you know, that" -- you know.

And I was like --

**Q. Did you feel like the --**

A. -- you know, what's going on?

**Q. Did you feel like the --**

A. It was just crazy.

**Q. Did you feel like --**

A. It was crazy.

**Q. -- the building was blaming you, the --**

A. Huh?

**Q. -- property manager?**

**Did you feel like the building manager -- the property manager was making it feel like it was your fault?**

A. When she -- when she -- when she did tell me that I had to leave, I -- I felt like

Page 166

that, but I think, like, later on that day when I got back to -- to my granny house, I -- I -- I started, like, Well, it is -- He do know people in the neighborhood. He's been there longer than me, you know, and somebody would -- may try to want to hurt me like she said. So I -- I kind of agreed --

**Q. All right.**

A. -- you know, with it and said, Well, I just gotta get another place to say.

THE VIDEOGRAPHER: Excuse me. Mr. Reed, could you please not touch the microphone?

THE WITNESS: Oh, I'm sorry.

THE VIDEOGRAPHER: That's okay.

THE WITNESS: I'm sorry.

BY MR. LOEVY:

**Q. All right. What I was actually asking you, how -- Well, when you were in the police custody -- You get arrested sometime that morning and you give a statement at 1:00 a.m. the next day.**

A. I don't --

**Q. Was there waiting time --**

A. I was just --

Page 167

MS. EKL: Hold on. Hold on. Let me -- Let me object. I object --

THE WITNESS: Right.

MS. EKL: -- to -- to the way -- the form of that question, specifically the context of you saying that he was being arrested and was in custody.

THE WITNESS: Right.

MR. LOEVY: I don't think I said "arrested." I said "in custody."

BY MR. LOEVY:

**Q. You were in the police --**

UNIDENTIFIED SPEAKER: Yeah, you said --

BY MR. LOEVY:

**Q. -- custody, right?**

A. No.

MS. EKL: We can have it --

BY THE WITNESS:

A. I wasn't arre- -- I wasn't ever arrested.

BY MR. LOEVY:

**Q. All right. But you were in their custody?**

A. I was in their custody. That -- And

Page 168

that -- that was like, ah, from weeks afterwards --

**Q. Right.**

A. -- I think, yeah.

**Q. Well, I'm talking about weeks after. The --**

A. Mm-hmm.

**Q. -- police report says you start getting interviewed -- It says they picked you up at 5213 South Indiana. They located --**

A. Okay.

**Q. -- you. They brought you to the station, and then they started inter- -- in- -- you know, interviewing you or interrogating you --**

A. Interviewing.

**Q. -- at --**

MS. EKL: And I'm --

BY MR. LOEVY:

**Q. -- 11:15 a.m.**

MS. EKL: I object to you purporting to read from the -- from this statement or from this police report but not actually reading the words that are on the page.

Page 169

BY MR. LOEVY:
**Q. Well, I don't know that I have to indulge that objection, but I will read it verbatim.**
**"R/D's then proceeded to 5213 South Indiana to locate DeLong Reed." Then there's a paragraph about them reading you your rights and transporting you back to Area 3.**
MS. EKL: And, again, I object --
MR. LOEVY: And on the next line -- Let me --
MS. EKL: You're --
MR. LOEVY: -- finish.
MS. EKL: You're skipping over the sent- --
MR. LOEVY: I'm skipping all kinds of stuff, Beth. This is a long police report.
BY MR. LOEVY:
**Q. And then it starts on -- 11:15 a.m., Detective Thompson -- and it notes an interview that he did with DeLong Reed. And in between, it says you were advised of your constitutional rights. It says you understood your rights and waived them. It says the interview was summary and not verbatim. Dates and times were approximations, and then it says at 11:15 a.m.**

Page 170

**it starts the interview.**
**Does that refresh your recollection to the timing?**
A. Not really. I remember them just picking me up, taking me to the police station, and asking me some questions.
**Q. Do you remember when the lie detector came into it?**
A. Yeah. That wasn't long after I was at the police station.
**Q. All right. And that -- Do you remember what -- how many hours you were in custody before they started asking you --**
A. Uh...
**Q. Now, let me ask the question.**
A. Mm-hmm.
**Q. Do you remember how many hours you were in custody until they started asking you in the lie detector room if you had killed Mr. Van Vo?**
MS. EKL: Objection, form.
BY MR. LOEVY:
**Q. How many hours had gone by?**
A. I don't know.
**Q. What's your best rec- --**

Page 171

A. I don't know.
**Q. -- estimate?**
A. Probably an hour. Probably an hour probably went by.
**Q. All right. Would it refresh your recollection --**
A. I don't know what --
**Q. -- if the polygraph documents say that it was at --**
A. Uh...
**Q. -- 1400, which is 2:00 p.m.?**
**Would you defer to that?**
A. I -- I -- I don't know. I wouldn't know. I hate this. This --
**Q. But --**
A. -- sucks. I hate this.
**Q. Really unfair.**
**Isn't it?**
A. It is.
**Q. Are you still claiming you saw Mr. Reed going in and out of the victim's --**
A. Yeah.
**Q. -- apartment?**
MS. EKL: Objection --

Page 172

BY MR. LOEVY:
**Q. All right. Then --**
MS. EKL: -- form. You're -- you're completely badgering him at this point. Come on. Just ask --
BY MR. LOEVY:
**Q. -- sir --**
MS. EKL: -- questions that are proper.
BY MR. LOEVY:
**Q. -- it's not badgering if you're sitting here saying you saw a man leave the apartment of a man who got murdered. Then you have to answer questions about it. If you're not sure, you're not sure. You're going to claim it? Then the -- I've got questions.**
**Did they let you use the bathroom when they were asking you these questions, the police?**
A. I'm not sure.
**Q. Did you have access to the drugs to which you were addicted while you were in there?**
MS. EKL: Objection. In where?
BY MR. LOEVY:
**Q. In the police station during that 12,**

Page 173

**14 hours.**
A. Pardon me?
**Q. Did you have access to the drugs to which you were addicted during the 14 hours you were in police custody?**
A. Of course not.
**Q. Did that create problems for you?**
MS. EKL: Objection, form.
BY THE WITNESS:
A. Not really.
BY MR. LOEVY:
**Q. It wasn't like that?**
A. Crack don't work like that.
**Q. All right. I'll take your word for it.**
**At this point, you had been to prison before, right?**
A. Yeah.
**Q. How many years had you been in prison?**
A. I was -- Five years.
**Q. You did not want to go back to prison, did you?**
A. No, man.
**Q. Especially for something you didn't do, right?**

Page 174

A. Exactly.
**Q. You did not kill this man?**
A. No.
**Q. You did not want to be accused of killing this man?**
A. No.
**Q. And you didn't want to have the police think you did?**
A. No.
**Q. Did you feel any pressure to give the police information about somebody else?**
A. No.
**Q. Did the police tell you Carl Reed was in another interrogation room in the station?**
A. They let me see him, actually.
**Q. All right. Before they let you see him, did they tell you about him?**
A. They -- they told me he's -- he's in there and I -- They -- They -- No. When they -- when -- when they was fixing to bring me home after the -- the lie detector test was over and everything and they told me that he's in the -- in the little room and I asked them, "Can I see him?"

Page 175

**Q. Was it your idea to see Carl Reed or their idea?**
A. It was my idea.
**Q. You sure?**
A. Yeah. I -- Yeah.
**Q. What were you thinking?**
A. I -- I wanted -- I -- I -- I wanted to see, like, you know, how -- how could you do something like this, you know? I -- I -- I just wanted to see him in there and -- and just -- You know, and it -- it -- Shh... I don't know what I was thinking.
**Q. Is it the police's idea that they were trying to --**
A. No, no.
**Q. No? Not the police's --**
A. It was my idea.
**Q. All right. Did the police tell you that Carl said that you were lying?**
A. No.
**Q. All right. I'm going to --**
A. Not that I remember that.
**Q. I'm going to see if I refresh your recollection with the police report.**

Page 176

**On page 16 of my version, which is Bates CITY-REED-000492 --**
A. Oh, Lord.
**Q. -- I'm going to read to you this line here.**
MS. EKL: That's your water.
THE WITNESS: It's open?
MS. EKL: Yeah. I opened it for you.
THE WITNESS: Okay.
MS. EKL: Yeah.
THE WITNESS: Thanks. Thank you.
MS. EKL: You're welcome.
BY MR. LOEVY:
**Q. At 11:45 on July 22nd, it says, "Carl Reed stated that DeLong was lying."**
**Do you have any memory if the police told you that?**
A. No. I remember Carl saying that.
THE COURT REPORTER: Sorry. Could you repeat --
MR. LOEVY: "I remember Carl saying" --
BY THE WITNESS:
A. I remember Carl saying that to me when the police let me see him.

Page 177

BY MR. LOEVY:
**Q. He said, "You're lying"?**
A. Yeah. He said, "You -- You lying. You lying. You know you killed that man."
And I was like, "He's disgusting. Why you -- I was like, How could you, you know, do this?"
And then they pulled me out the room, and they took me back to the South Side.
**Q. So you said he said, "You know you killed that man?" He said that?**
A. Yeah. He said --
**Q. In front --**
A. -- it.
**Q. -- of the police?**
A. In front of the police.
**Q. In front of the police --**
A. In front --
**Q. -- Carl Reed --**
A. -- of the police.
**Q. Hold on. Let me -- In front of the police, Carl Reed accused you of being the murderer?**
A. Yeah. And that -- I -- My stomach just

Page 178

flipped. I was -- I was sunk. I was like, "Whahh. You know, I done know he didn't just say that." You know?
**Q. I'd imagine.**
A. I -- I was, like, dumfounded.
**Q. So you -- They got --**
A. How...
**Q. The police have you and Mr. Reed in separate rooms, and you guys are both accusing each other of doing this?**
MS. EKL: Objection.
BY MR. LOEVY:
**Q. Is that -- Was that what was happening?**
MS. EKL: Objection, form, if you're asking him what Carl Reed was --
THE WITNESS: I don't know what --
MS. EKL: -- saying to the police outside his presence.
BY THE WITNESS:
A. I don't know if they was questioning him at the time. It -- It really -- Where they had him at, it was like he was in a little holding area.

Page 179

BY MR. LOEVY:
**Q. Different than yours?**
A. And where they -- Right. Where they had me at it was like a desk and chairs and that --
**Q. All right.**
A. -- where they was questioning me at and where I took the lie detector at. Where they had him at, it was, like, a little bench on the wall, a little -- just a bare room. So I don't think they was in there questioning him --
**Q. All right.**
A. -- at all.
**Q. Wherever he was, he was saying, "DeLong did it," and where you were, you were saying, "Carl" --**
A. He was thinking --
**Q. -- "did it"?**
MS. EKL: Objection --
THE WITNESS: He was thinking --
MS. EKL: -- foundation.
BY THE WITNESS:
A. See, the po- -- When the -- Where they -- Where they had him at, wasn't no police

Page 180

in there with him. He was in, like, a holding area, and -- and they -- When they brought me from this room and -- and over across the floor, you know, I was like, "Can I see him?" And -- and they -- "Okay."
And they opened the door. I -- And I -- and I kind of got the feeling that they wanted to see what was going to go on, you know, how -- You know, they -- You know, they -- they wanted to see what I was going to say or what Carl would say. And then I opened the door, and I was like, "Carl."
And he was like, "Man, you know you killed that man. You know you killed that man."
And my -- I was like, "Whooh." Yeah, I was like, "Uhh, man."
BY MR. LOEVY:
**Q. Talking about -- So how did that make you feel?**
MS. EKL: Wait. Hold on. Hold on. I -- I am --
THE WITNESS: That is scary.
MS. EKL: I don't want to talk -- Hold on one second. I don't want to talk over anyone. So I

Page 181

have to pose my objection from the last question, which is I object based on foundation to any questions about what the police were saying to Carl Reed or Carl Reed was saying to the police outside of this witness's presence.
MR. LOEVY: Okay.
MS. EKL: Sorry.
BY MR. LOEVY:
**Q. All right. So the police report says, "Carl Reed stated that DeLong was lying." "The R/D's then brought DeLong Reed into the interview room that Carl Reed was in."**
**Does that refresh your recollection that Reed actually was in an interview room?**
A. No. I -- It looked like a holding area.
**Q. Okay.**
A. Mm-hmm.
**Q. When they brought you in there with Reed, Reed basically said you did it.**
**You, DeLong Reed, did it?**
A. Basically.
**Q. And then you said Reed did it?**
A. Huh?

Page 182

**Q. You told the police that --**
A. Nah. I --
**Q. -- Reed did it?**
A. No. I said, "You is disgusting." And I think I -- I said something to that effect. I was like, "You" -- I was like, "Uhh..." You know, I was like, "Ohh." Or I -- You know, I was like, "How could you do this?" It's -- Like, it's -- it's -- was crazy to me. It -- It was -- It upended my world. Does -- You know what I'm saying?
**Q. To be falsely accused?**
A. It -- It really -- It was something big, and I was like, "Uh..." You know, it'll be like -- "I'm glad when this is over," you know.
**Q. Yeah.**
A. So --
**Q. I mean, you felt disgusted to be falsely accused of a murder?**
A. Yeah.
**Q. And you were disgusted with Carl --**
A. And I was --
**Q. -- Reed?**

Page 183

A. And I -- Yeah, yeah.
**Q. So did you have any problem telling the police, "You know what? I saw Carl Reed going in and out of the apartment"?**
**Did that --**
A. No. I didn't have -- I wouldn't have no problem with that. I wouldn't have no problem with that.
**Q. Because you were disgusted with Carl Reed --**
MS. EKL: Objection, form, foundation.
BY MR. LOEVY:
**Q. -- right?**
A. Pretty much.
**Q. You don't know if the police told Carl Reed that you did it, do you?**
**You don't know either way?**
A. Mm-umm.
**Q. You don't know if Carl Reed made this up out of his head or if the police told him --**
A. No.
**Q. -- that?**
A. The only thing I know -- The only time I ever saw him tell and -- you know, and the

Page 184

police that I did it was when they opened the door, and he said, "You know you killed that man. You know you did it."
And he was, you know, sitting on a bench. And I was like, "Uh..." You know, I was just distraught, you know --
**Q. But you don't know --**
A. -- off the --
**Q. -- what the police --**
A. -- map or something, you know.
THE COURT REPORTER: Sorry? I couldn't hear you.
BY THE WITNESS:
A. I -- I was -- No. I was, like, you know, just showing him I -- You know, I was mad at him, you know.
BY MR. LOEVY:
**Q. But you don't know what the police said to Carl that got him to say that?**
MS. EKL: Objection, form, assumes facts not in evidence.
BY THE WITNESS:
A. I would hope not anything. I don't --

BY MR. LOEVY:
**Q. But you don't know?**
A. I don't know.
**Q. All right. Carl was a little bit off, wasn't he?**
**Would you agree?**
MS. EKL: Objection --
BY THE WITNESS:
A. Hmm?
MS. EKL: -- form.
BY MR. LOEVY:
**Q. Do you remember Carl -- Do you remember Carl Reed?**
MS. EKL: Objection, form and --
BY THE WITNESS:
A. He was what?
MS. EKL: -- and foundation.
BY MR. LOEVY:
**Q. Do you remember Carl Reed?**
A. Pretty much. I know he was my neighbor, he had diabetes, and, you know --
**Q. Do you remember he was a bit off?**
MS. EKL: Objection, form, foundation.



BY THE WITNESS:
A. Off?
BY MR. LOEVY:
**Q. Yeah.**
A. I didn't see nothing wrong him.
You're talking about mentally?
**Q. Yeah.**
A. Nah.
**Q. Did you interact with him ever?**
A. Well, just -- He'd been in my apartment before, and I sent him to the store, you know, a couple of times, you know, quite a few times, and I stopped sending him to the store. I told him -- One time I sent him to the store he didn't come back and -- But he seemed like he a normal-thinking person to me.
**Q. But you didn't have a whole lot of interaction with him.**
**Is that accurate?**
A. Nah.
**Q. So you didn't notice he was mentally ill?**
MS. EKL: Objection, form, foundation.



BY THE WITNESS:
A. No.
BY MR. LOEVY:
**Q. Did you notice anything about his intelligence or his --**
A. No.
**Q. Nothing like that?**
A. No.
**Q. You just didn't know him that well?**
A. He just --
MS. EKL: Objection, form.
BY THE WITNESS:
A. I didn't know him that well, but I -- I think I knew him well enough that -- that I judged him to be a -- a normal person that you might see in the grocery line. You know, "Hey, how you doing?" You know, "Hey, could you pass me those chips?" You know, like that, be a normal person. I ain't -- I ain't never seen him do anything off.
BY MR. LOEVY:
**Q. All right. So I want to bring you back to the police bring you into the room where Carl is and Carl says, "You know you did it."**



**Did you -- did you say, "Carl, you know you did it"?**
A. No. I just said, you know, "You" -- You know, "You make me sick. You disgust me." And, you know, "You -- I hope you get what's coming to you," pretty much. And then the police pulled me on out the room --
**Q. All right. Why --**
A. -- and took me home.
**Q. Why did so much time go by between then and you giving this statement at 1:00 in the morning saying that you saw Carl Reed --**
A. I don't remember the --
**Q. You've got to let me ask the question.**
A. -- anymore.
**Q. You've got to let us ask the question.**
**Why did so much time go by between this confrontation with Carl when he said you did it and then 1:00 in the morning when you give a statement and it says, "Oh, I saw Carl coming in and out with the speakers"?**
MS. EKL: Objection, form.
BY MR. LOEVY:
**Q. Do you know why so much time went by?**

Page 189

MS. EKL: Objection, form, foundation, misstates the evidence.
BY THE WITNESS:
A. I don't remember ever -- ever talking to the police at 1:00 in the morning. I -- In -- In my mind, all my interactions with the police were in the a.m. hours, in -- in the daylight hours. I don't remember anything in the --
BY MR. LOEVY:
**Q. Do you have any explanation at all for why the statement is signed at 1:00 in the morning on the 23rd of July?**
A. No.
**Q. You think that's wrong?**
A. Yeah. I think it's wrong because I don't ever remember being with the police at 1:00 in the morning when it's dark outside. No.
**Q. Would there have been any reason for you to be in the police station at 1:00 a.m. if you got picked up at -- the morning the day before?**
MS. EKL: Objection, form, foundation.

Page 190

BY THE WITNESS:
A. Nah. I wasn't in the police station. I don't remember it.
BY MR. LOEVY:
**Q. Were you interrogated the whole time?**
MS. EKL: Objection, form.
BY THE WITNESS:
A. What whole time?
BY MR. LOEVY:
**Q. Between when you got picked up sometime before 11:00 a.m. --**
A. Mm-hmm.
**Q. -- brought to the police station, and then 1:00 a.m. the next day when you give the statement, were you questioned the whole time?**
A. Not that I know of. Not that I know of. I'm sorry.
**Q. Do you remember how many hours went by until you first mentioned, "Hey, I saw Carl Reed going in and out of that apartment"?**
A. No, I don't.
**Q. The police asked you about the stereo speakers before you mentioned the stereo speakers.**

Page 191

**Isn't that true?**
MS. EKL: Objection, form.
BY THE WITNESS:
A. I don't remember.
BY MR. LOEVY:
**Q. You don't remember either way?**
A. No.
**Q. I'm going to show you page 10 of the police report.**
MS. EKL: Again, he can't read the police report.
BY MR. LOEVY:
**Q. I'm going to read it to you.**
MS. EKL: Can you make sure that I get to the same spot?
MR. LOEVY: Sure. It's CITY-REED-486.
MS. EKL: I have a different version than you do. So just if you could read the first couple --
MR. LOEVY: It's page 10.
MS. EKL: -- paragraphs.
MR. LOEVY: It's page 10 of my 19. The first full paragraph says, "DeLong Reed stated that the last time..." at the top of the page.

Page 192

MS. EKL: Got it.
BY MR. LOEVY:
**Q. All right. Sir, I am going to read you from the police report. It says, "R/D" -- which means the reporting detective -- "asked DeLong Reed if Mr. Van Vo kept his apartment orderly and if he was aware if Mr. Van Vo might have had a television or stereo equipment in his apartment."**
MS. EKL: Okay.
BY MR. LOEVY:
**Q. I just read you from the police report.**
**Do you remember that?**
A. I don't remember that, but I know he did have a stereo.
**Q. All right. But isn't it true that the police officers asked you about --**
A. I don't remember.
**Q. -- Van Vo's -- I better ask the question.**
**Isn't it true that the police officers asked you about if Van Vo kept stereo equipment in his apartment before you mentioned to the police that you saw stereo equipment?**

Page 193

A. I don't know. I don't remember.
**Q. Well, if -- if the police --**
A. I'm getting -- I'm sorry, sir.
**Q. No. I'm sorry. You were still talking.**
A. I'm -- I'm -- I need -- I'm ready to go home. I'm tired of this. I'm tired of --
**Q. Would you like --**
A. -- of this.
**Q. -- a break, sir?**
A. Huh?
**Q. Would you like a break?**
A. Ah, yeah.
MR. LOEVY: All right. Why don't we take a break?
MS. EKL: Yeah.
THE VIDEOGRAPHER: Okay. The time is 12:45 p.m. This is the end of --
THE WITNESS: Oh, Lord.
THE VIDEOGRAPHER: -- Media Unit 2. And we're going off the video --
THE WITNESS: Jesus Christ.
THE VIDEOGRAPHER: -- record.

Page 194

(Whereupon, a lunch break was taken.)
THE VIDEOGRAPHER: The time is 1:28 p.m. This is the beginning of Media Unit 3. And we're back on the video record.
MS. EKL: This is Elizabeth Ekl. In the course of the deposition -- Well, actually, we took a break for lunch. During the lunch, Mr. Reed conveyed to me some concerns that he believes he may need a lawyer or feels like he may want to explore having a lawyer for the remainder of the deposition based on the first half of the deposition.
The parties have conferred based on this and have attempted to reach out to the Court but have not heard back yet at this time. So we are going to be by agreement of the parties basically --
MR. LOEVY: Well, that skips a step.
I mean, this dep is --
BY MR. LOEVY:
**Q. Mr. Reed, I would like to keep asking you questions, but you have expressed a concern for your legal rights, and you have asked if we**

Page 195

**could get you a -- an appointed lawyer. We tried to call the Court to see --**
A. Mm-hmm, mm-hmm.
**Q. -- how the Court wanted to guide us in that. We couldn't succeed. I am asking if you would like -- I would like to keep asking you questions, but if you're saying to us that you don't feel comfortable without a lawyer, then we're going to respect that, but I am requesting --**
A. And should I be --
THE COURT REPORTER: Sorry. At the same, I can't --
THE WITNESS: Oh, I'm sorry. I apologize.
BY MR. LOEVY:
**Q. So, in other words, it's your choice. I -- I would like to proceed, but I'm not going to force you to proceed if you don't want to proceed, but I would like to proceed. And if you're saying, "With all due respect, Mr. Lawyer, I think I'd like to get a lawyer and I don't want to answer further questions," we're going to respect that, but you're driving this here, not the lawyers. We're not canceling it.**

Page 196

MS. EKL: So, Mr. Reed, is it your -- is it your --
THE WITNESS: I'm -- I'm scared.
MS. EKL: Would you like to continue with the deposition, or would you like us to basically take a --
THE WITNESS: I am too -- It -- It's scary. I don't -- I don't know why I'm -- why I'm scared or if I should be scared, but it's really scary and to just go over this stuff again, and some of this -- You know, I -- I feel like it's haunting me from 25 years ago. And -- And -- And it's not -- And -- And I guess it's a chance that I could be prosecuted for something, you know, and -- and that's scary.
That -- that's life-changing, and I -- I can't -- You know, and everybody else -- Like I said, everybody else in here, it -- you know, knows the law, and I feel like I should have counsel --
MS. EKL: Okay.
THE WITNESS: -- here and somebody just to make sure that everything is -- is -- is -- to say, "Hey, everything was done -- obtained

Page 197

legally and was done right." And I feel like that odd man out.

MR. LOEVY: All right. If you're requesting that we adjourn the deposition so that you can either get one appointed or find your own, then we're going to respect that. And that -- It sounds like that --

THE WITNESS: Thank you so much.

MR. LOEVY: All right. That -- Well, it's your choice, but --

THE WITNESS: Thank you, guys.

MR. LOEVY: -- we just needed you to request it.

All right.

THE WITNESS: Thank you so much.

MR. LOEVY: So that's what we'll do. And I have nothing further.

And I suppose that means we're off the record, unless you guys do?

MS. EKL: Not -- not on this point, no. I am -- I think we've all agreed that we will allow Mr. Reed to go home with the understanding he's still under oath for purposes of the deposition --

Page 198

THE WITNESS: Yes.

MS. EKL: -- and he understands that he will have to come back and complete answering questions, but that we're going to reach out to the Court and try to accommodate his request to talk to the Court.

MS. SULLIVAN: It's agreed.

MS. ITCHHAPORIA: Agreed.

THE VIDEOGRAPHER: The time is 1:31 p.m. This is the end of Media Unit 3. It's also the end of the deposition or at least Part I --

(Loud microphone noise.)

THE COURT REPORTER: Sorry?

THE VIDEOGRAPHER: -- Part I of the deposition of DeLong Reed.

And we're going off the video record.

(Deposition concluded at 1:31 p.m.)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CARL REED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 23 C 7186 |
| | ) | |
| RICHARD ZULEY; TIMOTHY THOMPSON; the CITY OF CHICAGO; COOK COUNTY STATE'S ATTORNEY; NANCY GALASSINI ADDUCI; and COOK COUNTY, | ) | |
| | ) | |
| Defendants. | ) | |

I, DeLONG REED, state that I have read the foregoing transcript of the testimony given by me at my deposition on July 17, 2025, and that said transcript constitutes a true and correct record of the testimony given by me at said deposition except as I have so indicated on the errata sheets provided herein.

______________________________

DeLONG REED

No corrections (Please initial)_______________________

Number of errata sheets submitted________________(pgs.)

SUBSCRIBED AND SWORN to Before me this _____ day of ______________, 2025.

____________________________
NOTARY PUBLIC

UNITED STATES OF AMERICA )
NORTHERN DISTRICT OF ILLINOIS )
EASTERN DIVISION ) SS.
STATE OF ILLINOIS )
COUNTY OF COOK )

I, Kari Wiedenhaupt, Certified Shorthand Reporter, do hereby certify that DeLONG REED was first duly sworn by me to testify to the whole truth and that the above deposition was reported stenographically by me, and reduced to typewriting under my personal direction.

I further certify that the said deposition was taken at the offices of Burns Noland LLP, 311 South Wacker Drive, Suite 5200, Chicago, and that the taking of said deposition commenced on July 17, 2025, at 10:25 a.m.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, nor financially interested directly or indirectly in this action.

The signature of the witness, DeLONG REED, was reserved by agreement of counsel.

Witness my signature as a Certified Shorthand Reporter in the State of Illinois, on July 24, 2025.

KARI WIEDENHAUPT, CSR
161 North Clark Street
Suite 2060
Chicago, Illinois 60601
Phone: 312.361.8851

CSR No. 084-004725

**A**

**a.m** 1:21 5:4,10 63:23 82:13,18 107:11 145:24 152:15,17,21 153:4,18 154:12 166:20 168:20 169:17 169:24 189:7 189:20 190:11 190:14 200:16
**Aberdeen** 2:3
**ability** 131:11
**able** 61:7 62:8 62:12 63:2 97:3 113:23
**Absolutely** 116:17
**acc-** 70:18
**access** 58:19 70:18 71:24 157:8 172:20 173:3
**accommodate** 198:5
**accurate** 114:20 115:10 116:5 147:23 186:19
**accurately** 146:4
**accused** 127:19 129:17 131:22 174:4 177:22 182:12,20
**accusing** 178:9
**action** 200:22
**actual** 55:6
**addict** 12:24
**addicted** 12:5,14 93:20 172:21 173:4
**addiction** 12:1,3 13:3,14 14:11 15:2
**additions** 114:6
**address** 39:4
**Adduci** 1:8 8:6 199:8
**adjourn** 197:4
**adjustments** 19:22 20:2,5,6
**advantage** 110:19 111:24
**advised** 63:24 124:13 125:20 169:20
**affect** 9:23 10:1 10:10
**age** 123:6
**ago** 14:9 17:18 18:20 21:24 22:12,22 23:24 25:8,19,19 28:12 31:8 34:15,16 40:19 88:22 139:3 142:19 196:12
**agree** 18:8,10,11 18:16,17,18 21:19,20,21 22:23 23:18 30:3 32:9 33:8 33:9 68:21 84:2 111:14 112:8 185:6
**agreed** 64:3 166:7 197:21 198:7,8
**agreement** 194:17 200:24
**ah** 21:11 25:17 47:11 73:4 74:19 85:12 168:1 193:13
**ahead** 6:9 45:6 86:8
**ain't** 71:7,8,12 71:15 117:7,9 149:6 157:14 187:19,19
**al** 5:16
**al-** 115:19
**alive** 73:2
**allegedly** 150:5
**Allen** 3:4 7:11 7:11
**allow** 83:4 197:22
**allowed** 112:19 146:21
**AMERICA** 200:1
**an-** 11:3 149:3
**anemia** 123:13
**Anixter** 11:3,5
**announce** 6:20 6:23
**ans-** 49:21
**answer** 21:5 44:6,9 45:4 47:13 48:7,22 48:23 49:17,17 49:23 58:13 67:21 74:7 75:2,17 101:3 101:5,6,19,22 102:1,11,13,18 103:3 105:11 107:7,14,23 134:11 146:20 146:21 149:4 172:12 195:22
**answered** 35:6 65:10,15 88:23 103:2,14 111:12 119:2 135:21 140:22 145:17 159:17
**answering** 50:3 144:3 198:3
**answers** 75:3 127:22
**antidepressant** 95:11
**antidepressants** 93:18
**anybody** 26:22 41:21 43:14 46:5 54:15,22 55:10 56:8 97:23 98:1
**anymore** 18:10 188:15
**anyways** 68:13 116:13
**apartment** 15:21 26:1 37:15,17,19 46:16 57:23,23 58:20 59:6,6 69:6,12,17 70:2,7,10,10 70:17,18 71:1 71:7,8,9,19,19 72:1 78:8 81:20,23 84:4 96:7,14 110:7 110:10,17 111:22 119:11 129:16 130:10 131:17 137:24 140:14 151:14 152:9,15 154:9 157:16,21,24 158:9,15 159:4 163:24 164:6 164:22,23 171:23 172:11 183:4 186:10 190:20 192:6,9 192:23
**apartments** 37:16 40:21 54:5 58:23 59:11 74:6,24
**apartments'** 74:21
**apologize** 195:14
**APPEARAN...** 2:1
**appointed** 195:1 197:5
**approximately** 12:9 14:7,8
**approximations** 169:24
**area** 169:8 178:23 180:2 181:16
**areas** 65:7
**argumentative** 140:19 141:6 141:14 155:7
**arre-** 167:19
**arrest** 119:22
**arrested** 142:4 157:1 166:19 167:6,9,20
**arrived** 27:21
**ASA** 114:11,18 115:8
**aside** 54:24 55:5
**asked** 16:1 31:17 35:5,6 56:18,21 57:4 80:6,8 83:10 88:13 90:20 91:5,13,13,13 103:2,14 111:12 119:2 119:11,12 120:15 134:18 134:20,24 135:21 140:1 140:22 145:17 150:13,17 159:16 163:6,9 174:23 190:22 192:5,17,22 194:24
**asking** 41:19 57:8 58:10,11 58:12 65:8,14

69:23 86:11 88:16 93:4 98:19 99:1 100:10 102:14 102:17 107:20 136:13 149:3 149:24 150:10 157:12 166:17 170:6,13,18 172:17 178:14 194:22 195:5,6
**asleep** 134:6
**aspirin** 123:13
**assembling** 11:8
**associates** 6:13 6:15
**assum-** 80:15
**assume** 78:1
**assumes** 16:20 17:23 128:13 128:21 131:9 132:10 136:21 144:4 150:24 151:6 156:2 184:20
**assuming** 78:21
**assumption** 61:11 80:17
**Atlanta** 40:9
**attempted** 194:15
**attending** 6:11 6:15,22
**attorney** 1:7 25:15 30:4 51:1 64:2 133:14,17 199:7 200:18 200:20
**attorneys** 7:24 28:24 29:14 104:15 106:14 107:10 109:1 111:3 143:13 147:10
**August** 73:14
**aware** 192:7

**B**

**B** 4:10
**back** 14:13 18:6 26:20 28:11 32:10 37:6,13 38:10,11,12,17 38:20 40:5,5,9 45:22 52:5 55:19 56:23 67:2 68:2,9 70:7 73:8 75:16 76:19,21 78:11 80:1 81:10,14 82:20 85:22 89:2,8 89:10 98:18 101:9,12,15 102:3,8,15 126:22 143:18 143:19 145:6 152:4 166:2 169:8 173:20 177:9 186:15 187:22 194:5 194:16 198:3
**bad** 77:1
**badgering** 134:23 172:4 172:10
**bare** 179:10
**Bart** 3:4 7:15,15
**based** 181:2 194:12,14
**basically** 181:20 181:22 194:18 196:5
**Bates** 176:2
**bathroom** 13:23 57:24 58:22,23 59:1,7,12,23 60:14 61:13 64:9,11,22 65:2 68:11 69:2 70:2,6,19 71:2 73:9 74:7 74:13 77:12 88:16 157:7 159:9 172:16
**bathrooms** 74:21,24
**BATTLE** 2:19
**beat** 13:4
**bed** 60:3 164:21
**beds** 14:1
**beers** 47:9
**beginning** 82:19 194:4
**behalf** 2:6,11,17 2:23 5:15 8:3,5
**believe** 35:14,21 35:24 68:6 72:5,8,10 87:7 90:14 133:19 133:22 147:23
**believes** 194:10
**Belmont** 63:23 107:12
**bench** 179:9 184:5
**best** 170:24
**Beth** 15:13 22:9 22:18 23:8 25:13,15,15 30:24 31:3,6 32:20 48:20 49:18 102:7,10 114:13 134:13 134:21 169:15
**Beth's** 22:14 49:10 107:7
**better** 38:14,15 38:23 48:18 128:5 192:19
**big** 71:7 182:14
**bipolar** 9:13 10:4,10
**bit** 46:23 52:6,6 185:4,22
**blaming** 165:17
**blind** 123:2
**blood** 91:8
**bloodstream** 123:14
**blur** 62:15
**blur-** 62:15
**blurry** 62:10,11 123:3
**Boatman** 3:5 7:7 7:7
**body** 79:14 89:14 140:8
**booted** 45:19
**BORKAN** 2:7
**born** 37:7,8,20 37:21,21 52:14
**bottom** 126:13
**Boulevard** 2:20
**break** 82:4,16 129:8 193:10 193:12,15 194:1,8
**breath** 53:1,2
**bring** 21:23 23:23 30:7 109:20 174:20 187:22,23
**bringing** 118:21
**brought** 28:15 83:9 85:22 168:12 180:2 181:11,19 190:13
**building** 39:2 40:2,4,14 41:8 42:24 43:2,7 45:20 51:7 52:5,8,11 53:13,16,21 54:1 80:9,24 83:4 84:17 165:8,17,20
**buildings** 84:7,9
**bunch** 69:9
**Burns** 1:17 2:13 3:6 5:11 200:13
**business** 31:3 100:9 153:20 154:7 157:6

**C**

**C** 1:5 2:19 5:17 199:5
**c-** 98:21
**cab** 36:14,15,16
**call** 106:4 132:22 195:2
**called** 1:13 24:22 94:14 106:10
**calls** 41:17 43:19 50:16 67:12 68:14 99:19 112:14 125:13 127:5 151:23
**canceling** 195:24
**car** 46:17 53:18 53:19 78:8 81:22 118:19 160:21,24 161:9,10,16 162:3,24 163:16,18 164:8
**card** 31:3 62:5
**Care** 10:22
**carefully** 102:4
**Carl** 1:3 5:15 6:8 11:22 26:4 26:11 28:8 41:9 42:4,7,8,8 42:13,14 43:13 43:14 45:8,16 46:15 47:1 50:5,15 80:14 81:17 89:23

Case: 1:23-cv-17186 Document #: 201-15 Filed: 10/05/26 Page 60 of 80 PageID #:3762



90:3,9,10 94:1 100:9 103:1,10 104:11,17 105:5,18,20 106:14 108:4 110:6,9,17,19 111:21,23 116:20,21 117:12,24 118:6 119:10 120:20,24 121:6 129:16 130:9 131:17 131:19 133:19 136:15 137:23 138:22 139:19 139:23 140:13 150:21 151:13 152:5,14 153:22 154:8 157:16,20 160:21,24 161:16 162:1,2 162:22 163:5 163:14,17,21 163:24 164:6,8 174:13 175:1 175:19 176:14 176:18,21,23 177:19,22 178:15 179:16 180:11,12 181:4,4,10,12 182:22 183:3,9 183:15,19 184:19 185:4 185:12,13,19 187:23,24 188:1,12,18,20 190:19 199:3
**Caroline** 3:5 7:2 7:3
**case** 5:16,17 22:3 34:13 45:14 73:14
**Casey** 3:5 7:2,2 7:3
**caught** 47:10
**cause** 96:11,22 98:19 99:17 126:1,4 130:8
**causes** 110:18 111:23
**Center** 10:24 11:3,5
**century** 11:14 11:16
**certain** 38:23 45:14
**certified** 1:20 5:21 200:6 201:1
**certify** 200:7,12 200:17
**chairs** 179:4
**chance** 27:16 102:12 114:6 115:24 196:13
**change** 107:14 107:23
**changes** 114:7
**Chicago** 1:7,19 2:4,9,15,18,21 5:12,23 7:18 37:8,13 38:17 38:19,20 39:23 52:14,14 84:22 85:1 199:7 200:15 201:11
**chicken** 119:8 164:2
**children** 33:14 33:16 34:5
**chips** 187:18
**choice** 86:17,19 87:5 144:16 146:2,13,23 147:3 195:16 197:10
**Christ** 193:22
**cigarettes** 52:24 53:3 112:19
**circles** 49:3
**circumstances** 133:24
**City** 1:7 2:17 7:18 199:7
**CITY-REED-...** 176:2
**CITY-REED-...** 191:16
**civil** 1:15 131:10
**claim** 172:14
**claiming** 110:1,6 110:9 171:20
**Clark** 2:8 5:23 201:10
**classic** 12:17
**clean** 13:22,23 94:3,5
**cleaning** 9:10 10:22
**clear** 74:11 157:13
**clearly** 41:14 101:10
**client** 97:21,22 98:1
**closed** 60:8,9 73:9 75:16 81:14
**closing** 121:14
**clothing** 71:20
**Cobb** 10:23
**cocaine** 12:4,6 12:15 13:6,14 14:5 93:21
**come** 13:8,9,13 22:16 23:12 32:15 38:12 45:18 70:23 82:22 83:23 85:10 86:18 87:8 119:21 120:17 144:10 144:22 146:13 172:4 186:15 198:3
**comfortable** 100:6 195:8
**coming** 55:17 57:1 77:23 86:21 97:16 118:14,15,19 131:17 134:1 135:18 136:15 137:8 160:18 188:6,20
**commenced** 200:16
**commencing** 1:20
**community** 72:17,23 74:7 74:13 84:7
**complained** 78:15 79:3
**complaining** 24:19
**complete** 198:3
**completely** 172:4
**con-** 20:23
**concern** 126:5 194:23
**concerned** 129:3 129:15 130:2,7
**concerns** 194:9
**concluded** 198:17
**conferred** 194:14
**confrontation** 188:18
**connected** 122:8
**connection** 92:19
**consent** 158:3
**consider** 33:4 54:4
**constitutes** 199:12
**constitutional** 124:13 169:20
**contained** 116:12
**context** 76:1,8 107:2,21 167:5
**continue** 196:4
**control** 10:8
**conversation** 47:13,24
**conveyed** 194:9
**convicted** 18:22 19:1,3,15 20:10,11 55:23
**conviction** 19:13 20:24 27:3 28:8
**COOK** 1:7,8 199:7,8 200:3
**cool** 17:9 21:7 21:11 44:23 53:9 160:19
**cooperated** 164:14
**copy** 31:7 124:6 124:7
**copying** 76:6
**correct** 11:22 23:5 58:20 59:15 80:3 89:24 115:5 119:1 120:20 199:13
**corrections** 19:17 20:13 114:6 199:17
**counsel** 6:3 51:19 196:20 200:18,20,24
**county** 1:7,8 10:23 19:15,24 20:7 199:7,8 200:3

**couple** 186:12 191:19
**course** 51:23 82:7,9 127:24 173:6 194:7
**court** 1:1 5:18 5:24 6:5 8:11 17:22 19:23 20:1 24:14 25:3 35:11,17 44:10 47:6,17 47:21 49:11 50:20 51:1,5 51:13 75:12 78:22 85:24 101:14 102:3 106:5 119:24 126:3 131:1 146:16 153:11 154:3 163:7 176:19 184:11 194:16 195:2,4 195:12 198:5,6 198:13 199:1
**Courts** 1:16
**COVID** 26:17
**crack** 12:4,5,14 12:24 13:6,14 14:4,10 15:1 93:21 94:2 116:21 117:5 173:13
**crazy** 127:24 128:4 138:12 153:7,15 162:16,18,19 165:14,16 182:9
**create** 173:7
**crime** 18:23 129:17
**crimes** 19:1
**cross** 160:9,11
**crossed** 160:17
**crying** 165:5
**CSR** 201:10,13
**cuff** 91:8
**cur-** 113:23
**curious** 18:5 31:22
**cursive** 113:23 115:21
**custody** 13:24 143:22 148:6,9 166:19 167:7 167:10,15,23 167:24 170:12 170:18 173:5
**cut** 49:1 144:2
**cutting** 102:11

**D**

**D** 4:1
**D-e-L-O-N-G** 9:3
**dark** 189:18
**date** 22:24 23:1 23:2,3 107:17 119:23 142:12
**dated** 154:11
**dates** 11:13 12:11 14:18 15:8 22:1,24 23:9,12 73:7 169:23
**daughter** 33:19
**David** 3:4 7:1,5
**day** 14:11 24:23 69:1 72:19 73:3 76:19,21 78:11 79:19,20 81:2 83:7 85:10 88:12,23 89:3,6,12,18 119:22 120:24 121:6 137:13 139:12,16 142:17 143:19 145:19 166:1 166:21 189:21 190:14 199:20
**daylight** 189:8
**days** 65:1 80:1,4
**daytime** 143:20
**dead** 69:6 79:14 140:8
**dealer** 12:16 161:15
**dealers** 160:24 161:5 162:3 164:8
**dealing** 29:12
**death** 96:11 98:20 99:17
**deception** 36:9
**defendant** 1:13 2:17,23 8:4,6
**Defendants** 1:9 2:11 199:9
**defense** 51:19
**defer** 149:13 171:12
**defining** 38:24
**degenerated** 123:11,12
**DeLONG** 1:12 4:3 5:3 8:15 9:2 60:13 63:15,22 64:9 64:10 93:6 104:10 105:19 110:16 111:20 113:1,6,12 114:4,10,17 115:7,9,11 116:20,21,22 117:13 121:16 123:19 124:12 125:20 153:8 153:19 169:6 169:19 176:15 179:14 181:10 181:11,21 191:23 192:5 198:15 199:11 199:16 200:7 200:23
**demonstrated** 113:2,7
**deny** 96:17,19 96:19 111:7,10 111:14,15 112:8
**denying** 154:1
**dep** 194:20
**Department** 19:16 20:13
**deposition** 1:12 4:12 5:3,14 14:21,24 15:9 15:14 16:15 17:11 22:21 24:22 26:20 27:13,15 28:6 28:15,17,21 29:16 34:7 36:12,24 43:13 94:11 97:18 122:11 124:8 158:3 160:23 162:10 194:7 194:12,13 196:5 197:4,24 198:11,15,17 199:12,13 200:9,13,15
**depositions** 1:17
**describing** 39:6 152:14
**desk** 80:6 179:4
**detective** 149:9 169:18 192:5
**detector** 34:24 35:1,8,19,20 56:11,15 57:12 86:4 88:4,7,14 90:18,19 91:5 91:8,15,18,24 92:15,18 96:20 99:12,14 100:10,20 103:1 119:1,12 119:22 120:18 131:16 145:11 150:14,16 170:7,19 174:21 179:8
**Dhara** 3:4 7:13
**diabetes** 185:21
**diagnosed** 9:19
**died** 110:18 111:22
**different** 16:3,6 40:20 45:19 49:18,20 65:8 72:23 98:16 126:15 179:2 191:17
**difficult** 40:22
**direct** 54:19
**direction** 200:11
**directly** 200:21
**disability** 9:12
**disabled** 9:5,9
**disagree** 125:5
**disgust** 188:4
**disgusted** 182:19,22 183:9
**disgusting** 177:5 182:4
**dispute** 138:1 149:12 154:23
**distraught** 184:6
**District** 1:1,1,16 5:18,19 199:1 199:1 200:1
**Division** 1:2 5:19 199:2 200:2
**DNA** 45:15
**document** 127:14
**documents** 23:9

30:4 36:20,21 94:10 97:2 171:8
**dog** 109:6
**doing** 24:23,24 28:20 34:8 38:14,15 41:14 48:4 50:1 51:18 53:11 67:7 75:10 133:11 147:12 147:20 178:10 187:17
**Dollar** 11:9
**door** 26:1 54:6 59:1,2,11,15 59:17,20,23 60:4,8,9,14 61:13 64:11,23 65:2 67:9 68:11 69:2,11 69:12,15,16,17 70:2,3,6,17 71:2 73:9 75:14 76:8 77:6,23 81:13 81:14 88:17 118:20 159:9 180:6,11 184:2
**doors** 60:2 74:20 74:23 75:24 135:3
**doorway** 71:5
**double** 69:19
**doubt** 97:3 114:9 122:1
**downstairs** 165:2
**downtown** 41:16
**drinking** 47:9
**Drive** 1:18 2:14 5:12 200:14
**driving** 195:23
**drop** 16:12,13
**dropped** 16:14
23:13
**drug** 11:24 12:3 94:14,17 160:24 161:5 161:15 162:3 164:8
**drugs** 19:2,4 38:9,16 39:1 161:22 162:4 163:11,13 172:20 173:3
**due** 61:22 195:20
**duly** 8:9,16 200:8
**dumfounded** 178:5
**duress** 29:11
**Durrest** 157:3
**durrested** 156:19 157:2
**duty** 29:8

**E**

**E** 4:1,10
**E-mail** 2:5,10,16 2:22
**earlier** 27:7 103:20 104:8 107:9 146:14 147:15 159:8
**early** 145:21
**earned** 92:12
**Eastern** 1:2 5:19 199:2 200:2
**eekl@burnsn...** 2:16
**effect** 182:5
**egg** 119:8
**eight** 41:6
**either** 18:15 49:2 96:18,23 125:6,7 131:11 183:17 191:6 197:5
**Ekl** 2:14 6:9,17 6:21 7:17,17 7:23 8:12,14 15:13 16:18,20 16:22 17:20,23 18:15 21:4,8 21:12,16,18,22 24:4,9,11,13 24:15 25:15 27:1,16,16,22 28:12,13,20 30:15,22 31:3 31:6 33:24 43:3,5,15,17 43:19,21,24 44:2,4,6,8,13 44:15,17,19,22 44:24 45:3,6 45:11 47:14,19 47:22 48:2,11 48:13,15,21 49:13 50:16 57:16 58:6 60:24 61:6,7 61:19,22 63:13 63:16,20 64:17 66:1,13 67:12 67:18 68:14 72:2,4,6 73:21 73:23 74:10,15 74:17 75:17,20 76:12 77:20 79:16 81:4 82:7,9 83:17 83:19 86:24 87:12 88:1 89:16 95:17,24 96:2 98:6,22 98:24 99:19 100:3,13,15 101:5,7,13,15 101:17,19,21 101:23 102:1,5 102:8,11,16 103:2,14,22 104:5,21,23 106:17,20,24 107:15 108:5,8 108:11,18 109:10,12 111:12 112:2,4 112:6,12 114:14 115:1,3 115:5,13 117:16 118:7 119:2,16 120:1 120:5,7,9,21 121:7 122:8 124:7,18,20 125:13,16,19 126:6,8,10,12 126:18 127:5 128:8,11,13,21 129:6,8,18,20 130:11 131:8 132:8,10,12 133:3,4,8 134:8,11,16,18 134:20,22 135:1,6,9,19 135:21 136:19 136:21,23 137:1,3 138:2 140:18,22 141:4,6,12,14 142:10,12 144:1 145:15 145:17 146:5 146:10 148:8 148:16 150:2,5 150:24 151:3,6 151:8,15,21,23 152:16,18,22 154:24 155:6 155:21,24 156:2,4,6 157:18 159:5 159:16 160:22 161:1,18 162:9 167:1,4,17 168:18,21 169:9,11,13 170:20 171:24 172:3,8,22 173:8 176:6,8 176:10,12 178:11,14,17 179:19,21 180:20,23 181:7 183:11 184:20 185:7 185:10,14,17 185:23 186:23 187:11 188:22 189:1,23 190:6 191:2,10,14,17 191:21 192:1 192:10 193:16 194:6,6 196:1 196:4,21 197:20 198:2
**Elizabeth** 2:14 7:17 194:6
**Ellen** 3:4 7:15
**else's** 46:5
**emotions** 10:9
**employee** 200:18,19
**employers** 10:21
**English** 113:2,7
**enter** 70:1 71:1
**entire** 107:17
**equipment** 192:8,22,24
**errata** 199:14,18
**especially** 22:2 173:23
**establish** 40:24
**Estate** 2:12
**estimate** 171:2
**et** 5:16
**event** 119:23
**everybody** 47:4 80:24 89:15 196:17,18

**evidence** 16:22 17:23 112:14 128:13,22 132:12 137:1 144:4 151:3,8 152:18,22 155:7 156:6 184:21 189:2
**exactly** 27:14 28:5 32:12 90:8 174:1
**examination** 1:13 4:4 8:18
**examined** 8:16
**example** 58:19
**excited** 10:7
**Excuse** 5:6 62:16 82:2 137:17 166:11
**exhibit** 4:12 63:18 122:10 122:12
**explain** 24:4 29:2,14 32:16 70:21 117:2,4 117:15
**explained** 65:18
**explaining** 55:18
**explanation** 189:11
**explore** 194:11
**express** 48:1
**expressed** 194:23
**extent** 131:9
**eyes** 153:6
**eyesight** 121:17

**F**

**facing** 133:24
**fact** 79:22 107:18 141:20
**facts** 16:22 17:23 112:13 128:13,21 132:10 136:23 144:4 150:24 151:6,8 184:20
**fail** 35:9,20
**fair** 18:21 29:9 29:13 49:1 50:2 51:22 61:10 66:19 97:16 128:24 128:24 129:1,4 129:12,12
**false** 68:5 116:13
**falsely** 182:12 182:20
**familiar** 26:3
**family** 55:15,17
**far** 117:4,11 132:24
**fast** 38:3
**fast-forward** 141:22
**fault** 165:22
**fear** 128:18
**Federal** 1:14
**feed** 13:3,5,14
**feel** 29:18 97:14 97:20 98:20 99:18,24 100:1 109:24 127:10 144:16 146:2 146:12,22 147:3 156:15 156:18,23 157:1 159:14 159:21 160:17 165:11,13,15 165:20,22 174:10 180:19 195:8 196:11 196:19 197:1
**feeling** 10:8 29:6 180:7
**feels** 194:10
**felt** 88:3 116:22 117:13 135:24 139:17 156:20 158:8 165:24 182:19
**figure** 42:9
**filed** 5:17
**financially** 200:20
**find** 84:14,18 140:8 165:3 197:5
**fine** 6:21,21 24:15 44:8 51:21,23
**finger** 62:20
**fingerprints** 92:24
**fingers** 93:1,1
**finish** 44:2 45:1 48:2,22,24 75:17 79:1 101:23 102:6 105:14,17 113:16 129:9 134:8,21 135:15 169:12
**finished** 111:19
**finna** 44:9
**firm** 6:11
**first** 8:16 9:2 12:18,20,22 20:23 24:20 25:13,14 28:7 28:9 36:24 37:11 41:12 62:3 77:6 78:11 84:2 90:13 92:2,3 110:24 118:24 119:5,21 131:14 140:4 140:10 149:22 150:20,20 151:13 152:11 154:22 155:16 164:1,3 190:19 191:18,22 194:12 200:8
**fist** 149:9
**five** 19:16,16 20:12 32:6 173:19
**fixing** 174:20
**flipped** 178:1
**floor** 2:3 9:11 42:15 180:3
**focus** 48:6 139:24 140:4
**followed** 114:19 115:10
**following** 64:3 104:10
**follows** 8:17
**food** 38:3
**force** 195:18
**foregoing** 199:11
**forget** 12:12 14:17 15:12 45:15,16
**form** 16:18 17:20 21:4 27:1 43:5,17 45:11 50:16 57:16 58:6 60:24 64:17 66:1,13 67:12 68:14 72:4 76:12 77:20 81:4 83:19 86:24 87:12 88:1 89:16 95:17,24 98:9 98:22 99:19 100:3,15 102:16 103:22 107:3 108:8,11 108:18 112:2 116:15 117:16 118:7 119:16 120:5,21 121:7 125:13 127:5 128:11,21 129:18 130:13 131:8,24 132:8 136:21 138:2 140:18 141:6 141:12 146:5 148:9,16 150:24 151:6 151:15,21 152:16 154:24 155:6,24 157:18 158:4 159:5,16 161:1 161:18 167:4 170:20 172:3 173:8 178:14 183:11 184:20 185:10,14,23 186:23 187:11 188:22 189:1 189:23 190:6 191:2
**formal** 109:2
**format** 49:16,20 59:4
**forward** 92:17
**found** 37:15 69:6 70:16 89:14,15,20
**found-** 106:17
**foundation** 58:6 72:6 76:12 79:16 83:19 87:12 88:1 89:16 100:3 103:22 104:21 106:20 108:11 108:18 117:16 118:7 120:21 142:12 146:6 148:16 150:2 159:5 179:21

181:2 183:11 185:17,23 186:23 189:1 189:23
**free** 148:15,23
**friend** 116:23 117:14
**friendly** 53:4,9 53:10,10
**friends** 41:7 47:1,3 52:7,10 52:12 54:3 55:18
**front** 34:9,12 59:1 69:17 80:6 122:6 177:13,16,17 177:18,21
**full** 191:23
**further** 195:22 197:17 200:12 200:17
**future** 144:21

**G**

**Gala-** 114:11
**Galassini** 1:8 2:23 114:11,14 114:18 115:8 199:8
**gen-** 55:22
**general** 93:4,16
**generally** 55:22
**Georgia** 10:23 10:23 11:1 37:10,12 38:6 38:7,10,11,12 38:18,21 40:5 40:9 45:22 55:19 84:15 91:22
**Geri** 2:11
**getting** 25:11 163:11,13 168:8 193:3
**give** 12:8 26:20 28:21 29:15 64:3 73:21 78:6 91:15 92:22 97:18 104:12 125:22 126:1,4 127:21 130:23 143:12 152:13 155:5 155:15 160:3 166:20 174:10 188:19 190:14
**given** 16:15 19:15 34:7 91:18,23 112:18 199:11 199:13
**giving** 25:3 36:4 60:11 73:17 75:3 103:18 111:3 188:11
**glad** 132:21 182:15
**go** 6:9 13:21 14:2 17:15,19 18:2,4,7 20:15 26:5 37:9 38:6 45:6,22 46:11 46:20 69:16 70:7 71:21 79:1 83:10 84:6,8 132:24 133:1 144:15 146:2 147:6 155:19 156:13 161:6 173:20 180:8 188:10 188:17 193:6 196:10 197:22
**goes** 164:17
**going** 19:24 21:5 22:20 23:24 24:21 25:7 28:21 33:10 41:15,16 45:19 49:3,7,9,9,15 57:2 62:18,24 67:23 78:6 82:15 101:12 102:2,5 104:2 109:22 114:2 119:10 122:4,6 124:1,2 127:3 129:23 130:15 137:23 138:23 140:13 144:1 149:12 152:7 152:14 153:22 154:8 155:14 156:16 159:15 164:14 165:12 171:21 172:14 175:21,23 176:4 180:8,10 183:3 190:20 191:8,13 192:3 193:21 194:17 195:9,17,23 197:6 198:4,16
**gonna** 22:1,11 22:11,20 33:7 33:8,10 48:16 48:16,18,19 138:16,16,16 138:17 158:8 161:21,24 162:3
**good** 5:1 8:2 11:13 42:14 46:3 141:10,13 141:19,21 163:23
**goods** 11:7,8
**gotta** 25:2,4 29:9 84:10 166:10
**graduate** 10:13 37:23
**grand** 31:11 34:10,12,19 73:14 75:8 76:5 97:17 161:7
**granddaughter** 85:9
**grandkids** 13:24
**grandmother-...** 13:22
**grandmother-...** 40:6
**granny** 166:2
**grew** 52:12
**Greyhound** 40:9
**grocery** 38:4 187:16
**guess** 31:14 85:17 121:15 155:14 196:13
**guide** 195:4
**guilty** 116:22 117:13
**guy** 41:22 43:1,7 46:9,10 52:15 53:5 70:16 97:23 98:2 99:14 157:16 157:20
**guys** 86:14 148:21 163:10 178:9 197:11 197:19

**H**

**H** 4:10
**H-A-D-R-I-O-N** 94:18
**Habrium** 94:19
**Hadrion** 94:13 94:17
**Hadrium** 94:14
**Haldol** 95:3,4,5 95:8,10,11
**half** 94:4,6 143:23 148:11 194:13
**Hall** 3:4 7:9,9
**hand** 8:12
**handle** 132:19 133:2
**handwritten** 61:18 104:7 113:13 114:5 147:10
**hang** 47:5,9
**happen** 22:11,11 33:11 81:6 112:23 113:4 113:15,20 114:8,21 125:5 147:24 148:1
**happened** 26:7,9 29:22 47:2 50:6,13 72:22 76:16 78:12,20 83:7,24 86:2 90:8 92:2 96:8 105:8 106:16 113:9 119:21 120:17 141:20 144:17,18,19 145:9 149:17 164:11
**happening** 64:7 178:13
**happenings** 23:6 25:8
**harassing** 129:20
**hard** 29:21,23 160:18
**harder** 48:19
**harm** 83:24
**Harold** 37:15 39:7
**harrassatory** 130:4
**hate** 171:14,16
**haunting** 196:12
**head** 12:13 14:18 183:20

**hear** 5:7 33:23 62:21 68:10 184:11
**heard** 94:24 101:10,17,18 194:16
**heavy-set** 86:16
**held** 152:4
**help** 13:20 24:6 24:10,18 62:24 97:1 121:15 122:4 160:5,12
**Hey** 46:11,14 53:11 67:9 70:12 86:20 118:16 130:21 132:22 137:8 149:24 157:14 157:15 163:23 164:6,7 187:16 187:17 190:19 196:24
**hide** 117:7,9
**high** 10:14 37:23 37:24 38:1
**Hmm** 12:19 86:10 185:9
**hold** 21:18 23:18 23:18 63:13,16 81:19 126:6,8 126:10 167:1,1 177:21 180:20 180:20,23
**holding** 178:23 180:1 181:15
**home** 45:18 47:11 72:11,13 83:2 120:17,18 143:19 174:20 188:9 193:7 197:22
**honest** 31:24 33:5
**hook** 21:14 91:7
**hooked** 91:11,12 92:23
**hope** 184:23 188:5
**hot** 109:6
**hour** 143:23 148:11 171:3,3
**hours** 143:24 148:12,12 149:21 150:19 151:12 154:21 155:4,13,19 156:8,12,13,15 170:12,17,22 173:1,4 189:7 189:8 190:18
**house** 13:22 40:6 57:1 78:1 78:10 83:1 118:15,19,22 134:1 139:21 144:9 166:2
**Huh** 14:22 42:1 91:17 94:16 153:13 165:18 181:24 193:11
**human** 66:20
**hung** 42:22,24 50:5
**hurt** 166:6

**I**

**ID** 4:11
**idea** 152:13 175:1,2,3,13 175:17
**identification** 122:13
**ill** 186:22
**Illinois** 1:1,19 2:4,9,15,21 5:13,19,24 11:2 37:8 199:1 200:1,2 201:2,11
**imagine** 178:4
**immediately** 24:22 155:16
**important** 31:15 141:16 142:20 142:22
**in-** 123:16 168:13
**in-laws** 52:13 85:6,6
**in-laws'** 83:1 84:20 85:3 87:7 139:21 143:9 144:9
**inaccurate** 21:2
**incident** 42:11 88:13,24 89:3 89:6,12,19 121:3 137:13
**includes** 112:13
**Indiana** 168:10 169:6
**indicated** 5:5,10 199:13
**indirectly** 200:21
**individual** 8:4
**indulge** 169:3
**information** 174:11
**initial** 199:18
**initially** 28:14
**injury** 123:10
**innocent** 26:23
**inquiry** 129:10
**inside** 69:13,20
**instances** 139:11
**intelligence** 187:5
**inter-** 168:13
**interact** 186:9
**interaction** 186:18
**interactions** 189:6
**interested** 200:21
**intern** 3:6 7:3,5 7:7,9,11,13,15 7:19
**Interns** 3:3
**interrogate** 120:13
**interrogated** 95:14 190:5
**interrogating** 120:3 168:14
**interrogation** 95:23 96:2 120:9 174:14
**interrupt** 27:9
**interview** 137:19 169:18 169:22 170:1 181:12,14
**interviewed** 123:16 142:6 149:9 168:9
**interviewing** 168:14,16
**introduced** 26:2
**investigating** 140:9
**investigation** 125:11 160:13
**involved** 12:21 12:22 56:1
**irrelevant** 151:10
**issue** 14:21,23
**it'll** 49:20 106:12 125:22 126:1,4 182:14
**Itchhaporia** 2:7 8:2,3 44:14,16 50:18 51:15,22 51:24 52:2 98:8 119:18 125:23 126:20 198:8

**J**

**Jack** 3:6 7:20
**Jackson** 2:20
**jail** 19:15,24 20:7 26:12,13 26:17,20,23
**Jesus** 193:22
**job** 10:17 92:4
**jobs** 10:16,18 13:17,19 38:3 38:3
**join** 44:14 49:9 49:10 50:18 51:2,19 129:23
**joke** 22:8,17
**Jon** 6:7 48:13 51:17 61:19 63:16
**jon@loevy.com** 2:5
**JONATHAN** 2:2
**judge** 21:8,9 25:3 29:8 67:17
**judged** 187:15
**July** 1:21 5:4 60:12 63:23 104:3 107:11 131:15 135:14 135:17 137:16 137:19 149:10 154:11 176:14 189:13 199:12 200:16 201:3
**jumping** 86:8
**jury** 31:11 34:10 34:12,19 73:14 75:8,13 76:5 97:17 161:7

**K**

**Kari** 1:19 6:1 200:6 201:10
**keep** 14:18

38:22 51:18,20 65:14 67:23 78:7 129:16 130:9 194:22 195:6
**kept** 60:14 61:12 64:10 75:1,24 192:6,22
**keys** 46:16,16 57:2 77:24 78:6,7,8,8 80:14 81:19,19 81:22 118:19 118:20 134:2 135:3,18 136:16 137:24 138:23 140:16
**kicked** 83:14,15 84:13,16
**kids** 85:6
**kill** 54:22 56:6,7 56:8 150:17 174:2
**killed** 54:13,15 55:8 83:16 100:11 117:10 118:16 133:19 133:23 170:19 177:4,11 180:14,14 184:2
**killing** 54:11 174:5
**kind** 166:7 180:7
**kinds** 16:3,6 169:14
**kitchen** 13:23
**kitchenette** 37:18
**knew** 43:8 67:10 69:23 78:16,18 79:6 90:24 91:1 144:20 187:14
**knock** 77:6 81:12,12
**knocked** 26:1
**know** 6:9 10:3,6 11:6 13:23 14:1,1,12,15 15:11 16:21,24 21:15 22:4,5 22:10,19 23:6 23:7 24:20 25:3 28:10 29:7,7,11,24 30:22 31:23 32:1 33:5 36:2 36:5,7,22 38:3 38:17,21 39:15 41:9,9,10,11 41:13,15 42:12 42:17,19 45:17 49:24 52:13,14 52:19,19 53:11 55:15,16,16,17 55:19 56:7,13 56:22,24 57:3 57:3 60:2,3,8 60:22 61:12 62:15 64:24 65:3 68:21,22 69:10,14,21,22 71:14 72:13 73:5,6,7 75:9 75:10 76:16 77:14,16 78:12 80:13,16,19 81:8,15 83:13 83:24 84:4,5 84:11 85:16 87:2 88:11 89:9 90:13 93:6 94:17,23 97:17,21 98:2 98:2 100:5 107:8,24 114:12 116:7,8 117:6,7,9 118:1,10 119:20 124:21 124:23 125:2 127:11,15 128:12,15 130:24 131:21 132:2,20,23 133:12 134:6 139:19 140:1,3 141:5 142:18 145:8,20,20 148:3,13,24 149:4,4,6 150:23 151:2 155:2 156:23 157:14 158:6,6 159:10 160:19 161:20 162:6,8 162:23 164:1,3 164:3,4,19 165:5,8,8,9,12 166:3,5,9 168:14 169:2 170:23 171:1,7 171:13,14 175:8,9,11,11 177:4,6,10 178:2,2,3,16 178:20 180:4,8 180:9,9,13,14 182:7,7,10,14 182:16 183:3 183:15,17,19 183:23,24 184:2,3,4,5,6,7 184:10,15,15 184:16,18 185:2,3,20,21 186:11,12 187:9,13,16,17 187:18,24 188:1,3,4,5,24 190:16,16 192:14 193:1 196:8,11,15,17 196:18
**knowledge** 54:19 55:6 155:13
**knows** 196:19

**L**

**large** 122:3
**lasted** 164:24
**late** 77:23 118:20 143:3 145:24 153:10 153:16
**law** 164:17 196:19
**lawyer** 64:2,2 97:15,19 194:10,11 195:1,8,21,21
**lawyers** 130:7 131:10 195:24
**learned** 28:7,9
**leave** 53:13,16 53:18 59:15,20 59:22 60:2 65:19 68:22 70:5,7 84:3 88:11 93:9 120:16 148:15 148:23 149:5,5 158:8 165:1,5 165:24 172:11
**leaves** 67:9
**leaving** 54:24 55:5
**lectures** 130:24
**led** 59:12
**left** 37:12 53:21 56:22 59:17 68:11 73:6 89:7
**legal** 5:21 194:24
**legally** 197:1
**let's** 7:22 26:15 37:5 51:12 61:21 68:9 82:6,8 101:9 102:13 134:3 139:24 140:4 141:22 144:6
**letters** 63:3,8
**lie** 34:24,24 35:8 35:19,20 56:11 56:15 57:11 86:3 88:4,7,14 90:18,19 91:5 91:7,15,18,24 92:14,18 96:20 99:12,14 100:10,19 102:24 118:24 119:12,21 120:18 131:15 145:11 150:13 150:16 170:7 170:19 174:21 179:8
**life** 9:23 10:1,10 10:16,19 38:8 40:22 42:9,10 45:18 113:22
**life-changing** 196:16
**line** 73:23 74:2,3 74:4 129:10 169:10 176:4 187:16
**liquor** 22:10,18 32:16,20
**listen** 77:22 81:17 97:7,9 97:11,11,11,11 102:3 109:12 153:24
**litigation** 131:10
**little** 20:6 37:18 38:14,15 46:23 52:6 134:5 156:18,23

163:10 174:23 178:22 179:9 179:10 185:4
**live** 39:10,14,17 40:3 45:20,21 83:4 84:8 93:7 159:8
**lived** 40:13,19 40:19,21 41:1 42:14
**living** 9:4 37:14 39:3,9
**LLP** 1:18 2:13 2:19 3:6 200:14
**lobby** 41:16,17
**locate** 169:6
**located** 5:11 168:10
**lock** 58:24 59:1
**locked** 60:9,10 69:11,12,19,19 70:17
**Loevy** 2:2,2,2 3:3,3 4:4 5:6,8 6:7,7,12,23,23 7:4,4,6,6,8,8 7:10,10,12,12 7:14,14,16,16 7:22 8:7,19 17:1 18:3 20:2 20:9 22:6 25:12 27:2 30:16,19,24 31:1 34:1 35:12,18 43:9 45:7 46:1 47:7 47:15 48:3,17 48:20 49:3,6,8 49:12,14 50:23 51:9,21,23 52:1,3 57:19 58:9 61:3,15 61:21,23 62:1 62:16,18,22 63:1,14,19,21 65:4 66:4,16 67:14,19 68:18 72:9 73:22 74:1,12,16,18 76:2,15 78:3 78:23 79:17 81:7 82:3,6,8 82:21 84:12 87:3,13 88:5 89:17 95:21 96:5 98:12 99:4,23 100:7 100:18 101:9 101:12,14,16 101:24 102:2,7 102:10,12,19 102:22 103:8 103:17 104:1,6 105:3 106:6,18 107:4,22 108:9 108:15,22 109:15 111:17 112:10,16 114:12,15,16 115:17 116:18 117:21 118:12 119:6 120:2,12 121:1,8 122:10 122:16,19 124:22,24 125:3,20 126:2 126:15,19,21 127:12 128:9 128:17 129:2,7 129:9,14 130:1 130:6,16,21,22 130:23 131:2,4 131:12 132:5 132:15 133:7 134:9,12,14,17 134:19,21,24 135:2,7,12 136:4 137:10 138:6 140:20 141:1,9,17 142:11,15 144:5 145:22 146:8,11,19,21 147:1 148:14 148:19 150:9 151:4,11,18 152:3,20 153:1 153:14 154:4 155:3,11,22 156:10 157:22 159:11,20 161:8,23 163:12 166:16 167:9,11,14,21 168:19 169:1 169:10,12,14 169:16 170:21 172:1,6,9,23 173:11 176:13 176:21 177:1 178:12 179:1 180:17 181:6,8 183:12 184:17 185:1,11,18 186:3 187:3,21 188:23 189:10 190:4,9 191:5 191:12,16,20 191:22 192:2 192:11 193:14 194:19,21 195:15 197:3,9 197:12,16
**long** 12:5,7,10 15:16,17 16:2 31:8 34:15 39:9,10,14 40:10,12 42:23 85:13 88:10 143:21 148:4 148:13 149:1 169:15 170:9
**longer** 41:1 166:4
**look** 17:9 21:9 22:21 61:4 121:10 122:20 160:6
**looked** 36:23 86:13 121:4 181:15
**looking** 80:5 104:5 126:12 133:8,11 160:15
**looks** 30:19 31:2 31:7
**Lord** 11:12 12:22 26:5 176:3 193:19
**lose** 84:3 123:5
**lost** 55:19
**lot** 15:9 18:7 21:13 22:23 23:19,20 25:10 29:11,24 30:1 30:1 38:4 40:20 41:11 51:4 52:24 57:7 59:14,21 61:13 148:5 151:10 155:14 186:17
**loud** 113:3,8 114:19 115:9 115:23 116:12 121:16 198:12
**low** 9:13 10:8
**lunch** 194:1,8,8
**lying** 175:19 176:15 177:2,3 177:4 181:10

**M**

**machine** 91:8,11
**mad** 184:15
**main-** 9:11
**maintenance** 9:11,11
**making** 64:20 67:20 97:14,19 159:14,21 165:21
**man** 22:12 41:10 53:12 78:5 134:1,5 172:11 172:12 173:22 174:2,5 177:4 177:11 180:13 180:14,14,16 184:3 197:2
**manager** 46:12 77:5,9,10 78:16 79:4,21 80:2 83:3,8 90:1,15 92:7 100:21 105:22 106:8 108:14 108:24 132:4 132:14,18,19 136:1,2,15 139:5,19 155:10 158:7 165:2,19,21,21
**manager's** 133:1
**managers** 117:6
**manic** 10:5
**map** 184:10
**Marietta** 10:23 91:22
**marijuana** 12:4
**mark** 122:7,10
**marked** 4:11 122:12
**marking** 63:18
**married** 33:20 33:22 34:2 85:3
**Marshan** 3:4 7:11
**matter** 5:15 39:13 51:11
**Maureen** 46:21

83:8
**mean** 9:14 18:9 32:22,23 41:13 41:16 61:14 81:2,8 83:5 89:18 94:22 95:5 118:2,3 120:14 148:20 182:19 194:20
**meaning** 115:9
**means** 9:15 39:1 192:5 197:18
**meant** 76:4 117:2,15
**med** 95:12
**Media** 82:14,19 193:20 194:4 198:10
**medication** 29:24 30:1
**meds** 95:13,19 95:22
**meet** 15:13,16 15:17 25:13,14 25:20,23
**meeting** 16:8
**meetings** 16:4,4 16:7
**members** 55:15 55:17
**memory** 14:20 14:23 110:14 118:5 164:18 176:16
**mentally** 186:6 186:21
**mention** 89:23 90:9,10,14 100:9 120:19 121:6 131:16 131:19
**mentioned** 90:7 120:23 151:13 151:19 190:19 190:23 192:23
**met** 16:2 24:20 27:10 28:12,13
**mic** 30:11 62:17
**Michigan** 85:1
**microphone** 5:7 62:21 122:9,15 166:12 198:12
**middle** 102:17 122:22
**Milo** 3:2 5:20
**mind** 25:11 31:24 136:14 160:9,11,17 189:6
**mine** 65:2 71:7 126:2,16
**minute** 11:18 36:10 139:3 143:4
**minutes** 15:19 27:17 28:3 32:6 164:24
**Mirandize** 145:8
**Mirandized** 87:17,18
**miscellaneous** 38:5
**Misha** 2:7 8:3 44:16 51:16 98:8 120:1 126:17,17
**misread** 74:10 115:6
**miss-** 81:17
**missed** 51:13 74:15
**missing** 80:20 81:9,15
**misstate** 130:18
**misstates** 130:18 137:3 146:10 152:16,18,22 155:6 156:4 189:2
**mitchhaporia...** 2:10
**mm-hmm** 28:2 46:24 87:9 89:22 92:1,20 114:3 121:19 126:11 137:20 140:5,7,15 144:8,14 149:23 154:6 154:10,20 159:2 168:7 170:16 181:18 190:12 195:3,3
**Mm-mm** 110:21
**Mm-umm** 183:18
**Mmm** 144:12
**Monday** 89:9 132:24
**money** 13:11,13 92:4,6,11,12
**monies** 13:7
**monitor** 5:5
**month** 40:7,8 139:13
**months** 39:13 40:14 41:1,5,6 51:11
**Morgan** 3:4 7:9
**morning** 5:1 8:2 27:10,19 60:13 76:23 93:10 133:1 137:21 142:7 143:10 143:14,16,17 143:18 145:20 149:10 152:15 152:19,21 153:4,18 154:14,21 166:20 188:12 188:19 189:5 189:13,18,21
**mother** 34:4
**mouth** 156:14
**move** 13:20 116:10
**multi-page** 107:19
**murder** 13:1,18 14:5 34:13 39:3 43:12 54:9,20 55:23 56:10 57:15,21 72:22 82:23 85:15 89:15 92:19 95:16,23 98:3 125:11 127:3,23 128:3 140:9 150:11 182:20
**murdered** 19:10 46:7 50:14 52:15 55:11,14 72:11 172:12
**murderer** 177:23
**music** 60:5
**mustache** 86:15

**N**

**N** 4:1
**nah** 71:12 81:6 144:17 148:23 160:14 182:2 186:8,20 190:2
**name** 5:20 7:17 8:21,24 9:2,3 41:7 42:15,17 45:16,24 46:6 50:8 52:16 65:24 66:5,12 68:12 83:9 90:7 93:5
**named** 41:10,22 46:9,10 94:17
**names** 6:10,13 6:18 41:11,12 41:21,24 42:2 46:5
**Nancy** 1:8 2:23 8:6 199:8
**narratives** 134:12
**narrow** 11:19
**natural** 110:18 111:23
**nearest** 77:11
**necessarily** 127:8 144:15
**need** 16:17 32:2 46:11,20 82:11 97:15 115:5,5 129:6,6 132:17 147:6 149:3 193:6 194:10
**needed** 197:12
**neighbor** 45:17 54:5 57:1 77:11,11 80:8 81:24 185:21
**neighborhood** 83:23 163:11 166:4
**neighborly** 47:3
**neighbors** 77:23
**neither** 95:1
**nervous** 127:4 127:10,15
**never** 42:22,23 42:23 59:17,19 94:24 113:22 113:22 118:15 123:20,20,21 123:23,24 124:2,6 153:3 187:19
**news** 163:24
**nice** 53:12 160:10
**night** 22:9 47:11 56:23 69:1 77:24 81:21 118:21 134:5

143:2,8
**no-** 46:15
**Nobis** 10:24
**nobody's** 46:15
**noise** 198:12
**Noland** 1:18 2:13 3:6 5:11 200:14
**Nope** 123:23
**Nordstrom** 11:9
**normal** 187:15 187:19
**normal-thinki...** 186:16
**normally** 74:24 75:24
**North** 2:3 5:23 85:23 145:6 201:10
**Northern** 1:1 5:18 199:1 200:1
**Northwest** 11:4
**NOTARY** 199:22
**note** 31:3
**notes** 137:15,18 137:22 169:18
**notice** 1:14 186:21 187:4
**number** 4:11 5:17 6:12 38:18 73:21 84:6 199:18
**numbers** 126:12

**O**

**O'CONNOR** 2:19
**oath** 197:23
**Ob-** 125:13
**object** 44:24 48:24 98:8 107:2 144:1 167:2,2 168:21 169:9 181:2
**Object-** 146:5
**objected** 50:20 51:13 67:16
**objecting** 48:23 51:14 102:16
**objection** 16:18 17:20 21:4,10 24:9 27:1 43:3 43:15,21 44:4 44:14 45:11 49:10 50:16 51:18 57:16 58:6 60:24 64:17 66:1,13 67:12,20 68:14 72:2 76:12 77:20 79:16 81:4 83:17 86:24 87:12 88:1 89:16 95:17,24 98:6 98:22 99:19 100:3,13 103:2 103:14,22 104:21 106:17 106:20 107:8 107:15,16,18 108:5,11,18 112:2,12,13 116:15 117:16 118:7 119:2,16 119:18,24 120:5,21 121:7 125:13 127:5 128:8,21 129:18,24 130:11,13 131:8,24 132:8 133:4 135:19 136:19 138:2 140:18 141:4 141:12 142:10 144:3 145:15 146:5 148:8,16 150:2,24 151:6 151:15,21 152:16 154:24 155:6,21 157:18 159:5 159:16 161:1 161:18 169:3 170:20 171:24 172:22 173:8 178:11,14 179:19 181:1 183:11 184:20 185:7,14,23 186:23 187:11 188:22 189:1 189:23 190:6 191:2
**objections** 21:6 21:13
**obligation** 24:2 24:2
**obtained** 196:24
**Occasionally** 64:23
**occupancy** 37:17
**occurred** 23:7
**odd** 13:17,19 197:2
**office** 6:15 83:9 133:2
**officer** 36:4
**officers** 8:4 25:16 29:15 30:5 34:23 85:20 86:12 98:3,18,20 130:8 162:17 162:21 192:17 192:21
**officers'** 131:10
**offices** 1:17 5:22 200:13
**oh** 7:2,23 9:2,21 10:22 11:12 12:22 15:19 20:16,18 26:5 30:22 37:11 38:1 42:19 44:9 49:5 67:23,23 68:10 68:20 73:3 85:16 86:14 115:12 117:8 136:11 138:10 143:23 150:21 157:3 166:13 176:3 188:20 193:19 195:14
**Ohh** 182:7
**okay** 6:17 8:13 17:15 18:12 22:16 23:16 24:15 26:14 30:10,13 31:4 42:19 44:1,3 44:11,12,18 45:2,5 48:9,12 51:24 52:1 58:1,4 59:8 60:11 62:17,20 63:9,11,20 65:11 66:21 68:1,7,24 73:20 75:14 82:10 84:13 85:10 90:14 95:1 107:23 108:16 109:10 115:2 122:23 136:11 145:13 149:15 157:5 158:8 166:14 168:11 176:9 180:5 181:6,17 192:10 193:17 196:21
**okaying** 78:9
**old** 9:6 12:18,20 12:23 33:18 41:22 52:18,21 53:12 134:5
**older** 41:9
**once** 19:5 34:3 160:16
**open** 59:15,17 59:20 60:1,2,4 60:14 61:13 64:11,23 65:2 65:3,19 67:10 68:11,23 69:1 69:2 70:3,4,6 75:2,24 76:8 176:7
**opened** 58:23 176:8 180:6,11 184:1
**opening** 30:20 36:24
**opportunity** 110:20 111:24
**option** 132:20 132:21
**order** 25:3
**orderly** 192:6
**outside** 42:24 52:7,10 53:24 178:17 181:5 189:18
**overtalk** 10:5
**overturned** 27:5 28:8
**owned** 84:6

**P**

**p.m** 145:21 171:11 193:18 194:3 198:9,18
**packaging** 11:6 11:7
**packet** 16:12,14 18:7 23:15 30:4,7 32:14 36:18,22 67:1
**packing** 11:8

**page** 4:2 62:9,13 63:5,10 73:21 74:2,2 104:4 116:20 121:14 124:12,22 125:23,24 126:12 168:24 176:1 191:8,20 191:22,24
**pages** 113:13 114:5 122:22
**paid** 36:15,16
**paint** 13:19
**paper** 61:18 62:4,4
**papers** 5:7 37:4 61:6
**paragraph** 124:24 169:7 191:23
**paragraphs** 191:21
**paralegals** 25:24
**Pardon** 8:23 15:23 16:5 20:3 26:8 27:18 32:18 53:15 56:4 97:24 110:8 113:5 133:6,16 146:7 173:2
**park** 91:22 92:5 92:6
**part** 30:18,20 31:15 32:12 42:10 45:15 64:8 89:1 107:1,20 109:7 158:2 198:11 198:14
**participate** 54:11
**particular** 107:20
**parties** 194:14 194:18 200:19
**parts** 45:14
**pass** 30:15 35:8 35:19 187:17
**passed** 35:23,24 36:2,3 144:24
**pause** 51:12
**pay** 13:6 14:3
**people** 6:10,22 14:16 35:2,4 41:11,11,19,20 49:19 51:4,7 52:4,13 55:18 55:24 69:16 166:3
**period** 14:5 104:23 106:24
**periods** 10:18 42:23
**permission** 158:13
**person** 16:11 36:3 186:16 187:15,19
**person's** 21:24
**personal** 54:19 200:11
**pertaining** 1:16
**pgs** 199:19
**phone** 2:4,9,16 2:21 49:19 201:12
**phrase** 32:19 95:24 148:8
**picked** 83:1 85:22 87:6 88:8 139:14,20 142:5,17 143:5 143:9 144:24 145:4,5 168:9 189:21 190:10
**picking** 145:14 170:5
**picture** 81:24
**piece** 62:3
**pile** 61:5,17
**place** 11:5 55:19 83:10 150:5 166:10
**places** 40:20
**plaintiff** 1:4 2:6 5:15 6:7 199:4
**playing** 60:4
**please** 5:6 6:3,23 9:1 48:22 62:17 102:15 122:14 166:12 199:17
**po-** 161:3 179:23
**point** 11:21 22:14 69:6 82:23 125:16 143:12 147:9 172:4 173:15 197:20
**pol-** 34:21
**police** 20:5 25:16 29:15 30:5 34:22 35:6 53:21,23 56:9,13,20 60:12 69:5 70:11,15,21 71:23 72:21 76:10,24 82:22 84:18 85:10,19 85:24 86:12 87:20 89:2,6 89:24 90:2,10 90:11,17 95:7 98:3,18,20 100:1,19,22 102:24 103:10 103:11,20 104:11,18 105:5 106:4,10 106:15 108:4 109:3 110:16 111:21 112:21 117:5,24 118:6 118:16,18,23 119:10 120:4 121:5,10 123:16,18,24 124:3,4,12 125:8 126:24 128:6 130:8 131:6,9,13,15 132:7,17,22 133:15,18 135:14,16,24 136:3,9,17 137:5,6,15,18 137:23 138:8 138:11,15,20 139:1,4,12,14 139:17,20,22 140:6,9,17 141:3 142:3,7 142:24 143:22 144:10 145:6 146:13 147:5,6 148:6 149:2,2 149:6,24 150:20 152:12 153:4,10,16 154:22 158:11 159:3,14 160:20,23 161:4,14 162:2 162:17,21 163:4,16,21 164:6,7,14,20 166:18 167:12 168:8,23 169:15 170:5 170:10 172:18 172:24 173:5 174:7,11,13 175:18,24 176:16,24 177:15,16,17 177:20,22 178:8,17 179:24 181:3,5 181:9 182:1 183:3,15,20 184:1,9,18 187:23 188:7 189:5,7,17,20 190:2,13,22 191:9,10 192:4 192:12,17,21 192:24 193:2
**police's** 175:13 175:16
**policeman** 35:1
**policy** 92:7
**polygraph** 94:10 171:8
**poor** 38:2
**pose** 181:1
**possible** 164:5
**precinct** 85:24 145:7
**preparation** 158:3
**prepare** 17:10
**preposterous** 25:7
**presence** 178:18 181:5
**present** 3:1 7:19
**pressure** 91:8 174:10
**pretty** 33:5 100:6 138:19 160:10,19 183:14 185:20 188:6
**print** 121:23,23 121:24
**prior** 17:4 130:19
**prison** 19:18 20:8,19 21:2,3 173:15,18,20
**prob-** 52:21 75:9 147:21
**probably** 9:22

11:20 12:23 15:19 16:15 25:21 26:15 37:11 41:4,5 50:19,22 52:21 68:6,17,20 75:10 80:3 85:16,17 103:7 115:19 131:23 140:24 143:23 148:11 156:5,8 156:12,18,23 159:7,10 164:24 171:3,3 171:4
**problem** 108:13 108:16,20 183:2,7,8
**problems** 130:8 173:7
**Procedure** 1:15
**proceed** 195:17 195:18,19,19
**proceeded** 169:5
**products** 11:7,8
**professional** 9:10 17:3
**proper** 172:8
**property** 46:12 77:5,9,10 78:16 79:4,21 80:2 83:3,7 90:1,15 93:9 93:12,15 100:21 105:22 106:8 108:14 108:24 117:6 132:4,11,18,19 133:1 136:1,2 136:15 139:5 139:18 155:10 158:7 165:2,19 165:21
**prosecute** 98:1 131:6,11
**prosecuted** 127:22 128:1 196:14
**prosecuting** 97:22
**provided** 199:14
**psych** 95:12,13 95:22
**psychologically** 25:10
**PUBLIC** 199:22
**pull** 30:8
**pulled** 177:8 188:7
**purporting** 168:21
**purposes** 197:23
**pursuant** 1:14 1:14
**pushing** 76:11
**put** 5:6 6:9,17 8:12 12:13 26:19 62:17 86:1 97:18 112:12 122:6 139:22
**putting** 11:7 60:15 98:15,21 127:20

**Q**

**que-** 107:16
**question** 35:15 47:16 48:7,7 49:16,21,23 59:5 65:8,15 65:16,23 66:5 66:10 67:15,22 68:1,2,7 70:14 74:9,20 82:23 86:9 98:17 101:1,3,7,8 102:14,15,17 102:23 104:13 105:10,12,13 106:3,11,12,13 107:3 109:12 111:2 126:22 134:7,15 135:8 135:15 144:4 147:2 150:3 154:2,19 158:23 159:1 167:5 170:15 181:2 188:14 188:16 192:20
**question-and-...** 59:3
**question/answ...** 22:14 48:5
**questioned** 86:1 88:9 190:15
**questioning** 21:20 98:15 99:12 101:2 178:20 179:7 179:11
**questions** 33:13 35:5 49:17,18 49:20 50:3 56:18 58:12 88:23 91:4,14 93:4,16 96:21 98:13 99:1 127:3 136:13 145:9 149:3,4 170:6 172:8,13 172:15,17 181:3 194:23 195:7,22 198:4
**quite** 186:12

**R**

**R-E-E-D** 9:3
**R/D** 192:4
**R/D's** 169:5 181:11
**ran** 38:2
**rarely** 53:21
**re-** 99:10
**reach** 194:15 198:4
**read** 17:10,13 17:14 18:14 23:17 30:7 31:17,20 32:12 61:8,19 62:2 62:10 63:9 66:7,15,18 67:1,3,8 68:3 68:10 73:18,19 87:14 101:9,12 101:15 102:3,8 102:13,15,20 104:2,9,9 107:1 111:18 113:1,6,12,23 114:1,2,4,18 115:7,8,12,13 115:20,20,21 115:23 116:11 118:2 120:4 121:11,13,16 121:16,18,22 121:22,24 123:1 124:9,9 140:2 147:18 153:6 168:21 169:3 176:4 191:10,13,18 192:3,12 199:11
**reading** 32:4,6 95:1 113:2,7 113:18 124:20 125:17 168:23 169:7
**ready** 155:5,15 193:6
**real** 10:5,8 11:13 42:14
**really** 6:12,13 10:3 29:10 37:17 42:22 53:8 84:2 85:14 86:11,14 100:6 138:22 139:17 147:4 147:22 158:6 170:4 171:17 173:10 178:21 182:13 196:9
**reason** 42:4 45:8 58:14,18 101:13 103:19 116:7 132:6 133:22 138:24 141:10,16,19 141:21 152:4,8 152:10 158:17 159:3,13 163:17 189:19
**reasoning** 83:22 84:1
**reasons** 57:14 57:20 69:4
**rec-** 170:24
**recall** 52:23 85:19 99:1,10 99:11
**recollection** 97:1,12 121:4 121:9 124:17 131:18 142:9 170:2 171:6 175:24 181:13
**record** 5:2 6:4 6:10,18,24 8:21 9:1 82:15 82:20 102:20 112:13 131:2,5 193:23 194:5 197:19 198:16 199:13
**reduced** 200:10
**Reed** 1:3,12 4:3 4:12 5:3,16 6:8 8:15 9:3 11:22 26:4,11 41:9 42:5,7,8,8,13

42:14,16,17 43:13,14 45:9 45:16 46:15 47:1 50:5,15 55:21 63:15,22 80:14 81:17 89:23 90:3,9 90:10 93:6 100:9 103:4,11 105:21,22,23 116:6 120:20 120:24 121:6 122:11 123:19 124:13 125:20 127:1 129:16 130:10 131:17 131:19 133:18 133:19 134:7 135:13,17 136:15 137:23 138:23 139:19 139:23 140:13 150:21 151:13 152:5,14 153:20,22 154:8 157:16 157:20 163:5 164:8 166:11 169:6,19 171:20 174:13 175:1 176:15 177:19,22 178:8,15 181:4 181:4,10,11,12 181:14,20,20 181:21,23 182:3,24 183:3 183:10,16,19 185:13,19 188:12 190:19 191:23 192:6 194:9,22 196:1 197:22 198:15 199:3,11,16 200:7,24

**Reed's** 28:8
**reflects** 131:14
**refresh** 97:1,10 121:2,9 124:16 131:18 142:9 170:2 171:5 175:23 181:13
**relapse** 38:24 39:1
**relapsed** 38:20 38:21
**related** 136:2
**relation** 50:11
**relative** 200:18 200:19
**relies** 10:4
**remain** 87:16 125:9 127:1 136:6,13
**remainder** 194:12
**remember** 9:21 11:12,13 12:11 14:6,6 15:1,5,7 15:8,8,10,10 18:13,19 19:13 19:14 22:1,21 23:19 24:1,3,7 24:7,12,18 25:8,10,17,18 29:3,21 30:6 32:2,8,11,14 33:1,2,6,8 34:18 39:5,11 39:16 40:12,13 40:17,18,24 41:12,13,14,20 41:21,22 42:4 42:13,14 45:8 45:23 46:4,6,9 50:15 51:8 53:4,20,23 56:19 59:3 60:11,15 61:2 64:5,7,8,12,20 65:17 67:6,15 72:18,20 73:6 73:8,13,17 75:3 76:10,20 76:24 83:8 85:12 86:12,13 89:5,11 91:2,4 91:10 92:21,24 93:2,3,13 94:8 96:9,12,15,16 96:18,23,24 103:18,24 104:16 106:23 107:6 108:2 109:22 110:3,6 110:9,11,12,23 111:5,6,8,15 112:9,22 113:9 113:10 117:19 117:20 120:11 124:16 125:6,7 131:21 138:4 140:2 142:16 142:19 143:21 145:13,16 147:12,20,22 148:1,2,2 149:15,18,19 153:9,16,17 158:5,10,24 162:13 170:4,7 170:11,17 175:22 176:18 176:21,23 185:12,12,19 185:22 188:13 189:4,8,17 190:3,18 191:4 191:6 192:13 192:14,18 193:1
**remembered** 43:14
**repeat** 20:1 153:11 176:20
**report** 104:10 104:17 105:5 106:14 108:4 121:15 123:18 123:24 124:3,5 124:12 131:13 137:15 138:21 149:8 168:8,23 169:15 175:24 181:9 191:9,11 192:4,12
**reported** 105:16 105:20 200:9
**reporter** 1:20 5:24 6:5 8:11 17:22 19:23 20:1 24:14 35:11,17 44:10 47:6,17,21 49:11 50:20 51:1,5,13 78:22 101:14 102:3 106:5 119:24 126:3 131:1 146:16 153:11 154:3 163:7 176:19 184:11 195:12 198:13 200:7 201:2
**reporting** 5:22 6:1 192:5
**reports** 121:5,10 137:18
**represent** 7:18 131:5 137:14
**Representative** 2:12
**representing** 5:21 97:6
**request** 197:12 198:5
**requested** 102:21
**requesting** 195:10 197:3
**reserved** 200:24
**respect** 195:9,20 195:23 197:6
**responsive** 135:4
**rest** 55:17
**restroom** 82:5 82:12
**return** 93:11
**returned** 93:15
**Returning** 69:4
**review** 36:17,19 36:21
**reviewed** 158:2
**Richard** 1:6 2:11 5:16 199:6
**right** 6:21 8:7,20 11:21 15:14 16:2,3 22:13 22:17 23:21 24:6 27:12 28:11,19 30:8 30:21 31:2,12 31:13 33:3,12 34:11,13,14 36:8 37:5,20 39:2 42:8,21 43:10,20 44:21 46:2,7,8,12,22 49:22,24 50:4 50:9 51:10,12 54:8 56:9 57:13,24 58:2 59:7,12,22 60:6 61:4,16 63:2 65:20 66:17 67:5 68:4 69:4,7,8 69:11 70:1,3 70:11,14 71:23 72:10 73:11 74:15 76:19 77:8 78:4,13

78:17 79:9,18 79:22,23 82:1 82:22 84:16 86:6 87:6,11 87:16,19 88:22 89:15,21 90:5 90:17 92:17 96:6 99:3 100:23 101:2 101:24 102:2 102:14 103:18 104:2 107:7,9 108:3,23 109:7 110:13,22,24 112:17 113:24 114:23 116:2 116:11,19 117:11,24 121:13,20 122:5 123:18 124:4,7,10 125:4,8 126:19 126:22,23 127:1,13,22 128:18 130:17 131:13 132:16 134:17 135:13 136:6,12 138:14 139:1,2 139:15,24 140:10,12,21 141:2,22 143:10,11 144:6,13,18 145:23 147:9 149:8,16,20 150:1,12,15,17 150:19 151:5 151:19 152:11 152:24 153:3,7 153:19,21 154:13,18 155:12 157:9 157:11,13,16 158:2 160:1,2 162:10,12 163:20,23 164:13,18 166:8,17 167:3 167:8,15,22 168:3 170:11 171:5 172:2 173:14,16,24 174:16 175:18 175:21 179:3,6 179:12 181:9 183:13 185:4 187:22 188:8 192:3,16 193:14 197:1,3 197:9,14

**rights** 87:14 120:4 124:13 124:14 140:2 169:8,21,21 194:24

**rock** 117:9

**room** 27:21 35:1 35:2,4 86:1 136:5,8,9 137:5 139:22 145:7 162:10 170:19 174:14 174:23 177:8 179:10 180:3 181:12,14 187:23 188:7

**rooms** 178:9

**Royal** 5:21 6:1

**Rules** 1:15

**running** 156:13

## S

**S** 4:10

**s-** 64:20 140:18

**sat** 164:21

**Saturday** 56:23 89:8 93:14

**Savich** 3:2 5:20

**saving** 92:4,6

**saw** 73:1 75:14 137:23 138:22 152:5 163:24 164:6 171:20 172:11 183:3 183:24 188:12 188:20 190:19 192:24

**saying** 23:8 29:9 51:20 61:2 64:8,12 75:22 76:7 83:14 85:2 88:11 99:16 104:16 111:7,10 117:23 125:5 126:24 129:16 138:7 144:7 161:16 162:7 167:6 172:11 176:18,21,23 178:17 179:14 179:15 181:4,4 182:11 188:12 195:7,20

**says** 63:10 97:8 112:18 113:1,6 113:12 114:2 114:10,10,17 114:24 115:6 115:16,18 116:19 123:18 124:4,10 126:2 126:16,17 149:8,11 153:8 168:8,9 169:20 169:21,22,24 176:14 181:9 187:24 188:20 191:23 192:4

**SCAHILL** 2:7

**scared** 125:11 126:9 127:16 127:21 130:20 196:3,9,9

**scary** 180:22 196:7,10,15

**schizoaffective** 9:13,14 10:4

**schizophrenia** 9:17,20,24

**school** 10:14 37:23,24 38:1

**screen** 5:10

**scrutinized** 109:24

**scrutiny** 57:7

**Seaman** 3:4 7:1 7:1,5,5

**search** 157:23 158:4,9,13 159:4

**second** 45:1 63:9 63:13,17 88:22 91:23 92:18 124:24 126:8 126:10 142:2 164:4 180:24

**see** 17:4 18:5,6 22:24 23:1 30:17 54:22 62:8,12,14,24 77:22 80:21 81:3,16,19 85:8 97:3 113:20 121:5 121:12,20,21 122:18,21 123:15 125:19 163:15 174:15 174:16,23 175:1,8,10,23 176:24 179:23 180:4,8,10 186:5 187:16 195:2

**seeing** 80:22 81:1 88:11 133:24

**seen** 46:15 56:24 77:11,13 80:7 80:8,9,10,14 94:10 118:18 118:21 123:21 123:21,23,24 124:2 132:3 135:17 137:8 140:12 187:19

**sell** 71:11,13,15 71:20,22

**selling** 12:16 19:2,4

**sending** 186:13

**sense** 136:18 139:7

**sent** 186:11,14

**sent-** 169:13

**sentence** 26:14 107:19 121:13

**separate** 178:9

**serve** 19:16

**Services** 5:22 6:2

**seven** 113:13 114:4

**seven-page** 114:18 115:8

**shaken** 156:24

**share** 74:5 77:12 157:7 159:9

**shared** 57:24 58:22 64:9 74:8,14

**sharing** 88:17

**sheets** 199:14,18

**shelter** 37:14 39:22

**Shh** 175:11

**shocker** 154:15

**Shooting** 92:17

**short** 53:1,2 82:16

**shorter** 41:2

**Shorthand** 1:20 200:6 201:2

**show** 62:19 153:5 191:8
**showed** 23:8 36:18 97:2 123:20
**showing** 184:15
**sic** 9:16,17 67:9 92:24 94:14,19 104:3 105:14 153:17 156:19
**sick** 188:4
**sickle-cell** 123:12
**side** 10:4 11:4 37:14 39:23 84:22 85:1,23 145:6 164:21 177:9
**sign** 64:14 65:23 66:11,22 115:2 116:7
**signature** 200:23 201:1
**signed** 66:5,23 67:10 68:12 111:20 115:4 116:13 147:19 148:7 189:12
**signing** 158:10
**silent** 87:16 125:9 127:1 136:6,13
**simple** 138:19
**Simultaneous** 8:1
**Singh** 3:4 7:13 7:13
**single-room** 37:16
**sir** 9:6 49:15 62:4,7 82:22 103:9 109:18 120:13 123:1 131:13 172:7 192:3 193:3,10
**sit** 164:22
**sitting** 35:2,4 60:3 144:9 164:19 172:10 184:4
**situation** 109:19 156:21
**six** 41:5,5,6
**skipped** 88:24
**skipping** 169:13 169:14
**skips** 194:19
**skittish** 9:15
**small** 60:5 65:6
**smell** 76:20 77:1 79:9,14
**smoke** 112:19
**smoked** 52:24 94:2 116:21 117:8
**smoking** 117:4
**snitch** 103:21 104:12,19 108:10,17 109:4
**socializing** 52:4
**soda** 112:18
**somebody** 13:20 13:20 23:23 25:7 33:1,9 51:13 66:21 78:6 83:22 115:12,19,19 115:23 116:11 117:10 165:6,6 166:5 174:11 196:22
**someone's** 77:23
**somewhat** 100:5 100:5
**son** 33:19 54:2
**sorry** 5:8 17:22 19:23 24:13,13 33:22 35:11,17 44:5,7 45:4 47:6,17,21 49:11 50:20 51:5 74:22 78:22 106:5,5 106:5 117:20 122:16 138:5 139:9 142:4 153:11 154:3 163:7 166:13 166:15 176:19 181:7 184:11 190:17 193:3,4 195:12,14 198:13
**sounds** 116:4 197:7
**South** 1:18 2:8 2:14 5:12 84:22 85:1 168:10 169:6 177:9 200:14
**span** 23:5,5
**speak** 27:16
**SPEAKER** 130:13 131:24 167:13
**speakers** 8:1 116:22 117:13 188:21 190:23 190:24
**Spec-** 55:2
**Special** 2:11
**specifically** 167:5
**speculated** 55:4
**speculation** 43:19 50:17 54:24 55:5 67:13 68:15 99:20 112:15 125:14 127:6 151:23
**speeches** 130:24
**spell** 8:20,22,24
**spend** 14:4,11 15:6 19:18 20:7 21:1,3
**spoke** 28:3
**spot** 123:2 191:15
**Springfield** 41:17
**sprung** 22:8
**squeeze** 22:10 32:20
**squeezing** 22:18 32:16
**SRO** 37:16 39:6 40:2,4,14 41:1
**SS** 200:2
**stabbed** 69:9 70:16
**staff** 41:13,15 89:10
**start** 142:7 160:15 168:8
**started** 32:4,6 38:15 55:16 100:10 144:3 152:11 154:22 157:15 160:23 166:3 168:13 170:13,18
**starting** 137:21
**starts** 63:24 169:17 170:1
**state** 8:20,22,24 115:11 199:11 200:2 201:2
**state's** 1:7 64:1 104:14 106:14 107:10 109:1 111:3 143:13 147:10 199:7
**stated** 60:13 176:15 181:10 191:23
**statement** 31:8 60:12,16,23 61:5,11,17 63:15,22 64:3 64:14,21,22 65:21,24 66:6 68:10 103:19 104:3,5,7 105:4 106:19 107:1,2,5,8,10 107:12,17,19 107:21,24 109:2,8 110:15 111:3 112:18 113:13 114:5 115:13 116:19 117:23 123:22 143:2,13 147:10,13,14 148:7 152:13 153:19 154:7 155:5,9,15 166:20 168:22 188:11,20 189:12 190:15
**statements** 114:19 115:9
**states** 1:1,15 5:18 64:10 104:10 110:16 111:20 113:6 113:12 114:4 114:17 115:7 199:1 200:1
**stating** 64:1
**station** 19:22 20:2,5,6 34:22 120:4 136:10 137:6 138:15 139:14,22 142:8,24 144:23 150:20 155:18 164:20 168:13 170:5 170:10 172:24 174:14 189:20 190:2,13
**stay** 38:9 40:10

83:11 84:14 142:24
**stayed** 40:6 41:3
**stays** 107:15
**steal** 13:12
**stenographer** 76:5
**stenographica...** 200:10
**step** 61:23,23 194:19
**stereo** 190:22,23 192:8,15,22,24
**stereos** 71:19
**stick** 128:6,19
**stole** 92:11
**stolen** 161:16
**stomach** 177:24
**stood** 71:5
**stop** 10:6 32:7,7 32:7
**stopped** 186:13
**store** 14:2 186:11,13,14
**stores** 11:6,9,9 38:4
**stories** 48:10
**story** 12:17 119:10 128:6 128:19 130:9 135:3 138:19
**straight** 32:13
**street** 2:8 5:23 40:1 84:24 201:10
**streets** 38:2 40:22
**strike** 149:22
**stuff** 11:6 12:12 14:1 29:5 38:5 45:9 46:17 77:24 78:9 118:21 169:14 196:10
**submitted** 199:19
**SUBSCRIBED** 199:20
**succeed** 195:5
**sucks** 171:16
**suffer** 9:23 11:24
**Suite** 1:18 2:8 2:15,20 5:12 5:23 200:14 201:11
**Sullivan** 2:19 8:5,5 49:5,7,9 49:13 116:15 129:23 130:3,5 130:18,22 131:1,3 198:7
**summary** 64:4 169:22
**summer** 3:3,6 6:13,15 7:3,5,7 7:9,11,13,15 92:4
**Sunday** 56:23 89:8 93:14
**sunk** 178:1
**supp** 121:14
**suppose** 197:18
**supposed** 15:10 49:21 105:24 130:23 147:4
**supposedly** 151:14 152:5
**sure** 6:14 9:21 9:22 11:4 16:16 22:7 82:3 84:24 85:18,23 86:16 90:4,4,6,8,12 90:22 92:16 96:1,4 102:14 105:6 106:15 108:7 109:5 116:3,3 117:1 119:4,13,17 120:14,15,23 125:2 134:5 137:12 138:4 144:6 148:18 149:14,15 151:7,17,22 152:2 155:17 156:1 163:1,3 164:16 172:13 172:14,19 175:4 191:14 191:16 196:23
**surprise** 47:10
**suspect** 56:10,14 56:20 57:10,14 57:21 58:5,8 58:17 70:12,16 71:24 77:14 87:23 88:3 97:14,20 99:18 100:2 103:10 103:12 132:23 160:8
**suspected** 69:5 77:14
**suspecting** 163:21
**suspects** 56:3
**swear** 6:5 7:22 29:10
**swearing** 8:7
**sworn** 8:10,16 199:20 200:8

**T**

**T** 4:10
**tactics** 21:20
**take** 27:15 44:19 57:11 61:4,16 61:21 71:21 78:9 82:4 86:3 86:7 88:4,7,13 90:18 92:14 119:11 120:18 129:6,8 145:11 150:13 155:12 156:13 173:14 193:14 196:6
**taken** 1:13,17 5:3,14 63:22 76:7 82:17 155:4,16 194:2 200:13
**talk** 13:1 34:11 44:20 46:11,20 46:22 53:2 55:10,13 85:11 85:20 87:20 89:2 140:10 144:10,22 147:5,6,7 163:9 165:2 180:23,24 198:6
**talked** 104:8 107:9 118:24 131:14 140:6 142:2 153:3 161:5
**talking** 10:6 18:19 26:11 34:22 42:5 45:9 71:6 89:5 104:24 107:8 107:13,24 133:12 142:7 146:14 147:11 152:12 154:22 168:5 180:18 186:6 189:4 193:5
**teens** 38:2
**Tegart** 3:6 7:20 7:21
**television** 192:8
**tell** 14:16 19:12 22:18 23:18 26:22 32:13 33:24 41:4 53:7 56:17,19 62:2 72:21 88:6 90:2 91:10 92:21 93:17,20,23 94:1,3,5,13 95:7 100:22 103:10,19 106:13 109:1,3 109:3 110:16 111:21 113:19 116:20 117:12 117:23 118:5 118:23 119:9 124:1,2 128:10 130:15 132:17 132:18,22 135:14,16,24 136:12,16 137:7,9 138:9 138:13,16,17 138:20,24 141:2 144:18 156:17 160:22 161:4 164:5 165:24 174:13 174:17 175:18 183:24
**telling** 24:19 36:6 48:10 53:20,23 76:24 89:7 91:1,1 94:8 108:14,21 117:12 130:9 133:3,9 135:3 157:15 161:14 163:4 183:2
**ten** 15:19 135:21
**terrible** 79:12
**Terrie** 2:19 8:5 49:13 130:5
**test** 34:24 35:1,8 35:19,20 36:6 56:12,16 57:12 86:4 88:4,7,14 90:18,19 91:16

91:18,24 92:15 92:18,22,23 96:20 99:13 100:10,20 103:1 119:1,12 119:22 120:18 131:16 145:11 150:14,16 174:21
**testified** 8:17 34:11 146:12
**testify** 75:7 200:8
**testifying** 73:13 75:12
**testimony** 17:5 17:16 18:15 31:9 32:10 34:19 73:18 75:5 79:3 130:19 146:10 199:11,13
**thank** 8:11,14 30:13,16 52:2 74:19 102:4,19 114:15 176:11 197:8,11,15
**thanks** 30:24 86:21,22 176:11
**That'd** 21:7
**theme** 91:21 92:5,5
**theories** 56:3,5
**theory** 161:15
**they'd** 14:17
**theyself** 26:2
**thing** 36:23 38:23 43:11 88:12 91:13 116:9 124:2 133:11 137:7 144:7 151:13 183:23
**things** 14:17 18:9 22:20,22 29:21 31:5 41:14 55:1 66:20 71:10,11 71:16 116:12 123:15 148:5
**think** 6:17 14:13 21:24 22:14 23:4,5,22,22 23:24 25:7 29:9,12 34:9 34:21 49:1,15 57:9,20 58:14 58:16 61:7,10 61:19 74:10 75:18,24 76:7 83:16 84:23,24 86:15 87:2,4 87:22 91:21 93:1 97:16 98:13 103:6,11 108:13 109:22 112:24 115:6 120:15 128:5 140:11 150:7 150:21 151:12 160:2,5 161:7 162:5,11 163:17,20 164:13 166:1 167:9 168:4 174:8 179:11 182:5 187:14 189:15,16 195:21 197:21
**thinking** 20:21 20:22 26:19 83:12 92:10 175:6,12 179:17,20
**third** 164:4
**Thompson** 1:7 2:12 149:9 169:18 199:7
**thought** 20:14 55:24 110:18 111:22 143:15 159:24
**three** 28:18 65:1 85:18 148:12
**throw** 122:14
**time** 5:4,9 6:3 11:11,19,24 12:7,10,24 13:16 14:5 19:18 20:6,6,7 20:11 21:1,3 23:1,2,4,5 26:17 28:7,9 31:8 34:15 37:4,11 38:19 38:19 39:3 42:23 44:20 60:8 61:14,23 61:24 65:19 68:23 69:1,3 73:1,7 76:6,9 79:10 82:10,18 83:13 85:3 89:24 91:2,23 92:2,3,18 95:13,22 96:7 99:24 104:23 106:21 131:14 134:6 140:4,10 142:2,11,14,16 142:18,19 143:1 145:13 145:19 146:1 146:14 164:19 166:23 178:21 183:23 186:14 188:10,17,24 190:5,8,15 191:24 193:17 194:3,16 198:9
**times** 10:7 14:18 15:8 19:3 22:1 28:13,18 34:2 38:18 40:22 59:14,21 69:9 135:21 169:23 186:12,12
**timing** 170:3
**Timothy** 1:6 2:12 199:6
**tired** 193:7,7
**today** 5:24 7:19 14:21 17:11 27:7 28:16 34:8 36:13 48:4 49:16 94:11 127:16
**told** 22:19 24:21 27:6,7 28:19 28:23 29:18 32:5,20 36:1,2 36:3,4,4 39:14 39:18 46:11,14 56:22 77:5,8 77:10,13 79:21 80:2 81:17 86:2 88:12 90:18 93:10,13 93:14 97:4 100:19,21 102:24 108:14 108:24 117:5 118:9,16,18 119:14,20 125:8 132:3,6 132:9 136:1,6 136:14 137:12 137:22 138:7 139:4,4,18,23 140:17 141:10 141:20 158:7 160:21,23 162:2,9,21 163:16 164:2,7 164:22 165:1,3 174:18,22 176:17 182:1 183:15,20 186:13
**Tommy** 10:24
**top** 61:5,17 126:13 191:24
**total** 39:15
**totally** 116:3
**touch** 166:12
**track** 38:8 49:16 139:10
**transcript** 199:11,12
**transpired** 118:10,10
**transporting** 169:8
**traumatic** 22:3 43:11
**traumatized** 42:12
**treat** 56:9 57:6 98:3
**treat-** 56:20
**treated** 87:23 112:19 147:18
**treating** 56:14 56:20 57:9 71:23
**trial** 97:19 98:15 98:21
**tried** 195:2
**trouble** 29:6,19 128:20 131:7 156:16 159:15 164:15 165:8
**true** 18:16 27:23 58:2 59:9 60:20,23 64:15 64:21 65:24 66:7,9,11 68:12 72:12 100:8,12,17 103:9,16,16 104:17,20 105:2 108:3 114:20 115:10 116:24 118:4

119:9 132:7 138:22 141:11 191:1 192:16 192:21 199:12
**truly** 140:12
**trust** 133:13,13 133:14,17
**trusts** 134:22 135:2
**truth** 14:16 36:6 91:1 130:15 200:9
**truthful** 75:5
**try** 24:18 38:7,8 38:8 47:13 48:6,16,16,18 48:19 65:11 166:5 198:5
**trying** 21:14 24:6,8 26:18 26:19 38:22 40:23 44:15,17 49:8 81:9 100:1 101:3,5 101:6,17,22 175:14
**tsullivan@mo...** 2:22
**Tuesday** 73:4
**turn** 48:20 62:7 106:12
**TV** 60:4 71:18
**twice** 28:14 160:16
**two** 7:23 33:17 80:3,4 86:14 94:4,6 139:11 143:24 148:12
**type** 24:2 78:5 81:24
**type-** 62:3
**typewriting** 200:11

**U**

**Uh** 170:14 171:10 182:14 184:5
**Uh-huh** 27:20 69:18 147:17
**Uhh** 180:16 182:6
**um** 29:11 119:4 127:10
**un-** 26:23 75:10 142:23
**understand** 40:23 48:23 79:2 81:9 103:4 138:21
**understanding** 148:21 197:22
**understands** 198:2
**understood** 48:17 64:1 98:5,11 124:14 169:21
**unfair** 23:23 75:11 106:24 109:13,14,18 109:18 110:5 171:17
**UNIDENTIFI...** 130:13 131:24 167:13
**Unit** 82:14,19 193:20 194:4 198:10
**United** 1:1,15 5:18 199:1 200:1
**unsolved** 98:3
**untruthfully** 75:7
**unusual** 73:11
**upended** 182:10
**upsidedown** 62:8
**use** 82:4,11 120:9 125:9 161:21 162:3 172:16
**user** 12:17
**usually** 164:17

**V**

**Van** 19:9 41:10 46:6,15 50:14 52:17,18 54:3 54:9 55:11,14 55:14 57:1 58:20 59:6,14 60:14 64:9,10 73:1 74:8,14 78:5,13,20 79:7 80:5,10 80:19 81:18 95:23 96:7 100:11 110:17 110:18 111:21 111:22 116:22 116:23 117:13 117:14 133:20 133:23 150:17 164:23 170:19 192:6,7,19,22
**verb** 157:5
**verbatim** 169:4 169:23
**version** 126:15 176:1 191:17
**versus** 5:16
**victim** 154:11 157:7
**victim's** 110:7 110:10 137:24 138:23 140:13 140:16 162:3 162:24 163:5 163:18 171:21
**video** 5:5,10 82:15,20 193:21 194:5 198:16
**videoconference** 2:7,19 3:3
**videographer** 3:2 5:1,9,21 6:19 30:12 62:16,20 82:10 82:13 122:9,14 166:11,14 193:17,20,23 194:3 198:9,14
**videotaped** 1:12 5:2
**vision** 9:13 61:22 115:22 123:5
**visit** 54:2
**visitors** 53:24
**Vo** 19:9 41:10 46:15 50:14 52:17,18 54:3 54:9 55:11,14 57:1 59:14 60:14 64:9,10 73:1 74:8,14 78:5,13,20 79:7 80:5,10 80:19 81:18 95:23 100:11 110:18 111:22 116:23 117:14 133:20,23 150:17 170:19 192:6,7,22
**Vo's** 46:6 58:20 59:6 96:7 110:17 111:21 116:22 117:13 164:23 192:19
**voice-identify** 6:4
**voluntarily** 143:1
**vs** 1:5 199:5

**W**

**w-** 56:21
**Wacker** 1:18 2:14 5:12 200:14
**wait** 11:18 24:11 45:1 106:1,9 106:11 134:18 134:18,18 143:3 180:20
**waiting** 164:19 166:23
**waived** 124:14 169:22
**walk** 12:8 62:18
**wall** 179:10
**walnut** 22:10,18 32:16,21
**wanna** 144:10
**want** 15:11 17:15 29:15 48:21 56:8 71:15 83:23 102:8 103:20 104:11,18 108:10 109:4,8 110:13 116:20 128:1,6 144:2 144:15 145:2 147:7 149:5 165:7 166:6 173:20 174:4,7 180:23,24 187:22 194:11 195:18,22
**wanted** 17:19 18:2 56:6,7 71:20 86:17 114:7 116:10 159:4 175:7,7 175:10 180:8 180:10 195:4
**wanting** 117:12 147:5
**wants** 33:9 48:20 102:6,13

**Washington** 37:16 39:7
**wasn't** 24:8 37:17 60:23 64:15 65:24 66:9,11 72:14 75:11 78:5 81:11 87:17 148:13,23 167:19,19 170:9 173:12 179:24 185:5 190:2
**watching** 60:3
**water** 91:21 92:5 176:6
**way** 10:11,12 22:5 27:8 45:22 47:4,24 85:2 96:18,23 125:6,7 127:20 167:4 183:17 191:6
**we'll** 34:11 36:10 46:22 122:7 197:16
**we're** 8:7 13:1 34:8 42:5 45:9 47:12 48:4 49:3,15 82:15 82:20 101:12 102:14 107:8 127:2 130:23 144:7 146:14 193:21 194:5 195:9,22,24 197:6,18 198:4 198:16
**we've** 22:13 147:11 197:21
**Wednesday** 56:22 73:5 89:8 93:10
**week** 79:22
**weekend** 45:18 64:24 80:11
**weeks** 25:18,19 28:12 85:18 142:3 144:24 168:1,5
**welcome** 176:12
**went** 19:14 38:7 40:4,5,5,9 77:5 77:8 78:15 79:3,22 81:2 84:15 111:6,9 111:16 112:9 120:16 123:22 147:14,22 149:21 151:12 162:13 165:1 171:4 188:24 190:18
**weren't** 28:20 28:20 83:2 85:3 105:6 106:15 159:21
**West** 2:20 37:14 39:23 63:23 107:12
**wh-** 138:19
**Whahh** 178:2
**When's** 73:1
**white** 53:18 86:14 91:21 92:5
**Whoaf** 46:18
**Whooh** 52:12 180:15
**Wiedenhaupt** 1:19 6:1 200:6 201:10
**wife** 23:17 30:6 31:17,20 36:16
**wife's** 33:23
**William** 3:5 7:7
**Willie** 41:10,22 46:9,10 80:9
**willing** 87:19
**witness** 4:2 6:6 7:22 8:8,9,13 11:22 16:19,21 16:23 17:21 18:1 19:24 20:3,4 21:7,11 21:13,17,19,23 24:10,12,16 30:11,13,17,20 43:4,6,16,18 43:20,23 44:1 44:3,5,7,9,12 44:18,21,23 45:2,5,12 47:18,20,23 48:12,14,16,18 50:19,21 51:3 51:6 57:17 58:7 61:1,9 62:23 64:18 66:2,14 68:16 72:3,5,7 75:19 75:21 76:13 77:21 81:5 82:2,4,11,18 83:18,20 87:1 88:2 95:18 96:1,3 98:7,10 98:23 99:2,21 100:4,14,16 101:6,8,10,18 101:20,22 103:5,15,23 104:22 105:1 106:22 108:6 108:12,19 109:11,13 111:13 112:3,5 112:7 115:2,4 115:12,14 116:16 117:17 118:8 119:3,17 119:19 120:6,8 120:10,22 122:17 124:19 124:21,23 125:1,15,18,22 126:1,4,7,9,11 127:7 128:12 128:14,23 129:11,19,20 129:21 130:12 130:14 132:1,9 132:11,13 133:5 134:23 135:5,10,20,22 136:20,22,24 137:2,4 138:3 140:23 141:5,7 141:13,15 142:13 145:16 145:18 146:7 146:20,22 148:10,17 150:4,6 151:1 151:7,9,16,22 152:1,17,19,23 153:13 155:1,8 156:1,3,5,7 157:19 159:6 159:18,24 161:2,19 163:8 166:13,15 167:3,8,18 173:9 176:7,9 176:11,22 178:16,19 179:20,22 180:22 184:13 184:22 185:8 185:15 186:1 187:1,12 189:3 190:1,7 191:3 193:19,22 195:14 196:3,7 196:22 197:8 197:11,15 198:1 200:23 201:1
**witness's** 130:19 181:5
**witnesses** 162:7
**Woah** 14:12
**wondering** 14:24
**word** 64:4,4 74:15,16 173:14
**words** 62:14 168:23 195:16
**work** 9:5 11:14 11:15 91:15 92:9 173:13
**worked** 10:22 10:24,24 11:2 11:11,18,19 38:3
**workers** 25:24 92:8
**working** 38:16 92:12
**works** 92:22
**world** 182:10
**worse** 79:10
**worst** 14:10 15:1
**would've** 71:21
**wouldn't** 13:10 13:12,12 25:5 43:18 50:13 65:6 71:6 75:6 83:3 126:7 127:4,10,10 129:13 132:6 132:17 138:20 139:4,16 141:10,19 158:20 171:13 183:6,7
**write** 138:8
**writing** 113:23 115:21 146:16
**written** 36:24
**wrong** 77:18 78:2 79:7 81:23 95:2 127:9 128:16

149:7 186:5 189:15,16
**wrote** 147:13,15

**X**

**X** 4:1,10

**Y**

**Yanow** 2:11
**Ye-** 135:5
**yeah** 9:18 16:1 24:24 26:17 27:24 30:12,12 30:19,23 31:10 31:21 34:9,17 34:20 35:4 36:20 37:2 38:5 44:23 45:13,23,23 52:9 53:6,17 55:12 56:11 67:17,24 73:7 73:10,16 76:23 77:2,17 78:24 79:11,11,13,15 83:15 86:5,20 89:20,20 90:22 91:9 94:20 95:9,15,15,20 97:5 103:7 115:18 121:21 122:5 123:17 127:18,24 134:24 135:11 138:15 140:11 147:5 150:18 156:19 157:4 161:10 162:5 162:11 163:19 163:22 167:13 168:4 170:9 171:22 173:17 175:5,5 176:8 176:10 177:3 177:12,24 180:15 182:17 182:21 183:1,1 186:4,7 189:16 193:13,16
**year** 37:20 39:12
**years** 12:11,23 14:9 17:18 18:20 19:16 20:12 21:24 22:12,22 23:24 25:8 30:2 34:16 40:11,11 40:16,19 55:12 94:4,6 142:19 173:18,19 196:12
**Yep** 7:21 30:15
**yesterday** 15:14 28:15 37:3
**you-all** 147:8 162:7

**Z**

**Zoom** 6:16 16:4 16:8
**Zuley** 1:6 2:11 5:16 199:6

**0**

**084-004725** 201:13

**1**

**1** 4:13 74:3 82:14 122:10 122:12
**1:00** 60:13 63:23 107:11 152:15 152:17,21 153:4,18 154:12,14,21 166:20 188:11 188:19 189:5 189:12,18,20 190:14
**1:28** 194:3
**1:31** 198:9,18
**10** 191:8,20,22
**10:00** 27:10,19 81:21 134:4
**10:25** 1:21 5:4 5:10 200:16
**11-** 82:10
**11:00** 81:21 134:4 190:11
**11:15** 137:21 142:6 149:10 152:12 168:20 169:17,24
**11:32** 82:18
**11:45** 176:14
**111** 2:20
**12** 172:24
**12:45** 193:18
**122** 4:13
**12th** 23:1
**13th** 23:2
**14** 125:24 126:17,18,19 126:20,20 154:21 155:4 155:13,19 156:8,12,13,15 173:1,4
**1400** 171:11
**15** 121:14 124:12,24 125:24 126:2 126:16
**16** 126:17 176:1
**161** 5:23 201:10
**17** 1:21 199:12 200:16
**1700** 2:8,20
**17th** 5:4 73:14
**19** 74:4 121:14 191:22
**19-page** 121:14
**1965** 37:21
**1987** 91:21
**1990** 19:7
**19th** 23:3
**1st** 40:7,8

**2**

**2** 82:19 193:20
**2-** 11:16
**2:00** 171:11
**20** 2:8 164:24
**20-** 29:22
**2000** 16:16 37:13,19
**2000s** 11:16
**2001** 16:16 67:2 68:9 73:15 117:22 123:15 135:14,17
**2003** 123:7,9
**2004** 113:22 123:9
**2008** 11:20
**2010s** 11:17
**2020s** 11:17
**2025** 1:21 5:4 199:12,21 200:16 201:3
**2060** 201:11
**21** 74:2
**22nd** 131:15 135:14,17 137:16,19 149:10 176:14
**23** 1:5 5:17 199:5
**23rd** 60:12 63:23 104:3 107:11 154:12 189:13
**24** 201:3
**2452** 63:23 107:12
**25** 12:23 17:16 18:20 21:24 22:12,22 23:24 25:8 34:16 40:19 82:13 126:13 142:19 196:12

**3**

**3** 74:2 169:8 194:4 198:10
**3050** 5:23
**311** 1:18 2:3,14 5:12 200:14
**312.243.5900** 2:4
**312.361.8851** 201:12
**312.580.1030** 2:9
**312.786.4600** 2:21
**312.982.0090** 2:16
**38** 33:19
**3rd** 2:3

**4**

**4** 74:2
**40** 33:19

**5**

**5** 92:9 104:4
**5200** 1:18 2:15 5:12 200:14
**5213** 168:10 169:6
**56th** 84:23
**57th** 84:24
**59** 9:7

**6**

**6** 116:20
**60601** 5:24 201:11
**60603** 2:9
**60604** 2:21
**60606** 2:15 5:13
**60607** 2:4

**63rd** 52:13

**7**

**7186** 1:5 5:17 199:5

**8**

**8** 4:4
**80s** 20:22 52:22

**9**

**9** 126:16
**90** 19:7
**90s** 19:19 20:8 20:11,20,21
**91** 19:7
**94** 9:22
**96** 9:22
**98** 37:12