THE FOREPERSON: Raise your right hand, please.

(Witness duly sworn.)

MS. LANAHAN: I am Assistant State's Attorney Kathaleen Lanahan of the Homicide-Sex Unit.

I am appearing on Grand Jury Number August 2191 which is a John Doe investigation relating to the murder of Kim Van Vo which occurred on July 14th of 2001. We are not seeking an indictment at this time.

The Grand Jury does have the right to subpoena and question any person against whom the State's Attorney is seeking a Bill of Indictment, or any other person, and to obtain and examine any documents or transcripts relevant to the matter being prosecuted by the State's Attorney.

At this time I ask leave to call Delong Reed.

DELONG REED,

having been first duly sworn, was examined and testified as follows:

EXAMINATION BY

MS. LANAHAN:

Q. Mr. Reed, please state your name.

A. Delong Reed.

Q. Have you already been sworn in?
A. Yes.
Q. What is your date of birth?
A. 11-19-65.
Q. How old are you?
A. Thirty-five.
Q. And where do you live?
A. 5213 South Indiana.
Q. Did you attend high school?
A. Yes.
Q. Where did you attend high school at?
A. Engelwood High School.
Q. I want to call your attention back to July 12 of 2001, where were you living at that time?
A. 4946 North Sheridan, apartment 309.
Q. Okay. And who was your next door neighbor?
A. Mr. Kim Van Vo.
Q. And did you share anything between apartments?
A. We had a community bathroom that we shared between me and Mr. Van Vo.
Q. And how were the doors of the apartments and the bathrooms normally kept?

A. Open.
Q. Okay. Now, I want to call your attention to July 13th of 2001, did you go somewhere?
A. Yes.
Q. Where did you go?
A. 5213 South Indiana.
Q. Whose house is that?
A. My grandmother's.
Q. Did you leave for the whole weekend?
A. Yes.
Q. Did you return on July 15?
A. Sunday, yes.
Q. That was in the evening?
A. Yes.
Q. And did you notice anything about the doors to Mr. Van Vo's apartment and bathroom?
A. Yes.
Q. What did you notice about the doors?
A. They were shut.
Q. What did you do?
A. I -- I knocked.
Q. Did you get any response?
A. No.
Q. The next day did you go to Mr. Van Vo's

apartment?

A. Yes, I knocked.

Q. Where did you knock at?

A. The bathroom door and I tried the lock out policy, the knob on the door that locks.

Q. What happened when you tried that?

A. It was broken.

Q. Okay. Did you get any answer from Mr. Van Vo's apartment on that date?

A. No.

Q. What did you do then?

A. I --

Q. Did you run into --

A. I didn't do anything at that time.

Q. Okay. Did you run into a Corneal Carter that day?

A. Yes, later that evening.

Q. Okay. What was Corneal Carter doing?

A. Corneal Carter was selling an air conditioner.

Q. Okay. And did you help him out in any way?

A. Yes, we -- I helped him carry the air conditioner from the second floor to the first floor.

Q. Did you run into anyone when you were carrying the air conditioner downstairs?

A. Yes, we placed the air conditioner in Carl Reed's hands.

Q. Okay.

A. And we returned back up the stairs.

Q. When you say Carl Reed, who is Carl Reed?

A. Carl Reed is the tenant in apartment 305.

Q. How long have you known him?

A. Not very long.

Q. Okay. I want to show you what I marked -- previously marked as People's Exhibit Number 1 for identification.

Do you recognize this photograph?

A. Yes.

Q. Who is that a photo of?

A. Carl Reed.

Q. When you saw Carl Reed, what did you do?

A. When I seen Carl Reed, I just gave him the air conditioner.

Q. Okay. Did you go somewhere?

A. We went -- me and Corneal Carter went back to his apartment, apartment 210.

Q. Whose apartment was that?

A. Corneal Carter.
Q. You went to Corneal's apartment?
A. Yes.
Q. What did you do there?
A. We smoked crack cocaine.
Q. Okay. And did something happen when you were at Corneal's apartment?
A. Later -- 15 minutes later Carl Reed came. He smoked crack cocaine. After we were through, he gave me his house keys.
Q. Did he tell you to do something?
A. He asked me to remain in his house.
Q. Did he tell you why?
A. He didn't. He wasn't -- he didn't make sense why, but he told me that he would bring back beer and some more cocaine.
Q. Did you go to his apartment?
A. Yes, I did.
Q. And did you stay in his apartment?
A. Not very long.
Q. What did you do then?
A. After 5 minutes I walked to my apartment to turn my light off.
Q. What else did you do?

A. I got water.
Q. Did you notice anything?
A. Yes, when I turned the light off and opened my front door, I noticed Carl Reed in Mr. Van Vo's apartment.
Q. What did you do when you noticed him in Mr. Van Vo's apartment?
A. He went back in and shut the door really quick.
Q. Did he come back out?
A. Yes, because I stood there.
Q. Okay. When he came back out, did he have anything with him?
A. When he came back out, he was pulling out a tall speaker, like a tower speaker, that belonged to Mr. Van Vo.
Q. Did he say anything to you?
A. I asked him what was he doing in Mr. Van Vo's apartment.
Q. What did he say?
A. He asked me, why can't you do what you told? Just stay where you told.
Q. And did you ask him where Mr. Van Vo was at?

A. Not at that time. Well, I asked him where Mr. Van Vo was after I went back to Carl Reed's apartment.

Q. What did he tell you?

A. He said Mr. Van Vo was out of town.

Q. Okay. And did Carl come back to Carl's apartment with something?

A. He came -- he -- he proceeded -- left out of the building with the speaker and he returned with crack cocaine.

Q. Okay. After he returned with the crack cocaine, did he do anything else later that night?

A. Yes, he went for the second speaker.

Q. Did you see him take the second speaker?

A. No, he just brung it to his house.

Q. You just saw it?

A. I just saw it in his house.

Q. The next day did you notice anything coming from Mr. Van Vo's apartment?

A. Yes.

Q. What did you notice?

A. Foul odor.

Q. Okay. And what did you do then?

A. I -- I went to Carl Reed's apartment and

asked him was Mr. Van Vo in there because it was very dark. I asked him was he in there.

Q. What did he say?

A. He said, no.

Q. Okay. Did you do anything with the doors at that time?

A. No. No, the lock out policy was still locked.

Q. So you noticed that the door from the bathroom to Mr. Van Vo's apartment --

A. Is broken.

Q. Okay. So you couldn't open it?

A. No.

Q. On July 19th of 2001, what did you do?

A. I wanted to clean my apartment but I couldn't because I -- I could not open my bathroom because of the odor anymore, so I went to social services downstairs and asked them to check and see.

Q. What did you think was going on at that time?

A. I thought because Mr. Van Vo's has pets, fish, really large fish, I thought maybe if he was away maybe one of them might have perished or something. I didn't want to be guessing, so I went

to social services and asked them to come up and check.

Q. Did somebody come up?

A. Yes.

Q. When they came up, what did you learn?

A. After they came up and checked the apartment, they came back downstairs and informed me and Corneal Carter that Mr. Van Vo had passed.

Q. Okay. Did you tell anybody at that point that Carl Reed had been in that apartment?

A. No.

Q. Why not?

A. Because -- because I felt that I would have been speculating what had happened if he may have found him there or, you know, if he may have did something.

Q. Okay.

A. That then it was really creepy at that time.

Q. Okay. There were detectives that came to the scene, is that correct?

A. Pardon me.

Q. There were detective that came to the scene?

A. Yes.

Q. And did you tell them what happened at that time?

A. No, I only told them about that the door is normally open.

Q. Then a few days later the detectives came back to talk to you, is that correct?

A. Yes.

Q. And they told you that your friend Mr. Van Vo had been murdered?

A. Yes.

Q. At that point what happened?

A. That's when I told them that I -- Carl Reed, I had seen Carl Reed.

Q. That's what you told them what you are telling the Grand Jury today?

A. Yes.

Q. Now, back on July 23rd of 2001 at approximately 1 o'clock in the morning, were you at Area 3 Violent Crimes?

A. Yes.

Q. At that time did you speak with Assistant State's Attorney Nancy Galassini and Detective Thompson?

A. Yes.
Q. And did you tell them the same facts that you are telling the Grand Jury today?
A. Yes.
Q. Was that statement written down?
A. Yes.
Q. I am going to show you what I've marked -- previously marked as People's Exhibit Number 2 for identification.
Do you recognize this statement?
A. Yes.
Q. Is that a true and accurate copy of the statement that was written down by Assistant State's Attorney Nancy Galassini?
A. Yes, it is.
Q. Did you sign each and every page of that statement?
A. Yes.
Q. Do you recognize the signatures on the bottom of those pages?
A. Yes.
Q. Were you under the influence of drugs or alcohol when you gave this statement.
A. No.

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER



Q. Did anyone threaten you with anything or promise you anything in return for giving this statement?

A. No.

Q. How were you treated by the assistant state's attorney and the detective?

A. Fairly well.

Q. Okay. Now, when you came to the building today, did I introduce myself as an assistant state's attorney, a lawyer, a prosecutor, and not the attorney for Carl Reed?

A. Yes.

Q. And how were you treated today by myself and the detective?

A. Fairly well.

Q. And are you under the influence of drugs or alcohol today?

A. No.

Q. Did anyone threaten you with anything or promise you anything today for your testimony before the Grand Jury?

A. No.

MS. LANAHAN: I have no further questions.

Any questions?

Case: 1:23-cv-17186 Document #: 198-16 Filed: 08/25/25 Page 14 of 14 PageID #:3796


(No response.)

(Witness excused.)