IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CARL REED, )
Plaintiff, )
-vs- ) No. 23 C 17186
RICHARD ZULEY, TIMOTHY THOMPSON,)
the CITY OF CHICAGO, COOK COUNTY)
STATE'S ATTORNEY NANCY GALASSINI)
ADDUCI, and COOK COUNTY, )
Defendants. )

The Zoom-recorded continued deposition of DeLONG REED called for examination pursuant to Notice and the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Jana E. Cox, via videoconference, on the 19th day of March, 2026, at the hour of 1:06 p.m.

Reported By: Jana E. Cox, CSR
License No.: 084-004399

REMOTE APPEARANCES:

LOEVY & LOEVY
BY: MR. JON LOEVY
311 North Aberdeen Street
Third Floor
Chicago, Illinois 60607
(312) 243-5900
jon@loevy.com
Representing the Plaintiff;

O'CONNOR & BATTLE, LLP
BY: MS. MICHELE J. BRAUN
111 West Jackson Boulevard
Suite 1700
Chicago, Illinois 60604
(312) 786-4600
mbraun@mokblaw.com
Representing the Defendants;

REMOTE APPEARANCES (CONTINUED):

CHERONIS & PARENTE, LLC
BY: MR. DAMON M. CHERONIS
140 South Dearborn Street
Suite 404
Chicago, Illinois
(312) 971-3803

Representing the Deponent.

I N D E X


| WITNESS | EXAMINATION |
|---|---|
| DeLONG REED | |
| By Mr. Loevy | 6, 65 |
| By Ms. Braun | 25 |


E X H I B I T S


| NUMBER | PAGE |
|---|---|
| Deposition | |
| Exhibit A | 32 |
| Exhibit B | 43 |

(Witness sworn.)

MS. BRAUN: Can you please state your full name for the record?

THE WITNESS: DeLong Patrick Reed.

MS. BRAUN: Let the reflect that this is the continued discovery deposition of DeLong Patrick Reed taken pursuant to notice and in accordance with the applicable Federal Rules of Civil Procedure and the local Rules of the Northern District of Illinois.

We concluded the first part of your deposition that was taken on July 17, 2025, with the understanding that you would be retaining a lawyer who would be representing your interests in the conclusion of this deposition. So we're going to allow Mr. Loevy who represents Carl Reed to finish his questioning of you before I start to ask you questions. Is that okay, Mr. Reed?

THE WITNESS: That will be great.

MR. CHERONIS: Just before we get started, for the record, my name is Damon Cheronis, C-H-E-R-O-N-I-S. I was appointed by Judge McShane to represent Mr. Reed for the purposes of this deposition. Good afternoon, everybody.

MR. LOEVY: Good afternoon. And thank you, Mr. Cheronis, for making the continued deposition possible.

MR. CHERONIS: Yes, sir.

WHEREUPON:

DeLONG REED,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION (continued)

BY MR. LOEVY:

**Q. Mr. Reed, how are you?**

A. I'm fine.

**Q. Anything material change in your life since you gave the first part of the deposition?**

A. No.

**Q. Any health problems or memory problems since then?**

A. Just lungs. Just lungs got worse.

**Q. How about your memory?**

A. My memory?

**Q. Yes.**

A. My memory is fine.

**Q. Have you worked since we talked last?**

A. No, ma'am. No, sir.

Q. All right. When we left off at the last part of the deposition, you thought that it made sense for you to get an attorney before continuing questions. And my first question to you, sir, is what was your thought process there?
A. My thought process was I didn't understand the format. My attorney explained it to me.
Q. Do you have any concern that the Chicago Police Department was looking at you as a suspect in this murder?
A. No.
Q. Did you ever have a concern?
A. No.
Q. How about back when they asked you to take a lie detector test? Did that cause you to believe that they were treating you like a suspect?
A. No.
Q. Why not?
A. I figured it was just for the record.
Q. At any point, did you feel like you know what, I wonder if the police are going to accuse me of this?
A. No.
MS. BRAUN: Objection, asked and answered.

BY MR. LOEVY:

Q. Did it even cross your mind?

A. No.

Q. And where were you the night the murder occurred?

A. I don't know what night it occurred.

Q. Do you know approximately when it occurred?

A. No.

Q. Do you have any memory at all where you were during the week that the murder happened?

A. I was -- I was visiting my grandmother-in-law.

Q. How is it that you remember that?

A. Because that's what I did. I had a nice time.

Q. What did you do the weekend before the murder -- I mean a week before the murder?

A. I don't know. I don't know.

Q. What did you do the week after the murder?

A. I went back to my in-law's house and stayed there.

Q. Do you remember anything about that week? How about the next month? Do you remember anything

that happened the next month?
A. No.
Q. How long was it until you reported a suspicion to the property manager?
A. It was probably one night to two nights, something like that.
Q. What did you -- What caused you to report suspicion to the property manager?
A. I was suspicious myself.
Q. What were you suspicious about?
A. I was suspicious as to what was going on and why Mr. Reed was coming in and out of Mr. Van Vo's apartment.
Q. Did you know that Mr. Van Vo had been murdered?
A. No, not right away.
Q. So did you report to the property manager before you knew that any harm had come to Mr. Van Vo?
A. No.
Q. I'm sorry?
A. I think it was the -- I think it might have been a Monday when the property manager was in in the morning. I just report to her that --

suspicious activities of Mr. Reed.

Q. So you did not report -- So before you knew Van Vo had been murdered, you reported this to the property manager?

A. No.

Q. You knew that Mr. Van Vo had been murdered by the time you made the report to the property manager?

A. No.

Q. Well, which is it? You answered both ways.

A. No. I said I reported to the property manager the suspicions of Mr. Reed coming in and out of Mr. Van Vo's apartment. And I wasn't sure, but the smell gave me some kind of idea; but I didn't say that was he deceased or anything.

Q. Did you report a smell to the property manager?

A. Yes, I did.

Q. And do you have any records of what you reported to the property manager?

A. Not with me.

Q. Anywhere do you have any records of what you reported to the property manager?

A. Not with me.
Q. Are you just going by memory on what you reported to the property manager?
A. Yeah, pretty much.
Q. Is it possible that what you reported to the property manager was that there was a very unpleasant smell coming from the apartment?
A. Yes.
MS. BRAUN: Objection, calls for speculation.
BY MR. LOEVY:
Q. Is it possible all these years later based on your memory that that's all you reported to the property manager?
MS. BRAUN: Same objection, calls for speculation.
BY MR. LOEVY:
Q. You can answer, sir.
A. Can I have the question again?
Q. Sure. It's been a long time to remember these things, right?
A. Yes, sir.
Q. And your memory is that you told the property manager that there was a bad smell coming from the apartment, right?

A. Yes.

**Q. All right. My next question is, given all those passage of years, is it possible that was the only thing you told the property manager?**

MS. BRAUN: Objection, calls for speculation.

You can answer, Mr. Reed.

BY THE WITNESS:

A. Yes. It was -- It was the only thing I reported to the property manager.

**Q. All right. And at that time, where did the police find you?**

A. I was in my apartment sitting on my bed.

**Q. And what did they tell you?**

A. They just asked me some questions, and they told me I could go.

**Q. Did they bring you to the station?**

A. Yeah, they brought me to the station, but I don't remember what day it was because -- I think they brought me to the station. I'm not sure if they brought me to the station that day. I can't remember, but I did go to the police station.

**Q. Do you remember how many times you talked to the police?**

A. I think it was twice I think. I'm --

**Q. Could it have been three times? Could it have been one time, or you're pretty sure it was two?**

A. It was probably approximately one or two. I'm not sure.

**Q. All right. Could it have been as many as three?**

MS. BRAUN: Objection, calls for speculation.

BY THE WITNESS:

A. I'm sorry. I'm sorry. I meant two to three times.

**Q. All right. So you don't -- You're not totally sure anymore all these years later, right?**

A. No.

**Q. And your best guess all these years later is that you talked to the police two or three times?**

A. Yes.

**Q. All right. Tell me what you remember about the first conversation.**

A. The first conversation is they asked me my name and -- They asked me my name and what did -- how long was I home and just -- to just to explain to them what I told the property manager.

Q. And in that conversation, did they take you to the police station?
A. I'm not sure.
Q. And were you treated as a suspect at that time?
A. I didn't feel so.
Q. Did they ask you to take a lie detector test?
A. Yes.
Q. The first time?
A. I'm not sure which time.
Q. When you took the lie detector test, was that at home or at the station?
A. At the station.
Q. Do you remember if you they asked you to take the lie detector test on the last time you talked to them or the second time or the first time?
A. I think it was at the time that I was at the station. First, second. I'm not sure.
Q. Do you remember anything about the police officers, what they looked like?
A. I know one had a mustache, but it's kind of vague. It's really vague.

Q. How many times have you interacted with police in your life?
A. I don't know.
Q. More than a couple?
A. Probably so.
Q. More than a hundred?
A. No.
Q. How many times have you been arrested, if ever?
A. I don't know.
Q. More than a dozen times?
A. I'm not sure.
Q. Maybe more than a dozen? Maybe less? Somewhere -- You can't be sure?
A. I can't be sure.
Q. Have you ever been accused of a serious crime before?
A. Yeah.
Q. What crime was that?
A. It was kind of domestic violence like.
Q. Any other serious crimes?
A. Selling drugs.
Q. What year was the domestic situation?
A. I'm not sure. Probably -- Because there

were two situations, and probably the first time might have been in 2006 or 2007.

**Q. How about the second?**

A. I'm not sure. Probably 2004 or 2005.

**Q. Did either result in a conviction?**

A. Yes.

**Q. What was the conviction for?**

A. The first was aggravated -- aggravated assault probably. I'm not sure, but me and that person was convicted of the same thing.

**Q. Have you ever spent time in jail or prison?**

A. Yeah.

**Q. How many times?**

A. Let me see. I'm not sure. A number of times.

**Q. More than six times?**

A. Probably -- Probably five.

**Q. How about in prison for a sentence? How many times have you been to prison?**

A. Once.

**Q. Was it for this aggravated assault?**

A. No.

**Q. For drugs?**

A. Yeah.
Q. How long were you in prison?
A. Five years.
Q. Was that before or after this murder, the Van Vo murder?
A. That was before, way before.
Q. All right. You did not want to go back to prison I take it?
A. No.
Q. The last deposition, you brought your wife. Is she with you again today?
A. Yes.
Q. Is she sitting in the room or not in the room?
A. She's not in the room.
Q. What's her name again?
A. Brenda.
Q. All right. What have you reviewed to prepare for today's deposition?
A. What have I reviewed?
Q. Yes.
A. My signed statement.
Q. Anything else you reviewed?
A. No.

Q. Have you spoken to Ms. Braun before the deposition, the attorney there on the screen?
A. No.
Q. Have you ever spoken to anybody that you know is associated with the County?
A. Not that I know of.
Q. Without --
A. I'm not sure of everybody's titles.
Q. Well, without getting into conversations and such, you've met with your new attorney, Mr. Cheronis?
A. Yes.
Q. How many times have you met with him?
A. Just today is my first day meeting him in person.
Q. How long did you guys spend preparing for the deposition?
A. I don't know.
Q. More than an hour?
A. Probably less than an hour.
Q. Did you go over documents to help your memory?
A. Yes.
Q. All right. Do you remember if when you

told the property manager that there was a smell and then the police interviewed you shortly after or some point after, that that's -- Is that what you told the police, that there was a smell coming from the room?

A. Yes.

Q. Do you remember the next time the police came to talk to you?

A. The next time the police came to talk to me, I remember they came to my grandmother-in-law's house.

Q. What do you remember about that interview?

A. That's when they took me to the station to meet like -- No. They -- To meet, like, a grand jury.

Q. Tell me about what you remember about that.

A. Just giving my statement.

Q. Well, before you gave your statement, they had to interview you, right?

A. I'm not sure what happened first or second. It's been so long ago.

Q. Sure. Do you remember the questions they asked you when they put you to the lie detector?

A. No.
Q. Did they ask you if you were involved in the murder when you were hooked up to the lie detector test?
MS. BRAUN: Objection, calls for speculation.
BY MR. LOEVY:
Q. Do you remember the question? Did they ask you if you were involved in the murder?
A. The question -- I think, yes.
Q. All right. Did that -- I'm sorry. Did that scare you when they hooked up to a lie detector and asked you if you were involved in the murder?
A. No.
Q. Why not?
A. Because I wasn't involved with it.
Q. All right. After you finished the lie detector test, did they try to get you to tell them who might have been involved?
A. No.
Q. Do you know who might have been involved?
A. Yes.
Q. All right. Did you tell them that after you finished the lie detector test?

A. No. We didn't talk in that -- in that way.

**Q. All right. At any point after the lie detector test, did you tell the police who you thought might have been involved?**

A. Mostly I just told them what I -- my movements and what I did and talking to the property manager.

**Q. All right. Do you have any memory at all after the lie detector test of telling the police that maybe Carl Reed was involved?**

A. I probably did. I'm not sure. I'm not totally sure.

**Q. It's hard to remember it many years later, right?**

A. Yes. Yeah.

**Q. Would it have been possible that after they hooked you up to the lie detector and asked you if you were involved, that you were trying to put suspicion on somebody other than you?**

MS. BRAUN: Objection, form --

BY THE WITNESS:

A. No.

MS. BRAUN: Calls for speculation.

If you could just let me finish my objection before you start to respond, it would be easier for the court reporter to take it down. Okay? Is that okay?

BY MR. LOEVY:

**Q. Mr. Reed?**

A. Sure.

**Q. All right. So the question was after they hooked you up to a lie detector and asked you if you were involved in the murder, did that cause you to maybe want to shift suspicion onto somebody else like Mr. Reed?**

A. No.

**Q. Why not?**

A. Because I wasn't suspicious of myself. I wasn't -- I didn't feel guilty of it.

**Q. All right. And you have no idea if Mr. Reed was involved in the murder, right?**

MS. BRAUN: Objection, misstates his testimony.

BY MR. LOEVY:

**Q. It's a question. Mr. Reed, you have no idea if Carl Reed was involved or not involved in this murder personally, right?**

MS. BRAUN: Same objection.

BY THE WITNESS:
A. No.
Q. And you weren't there when any murder happened, right?
A. No, not that I know of. No.
Q. And to the best of your knowledge, you have no idea who actually killed him? You can guess, but you don't know, right?
A. Right.
Q. And have you ever told anybody else that you know who killed the victim?
A. I told a lot of people my belief.
Q. Well, have you ever told anybody that you know who killed him?
A. You.
Q. Do you know who killed Mr. Van Vo?
A. Just my belief. I don't know for a fact.
Q. And, by the way, when we talk about your beliefs, you did not know that Carl Reed's conviction was overturned, right?
A. No.
Q. You didn't know anything about the DNA evidence?
A. No.

Q. Have you ever heard of a wrongful conviction?

A. Yes.

Q. Is it your understanding that sometimes the legal system makes mistakes?

A. Yes.

Q. To this day, you have your belief, but do you have any knowledge about who killed Mr. Van Vo?

MS. BRAUN: Objection, asked and answered.

BY THE WITNESS:

A. No.

Q. What you do know is that you didn't, right?

A. Pardon me?

Q. What you do know is that you didn't kill him, right?

A. Yes.

MR. LOEVY: All right. I have used up my time.

Michele, thank you for allowing me to jump in there. It's your turn.

MS. BRAUN: Thank you.

MR. LOEVY: Thank you, Mr. Reed.

EXAMINATION

BY MS. BRAUN:

Q. Mr. Reed, I provided your attorney, Damon Cheronis, with the transcript of your deposition from July 17, 2025, for someone to review it with you. Did anyone read it to you before today?

A. No. My wife read some of it, but not -- not the complete transcript.

Q. Did that -- The portion that she read to you, do you recall what it was about?

A. No, not at this time. That was, like, so many months ago.

Q. Yeah. I just sent it to your attorney, I believe, this week, earlier this week. Did your wife read any portion of the deposition that you gave back in July to you at any time before today?

A. Yes, she did. Yeah.

Q. Okay. And do you remember what portion of the deposition she read to you?

A. Just -- Just the opening part. Probably about two pages. Probably about one or two pages.

Q. Okay. So before I start asking you questions -- I'm sure your attorney told you this,

but we don't want you guessing at your answers. If you don't recall, just let me know. Okay? If you don't recall what it is I'm asking you, will you tell me that?

A. Yes.

Q. And, you know, again, we don't want you guessing -- we just -- or telling us what you probably would have done. We just want to know what you personally know and recall. Okay?

A. Yes. Yes, ma'am.

Q. So did you review the transcript of your grand jury testimony before coming today?

A. No, ma'am.

Q. So, Mr. Reed, I represent the Assistant State's Attorney who took your statement in this case. Does the name Nancy Galassini sound familiar to you?

A. No, ma'am.

Q. Do you recall giving or talking to an Assistant State's Attorney after you spoke with the police?

A. No.

Q. So as you sit here today, you don't know whether or not that Assistant State's Attorney was

a female or a male; is that true?
A. Yes.
Q. And you cannot describe what that person looked like; is that correct?
A. Yes.
Q. Do you recall in what room at the police station the Assistant State's Attorney spoke to you?
A. No.
Q. Can you tell us at what time the Assistant State's Attorney first spoke to you before --
A. No.
Q. -- the statement was reduced to writing?
A. No, ma'am.
Q. Was anyone else in the room when you spoke with the Assistant State's Attorney?
A. I'm not sure. I don't remember.
Q. Do you recall there being a detective by the name of Detective Thompson being in the room when you spoke with the Assistant State's Attorney?
A. I don't remember, ma'am.
Q. Now, am I correct that the police interviewed you before you met with the Assistant State's Attorney?

A.  I'm not sure.  I don't remember.

Q.  Well, is it true that when you spoke with the police, an Assistant State's Attorney was not in the room?

Let me rephrase that.  Am I correct that the Assistant State's Attorney was not in the room when the police interviewed you?

A.  Yes, ma'am.

MR. LOEVY:  Objection to the foundation as far as memory.

BY MS. BRAUN:

Q.  When you met with the Assistant State's Attorney, you understood that she was not your lawyer or Mr. Carl Reed's lawyer, correct?

A.  I don't remember, ma'am.  I don't remember speaking to...

Q.  Okay.  Do you recall one way or the other whether you ever told the Assistant State's Attorney that you understood her to be a prosecutor and not your lawyer?

A.  I don't remember.

Q.  Now, the Assistant State's Attorney asked you if you would be willing to speak with her about what you knew about the Van Vo murder, and you

agreed to speak with her. Do you recall that?
A. No.
Q. Do you dispute that occurred?
A. I don't remember.
Q. Do you have any reason to dispute that that occurred?
A. Yes.
Q. Do you understand my question? I'm trying to find out if you have any reason --
A. I don't remember this person.
Q. -- to question whether or not you agreed to speak with the State's Attorney?
A. I don't remember.
Q. So as you sit here today, you have no recollection as to meeting with the State's Attorney; is that right?
A. Yes, ma'am.
Q. And you have no recollection as to what questions she asked you or what answers you gave; is that right?
A. That's right, ma'am.
Q. So without recalling your meeting with the State's Attorney, would I be correct in stating that you have no recollection whether she ever told

you what to say in response to her questions?
A. No memory, no.
Q. And you cannot say whether she promised you anything in exchange for your answers, correct?
A. Correct.
Q. Do you recall whether or not you told the Assistant State's Attorney that anything you told her was false?
A. No.
Q. Do you recall one way or another whether you had something to eat while you were speaking with her?
A. No.
Q. Do you recall whether you had something to drink when you were speaking with her?
A. No.
Q. Or whether you were allowed to smoke cigarettes?
A. No.
Q. Or whether you were allowed to go to the washroom?
A. No.
Q. At some point, you agreed to give the Assistant State's Attorney a written statement. Do

you recall that?
A. No.
Q. Do you recall if the Assistant State's Attorney, Nancy Galassini, remained in the room when she wrote out a summary of what you had told her?
A. No.
Q. Can you tell us whether anyone else was in the room when Assistant State's Attorney Nancy Galassini was summarizing what you told her in writing?
A. No, I cannot.
Q. You told us at your first deposition that you have vision problems; is that correct?
A. Yes, ma'am.
Q. Can you -- Today can you -- are you considered blind?
A. Yes.
Q. I see that you're wearing glasses. Are those -- Do those --
A. No.
Q. -- assist you in some way?
A. No.
MS. BRAUN: I believe each of you have a copy

of his handwritten statement. I could bring it up if you need me to, but I'm just going to ask a few questions about it. And we're going to mark his handwritten statement or the handwritten statement as Exhibit A.

BY MS. BRAUN:

**Q. I believe you told us earlier that someone read to you the handwritten statement that you gave to Assistant State's Attorney prior to today's deposition; is that right?**

A. Yes.

**Q. Okay. Now, there is a signature at the bottom of each page of your statement that reads "DeLong Reed." Do you recall signing each page of your statement?**

A. I don't recall signing. I remember signing some papers, but I'm not sure.

**Q. Who was it that read the statement to you before today's deposition?**

A. My wife.

**Q. Did she happen to tell you that your signature appears at the bottom of each page?**

A. Yes.

**Q. Okay. And do you have any reason to**

dispute that, the accuracy of that fact?
A. Yeah. I -- That's my signature.
Q. Okay.
MR. CHERONIS: And for the record, I have a copy of it of the handwritten that I'm just showing him. It's the same that you sent -- somebody sent me.
MS. BRAUN: Okay. Thank you.
BY MS. BRAUN:
Q. Your signature is in cursive on each page. It's not in print. So is it fair to say that back in July 2001, you were able to sign your name in cursive?
A. No. I've been able to sign my name for years before.
Q. But you did -- You can sign -- You can sign in script as opposed to just signing in print; is that right?
A. Excuse me. What was that?
Q. Sure. When you sign your name, are you signing -- are you printing it out each letter, or are you signing --
A. No.
Q. -- in cursive?

A. I write it. I write it out.
Q. And you write it in cursive?
A. Yes.
Q. Okay. Now, I understand you don't recall speaking with Assistant State's Attorney Galassini before she reduced your statement into writing, but do you recall at what time Assistant State's Attorney Galassini wrote out your seven-page statement?
A. No.
Q. Were you under the influence of drugs or alcohol when she wrote out your statement?
A. No.
Q. Were you under the influence of drugs or alcohol when you spoke with her at any point in time?
A. I'm not sure. I don't remember.
Q. I believe the statement says that you were taking Haldol at the time. Am I correct that the reason you were taking Haldol was to help you stay lucid?
A. No.
Q. Okay. Do you recall that you were taking Haldol as one of your medications back in July of

2001?
A. Yes.
Q. And what was the reason for taking Haldol?
A. Depression and hearing voices.
Q. So did it help you keep your head clear?
A. Yes, sometimes.
Q. Do you -- Well, strike that.
The second paragraph of your statement, it says, "DeLong states he is 35 years old." Were you 35 years old back in July of 2001?
A. I'm not sure.
Q. Do you have any reason to dispute that you were 35 years old at that time?
A. I'm not sure because I never counted.
Q. That paragraph also states that -- Well, strike that.
Back in July 12, 2001, you were living at 4946 North Sheridan; is that right?
A. Yes, ma'am.
Q. And in the statement, it says that you were living in Apartment 309. Was that true?
A. I don't remember.
Q. As you sit here today, do you remember the apartment number you were living in --

A. No.
Q. -- back on July 12, 2001?
A. No.
Q. The next sentence says that DeLong states he would -- he went to the eleventh grade. Did you complete the eleventh grade?
A. Did I go to the eleventh? Excuse me. Can you rephrase?
Q. Sure. Did you go to the eleventh grade?
A. Yes.
Q. So that statement is true, correct?
A. Yes.
Q. It then states that you could -- you can read and write English with the word "write" inserted before the word "English." And your initials appear right after that sentence. So would it be fair to say that you would not have placed your initials there unless you agreed that the word "write" should come before the word "English"?
A. I didn't read it.
Q. Do you understand my question, Mr. Reed?
A. I understand.
Q. I'm not asking whether you read the

statement. I'm simply asking you whether you were able to read and write English back in July of 2001?

A. No.

Q. You went to the eleventh grade, correct?

A. Yes.

Q. Were you able to read by the eleventh grade?

A. Yes.

Q. So as of July 2001, you were still able to read English; is that right?

A. Yeah.

Q. And you were still able to write English, correct?

A. No.

Q. When you went to the eleventh grade, were you able to write English?

A. No. A lot, no.

Q. So you were able to read English, but you could not write English? Is that your --

A. I can't read -- I can't read cursive writing.

Q. I understand that. That's not my question. I'm simply asking you to tell me whether

or not you were able -- whether -- to write English as of July 2001?

A. Print.

Q. Okay. So when it said that you could read and write English -- And it's not saying whether or not it's in cursive or in print; but when it said that you can read and write English, that was a true statement, correct?

A. I can print.

Q. Okay. And you can read?

A. Yes, I can read.

Q. Okay. So when you placed your initials there at the end of the sentence, you were agreeing that that statement was true, correct?

A. I didn't read it, ma'am.

Q. I'm not asking you if you read it. I'm asking when you placed your initials at the end of the sentence, you were indicating that the statement was true?

A. Yes.

Q. And it was the correction with -- By inserting the word "write" before "English" was also true, correct?

MR. LOEVY: Objection, asked and answered.

BY MS. BRAUN:

Q. You can answer.

A. Yes.

Q. So you were afforded an opportunity to make a correction where you placed your initials at the end of the sentence, correct?

A. Yes.

Q. And in order for you to know that it needed a correction, someone must have read that sentence to you out loud, correct?

A. No.

Q. Well, how then would you have known that a correction needed to be made unless someone read the sentence to you?

A. I -- I put my initials out of ignorance.

Q. Okay. But you needed -- Before putting -- signing anything, would I be correct in saying that you would read it before signing it --

A. No.

Q. -- or have someone read it to you?

A. They didn't read it to me there.

Q. At your first deposition, you testified that someone probably read the statement out loud to you because, as you said at your deposition,

**that would be the reason you would have signed the statement.  Do you recall that testimony?**

MR. LOEVY:  Objection to that question.  It was an improper question and a summary.

BY MS. BRAUN:

**Q.   You can answer.**

A.   I don't remember.

**Q.   Give me one minute, please.  I'm pulling up the transcript of your deposition from July of 2025, page 116 at line 19.  I'm going to read your answer.  It says -- You said, "Somebody probably did read it to me because I didn't read this.  I can't read cursive writing even when I had my vision."**

**Do you recall --**

A.   I --

**Q.   -- giving that testimony at your first deposition?**

A.   I --

MR. LOEVY:  Hold on.  Let me just state an objection here.  It's objection to speculation and improper question.

BY MS. BRAUN:

**Q.   You can answer.**

A. I remember making that statement.
**Q. Okay. And after that, you were asked the question: "Did somebody read it out loud to you and you had a chance to make any?"**
"ANSWER: Maybe so. I'm not --
"QUESTION: All right.
"ANSWER: I'm not totally sure, but it -- That sounds like it might be more accurate.
"QUESTION: If it was Reed?"
And you go on with your answer. "It would be accurate -- a reason for me to sign, you know. And then again, you know, I might have been in a thing where I just wanted to move it along."
Do you recall giving those questions and giving those answers?
A. Yes.
**Q. Okay. So based on that testimony, you would agree that it's probable that somebody read the statement to you out loud; would you agree with that?**
MR. LOEVY: Objection, foundation and speculation and asked and answered.
BY THE WITNESS:
A. I don't remember.

Q. On page 7 of your handwritten statement, your initials also appear in the last paragraph, second sentence. The sentence reads, "DeLong states he has read all." And then there's a space. And it says, "Seven pages of his handwritten statement and had a chance to make any additions, corrections, and changes that he wanted."

You placed your initials in the space between the words "all" on seven pages. Do you recall doing so?

A. No, ma'am.

Q. Would you agree that when you placed those initials, you were affirming that the correction being made was accurate?

A. No, ma'am.

Q. Do you recall why you were placing your initials there?

A. No, ma'am.

Q. Just like the first correction that we discussed earlier, you would agree that someone read this statement out loud to you before this correction was made?

MR. LOEVY: Objection, leading, foundation, asked and answered.

BY MS. BRAUN:

**Q. You can answer.**

A. I'm not sure.

**Q. Mr. Reed, am I correct that you would not have signed this statement unless it was true and accurate?**

A. I'm not sure, ma'am. I don't remember.

**Q. Well, in fact, you testified before the grand jury in this case. Do you recall that?**

A. Yes.

**Q. And you were shown this handwritten statement as an exhibit when you testified before the grand jury. Do you recall that?**

A. No, ma'am.

**Q. I'm now going to pull up your grand jury testimony, and we're going to mark it as Exhibit B.**

MS. BRAUN: And, John, do you need me to pull it, or do you have a copy?

MR. LOEVY: You know, if you could email it to me, Michele, I'd appreciate that.

MS. BRAUN: Sure. Give me one minute.

MR. LOEVY: Thank you.

MS. BRAUN: Damon, do you have a copy?

MR. CHERONIS: Yeah. I'm trying to pull it up.

Maybe shoot me an email again. I can just print it up real quick.

MS. BRAUN: I'll send it to both of you. I just sent it. You let me know when you receive it.

MR. CHERONIS: Got it. Just printing it up real quick.

MR. LOEVY: Sorry. I was on mute. Thank you for doing that.

MS. BRAUN: Sure.

BY MS. BRAUN:

**Q. So if we turn to page 12 of your grand jury testimony starting at line 18.**

"QUESTION: Now, back on July 23 of 2001 at approximately 1:00 o'clock in the morning, were you at Area Three Violent Crimes?

"ANSWER: Yes."

Was that a truthful answer, Mr. Reed?

A. I don't remember.

**Q. Okay. You were sworn under oath before testifying before the grand jury. Do you understand what it means to be -- to testify under oath?**

A. Yes.

**Q. Did you agree -- You agreed to testify**

truthfully; is that correct?
A. Yes.
Q. And you did so, correct?
A. Yes.
Q. The next question reads, "At the time that -- Did you speak with Assistant State's Attorney Nancy Galassini and Detective Thompson? And on the top of page 13, your answer was "Yes."
Do you recall that question and giving that answer?
A. No, ma'am.
Q. But all of your answers were truthful, correct?
A. I --
MR. CHERONIS: Objection, foundation.
BY THE WITNESS:
A. I can't remember.
Q. Okay. The next question is: "Did you tell them the same facts that you are telling the grand jury today?
"ANSWER: Yes.
"QUESTION: Was the statement written down?
"ANSWER: Yes.

"QUESTION: I'm going to show you what I have marked, previously marked, as People's Exhibit No. 2 for identification. Do you recognize this statement?

"ANSWER: Yes.

"QUESTION: Is this a true and accurate copy of the statement that was written down by Assistant State's Attorney Nancy Galassini?

"ANSWER: Yes, it is."

Do you recall being asked those questions and giving those answers?

A. No.

**Q. You did testify or agree to tell the truth when you testified before the grand jury, correct?**

A. I believe so.

**Q. So your testimony that I just read, do you believe it was truthful?**

A. I don't know. I don't know. I honestly don't know.

**Q. Do you recall lying before the grand jury?**

A. Do I recall lying --

**Q. Yes.**

A. -- to the grand jury? No.

**Q. The next question reads: "Did you sign**

each and every page of that statement?" And your answer was "Yes."

Was that truthful?

A. I guess.

Q. Next question: "Do you recognize the signature on the bottom of those pages?

"ANSWER: yes."

Was that truthful?

A. What was the question?

Q. "Do you recognize the sig-" -- "your signature on the bottom of those pages?

"ANSWER: Yes."

A. Yeah.

Q. "QUESTION: Were you under the influence of drugs or alcohol when you gave the statement?

"ANSWER: No."

Was that truthful?

A. Yes.

Q. The next question: "Did anyone threaten you with anything or promise you anything in return for giving this statement?

"ANSWER: No."

Was that a truthful answer?

A. Yes.

Q. "QUESTION: How were you treated by the Assistant State's Attorney and the detective?
"ANSWER: Fairly well."
Was that a truthful answer?
A. Yes.
Q. Okay. Getting back to the statement. I understand that at your first deposition, you initially denied saying that you always kept the bathroom door open between your room and Mr. Van Vo's room, but then you also said that you did not recall. So now that you're sitting here today, do you recall either way whether you told ASA Galassini in July 2001 whether the bathroom door was always open or not?
A. Either way it wasn't always open.
Q. When you testified before the grand jury -- And I'm turning to page 12 of your testimony starting at line 2. You were asked the question: "And did you tell them what happened at that time?
"ANSWER: No. I only told them about the door is normally open."
Was that a truthful answer?
A. I don't remember.

Q. Do you recall whether the door, the bathroom door, was normally open?
A. That wouldn't be true.
Q. Why do -- Are you saying that you lied at the grand jury when you said it was normally --
A. No, I'm not.
Q. -- open?
A. No, I'm not. The door wasn't always open.
Q. Okay.
A. The door wasn't always open. It was open a lot of the time, but not always. We did have our privacy.
Q. But there were times when it was open, correct?
A. Yes. Yes, that will be correct.
Q. Turning to page 2 of the handwritten statement. On the fifth line, the sentence reads, "DeLong states on July 13, 2001, he left to go to his grandma's, and DeLong returned home July 15, 2001, in the evening."
Was that a truthful statement?
A. I'm not sure. I don't remember.
Q. You told us earlier when Mr. Loevy was questioning you that you did go to your

grandma-in-law?
A. Uh-huh.
Q. Is that right?
A. Yes.
Q. And after going there, you did return to your home, correct, at some point?
A. Yes.
Q. The next sentence reads, "DeLong noted Mr. Van Vo's bathroom door and front door were closed, which was unusual." Was that correct and true?
A. I don't remember.
Q. The next sentence reads, "DeLong knocked on the bathroom door with no response." Is that a truthful statement?
A. I don't remember, ma'am.
Q. So you -- As you sit here today, you don't recall either way whether you noticed the bathroom door --
A. I don't remember.
Q. -- closed?
A. I don't remember, ma'am.
Q. The next paragraph reads, "The next day DeLong states he knocked on the front door of

Mr. Van Vo's apartment with no answer." Do you recall that happening?

A. I don't remember.

Q. Can you say one way or another if that --

A. No.

Q. -- is an accurate statement?

A. No, ma'am.

Q. When you testified before the grand jury, you did testify that your statement was true and accurate. Was that a truthful answer when you gave it before the grand jury?

A. I'm not sure. I don't remember. It's so long ago.

Q. Well, do you recall --

MR. CHERONIS: Do you need to take a break? Are you okay?

THE WITNESS: I'm kind of edgy.

MR. CHERONIS: Do you want to take, like, two minutes?

THE WITNESS: Yeah. I can use --

If I can use the restroom, ma'am.

MS. BRAUN: Absolutely. Let's take a break.

MR. LOEVY: Hold on one sec. Michele?

MS. BRAUN: Sure.

MR. LOEVY: How long do you think you're going to go here?

MS. BRAUN: Not much longer. I'm almost done.

MR. LOEVY: All right. Thank you. So, you know, we could push through if we could finish, but it's up to Mr. Reed.

THE WITNESS: I'll be right back. I just got to --

MR. LOEVY: Bathroom it is. Thanks.

(A break was taken.)

MS. BRAUN: Back on the record.

BY MS. BRAUN:

**Q. Mr. Reed, you told us that someone reviewed or read your handwritten statement to you before today's deposition, right?**

A. Yeah.

**Q. Who was that?**

A. My wife read the first -- like, the first two pages.

**Q. I'm not talking about your deposition. I'm talking about --**

A. Oh.

**Q. -- your handwritten statement.**

A. Oh.

Q. You read -- Someone read that handwritten statement to you that you gave to the Assistant State's Attorney at some point before today's deposition?

A. I don't remember. I'm sorry.

Q. Okay. We're talking about the statement that you gave to Assistant State's Attorney Galassini on July 23, 2001, at 1:00 o'clock a.m. Do you recall anyone ever reading that statement to you?

A. No.

Q. Because I was -- Then I'll just continue going through it. I believe we left off with the sentence on page 2, "DeLong knocked on the bathroom door with no response." Do you recall telling that to Assistant State's Attorney Galassini?

A. No.

Q. Was that statement true?

A. Yes.

Q. The next paragraph reads, "The next day DeLong states he knocked on the front door of Mr. Van Vo's apartment with no answer." Is that true?

A. Yes.

Q. "Van Vo's" -- I'm sorry. "DeLong states that day Corneal Carter wanted to his sell his air conditioner to buy crack." Was that statement true?

A. I don't remember.

Q. Do you recall Corneal Carter?

A. No.

Q. The next sentence reads, "DeLong states Carter lives in Apartment 210." Do you recall that?

A. No.

Q. "DeLong states he carried the air conditioner downstairs and saw Carl Reed outside." Do you recall that happening?

A. No, ma'am.

Q. Was it true when you told ASA Galassini that you carried the air conditioner downstairs and saw Carl Reed outside?

A. I don't remember.

Q. Mr. Reed, would you agree that your memory was fresher back in 2001 than it is today?

A. Yes. The day -- For the day, yes, for that day.

Q. So you recalled things better back in 2001

than you do today; is that right?
A. That is correct, ma'am.
Q. The next sentence reads, "DeLong states Carl Reed stays in Apartment 305." Was that statement true?
A. I don't remember.
Q. Okay. But when you said it back in 2001, your memory of that fact would have been better than it is today, correct?
A. Correct, ma'am.
Q. And, again, you wouldn't have signed the statement unless you thought that what you were telling the ASA was truthful, correct?
A. Yes, ma'am.
Q. Okay. "That night DeLong states Corneal gave him some crack and later Carl Reed smoked some with DeLong." Do you remember if that occurred?
A. I'm not -- I don't remember, ma'am.
Q. "DeLong states they were in Corneal's apartment when Carl gave DeLong the keys to Carl's apartment and told DeLong to go sit there while Carl got beer." Do you recall that occurring?
A. No, ma'am. I don't remember. I did sit in his apartment, but I didn't go in with his key.

I went in with him.
Q. Are you saying that you went in Carl Reed's apartment?
A. Yes. Yes, ma'am.
Q. And he told you to go sit there while he got beer?
A. Yes. Yes, ma'am.
Q. So that was true, correct?
A. Yes.
Q. "DeLong states he went to Carl's apartment, but left a short time later to go to DeLong's apartment to turn off the lights."
A. Yes, ma'am.
Q. Was that true?
A. Yes, ma'am.
Q. "DeLong states he got a glass of water at his place, turned off the lights, and went into the hall." Was that true?
A. Yes, ma'am.
Q. "DeLong states he saw Carl in Mr. Van Vo's apartment with the door open a crack." Is that true?
A. Yes, ma'am.
Q. "DeLong states Carl saw him and shut

Mr. Van Vo's door." Is that true?
A. Yes.
Q. "DeLong states he waited, and 20 seconds later Carl came out of Mr. Van Vo's apartment with a big, tall speaker and asked DeLong, Why can't you do what you were told?" Is that true?
A. Yes, ma'am.
Q. And that was meaning -- I'll read the sentence again because I didn't complete it. "DeLong states he waited, and 20 seconds later Carl came out of Mr. Van Vo's apartment with a big, tall speaker and asked DeLong, Why can't you do what you were told, meaning staying in Carl's apartment."
A. Yes.
Q. That was true, correct?
A. Yes.
Q. "DeLong asked Carl why he was in Mr. Van Vo's apartment, and Carl told DeLong to go back to Carl's apartment and wait." Is that true?
A. Yes, ma'am.
Q. "DeLong states Carl told him Mr. Van Vo was out of town." Is that true?
A. Yes, ma'am.
Q. "DeLong states he went back to Carl's

apartment, and later Carl came back with crack which they smoked." Is that true?

A. No, ma'am.

Q. What part is not true?

A. He didn't come back with any crack.

Q. Okay.

A. We only -- We only smoked crack once. And that was when I got home, and he took me to his apartment, and he left and said he was going to get some beer and get some more crack. And he didn't -- When he didn't come back right away, that's when I went to my apartment. And when I looked back out in the hall from my apartment, that's when I seen Carl Reed coming from his apartment -- I mean coming from Mr. Van Vo's apartment.

Q. With a speaker?

A. Yes.

Q. And after Mr. Carl Reed asked you why can't you do what you were told, you asked Carl why he was in Van Vo's apartment, and he said to go back to Carl's apartment and wait. We just went over that?

A. Uh-huh.

Q. Is that right?
A. Yes.
Q. Okay. And after Carl told you Mr. Van Vo was out of town, you went back to Carl's apartment and waited for him; is that right?
A. I'm not sure. I can't remember.
Q. It goes on to state, "DeLong states later that night, Carl went and got another speaker from Mr. Van Vo's apartment and brought it back to Apartment 305." Is that true?
A. I don't remember, ma'am.
Q. You don't recall that?
A. Yes.
Q. Okay. But you're not saying whether it's true or not? You just don't recall?
A. Exactly. Thank you.
Q. All right. "DeLong states the next day he noticed a smell in his bathroom." Is that true?
A. That is true.
Q. "DeLong states he tried to open Mr. Van Vo's bathroom door, but it was latched on the inside." Is that true?
A. No, ma'am. I don't remember.
Q. So you don't recall whether or not you

tried to open Mr. Van Vo's bathroom door; is that right?
A. No, no.
Q. Again, you're not saying whether it was true or not? You just don't recall?
A. I don't recall that.
Q. Okay. "DeLong noticed the bathroom door" -- "that the bathroom doorknob lock seemed broken." Do you recall that?
A. No, ma'am. I don't remember.
Q. "DeLong states after he noticed the smell, he asked Carl if Carl saw Mr. Van Vo in the apartment when he was in there." Do you recall asking Carl that?
A. No, ma'am.
Q. "DeLong states Carl told him Mr. Van Vo wasn't in there." Is that true?
A. I don't remember, ma'am, that conversation.
Q. "DeLong states he didn't report Carl to the police because he didn't want to be a snitch, and DeLong wasn't sure what happened." Is that true?
A. I believe so.

Q. "DeLong states on July 19, 2001, the smell was so bad that he went to social services and asked them to look into Mr. Van Vo's apartment." Is that true?
A. No.
Q. Well, did you go to -- Did you tell anyone that -- to look into Mr. Van Vo's --
A. I told the property manager in her office.
Q. Is the property manager part of the social services in the building?
A. No. We didn't call the property manager. She was the -- She was Maureen, the property manager. She didn't work with social services department. She was just the property manager.
Q. Did you ask --
A. We did have social services there.
Q. Did you speak with them?
A. She was the manager.
Q. She was the manager, but did you speak with social services also?
A. No.
Q. Do you know if the property manager spoke with social services?
A. I'm not -- I don't know. I don't know. I

know that I spoke to the property manager.
Q. Do you recall one way or another whether you also spoke to social services?
A. I don't remember that.
Q. So, again, because you don't recall, you can't say whether or not it was true or false?
A. Correct, ma'am. Correct.
Q. "DeLong states he believed Mr. Van Vo was dead." Did you believe he was dead at that point?
A. I did.
Q. So that was truthful?
A. Yes, because she took me up there with her.
Q. "DeLong states someone came up and found Mr. Van Vo's body." Was that true?
A. That's -- That's right.
Q. "DeLong states someone told him it looked like Mr. Van Vo fell." Do you recall that?
A. Not -- I'm not sure, ma'am. I can't remember.
Q. "DeLong states he didn't tell the police about Carl in Van Vo's apartment because he thought Mr. Van died of natural causes, and Carl was just taking advantage of an opportunity." Do you recall

that?
A. I can't remember that statement.
Q. So you cannot say one way or another whether it was truthful or false, correct?
A. Correct, ma'am.
Q. "DeLong didn't want to tell on Carl because DeLong smoked crack with Carl because of Mr. Van Vo's speakers and DeLong felt guilty because Mr. Van was his friend."
A. Yes, ma'am. That's correct.
Q. That's correct?
A. Yeah.
Q. "DeLong states when the detectives told him Mr. Van was murdered, DeLong told them everything he saw." Is that true?
A. Yeah.
Q. "DeLong states he was not threatened or promised anything in return for this statement." Is that true?
A. That is true.
Q. "DeLong states he is not under the influence of drugs or alcohol at the time of this statement, but did take his Haldol this month to be kept lucid." Is that true?

A. I'm not -- I don't remember either way. I'm sorry.

**Q. "DeLong states he was given soda to drink and McDonald's to eat and allowed to smoke cigarettes and use the bathroom." Is that true?**

A. Excuse me. Can you rephrase that?

**Q. I'll read it again. "DeLong states he was given soda to drink and McDonald's to eat and allowed to smoke cigarettes and use the bathroom."**

A. Yes, at the police station.

**Q. Okay. "DeLong states he was treated well by the police and Assistant State's Attorney Galassini."**

A. Yes.

**Q. That was true, correct?**

A. I didn't -- I didn't -- I don't remember the State's Attorney, but I remember the police was pretty nice. There were very nice.

MS. BRAUN: I think the rest of it we went over at the first part of your deposition. So I'm going to stop there.

John, I'm just going to look over my notes. If you want to ask any follow-up questions in the interim.

MR. LOEVY: Okay. I do have some follow-up. It won't take long.

FURTHER EXAMINATION

BY MR. LOEVY:

**Q. Mr. Reed, it sounds like you don't have much memory of talking to the State's Attorney; is that accurate?**

MS. BRAUN: Objection to form.

BY THE WITNESS:

A. No, sir.

**Q. Do you recall either way whether and at what point the ASA joined the conversation with the police?**

A. No.

**Q. Is it possible that the ASA was in earlier, rather than later, or do you just not remember?**

MS. BRAUN: Objection, calls for speculation.

Again, Mr. Reed, if you let me --

THE WITNESS: Okay, okay. I apologize.

MS. BRAUN: Thank you.

Objection, calls for speculation.

You can answer.

BY THE WITNESS:
A. Yes, that's very possible.
**Q. All right. You're not claiming to remember the exact sequence of when the ASA joined the conversation, correct?**
A. Exactly. Thanks.
**Q. All right. You say in your statement and you told Ms. Braun it is true that DeLong states he didn't tell the police about Carl in the Van Vo's apartment because he thought that Van Vo had died of natural causes. Do you remember answering those questions with --**
A. I can't remember that. I can't remember that part.
**Q. All right. I think you told Ms. Braun that it was true that you didn't tell the police about Carl being in the Van Vo's apartment because you thought that Van Vo had died of natural causes. Is that a true statement?**
MS. BRAUN: Objection, asked and answered.
BY THE WITNESS:
A. I don't remember that part.
**Q. All right. Next question I have is, is the first time that you started talking about**

Carl's involvement when you gave this written statement that Ms. Braun was asking you about, is that first time you started talking about Carl's involvement?

A. I'm not sure when that transpired, whether it was at the apartment building or whether it was at the police station.

Q. Well, when you were giving this written statement that they had you sign, was that the first time that you talked about Carl's involvement?

A. I'm not sure. I don't remember at what time.

Q. What do you remember about giving this written statement?

A. I remember signing some papers and that's -- that's about it.

Q. Was that the conversation when you told the police about Carl?

MS. BRAUN: Objection, calls for speculation.

BY THE WITNESS:

A. Yes.

Q. And so there was an objection. So I'll just ask it clearer. Was the conversation that got

**recorded in this written statement and written down and you signed it, was that when you told the police and the State's Attorney about Carl's involvement?**

MS. BRAUN: Objection.

BY THE WITNESS:

A. I don't remember.

**Q. What was your answer, sir?**

A. I can't remember, sir.

MR. LOEVY: All right. I don't have any other questions.

MS. BRAUN: Thank you, Mr. Reed. We're done.

MR. CHERONIS: Thank you.

MR. LOEVY: DeLong, this might be the end of it for you. And it might go to trial. It might not. But if not, nice to have met you and good luck.

MS. BRAUN: And just about signature. I assume we're waiving signature, Damon?

MR. CHERONIS: Yeah.

MR. LOEVY: All right. Thanks again for your involvement.

(Whereupon, the deposition concluded at 2:30 p.m.)

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

I, Jana E. Cox, an Officer of the Court, do hereby certify that heretofore, to-wit, on the 19th day of March, 2026, appeared before me via videoconference, DeLONG REED, a witness in a certain cause now pending and undetermined in the United States District Court, Northern District of Illinois, Eastern Division, wherein CARL REED is the Plaintiff and RICHARD ZULEY, TIMOTHY THOMPSON, the CITY OF CHICAGO, COOK COUNTY STATE'S ATTORNEY NANCY GALASSINI ADDUCI, and COOK COUNTY are the Defendants.

I further certify that the said witness, DeLONG REED, was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

I further certify that the signature to the foregoing deposition was waived by counsel for the respective parties.

I further certify that the taking of this deposition was pursuant to Notice and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have hereunto set my verified digital signature this 20th day of April, 2026.

____________________________________

Illinois Certified Shorthand Reporter

1

116
40:10
12
35:17 36:2 44:11 48:17
13
45:8 49:18
15
49:19
17
5:12 25:5
18
44:12
19
40:10 61:1
1:00
44:14 53:8

2

2
46:3 48:18 49:16 53:14
20
57:3,10
2001
33:12 35:1,10,17 36:2 37:3,10 38:2 44:13 48:13 49:18, 20 53:8 54:21,24 55:7 61:1
2004
16:4
2005
16:4
2006
16:2
2007
16:2
2025
5:12 25:5 40:10
210
54:9
23
44:13 53:8
2:30
68:23

3

305
55:4 59:10
309
35:21
35
35:9,10,13

4

4946
35:18

7

7
42:1

A

a.m.
53:8
Absolutely
51:22
accordance
5:7
accuracy
33:1
accurate
41:8,11 42:14 43:6 46:6 51:6,10 65:7
accuse
7:21
accused
15:16
activities
10:1
additions
42:6
advantage
62:24
affirming
42:13
afforded
39:4
afternoon
5:24 6:1
aggravated
16:8,22
agree
41:18,19 42:12,20 44:24 46:13 54:20
agreed
29:1,11 30:23 36:18 44:24
agreeing
38:13
air
54:2,12,17
alcohol
34:12,15 47:15 63:22
allowed
30:17,20 64:4,9
allowing
24:19
answering
66:11
answers
26:1 29:19 30:4 41:15 45:12 46:11
anymore
13:13
apartment
9:13 10:14 11:7,24 12:12 35:21,24 51:1 53:22 54:9 55:4,20, 21,24 56:3,11,12,21 57:4,11,13,18,19 58:1,9,12,13,15,16, 21,22 59:4,9,10 60:13 61:3 62:22 66:10,17 67:6
apologize
65:20
appears
32:22
applicable
5:8
appointed
5:22
approximately
8:7 13:4 44:14
Area
44:15
arrested
15:8
ASA
48:13 54:16 55:13 65:12,15 66:4
assault
16:9,22
assist
31:22
Assistant
26:14,20,24 27:7,10, 16,20,23 28:3,6,12, 18,22 30:7,24 31:3,9 32:9 34:5,7 45:6 46:8 48:2 53:2,7,16 64:12
assume
68:17
attorney
7:3,7 18:2,10 25:3, 14,24 26:15,20,24 27:7,11,16,20,24 28:3,6,13,19,22 29:12,16,23 30:7,24 31:4,9 32:9 34:5,8 45:7 46:8 48:2 53:3, 7,16 64:12,17 65:6 68:3

B

back
7:14 8:21 17:7 25:17 33:11 34:24 35:10, 17 36:2 37:2 44:13 48:6 52:7,11 54:21, 24 55:7 57:19,24 58:1,5,11,13,22 59:4,9
bad
11:23 61:2
based
11:11 41:17
bathroom
48:9,13 49:2 50:9, 14,18 52:9 53:14 59:18,21 60:1,7,8 64:5,9
bed
12:12
beer
55:22 56:6 58:10
belief
23:12,17 24:7
beliefs
23:19
believed
62:8
big
57:5,11
blind
31:17
body
62:15
bottom
32:13,22 47:6,11
Braun
5:2,5 7:24 11:9,14 12:5 13:8 18:1 20:5 21:21,24 22:19,24 24:9,21 25:2 28:11 31:24 32:6 33:8,9 39:1 40:5,23 43:1, 17,21,23 44:3,9,10 51:22,24 52:3,11,12 64:19 65:8,18,21 66:8,15,20 67:2,20 68:5,12,17
break
51:15,22 52:10
Brenda
17:17
bring
12:16 32:1
broken
60:9
brought
12:17,19,20 17:10 59:9
building
61:10 67:6
buy
54:3

C

C-H-E-R-O-N-I-S
5:22
call
61:11
called
6:7
calls
11:9,14 12:5 13:8 20:5 21:24 65:18,22 67:20
Carl
5:16 21:11 22:22 23:19 28:14 54:13, 18 55:4,16,20,22 56:3,20,24 57:4,10, 17,18,21 58:1,14,19, 20 59:3,8 60:12,14, 16,20 62:22,23 63:6, 7 66:9,17 67:19
Carl's
55:20 56:10 57:13, 19,24 58:22 59:4 67:1,3,10 68:3
carried
54:12,17
Carter
54:2,6,9
case
26:16 43:9
caused
9:7
chance
41:4 42:6
change
6:13
Cheronis
5:20,21 6:2,4 18:11 25:4 33:4 43:24 44:5 45:15 51:15,18 68:13,19
Chicago
7:8
cigarettes
30:18 64:5,9
Civil
5:8
claiming
66:3
clear
35:5
clearer
67:24
closed
50:10,21
complete
25:9 36:6 57:9
concern
7:8,12
concluded
5:11 68:23
conclusion
5:15
conditioner
54:3,13,17
considered
31:17
continue
53:12
continued
5:6 6:2,9
continuing
7:3
conversation
13:20,21 14:1 60:19 65:12 66:5 67:18,24
conversations
18:9
convicted
16:10
conviction
16:5,7 23:20 24:2
copy
31:24 33:5 43:18,23 46:7
Corneal
54:2,6 55:15
Corneal's
55:19
correct
27:4,22 28:5,14 29:23 30:4,5 31:14 34:19 36:11 37:5,14 38:8,14,23 39:6,10, 17 43:4 45:1,3,13 46:14 49:14,15 50:6, 10 55:2,9,10,13 56:8 57:15 62:7 63:4,5, 10,11 64:15 66:5
correction
38:21 39:5,9,13 42:13,19,22
corrections
42:7
counted
35:14
County
18:5
couple
15:4
court
22:3
crack
54:3 55:16 56:21 58:1,5,7,10 63:7
crime
15:17,19
crimes
15:21 44:15
cross
8:2
cursive
33:10,13,24 34:2 37:21 38:6 40:13

D

Damon
5:21 25:4 43:23 68:18
day
12:18,20 18:14 24:7 50:23 53:20 54:2,22, 23 59:17
dead
62:9
deceased
10:16
Delong
5:4,6 6:6 32:14 35:9 36:4 42:3 49:18,19 50:8,13,24 53:14,21 54:1,8,12 55:3,15, 17,19,20,21 56:10, 16,20,24 57:3,5,10, 12,17,18,21,24 59:7, 17,20 60:7,11,16,20, 22 61:1 62:8,14,17, 21 63:6,7,8,13,14, 17,21 64:3,7,11 66:8 68:14
Delong's
56:12
denied
48:8
department
7:9 61:14
deposition
5:6,12,15,24 6:2,14 7:2 17:10,19 18:2,17 25:5,16,20 31:13 32:10,19 39:22,24 40:9,18 48:7 52:15, 20 53:4 64:20 68:22
Depression
35:4
describe
27:3
detective
27:18,19 45:7 48:2
detectives
63:13
detector
7:15 14:7,12,16 19:24 20:4,12,18,24 21:4,10,18 22:9
died
62:23 66:10,18
discovery
5:6
discussed
42:20
dispute
29:3,5 33:1 35:12
District
5:10
DNA
23:22
documents
18:21
domestic
15:20,23
door
48:9,14,22 49:1,2,8, 10 50:9,14,19,24 53:15,21 56:21 57:1 59:21 60:1,8
doorknob
60:8
downstairs
54:13,17
dozen
15:11,13
drink
30:15 64:3,8
drugs
15:22 16:24 34:11, 14 47:15 63:22
duly
6:7

E

earlier
25:15 32:7 42:20 49:23 65:16
easier
22:3
eat
30:11 64:4,8
edgy
51:17
eleventh
36:5,6,7,9 37:5,7,16
email
43:19 44:1
end
38:13,17 39:6 68:14
English
36:14,15,20 37:2,11, 13,17,19,20 38:1,5, 7,22
evening
49:20
everybody's
18:8

**evidence** 23:23
**exact** 66:4
**EXAMINATION** 6:9 25:1 65:3
**examined** 6:8
**exchange** 30:4
**Excuse** 33:19 36:7 64:6
**exhibit** 32:5 43:12,16 46:2
**explain** 13:23
**explained** 7:7

F

**fact** 23:17 33:1 43:8 55:8
**facts** 45:19
**fair** 33:11 36:17
**Fairly** 48:3
**false** 30:8 62:6 63:4
**familiar** 26:16
**Federal** 5:8
**feel** 7:20 14:6 22:16
**fell** 62:18
**felt** 63:8
**female** 27:1
**figured** 7:19
**find** 12:11 29:9
**fine** 6:12,22
**finish** 5:17 22:1 52:5
**finished** 20:17,24
**follow-up** 64:23 65:1
**form** 21:21 65:8
**format** 7:7
**found** 62:14
**foundation** 28:9 41:21 42:23 45:15
**fresher** 54:21
**friend** 63:9
**front** 50:9,24 53:21
**full** 5:2

G

**Galassini** 26:16 31:4,10 34:5,8 45:7 46:8 48:13 53:8,16 54:16 64:13
**gave** 6:14 10:15 19:19 25:17 29:19 32:8 47:15 51:10 53:2,7 55:16,20 67:1
**give** 30:23 40:8 43:21
**giving** 19:18 26:19 40:17 41:14,15 45:9 46:11 47:21 67:8,14
**glass** 56:16
**glasses** 31:19
**good** 5:24 6:1 68:16
**grade** 36:5,6,9 37:5,8,16
**grand** 19:14 26:12 43:9,13, 15 44:11,20 45:20 46:14,20,23 48:16 49:5 51:8,11
**grandma's** 49:19
**grandma-in-law** 50:1
**grandmother-in-law** 8:13
**grandmother-in-law's** 19:10
**great** 5:19
**guess** 13:15 23:8 47:4
**guessing** 26:1,7
**guilty** 22:16 63:8
**guys** 18:16

H

**Haldol** 34:19,20,24 35:3 63:23
**hall** 56:18 58:13
**handwritten** 32:1,4,8 33:5 42:1,5 43:11 49:16 52:14, 23 53:1
**happen** 32:21
**happened** 8:11 9:1 19:21 23:4 48:19 60:22
**happening** 51:2 54:14
**hard** 21:14
**harm** 9:18
**head** 35:5
**health** 6:16
**heard** 24:1
**hearing** 35:4
**Hold** 40:20 51:23
**home** 13:23 14:13 49:19 50:6 58:8
**honestly** 46:18
**hooked** 20:3,11 21:18 22:9
**hour** 18:19,20
**house** 8:21 19:11
**hundred** 15:6

I

**idea** 10:15 22:17,22 23:7
**identification** 46:3
**ignorance** 39:15
**Illinois** 5:10
**improper** 40:4,22
**in-law's** 8:21
**indicating** 38:18
**influence** 34:11,14 47:14 63:22
**initially** 48:8
**initials** 36:16,18 38:12,17 39:5,15 42:2,8,13,17
**inserted** 36:15
**inserting** 38:22
**inside** 59:22
**interacted** 15:1
**interests** 5:14
**interim** 64:24
**interview** 19:12,20
**interviewed** 19:2 27:23 28:7
**involved** 20:2,8,12,16,19,21 21:5,11,19 22:10,18, 22
**involvement** 67:1,4,11 68:4,21

J

**jail** 16:11
**John** 43:17 64:22
**joined** 65:12 66:4
**Judge** 5:22
**July** 5:12 25:5,17 33:12 34:24 35:10,17 36:2 37:2,10 38:2 40:9 44:13 48:13 49:18, 19 53:8 61:1
**jump** 24:19
**jury** 19:15 26:12 43:9,13, 15 44:12,20 45:20 46:14,20,23 48:17 49:5 51:8,11

K

**key** 55:24
**keys** 55:20
**kill** 24:15
**killed** 23:7,11,14,16 24:8
**kind** 10:15 14:23 15:20 51:17
**knew** 9:18 10:3,6 28:24
**knocked** 50:13,24 53:14,21
**knowledge** 23:6 24:8

L

**latched** 59:21
**lawyer** 5:14 28:14,20
**leading** 42:23
**left** 7:1 49:18 53:13 56:11 58:9
**legal** 24:5
**letter** 33:21
**lie** 7:15 14:7,12,16 19:24 20:3,11,17,24 21:3,10,18 22:9
**lied** 49:4
**life** 6:13 15:2
**lights** 56:12,17
**lives** 54:9
**living** 35:17,21,24
**local** 5:9
**lock** 60:8
**Loevy** 5:16 6:1,10 8:1 11:10,16 20:6 22:5, 20 24:18,22 28:9 38:24 40:3,20 41:21 42:23 43:19,22 44:7 49:23 51:23 52:1,4,9 65:1,4 68:10,14,20
**long** 9:3 11:19 13:23 17:2 18:16 19:22 51:13 52:1 65:2
**longer** 52:3
**looked** 14:22 27:4 58:13 62:17
**lot** 23:12 37:18 49:11
**loud** 39:10,23 41:3,19 42:21
**lucid** 34:21 63:24
**luck** 68:16
**lungs** 6:18
**lying** 46:20,21

M

**made** 7:2 10:7 39:13 42:14,22
**make** 39:5 41:4 42:6
**makes** 24:5
**making** 6:2 41:1
**male** 27:1
**manager** 9:4,8,17,23 10:4,8, 13,18,21,24 11:3,6, 13,23 12:4,9 13:24 19:1 21:8 61:8,9,11, 13,14,18,19,22 62:1
**mark** 32:3 43:16
**marked** 46:2
**material** 6:13
**Maureen** 61:12
**Mcdonald's** 64:4,8
**Mcshane** 5:22
**meaning** 57:8,13
**means** 44:21
**meant** 13:10
**medications** 34:24
**meet** 19:14
**meeting** 18:14 29:15,22
**memory** 6:16,19,20,22 8:10 11:2,12,22 18:22 21:9 28:10 30:2 54:20 55:8 65:6
**met** 18:10,13 27:23 28:12 68:16
**Michele** 24:19 43:20 51:23
**mind** 8:2
**minute** 40:8 43:21
**minutes** 51:19
**misstates** 22:19
**mistakes** 24:5
**Monday** 9:23
**month** 8:24 9:1 63:23
**months** 25:13
**morning** 9:24 44:14
**move** 41:13
**movements** 21:7
**murder** 7:10 8:4,11,18,20 17:4,5 20:3,8,13 22:10,18,23 23:3 28:24
**murdered** 9:15 10:3,6 63:14
**mustache** 14:23
**mute** 44:7

N

**Nancy** 26:16 31:4,10 45:7 46:8
**natural** 62:23 66:11,18
**needed** 39:9,13,16
**nice** 8:15 64:18 68:16
**night** 8:4,6 9:5 55:15 59:8
**nights** 9:5
**North** 35:18
**Northern** 5:9
**noted** 50:8
**notes** 64:23
**notice** 5:7
**noticed** 50:18 59:18 60:7,11
**number** 16:15 35:24

O

**oath** 44:19,22
**objection** 7:24 11:9,14 12:5 13:8 20:5 21:21 22:2,19,24 24:9 28:9 38:24 40:3,21 41:21 42:23 45:15 65:8,18, 22 66:20 67:20,23 68:5
**occurred** 8:5,6,8 29:3,6 55:17
**occurring** 55:22
**office** 61:8
**officers** 14:22
**open** 48:9,14,15,22 49:2, 7,8,10,13 56:21 59:20 60:1
**opening** 25:21
**opportunity** 39:4 62:24
**opposed** 33:17
**order** 39:8
**overturned** 23:20

P

p.m.
68:23
pages
25:22 42:5,9 47:6,11 52:19
papers
32:17 67:16
paragraph
35:8,15 42:2 50:23 53:20
Pardon
24:14
part
5:11 6:14 7:2 25:21 58:4 61:9 64:20 66:14,22
passage
12:3
Patrick
5:4,6
people
23:12
People's
46:2
person
16:10 18:15 27:3 29:10
personally
22:23 26:9
place
56:17
placing
42:16
point
7:20 19:3 21:3 30:23 34:15 50:6 53:3 62:9 65:12
police
7:9,21 12:11,21,23 13:16 14:2,21 15:2 19:2,4,7,9 21:4,10 26:21 27:6,22 28:3,7 60:21 62:21 64:10, 12,17 65:13 66:9,16 67:7,19 68:3
portion
25:10,16,19
prepare
17:19
preparing
18:16
pretty
11:4 13:2 64:18
previously
46:2
print
33:11,17 38:3,6,9 44:1
printing
33:21 44:5
prior
32:9
prison
16:12,19,20 17:2,8
privacy
49:12
probable
41:18
problems
6:16 31:14
Procedure
5:9
process
7:5,6
promise
47:20
promised
30:3 63:18
property
9:4,8,17,23 10:4,7, 12,17,21,24 11:3,6, 13,23 12:4,9 13:24 19:1 21:8 61:8,9,11, 12,14,22 62:1
prosecutor
28:19
provided
25:3
pull
43:15,17,24
pulling
40:8
purposes
5:23
pursuant
5:7
push
52:5
put
19:24 21:20 39:15
putting
39:16

Q

question
7:4 11:18 12:2 20:7, 9 22:8,21 29:8,11 36:22 37:24 40:3,4, 22 41:3,6,9 44:13 45:5,9,18,22 46:1,6, 24 47:5,9,14,19 48:1,19 66:23
questioning
5:17 49:24
questions
5:18 7:4 12:14 19:23 25:24 29:19 30:1 32:3 41:14 46:10 64:23 66:12 68:11
quick
44:2,6

R

read
25:6,8,10,16,20 32:8,18 36:14,21,24 37:2,7,11,19,21 38:4,7,10,11,15,16 39:9,13,18,20,21,23 40:10,12,13 41:3,18 42:4,21 46:16 52:14, 18 53:1 57:8 64:7
reading
53:9
reads
32:13 42:3 45:5 46:24 49:17 50:8,13, 23 53:20 54:8 55:3
real
44:2,6
reason
29:5,9 32:24 34:20 35:3,12 40:1 41:11
recall
25:11 26:2,3,9,19 27:6,18 28:17 29:1 30:6,10,14 31:1,3 32:14,16 34:4,7,23 40:2,15 41:14 42:10, 16 43:9,13 45:9 46:10,20,21 48:11, 12 49:1 50:18 51:2, 14 53:9,15 54:6,9,14 55:22 59:12,15,24 60:5,6,9,13 62:2,5, 18,24 65:11
recalled
54:24
recalling
29:22
receive
44:4
recognize
46:3 47:5,10
recollection
29:15,18,24
record
5:3,21 7:19 33:4 52:11
recorded
68:1
records
10:20,23
reduced
27:13 34:6
Reed
5:4,7,16,18,23 6:6, 11 9:12 10:1,13 12:6 21:11 22:6,12,18,21, 22 24:22 25:3 26:14 32:14 36:22 41:9 43:4 44:17 52:6,13 54:13,18,20 55:4,16 58:14,19 65:5,19 68:12
Reed's
23:19 28:14 56:3
reflect
5:5
remained
31:4
remember
8:14,23,24 11:19 12:18,21,22 13:19 14:15,21 18:24 19:7, 10,12,16,23 20:7 21:14 25:19 27:17, 21 28:1,15,21 29:4, 10,13 32:16 34:17 35:22,23 40:7 41:1, 24 43:7 44:18 45:17 48:24 49:22 50:12, 16,20,22 51:3,12 53:5 54:5,19 55:6, 17,18,23 59:6,11,23 60:10,18 62:4,20 63:2 64:1,16,17 65:17 66:4,11,13,22 67:12,14,16 68:7,9
rephrase
28:5 36:8 64:6
report
9:7,17,24 10:2,7,17 60:20
reported
9:3 10:3,12,21,24 11:3,5,12 12:9
reporter
22:3
represent
5:23 26:14
representing
5:14
represents
5:16
respond
22:2
response
30:1 50:14 53:15
rest
64:19
restroom
51:21
result
16:5
retaining
5:13
return
47:20 50:5 63:18
returned
49:19
review
25:6 26:11
reviewed
17:18,20,23 52:14
room
17:13,14,15 19:5 27:6,15,19 28:4,6 31:4,9 48:9,10
Rules
5:8,9

S

scare
20:11
screen
18:2
script
33:17
sec
51:23
seconds
57:3,10
sell
54:2
Selling
15:22
send
44:3
sense
7:3
sentence
16:19 36:4,16 38:13, 18 39:6,10,14 42:3 49:17 50:8,13 53:14 54:8 55:3 57:9
sequence
66:4
services
61:2,10,13,16,20,23 62:3
seven-page
34:8
Sheridan
35:18
shift
22:11
shoot
44:1
short
56:11
shortly
19:2
show
46:1
showing
33:5
shown
43:11
shut
56:24
sig-
47:10
sign
33:12,14,16,17,20 41:11 46:24 67:9
signature
32:12,22 33:2,10 47:6,11 68:17,18
signed
17:22 40:1 43:5 55:11 68:2
signing
32:14,16,17 33:17, 21,22 39:17,18 67:16
simply
37:1,24
sir
6:4,24 7:4 11:17,21 65:10 68:8,9
sit
26:23 29:14 35:23 50:17 55:21,23 56:5
sitting
12:12 17:13 48:11
situation
15:23
situations
16:1
smell
10:15,17 11:7,23 19:1,4 59:18 60:11 61:1
smoke
30:17 64:4,9
smoked
55:16 58:2,7 63:7
snitch
60:21
social
61:2,9,13,16,20,23 62:3
soda
64:3,8
sound
26:16
sounds
41:8 65:5
space
42:4,8
speak
28:23 29:1,12 45:6 61:17,19
speaker
57:5,12 58:17 59:8
speakers
63:8
speaking
28:16 30:11,15 34:5
speculation
11:9,15 12:5 13:8 20:5 21:24 40:21 41:22 65:18,22 67:20
spend
18:16
spent
16:11
spoke
26:20 27:7,11,15,20 28:2 34:15 61:22 62:1,3
spoken
18:1,4
start
5:17 22:2 25:23
started
5:20 66:24 67:3
starting
44:12 48:18
state
5:2 40:20 59:7
State's
26:15,20,24 27:7,11, 16,20,24 28:3,6,12, 18,22 29:12,15,23 30:7,24 31:3,9 32:9 34:5,7 45:6 46:8 48:2 53:3,7,16 64:12,17 65:6 68:3
statement
17:22 19:18,19 26:15 27:13 30:24 32:1,4,8,13,15,18 34:6,9,12,18 35:8,20 36:11 37:1 38:8,14, 19 39:23 40:2 41:1, 19 42:1,6,21 43:5,12 45:22 46:4,7 47:1, 15,21 48:6 49:17,21 50:15 51:6,9 52:14, 23 53:2,6,9,18 54:3 55:5,12 63:2,18,23 66:7,19 67:2,9,15 68:1
states
35:9,15 36:4,13 42:4 49:18 50:24 53:21 54:1,8,12 55:3,15,19 56:10,16,20,24 57:3, 10,21,24 59:7,17,20 60:11,16,20 61:1 62:8,14,17,21 63:13, 17,21 64:3,7,11 66:8
stating
29:23
station
12:16,17,19,20,21 14:2,13,14,20 19:13 27:7 64:10 67:7
stay
34:20
stayed
8:22
staying
57:13
stays
55:4
stop
64:21
strike
35:7,16
summarizing
31:10
summary
31:5 40:4
suspect
7:9,16 14:4
suspicion
9:4,8 21:20 22:11
suspicions
10:13
suspicious
9:9,10,11 10:1 22:15
sworn
5:1 6:8 44:19
system
24:5

T

taking
34:19,20,23 35:3 62:24
talk
19:8,9 21:1 23:18
talked
6:23 12:22 13:16 14:17 67:10
talking
21:7 26:19 52:20,21 53:6 65:6 66:24 67:3
tall
57:5,11
telling
21:10 26:7 45:19 53:15 55:13
test
7:15 14:8,12,16 20:4,18,24 21:4,10
testified
6:8 39:22 43:8,12 46:14 48:16 51:8
testify
44:21,24 46:13 51:9

**testifying**
44:20
**testimony**
22:19 26:12 40:2,17 41:17 43:16 44:12 46:16 48:18
**thing**
12:4,8 16:10 41:13
**things**
11:20 54:24
**Thompson**
27:19 45:7
**thought**
7:2,5,6 21:5 55:12 62:22 66:10,18
**threaten**
47:19
**threatened**
63:17
**time**
8:16 10:7 11:19 12:10 13:2 14:5,10, 11,16,17,18,19 16:1, 11 19:7,9 24:18 25:12,17 27:10 34:7, 16,19 35:13 45:5 48:20 49:11 56:11 63:22 66:24 67:3,10, 13
**times**
12:22 13:1,11,17 15:1,8,11 16:14,16, 17,20 18:13 49:13
**titles**
18:8
**today**
17:11 18:14 25:7,17 26:12,23 29:14 31:16 35:23 45:20 48:12 50:17 54:21 55:1,9
**today's**
17:19 32:9,19 52:15 53:3
**told**
11:22 12:4,15 13:24 19:1,4 21:6 23:10, 12,13 25:24 28:18 29:24 30:6,7 31:5, 10,13 32:7 48:12,21 49:23 52:13 54:16 55:21 56:5 57:6,13, 18,21 58:20 59:3 60:16 61:8 62:17 63:13,14 66:8,15 67:18 68:2
**top**
45:8
**totally**
13:13 21:13 41:7
**town**
57:22 59:4
**transcript**
25:4,9 26:11 40:9
**transpired**
67:5
**treated**
14:4 48:1 64:11
**treating**
7:16
**trial**
68:15
**true**
27:1 28:2 35:21 36:11 38:8,14,19,23 43:5 46:6 49:3 50:11 51:9 53:18,23 54:4, 16 55:5 56:8,14,18, 22 57:1,6,15,19,22 58:2,4 59:10,15,18, 19,22 60:5,17,23 61:4 62:6,15 63:15, 19,20,24 64:5,15 66:8,16,19
**truth**
46:13
**truthful**
44:17 45:12 46:17 47:3,8,17,23 48:4,23 49:21 50:15 51:10 55:13 62:11 63:4
**truthfully**
45:1
**turn**
24:20 44:11 56:12
**turned**
56:17
**turning**
48:17 49:16

**U**

**Uh-huh**
50:2 58:24
**understand**
7:6 29:8 34:4 36:22, 23 37:23 44:21 48:7
**understanding**
5:13 24:4
**understood**
28:13,19
**unpleasant**
11:7
**unusual**
50:10

**V**

**vague**
14:24
**Van**
9:13,14,19 10:3,6,14 17:5 23:16 24:8 28:24 48:10 50:9 51:1 53:22 54:1 56:20 57:1,4,11,18, 21 58:15,21 59:3,9, 21 60:1,12,16 61:3,7 62:8,15,18,22,23 63:8,9,14 66:9,10, 17,18
**victim**
23:11
**violence**
15:20
**Violent**
44:15
**vision**
31:14 40:14
**visiting**
8:12
**Vo**
9:14,19 10:3,6 17:5 23:16 24:8 28:24 57:21 59:3 60:12,16 62:8,18 66:10,18
**Vo's**
9:13 10:14 48:10 50:9 51:1 53:22 54:1 56:20 57:1,4,11,18 58:15,21 59:9,21 60:1 61:3,7 62:15,22 63:8 66:9,17
**voices**
35:4

**W**

**wait**
57:19 58:22
**waited**
57:3,10 59:5
**waiving**
68:18
**wanted**
41:13 42:7 54:2
**washroom**
30:21
**water**
56:16
**ways**
10:11
**wearing**
31:19
**week**
8:11,18,20,23 25:15
**weekend**
8:17
**wife**
17:11 25:8,16 32:20 52:18
**word**
36:14,15,19 38:22
**words**
42:9
**work**
61:13
**worked**
6:23
**worse**
6:18
**write**
34:1,2 36:14,19 37:2,13,17,20 38:1, 5,7,22
**writing**
27:13 31:11 34:6 37:22 40:13
**written**
30:24 45:22 46:7 67:1,8,15 68:1
**wrongful**
24:1
**wrote**
31:5 34:8,12

**Y**

**year**
15:23
**years**
11:11 12:3 13:13,15 17:3 21:14 33:15 35:9,10,13