IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT-CRIMINAL DIVISION

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff, | ) |
| vs. | ) No. 01 CR 20237 |
| CARL REED, | ) Charge: Murder |
| Defendant. | ) |

TRANSCRIPT OF PROCEEDINGS had at the hearing of the above-entitled cause before the Honorable MARJORIE LAWS, judge of said Court, on the 27th day of April, 2005, at the hour of 11:00 a.m.

PRESENT:

HON. RICHARD DEVINE
State's Attorney of Cook County, by
MR. GEORGE CANELLIS
Appearing on behalf of the Plaintiff;

HON. EDWIN BURNETTE
Public Defender of Cook County, by
MS. MARIJANE PLACEK and
MS. RUTH McBETH
Appearing on behalf of the Defendant.

Paul W. O'Connor
Official Court Reporter
Circuit Court of Cook County
County Department

# I N D E X

Date: April 27, 2005


| | |
|---|---|
| Motion to Suppress | 3 |
| State Rests | 131 |
| Argument on MDF | 131 |


Continued to 5-20-05


| WITNESS | DX | CX | RDX | RCX | FD | FC |
|---|---|---|---|---|---|---|
| MICHAEL CUSACK | 3 | 15 | 23 | | | |
| RICHARD P. ZULEY | 24 | 41 | 92 | 93 | | |
| NANCY GALASSINI | 94 | 112 | | | | |

THE COURT: Do you feel okay?

THE DEFENDANT: Yeah, I feel okay.

MS. PLACEK: We have inquired of him, he says he feels all right. I don't know what to say.

THE COURT: This is matter of People versus Carl Reed. Motion commenced and continued from April 22nd. Did the state rest?

ASA CANELLIS: No judge.

THE COURT: Call your next witness.

ASA CANELLIS: Thank you.

(Witness sworn)

MICHAEL J. CUSACK,

called as a witness herein, having been first duly sworn, was examined upon oral interrogatories and testified as follows:

DIRECT EXAMINATION

By Mr. Canellis:

Q. Sir, in a loud voice, if you please state your name, spelling your first and last name for the record?

A. Michael J. Cusack, C-u-s-a-c-k.

Q. By whom are you employed?

A. Chicago police.

Q. What's your star number?

A. 60053.
Q. How long have you been employed by the Chicago police?
A. I'm on my 26th year.
Q. What's your current assignment?
A. Area three violent crimes.
Q. What's your position at Area three violent crimes?
A. I'm a gang crimes specialist.
Q. How long have you been so?
A. About 15 years.
Q. Directing your attention to July 20th, 2001. Were you assigned to Area three back on that date?
A. Yes I was.
Q. Do you recall if you worked on that date?
A. Yes, I did.
Q. Do you recall what time you started work?
A. Approximately 16:30.
Q. That be 4:30 in the afternoon?
A. Yes.
Q. Were you working on a particular case?
A. Yes I was.
Q. What was nature of the case you were working on?

A. It was a homicide investigation.
Q. Was victim in that case person by the name of Kim Van Vo, three words?
A. That's correct.
Q. Were you working alone or with a partner?
A. I was with partners.
Q. Who were they?
A. Detective Gildea and gang specialist Zacharias.
Q. G-i-l-d-e-a, and Zacharias, Z-a-c-h-a-r-i-a-s?
A. Yes.
Q. Did you have an opportunity to go to the area of 4946 North Sheridan in the evening hours?
A. Yes.
Q. What's located at that address?
A. An apartment building.
Q. And in regards to this case, what specifically is located at that address?
MS. PLACEK: Objection, presuming.
THE COURT: Overruled.
THE WITNESS: A There's apartments -- that was the apartment related, that was the scene of the crime, in that building.

ASA CANELLIS: Q Little bit after 8:00 o'clock in the evening, did you have an opportunity to meet with anybody there?
A. Yes.
Q. Who did you meet with?
A. The manager of the building, a woman.
Q. Did you meet anybody after you met the woman?
A. Yes, I did.
Q. Who did you meet with?
A. Gentleman by the name of Carl Reed.
Q. Do you see him in court today?
A. Yes.
Q. Can you point to him, describe something he's wearing?
A. It's gentleman to the -- seated gentleman in the DOC brown jumpsuit to left of counsel.
ASA CANELLIS: Your Honor, if the record could reflect in-court identification of the defendant.
THE COURT: It may.
ASA CANELLIS: Q Did you have an opportunity to go anywhere with the defendant after meeting with him?
THE WITNESS: A Yes.
Q. Where did you go?

A. We, he voluntarily accompanied us to Area three violent crimes.

MS. PLACEK: Objection.

THE COURT: Sustained.

MS. PLACEK: Motion to strike.

THE COURT: Stricken.

ASA CANELLIS: Q Was defendant under arrest when you took him to Area three?

MS. PLACEK: Objection, leading.

THE COURT: Sustained.

ASA CANELLIS: Q Did you place the defendant under arrest when you saw him at 4946 West Sheridan?

MS. PLACEK: Leading.

THE COURT: Sustained.

ASA CANELLIS: Q What did you do when you saw the defendant at Sheridan?

THE WITNESS: A We had a brief conversation and he accompanied us to Area three violent crimes.

Q. When he accompanied you was he cuffed or uncuffed?

A. He wasn't cuffed.

Q. When you went to Area three,what did you do there?

A. He was put in one of the interview rooms, nearest one to the violent crimes office.

Q. What happened when you put him into the interview room there?

A. We shortly thereafter left and continued the investigation.

Q. Before leaving, did you make any requests of the defendant?

A. He was --

MS. PLACEK: Presuming, judge. Request.

THE COURT: Overruled.

THE WITNESS: A Subject was asked if he needed any basic necessities tended to in the way of food or the bathroom.

ASA CANELLIS: Q Did the defendant need to go to the bathroom?

A. Not to my knowledge.

Q. You mention food. Was the defendant given food?

A. I believe he had some chips and can of pop.

Q. When the defendant was in the interview room, was he cuffed or uncuffed?

A. He was uncuffed.

Q. What did you do next when you left the

interview room?

A. We went about our investigation.

Q. What did you do during course of your investigation?

A. We went back out on the street.

Q. Did you speak to anybody out on the street?

A. Yes, we did.

Q. Who did you speak with?

A. Mr. Burns.

Q. Besides speaking with Mr. Burns, what did you do?

A. He accompanied us back into Area three violent crimes.

Q. Did you speak with him back at Area three violent crimes?

A. Yes, we did.

Q. Before speaking with him did you do anything with him?

A. Yes.

Q. What did you do?

A. He was Mirandized.

Q. At approximately 1:00 o'clock in the morning did you have an opportunity to meet the defendant again?

MS. PLACEK: With due respect, we will object and move to strike Mr. Burns' conversation unless foundation is established.

THE COURT: I heard he was Mirandized.

MS. PLACEK: Exactly. I believe that still goes to conversation.

THE COURT: Overruled. I will allow it to stand.

ASA CANELLIS: Q Approximately 1:00 o'clock in the morning did you meet with the defendant again?

THE WITNESS: A Yes, I did.

Q. Where did you meet with him this time?

A. The same room he was sitting in before we left.

Q. Who were you with at this time?

A. The same partner's, Gildea and Zacharias.

Q. How did this conversation begin?

A. Mr. Reed was Mirandized.

Q. Who was he Mirandized by?

A. Zacharias.

Q. How did gang specialist Zacharias Mirandize him?

A. He read from the FOP book line by line.

Q. Did the defendant subsequently waive his

rights?

MS. PLACEK: Objection, conclusion.

THE COURT: Sustained.

ASA CANELLIS: Q Did the defendant respond as to whether or not he understood his rights?

THE WITNESS: A Yes, he did.

Q. What did he respond?

A. Yes.

MS. PLACEK: Objection, compound.

THE COURT: Sustained.

ASA CANELLIS: Sustained as to which part. What did he say.

THE COURT: Compound question.

ASA CANELLIS: What did he say.

MS. PLACEK: Objection.

THE COURT: What's your objection.

MS. PLACEK: Presuming foundation. To what, judge.

THE COURT: Lay a better foundation.

ASA CANELLIS: Q You had a conversation with the defendant at about 1:00 o'clock, correct?

THE WITNESS: A That's correct.

Q. You guys were in the same interview room you stayed in?

A. That's correct.
Q. Also stated you were with Gildea and Zacharias?
A. That's correct.
Q. You also stated that Zacharias advised him of his Miranda rights?
A. That's correct.
Q. What did the defendant respond when he was advised of his Miranda rights?
MS. PLACEK: Objection, compound.
THE COURT: You have to go through each right. That's one of the allegations, that he wasn't given his Miranda.
ASA CANELLIS: Q Was the defendant advised that he had a right to remain silent?
MS. PLACEK: Again leading. The witness is to testify.
I know counsel is laughing and thinking this is a joke, but this is actually not a joke. The Illinois Supreme Court.
THE COURT: Ladies and gentlemen, ladies and gentlemen; don't lead your witness.
ASA CANELLIS: Judge, just for the record I most certainly do not think this case is a joke.

Especially in light of the fact that we do have a victim who's been brutally murdered in this case.

THE COURT: We are not going to have arguments, I'm admonishing both sides. All right. Sustained. The objection. Don't lead your witness.

ASA CANELLIS: Q Was there a conversation with the defendant?

THE WITNESS: A Yes.

Q. Approximately how long did this conversation last?

A. About ten minutes.

Q. Did the defendant ever have any questions during this conversation?

MS. PLACEK: Objection.

THE COURT: Overruled.

THE WITNESS: A No.

ASA CANELLIS: Q What did you do after the conversation?

A. We left.

Q. Were any requests made of the defendant?

A. No.

Q. Did the defendant ever tell you he was a diabetic?

A. I never heard that.

Q. Did the defendant ever tell you he needed any sort of medication?

A. No.

Q. Can you describe the defendant's demeanor while you dealt with him?

MS. PLACEK: Objection, compound in nature.

THE COURT: Overruled.

THE WITNESS: A He was pleasant.

ASA CANELLIS: Q When you spoke with the defendant, did he ever tell you he wished to remain silent?

A. No.

Q. Did he ever tell you he wanted a lawyer?

A. No.

Q. Did you ever physically coerce the defendant?

A. No.

Q. Did you ever mentally coerce the defendant?

A. No.

Q. Psychologically coerce the defendant?

A. No.

Q. Did you ever threaten to beat up the defendant if he didn't give you a statement?

A. No.

Q. In your presence did either of the other

detectives ever make any of those threats to the defendant?

A. No.

Q. Did you ever make any material misrepresentations to the defendant?

A. No.

Q. Did you ever tell the defendant his fingerprints were found at the crime scene?

A. No.

Q. Did you ever confront the defendant with any illegally-obtained evidence?

A. No.

Q. In terms of your conversations, did anybody, that being the detectives you were working with, ever make those comments to the defendant?

A. No, not in my presence.

ASA CANELLIS: No further questions, judge.

THE COURT: May inquire.

MS. McBETH: Thank you.

CROSS EXAMINATION

by Ms. McBeth:

Q. Officer, what you testified to, is that the sole contact you had with Carl Reed?

A. That's correct.

Q. Those two encounters you told us about are the only encounters you had, is that correct?

A. To the best of my recollection, that's correct.

Q. After the 1:00 o'clock conversation, by the way the 1:00 o'clock conversation, would it be fair to say that you told him what Mr. Burns had told you?

ASA CANELLIS: Objection.

THE COURT: Overruled.

THE WITNESS: A Yes.

MS. McBETH: Q After the 1:00 o'clock conversation, did you turn this case over to detectives who continued working on it?

A. Yes.

Q. Who were those detectives you turned the case over to?

A. I believe Zuley and Thompson picked up the case. But not immediately. I'm not sure how you're framing that, counsel. I don't understand. You mean immediately or --

Q. You said that there was a 1:00 o'clock encounter with Carl Reed, is that right?

A. 1:00 a.m., correct.

Q. 8:00 o'clock is when you took him from the

apartment building to the police station, right?

A. Yes.

Q. Then there was a 1:00 o'clock encounter you had with him that was about a 10-minute conversation, is that right?

A. That's correct.

Q. After that 10-minute conversation you turned the case over to other detectives?

A. Somebody else picked up the case, but I don't know who picked it up from there. If that's what you're saying.

Q. Did you write out what Mr. Reed told you in that 1:00 o'clock conversation?

A. I believe there were GPR's written out, yes.

Q. Did you do that?

A. No, I didn't write them out.

Q. What does detective Gildea look like?

A. Early 50s, male white. About 6-1, 230.

Q. Could you describe his hair?

A. Black.

Q. Does he have any facial hair?

A. No.

Q. Was there any time the detective Gildea was present with Mr. Reed when you were not, if you know?

A. I don't know.
Q. Was there any time the detective Thompson was present with Mr. Reed when you were not, if you know?
A. I don't know.
Q. What about your partner, the gang specialist officer Zacharias, was there a time that he was present with Mr. Reed when you were not?
A. I don't know, not in my presence.
Q. So all you can tell us about is the two encounters you had with Mr. Reed, is that correct?
A. Yes.
Q. After you spoke to Mr. Reed at 1:00 o'clock, did you give him an opportunity to memorialize his statement to you?
A. I don't understand what you mean.
Q. After you spoke to him at 1:00 o'clock, did you let him write out what he had told you?
A. That never came to pass, so I guess no.
Q. Did you write out what he told you and ask him if he would sign it?
A. I don't remember that.
Q. Is that because you didn't?
A. I didn't write anything down.
Q. Did you offer to bring a court reporter in to

record what he was saying?
A. No, none of that occurred.
Q. Or videographer?
A. None of that occurred.
Q. You told us that you did tell Mr. Reed about the conversation that you had with Mr. Burns, is that correct?
ASA CANELLIS: Objection.
THE COURT: Sustained. Asked and answered.
MS. McBETH: Q Did you tell him about any evidence that had been recovered from the scene of the homicide?
THE WITNESS: A I don't recall that.
Q. Is it possible you talked to him about that either at 8:00 p.m. or 1:00 a.m.?
ASA CANELLIS: Objection.
THE COURT: He can answer.
THE WITNESS: A No.
MS. McBETH: Q It's not possible.
A. I don't believe I did that, no, I'd have -- no.
Q. Did the other law enforcement officials do that, talk to Mr. Reed about recovered evidence in your presence?

A. Not in my presence.

Q. You already told us you don't know if they spoke with him when you weren't there?

A. Not in my presence I didn't see him speaking to him, in my presence.

Q. Had there been any evidence recovered at the time you spoke to Mr. Reed either at 8:00 p.m. or 1:00 a.m.?

A. Not to my knowledge.

Q. Did you show Mr. Reed any evidence?

A. I don't recall that.

Q. Is there anything that would help you remember if you did or not?

A. I don't recall it.

Q. Does that mean there's nothing that would help you remember if you did or not?

A. As I said, I don't remember that.

Q. Nothing further. I'm sorry, if I can have a minute.

Do you have a memory of the first conversation with Mr. Reed, the 8:00 p.m. conversation?

A. Yes.

Q. Where did that take place?

A. He accompanied us into Area three.

Q. The conversation took place at Area three the police station?

A. Yes.

Q. Was it in that interview room directly off the detective's station?

A. Yes.

Q. At that time did you or your partners Mirandize Mr. Reed? At 8:00 p.m. on July 20, 2001?

A. He was brought in and sat down. Asked if he need necessities taken care of.

Q. Was he Mirandized at that time?

A. No.

Q. You said you brought Mr. Reed into the police station and left him in the interview room and went back out on the street, is that right?

A. That's correct.

Q. You said that you asked him if he needed to go to bathroom or if he needed anything to eat, is that right?

A. Yes.

Q. That's because he needed to ask a police officer to either go to the bathroom or get something to eat, is that right?

A. Essentially that's correct.

Q. He was not able to leave the room and go to the bathroom on his own, is that right?

A. Yes.

Q. He was not able to leave the room and go get something to eat on his own?

A. No.

Q. He was in your custody and control?

ASA CANELLIS: Objection.

THE COURT: Overruled.

THE WITNESS: A Yes.

MS. McBETH: Nothing further. I apologize your Honor.

Q. Was there a fourth detective involved in this investigation, sir?

A. I don't understand your question. A fourth investigation involved in the totality of this investigation? I don't understand that question.

Q. Sir, is there a detective Zin, Z-i-n, involved in the investigation of this homicide?

A. Z-i-n, I don't know that name.

Q. I apologize. J-i-n.

A. I know the name Jin. I don't know if he was involved.

Q. Did you see him either on the 20th or the

21st at the police station when you were involved with Carl Reed?

A. I don't recall, I don't recall Jin.

Q. You know that gentleman, is that correct?

A. Yes.

Q. Could you describe him for Judge Laws?

A. He's an Oriental gentleman, about 50.

MS. McBETH: Nothing further at this time.

THE COURT: Redirect.

REDIRECT EXAMINATION

By Mr. Canellis:

Q. At 8:00 o'clock, when the defendant was first taken to Area three, was he under arrest?

A. No he was not.

MS. PLACEK: Objection, legal conclusion.

THE COURT: Sustained.

ASA CANELLIS: No further questions.

THE COURT: Any recross based on that question.

MS. McBETH: No your Honor.

THE COURT: Thank you, you may step down. Call your next witness.

(Witness sworn)

RICHARD P. ZULEY,

called as a witness herein, having been first duly sworn, was examined upon oral interrogatories and testified as follows:

DIRECT EXAMINATION

By Mr. Canellis:

Q. In a loud voice, please state your name, spelling your first and last name for the court reporter?

A. Richard P. Zuley, Z-u-l-e-y.

Q. By whom are you employed?

A. Chicago Police Department.

Q. What's your star number?

A. 21290 now.

Q. How long you been employed with the Chicago Police Department?

A. I was hired in September of 1970.

Q. What's your current assignment?

A. I'm a detective with Area three homicide.

Q. How long have you been a detective with Area three homicide?

A. I've been working as a detective in homicide since 1977, when I made detective. The, it's the same office. Area three used to be area six, but I have

been working in homicide since '77.
Q. Where is Area three located now?
A. 2452 West Belmont.
Q. Directing your attention to July 21, 2001 in the morning hours. Were you working?
A. Yes I was.
Q. Where were you working out of?
A. Area three homicide.
Q. Were you working alone or with a partner?
A. I was working with detective Tony Jin.
Q. Approximately 8:30 in the morning, were you assigned a particular case to work on?
A. Yes, sir.
Q. What was the nature of that case?
A. It was to assist in the investigation into the murder of Vietnamese man by the name of Van Vo.
Q. Did you work with any other detective or detectives when you were working on this investigation?
A. I worked primarily with detective Timothy Thompson.
Q. Approximately 9:00 o'clock that morning, did you meet with a person named Carl Reed?
A. Yes, sir.
Q. Do you see him in court today?

A. Yes, sir, the gentleman sitting to the right of counsel in the tan uniform.

ASA CANELLIS: Record may reflect in-court identification of defendant.

THE COURT: It may.

ASA CANELLIS: Q Where did you meet the defendant?

THE WITNESS: A He was in an interview room of the, in the offices of Area three. I believe it was room 239. Which was right next to our office door.

Q. Who were you with when you met the defendant for the first time?

A. Detective Thompson.

Q. What happened when you went in and met the defendant?

A. He was asked if he needed anything, if he wanted anything to eat. He was offered water, he took water, took cigarettes and he was taken to the washroom.

Q. Once defendant was brought back from the washroom, what happened next?

A. Detective Thompson advised him of his rights, his Miranda rights from his FOP book.

Q. Did the defendant waive those rights?

A. Yes, sir he did.

MS. PLACEK: Objection.

THE COURT: Sustained.

ASA CANELLIS: Q What rights did detective Thompson advise him of specifically?

THE WITNESS: A He was advised that he had a right to remain silent. If he gave that up, anything he said or did could be used against him in a court of law. He was advised that he had a right to an attorney. To have that attorney present during questioning. If he desired an attorney and could not afford one, one would be appointed for him by the court.

He was asked if he understood those rights, he stated he did. He was asked if he waived those rights, he stated he did and the conversation continued.

Q. Approximately how long did the conversation last?

A. Approximately 15 minutes.

Q. What did you do after this conversation?

A. After that conversation, we met with another individual and subsequently went out with that individual. To his residence.

Q. What individual was that?
A. That was Ricardo Burns.
Q. Why did you go to his residence?
MS. PLACEK: Objection, relevancy.
THE COURT: Overruled.
THE WITNESS: A Ricardo Burns told us he was diabetic and he needed his insulin, so we took him to his house where he took his insulin. He took his regular injection and he took his kit with him and we returned ultimately back to our office.
ASA CANELLIS: Q At approximately 12:30 in the afternoon, did you have an opportunity to see the defendant again?
A. Yes, sir.
Q. What did you do when you saw him?
A. We returned with Mr. Burns, we stopped at McDonald's and picked up lunch. So the first thing we did was we went in, offered him his lunch, gave him his lunch and gave him the opportunity to use the washroom.
Q. Do you recall what you gave him for lunch?
A. That meal was a quarter pounder, diet coke and -- quarter pounder meal, diet coke, and he was given more cigarettes.
Q. At this time did you talk with the defendant

regarding the case at all?

A. There was brief conversation I believe. Approximately 40 minutes, 45 minutes.

Q. After this, what did you do next?

A. We continued our investigation. We went out looking for other witnesses and other individuals that could provide information about the case.

Q. Did you subsequently meet with the defendant again at about 7:00 o'clock in the evening?

A. Yes, sir.

Q. Who was present when you met with him this time?

A. In fact sir, if we can back up. There was no conversation after that lunch. We went, we continued our work. I don't believe we had a conversation at 1:00 o'clock.

Q. Is that the 40-minute conversation you previously mentioned?

A. Yes, sir. I don't think that took place then.

Q. At 7:00 o'clock did you meet with the defendant?

A. Yes, sir.

Q. Who was present at this time?

A. Detective Thompson, myself and Mr. Reed.
Q. Where did this conversation take place?
A. That was in the same interview room, 239.
Q. How did this conversation start?
A. He was given a meal. That meal was another McDonald's meal, I believe it was a Big Mac. Another diet coke, more cigarettes. He was also given the opportunity to use the washroom.
Q. Did the defendant use the washroom at that time?
A. Yes, sir.
Q. When the defendant returned from the washroom, did you have an opportunity to speak with him?
A. Yes, sir.
Q. How did this conversation begin?
A. He was given his rights again by detective Thompson.
Q. Was this -- how was this done, by memory or FOP?
A. It was done through his FOP book.
Q. Do you remember what he specifically asked the defendant at that time?
A. He was given those rights out of the book and

was asked if he understood those rights. If he waived those rights. And if he would consent to the continued interview.

Q. Did anything unusual happen during the course of his advisement of the rights?

A. No, sir.

Q. Did you have a conversation with the defendant at that time?

A. Yes, sir.

Q. What happened next?

A. After that conversation, we continued our investigation and went out looking for additional witnesses and people that could provide information relative to this case.

Q. Do you recall approximately how long that conversation was?

A. Approximately 45 minutes again. 40, 45 minutes.

Q. Like to direct your attention now to July 22, 2001. At 8:30 in the morning.

Did you work on that date?

A. Yes, sir.

Q. Were you still working on this particular case?

A. Yes, sir.
Q. Did you have an opportunity to speak with the defendant then?
A. Yes, I did.
Q. Who were you with?
A. Detective Thompson.
Q. Where did the conversation take place?
A. In the same interview room, 239, at the offices of Area three.
Q. How did that conversation begin?
A. Again it began with the opportunity to use the washroom. He was given some breakfast. And he was again given his rights by detective Thompson.
Q. Did the defendant in fact use the washroom?
A. Yes, sir.
Q. Stated he was given some breakfast. What was he given for breakfast?
A. He was given a bottle of cranberry juice and a doughnut. He was also given cigarettes.
Q. The doughnuts you're referring to, is that Krispy Kreme?
A. Yes, sir, it is, or was.
Q. Do you know who bought that doughnut?
A. Yes, sir I do.

Q. Who?

A. I bought the doughnut, actually it was one of three-dozen doughnuts I bought in my way to work. Dropped off a dozen with the desk personnel at the 19th District. And I brought the other two dozen up to my office and they were shared with the personnel on the floor.

Q. Did you ever give the defendant three-dozen Krispy Kremes?

A. No, sir.

Q. You stated detective Thompson advised him of his Miranda rights?

A. Yes, sir.

MS. PLACEK: Objection.

THE COURT: Overruled.

ASA CANELLIS: Q How did he advise him of his rights?

THE WITNESS: A He advised him from his FOP book.

Q. Did the defendant state whether or not he understood his rights?

A. Yes.

MS. PLACEK: Compound.

THE COURT: Overruled.

THE WITNESS: A Yes, sir, he stated he understood and waived those rights and continued his conversation with us.

ASA CANELLIS: Q How long did this conversation last?

A. Again about 40, 45 minutes.

Q. Can you describe the defendant's behavior up to this point?

A. The defendant was actually quite pleasant, very responsive. Seemed quite comfortable.

Q. Did the defendant ever ask any questions of you and detective Thompson while he was being Mirandized?

A. No, sir. In fact --

MS. PLACEK: Objection, form.

THE COURT: Overruled.

THE WITNESS: A In fact when he was given his rights, one, the time when detective Thompson read them from the book, he stated I know my rights, you don't have to keep giving me my rights, but they were given nonetheless. And he was asked if he understood, if he waived those and he stated he did. And he did waive them.

ASA CANELLIS: Q After you spoke with the

defendant, for this approximate I believe you stated 40, 45 minutes, what happened next?

A. At that point, we left him and we took our investigation to the south side. We looked for an individual by the name of DeLong Reed. Same last name.

Q. Did you find DeLong Reed?

A. Yes, sir.

Q. What did you do when you found DeLong Reed?

A. We spoke to him briefly about this. And asked him if he'd come back to our office to talk to us some more. In more depth about it. He agreed. We returned to Area three.

Q. Directing your attention now to about 11:30 in the morning, that same day.

Did you have an opportunity to see the defendant at that time?

A. Yes, sir.

Q. Where was that?

A. That was in the same interview room. 239 at the offices of Area three.

Q. What happened when you saw defendant at that time?

A. He was given again the opportunity to use the washroom. Then we actually confronted him with DeLong

Reed.

Q. What happened once the defendant was confronted with DeLong Reed?

A. DeLong told him that he had told us --

MS. PLACEK: Objection.

THE COURT: What's your objection.

MS. PLACEK: Conversation of DeLong Reed.

THE COURT: Hearsay is admissible.

MS. PLACEK: I understand, judge. Then foundation should be established. We are not sure whether this is a repeating or whether -- that's why we are objecting on motion of foundation.

THE COURT: Lay a foundation then.

ASA CANELLIS: Q Who else was present for this conversation?

THE WITNESS: A Detective Thompson, myself, Mr. Reed, and DeLong Reed.

Q. What was said?

A. DeLong Reed told Carl Reed that he had told us about events that took place in the building where they lived. On Sheridan. And that he should tell us the truth, too.

Q. What did you do with DeLong Reed after that?

A. After that he was released from our office --

not released, he wasn't in custody. He was allowed to leave and we told him we would be reaching out to him later. Chances are the state's attorney's office would want to talk to him also.

Q. Was the defendant given lunch on this date?

A. Yes, sir.

Q. What was he given?

A. Again, I think every meal except for the first one was same, Big Mac meal and diet coke and cigarettes.

Q. After the conversation between yourself, detective Thompson, the defendant and DeLong Reed, did you see the defendant again?

A. Yes, sir.

Q. Who was present for this?

A. Myself, detective Thompson and Mr. Reed.

Q. Was this at approximately noon time?

A. Yes, sir.

Q. What room was this in?

A. This is in room 239.

Q. How did this conversation start?

A. This time I gave him his rights. I gave these rights from memory. Not from the book. And --

Q. Can you please demonstrate how you gave the

defendant his rights?

A. As stated earlier, I told him he had a right to remain silent. If he gave up the right to remain silent, anything he did or said could be used against him in a court of law. I asked him if he understood those. He stated he did.

I told him he had a right to attorney and have him, that attorney present during any questioning. If he desired that attorney and could not afford one, an attorney would be appointed for him by the court. I asked him if he understood those rights and stated he did. I asked him if knowing and understanding these rights, do you agree to continue to talk to me about this. He stated he did.

Q. Did you then proceed to have a conversation with the defendant?

A. Yes, sir.

Q. Approximately how long was this conversation?

A. This conversation was approximately 45 minutes.

Q. Was an assistant state's attorney subsequently called out to Area three?

A. Yes, sir.

Q. Detective, during course of your

conversations did the defendant, did he ever elect to remain silent?

A. No, sir.

Q. Did he ever state he wished to remain silent?

A. No.

Q. Did he ever say he wanted a lawyer?

A. No he did not.

Q. Did you ever threaten to beat the defendant if he didn't give a statement?

A. No, sir.

Q. Did detective Thompson ever threaten to beat the defendant if he didn't give a statement in your presence?

A. No.

Q. Did you ever physically coerce the defendant?

A. No, sir.

Q. Did you ever mentally coerce the defendant?

A. No.

Q. Did you ever psychologically coerce the defendant?

A. No, sir I did not.

Q. Did you ever make any material misrepresentations to the defendant?

A. No.

Q. Did you ever tell the defendant his fingerprints or his prints were found at the crime scene?
A. No.
Q. Did you ever confront the defendant with any illegally-obtained evidence?
A. No, sir.
Q. Did the defendant ever tell you he was a diabetic?
A. No, sir he did not.
Q. Did the defendant ever tell you he needed medication for a diabetic condition?
A. No, sir he did not.
Q. Did the defendant ever tell you that any other detective or police officer made him any threats or promises?
A. No he did not.
Q. Did the defendant at any point which you saw him, ever appear to need any sort of medical treatment?
A. No, sir, he appeared quite comfortable.
ASA CANELLIS: No further questions, judge.

CROSS EXAMINATION

by Ms. Placek:

Q. Detective, the last Miranda rights you gave to him, you said an attorney would be appointed in a courtroom, correct, by the court?

A. I told him if he desired an attorney and could not afford one, one would be appointed for him by the court.

Q. Is that your understanding of Miranda?

A. That's one of the rights under Miranda, yes, ma'am.

Q. Let me ask you this: Where were you going to get an attorney for Mr. Reed?

A. The questioning would stop the moment he stated he needed or wanted an attorney.

Q. That's not my question, detective.

A. That's my answer, ma'am.

ASA CANELLIS: Objection.

THE COURT: Overruled. Let him answer.

THE WITNESS: A The questioning would stop the moment he said he wanted an attorney and then the process would begin to get him an attorney.

MS. PLACEK: Q Where would you have gotten him an attorney?

A. Once went into court, if he went into court, one would be appointed for him.

Q. In other words, what you're saying is you wouldn't have gotten him an attorney at the station?

A. I'm telling you that the questioning would have stopped the moment he asked for an attorney.

Q. Let me ask you this: Would you have attempted to get him an attorney?

A. I would have reached out and tried, yes.

Q. Where?

A. I would have called the felony review office and I probably would have called the public defender's office.

Q. Let me ask you this: When you say the felony review office, that would be the state's attorney's office, correct?

A. Yes.

Q. Now, you never met Carl Reed before that date and time, correct?

A. That's correct.

Q. When you say you have never met Carl Reed, you have no idea what normal behavior is for him, do you?

A. I have no idea, I'd say that's correct, yes,

ma'am.

Q. Not only normal behavior, but when you in fact answered to the state's attorney, he was one way or another way, you're actually making conclusion, correct?

A. I'm basing my answer on my experience and dealing with people on the street. And his behavior was consistent with normal behavior of the people that I meet on the street.

Q. Let's talk about that for a moment. When you say his behavior was consistent.

How long was Mr. Reed in custody?

A. Placed in custody approximately 01:00 on the 21st. So my first contact with him, he would have been in custody for approximately eight hours.

Q. How long was he in that room?

A. I would know at least since from 01:00.

Q. What about before that?

A. He came into the office with the officers. I believe it was at about 8:00 o'clock, but I'm not sure where they had him at that point.

Q. What date?

A. Same date. Well no, not the 21st. It would have been the 20th.

Q. 20th. 8:00 o'clock a.m. or p.m.?

A. P.m.

Q. And so the first time you questioned him, how long had he been in that room?

A. From at least 01:00. I don't know where he was prior to that.

Q. Well let me ask you this: Had you ever talked to him outside of that room?

A. When he went to the washroom, but we didn't have any substantive conversation relative to this matter.

Q. Specifically he had to have permission to go to the bathroom, correct?

A. He would ask and we would take him, yes.

Q. When you say he would ask and you would take him. That's you initiated asking him, correct?

A. We would initiate each time they brought a meal in or began a shift, but if he had to go at any other time, he would ask and we would take him.

Q. Who would he ask, was there somebody in the room with him?

A. No.

Q. Was he allowed to leave the room?

A. He could knock on the door.

Q. When you say knock on the door, the door was locked then?

A. Yes.

Q. Let me ask you this: So he was not free to leave the room at any time, correct?

A. Not from the point he was in custody, no, ma'am.

Q. Well let me ask you this: Was the door locked or do you know whether the door was locked prior to that?

A. I do not know.

Q. Specifically let me also ask you this.

Describe the room for her honor Judge Laws?

A. Interview room is approximately ten feet by maybe 16 feet. Acoustical tiles in the ceiling. Tile floor. Cinder block walls. There's a bench along one wall, there are chairs in the room. And there's a hook in the wall if you chose to shackle the detainee to the restraint.

Q. Specifically when you say there are chairs, were there chairs in the room when Mr. Reed was there?

A. Yes, sir -- yes, ma'am, I'm sorry.

Q. That's all right. I got to wear darker

lipstick.

Were those chairs in fact hard chairs or soft chairs like in the court?

A. I know two of the chairs were upholstered desk type chairs. There was also a harder metal chair and of course the bench.

Q. Where was Mr. Reed taken to sleep at night when he stayed overnight there?

A. He stayed in that room.

Q. Is there a pillow in this room?

A. No.

Q. Is there a bed in this room?

A. No.

Q. There a blanket in this room?

A. No.

Q. So would it be fair to say you considered it normal behavior for somebody who had -- well let me ask you this. Withdraw and rephrase, judge?

THE COURT: Yes.

MS. PLACEK: Q That bench, that bench isn't very wide, is it?

THE WITNESS: A Not extremely wide, no.

Q. About actually less than 18 inches, isn't that correct?

A. That's correct.

Q. You couldn't lay down comfortably, especially man of Mr. Reed's size?

A. You could not lay down comfortably.

Q. On that bench. You couldn't really on those chairs make a comfortable bed out of those chairs either, correct?

A. Actually, you can.

Q. You have slept on them then?

A. I have.

Q. When you say you have slept on them, you slept on them for three days like Mr. Reed was forced to do, correct?

ASA CANELLIS: Objection.

THE COURT: Rephrase your question.

MS. PLACEK: Surely.

Q. Mr. Reed, how many days did he stay sleeping in that room?

THE WITNESS: A He was there two nights during the course of this investigation.

Q. Let me ask you this. You slept two nights on those chairs?

A. No I did not.

ASA CANELLIS: Objection.

THE COURT: His answer may stand. Overruled.

MS. PLACEK: Q So in other words, you would find those chairs comfortable and you would want to sleep on those chairs for two nights?

ASA CANELLIS: Objection.

THE COURT: Sustain the question.

MS. PLACEK: Q You said you took Mr. Reed to the bathroom?

THE WITNESS: A Yes.

Q. Each time he asked. You of course allowed him to wash and clean himself. And shave.

A. What Mr. Reed did in the bathroom was up to him. I don't know what he did in the bathroom. He did not shave though.

Q. Let me ask you this: Specifically when you say Mr. Reed acted normally, would it be correct in saying that he acted normal for somebody who wasn't given proper sleeping area or wasn't allowed shall we say proper washing ability. You said he acted like other people you questioned on the street or met on the street?

ASA CANELLIS: Objection.

THE COURT: You understand the question?

THE WITNESS: Not sure.

THE COURT: Rephrase it.
MS. PLACEK: Break it up.
Q. Specifically, Mr. Reed, how many times was he questioned the first day if you know?
THE WITNESS: A It was two short interviews.
Q. How long did he sleep?
A. I don't know. As long as he chose to when we weren't in the room.
Q. When you say as long as he chose to, did you ever see him sleeping?
A. Yes.
Q. So you saw him?
A. Yeah.
Q. Is there a window?
A. There's a peephole.
Q. So you were watching him, right?
A. I would check on him periodically, of course.
Q. Let me ask you this: If he wasn't in custody, why would you leave him in that room?
A. I didn't say he wasn't in custody, ma'am.
Q. So he was in custody?
ASA CANELLIS: Objection.
THE COURT: Let me rule on the objection. It

calls for conclusion. I think you objected to that.

MS. PLACEK: Q He knows the difference. Arrest is different than custody. He just contradicted himself saying that I believe he told the state he wasn't in custody.

THE COURT: Sustained, but you can ask questions along that line.

MS. PLACEK: Q Sure. You checked on him because he wasn't free to leave, correct?

ASA CANELLIS: Objection.

THE COURT: Overruled. Cross-examination.

ASA CANELLIS: If I can have a foundation.

THE COURT: Sustained.

MS. PLACEK: Q During your stint with Mr. Reed, Mr. Reed was never free to leave, correct?

THE WITNESS: A During time that I had with him, no, he was not free to leave.

Q. That's one of reasons you were checking on him, correct?

A. That's one, yes.

Q. Let's go one step further. When you say that's one, what's the other?

A. To see if he was sleeping.

Q. So in other words, you were checking on him

sleeping?
A. I would look into the room periodically to see what he was doing, yes.
Q. Okay. Let me ask you this: The first conversation you had with Mr. Reed, first one.
You then went out and you did more investigation, correct?
A. That's correct.
Q. You had another conversation with Mr. Reed, correct?
A. That's correct.
Q. Then you went out and did more investigation, correct?
A. That's correct.
Q. Then you had another conversation with Mr. Reed, correct?
A. Yes.
Q. I think there was another conversation after that or am I incorrect?
A. That sounds about right, yes.
Q. Before that last conversation you had with Mr. Reed, you went out and did other investigation, correct?
A. Yes, that's correct.

Q. Just so we are clear, that other investigation was in fact dealing with this case or did you work on other cases?

A. No, all the investigation was relative to this case.

Q. Each time you had a conversation with Mr. Reed, you came back and you told him a little bit about the investigation, correct?

A. That's correct.

Q. So you did confront him so to speak with things you found out during that investigation, correct?

A. Yes.

Q. Now let's talk for one second. I believe you said the last conversation you had, you brought in a person by the name of DeLong Reed, correct?

A. That was just prior to the last conversation, yes.

Q. Prior to the last conversation. You brought DeLong Reed right into that room with Mr. Reed, correct?

A. Yes.

Q. How long was DeLong Reed in that room with Mr. Reed?

A. Approximately ten minutes.

Q. Who handled the questioning then, you, Mr. Reed or DeLong Reed?

A. There wasn't any questioning of Carl Reed at that point.

Q. Do you know what the relationships between DeLong Reed and Carl Reed?

A. Do I know what the relationship is, I know they lived in the same building.

Q. Specifically do you know if they are related in any way?

A. I don't know that.

Q. Do you know whether or not DeLong Reed had had a criminal history?

ASA CANELLIS: Objection.

THE COURT: Overruled.

THE WITNESS: A I don't recall.

MS. PLACEK: Q Would there be anything to refresh your recollection?

A. If he has a criminal history sheet, that certainly would.

ASA CANELLIS: Objection judge.

MS. PLACEK: Q Did you in fact run a criminal history sheet?

THE COURT: What is your objection.

ASA CANELLIS: Relevance.

THE COURT: What's your response.

MS. PLACEK: Goes as in fact to they were allowed to go into conversation why DeLong Reed, and the impression that goes into material misrepresentation.

THE COURT: Sustained -- your objection is overruled.

MS. PLACEK: Thank you, judge.

Q. So you did run a criminal history on Mr. DeLong Reed?

THE WITNESS: A I didn't.

Q. Did anyone in the station run a criminal history on DeLong Reed?

A. I don't know.

Q. Did you in fact when you brought Mr. DeLong Reed in, what time did he first come in the station?

A. Approximately 11:00 o'clock, 11:30 in the morning. 11:30.

Q. What time did you allow him to see Mr. Reed?

A. Approximately 12:00 to 12:30, right around noon time.

Q. Specifically when you say 12:00, 12:30, you

didn't immediately bring in DeLong Reed, correct, to speak to Mr. Reed?

A. Not right away, no.

Q. Why?

A. Because as I said, we were talking to him. We brought him back to the office to go into more detail as far as what he had to say.

Q. He already told you something, hadn't he?

A. He did.

Q. DeLong Reed I'm speaking of, in the car?

A. Yes.

Q. You wanted to refine that, correct?

ASA CANELLIS: Objection.

THE COURT: Hold on, let me rule. Overruled.

MS. PLACEK: Q What was your answer, officer?

THE WITNESS: A What was the question?

Q. The question was you had already talked to him on both the street and in the car?

A. That's correct.

Q. He already told you what in fact he had to say, correct?

A. He told us things, yes.

Q. As a matter of fact, the things he told you

in the car in the street were different from the things that he said in front of Carl Reed, correct?

A. No.

Q. Are you saying that's the exact same thing?

A. I'm saying that it was essentially the same information that he had told us in the car.

Q. But there were differences, weren't there?

A. I don't recall any specific differences.

Q. Let me ask you this: Since they were essentially the same thing, it was about ten minutes worth of information, would it be true and correct in saying you had no need to speak to him for about a half hour, 20 minutes before in fact bringing him to Carl Reed, is that correct?

A. Is what correct, counsel?

Q. The fact that in fact on the street, and in the car, he told you the -- essentially the same things that he told you when he was present with Carl Reed, there was no need to prepare him to speak to Carl Reed, was there?

A. There was no preparation of him before he went in to Mr. Reed.

Q. Then why did you speak to him for approximately 20 to half hour as we previously

discussed?

ASA CANELLIS: Objection.

THE COURT: I'll allow it.

MS. PLACEK: Thank you.

Q. Why did you speak to him for approximately 20 minutes to half an hour?

THE WITNESS: A To make sure that we had his facts all exactly as he was telling them and he was consistent with what he was telling us.

Q. Specifically did that take 20 minutes over and above or more as you stated?

A. Counsel, there may have been washroom break for myself in there, too.

Q. Specifically was there also running of Mr. Reed's rap sheet?

ASA CANELLIS: Objection.

MS. PLACEK: That's DeLong Reed.

THE COURT: Overruled. You can answer.

THE WITNESS: A Not by me.

MS. PLACEK: Q By another officer in your presence?

A. Nobody in my presence.

Q. Showing you what would be marked as Respondent No. One I believe, judge. Strike that, we

are Petitioner. Petitioner No. One.

Is this in fact the rap sheet of DeLong Reed?

A. It appears so, yes.

Q. Two pages, right?

A. Yes.

Q. Thank you. May I?

A. You may.

Q. Thank you. Now, what was different since you did say there were minor differences about the conversation -- may I withdraw and rephrase?

THE COURT: Yes.

MS. PLACEK: Q Approximately how long did you speak to DeLong Reed on the street?

THE WITNESS: A Brief conversation. Maybe two, three, four minutes on the street.

Q. How long did you speak to him in the car?

A. There was general conversation in the car. I don't recall if it was, how long we talked about this particular issue in the trip back, but the trip back would have taken approximately half an hour.

Q. So would it be correct in saying that you spoke to him in the car and on the street about this thing conservatively about ten minutes?

A. That is probably a good estimation.
Q. You said that Mr. DeLong Reed was approximately with Carl Reed for ten minutes, correct?
A. Yes.
Q. You said there are minor differences in what Mr. DeLong Reed said to Carl Reed than what he told you in the car in the street, correct?
A. No, I didn't say that.
Q. Were there any differences?
A. Not that I recall.
Q. So in other words, they were perfectly mirror images of one another?
A. In substance, yes.
Q. When you say in substance, who determined what was the substance, you?
A. The facts he told us on the street and in the travel back, and the conversation prior to going in with Carl Reed were almost -- essentially the same.
Q. Why did you have to have that conversation prior to in fact bringing Mr. DeLong Reed in?
A. I was -- it was an attempt to be as thorough as possible and as accurate as possible.
ASA CANELLIS: Objection.
THE COURT: Answer may stand.

MS. PLACEK: Q Every time you came back in you told Mr. Reed what was the finding of your investigation, correct? We already talked about that, you agreed, correct?

THE WITNESS: A He was told of certain facts that we had learned on the street, yes, and how they conflicted with his account.

Q. Let me ask you this: During the first conversation after you'd gone out in the street, what facts did you confront Mr. Reed with?

ASA CANELLIS: Objection.

MS. PLACEK: One of the allegations within the motion, judge.

THE COURT: I will ask for a better foundation, which conversation.

MS. PLACEK: Surely.

Q. You had your first conversation with Mr. Reed at what time?

THE WITNESS: A First conversation was approximately 9:00 o'clock in the morning on the 21st of July.

Q. He was not Mirandized at that time because according to you, you had no conversation?

A. He was Mirandized at that point.

Q. Were those the three rights you in fact said to the assistant state's attorney?

A. It was rights that were read to him by detective Thompson from the FOP book.

Q. I believe you said specifically there were -- you mentioned certain rights that the court reporter took down. Were those the rights that in fact were given by detective Thompson?

A. Yes, essentially they were the same rights, yes.

Q. When you say essentially, in other words would you agree that you did not state them as stated in the FOP book?

A. I don't know exactly how the FOP book states it. But they were essentially the same rights.

THE COURT: Wait a minute. Ask a question, let the witness testify.

MS. PLACEK: Surely judge.

THE COURT: And if there's an objection, let me rule on it. Ask another question.

MS. PLACEK: Q Specifically the rights in fact you testified into court that were given by detective Thompson during that first conversation, would it be correct in saying that those are not the

exact rights as stated within the FOP book?

THE WITNESS: A Are you asking me if they are the exact word for word?

Q. Yes. And the number?

A. I would say that those are probably not exactly word for word as it's typed up in the FOP book.

Q. Or in the extent?

A. I believe it's the same as the FOP book.

Q. So in other words, what I'm saying is essentially what you did for her Honor Judge Laws is to summarize those rights as you remember hearing them, correct?

A. They are the rights, yes, I suppose.

Q. Would it be correct in saying that you summarized the evidence as well as you summarize -- when I say as well, I'm speaking as good or in other words quality or qualifying. Quality.

As well as you summarized the evidence to Mr. Reed when you brought it back?

ASA CANELLIS: Objection.

THE COURT: Sustained. Ask another question.

MS. PLACEK: Q Surely. That first conversation after Mr. Reed was Mirandized.

THE WITNESS: A Yes.

Q. You didn't speak about the case that first conversation, am I correct or incorrect?
A. Didn't speak about the case?
Q. Yes. You said it is a very short conversation?
A. Yes.
Q. Did you speak about the case?
A. He was asked certain questions and he denied, he provided an answer.
Q. And he provided an answer. You then went out, correct?
A. That's correct.
Q. Now, when you say you went out, who did you speak to at that time?
A. We went out with Mr. Burns, Ricardo Burns.
Q. When you say you went out with Mr. Ricardo Burns, Mr. Ricardo Burns was already at the station after that, at the same time you were having that conversation with Mr. Carl Reed, correct?
A. That's correct.
Q. But yet you went out with Mr. Burns, correct?
A. That's correct.
Q. And when you went out to Mr. Burns, you went to seek evidence, correct?

A. No, that's not correct.

Q. Well, was that when you said you went to get his diabetic setup?

A. We went out with him because told us he was diabetic and he needed his medication. So we took him out for that.

Q. You found no information dealing with this case?

A. No. I'm answering your question as you asked it.

Q. Did you find out any information as dealing with this case?

A. Yes.

Q. That information, you came back and you confronted Mr. Reed with it, correct?

A. When we re-initiate conversation with Mr. Reed, we would, I would and Mr. -- detective Thompson would confront him with information as it was collected and how it was opposed what he had been saying.

Q. Specifically on the second conversation, what information did you confront Mr. Reed with?

A. I believe it was more conversation or more information relative to his involvement with the

victim's car.

Q. Well specifically, was that information given to you by in fact Mr. Burns?

A. Yes, yes.

Q. Was that information given to you before or after you went for his diabetic setup?

A. That was given prior to and while we went out and after.

Q. So in other words, it was given prior to your original conversation with Mr. Reed?

A. Yes.

Q. Yet when you in fact sat there speaking to Mr. Reed, you had that same information that you later confront him with at the later conversation?

ASA CANELLIS: Objection.

THE COURT: Overruled.

THE WITNESS: A That was the basis for the question that we asked Mr. Reed.

MS. PLACEK: Q At the second conversation?

A. First conversation.

Q. So you confronted him at the very first conversation, correct?

A. It wasn't a confrontation. It was a question.

Q. So you questioned him about it, correct?
A. That's correct.
Q. What did you find out at the second conversation that you confronted him with?
A. More information relative to very same thing.
Q. The car?
A. Yeah.
Q. Was that also for Mr. Burns?
A. We also more or less corroborated that through other individuals that we spoke to out on the street.
Q. What individuals did you speak to on the street?
ASA CANELLIS: Objection.
THE COURT: Overruled.
THE WITNESS: A One of the individuals was a police officer that Ricardo Burns had contacted on the street relative to the car and his concerns about the origin of the car and whether or not the car was involved in anything.
MS. PLACEK: Q So specifically, the information was get information, that was given or somehow came back to Carl Burns or strike that, Ricardo Burns, correct?

A. That particular thing, yes.

Q. Now, so the second conversation you confronted him with information that you had during the first conversation?

A. Yes.

Q. You had a third conversation, correct?

A. Yes.

Q. That third conversation you said you went out, what information did you confront him with that?

A. I believe that was involving his contact with the victim and it was also with him hauling property out of the building, bundles I believe.

Q. Who did you get that information from?

A. Another tenant of the building.

Q. What's the name of that tenant?

A. I think it was a Mr. Sasu, Saso.

Q. You're sure? Are you sure of that name?

A. Sasu or Saso, something similar to that.

Q. When did you speak to him?

A. That was the evening of the 21st.

Q. Did he come down to the station or did you go out?

A. We went out.

Q. You spoke to him at the building, correct?

A. Yes.

Q. Now, did you bring him back to confront Mr. Reed?

A. No.

Q. Would it be correct in saying you never let Mr. Saso or whatever his name is, confront Mr. Reed, correct?

A. That's correct.

Q. By the way, Mr. Reed is still denied after that, correct?

ASA CANELLIS: Objection.

THE COURT: Sustained.

MS. PLACEK: Let's talk for five seconds.

Q. Then you went out again and that's when you found the other Mr. Reed, correct?

THE WITNESS: A The following morning, yes.

Q. What is windows 435, or from 435 windows.

A. I haven't the slightest idea.

Q. Showing you what would be marked again as Petitioner's No. One. There seems to be some sort of police code where it says July 22, 2001, 19:05, time 19:05.

Do you know what the significance is on that rap sheet?

A. That would be the time in military time.
Q. I understand.
A. That was printed.
Q. Would it be correct in saying that's about the same time that DeLong Reed was being talked to for about 20 minutes?
A. No.
Q. What time would that be in relationship to your conversation with DeLong Reed?
A. Conversation with Reed was --
Q. DeLong Reed.
A. Was approximately 11:00 o'clock, 12:00 o'clock in the morning. 11:00, 12:00, this is 19:00.
Q. So there would be no reason to run DeLong Reed's rap sheet. He went away after that, correct? After he confronted Mr. Reed in the morning.
ASA CANELLIS: Objection.
MS. PLACEK: Q Correct?
THE WITNESS: A There would be no --
THE COURT: Overruled.
THE WITNESS: A You'll have to rephrase that.
MS. PLACEK: Q Surely. Mr. Reed after confrontation with Mr. Reed which you said happened in

the morning, Mr. Reed went away, correct?

A. He left, yes.

Q. So there would be no reason to run Mr. DeLong Reed's rap sheet after he left, would there?

ASA CANELLIS: Objection.

THE COURT: Overruled. I will allow it.

THE WITNESS: A It may be because the state's attorney or somebody wanted to see if he had a criminal history.

Q. Let me ask you this, sir: Do you remember why it was run?

A. No, I didn't run it.

Q. Thank you. So what you're essentially saying is you don't know because you didn't run his rap sheet, you didn't know whether DeLong Reed was telling you the truth or not?

ASA CANELLIS: Objection.

THE COURT: I will sustain it. As to this motion.

MS. PLACEK: Q You recovered a car, you said you picked up Mr. Ricardo or Mr. Ricardo Burns in fact came to the station with you, correct?

THE WITNESS: A Which time are you talking about?

Q. The first time?

A. I had nothing to do with that.

Q. So you don't know whether or not a car was impounded from Mr. Burns at that particular time, whether the victim's car was in fact impounded from him?

A. I don't know.

Q. Mr. Burns was advised of his constitutional rights, correct?

A. Yes.

Q. Witnesses are not in fact advised of their constitutional rights, are they? Or are they?

A. As a precautionary thing, if you're not sure where you're going and what your potential witness is, then yes.

Q. So one of the reasons when you're saying that if you're not sure whether or not the witness might become an offender or not, you know that in fact you weren't quite sure about Mr. Burns, whether he was going to become possibly an offender in this case?

ASA CANELLIS: Objection.

THE COURT: Sustained.

MS. PLACEK: Q He was advised of his rights, correct?

ASA CANELLIS: Objection.

THE COURT: Asked and answered, sustained.

MS. PLACEK: Q Victim's car was found with him?

ASA CANELLIS: Objection.

THE COURT: Sustained.

MS. PLACEK: Q Well, is one of the reasons that he in fact was Mirandized is because the victim's car was found within his possession?

ASA CANELLIS: Objection.

THE COURT: What does that have to do with the relevancy of the motion?

MS. PLACEK: Goes as to the misrepresentation of matters because it was said he was in fact confronted of what was said by Mr. Reed.

THE COURT: What's your response? I am still going to sustain the objection.

MS. PLACEK: Fine judge.

Q. Was Mr. Carl Reed allowed to change clothes?

THE WITNESS: A In the two days he was with us, no.

Q. Was he given any hygiene products?

A. There's water and there's soap and there are towels in the washroom, so he had the opportunity to

use those things.

Q. Do you know whether he did or not?

A. As I said ma'am, I wasn't in the bathroom with him, I don't know what he did.

Q. But you were looking in through the peephole, right?

A. There was no peephole in the bathroom.

ASA CANELLIS: Objection, withdrawn.

MS. PLACEK: Q Was Mr. Reed ever asked to sign anything in your presence?

THE WITNESS: A Yes.

Q. Was that a consent to search form?

A. Yes, ma'am.

ASA CANELLIS: Objection.

THE COURT: How is that relevant?

MS. PLACEK: Goes as to in fact misrepresentation of fact dealing specifically --

THE COURT: Lay a better foundation. When, what time.

MS. PLACEK: Q Approximately what time was Mr. Reed asked to sign something?

THE WITNESS: A Approximately 16:00, 4:00 o'clock in the afternoon.

Q. That was specifically a consent to search

form, correct?

A. That's correct.

Q. Did you ask him to sign that?

A. I was there with detective Thompson. I'm not sure which of us actually asked him.

Q. Specifically that was a right to go to his apartment, correct?

A. That's correct.

Q. Did you go to his apartment?

ASA CANELLIS: Objection.

THE COURT: Overruled.

THE WITNESS: A Yes.

MS. PLACEK: Q Was that before or after you picked up DeLong Reed?

A. That was after DeLong Reed and after Mr. Carl Reed admitted to the murder.

Q. Well, is that what you put in your police report?

A. That's the timing so it should be in there, yes.

Q. Did you ask Mr. DeLong Reed whether or not he would sign a consent to search form?

A. No.

Q. Does it state in your police report or your

detective summary, RD's asked DeLong Reed if he was voluntarily grant permission for RD's to search and obtain, remove any material or items from his residence related to the incident. DeLong agreed to the CPD consent to search form, was read and explained and this was signed by DeLong Reed.

Is that contained within your detective's supplement?

A. I'd have to see the report.

Q. Showing you what would be marked as Petitioner's No. Two. May I approach, your Honor. Page 17. Specifically right there. Dealing with DeLong Reed.

A. Yes. Okay.

Q. Would you like to change your answer now as to whether DeLong Reed was asked to in fact sign a consent to search form?

ASA CANELLIS: Objection.

THE COURT: Sustained.

MS. PLACEK: Q Let me ask you this: Did you then execute the consent to search form both as to Mr. DeLong Reed and Mr. Carl Reed?

THE WITNESS: A I believe so. Frankly I don't recall.

Q. Does it state that detective Zuley, Jin and Thompson proceeded to 4946 North Sheridan and conducted a search of the above apartments. Numerous articles were recovered and inventoried, these items have been listed and recovered under evidence which is contained within the format of this report.

A. If it says it, that's what happened. I recall specifically the consent to search from Carl Reed. I don't recall the other one, but if it's in there, it happened.

Q. So is this before or after the recovery of these items, that you confronted Carl Reed with DeLong Reed?

A. This is well after, counsel.

Q. So when you say well after, DeLong Reed remained within the station?

A. It's my recollection that DeLong Reed left after the confrontation. I know he was told that the state's attorney's office would want to talk to him. What time exactly in the afternoon, I'm not sure. But shortly after his confrontation or his opportunity to talk to Carl, is when Carl said he wanted to tell the truth.

Q. Let me ask you this. You of course ushered

DeLong Reed out and according to you, he left, correct?

A. Counsel, I said I don't recall exactly what time he left. It's my recollection that it was shortly thereafter, but I don't recall.

Q. Would it be correct in saying that your memory of these events are as good as shall we say your memory of your actions with DeLong Reed?

ASA CANELLIS: Objection.

THE COURT: You understand the question?

THE WITNESS: No, ma'am, I don't.

MS. PLACEK: Q Would you say in fact your memory of this, what you did those two days that you were questioning Carl Reed, is as good as your memory of your actions with DeLong Reed?

THE WITNESS: A I believe I can say that my recollection of the events with Carl Reed are much more vivid than the recollections of the contact with DeLong Reed.

Q. Isn't it correct that in fact DeLong Reed stayed at the station?

A. I don't recall. I didn't have that I recall, I don't recall any additional contact with DeLong Reed after the confrontation and after my time with Carl.

Q. Do you know whether or not that same day

Mr. DeLong Reed gave a statement to the assistant state's attorney?

ASA CANELLIS: Objection.

THE COURT: Sustained.

MS. PLACEK: Goes as to impeachment, also ability to recall.

THE COURT: I'm looking at the motion to suppress the statement. I want you to stay within the four corners of the motion.

MS. PLACEK: Q Is it your testimony in fact that after Mr. DeLong Reed had a conversation with Carl Reed, that Mr. Carl Reed said or gave you the inculpatory statement that we are now seeking to suppress?

THE WITNESS: A You're asking me is it after the confrontation with DeLong Reed and Carl Reed, and I say that word confrontation, the contact that he had with him, that he made his admission after that? The answer is yes.

Q. How soon after?

A. Approximately 40, 45 minutes maybe.

Q. Specifically, isn't it correct after DeLong Reed left the room, Carl Reed said DeLong Reed was lying?

A. That was his first thing, yes.
Q. You continued questioning him, correct?
A. He was confronted with the overwhelming information that we had developed and the fact that he had adjusted his story multiple times since the first story.
Q. Let me ask you this: When you say -- you had Mirandized him before bringing in DeLong Reed, correct?
A. Before bringing in DeLong Reed?
Q. Yes.
A. No.
ASA CANELLIS: Objection.
THE COURT: Overruled.
MS. PLACEK: Q After Carl Reed said that DeLong Reed was lying, you asked him whether or not he wanted to tell you what really happened, correct?
THE WITNESS: A That was the question that was posed to him, yes.
Q. Then you gave him his constitutional rights?
A. Yes.
Q. How did you give them?
A. From memory.
Q. You approximated again what Carl Reed had to say, correct?

ASA CANELLIS: Objection.

THE COURT: Sustained. Ask another question.

MS. PLACEK: Q Well, you stated that during this 45 minutes, did you ever tell DeLong Reed what Carl Reed had said?

ASA CANELLIS: Objection.

MS. PLACEK: Material misrepresentation, judge.

THE COURT: During what 45 minutes.

MS. PLACEK: Q Let me ask you. Did you ever leave the room during this questioning of this 45 minutes?

ASA CANELLIS: Objection.

THE COURT: Foundation. Which period.

MS. PLACEK: Q The last conversation you had after in fact Carl Reed said DeLong Reed was lying.

THE WITNESS: A When Carl said that he was going to tell what happened, I stayed with him until he finished his account.

Q. Did you ever tell him that in fact, DeLong Reed had been told that he had been implicated in this incident by Carl Reed and DeLong Reed had said that he was lying?

ASA CANELLIS: Objection.

THE COURT: You understand that question?

THE WITNESS: A No, ma'am.

MS. PLACEK: Q Specifically Mr. Reed, that is Carl Reed, continued to deny for that time after he said DeLong Reed was lying, correct?

A. No, he made one denial. Then he was confronted with the information as it had been accumulated over the course of the investigation.

The fact that he had adjusted his story correspondingly to the evolving investigation and he was given the opportunity to tell his side of the story. That's when he chose to tell, make his admission.

Q. You never informed Carl Reed that DeLong Reed was told that he had been implicated in this incident by Carl Reed and DeLong Reed said Carl was lying?

A. I don't follow that question. So.

Q. Surely. Does it contain in your police report a statement or a summary of the 45-minute conversation that you had after Carl Reed said that DeLong Reed was lying?

A. Yes.

ASA CANELLIS: Objection. Withdrawn.

MS. PLACEK: Q Then after that summary,

does it then say Carl Reed was then informed that DeLong Reed was told that he, Carl Reed, had implicated, had been implicated, DeLong Reed was told that he, DeLong Reed -- I do beg your pardon, start over. Withdraw that. Start over.

Carl Reed was informed that DeLong Reed was told, page 17, that he had been implicated in this incident by Carl Reed and DeLong Reed stated he was lying.

THE WITNESS: A Yes, I think that's accurate.

Q. Then the next question, it says nothing about in your police report about supposedly confronting him with the many stories or the evidence you found, that in fact what you asked is what he was wearing at the incident, correct?

A. I believe it says in there that he was given a chance to tell his version of the story, his account.

Q. Specifically, isn't the next line out of there the RD's asked Carl Reed what he was wearing at the time of the incident. Carl Reed stated he was wearing blue shorts, T-shirt and shoes that he was currently wearing. The interview was -- with Carl Reed was terminated.

ASA CANELLIS: Objection.

THE WITNESS: A You're at the last part of that?

MS. PLACEK: Q Exactly.

A. The beginning of the paragraph --

THE COURT: Let me rule. Overruled. Go ahead.

MS. PLACEK: Q Beginning the paragraph contains in fact what you stated was the summary after DeLong Reed said or after Carl Reed said DeLong Reed was lying, correct?

THE WITNESS: A Where are you at, counsel?

Q. I'm right here where it says --

THE COURT: What exhibit are you showing him?

MS. PLACEK: Q Petitioner's Two. Carl Reed was informed DeLong Reed had been told that he had been implicated in this incident by Carl Reed. DeLong Reed had stated Carl was lying.

THE WITNESS: A I thought you were talking about a conversation with Carl Reed. Now you're talking about DeLong Reed.

Q. I'm speaking of Carl Reed was then informed DeLong Reed was told that he had been implicated by this event, in this incident by Carl Reed, DeLong Reed

said Carl Reed was lying.

ASA CANELLIS: Objection.

THE COURT: Do you understand that question?

THE WITNESS: A I haven't the slightest idea what she's asking.

MS. PLACEK: Q Let's talk about, would you agree your police reports were taken at the time?

A. Were taken at the time where?

Q. Were they in fact taken closer to time of your interview with Carl Reed?

A. The notes, information taken at the time?

Q. Yes.

A. Yeah, it wasn't written at that time.

Q. Is it true and correct or do you wish to correct any of these?

A. I don't choose to correct anything there.

Q. Just so we are clear. After you brought in DeLong Reed, Carl Reed said he was lying?

A. Right.

Q. Carl Reed then was asked to tell his account, correct?

A. That's correct.

Q. You Mirandized him, correct?

A. That's correct also.

Q. He gave a statement, correct?
A. That's right.
Q. You then said to him, Carl Reed, was then informed that DeLong Reed was told that he had been implicated in this incident by Carl Reed and that DeLong Reed said Carl was lying.
A. I believe that was said. I don't know where you got that in the context of the conversation, but --
Q. It's right at the last part after he gave a statement to you.
A. Okay. So Carl says that we told him --
Q. No, you said Carl, you said --
ASA CANELLIS: Objection.
THE COURT: Let her ask the question.
MS. PLACEK: Q You said Carl was then informed that DeLong Reed was told he had been implicated in this incident by Carl Reed and DeLong Reed said Carl was lying.
THE WITNESS: A Okay. Yes.
Q. When did you tell DeLong Reed about the statement that Carl Reed had told him, told you?
ASA CANELLIS: Objection.
THE COURT: Overrule.
THE WITNESS: A I don't recall telling him

that. That could have been detective Thompson.
MS. PLACEK: Q Didn't you say you interviewed him with Thompson?
A. Who, DeLong Reed?
Q. Carl Reed?
A. Carl Reed, yes.
Q. Did you ever tell DeLong Reed or did you ever tell Carl Reed or did any detective in his presence ever, in your presence ever tell Carl Reed that DeLong Reed had been told what he had said and he's lying?
A. I don't recall that. May have been said, I don't recall.
Q. That would be a misrepresentation, correct?
ASA CANELLIS: Objection.
THE COURT: Sustained. Said he didn't recall.
MS. PLACEK: Let's ask. I'm saying it would be a misrepresentation if anyone said that Carl Reed's statement, that is the statement that was given, after DeLong Reed was brought into the room for ten minutes, taken out, and then Carl Reed spoke.
ASA CANELLIS: Objection.
MS. PLACEK: Q No one ever told DeLong Reed because according to your testimony, DeLong Reed left

the station.

ASA CANELLIS: Objection.

MS. PLACEK: Correct?

ASA CANELLIS: Objection.

THE COURT: If the witness understands the question, he can answer.

ASA CANELLIS: I'm going to object as to it being a conclusion.

THE COURT: If he understands.

THE WITNESS: A I have no idea where we are going with this question.

MS. PLACEK: Q Let's talk, detective.

You told her honor that DeLong Reed left the station after the ten minutes with advice that in fact the state's attorney may want to talk to him later, right?

A. It was my recollection that he -- I had no more contact with him that I recall, I'm sorry.

Q. Did detective Thompson have?

A. Did detective Thompson have contact with DeLong Reed?

Q. Yes.

A. I can't answer that. I don't know if he did or not. If it's in there, I would say he did.

Q. At 12:00 hours, on July 22, '01, Carl Reed gave you a statement, correct?
A. That's correct.
Q. In front of you -- or strike that. With you was detective Thompson, correct?
A. That's correct.
Q. The two of you were asking, you never left after that statement. The presence of Carl Reed, correct?
A. I never left Carl Reed after that statement?
Q. Did you?
A. Of course I did.
Q. Did you tell DeLong Reed that in fact Carl Reed had implicated him?
A. I don't recall telling him that at all. I don't recall contact with DeLong Reed after that point.
Q. During the entire statement, did detective Thompson stay with you in the room with Carl Reed?
A. Yes.
Q. Yet after writing down the statement that you and detective Thompson were present, the next thing you have is Carl Reed was informed that DeLong Reed was told that he had been implicated in the incident by Carl Reed, DeLong Reed stated that Carl was lying.

Was Carl Reed confronted with that during as you have in your reports, the July 22, '01 12:00 o'clock conversation?

ASA CANELLIS: Objection.

THE COURT: If he knows.

THE WITNESS: A I don't know.

MS. PLACEK: Q Would anything refresh your recollection?

A. Look at the report, see if that does.

Q. Surely. Am I correct in saying the report is written in a chronological order, correct, what you did?

A. Yes.

Q. Page 16, Petitioner's Two, documents that conversation of Carl Reed, correct?

A. Can I take a look at it, please.

Q. Sure. When was last time you read it?

A. Let's see. I spent two years in Iraq and Cuba. I haven't seen it probably for four years.

Q. So in other words, the state's attorney when he had you back preparing it, never showed to you at all?

A. I didn't read this report, no.

Q. Okay.

A. We are talking about the statement at 12:00 o'clock.

Q. Correct. If you go over to the next page where the statement is completed.

A. Here. Okay.

Q. It states that in fact Carl Reed was -- it's not typed correctly. Carl R-e-e-d, was informed that DeLong R-e-e-d, was told that he had been implicated in this incident by Carl R-e-e-d. DeLong Reed stated that Carl Reed was lying, correct?

A. That's what it says, yes.

Q. So it was during the 12:00 o'clock conversation that that confrontation was made, correct?

A. Yes, ma'am, it must have been. I don't recall it, but it must have been.

Q. That was a lie, correct?

ASA CANELLIS: Objection.

THE WITNESS: A There's no lie there.

THE COURT: His answer may stand.

MS. PLACEK: I will withdraw that.

Q. Specifically, there's no break stating that in fact you went out and talked to DeLong Reed after you found out what you claim for the state's attorney was a different version that Carl Reed had talked to

you, correct?

THE WITNESS: A That's correct.

Q. Beg your pardon?

A. That's correct, yes, ma'am.

Q. At that time the interview was terminated, correct?

A. Yes.

Q. It's at that time that you asked -- well DeLong Reed and Carl Reed to sign consent to searches, correct?

ASA CANELLIS: Objection.

THE COURT: Overruled.

MS. PLACEK: Q Correct?

THE WITNESS: A I was involved in having Carl Reed, asking Carl Reed to sign a consent at approximately 16:00. I don't recall being involved in asking DeLong Reed to sign a consent.

Q. Specifically would you like to see your report?

A. I'm not saying it's not there, I'm saying I don't recall.

Q. Then you went to the apartment?

A. We went to the building, yes, ma'am.

Q. You got things, correct?

A. That's correct.

ASA CANELLIS: Objection.

THE COURT: Overrule. His answer may stand.

MS. PLACEK: Thank you.

Q. After that you had no further conversations with Carl Reed, you personally?

THE WITNESS: A Me personally, that's correct.

MS. PLACEK: That's all judge.

THE COURT: Redirect.

REDIRECT EXAMINATION

By Mr. Canellis:

Q. These reports that counsel's asking you about, are they blow by blow events of what happened or are they summaries?

A. Summaries, not a verbatim account.

Q. In terms of the defendant, did he ever complain to you he wasn't getting any sleep?

A. No he did not.

Q. Did he ever fall asleep during any of your conversations?

A. No, not at all.

ASA CANELLIS: No further questions.

RECROSS EXAMINATION

By Ms. Placek:

Q. Would you remember whether he did or didn't?

A. Fall asleep during my conversation? Yes, ma'am, I would.

Q. Would you put that in your report?

A. If he fell asleep in my conversation?

Q. Yes.

A. Yes, ma'am I would.

Q. Because that would be an important thing, correct?

A. Frankly, if a defendant was falling asleep in my interview, the interview wouldn't continue. But of course it would be documented.

Q. To go through it, you want to put important things in your report, correct, leaving out what you consider is unimportant, correct?

ASA CANELLIS: Objection.

THE COURT: Overruled.

MS. PLACEK: Q Correct?

THE WITNESS: A Yes, ma'am.

Q. So it was important to you because you put it in your report, that Carl Reed was after he gave his statement, told that the statement was told to DeLong

Reed and DeLong Reed said he was lying?

ASA CANELLIS: Objection.

THE COURT: Actually beyond the scope.

MS. PLACEK: Withdraw, that's all I have.

THE COURT: Thank you. Any further questions.

ASA CANELLIS: No further questions.

THE COURT: Detective, thank you, you may step down. You have another witness?

(Witness sworn)

NANCY GALASSINI,

called as a witness herein, having been first duly sworn, was examined upon oral interrogatories and testified as follows:

DIRECT EXAMINATION

By Mr. Canellis:

Q. Ma'am, in a loud voice, please state your name, spelling last name for the court reporter?

A. Nancy Galassini, G-a-l-a-s-s like Sam, i-n-i.

Q. By whom are you employed?

A. Cook County state's attorney's office.

Q. How long you been employed by Cook County state's attorney's office?

A. Since 1996.

Q. What's your position?
A. I'm an assistant state's attorney.
Q. And as an assistant state's attorney are you licensed to practice law in the State of Illinois?
A. Yes.
Q. How long have you been so licensed?
A. Since 1996.
Q. Like to direct your attention to July 22, 2001. Were you employed by the Cook County state's attorney's office on that day?
A. Yes.
Q. Where were you assigned?
A. Felony review unit.
Q. Can you briefly describe what felony review is?
A. Unit of the state's attorney's office that works 24 hours a day, seven days a week. And are called to assist the police in current pending investigations.
Q. Were you working on July 22, 2001?
A. Yes.
Q. Do you recall which shift?
A. I was working nights.
Q. At approximately 7:30 in the evening, did you

have an opportunity to go to Area three?
A. Yes.
Q. Where is Area three located?
A. It's Belmont and Western.
Q. Were you assigned a case, is that how you wound up at Area three?
A. Yes.
Q. What was the nature of the case you were assigned?
A. A homicide.
Q. What did you do when you arrived at Area three?
A. I talked to the detectives.
Q. After -- do you recall which detectives you spoke with?
A. There was a detective Thompson, I believe there was a detective Jin. There was a third detective and I can't recall his name.
Q. After speaking with the detectives, did you do anything else?
A. I spoke to someone that they had in an interview room.
Q. Was that at approximately 8:00 o'clock in the evening?

A. Yes.
Q. Was that an individual by the name of Carl Reed?
A. Yes.
Q. Do you see him in court today?
A. Yes.
Q. Can you point to him, describe something he's wearing?
A. He's seated at the opposite table and he's wearing a tan DOC uniform.
ASA CANELLIS: If the record may reflect in-court identification of defendant.
THE COURT: It may.
ASA CANELLIS: Q Do you recall who you were with when you met the defendant for the first time?
THE WITNESS: A I believe it was detective Thompson.
Q. You stated it was in an interview room?
A. It was.
Q. What was the first thing you did when you met the defendant for this first time?
A. I introduce myself, I told him my name. I told him that who I was, that I was a lawyer, I was a prosecutor and I was not his attorney. I asked him how

he was feeling. How he was doing.

I gave him his Miranda, commonly known as his Miranda warnings.

Q. Let me ask you this. In terms of introducing yourself and explaining your position, did he state whether or not he understood?

A. Yes, he understood who I was.

Q. In terms of asking him how he was, did he state how he was doing at that time?

A. He said he was fine.

Q. You then stated you advised him of his Miranda warnings?

A. Yes.

Q. How did you go about doing that?

A. From memory.

Q. Can you describe to the judge or demonstrate to the judge how you advised defendant of his Miranda warnings?

A. I explained to him that he had the right to remain silent. That he did not need to speak to me. That anything he did say if he chose to speak to me, could and would be used against him in a court of law.

He had a right to have an attorney, if he couldn't afford an attorney, he had a right to have

an attorney appointed to him. He had a right to answer questions and at any time while answering questions, to stop answering questions for purposes of consulting with an attorney if he so chose to do.

Q. Did the defendant indicate whether or not he understood these rights?

A. I asked him if he understood after every right and said he did.

Q. After advising him of all the rights, did you ask him anything at that time?

A. I asked him if he wanted to talk to me.

Q. Did the defendant state anything to you at that time?

A. He said he didn't have a problem talking to me.

Q. Did you then proceed to have a conversation with defendant?

A. I had a short conversation with him.

Q. Approximately how long would you say it lasted?

A. With introducing myself and begin giving him his warnings, probably about ten minutes, maybe 15.

Q. I'd like to direct your attention now to approximately 9:30 in the evening.

Did you have an opportunity to see the defendant again?

A. Yes.

Q. Who were you with at this time?

A. Detective Thompson and I believe detective Jin was there, I don't know if he was in the room. Definitely detective Thompson.

Q. How did it proceed when you went and saw the defendant at this time?

A. At this time I had a longer conversation with the defendant. I again went in and I remind him who I was because I had been gone for a while.

I told him what I had been doing, which was talking to other people. Other witnesses on the case. And I again told him that I was going to ask him some questions and did he wish to answer the questions I was asking.

Q. Did he respond to you at that time?

A. He said that was fine, he'd answer my questions.

Q. Did you then proceed to speak with him?

A. I did.

Q. You stated this was a little bit longer of a conversation.

You remember approximately how long this conversation actually lasted?
A. It was over half hour, maybe not much longer than a half hour, but about that long.
Q. Did you have an opportunity to see the defendant again at about 2:00 o'clock in the morning?
A. Yes, I did.
Q. That would have actually rolled over from the previous night into the morning?
A. Right now we are talking about July 23rd.
Q. Yes.
A. Yeah.
Q. Would you still be working at that time?
A. I was.
Q. You were working nightshift?
A. Yes.
Q. Can you briefly describe how the nightshift works on felony review?
A. Back then we used to work 4:00 p.m. to 4:00 a.m. So I had started at 4:00 p.m., got this case around 7:00, got there 7:30, so I would still have been working at 2:00.
Q. When you spoke with the defendant this time, do you recall where you spoke with him at?

A. We talked about him memorializing his statement that he had given to me during that second, first and second conversation, so we actually moved to a larger conference room. So we could talk there.

Q. When did you talk about this memorialization of the statement?

A. Second time I talked to him.

Q. Did you present the defendant with any options?

A. At that conversation, briefly I told him there were lots of ways that what he was telling me could be recorded. That there was a videotape statement, which means a videographer would come in and basically video us talking. That a court-reported statement was possible, which is a court reporter, and explained to him what a court reporter was, would come in and basically take down our conversation. Or, we could do a handwritten statement, which is my writing out his statement and he could review it, sign it and make any corrections or changes that he wanted to.

Q. Which conversation is this with the defendant, the second or third one?

A. In the second conversation all I did was mention those things and I wanted him to think about

which option he wanted.

The third conversation I started out saying how do you want to go about memorializing what you have told me. That's when he told me he wanted to do a handwritten statement, so that's why we moved from the interview room to the conference room, because it's bigger and there's a table and more comfortable.

Q. Once the defendant informed you that he wanted to give a handwritten statement, what happened next?

A. I began to prepare to take a handwritten statement. He was brought into the conference room. I went and got some papers to write down his statement.

Q. Were you ever alone with the defendant at all?

A. Yes, at that point I was. I asked the detectives to get me something to drink and they left the room. Was one detective. Detective Thompson. He left and I believe he got the defendant something to drink. While he was gone, I had a private conversation with the defendant.

Q. What did you ask him during this conversation?

A. I asked him -- I had been in and out all

night, I wanted to make sure that he was still fine.
I asked him how the police had treated him and now that we were alone, this was his opportunity to tell me anything he wanted to outside earshot of the police.

Q. What did he tell you if anything?

A. Said he was fine. Said they treated him fine and that he was okay.

Q. He ever stated whether or not any threats or promises were made to him?

A. I specifically asked him that, and also during the handwritten statement I asked him that. He said no.

Q. About how long would you say this conversation lasted?

A. The 2:00 o'clock conversation?

Q. Not the 2:00 o'clock, but the time you spent alone with the defendant?

A. Not long. Less than five minutes.

Q. Did you ever ask the defendant whether or not he was under the influence of any drugs or alcohol?

A. Yes, I did.

Q. What did he tell you?

A. He said he was not.

Q. Was defendant ever asked whether or not he'd been given anything to eat or drink?

A. I saw him eat. And I saw him drink and I found out from him and the detectives things he had eaten before I was present, so yes, he had been given food and cigarettes and beverages.

Q. Ever tell you whether or not he was allowed to use the washroom?

A. Yes, he was allowed to use the washroom. I saw him taken to the washroom. I didn't see him use the washroom, I saw him taken and he told me that he had been allowed to use the washroom whenever he wanted. I specifically asked him that question.

Q. Did the defendant ever tell you how far he went in school?

A. He graduated high school I believe is what he told me.

Q. Did he ever tell you his age?

A. 41.

Q. You stated you took a handwritten statement from the defendant. Can you explain how that proceeded?

A. There's a form that we have on felony review. There's a front sheet that has where the statement's

taken and lines to fill it in. It also has a preprinted typewritten Miranda warnings. What I did is I started filling out that first page while I sat across from Mr. Reed. When I got it, that Miranda preprinted part, I turned the form around and I asked him to read it. Then to sign below. Stating he understood his rights.

Q. When you asked him to read it, did he read it out loud or did he read it to himself?

A. I did not ask him to read that portion out loud. I just had him to read it and when he read it, if he understood it and agreed with it, to sign it and watched him sign on the line.

Q. What happened after that?

A. Then I had the paper, asked him to turn the paper back towards me and I began writing the handwritten statement with him sitting across from me.

Q. Did you proceed to write out seven-page statement?

A. I believe it is seven pages, yes.

Q. After writing out the seven-page statement, what happened next?

A. Then I believe during the statement I made some errors in writing. That I scratched those out and

asked the detective and Mr. Reed to initial those at the time I made them.

Then after the entire statement was done, I then changed to the other side of the table so I was sitting next to Mr. Reed, and I sat next to Mr. Reed and I asked him to read the first paragraph, not the Miranda, but my handwritten first paragraph out loud to me so I knew he could one, read my handwriting and two, read. He did that.

Then I sat next to him and we went through it together. I read it out loud, he followed along. And we went through the statement and any correction or changes he wanted to make, we made.

Then I asked him to sign each page and I asked the detective to sign each page and I signed each page.

Q. Stop you for a second. You talked about some initials that were made as you were writing the statement.

Did the defendant and detective in fact initial those changes?

A. Yes.

Q. Did you in fact initial those changes?

A. Yes.

Q. You talked about signatures at the bottom of each page.

A. Yes.

Q. When were those signatures affixed to this statement?

A. After it was all done and after the defendant and I had reviewed it. And all the corrections were made.

Q. You also stated that the defendant read the first paragraph of your handwritten portion of the statement out loud.

A. Yes.

Q. Did the defendant ever stumble over any of the words that you recall?

A. I don't recall how he read it. If he read it well or quickly, but I remember he read it. And I remember that I was confident that he could understand and read, understand and read English.

Q. During course of your conversations with the defendant, did he ever tell you that he wished to remain silent?

A. No.

Q. Did he ever tell you that he wanted a lawyer?

A. No.

Q. Did he ever tell you that anybody while he had been in police custody had threatened him?
A. He never told me that.
Q. Did the defendant ever tell you he was a diabetic?
A. No.
Q. Did the defendant ever tell you he needed medication for a diabetic condition?
A. No.
Q. How did the defendant appear to you during the course of the time you spent with him?
MS. PLACEK: Objection, conclusion.
THE COURT: Overruled.
THE WITNESS: A At the end, a little tired. But he was, he seemed fine.
ASA CANELLIS: Q When you say a little tired, can you describe what you mean by that?
A. I mean I noticed when I first talked to him, he seemed more interested in talking and then by the time the third conversation came around, he seemed sort of bored with being at the station and talking about what had happened.
Q. Defendant ever tell you he was not allowed to sleep while at the police station?

A. No, he never told me that.
Q. Did the defendant ever tell you that other police officers made misrepresentations to him?
A. I don't understand the question.
Q. Did the defendant ever tell you that the police lied to him about anything?
A. No.
Q. During course of your time with the defendant, did he ever appear that he needed medical treatment?
A. No, he did not.
Q. Showing you what's been previously marked as People's Exhibit 2A and -- actually 2 and 2A.
Do you recognize what that is?
A. Yes.
Q. What is it?
A. That's the handwritten statement and the Polaroid photograph of Carl Reed.
Q. Are there signatures affixed to that Polaroid of the defendant?
A. Yes.
Q. Are those, whose signatures are those?
A. My signature, Mr. Reed's signature and officer -- excuse me -- detective Thompson's signature.

Q. Can you take a look at the statement and tell me whether or not there are signatures at the bottom of each page?

A. Each page. Yes.

Q. Whose signatures appear at the bottom of each page?

A. My signature, Mr. Reed's signatures and detective Thompson's signature.

Q. Are People's Exhibits 2 and 2A in the same or substantially same condition as when you last saw them back on July 23, 2001?

A. Yes.

Q. Do you recall who took the photograph of the defendant in this case?

A. I don't recall. It's almost always our camera. But I just don't recall in this case if I took it. I usually take it, but I don't remember.

ASA CANELLIS: I have no further questions, judge.

THE COURT: You may inquire.

MS. McBETH: Thank you your Honor.

CROSS EXAMINATION

by Ms. McBeth:

Q. Miss Galassini, you said when you first arrived at the police station on the 22nd of July, first thing you did was talk to detectives, is that right?

A. Yes.

Q. Immediately after that, then you spoke to Carl Reed, is that right?

A. Yes.

Q. You did not speak to any other civilians first?

A. I just spoke to Mr. Reed first.

Q. What time was it you spoke to Mr. Reed?

A. About 8:00 o'clock.

Q. That's 8:00 p.m. on the 22nd of July?

A. Yes, 8:00 in the evening.

Q. You were aware at that time that he had been in the police station for 48 hours, is that correct?

A. I knew he had been there more than a day. I don't recall as I sit here today that was 48 hours, but I knew he had been there at least one day.

Q. You knew that from the detectives?

A. Yes.

Q. You did not inquire of Mr. Reed how long he had been in the police station, is that right?
A. No, I never asked him that question.
Q. You did not inquire as to which detectives he had been talking to prior to the time that you arrived there, is that right?
A. Did I ask Mr. Reed?
Q. Yes.
A. I did not ask Mr. Reed that question.
Q. Your concern talking to Mr. Reed is he knew who you were, is that right?
A. Part of my concern.
Q. You wanted to make it clear to him that you were not there as his lawyer?
A. Yes.
Q. You wanted to make it clear to him that you were there as the prosecutor?
A. Yes.
Q. That you'd been called in by the police, is that right?
A. Right.
Q. You were there to take a statement if he wished to give a statement?
A. I was there to see if he wished to speak to

me, yes.

Q. So at no time did you ever leave Carl Reed with the impression that you were doing anything but working with the police on this investigation, right?

A. That was my intent, to not leave that impression.

Q. You did everything you could to make sure he knew that you were working with the police in this investigation?

A. I told him I was a lawyer, a prosecutor, not his attorney and I was here to talk to him about the investigation.

Q. You never gave him the impression that you were there as his attorney or to take his side or to represent his interests, correct?

ASA CANELLIS: Objection.

THE COURT: You can answer.

THE WITNESS: A I don't know what his impression was. I know, I just know what I told him. I tried to impress upon him I was not his attorney.

MS. McBETH: Q Now at a certain point or at certain points you talked to him about ways to memorialize statements, correct?

A. Yes, yes.

Q. When was it you first began talking to Mr. Reed about memorializing statements?

A. In the second conversation I had with him.

Q. What time did that conversation take place?

A. That was after Dorothy's statement, so that's about 9:30, or is that before. It was later. It was about an hour and a half later because I talked to all the other witnesses or tried to talk to all the other witnesses in the interim. Before talking to Mr. Reed again, so I can have an idea of what they were saying.

Q. The other witnesses were at the station during the time you spoke to Mr. Reed and went back?

A. Dorothy was not.

Q. DeLong Reed, that witness, he was at the station, is that correct?

A. He was at the station, yes.

Q. You subsequently took a handwritten statement from DeLong Reed at 1:00 o'clock in the morning on the 23rd?

ASA CANELLIS: Objection.

MS. McBETH: Goes as to the previous witness.

THE COURT: You can answer.

THE WITNESS: A I did take a statement of DeLong Reed and I believe it was at 1:00 o'clock.

MS. McBETH: Q What is your memory as to the time that you took the handwritten statement of Carl Reed?

A. I think I started that at 2:15.

Q. That would be 2:15 a.m. on the 23rd of July, 2001?

A. Yes. I'm sorry, 2:15 a.m.

Q. That would be more than 48 hours after 8:00 p.m. on July 20th, correct?

A. I was not there on July 20th, but yes, it would be.

Q. You told us that you asked him whether he was under influence of alcohol or drugs, is that right?

A. Yes.

Q. You asked him whether he had been fed and had eaten and had something to drink?

A. Yes.

Q. You asked him whether he had been allowed to use the washroom?

A. Yes.

Q. All of those points are in the handwritten statement, is that right?

A. Yes.

Q. Is it also your testimony that Mr. Reed never

told you anything about any medical condition?

A. Yes, that's correct.

Q. Now, it is also correct, is it not, that there's no mention of any medical condition in the handwritten statement, is that right?

A. Right.

Q. Including the fact that you never asked him whether he had a medical condition, right?

A. Did I ask him? I do not recall asking him if he had any medical condition. There was nothing about him that prompted me in my recollection to ask him that, so no, I did not that I remember, no.

Q. In the seven-page handwritten statement you reflect you never asked him anything about his medical condition in there, is that correct?

A. Yes, that's correct.

Q. During this brief conversation that you had alone with Carl Reed and no one else in the room, the detective went out to get a drink or whatever, you did not change your tact at that time and tried to persuade Mr. Reed that you were there as his attorney, correct?

A. No.

Q. You did not change your tact and try to persuade him that you were there to represent his

interests?

A. I didn't tell him I was his attorney, but at that point I did tell him if there's anything he needed to tell me about the police, that he could tell me and this was the time to tell me.

Q. As far as you knew, detective Thompson was coming right back after he got something to drink, is that right?

A. I knew where detective Thompson went, yes, I knew where he was.

Q. And he didn't say anything in Carl Reed's presence like I'm leaving now and I won't be back, right?

A. No, that was not said.

Q. As far as Carl Reed knew, the detective was going to be right back?

ASA CANELLIS: Objection.

THE WITNESS: A I do not know what Mr. Reed thought.

THE COURT: Sustained.

MS. McBETH: Q You said by the third conversation that you had with him, he seemed tired, is that right?

THE WITNESS: A Seemed bored.

Q. You said tired and said he seemed like he was bored being at the police station?
A. Yeah, I was tired.
Q. Would it be fair to say he seemed tired of being at the police station?
A. He seemed more tired of talking about the incident, because this was the third time I was asking him somewhat of the same questions and he knew I was saying the same thing and he told it to me now couple times, so he seemed tired of talking about it. I think that's fair to say.
Q. When you mentioned the second conversation about different ways to memorializing, you brought up the possibility of videotaping, is that right?
A. I did.
Q. You told Mr. Reed that would be one way that you could get down what he was saying to you, is that right?
A. Yes.
Q. Did you tell him that you wanted him to do that?
A. Yes, I did.
Q. Why did you tell him you wanted to videotape the statement?

A. At the time in July of 2001, that was the preferred method of memorializing a statement in a homicide investigation. So I wanted him to do a video. I said that's -- this is how we're doing this now, we take videos.

Q. Is it still the preferred method in your mind?

A. In my mind?

Q. Yes.

A. Yeah. It is.

Q. When you tried to persuade Mr. Reed to give a videotaped statement, what did you see to try to persuade him?

A. I said this is the preferred method, this is you on tape, it's not subject to interpretation. It just gets viewed, that's evidence out there and this is one way we can do it.

But at the same time I explained to him it was not my decision, even though I thought it was the best way to do it. It was his decision as to how he wished to memorialize the statement. And he decided that he wanted to do a handwritten statement.

Q. What did he say in response to your telling him that videotaped statement was the preferred method?

A. He didn't want to go on tape. He didn't want to be on TV.
Q. Is that what he told you?
A. That's my recollection. I don't know if he said tape or TV, but I remember that was -- didn't want to be on either tape or -- either on TV or tape.
Q. Is that your recollection of what he said?
A. Something to that effect.
Q. Your recollection is only general at this time?
A. It's general.
Q. You didn't write down verbatim what he said with respect to that, is that correct?
A. Except in the handwritten, he did not want to do a videotaped statement.
Q. The reason that he did not want to do a videotape, did you write that down?
A. No.
Q. Did he ever tell you the reason he did not want to be on tape or TV?
A. The reason he didn't want to be on tape or TV? I think I asked him why not. He just didn't want to do it. That was it.
Q. What did you tell him when he said he didn't

want to be on videotape?
A. I told him that this is a good way to do it because it's all there. It's all very clear.
Q. So you continued to try to persuade him to do a video?
A. After he said he didn't want to do it, he was pretty clear he didn't want to do a videotaped statement, so I already told him it was his decision. So no, I asked him again are you sure. Yes. What about a court-reported. Which was not the preferred method of doing a statement. At that time. And he didn't want to do that either. I explained to him another person could come in and witness the statement, he didn't want to do that.
Q. How many times did you try to persuade him to take a videotaped statement?
A. I mentioned it the first time in the 9:30ish conversation. I just mentioned, asked him to think about it. Which one he wanted to do. Then I asked him which one he wanted to do. He said he didn't want to do a video; he didn't really say much about the court-reported.
So then I started to ask him about the handwritten. He agreed to the handwritten and then

when we started doing the handwritten, I think I asked him one more time are you sure you don't want to do a video. I told him it would take a little bit longer. Because we had to wait for videographer, but once the videographer would be there it would be fast because it's just talking, no writing.

Q. When did you tell him it would take a little longer but once the videographer got there, it would be fast?

A. We were in the conference room, almost going to start the handwritten statement and I said make sure is this what you want to do, this is what he wanted to do.

Q. Little while ago you said a court-reported statement was not the preferred method.

Did you tell Mr. Reed that a court-reported statement was not the preferred method?

A. No because it's the -- the videographer is a court reporter, so it's the same if we called for a video, we'd call, it's a court reporter is the person that does the video, so it's the same difference as far as we are concerned as far as calling the personnel out. There's no difference.

Q. Did you explain that to Mr. Reed?

A. No.

Q. What did you explain to Mr. Reed with respect to a court-reported statement?

A. That a court reporter who would probably be the -- another person would come in and they would sit down and they would take down everything that he's saying on a machine. Like you see in court. Explain to him like that, like on TV when there's a person sitting there typing. Like that. Like on TV.

Q. You told us that Mr. Reed told you that he can read and write English, is that your testimony?

A. He did tell me that.

Q. Did you offer him the opportunity to write out in English his statement?

A. No I did not.

Q. Why not?

A. It's our training and it's our policy that we write the handwritten statements. That we give them to the defendants who can read and write English, to review and make corrections or changes.

Q. What is, is it your memory that Carl Reed read part of this handwritten statement out loud?

A. Yes.

Q. Which part?

A. The first paragraph where it says after being advised of his rights, or constitutional rights, that first paragraph. Below the typewritten Miranda warnings.

Q. Did you also tell us that you do not remember how well he read that?

A. Yeah. I mean sometimes you can remember if sometimes very articulate and read's very quickly and easily or can read my handwriting easily. I don't remember that.

I just remember him reading it. I don't remember him having any difficulty, just remember him reading it. Everyone reads it.

Q. On the corrections you said there was some corrections that needed to be made because you had misspelled things?

A. Started to miswrite, yes.

Q. Were you the one that noticed those on the handwritten statement?

A. At least two of them I remember. I started to write it and a messed it up or I thought I messed it up, so I scratched it out.

Q. Immediately upon noticing that you made an error, is that the point at which you had Mr. Reed

initial it?

A. Yes.

Q. You said that's on at least two. Do you remember which two?

A. I believe I spelled or began to spell handle wrong. And killed. Those are the only two I remember off the top of my head.

Q. Showing you what's been labeled Respondent's Exhibit 2 and 2A. This is the original of the handwritten and the Polaroid, is that correct ma'am?

A. Yes.

Q. Turning your attention to page four, the correction two-thirds of the way down, is that the one you mentioned before, handle is misspelled?

A. Yes.

Q. That's one of corrections you made right away?

A. Yes.

Q. Turning your attention to page six. Approximately halfway down, is that the other one you recall you made the correction right away?

A. Yeah.

Q. Would it be fair to say the other corrections you made at the end of the statement?

A. Those are the only two I remember making in the middle. I believe the other ones were made at the end.

Q. What about this one on page seven where there's initials but doesn't seem to be anything crossed out, what is that correcting?

A. If you look, the paragraph ends at agreed to handwritten statement, there's a period. Then there's another line written in and then another paragraph starts where Carl states he can read and demonstrated by reading out loud.

I forgot to write that as I started to write the last paragraph on page seven, about halfway through it I realized that although I had written that the defendant did not wish to take a videotaped statement, which is spelled wrong, I forgotten to write that he did not wish to take the court-reported statement, I forgot to add that in there. So finish the last paragraph and I went back and said Mr. Reed, I forgot that you didn't want a court-reported statement either, I need to add that. Because it's missing.

I realized that after that last paragraph already been started, so that's why it's sort of added in there.

Q. That's why it's initialed because you realize you needed to add that at the end of the statement?

A. I forgot and I already started writing the next paragraph, so it was an addition.

Q. You said your memory is the handwritten statement was taken at 2:15 a.m. on July 23rd. Is that the beginning or the end?

A. Beginning.

Q. Do you recall what time it ended?

A. My recollection is it took around an hour, 45 minutes to an hour to do the statement.

Q. Were you in the room writing with Mr. Reed the entire time that you wrote on this piece of paper?

A. Just about, yes.

Q. Was there someone -- you said you can't recall specifics about the taking of the Polaroid.

Did that add some time to the process?

A. That would have been after the statement. That only takes a minute or two to take a picture.

Q. If you have someone there with a camera?

A. Right.

Q. Do you recall if you have someone, if it took some time to get someone there?

A. I usually when I was on felony review, I

would bring the camera with me when I went to the station. I almost always did that. I'm pretty sure I did that in this case, but I can't tell you if I did.

I don't really recall, but we are issued Polaroid cameras on felony review, we have them in the cars.

Q. Do you recall what time the Polaroid was taken of Mr. Reed?

A. It would have been taken after the handwritten statement, after all the corrections or changes. And since my recollection is the handwritten took 45 minutes to an hour, it would have been somewhere around 3:00 or 3:15 in the morning.

Q. You have no specific recollection of the time and it's not noted on the photograph, is that correct?

A. Unfortunately I do not.

Q. After that, your time with Mr. Reed was done, is that correct?

A. That's correct.

Q. Did he seem relieved that his time with you was done?

A. I don't recall him -- I don't recall.

Q. Didn't have to answer any more questions, didn't have to pose for any pictures?

ASA CANELLIS: Objection.

THE COURT: Sustained.

MS. McBETH: If I can have a minute. Nothing further.

THE COURT: Any further questions.

ASA CANELLIS: No judge, I have no additional questions.

THE COURT: Thank you.

ASA CANELLIS: At this time I'd be seeking leave to have the identification marks stricken from People's Exhibits 1, 2 and 2A. Have them admitted into evidence.

MS. McBETH: As to 2A, we would object to the substance of the statement coming in. Or 2, whichever the handwritten is. It's not relevant as to the issues.

THE COURT: I'm not going to read it, but.

ASA CANELLIS: In terms of the substance aside from the treatment and Miranda, I have got no problem with that.

THE COURT: All right. Any objection?

MS. McBETH: That is my objection.

THE COURT: 1, 2 and 2A, I will admit them into evidence. I'm not going to read the entire

handwritten statement.

ASA CANELLIS: With that the state would rest.

THE COURT: As a matter of fact you can keep it. I have got it in the notes. What was one.

ASA CANELLIS: The Miranda warnings.

THE COURT: Okay. Those exhibits will be admitted into evidence. And the identification marks stricken. State rests?

ASA CANELLIS: Yes judge.

THE COURT: Miss Placek and Miss McBeth.

MS. McBETH: At this time we have a motion for directed finding in our favor, your Honor. The state bears the burden in these hearings under the black letter law of establishing by clear and convincing evidence that Mr. Reed's statements were given freely and voluntarily and in the absence of any physical coercion.

We had the testimony at this hearing over course of two different days. The testimony was heard of four different police officers who are involved in this matter.

We've had the testimony of gang crimes specialist Zacharias, who testified to taking Mr. Reed

from the building at 4946 North Sheridan to Area three police headquarters. It's clear from the record that happened 8:00 p.m. on July 20th of 2001.

We have the testimony of detective Thompson, who was rather sketchy on a lot of matters, but did testify to your Honor about numerous encounters with Mr. Reed in the police station over the course of the next three days, the 20th, 21st, the 22nd and also the testimony of the witnesses today your Honor of -- actually Thompson was there on the 23rd he testified to it, as well as the testimony of the second gang specialist Cusack who came today, and detective Zuley and lastly the assistant state's attorney.

Your Honor, I would point out that the testimony of the detectives and the police officers contradicted each other on numerous matters. Certainly as to very important matter in this hearing as to when Mirandas were first given to Mr. Carl Reed. The two partners, the two officers do not even agree on that.

Officer Zacharias says first time he was at the police station at 8:00 p.m., he was getting Miranda warnings. Officer Cusack said no, no Mirandas until the second encounter 1:00 in the morning the next day.

Officer, detective Thompson said that in a certain meeting with Mr. Reed he said no, you don't need to repeat the rights. Detective Zuley said during that meeting nothing in particular happened. Later detective Zuley remembered there was a point at which he said that. Detective Thompson said that the receipts reflected in the file for the food that was ordered during this period of time reflects that he bought doughnuts, he bought the food at McDonald's and detective Zuley said no, no, no, I remember, I remember specifically I picked up those doughnuts on way into work. They are impeaching each other on these particulars.

And perhaps judge, the most important thing is not whether these particulars are big or small, significant or insignificant. But more to the point that detective Zuley wishes this court to believe that his memory as to these events is very good. Even though he doesn't review a police report, even though he's been out of the country for periods of time since this happened. He has a very specific memory of that. He is the kind of person whose memory is so good, does not need to resort to the FOP book. He can recite the Miranda warnings from memory. He was present he said

when Thompson gave them each time until the last time when he gave them himself.

He said that he told Mr. Reed with respect to the right to counsel, an attorney will be appointed by the court when you go to court. That is very significant. As well as the time frame because under the black letter of the law, under People versus Willis and cases that come after that, custodial interrogation that lasts beyond 48 hours is inherently coercive. Should result in suppression of the statement that Mr. Reed gave at 2:00 in the morning on the 23rd.

Under the black letter law, when the police give ambiguous Miranda warnings, give Miranda warnings that are sometimes correct and sometimes incorrect, in this particular case leave Mr. Reed with the impression that in combination of everything he's heard, including what he heard from Miss Galassini, that she's definitely trying to let him know that she's working with the police, she's a prosecutor, she's not his lawyer, Mr. Reed is left with the impression that he will not get that lawyer until he goes to court. That's simply not sufficient under Miranda.

Even in the light most favorable to the

state and there's -- there was great deal of impeachment as to detective Zuley as to his memory and having to have his memory refreshed and having to change answers as to when DeLong Reed came in, whether he signed a consent to search form, whether they went out and got evidence, whether they had his criminal history or not, even in the light most favorable to the state judge, this record establishes that Mr. Reed was kept in excess of 48 hours, was interrogated while in custody. Very clear from the testimony of the detectives.

And it's not for the police to decide if this amounts to custody under the law, it's for your Honor to decide. All of the factors we have, the physical factors, he's not free to leave, the door is locked. He's not free to tend to his own physical needs without assistance.

He must ask for assistance for all the basic things in life because he is in the custody of the police. He must ask for assistance to go to the washroom, to eat, get something to drink. He is remaining in that room because the police are keeping him in that room.

In the light most favorable to the

state, they have him in custody, there's custodial interrogation, extends beyond 48 hours. In violation of Louis. Inculpatory statement, the exhibit here, that we are seeking to suppress was taken, we have that clearly established on -- established on the record at 2:15 in the morning. As well as the one earlier the night before, which is beyond the 48 hours. The oral statement.

And we have also in the record detective Zuley's statement as to how they read the Mirandas even if that is to be believed, because they are the state's witnesses and at this point in the proceeding, that is the test. That is improper under Miranda so for both of those reasons and for all the reasons we stated in our motion, we ask you grant our motion to direct this at this time, grant our motion to suppress the statement.

THE COURT: Mr. Canellis.

ASA CANELLIS: Regarding the various arguments that have been made, two I'd like to address first off that are just flat out incorrect.

The first one being counsel stated that gang specialist Zacharias said that he Mirandized the defendant at 8:00 o'clock. That's flat out wrong.

Looking at page ten of the transcript, he states on ten turning into 11 that it was at 1:00 o'clock in the morning on July 21st. That the defendant was first Mirandized. The first time that being the 8:00 o'clock conversation he was placed in an interview room. He was asked if he needed to go to the bathroom. He was given a bottle of water I believe as well as bottle of pop or can of pop. As well as a bag of chips.

So in terms of him or counsel stating that he said he Mirandized at 8:00 o'clock, not true. Nobody has ever said the defendant was Mirandized at 8:00 o'clock. In fact the defendant went to the station voluntarily. Was asked if he needed anything. Was given the pop, was given the chips. Was asked if he needed to use a washroom. It wasn't until after the police went out, began or continued their investigation and came up with additional information that they then went back to the defendant at 1:00 o'clock in the morning and at that point the defendant was advised of his rights.

In terms of an additional comment regarding impeachment between detective Zuley and detective Thompson, that being the Krispy Kremes and

who gave them to him. Again, that's not supported in the record. The defendant never -- strike that. Detective Thompson never said he went out and bought the Krispy Kremes. He stated that he offered him a Krispy Kreme but specifically, he stated on page 57 I don't recall getting three-dozen glazed doughnuts.

In terms of the Miranda warnings that were given in this case, what detective Zuley said, detective Zuley when he came in and told you about the rights he gave, the rights were given appropriately. When you talk about the number of times the defendant was given his rights, you're talking about at least seven times he was given his Miranda warnings in this case.

There's no question that the defendant was in fact given his rights. You heard from detective Thompson, you heard from gang specialist Zacharias, you heard from gang specialist Cusack, you heard from detective Zuley, you heard from assistant state's attorney Galassini. All the times the defendant was given his rights.

In terms of detective Thompson and detective Zuley giving impeaching accounts of what the defendant stated, again judge, detective Thompson told

you at one point I believe it was the second time he was giving the defendant his rights, defendant kind of shooed him off, don't worry about it, I already know them.

Detective Thompson stated how he proceeded to give him his rights anyway. Detective Zuley said the same thing. In terms of what's going on and what's occurring, the detective recalled that at one point the defendant did in fact say don't worry, you don't need to give me the rights, I know them. That detective Thompson did in fact proceed to give him his rights again.

Counsel talks about Willis. Willis isn't the law. Willis is currently up on appeal and what is law --

MS. McBETH: Objection.

THE COURT: What's your objection.

MS. McBETH: It is the law. I think that's unfair to argue that one party or another wants to appeal it. It's the law.

THE COURT: Go ahead.

ASA CANELLIS: Currently up on appeal. Illinois Supreme Court has addressed the issue of time in custody and whether or not or what type of role that

plays in terms of the situation like that. That's addressed in People versus House. Supreme Court of Illinois specifically stated that the amount of time a person is in custody is but merely one factor. That needs to be addressed in determining from the totality of circumstances whether or not a statement is in fact voluntary.

Different factors are to be looked at according the Illinois Supreme Court. The age, the education, the intelligence of the accused, the length of detention, duration of questioning, whether or not he was in fact advised of his rights and whether or not he was mistreated.

In this case, going through them, looking at the age, you're not talking about a young kid in this situation, somebody who is 15 or 16 or even 18. You're talking about a man. Talking about a man that has been around, that has been on this planet for 41 years at the time of these events.

You're talking about an individual that graduated high school so you're not talking about for lack of a better word, an imbecile who was never able to complete grade school. You're talking about an individual that was smart enough to get through and to

graduate from high school.

In terms of the length of detention, yes, looking at the detention, you have a situation where looking first of all when he comes into the police station it's at 8:00 o'clock he came in, he was not arrested at that time. Okay.

At 1:00 o'clock he's advised and not free to leave at that point. It's approximately I believe 35 hours before he gives oral statement to detective Zuley in this case. Clearly within the 48 hours. And in terms of the oral statement to ASA, within 43 hours. Terms of handwritten statement it's 49 hours.

Looking at the duration of the questioning, the court in House focused on the fact that was the questions in the case intermittent, or were the questions in this case long, marathon sessions. In this case you don't have a marathon session where the defendant's being questioned three, four hours at a time. No. You have got a couple of 10-minute conversations, you got a couple of 30-minute conversations, maybe a 40 and maybe an hour or another hour later on.

You don't have a situation where we are

talking about a marathon interview that's really being done to wear the defendant down. As I stated, the advisement of the defendant's rights at least on seven separate occasions.

The defendant subject to any physical mistreatment. You saw the assistant state's attorney when she testified, he had an opportunity to say how he was treated. Treated fine. No threats, no promises. When you look at all the food and drink and allowed to go to the bathroom, police treated him well. He was given a meal at every interval, given cigarettes, allowed to use the washroom whenever he needed. He was allowed to sleep. There was no problem with how he was treated.

When you go back and talk about this time line, you look at the House case from the Illinois Supreme Court. You look at the circumstances of that case. In that case, it was 27-hour session. Before the defendant in that case gave an oral statement. It was a 44-hour session before he gave the handwritten statement.

Those time periods are very similar to what we have in this case. On top of all the other factors, it's clear that the statement in this case was

in fact voluntary and we'd ask you deny the defendant's motion at this time.

MS. McBETH: Judge, just briefly in response. I think that obviously Willis comes after House and the Willis court was aware of House, the case law involved in this, I think it's unfair to say that because a case is on appeal, that's not good law. That's not the state law, I think it's unfair to suggest in a court we are not bound by a higher court opinions.

Also I would point out briefly the detective Thompson, very cagey about how many hours this was. Maybe didn't want to do the math on the stand. But he contends there's a police procedure that they may not be kept more than 72 hours. He wants the rule to be 72 hours. That's not the rule, judge.

The rule is 48 hours. That was violated in this case. We would ask that you grant our motion.

THE COURT: Depending on my ruling, are you all going to present any evidence?

MS. McBETH: Judge, yes.

THE COURT: Okay. All right. Let me get a copy of the two cases. If you can get them to me. Any other cases you want to present to me.

MS. PLACEK: Yes judge, but we will give the

state.

THE COURT: If you want to brief it, that's fine.

MS. PLACEK: We would like to brief as to this motion, this section of the motion ourself. Alone. Without going into the full.

THE COURT: I can tell you my concern is the 48 hours.

MS. PLACEK: The Willis ruling, right.

THE COURT: Right. I think they have covered the Miranda. As far as I am concerned, I'm concerned about the 48 hours. I'm looking at the whole testimony and address --

MS. PLACEK: I'd be jumping up and down, trust me, I know how to do that. When do you want us back?

THE COURT: Are you all going to brief it or you want to give me cases.

MS. PLACEK: I'd like to brief it on that, judge.

THE COURT: How long is it going to take you?

MS. PLACEK: Next week we are supposed to be on trial. On the 20th, can we have the case up on the 20th but have this gentleman's presence waived.

THE COURT: I don't have a problem with it. But from my experience, once the clerk marks that mitt. a certain day, they are going to bring him. You can put on there defendant's appearance waived.

MS. PLACEK: That's what I'd like to try.

THE COURT: The 20th right now I have 15 cases, so shouldn't be up here all day.

MS. PLACEK: Just dropping off a brief.

THE COURT: Motion commenced and continued, May 20th. As to his probation case by agreement?

MS. PLACEK: Yes.

THE COURT: May 20th.

(Whereupon, proceedings were adjourned in this case)

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT-CRIMINAL DIVISION

I, PAUL W. O'CONNOR, an Official Court Reporter for the Circuit Court of Cook County, County Department/Criminal Division, do hereby certify that I reported in shorthand the proceedings had at the hearing in the above-entitled cause; that I hereafter caused the foregoing to be transcribed into typewriting, which I hereby certify to be a true and accurate transcript of the proceedings had before the Honorable MARJORIE LAWS, Judge of said court.

[signature]
Official Court Reporter

Lic. No. 084-002955

Dated this 11th day of May, 2005.