LOUISVILLE LEXINGTON LONDON FLORENCE CINCINNATI INDIANAPOLIS ORLANDO JACKSONVILLE TAMPA

KENTUCKIANA
COURT REPORTERS

**CASE NO. 23 C 17186**

**CARL REED**

V.

**RICHARD ZULEY, ET AL.**

**DEPONENT:**

**RICARDO BURNS**

**DATE:**

**February 03, 2025**

a courtroom powerhouse

schedule@kentuckianareporters.com

877.808.5856 | 502.589.2273

www.kentuckianareporters.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
JUDGE JOHN F. KNESS
MAGISTRATE JUDGE HEATHER K. MCSHAIN
CASE NO. 23 C 17186

CARL REED,
Plaintiff

V.

RICHARD ZULEY, TIMOTHY
THOMPSON, the CITY OF CHICAGO,
COOK COUNTY STATE'S ATTORNEY
NANCY GALASSINI ADDUCI, and COOK
COUNTY,
Defendants

DEPONENT: RICARDO BURNS
DATE: FEBRUARY 3, 2025
REPORTER: JESSICA AUBREY GJERDE

Page 2

APPEARANCES

ON BEHALF OF THE PLAINTIFF, CARL REED:
Israa Alzamli, Esquire
Loevy & Loevy
311 North Aberdeen
Floor 3/4
Chicago, Illinois 60607
Telephone No.: (312) 243-5900
E-mail: israa@loevy.com

ON BEHALF OF THE DEFENDANT, RICHARD ZULEY:
Emily E. Schnidt, Esquire
Misha Itchhaporia, Esquire (Appeared via videoconference)
Borkan & Scahill Ltd.
20 South Clark Street
Suite 1700
Chicago, Illinois 60603
Telephone No.: (312) 580-1030
E-mail: eschnidt@borkanscahill.com
mitchhaporia@borkanscahill.com

Page 3

APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:
Dhaviella N. Harris, Esquire
Burns Noland, LLP
311 South Wacker Drive
Suite 5200
Chicago, Illinois 60606
Telephone No.: (312) 872-8930
E-mail: dharris@burnsnoland.com
(Appeared via videoconference)

ON BEHALF OF THE DEFENDANT, COOK COUNTY STATE'S ATTORNEY NANCY GALASSINI ADDUCI:
Terrie Sullivan, Esquire
O'Connor & Battle
111 West Jackson Boulevard
Suite 1700
Chicago, Illinois 60604
Telephone No.: (312) 786-4612
E-mail: tsullivan@mokblaw.com

Also Present: Taylor Welsh, Videographer

Page 4

INDEX


| | Page |
|---|---|
| PROCEEDINGS | 7 |
| DIRECT EXAMINATION BY MS. ALZAMLI | 8 |
| CROSS-EXAMINATION BY MS. SCHNIDT | 114 |
| EXAMINATION BY MS. SULLIVAN | 187 |
| REDIRECT EXAMINATION BY MS. ALZAMLI | 189 |
| RECROSS-EXAMINATION BY MS. SCHNIDT | 219 |


EXHIBITS


| Exhibit | Page |
|---|---|
| 1 - E-mail from Ms. Schnidt to Mr. Ricardo on Friday, January 17th, 2025 | 21 |
| 2 - Statement of Ricardo Burns, Bates Stamped City Reed 49 - City Reed 56 | 31 |
| 3 - Supplemental Report, Bates Stamped City Reed 110 - City Reed 128 | 32 |
| 4 - E-mail from Ms. Schnidt to Counsel on Friday, January 31st, 2025 | 46 |
| 5 - E-mail from Ms. Schnidt to Counsel on Tuesday, January 28th, 2025 | 49 |
| 6 - General Progress Report, Bates Stamped City Reed 94 - City Reed 98 | 107 |


Page 5

FORMAL REQUESTS

1 - Ms. Alzamli requests that Mr. Burns submit the video of Ms. Alzamli talking to the owner of the store next to Mr. Burns Coffee Shop that was captured by his security cameras

2 - Ms. Schnidt requests that Mr. Burns submit a photograph of the card he received from the investigators he met with at McDonald's

Page 6

STIPULATION

The deposition of RICARDO BURNS was taken at REGUS - EVANSTON, 1603 ORRINGTON AVENUE, SUITE 600, EVANSTON, ILLINOIS 60201 on MONDAY the 3RD day of FEBRUARY 2025 at 9:59 a.m. (CT); said deposition was taken pursuant to the FEDERAL Rules of Civil Procedure.

It is agreed that JESSICA AUBREY GJERDE, being a Notary Public and Digital Reporter for the State of ILLINOIS, may swear the witness.

Page 7

PROCEEDINGS

THE VIDEOGRAPHER: We are now on record. My name is Taylor Welsh. I'm the videographer today, and Jessica Gjerde is the court reporter. Today is the 3rd day of February 2025, and the time is 10:00 a.m. Central.
We are at the Regus Hotel to take the deposition of Ricardo Burns in the matter of Carl Reed v. Richard Zuley, Timothy Thompson, the City of Chicago, Cook County State's Attorney Nancy Galassini Adduci, and Cook County, pending in the United States District Court for the Northern District of Illinois, Eastern Division. Case number 23 C 17186. Will counsel please identify themselves for the record?
MS. ALZAMLI: Israa Alzamli for Plaintiff Carl Reed.
MS. SCHNIDT: Emily Schnidt for Defendant Zuley.
MS. SULLIVAN: Terrie Sullivan for Defendant Nancy Adduci.
MS. HARRIS: And Dhaviella Harris on behalf of the City of Chicago.
MS. SCHNIDT: And also present is Misha

Page 8

Itchhaporia from my office.
THE VIDEOGRAPHER: Thank you. And Mr. Burns, will you please raise your right hand for the court reporter?
THE WITNESS: Yes.
THE REPORTER: Do you solemnly swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?
THE WITNESS: Yes.
THE REPORTER: Thank you. Counsel, you may begin.
MS. ALZAMLI: Thank you.

DIRECT EXAMINATION

BY MS. ALZAMLI:
**Q. Hi, Mr. Burns. My name is --**
A. Hi.
**Q. -- Israa. I am Carl Reed's attorney. Have you ever been deposed before?**
A. I'm sorry.
**Q. Have you ever been deposed before?**
A. What is that?
**Q. Okay, good. So I'm glad I asked you that. So have you ever sat for anything like this before?**
A. No, not like this.
**Q. Okay. So I'm just going to give you a kind of a quick overview of, like, what a deposition is and also, kind of some rules so that it goes smoothly.**

Page 9

A. Okay.
**Q. So a deposition is kind of like an interview. It's, like, when there's a case pending. And we can ask you questions about it, and it's under oath.**
A. Uh-huh.
**Q. And essentially, there's going to be a court reporter. So the court reporter is writing everything down that we say. And we also have a videographer who's, like, videotaping everything. So because the court reporter is typing everything, we want to be careful not to talk over each other. So I'll try really hard not to cut you off. Sometimes, I will. Just let me know. And then, you try really hard not to cut off my questions. So that's kind of how that works.**
**Because the court reporter is typing everything, you want to be careful not to say things like hmm or uh-huh. Because that won't be clear what your answer was. So just give, like, a verbal yes or a no and try not to, like, shake or nod your head. Like, try to say yes or no. Because, again, shaking or nodding your head won't reflect on what she's typing.**
A. Okay.
**Q. So a couple other things is you might hear**

objections. That's normal. Like, attorneys will do that for the record. It doesn't really have anything to do with you unless someone tells you, like, not to answer a question. But generally, like, you hear an objection, that's fine. Like, don't let that --
A. Okay.
Q. -- freak you out. So if you don't understand a question that I ask you, just let me know. I can rephrase it. (coughs) Sorry. I am losing my voice a bit. So if you can't hear me, just let me know. If you answer a question -- like, I'll assume that you understood what I meant, okay?
A. Okay.
Q. And we'll definitely take breaks. You can let me know when you need a break. Just try to make sure that I'm through my line of questioning.
A. Okay.
Q. And if I'm not, I'll let you know, hey, can I finish my questioning? And then, we can take a break. And if we go, like, long enough, we'll take a lunch break and all that kind of stuff.
A. Okay.
Q. Does that make sense?
A. Yes.
Q. Okay. Cool. So Mr. Burns, we talked on



Friday, right?
A. Yes.
Q. Okay. And you called me. We were able to coordinate this deposition today. Do you remember that?
A. Yes.
Q. Okay. And you were really cooperative, which I thank you for. But before all that happened, there was, like, a period of time when you weren't responding to my calls or messages, right?
A. Yes.
MS. SCHNIDT: Object to form. Leading.
BY MS. ALZAMLI:
Q. So I'm going to ask you a little bit about what was going on during that period of time, okay?
A. Yes.
Q. Okay. So do you remember, Mr. Burns, that first deposition that we scheduled in your case where you appeared from your coffee shop over Zoom?
A. Yes.
Q. Okay. So that one was supposed to go on, like, January 21st. Do you remember that?
A. Yes.
Q. All right. And it didn't end up going because there were technical issues, correct?
A. Yes.



MS. SCHNIDT: Object to form.
THE WITNESS: Yes.
MS. ALZAMLI: Counsel --
MS. SCHNIDT: Just referring to --
MS. ALZAMLI: -- I'm just going to ask that you finish my question before you -- I finish my question before you object.
MS. SCHNIDT: You were finished. I'm just going to make some objections. So just make sure you pause so that I can object. So I'm not speaking over you --
THE WITNESS: Yes.
MS. SCHNIDT: -- okay?
THE WITNESS: Yes.
MS. ALZAMLI: And -- wait. I'm just going to -- I'm not trying to be difficult, but if I can just finish my question before you object, and then I'll pause.
MS. SCHNIDT: Absolutely. You were finished. Go ahead.
MS. ALZAMLI: Thank you. Okay.
BY MS. ALZAMLI:
Q. So Mr. Burns -- so we just talked about that first deposition that we had scheduled, right? You remember that?



A. Yes.
Q. Okay. So before that first deposition, we talked on the phone twice, right? Do you remember --
MS. SCHNIDT: Object. Object to form. Leading.
MS. SULLIVAN: Join.
THE WITNESS: I don't remember.
MS. HARRIS: Join.
BY MS. ALZAMLI:
Q. Okay. So before your first deposition, that didn't end up going because it was canceled -- because of technical issues?
A. Yes.
Q. We talked on the phone twice before that deposition, right?
A. Yes.
MS. SCHNIDT: Object. Asked and answered. Leading.
MS. SULLIVAN: Join.
BY MS. ALZAMLI:
Q. Okay. Can you answer the question? It's a little hard to hear you.
A. Yes, I remember.
Q. Okay. And the first time we spoke on the phone, I introduced myself to you. I told you that I

Page 14

represent Carl. Do you remember that?
MS. SCHNIDT: Leading.
THE WITNESS: Yes.
BY MS. ALZAMLI:
Q. And I asked you if you'd be willing to speak to me about Carl's case; was that right?
MS. SCHNIDT: Form. Leading.
THE WITNESS: Yes.
BY MS. ALZAMLI:
Q. And you agreed to speak to me, right?
A. No.
Q. You do not agree to speak to me?
A. The first time, I said no.
Q. The first time on the phone, you did not agree to speak to me --
MS. SCHNIDT: Objection.
BY MS. ALZAMLI:
Q. -- about your testimony?
MS. SCHNIDT: Harassing. Asked and answered.
MS. SULLIVAN: Object. Sorry. Objection. Argumentative.
BY MS. ALZAMLI:
Q. You still have to answer the question.
A. The first time I ever spoke with you over the phone, I told you no.

Page 15

Q. Okay. Do you remember that conversation lasted for about 20 minutes?
MS. SCHNIDT: Objection. Leading.
THE WITNESS: I don't know how long it lasts, but my answer was no. I don't want to speak.
BY MS. ALZAMLI:
Q. Okay. So during that conversation, you don't remember telling me that you believe Carl could have been wrongfully convicted?
MS. SCHNIDT: Objection. Mischaracterizes. Leading.
THE WITNESS: No.
BY MS. ALZAMLI:
Q. You don't remember saying that?
A. No.
Q. Okay. During that conversation, do you remember telling me that when you were taken to the station, the officers told you that Carl had said that you were driving around the victim's car, and that scared you?
MS. SCHNIDT: Objection. Form. Leading.
BY MS. ALZAMLI:
Q. Do you remember telling me that?
A. No.
Q. Okay. So we actually spoke again after that

Page 16

initial phone call, right?
MS. SCHNIDT: Leading.
THE WITNESS: Yes.
BY MS. ALZAMLI:
Q. Okay. And we spoke again because at the end of our first conversation, I asked you if you would sit for a deposition in this case. Do you remember that?
A. Yes.
Q. Okay. And you agreed to sit for a deposition, right?
A. Yes.
Q. And when I called you the second time you picked up the phone; is that right?
A. Yes.
Q. And it was shortly after our first conversation, maybe, like, I don't know, ten or 30 minutes after our first conversation, right?
MS. SCHNIDT: Objection. Form. Leading.
THE WITNESS: Yes.
BY MS. ALZAMLI:
Q. And in that call, I was just trying to coordinate when I could send over a subpoena and when you would be home to accept it. Do you remember that?
A. Yes.
MS. SCHNIDT: Form. Leading.

Page 17

BY MS. ALZAMLI:
Q. And I successfully served you that day. You know, we sent over a detective who was able to hand you that subpoena at 5:30, which is when you told me you'd be home; is that right?
MS. SCHNIDT: Form. Leading.
THE WITNESS: Yes.
BY MS. ALZAMLI:
Q. Okay. So you -- we were able to coordinate that. And it was all good, right?
A. Yes.
Q. Okay. And it's still your testimony today that -- during that first conversation, you did not want to speak to me?
MS. SCHNIDT: Objection. Asked and answered. Harassing.
MS. SULLIVAN: Join.
BY MS. ALZAMLI:
Q. You still have to answer the question.
A. Yes.
Q. Okay. What did you say to me during that conversation?
MS. SCHNIDT: Asked and answered. Go ahead, sir.
THE WITNESS: I didn't want to speak about the

case. I thought it was all over. It's been this long. I don't remember. I don't want to have nothing to do with whatever was going on.
BY MS. ALZAMLI:
**Q. You told me that you don't remember on the phone?**
A. Yes.
**Q. Okay. Do you remember telling me on the phone that you have a really good memory of this case because it was so scary when it all happened?**
MS. SULLIVAN: Objection. Asked and answered.
MS. SCHNIDT: Form. Leading.
MS. SULLIVAN: Argumentative.
BY MS. ALZAMLI:
**Q. I'm sorry. You have to answer the question.**
A. No.
**Q. They can only object. Okay. So I'm just going to ask it again, so it's clear.**
A. Uh-huh.
**Q. So on our first phone call when we first talked about this case, it's your testimony that you did not tell me that you have a very good memory of everything that happened because it was so scary when you got wrapped up in this; is that right?**
MS. SULLIVAN: Objection. Asked and answered.



And you do not have to answer that question.
MS. SCHNIDT: Argumentative.
MS. HARRIS: Joined.
THE WITNESS: Fine.
MS. ALZAMLI: Terrie, what is your basis for instructing the witness that he doesn't have to answer that question?
MS. SULLIVAN: That you have already asked the same question multiple times, and he's given you an answer. And it's just harassing him at this point. That is --
MS. ALZAMLI: Okay.
MS. SULLIVAN: -- my basis.
MS. ALZAMLI: That is not a basis for --
MS. SULLIVAN: Yes, it is.
MS. ALZAMLI: -- not to answer the question.
BY MS. ALZAMLI:
**Q. So can you please answer the question?**
A. I don't remember.
**Q. Okay, sir. Let's keep going, okay? So after our second phone call early that morning, we coordinated your subpoena service. We talked about that. Later that day, did you speak to the attorneys who represent Defendant Zuley in this case?**
A. I -- I think so. Yes, I did. Yes.



**Q. Okay. Do you remember who you spoke to?**
A. I don't remember her name.
**Q. Was it Ms. Emily Schnidt, who's sitting right there?**
A. Sounds familiar, yes. That name, yes.
**Q. Okay. And what did you talk about with Ms. Schnidt?**
A. About the deposition.
**Q. Okay.**
A. That I would be hearing from someone serving me a subpoena to do this deposition.
**Q. Okay. What else did you talk about with Ms. Schnidt?**
A. And I also told her I didn't want to have nothing to do with it.
**Q. Okay. Is that all that you guys talked about?**
A. Yes.
**Q. The only thing that you talked about is that she was going to send you over a subpoena and that you told her you didn't want anything to do with this case?**
A. A subpoena would be coming over and I told her I don't want to have nothing to do with the case.
**Q. Did you ask her to send you your statements in this case?**
A. I don't remember.



**Q. Did she send you your statements in this case?**
A. Yes.
**Q. Okay. Why did she send you those statements?**
A. I don't know.
MS. SCHNIDT: Objection. Form. Speculation.
BY MS. ALZAMLI:
**Q. So you did not ask for her to send you those statements?**
A. I don't remember.
**Q. Okay. So I'm going to show you -- I'm going to now mark Exhibit 1 of your deposition. This is an e-mail from Ms. Schnidt from Friday, January 17th, to an e-mail, "BRicardo20@yahoo.com." So I'll just give this to you. Do you recognize this e-mail?**
(Exhibit 1 was marked for identification.)
A. That's my e-mail, yes.
BY MS. ALZAMLI:
**Q. Did you receive this e-mail?**
A. Yes.
**Q. Okay. Do you see here in the first sentence where it says, "Thank you for speaking with me today. As you requested, attached is a copy of the handwritten statement summarizing your interview with the State's attorney on July 22nd, 2001"?**

Page 22

A. Yes, I see that.
**Q. Okay. Does reading that sentence refresh your recollection as to whether you requested that Ms. Schnidt send you your statements from this case?**
A. Reading that sentence does bring back me speaking with her about that, yes.
**Q. Okay. So did you request that Ms. Schnidt send you your statements in this case?**
A. As of reading this sentence? Yes, I did.
**Q. Okay. Outside of reading this sentence, I don't want to ask, like -- okay. So this is a good moment for me to define a term for you. So sometimes**
**I'm going to ask you about your independent recollection. So independent recollection means things that you remember outside of what's on the paper. So sure, it can say on the piece of paper, as you requested, here's this, but what I'm not asking you, like, what the paper says. I'm asking you: Do you have a memory of that day of you requesting the statements? So that's what my -- does that make sense?**
A. Yes.
**Q. Okay. So do you have an independent recollection of whether you requested Ms. Schnidt send you your statements in this case?**
MS. SCHNIDT: Asked and answer.

Page 23

THE WITNESS: Yes.
BY MS. ALZAMLI:
**Q. Okay. So you did ask her to send you the statements?**
A. Yes.
**Q. Why did you ask her to send you the statements?**
A. I want to see what I said. It's been over 24 years. I don't remember. I take 19 medicines. I had a major surgery, transplant. By the time I leave here, I don't even remember what your name was. So I have to refresh my memory.
**Q. Okay. So did you feel like it was important to refresh your memory about what you said to the police because you were worried that you would say something --**
A. No.
**Q. -- differently today?**
A. No.
MS. SCHNIDT: Objection. Mischaracterizes his testimony.
THE WITNESS: No.
BY MS. ALZAMLI:
**Q. Okay. So --**
A. Absolutely not.
**Q. So why was it important for you to refresh**

Page 24

**your memory rather than coming in and saying, well, I just don't remember, it's been 20 years?**
A. Because same way as an attorney. I say, how long have you been fighting this case? I'm pretty sure you'd go over your notes as well.
**Q. Okay. So you want to go over your notes because you want to be able to testify in line with what your statement said?**
MS. SCHNIDT: Mischaracterizes his testimony.
BY MS. ALZAMLI:
**Q. You have to answer the question. I can rephrase it, if it was confusing.**
A. No. You don't have to rephrase it. I want to look over my notes, what was said. I remember to a certain extent from those years what was said, but just to refresh my memory.
**Q. Okay. So I want to talk about your memory, because you just mentioned that you're on a lot of medications and that -- did you mention that you had a procedure?**
A. Yes.
**Q. Okay. So what medications are you on that affect your memory?**
A. I take Envarsus. It's a rejection medicine because I had a kidney and pancreas transplant.

Page 25

MS. SCHNIDT: Yeah. Let me interrupt here, because you're not required to disclose your medical history at all. I think that it would be accurate to ask him first if he has any -- takes any medication that impacts his memory.
MS. ALZAMLI: Emily, I'm going to ask you not to --
MS. SCHNIDT: Israa, I'm happy to call the judge, but you cannot ask a witness about their medical condition.
MS. ALZAMLI: Emily, that's okay. I won't ask him about his medications, but you cannot -- you'll have a -- your time to ask questions. You can't testify on the record right now.
MS. SCHNIDT: I'm not --
MS. ALZAMLI: You can just say, hey, objection, I don't think he has to give his medication, so we can --
MS. SCHNIDT: Okay. Well, then you can -- I'm going to go ahead and let him know what he does and doesn't have to do, and if you want to struggle through it --
MS. ALZAMLI: Are you representing him in this case?
MS. SCHNIDT: -- you can. I told you that I

do not. You know that I do not.
MS. ALZAMLI: Okay.
MS. SCHNIDT: But he is a witness in this case, and you are not about to force him to give information that you know you cannot discover.
So Mr. Burns, you don't have to disclose any medical condition unless you want to. That is perfectly your choice. You also don't have to disclose the names of any medications that you take. That is also your choice. We may ask questions about what may impact your memory, but that is up to you as to whether you want to disclose anything -- any further details. Is that fair, Terrie?
MS. SULLIVAN: Fair.
MS. SCHNIDT: Yeah.
BY MS. ALZAMLI:
**Q. Okay. Do you have any conditions that affect your memory?**
A. Yes.
**Q. Okay. What are the conditions that affect your memory?**
A. I had a kidney and pancreas transplant and being under anesthesia for a long period of time.
**Q. Okay. What -- did that happen recently or was**



**that a long time ago?**
A. It was two years ago.
**Q. Two years ago? Okay. And you found that that affected your memory, that -- from things that happened before those two years and things that happened forward?**
MS. SCHNIDT: Form.
THE WITNESS: It was after the surgery.
BY MS. ALZAMLI:
**Q. Okay. Sorry, could you clarify what you mean by that?**
A. With my memory, not really remembering certain things.
**Q. I'm so sorry.**
A. I don't --
**Q. Could you speak up a little bit?**
A. Tell me -- rephrase what you were saying.
**Q. Yes. So you're saying when you had the surgery, that affected your memory, right?**
A. To a certain point.
**Q. Okay. What is the certain point that it affected you?**
A. My short term.
**Q. Oh, your short-term memory?**
A. Yeah.
**Q. So it affected your memory to things that**



**happened to you after surgery in the short term?**
A. Yeah, that's what I stated. Yeah.
**Q. Okay. I just wanted to make sure I understood. And so it -- that doesn't -- so it -- you're not testifying that it affects your long-term memory of things that happened before that surgery?**
A. It doesn't affect the long term. It's just a little short term at times.
**Q. Okay. Do you have any other conditions that affect your memory?**
A. No.
**Q. Are you on any other medications -- you don't have to name them -- that affect your memory?**
A. No. No.
**Q. Okay. Okay. So we were just talking about your first conversation with Ms. Schnidt, and you told me that she told you you were going to get a subpoena. She -- you told her that you wanted nothing to do with the case. And also, that you have an independent memory of requesting your statements in this case. Do you remember that?**
MS. SCHNIDT: Objection. Mischaracterizes his testimony.
BY MS. ALZAMLI:
**Q. Did I mischaracterize any of your testimony?**



MS. SCHNIDT: Objection. Form. Go ahead.
THE WITNESS: Can you please --
BY MS. ALZAMLI:
**Q. I'm sorry?**
A. Can you repeat that?
**Q. Yes. So we talked about your first conversation -- well, let's start with -- when you spoke with Ms. Schnidt on that Friday, after we talked in the morning, was that your first time speaking with Ms. Schnidt?**
A. Yes.
**Q. Okay. Was that your first time speaking with any of the attorneys who represent the defendants in this case?**
A. Yes.
**Q. Okay. And that first conversation that you had with Ms. Schnidt on that Friday, the things that you talked about were receiving a subpoena, requesting your statements, and also just you telling her that you wanted nothing to do with the case; is that correct?**
MS. SCHNIDT: Mischaracterizes.
THE WITNESS: I did say that.
BY MS. ALZAMLI:
**Q. Okay. So you did say that. Is there anything else that you talked about in that first conversation**

Page 30

**that we haven't talked about yet?**
A. No.
**Q. Okay. So those are the only three things that you talked about?**
A. (No verbal response.)
**Q. How did you know to request your statements? Did Ms. Schnidt tell you that you gave statements in this case?**
A. No, she didn't.
**Q. So you had an independent recollection that you gave statements in this case?**
A. I knew -- I knew I gave statements. I sat in front of the police officer and talked to him. He was writing down everything I say. What do you call it? A statement. That I'm writing.
**Q. Okay. Do you know how many statements you gave?**
A. No, I don't.
**Q. Okay. Did you review the documents that Ms. Schnidt sent you?**
A. Yes.
**Q. Okay.**
MS. SCHNIDT: Mr. Burns, I'm having just a little hard time hearing you. So the best you're able to just keep your voice up, it would make it

Page 31

easier for me. I appreciate it. Terrie's at the further end of the table and --
MS. SULLIVAN: I have pretty good hearing.
MS. SCHNIDT: Oh, she -- I don't.
BY MS. ALZAMLI:
**Q. Okay. Mr. Burns, is this one of the documents that Ms. Schnidt sent you over e-mail? I'll just give you a copy as well. You can take that.**
A. When I opened it, I did see this, but I couldn't -- I couldn't read what he was -- what he was writing. That's -- that's not my handwriting.
**Q. Right, it's not your handwriting.**
A. Yeah. But I couldn't read it, so I -- I just strolled through that and --
**Q. Okay.**
A. -- picked up what I could read.
**Q. Just picked up what you could read? Okay. And she sent you another document, too, right?**
A. Yes.
**Q. Actually, let me just be clear. I'm going to mark CD Reed 49 through CD Reed 56, the hand -- the statement of Ricardo Burns as Exhibit 2 of his deposition. I'll let you keep that. And now I'm going to hand you what is called a sup report in this case, which is basically on CD Reed 110 through CD Reed 128.**

Page 32

**And I'm going to mark those as Exhibit 3 of your dep. So I'm just going to let you hold one of those two copies. And --**
(Exhibit 2 was marked for identification.)
(Exhibit 3 was marked for identification.)
MS. SCHNIDT: Israa, this is not the document that I sent to you that I said I sent to him.
THE WITNESS: Yeah.
MS. ALZAMLI: I know that.
MS. SCHNIDT: Okay.
MS. ALZAMLI: I didn't ask him that question.
MS. SCHNIDT: Oh, you -- well, you did. You said, "And she sent you another document."
THE WITNESS: Yeah. I don't know what that is.
BY MS. ALZAMLI:
**Q. Okay. So did -- she sent you portions of this document, which included a summary of one of your interviews with the police. And it looked like this page, which is Page CD Reed 120. Did you read that?**
A. Yes. That's one of the documents.
**Q. Okay. Did she send you any other documents?**
A. Yes.

Page 33

**Q. Did they look similar, like this?**
A. Similar to this, yeah.
**Q. Okay. Great. We'll go back to those later. I want to go back to talking about the conversations that we had in this case. Okay. So in your first conversation with Ms. Schnidt, we talked about things that you talked about, she sent you these documents, correct?**
A. Uh-huh.
**Q. Okay. Did you speak to Ms. Schnidt again after that first phone call?**
A. Yes.
**Q. Okay. When did you speak to her?**
A. Probably -- I think it was after -- after you came to the cafe.
**Q. Okay. So the next time that you spoke to her was after I came to the cafe?**
A. Uh-huh.
**Q. Okay. And --**
MS. SCHNIDT: That's a yes.
THE WITNESS: Yes. I'm sorry.
MS. ALZAMLI: Oh, I'm sorry.
THE WITNESS: Sorry.
BY MS. ALZAMLI:
**Q. Okay. And why did you call her after I came**

**to the cafe?**
A. Because I felt harassed.
**Q. Why did you feel harassed?**
A. Because it's like you are pushing me into doing something that I told you previously that I didn't want to do.
**Q. Yeah. What was I pushing you into doing?**
A. Speaking about Mr. Reed in this case.
**Q. Did you ever tell me not to contact you?**
A. I believe that was the first conversation I had with you, when I told you I didn't want to talk about it.
**Q. Okay. So it's your testimony --**
A. You just didn't -- you just didn't say that in your first testimony that you're asking me when I supposed to first talk to you.
**Q. Okay. I want to make sure I'm understanding you correctly. So it's your testimony that in our first phone call together, you told me not to contact you again?**
A. I told you I don't want to talk about it, do not call me.
**Q. Okay. So it's your testimony that you told me, I don't want to talk about it, do not call me?**
A. Yes.



**Q. Okay. So after that first phone call, you did pick up my call again, right?**
A. Yeah. You called me.
**Q. Yeah. And we were able to coordinate very smooth service on your subpoena, right?**
MS. SCHNIDT: Objection.
THE WITNESS: Uh-huh.
BY MS. ALZAMLI:
**Q. Yeah?**
MS. SCHNIDT: Form.
MS. SULLIVAN: Join.
BY MS. ALZAMLI:
**Q. And you accepted it, right? And --**
MS. SCHNIDT: Israa, let us object to. Okay?
BY MS. ALZAMLI:
**Q. And it wasn't -- and you showed up to your deposition that was scheduled, right?**
A. Yes.
**Q. Okay. So once your deposition was canceled, why is it that you stopped then responding to my phone calls?**
MS. SCHNIDT: Objection. Form. Argumentative.
MS. SULLIVAN: Join.
THE WITNESS: Because after doing some homework and looking into it myself and then I



thought maybe a judge needed to sign a subpoena, then after doing some Google research and all that, a judge doesn't have to sign it, unfortunate. So that's when I just stepped up, because you're knocking on my door, coming to my job, and it was harassment. I just need it to stop. So I just followed through just to get it over with.
BY MS. ALZAMLI:
**Q. Okay. So you felt harassed -- okay. Well, let's work backwards here. We talked twice on the phone. You show up for your deposition. It gets canceled. I call you back after your deposition. I leave you -- and every time I called you, I left you a voicemail, right?**
MS. SCHNIDT: Object to form.
THE WITNESS: Either a voicemail or a text message, yes.
BY MS. ALZAMLI:
**Q. Okay. Did you listen to those voicemails?**
A. No.
**Q. Okay.**
A. But it -- I read it, because it comes through the --
**Q. So you read the voicemails?**
A. Uh-huh.



**Q. Do you remember what I said in the voicemails?**
A. Not right offhand. Yeah.
**Q. Okay. Did I -- does it refresh your recollection if I say, well, I said something along the lines of, hey, Mr. Burns, I'm trying to reschedule your deposition? Does that sound familiar?**
MS. SCHNIDT: Object to form. Leading.
THE WITNESS: Yes. After the first one didn't go well.
BY MS. ALZAMLI:
**Q. Right. So every time I tried to contact you after your first deposition didn't go through, I had left you a message, letting you know why I was calling you. And the reason why was because I was trying to reschedule your deposition, right?**
A. Yes.
**Q. Okay. Why did you feel comfortable reaching out to Ms. Schnidt?**
A. The reason being why I felt comfortable with Ms. Schnidt and not yourself is because I testified against your client. So I felt that I was comfortable with her because it's like me talking to the state's attorney, because I called them as well and told them about you and your team reaching out to me. The state's attorney told me that I do not have to talk to you. If

you-all step foot in my workplace, business, or home, call the police and fill out a report.
So that's when I started making those steps. But I felt comfortable with speaking with her because I testified against your client, so I felt comfortable with talking back to who I was working with, the police at the moment.
**Q. Okay. Thank you for explaining that. And Mr. Burns, just to clarify, when I came to your place of business to talk to you about your deposition, did you ask me to leave?**
A. I had guests in the coffee shop and that wasn't the time to come in because everyone see me on Channel 2 News. I have nothing to hide. So by you coming in and asking to speak about a legal issue at my workplace, where I could be working for someone else, that tears my character down. And I told you clearly that this is not the time and place for this.
You also stated after that, that before this deposition, that you would like to show me something. You never showed me, because -- you say you want to show me before this. You never showed me, but I told you, another time.
**Q. Mr. Burns, you told us during your first -- when we were on Zoom for your first deposition, that you**



**owned that coffee shop. Do you remember that?**
A. Yes.
**Q. So I knew that you were not an employee, but that you owned the shop, right?**
MS. SCHNIDT: Object to form. Speculation.
MS. SULLIVAN: Relevance.
THE WITNESS: Yes.
BY MS. ALZAMLI:
**Q. Okay. And when I came into the coffee shop, you were working on the front counter, right?**
A. Yes.
**Q. And when I approached you, you recognized me, right?**
A. Actually, when you walked through the door, I greet all my guests before they even step their second foot in. So when you and that gentleman came in and I had guests in the coffee shop, I thought you was going to come buy a cup of coffee. I didn't know y'all was lawyers. So no, I did not know who you were.
**Q. Okay. Do you remember --**
A. I only spoke with you over the phone.
**Q. Do you remember saying to me, oh -- something along the lines of, oh, I'm sorry, I've been meaning to call you back. I'll give you a call tonight?**
MS. SCHNIDT: Object to the form.



MS. SULLIVAN: Join.
THE WITNESS: I don't remember that.
MS. SCHNIDT: Leading.
BY MS. ALZAMLI:
**Q. Is it your testimony that you did not say that or is it your testimony that you don't remember saying that?**
MS. SCHNIDT: Object to form. Leading.
THE WITNESS: I don't remember saying that.
BY MS. ALZAMLI:
**Q. Okay. Mr. Burns, do you remember me telling you that I was just trying to figure out the location of your deposition?**
MS. SCHNIDT: Object to form. Leading.
THE WITNESS: I remember that.
BY MS. ALZAMLI:
**Q. And then do you remember me telling you that I would also like to talk more about your deposition and show you some documents? Do you remember that?**
MS. SCHNIDT: Form. Leading.
THE WITNESS: I clearly stated that, before you asked me this question, that you said you wanted to show me something.
BY MS. ALZAMLI:
**Q. Right.**



A. Before the deposition. I just never know what you want to show me before a deposition. And you're not representing me, you're representing your client.
BY MS. ALZAMLI:
**Q. Well, Ms. Schnidt showed you some documents before the deposition, right?**
MS. SCHNIDT: Objection. Mischaracterizes.
THE WITNESS: No.
BY MS. ALZAMLI:
**Q. No?**
A. She didn't show me. She sent them to me and I read over them.
**Q. Okay.**
A. It's a difference.
**Q. Now, Mr. Burns, when I asked you if we could talk, you asked if I could come back at 4:00 p.m. Do you remember that?**
A. Yes.
**Q. Okay. And then I left your coffee shop with the investigator whose name is Mark; is that right?**
A. Yeah.
MS. SCHNIDT: Objection. Form. Leading.
BY MS. ALZAMLI:
**Q. Okay. And then after we left, you called Ms. Schnidt, right?**

A. Yes.
**Q. And you told her that you felt like we were harassing you?**
A. Yes.
**Q. Okay.**
A. I also called the state's attorney and Chicago Police Department as well.
**Q. Okay. You called the Chicago Police Department as well?**
A. No. That was after Mr. Larry came. That was just -- when Mr. Larry came. I called the state's attorney, though.
**Q. Okay. How did you call the state's attorney? Is it just, like, a public number?**
A. Yeah, I Googled it. Everything is Google.
**Q. Okay. And what did you say to the state's attorney?**
A. I let them know who I was, and I told them that I needed some assistance due to the case that I testified against, and she had me speak to someone. And that's when they explained to me that it was no longer in their hands anymore, to contact the Evanston Police Department or the Chicago Police Department. And I do not have to speak to y'all. But if it's a judge that sends a subpoena, please follow the rules, Mr. Burns.



And I say, well, it's a guy coming. I don't know. Sheriff, whatever. I'm -- I'm used to a Cook County sheriff coming. If he comes, then I feel comfortable. And he said, I'm not your lawyer or anything, but just -- you make -- you make that decision.
**Q. Okay. When you called me back on Friday to coordinate this deposition, you mentioned that you didn't want to have to get the Court involved and get a court order and that you would cooperate, right?**
MS. SCHNIDT: Objection. Leading.
THE WITNESS: Can you -- a -- a court order?
BY MS. ALZAMLI:
**Q. Yeah, I'll rephrase it. So do you remember when you called me back this past Friday to tell me that you want to cooperate?**
MS. SCHNIDT: Object to form. Leading.
THE WITNESS: Yes, I remember.
BY MS. ALZAMLI:
**Q. Okay. In that phone call, you told me that you don't want the Court to have to get involved to make you cooperate and that you didn't want any trouble. Does that sound right?**
A. Yeah.
**Q. Okay. So how did you come to learn that if**



**you don't cooperate with a subpoena, the Court can get involved and essentially make you show up?**
A. Because clearly, I just stated to you on the record that the state's attorney told me if the judge signs a subpoena, I have to follow the rules. So before I did research -- I did research, and it does state that if a judge does sign a subpoena -- but I never know that the judge signed the subpoena that you gave me because I didn't look at it clearly.
**Q. Okay. Sorry if I -- I'm not trying to be confusing. I just want to make sure I understand what you're saying. But your understanding is, like -- I'm just going to leave that there. I -- for the -- just for the purpose of this deposition, I'll let you know that, like, a judge doesn't have to sign the subpoena, and --**
MS. SCHNIDT: Objection. Your testifying is wrong. That's -- you're not asking him a question.
MS. ALZAMLI: Okay. We'll move on. It doesn't really matter.
BY MS. ALZAMLI:
**Q. Okay. Let's go through every time that you've spoken to Ms. Schnidt, just to make sure we have the record totally clear. You spoke to her the Friday before your first deposition. The next time you spoke**



**to her was when I came to your coffee shop. When was the next time that you spoke to her?**
A. That's the last time I remember. The last time you came to the coffee shop.
**Q. So you've only spoken to her twice?**
A. As far as I remember, yes.
**Q. Okay. What did you speak to her during that second -- what did you guys talk about during the second call?**
A. That you came harassing me and I don't know what to do. And that if a judge -- if a sheriff didn't come and give me a -- a -- a subpoena, like, with a sheriff, I wasn't -- I -- I don't -- I won't have nothing to do with it, but --
**Q. Okay. Did you talk about anything else?**
A. No.
**Q. Okay. Did you tell Ms. Schnidt to e-mail me and tell me not to talk to you?**
A. I think that was part of the conversation, if I remember. Yeah. Because I know she had a contact she could -- as a lawyer, she could probably talk to, even though she did state that she's not representing me at all.
**Q. Okay. Did she offer to do that, or did you ask her to do that?**

Page 46

A. I asked her to do that.
**Q. Okay. And these are the two times that you spoke to Ms. Schnidt; is that right?**
A. As far as I know, yes.
**Q. Okay.**
A. That I can recall, yes.
**Q. I'm going to mark as Exhibit 4 to your deposition, another e-mail from Ms. Schnidt marked January 31st, that was sent to me and other people in this case. This e-mail is from Friday, January 31st, which is after I came to your coffee shop and after you spoke to Ms. Schnidt, the second time. This e-mail says, "Counsel, I spoke to Mr. Burns and he agreed to sit for the deposition on Monday at 10:00 a.m." Does reading this refresh your recollection about any other phone calls you may have had with Ms. Schnidt?**
(Exhibit 4 was marked for identification.)
MS. SCHNIDT: Objection. Mischaracterizes the record. There's more to what's in this document.
THE WITNESS: Where's the part when I said, don't talk -- don't -- don't -- I don't want to talk to you? This is just saying what I'm going to do. It ain't never state in the e-mail where it say, don't call me no more. That's what I want to

Page 47

-- I want -- that's what said.
BY MS. ALZAMLI:
**Q. You want to see that e-mail?**
A. I want to see everything. Don't show me half. Show it all.
**Q. Well, I'm asking you about this e-mail. I'm not asking you about the harassment comment at all.**
A. No. But you clearly said that on this day, I asked her to tell you to don't call me. And then you said you showed me this. This ain't what you asked me.
**Q. No, I'm asking you a different question. I'm not trying to catch you up. I'm really not.**
A. That's what this look like.
**Q. Okay.**
A. Because you asked me something, now you flipped it to show me this paper of a deposition from an e-mail.
**Q. No. No. Okay. I'm sorry if that was confusing, I'm going to clarify the question.**
A. It's not confusing. It's just -- you're not confusing me, but you -- you're showing me right here.
**Q. Okay. Mr. Burns, I'm asking you, like, a very specific question actually, and I'm going to rephrase the question, and if -- and then we can talk about it. Okay? What I'm asking you is: You've told me that**

Page 48

**you've talked to Ms. Burns twice, right?**
MS. SCHNIDT: I -- Ms. Schnidt.
THE WITNESS: Not Ms. Burns. Ms. Burns is dead.
BY MS. ALZAMLI:
**Q. I'm very sorry. You told me that you've spoken to Ms. Schnidt twice, right?**
A. Yes.
**Q. Okay. Now, the second time that you spoke to her was after I came to your coffee shop, right?**
A. Yes.
**Q. I came to your coffee shop, I believe, on the 20th of January, and you spoke to her as soon as I had left your coffee shop. That was your testimony, right?**
A. I didn't say soon as you left the coffee shop. I said I spoke with her, but it wasn't --
**Q. Did you speak to her that day?**
A. I spoke with her that day, yes.
**Q. Okay. So then I showed you this e-mail from the 31st of January, from Ms. Schnidt, that says, I spoke to Mr. Burns, along with some other things. Okay? The -- so what I'm asking you, the question is: Does reading this bring back any memories of you having any other conversations other than these two that we've talked about? Does that question make sense?**

Page 49

MS. SCHNIDT: Object to form. Mr. Burns, you can read the entire e-mail if you'd like.
BY MS. ALZAMLI:
**Q. You're more than welcome to read the entire e-mail.**
A. Yeah. That's what I want to read. Because that was --
**Q. Perfect. Read --**
A. That was -- that was -- that was after sending -- after you left, and I spoke with her and told her about that. But that's just half the e-mail.
**Q. Okay.**
A. That -- I don't know what the e-mail says. I know what I told her. Say, could she relate a message to you?
**Q. Okay. I'm going to mark as an exhibit to your deposition, Exhibit 5. This is an e-mail from Ms. Burns on the 28th. Why don't you read both of these e- mails, then we can talk about it?**
(Exhibit 5 was marked for identification.)
MS. SCHNIDT: Schnidt.
MS. ALZAMLI: I'm so sorry. I keep doing that.
BY MS. ALZAMLI:

**Q. Ms. Schnidt. Why don't you read both of these e-mails and then we can talk about it?**
A. Yes, this --
**Q. Okay. Did you read both of them?**
A. Yes.
**Q. Okay.**
MS. SCHNIDT: Did you read the second one? So there's one from the 28th and one from the 31st?
THE WITNESS: Yes. Yeah, so this is when you left, and this here is when -- when we spoke to her about that. And she's -- I got the e-mail for the -- the -- the -- what's-her-name.
BY MS. ALZAMLI:
**Q. Okay. Do you remember how I showed you an earlier e-mail?**
MS. SCHNIDT: I just want to put on the record which one you were indicating. So if you can just give the date.
THE WITNESS: It was Friday, January 31st, and then Tuesday, January 28th.
MS. SCHNIDT: So then, which one were you indicating the e-mail came from? The one from the 28th or the 31st?
THE WITNESS: The one when -- when I spoke with you about them coming in. That day, I spoke



with you about them coming in that day and I told you I didn't want to talk to them. And could you please rely [sic] a message to them and tell them don't come in because it's like they was harassing me.
And this e-mail about -- this was all, like, the same thing when I had told you that, you know, that I'll -- that I'll do it, that I'll come in and do it. But the only way I'll do it is if -- if the -- if the court send that. But then -- yeah, that's what I remember. That's all I remember.
BY MS. ALZAMLI:
**Q. Okay.**
MS. SCHNIDT: And let's go ahead and mark these as an exhibit for the witness so it's easier for him to follow --
MS. ALZAMLI: Okay.
MS. SCHNIDT: -- which ones.
MS. ALZAMLI: Do you have exhibit stickers on you? Can I also take this e-mail?
THE WITNESS: Uh-huh.
MS. ALZAMLI: All right. So those are the three e-mails. Can you --
MS. SCHNIDT: 20 -- 28th we've got as 5. I'm sorry. 31st is 4. And then the 17th is 1. Okay.



MS. ALZAMLI: Okay.
MS. SCHNIDT: That should make it easier to be able to refer to them.
BY MS. ALZAMLI:
**Q. So you now have those three e-mails in front of you, okay?**
A. Okay.
**Q. So I'm going to go back and ask you that same question again just -- now that we've looked over those. So at this point you've testified that you've spoken to Ms. Schnidt twice, right?**
A. To my memory, yes.
**Q. Okay. I have now shown you three e-mails in which Ms. Schnidt references speaking to you. Does that refresh your recollection as to whether you spoke to Ms. Schnidt more than just twice? And please feel free to look through Exhibits 1, 4, and 5, which are the three e-mails from Ms. Schnidt.**
A. Yeah. Sorry. It was -- it was three because then that was when I told her that I didn't want to get in no trouble. So I'll have no courts and, you know, people coming looking for me or something, so I'll do it on Monday.
**Q. Okay.**
A. That's when I -- I think I had made



arrangements for something with you or something like that, spoke with you.
**Q. Okay. So you remember speaking to her a third time. Was that the -- are those three the only times that you spoke to Ms. Schnidt?**
A. As far as I remember, yes.
**Q. Okay.**
A. Yes. That's it.
**Q. Do you think it's possible that there are other times that you spoke to her that you don't remember?**
A. Not to my knowledge. Yeah, I don't remember.
**Q. Okay. And in that third time that you spoke to Ms. Schnidt, did you talk about anything else other than the fact that you were willing to cooperate and show up for the deposition?**
A. Yes. That's all I remember. Yes. Uh-huh.
MS. SCHNIDT: Objection. Form. Mischaracterizes.
BY MS. ALZAMLI:
**Q. Okay. Do you want to take a short break?**
A. Uh-uh.
**Q. No, you want to keep going? Okay. Did you grow up in Chicago?**
A. Yes.

Q. Okay. Where in Chicago did you grow up?
A. I was born and raised on the south side of Chicago and then I moved to the Uptown area in around, I think, 1987. I think that's when my mom moved. '89, I think.
Q. And when were you born?
A. XXXX. XX-XX-XXXX
Q. Okay. So then you moved up on the -- how old were you then, when you were up on the -- in Uptown?
A. When I -- when I --
Q. Do you remember how old you were when you moved to Uptown?
A. I think I had my 10-year -- I think I was, like, 9. I think I had my 10-year birthday.
Q. Okay.
A. I think so.
Q. Did you always live in the same place when you were in Uptown?
A. Yes. We lived 5026 North Winthrop. We lived there for -- wow, quite a while. I don't -- my mom was never, like, a moving-type person. And then she was -- she moved. We were moving and then I know we had to stay with my sister for a while. For about a couple months we had -- until she'd find a new apartment.
Q. Okay. So you did eventually move out of the



apartment on North Winthrop?
A. Yes.
Q. Do you remember when about that was?
A. I think late or early 20 -- 20 -- 2000 -- yeah, in 1999. 2000, like, late 2000, I'll say. Somewhere around there.
Q. Okay. Do you remember what school you went to when you were younger? Like, what high school?
A. Senn High School.
MS. SCHNIDT: Mr. Burns, don't forget to keep your voice up, okay?
THE WITNESS: Yes.
THE REPORTER: I'm sorry. Could you repeat that question? What high school was that?
THE WITNESS: I'm sorry. Senn High School.
BY MS. ALZAMLI:
Q. Did you graduate from Senn High School?
A. No.
Q. Did you work any jobs when you were in high school?
A. Yes.
Q. Where'd you work?
A. I worked at the -- the Breakers of Edgewater. Breakers of Edgewater, right on -- it was on Sheridan Road.



Q. Did you work anywhere else?
A. Uh-uh.
Q. And then after high school, did you just keep working at Breakers? Did you work -- did you change jobs?
A. I worked at a couple car lots. I think I worked at Northside Ford. I think so. That was Northside Ford.
Q. And today, your job is that you own this cafe, right?
A. Yes.
Q. Can you walk me through, like, how you got to that part of your life? Like, what other jobs have you had in between?
A. I worked at the Carr's Honda. Was always in the car business. I like working around cars. I like cars. And then I worked at the Autobarn at Evanston for about -- I think that was, like, 13, 14 years.
Q. Do you live alone now?
A. No.
Q. Okay. Who do you live with?
A. My wife and two kids.
Q. Okay. So just to make sure you know exactly why you're here, we're here to talk about the 2001 murder investigation of Kim Van Vo. You're aware of



that, right?
A. Yes.
Q. Okay. So before that 2001 investigation of Kim Van Vo, had you been arrested by the police for any reason?
A. Yes.
Q. Do you remember why?
A. It was possession of a controlled substance.
Q. Was that the only time you were ever arrested?
A. I had several disorderly conducts, gang ordering, trespassing in front of my own building. Just a normal urban child growing up in the neighborhood being harassed by the police.
Q. Was it, like, the same officers who would typically arrest you or was it different people?
A. It was a team. They had a team. Yeah. It was a team of 20th District. There was a team. Yeah, so --
Q. Okay. The team was from, you said the 20th District?
A. Yes. Uh-huh.
Q. Did you know any of them by name?
A. They all had nicknames. Yeah. So we all gave them -- we gave nicknames, so yeah.
Q. Can you tell me some of the nicknames?

Page 58

A. Yeah. There was one who we called him Chuck Norris because he looked like Chuck Norris. One guy, I think we called him Fat Head because he looked like a wrestler. He was, like, just -- and it was -- it was two other guys. They was always together. It was a Korean guy and a Hispanic guy. They -- they was like, no holds barred. And then it was just -- I remember two brothers. They wasn't brothers, though, but they was brothers. Mitch and Dexter.
**Q. So --**
A. And a couple more. I just don't remember their name. Like, what we called them, you know. We just -- they knew me by my name.
**Q. They knew you by your name?**
A. Yeah.
**Q. Like, they would call you Ricardo or Ricardo Burns or what would they call you?**
A. Last name. Burns.
**Q. Burns. Did you have a nickname?**
A. Yeah. Either Ricky or Rick Rock.
**Q. Rick Rock.**
A. I don't know why Rick Rock. Ricky.
**Q. Who called you Ricky? Was that just the people that you were friends with or what?**
A. Yeah. Uh-huh.

Page 59

**Q. Sorry. I'm trying to do my best to catch when you say, uh-huh.**
A. Yes. Sorry. I'm -- we have to get out of the habit. Yes.
**Q. Yep. Okay. Did you have a lot of friends in the neighborhood?**
A. Yes.
**Q. Were you, like, a social guy?**
A. Pretty -- pretty quiet, you know. Like the class clown, you know, but still -- still a warm, smooth guy. Yeah.
**Q. So you've been arrested a couple times. Do -- were you ever charged with anything?**
A. Possession of -- I think I did bootcamp. I did bootcamp and then I think I was arrested for delivery -- delivery of a controlled substance as well.
**Q. I'm sorry if this is repetitive, but is -- have you ever been convicted with anything?**
A. Yeah. Delivery -- delivery of --
**Q. Okay. So --**
A. -- controlled substance.
**Q. Yeah. So those charges went through. Did you have to sit for, like, a trial?**
A. No. There -- no -- no trial. It wasn't a trial. There was just -- I did -- I just, like, copped

Page 60

out, I think, for like 61 days or something. And -- and then I had the -- the 120-day punishment of bootcamp. That was enough for me.
**Q. And then after that punishment of bootcamp, did you do anything differently, stop getting arrested? Did anything change in your life?**
A. I got a -- you know, I started working. Moved out of the neighborhood. That was a big change. Move out of the environment that you're in. You move out of the environment, then it changed me. Yeah.
**Q. When did you move out of the environment?**
A. I think my mom moved in Rogers Park, like, 2002 or something like that. Somewhere around there, I think.
**Q. So you left uptown around 2002 --**
A. Uh-huh.
**Q. -- and then things got a little bit better?**
A. A little bit. But then I backtracked and then I got in trouble over in that area as well. Yeah.
**Q. Were those the same patrol officers?**
A. No, that was totally different. Different district.
**Q. Different district?**
A. Yeah.
**Q. Okay. So when you were in uptown, the period**

Page 61

**that you were getting in trouble, do you remember kind of, like, the age range of when you were getting in trouble?**
A. Teenage years, high school years. Around my high school years.
**Q. Did you hang out with a group of friends who, like, also tended to get in trouble a lot?**
A. Yeah. We used -- yeah.
**Q. Yeah.**
A. That was the neighborhood we grew up in.
**Q. Did you have a friend named Rodney?**
A. I don't recall a Rodney. He had a nickname?
**Q. No, I don't know a nickname.**
A. I don't know Rodney.
**Q. Okay. Did you talk to anyone else about your deposition today, like, anyone in your life?**
A. Yeah, my wife.
**Q. Yeah. What'd you talk about with your wife?**
A. She just wanted to know what was going on and I explained to her what was going on.
**Q. And you said you had kids too, right?**
A. Yes. Uh-huh.
**Q. How old are your kids?**
A. 14 and 18.
**Q. Okay. So I want to ask you a little bit about**

Page 62

your independent recollection about this investigation, okay?
A. Okay.
Q. So again, independent recollection, like we said earlier, it's just things that you remember in your own mind, okay?
A. Uh-huh.
Q. Okay. So what do you remember about this investigation?
A. About -- all I know, it's about Carl Reed. What -- that's it. That's all I -- as far as I know. That's all I remember. It's about -- about Carl -- it's about Carl Reed.
Q. Okay. Do you remember talking to police at all?
MS. SCHNIDT: Object to form. Vague as to time frame.
THE WITNESS: When you say talk to police, what do you mean? Like --
BY MS. ALZAMLI:
Q. During the course of the investigation, do you remember talking to the police?
MS. SCHNIDT: Object to form.
THE WITNESS: At the beginning of everything, you're saying, or talking --

Page 63

BY MS. ALZAMLI:
Q. At any point during this investigation, did you talk to the police who made themselves known to you as being involved in this investigation?
MS. SCHNIDT: Object to form. Vague as to time frame.
THE WITNESS: No, I haven't talked to no police. I don't --
BY MS. ALZAMLI:
Q. When the investigation was happening in 2001, you didn't talk to anyone?
A. Oh, oh yes. Yes. Yes. Yes. Yes. Yes. Yes. Yes, I did.
Q. Okay.
A. Uh-huh.
Q. So your testimony is the only thing that you remember about this investigation is that it has to do with Carl Reed?
MS. SCHNIDT: Objection. Form. Mischaracterizes his testimony completely.
THE WITNESS: Could you please -- please say that again?
BY MS. ALZAMLI:
Q. Okay. I apologize. Let me rephrase that. So your independent recollection of this investigation, the

Page 64

only things that you remember is that it was about Carl Reed and that you talked to police during the investigation --
MS. SCHNIDT: Objection.
MS. ALZAMLI: Is that right?
MS. SCHNIDT: Mischaracterizes his testimony.
THE WITNESS: Yes. And during the investigation, yes. They wanted to speak to me about the vehicle and about where did I get it from. And I told them where I got it from.
BY MS. ALZAMLI:
Q. Okay. And what did you tell -- where did you tell them where you got it from?
A. I told them I got it from a guy I know by the name of Chuck.
Q. And what else did you tell them?
A. They asked me where I get it from. I told them Chuck. I told them that -- how much I gave him for the car.
MS. SCHNIDT: Can you repeat that?
THE WITNESS: What -- how much he was asking for the car.
MS. SCHNIDT: And how much you gave him?
THE WITNESS: How much I gave him for the car. Yeah.

Page 65

BY MS. ALZAMLI:
Q. Okay. And again, I'm only asking you about what you remember, so --
A. Uh-huh.
Q. -- it's okay to say, like, that's all I remember. I don't remember. So the only things that you presently remember from your conversations with the police during this investigation is that they asked you about the car, you told them how much you paid for the car, and that you got the car from a man named Chuck?
MS. SCHNIDT: Objection. You're mischaracterizing his testimony. And that's not fair to do to a witness who does not have an attorney here.
MS. ALZAMLI: Ms. Schnidt, he can answer the question and say, no, I talked about this. He said, I talked about this. Please don't testify during the -- please do not obstruct the deposition. You can ask him questions when it's your turn.
MS. SCHNIDT: I --
MS. ALZAMLI: It's -- if you keep obstructing, I'm, like -- I just -- please, please, you can ask questions when it gets to your turn.
MS. SCHNIDT: I haven't asked a single

Page 66

question. I haven't testified, nor have I obstructed. But he is a witness and you are mischaracterizing his testimony by ending a question and saying, okay, so that's all you remember. That's not appropriate at all.

BY MS. ALZAMLI:

**Q. Mr. Burns --**

MS. SULLIVAN: Joined.

BY MS. ALZAMLI:

**Q. -- when I say, is that all you remember, and I'm summarizing the things that you told me, you can say, no, there's also this. No, you forgot this. And maybe I did forget. That can happen. Feel free to interject.**

**I am not trying to catch you up in something, okay?**

A. So look. I talked to them about the vehicle. First time interacting with them, my parole officer told me to get in the house because the police is looking for you. Don't go nowhere. The officers came to my sister's home. I asked them what's going on, and they told me, "Where's the car?" I asked them, "What car are you talking about? The white Maxima I've been driving in?" And they stated, "Yes. Where is it?" And I told them I'll show them where the car was. After showing

Page 67

them where the vehicle was, the officer clearly said, "Oh, no wonder we couldn't find it, because it has a handicap plate." Oh, okay. What that mean? Put me in the car. Took me to the police station. Asked me where did I get the car from? I told him where I got the car from, how long I had the car, who saw me in the car. They checked out, asked everyone, did you see him? He said, yes, this, that. That's it. They ain't ask me nothing else. I ain't tell them nothing else.

**Q. Okay. Is there anything else that you remember?**

MS. SCHNIDT: Object to form.

THE WITNESS: And being at Mr. Reed's house.

BY MS. ALZAMLI:

**Q. Okay. So you remember being at Mr. Reed's house. What do you remember about that?**

A. I remember seeing Mr. Reed. Asked him, did he have the paperwork? Because I liked the car. A cool car for a teenager. Well, not a teenager, but I was up in it. He said, yeah, he had the paperwork. We went to his house. I signed in. You have to give your ID to sign in that building. It's a government building. We signed in the building.

**Q. When you say you signed in, did you --**

A. So what --

Page 68

**Q. -- physically sign something?**

A. I don't -- yeah, I don't sign in. Uh-uh. It's a lady behind the desk or it's a gentleman that works in those SRO buildings. In order to get in there, you have to sign -- so you got to give them the ID.

**Q. And then, like, she signed it?**

A. Yeah, she signed.

**Q. Okay.**

A. Yeah.

**Q. Do you remember if it was a woman or a man working at the desk?**

A. It was an older lady.

**Q. It was an older lady?**

A. Older lady. Then she buzzed us in. We went up and -- like, third floor. He said he had to go. He -- he always say, my payee. I mean, I'm -- I ain't know what a payee was. So he get in his house. It's about this size. Now I'm young. He said, "I'm going to go downstairs with my payee. He got it." Okay. So I'm sitting in the apartment. This is taking too long. What the fuck is going on? I'm getting impatient. So I leave out. Once I open the door and leave out the hallway, and then I see my friend Lester from the neighborhood.

**Q. He was your friend?**

Page 69

A. Yeah. From the neighborhood. Uh-huh.

**Q. Oh, how long did you know him?**

A. Wow. Over, like -- probably over ten years, if not a little longer, just in the neighborhood. Older -- older guy. Like, father figure. Older, cool guy. They say, "what you -- what you doing here, young blood?" I say, man, I'm waiting for Chuck to bring me this title to buy me a car. I'm going to buy a car. He was like, "I don't know." I'm like, "What?" He's like, "I ain't never seen him with no car." And I said, "Well, he say he got a car. I'm going to check it out." So about small talk, this, that, and I look over and I see the door. It's, like, taped up in dust and I'm like, damn, what happened right there? And he said, "Oh man. He find somebody in there." I said, "Oh, wow." By this time, Chuck coming up the stairs, up the hallway. And he's like, "What you do in the hallway, man?" So he walk off. Lester -- Mr. Lester walk off. All right, be careful. He walk off. He said, "Come on, man, what you doing in the hallway? Come back in the house." I said, "Nah, I ain't going back in the house. Where the paperwork at?" He said, "Come on, man. I got -- I couldn't get it right now, but come back in the" -- I said, "I ain't going back in the house. I said, here. Here go the keys, man. It's parked over there where you

showed me it's at. I say, look."
**Q. So you gave him the keys back at that point?**
A. Yeah. I gave him -- after riding around with him, then he said, you know, he wasn't -- he was going to give me the paperwork, you know? And then I spoke with some police before then, you know. I told them about the car because I knew him from the hood. It was early. I was outside. Nice car. It was nice, warm. I'm fixing to go out. But I was like -- I just -- it just seemed like something wasn't right. So I'm like, hey, come check this car. And it was parked by Goudy School.
**Q. You -- just some cop you saw walking around?**
A. Yeah. Yeah. They -- they -- early morning beat. Seen me some dicks. Dick boys. That's what we called them.
**Q. Oh, like, did you know them or no?**
A. Yeah, they arrested me before. I just don't remember their name. Yeah.
**Q. Okay. So it was more than one person?**
A. Yeah. It was two police in the car.
**Q. But you don't know their names?**
A. Yeah.
**Q. But they arrested you before?**
A. Yeah. I -- yeah. So I -- they -- he looked


at the car. They -- I walk them over to the playground parking lot. I had it parked over there. And he told me, he say, "Look, you know you don't buy no car without paperwork."
**Q. The police told you this, or Lester?**
A. The police told me --
**Q. The police told you that.**
A. -- you don't buy no car without paperwork. Second off, we see your ass in this car, we going to take it because it ain't got -- we -- now we know you ain't got no paperwork, Burns, and it got a handicap plate. So I'm like, "Oh, shit." So me, you know, ride around anyway. You know, but then I parked and that's when I went -- when he told me he had the paperwork, I went to his house with him later on that night.
**Q. Was that the first time you had been in his house?**
A. That was the first time I been -- we had went in his house.
**Q. Okay.**
A. Yeah. Yeah.
**Q. That was the first time you'd been to that apartment?**
A. In that apartment. Yeah.
**Q. To -- was it the first time you'd been to the**


**SRO?**
A. Well, the -- the -- like, to see him. Like, well, in that building period. I didn't know nobody in that building. I knew Mr. Lester, but I never signed -- hey, I'm going to visit somebody. Nah. Not -- never. That was the first time physically, like, going in there, going in the apartment like that. But after riding around that day and going to the car wash on -- on Broadway over there, because I always would go over there to the car wash and he cleaning the car out, whatever. And I'm looking and I see some paperwork, but it didn't say, like, you know, the -- the registration, it didn't say his name on there, Chuck. It ain't say -- I only knowed him by Chuck.
**Q. Yeah. Do you -- what name --**
A. Street name. I ain't know -- you know. I know Chuck and how Chuck looked.
**Q. Right. So you found these papers that had a different name on them.**
A. Uh-huh.
**Q. Do you remember what the name was?**
A. I don't remember the name.
**Q. Did you leave the --**
A. But I -- I don't remember the name, but I remember it was Chuck building.


**Q. Was it -- did you know where Chuck's building was? Like, did you know where he lived?**
A. Yeah, he lived in the SRO on Sheridan.
**Q. Oh.**
A. Yeah.
**Q. And you knew that, like, when he first sold you the car?**
A. Yeah. Because he from the neighborhood. I knowed him from the neighborhood, too. Walking around. Yeah.
**Q. Okay.**
A. Yeah.
**Q. So you knew that he lived at the SRO?**
A. Yeah. That wasn't the first time I ever met him in my -- nah. He from the hood. I knew him. Yeah. He smoked crack from the neighborhood.
**Q. You smoked crack together?**
A. I said he did. Yeah.
**Q. Oh, he smoked crack?**
A. Yeah. I knew him from the neighborhood.
**Q. Okay. When you say you know him from the neighborhood, can you tell me a little bit more, like, what that means?**
A. Like, walking around, you know. He was always a clean guy, you know, walking around that -- wasn't

like -- when I say clean, wasn't like a bum, you know, like, some people just don't take care of theirselves. So he was, you know, from the neighborhood. Always quiet, you know, unless he was coming to get high or something, you know. And that was it. But --

**Q. Had you ever hung out with him before?**

A. Never. I ain't have no reason to hang out with him.

**Q. Was the first time you guys talked was when he came up to you to sell the car to you?**

A. About the car, yeah.

**Q. So when you found the papers in the car with a name that was not Chuck's name --**

A. Yeah.

**Q. -- did you just leave the papers in the car?**

A. No. It kind of made me like, hmm, what the fuck? I remember what the police said. And then that's when I was like -- I went over there and I was like, hey, the lady was in -- I forgot. I think it was the same little short lady. And I was like, "You know this guy? This guy live here?"

**Q. So you went to the -- so you had been to the SRO other than when you talked to Carl?**

MS. SCHNIDT: Mischaracterizes his testimony.

THE WITNESS: So it'll be the second time I've been to the SRO. The first time was when I seen the registration.



BY MS. ALZAMLI:

**Q. Okay.**

A. And I asked the lady, "Hey, this guy live here?" And she said, "No. Uh-uh." "Oh, okay." Second time going to the SRO is when I seen Chuck later on that day and he said he had the paperwork. That was the last time I went in that building, signing in, period.

**Q. So once you showed the desk lady the paperwork, what did you do with it after that?**

A. I just -- the car was clean. It was nice out. I just threw the shit away because -- yeah.

**Q. Oh, you threw the papers away?**

A. Yeah, I threw it away.

**Q. Okay.**

A. It was --

**Q. Okay. What else do you remember other than what you've told me so far?**

A. Showing them where the car -- that -- going back to the station. I think that -- I didn't stay there that night. They -- they told me -- they -- stay in the house and they going to come back the next day or something. I was like, "All right." My mom was nervous. She was like, what's going on, this, that. So I said, I'm -- just relax. About this car and it was, you know, nothing. She was like, "Be careful." So they came. They say -- they came, took me back down there. But during the course, I told them about the officers. And they was, like, real nonchalant, like yeah. "Oh, yeah. What district? Where you at?" And I was like, "20th District," you know? So they drove over there to the old building on Foster. They drove over there and he went in there for a few minutes. I don't know which one it was went in there, but one of them went in there and he was in there for a minute. And I was, you know -- and he came back. And he looked at his partner and was like, "He ain't there." He was like, "What do you mean, he ain't there?" He said, "I talked to him over the phone and he clearly said that Mr. Burns was kind of worried about buying this car without paperwork." And what he said was what he said. If they see him in it, they going to take it, because they know he ain't got paperwork and give the car back or get the paperwork. Went back. We was driving. He say, "You hungry?" I say, "Yeah, I'm hungry." You know, I ain't have to take my insulin until 5:00. I only take it in the morning and at night. We were driving. He got me something to eat. We went back and sat me in the room. That day, it was, like, the same questions. Where you get it from?





This, that, da da da. You remember -- like, so the same thing. I said the same thing. And -- can I have some water?

**Q. So there was two -- so you were in the station two days in a row, but not overnight?**

MS. SCHNIDT: Mischaracterizes.

THE WITNESS: No. No. That's what I said. They took me home. Yeah. I ain't have to -- I ain't have to stay. They ain't tell me to stay.

BY MS. ALZAMLI:

**Q. Okay. And there was -- so you remember an interview happening on the first day and then an interview happening on the second day kind of with the same questions?**

A. Yeah, same thing.

**Q. Okay. And you told the police everything you knew on the first day and on the second day?**

A. Yes. Same thing I just told you. Yes.

**Q. And was it the same officers who interviewed you on the first day and on the second day?**

A. Yes. Yes. Yes, it was. They didn't change.

**Q. Did you have more than one interview on the first day?**

A. Yeah. One officer come in, asked me. Then the next officer come in and asked me something

different. And then one of the -- one of them came in and was like, "Are you -- you gay?" And I was like, "Nah man. Why do you ask me that?" And he was like, "Oh, I just wanted to know." And then he said, did I hang out with Mr. Reed? And I was like, "Who, Chuck?" And he was like, "Chuck?" And I was like, "I know him as Chuck." And he said, "If I show you a picture of Chuck, would you know him if you see him? Chuck, who you got the car from?" I say, "Yeah." He showed me a -- some pictures. I said, "This -- that's Chuck right here, man."

**Q. When you said -- when you're saying he showed you some pictures, did he show you multiple pictures?**

A. Yes.

**Q. Multiple pictures of the same person or --**

A. No, it was some different -- it was different. Different.

**Q. It was different people?**

A. Yeah. I remember it -- I -- it was different people.

**Q. Okay.**

A. And I say, yeah, that's -- that's Chuck right there.

**Q. When he said Mr. Reed, how did you know he was referring to Chuck?**



A. You said what?

**Q. I'm not -- I'm just trying to understand, like, what you were saying. So if I misheard you, let me know. You said something along the lines of he told you, oh, something, something, Mr. Reed. And then you said, oh, you mean Chuck? Is that -- did you say something like that?**

A. Yeah. Yeah.

**Q. Okay. When he said Mr. Reed, how did you know he was referring to Chuck?**

A. Because when he said Mr. Reed, where you get -- we was talking about the car. And he didn't know no Chuck until I started saying Chuck. And that's when he said, "You mean Mr. Reed?"

**Q. I see. So he was saying, you know, we know that Mr. Reed sold this car?**

A. Yeah. Yeah. He ain't say, I know Chuck sold you this car. You know? He's calling him by his real name.

**Q. Okay. I see.**

A. But I was saying Chuck. Chuck. And that's when he was like, "Chuck? If I showed you a picture of Chuck, would you -- would you be able to tell me who Chuck is, or would you be able to" -- and I was like, "Yeah." So Chuck was Mr. Reed.



**Q. Okay.**

A. I didn't say. He didn't write nothing on no paper. Nothing. His Mr. Reed and my Chuck was the same person when he showed me that paper with no names on it.

**Q. Okay.**

A. So that was it.

**Q. Got it. And then -- so they took you home at night, so you got to go back home. Did -- was there any other time that you left the station during your interviews?**

A. No. Just to go home, take my medicine, because I didn't have it on me. So they kept me there for a -- a little while. I had to go back, get the medicine, told my mom don't worry, it'll be all right. He'll be back. And then we went back. That's when he got me something to eat. Went back and this -- other officers come in. They was just asking the same questions, but different. Leave something out, but different. But I was like, "Dude, this is what it is. I know him." Do you know him, how you know him? This and that. And I just told them, from the street. That's it.

**Q. Is there anything else you remember about all this?**

A. No. That's it.

**Q. At any point, did they tell you that you were**



**a suspect in the murder?**

A. No.

**Q. Were you worried about being a suspect?**

A. I didn't know what was going on until -- I just knew he said I had a stolen car. The car was stolen, this, that. And then, I was like, "Stolen?" And then he said, "Yeah. You -- you got a unfortunate -- sorry, but you got a dead man's car." I was like, "Oh no." And that was that. I was like, oh man, I don't -- all I know is he just tried to sell me the car, man. I don't know nothing. And that was it.

**Q. And so the first contact you had with the police was when your parole officer called you, you said, and told you that they were looking for this car?**

A. Yeah. They -- so he -- he called my mama looking for me. My mama called me like your parole officer's calling the house. You need to get home. He said, get home now and don't go nowhere. Call him when you get here and some officers going to be there.

When I was running to the crib from hanging out, they was everywhere. They was all behind my sister house, all in the front. I'm like, damn, what the hell going on? I ain't violating nothing. What the -- what's going on? Only time I'm thinking police going to be outside, I violated parole. But I'm like, I ain't

Page 82

did nothing. So --
**Q. When you got home, there was police everywhere?**
A. Yeah. They was in the back of my sister house. They was in the front.
**Q. Like, how many patrol cars?**
A. I don't --
MS. SCHNIDT: Object to form. Foundation.
THE WITNESS: -- remember, but it was a lot. I don't remember how many cars, but it was -- it was a lot.
BY MS. ALZAMLI:
**Q. It was more than one car?**
A. Yeah. It was more than one.
**Q. Was that scary?**
A. Absolutely. For a young Black man, yeah it's scary.
**Q. When they knocked on your door, was it one person knocking on your door?**
A. No. It was -- it was a -- a couple of them. Yeah.
**Q. And then they asked you to go with them to the station?**
A. Yeah.
**Q. Did anything else happen or do you remember**

Page 83

**anything else happening or you just went to the station with them immediately?**
A. No, I wasn't going to the station with them. Once -- once they got me and then they said, "Where the car?" I was like, "The car?" He was like, "You know what the fuck car I'm talking about. Where's the car?" And I was like, "What, the white Maxima?" He, like, chuckled. "Yeah." I said, "Oh man, that car was parked where Chuck tried to -- the guy, Chuck, tried to sell me a car." He was like, "Show us where it's at, then." So I took them over there, showed them the car. He was like, "You got the keys?" I said, "Nah, I ain't got no keys. I gave them back to him. Been gave him back them keys." So they was just hovering around the car, looking, talking. Never forget that part. I just know he had a trench coat on. Like, I don't know the difference between them, their names. And lit his cigar. He said, "Yeah, we got it." Smoking. He was like, "No wonder we couldn't find it. Got a freaking handicap plate." He was like, "Where are the keys?" I was like, "I don't got no keys, man." I'm like, "I gave them back to him because he ain't had the paperwork." He was like, "All right. Get in the car." He put me in the car and then that's when they took me to the police station.

Page 84

**Q. Okay. Then --**
A. That was the first time going to the police station. But they wanted to know. I was not leaving my sister house without telling them, where is the car.
**Q. Okay. So you took them to the car first, then you went to the station. At that point, you did not have the keys?**
A. No keys.
**Q. Okay. You gave the keys back when you went with Carl back to his apartment?**
A. Yes.
**Q. Okay. When did you get the keys? Do you remember when you got the keys?**
A. First night, I got the keys and then we was all chilling outside. It was kind of -- it was kind of late, a little bit. Not late, like that. But we was all out. It was nice out and I was seeing them all, like, half the day, just breezing a little bit. And then later on at night, he was like, you got a car. Now first, he came with a radio and some shit. And he was like --
**Q. Chuck came with a radio?**
A. Yeah.
**Q. Did he come, like, with the car and the radio or how did he --**

Page 85

A. No, that was just on hand, on foot.
**Q. He was carrying it?**
A. He had the shit on foot. Come through the block. The block is the street where we hang at.
**Q. Yeah.**
A. Come through here, I don't want that shit. Get out of here. No, we don't want no radios. Get out of there.
**Q. When you say the block was where you guys hung out, like, what was that block?**
A. Argyle and Winthrop.
**Q. Argyle?**
A. Right there in that area. Right there.
**Q. And you were with a lot of people?**
A. Yeah, we was -- yeah. It was a lot of people. Lot of people out out back -- back then. Yeah.
**Q. Like a big group of friends or just people from the neighborhood?**
A. Yeah. Neighborhood, friends. It was still kind of early out. It wasn't too late.
**Q. Like, was the sun still up?**
A. No, it was dark.
**Q. It was dark. Okay. So he came by with the radio or the stereo?**
A. Yeah. Something like that. Yeah, I think it

was --
**Q. And you were like, "I don't want anything to do with that"?**
A. Yeah.
**Q. Okay. And then what happened after that?**
A. Then he gone. He left. He was gone. Came back maybe an hour later or something like, hey, I got -- you want to buy my car? Everybody like, you know what man? Get your old ass out of here. What's up? You got a car? He was like, yeah. He brought the car.
**Q. He physically brought the car to the block?**
A. Yeah. He drove up in the car.
**Q. Okay. He drove up in the car?**
A. He drove up in the car. I'm like, "Damn, how much you want for that?" He was like, "Give me 250." I was like, "This motherfucker must be stolen, 250." And he was like, "No, it ain't stolen. I got the paperwork. Got the paperwork, all that." I hesitated for a minute. So I'm, like, looking around. I said, "Man, give me the paperwork, man." You know, have the paperwork. I gave him 30 bucks, $30. It was late. The next day I was riding in the car. That's when I seen the police.
**Q. Wait. So that first night when he drove the car up and you gave him the $30, that's when you got the keys?**



A. Yeah.
**Q. Okay. So you got the keys the first time you saw him with the car?**
A. Yeah. First time I saw him. Yeah. Yeah. The second day I had the car. It's hot outside. I got up early, hey. But then I just -- and that's when I seen the officers and I told them about the car.
You see, then they told me, hey. Me, hard ass, hard head. I go get the car cleaned up. That's when I seen the paperwork, though. After getting it cleaned, I seen the paperwork and then I drove over there. I was like, man -- I was like, nah, I don't know him. Whether he -- she did or not, she ain't got to tell me, hey, yeah, he lives here.
**Q. Okay.**
A. She ain't got to tell me he live here just because I walk in, hey, do you know this guy? Do he live here? She said, "No, he don't live here." Oh, okay. Driving around, see him, park the car. See him later on, see he tell me, "Man, I got the paperwork." That night, I gave him the keys. I said, man, you ain't got no paperwork. You been gone too long. First of all, you ain't got no paperwork. Here. Gave him his keys back. That was it. Didn't see him no more until police started looking for me.



**Q. Right. That night when you were in his apartment is when you gave him the keys back and said, you've been gone too long and you don't have papers?**
A. I gave him the keys when he was in the hallway. When he came up saying --
**Q. In the hallway?**
A. -- go back in the house.
**Q. Okay.**
A. I still had the keys when I was in the -- because I had the keys.
**Q. Yeah.**
A. You going to go get the papers. I got the keys.
**Q. Yeah. Yeah.**
A. Yeah. When I came in the hallway and he was wanting to get me in the house, I'm not going in the house. Where the paperwork? You said you have it. Just give me the damn paperwork, man, and let me go. Get the rest of your money and I'm gone.
Well, he said, "Nah. Wait until later. I'll get it in a minute -- I just can't -- yeah. I'll get it later." I said, "That's" --
**Q. Do you remember how --**
A. That's it.
**Q. Sorry. Do you remember how long that was**



**between when, like, you first gave the $30, got the car from him, and then when you gave back the keys? How long were you --**
A. It was, like, later on that night.
**Q. Okay.**
A. Some -- later on that night, I think we went -- if I can remember, we went to his house.
**Q. So you had the car for about one day?**
A. Somewhere around there. Yeah.
**Q. Okay.**
A. I remember about a day. Yeah.
**Q. Is there anything else you remember about any of your interactions with Chuck?**
A. No, that's it. That's all I remember.
**Q. Was there anything else you remember about any of your interactions with the police related to this investigation?**
A. Nah, that's all I remember. Yeah, that's it.
MS. ALZAMLI: I think now is a good time for a break since we've been going for a while. So --
THE VIDEOGRAPHER: We are now off record. The time is 11:28 a.m.
(A recess was taken.)
THE VIDEOGRAPHER: We are back on record for the deposition of Ricardo Burns. My name is Taylor

Welsh. Today is February 3rd, 2025, and the time is 11:43 a.m.
BY MS. ALZAMLI:
**Q. Okay. Mr. Burns, thank you for sitting here today. So we just went through everything that you had an independent recollection of from this case; is that right?**
A. Yes.
**Q. Okay.**
A. Yes.
**Q. Is there anything else that you remember, other than what we talked about?**
MS. SCHNIDT: Object to form.
THE WITNESS: No.
BY MS. ALZAMLI:
**Q. Okay. And everything that you told me was the truth, and it was -- everything you told me was the truth?**
A. Yes.
**Q. Okay. Did you talk to your family about all -- your sister about this after it happened?**
A. Yeah. They wanted to know what was going on. My brother and -- and Mama, they didn't ask me what was going on. Something was wrong with them. Was showing concern about her brother in jail. Some precinct. And



my mama saying, hey, what is going on with you and a car and -- what's going on? Police at the door.
**Q. Yeah.**
A. Now, if they didn't say that -- I think there's a lot of family out there that probably don't even ask their kids that. They don't care. But my family do care.
**Q. Did you get a lawyer at any point during all of this?**
A. No. For what?
**Q. Okay. And then when you came home that first night, you stayed at your mom's house or was it your sister's house?**
A. Yes, my sister. We were staying with my sister. Yes.
**Q. And you talked to them that first night about everything that happened?**
A. Yeah. They was concerned. Asked what happened, what was going on, because they wasn't there. Yes.
**Q. Do you remember what you told them about what was going on?**
A. About the car and pretty much the same story I told the officers.
**Q. And do you remember about what time the next**



**day they picked you up?**
A. Yeah, I don't remember. I know it was day -- daylight outside. Yeah. It was daytime. I don't remember the actual time.
**Q. And then you went back to the station and do you know how long you were at the station for?**
A. Until dark. Until the sun went down, I believe. Yes. Until the sun went down.
**Q. Was it until you gave your final statement? Which, to clarify, when I say final statement, I mean your handwritten statement that was taken by ASA Adduci, Bates stamp CD Reed 49 through CD Reed 56. I designated it as an exhibit to your deposition earlier. I don't know if --**
MS. ALZAMLI: You know what exhibit it was?
THE REPORTER: 2.
BY MS. ALZAMLI:
**Q. So it was Exhibit 2.**
**Do you remember this document?**
A. I don't remember. Yeah.
**Q. You don't remember looking at this document at any point in time?**
A. No, I don't remember. It's been a while. I don't remember.
**Q. Okay.**



MS. SCHNIDT: I'm sorry. I couldn't hear.
THE WITNESS: I said it's been a while. I don't remember looking.
BY MS. ALZAMLI:
**Q. Okay.**
A. Yeah.
**Q. This document --**
A. During that time.
**Q. Sorry?**
A. Yeah. During that time, I don't -- from then to now, I don't remember this document.
**Q. Okay. Do you remember when you gave this statement? Like, do you -- I'll rephrase. Do you have an independent memory of giving the statement to the ASA who took it from you?**
A. Yes. I remember sitting and talking to them, but yeah.
**Q. And this statement, on the second line from the top, says, taken on 22nd, July '01 at 2345. I believe 2345 is 11:45 p.m. So does that refresh your memory at about what time you were at the station for?**
A. I think that was the first time I was there. Kind of, like, late like that.
**Q. The first day you were there late?**
A. I think that was late. Yeah. Because it was

-- it was dark the first time when I showed them the car and then they took me there. So that was -- I was there kind of late during that first interview with them.
**Q. Okay.**
A. And the second time, I know they picked me up early, but I don't recall like what -- what time I got out of there. I -- I don't remember.
**Q. Was it still daylight outside?**
A. I think it was starting to get dark afterwards, if I remember. I don't remember. I'm sorry.
**Q. No, that's okay. So you mentioned that when you picked the photo of Chuck --**
A. Uh-huh.
**Q. -- they had showed you photos of a few other people. Did you do any other photo selections while you were at the station or at any time?**
A. Just with the ones they showed me. I don't know how many they showed me, but they were all, like, on the table. Yeah. And before, that was the only time they showed me them.
**Q. Okay.**
A. While we were talking about that.
**Q. Was that the only time that you ID'd somebody in this case with a photo?**


A. Yes.
**Q. Okay.**
MS. SCHNIDT: Object to form.
BY MS. ALZAMLI:
**Q. Other than that, if you had to tell the police about a witness who was going to corroborate your story, were you just able to tell them the name and where to find them?**
MS. SCHNIDT: Object to form.
THE WITNESS: That was a friend of mine that was standing outside with me.
BY MS. ALZAMLI:
**Q. Oh, your friend was standing outside with you. When?**
A. Are you asking -- could you repeat that for me?
**Q. Yes. Okay. So in your statements, you mentioned a few people who you talked to or who were around when this all happened, right?**
A. Uh-huh.
**Q. Okay. So when you told the police about those people, did you just give their names and their addresses or how did you communicate to the police who those people were?**
A. I just told them that, you know, one of my


friends Pistol -- you know, that's what we called him on the street, Pistol, you know, he was out -- he was on the block with us that night. You know, he overheard the car wanted to be sold to me, you know? So we did ride around looking for him, but Pistol wasn't over there. He was a late night cat. Yeah.
**Q. You were with the police on the ride around to find Pistol?**
A. Yeah. That was during the time when they was -- when they -- the second time when they picked me up to go talk to the police officer. And then that was during that same time before we went back to get lunch and then go to the station.
**Q. And you couldn't find him?**
A. No.
**Q. Was he a good friend of yours?**
A. Yeah, he's -- yes. Uh-huh.
**Q. Did you ever talk to him about this whole situation after?**
A. No.
**Q. You didn't tell him?**
A. No.
**Q. Did he ever ask you about the car since he was there when he sold it to you?**
A. Well yeah, they was on the block with me. We


was every day on the block. It was like, you know, Magnus or Winthrop going on. That was our -- our safe haven. So that's where we was all at so they seen me driving in the car, yeah.
**Q. So there was Pistol who was with you -- and you said there was a lot of people with you on the block, right?**
A. Yeah.
**Q. Like a ton of people? Yeah. Do you know somebody named Kornell? Kornell Jones or Kornell Johnson?**
A. I don't know a Kornell. That -- I don't know a Kornell.
**Q. Yeah.**
A. Yeah. I know -- I think they said his name wrong.
**Q. Who do you think said his name wrong?**
A. I think -- I think his name was mispronounced. It was probably Correl not Kornell.
**Q. Do you think the right name was Kornell or Correl? Just so that -- because I'm confused if you're saying --**
A. Like Correl. Call him Correl.
**Q. Okay. His name was Correl?**
A. Correl. Yeah.

Page 98

Q. But on the reports they wrote Kornell? Is that --
A. It might be a pronouncing -- I might be pronouncing his name wrong but I call him Correl.
Q. Oh, okay. So you -- so you did know someone named Correl?
A. Yeah.
Q. Okay. And he was there, too?
MS. SCHNIDT: Objection. Mischaracterizes.
BY MS. ALZAMLI:
Q. Was he there, too?
A. Yeah, he was on the block. Yes.
Q. Okay. Where did you see the misspelling of his name?
A. When you just said it and then that report that I could read. I'm like, wait a minute, this ain't --
Q. Oh, the typed one?
A. Right. Yeah, the typed one.
Q. Okay. At this point, I don't even know where I put my copy. Just take a look to try to find it together. So we're looking at supplemental report, which is Bates stamped CD Reed 110 through CD Reed 128. I think this was marked as Exhibit 3 to your deposition.
MS. SCHNIDT: Can I put the sticker on it?

Page 99

MS. ALZAMLI: Do you have -- do you have your copy?
MS. SCHNIDT: Oh.
MS. ALZAMLI: I can give you another one. Oh yeah, you have your copy.
MS. SCHNIDT: Nope. No. Wrong one.
MS. ALZAMLI: Here. Here. Wrong one.
THE REPORTER: All I know this one's the second one that I'm putting on. Just to keep everything --
MS. ALZAMLI: Okay.
THE REPORTER: And here is this.
MS. ALZAMLI: Okay, great. Just so that we're all talking about same thing. Great, so 3.
BY MS. ALZAMLI:
Q. So there's a section of this that you saw with the name and you thought, oh, that's not right. Is there anything else that you saw while you were reviewing this that you were like, oh, I don't think that's right?
A. No.
Q. Okay. I'm just going to quickly check what pages you actually have so that I know I'm asking you about what you actually had; is that okay?
A. Yes.

Page 100

Q. Okay. So you had Page 10, which is also Bates stamped CD Reed 119, Page 11, Page 12 and Page 13, and you also had Page 18. Okay. And you said you reviewed this, right?
A. Yes.
Q. Yeah. Okay. You know how you mentioned to me that you signed in or the lady signed you in to the -- did anyone ever show you that sign in log?
A. That's behind the desk.
Q. Behind the desk.
A. I ain't never seen it though after that.
Q. You never saw it after that?
A. Yeah.
Q. No?
A. I don't know.
Q. Did the police ever tell you like, oh, your story checked out? Like, we confirmed that you signed into the log or anything like that?
A. They never told me that. No. Just did their own homework. They didn't tell me that, nothing --
Q. Okay.
A. -- about sign in sheet because I knew I had to sign in. So when I told them that I had to sign in, of course, they going to do their homework and check. All they -- all my -- they had to do was be signed in on

Page 101

that paper with the lady who signed me in. I'm pretty sure the building got cameras, too, had cameras. They -- they seen me give them to what's her name. So they did their homework.
Q. Yeah. Okay. So here we have your friend Pistol who was known as Duran Watts. And you said you guys had never found him, huh?
A. Nah. No.
Q. Okay. And here on Page 13, the top of the page, if you want to look on -- follow along with me, I'm on Page 13 of 19 of Exhibit 3. At the top that's the Kornell Jones that you think maybe was a mistype and was supposed to be Correl?
MS. SCHNIDT: Mischaracterizes.
THE WITNESS: Yeah, it should be Correl.
BY MS. ALZAMLI:
Q. Okay. And why do you think that it should be Correl?
A. Because I know -- I know of a Correl.
Q. Okay. And that -- and you remember telling the police about a Correl who was there with you?
A. I saw -- I know Correl -- Correl, not no -- I don't know, Kornell. I know -- and then looking Kornell Jones. I know a Correl, not no -- not no Kornell -- Kornell. I don't know Kornell.

Page 102

Q. Okay.
A. We called him Cody. I don't know.
Q. Okay.
A. I don't know who Kornell is.
Q. What -- do you remember telling the police about a Correl and that he was -- he could corroborate your story?
MS. SCHNIDT: Objection. Mischaracterizes his testimony.
THE WITNESS: I said Pistol.
BY MS. ALZAMLI:
Q. Okay. So you only told the police about Pistol?
A. And Correl was outside with us, yes.
Q. Okay. So you told the police about Pistol and Correl?
A. Outside.
Q. Okay. He was outside with you guys? And you mentioned that you were -- you had known Lester for ten years, right?
A. Uh-huh.
Q. Had you ever, like, visited him before?
A. No.
Q. No. Where'd you guys like hang out?
A. From the street.

Page 103

Q. You'd hang out on the street?
A. Usually. The neighborhood, older guy.
Q. Yeah.
A. Would've been our daddy.
Q. What would you guys do when you would hang out together?
A. Who'd you say Lester?
Q. Yeah.
A. Lester was a neighborhood old guy. He was under the influence of narcotics as well, unfortunately. Yeah. So yeah. But we all treat him with respect just because he had an addiction but, you know, yeah. I still have morals. Seeing him in -- in how he carried his self then just because he had an addiction, I didn't look at him no different. He is a nice guy.
Q. You mentioned earlier that he -- you guys were friends? Would -- were you guys friends?
A. Yeah, I can say he's a friend, yeah.
Q. Can you tell me a little bit about what your friendship was like?
A. Just like a old school -- I'd say like father figure like, you know, and I was always taught to respect your elders, you know, so that's how it was with him, you know. It was -- like I say, just because a person has an addiction, I didn't look at him no different. You know, he was always a nice guy and carried his self with respect, so...

Page 104

Q. And other than like hanging out on the block together, did you ever do anything else like get food together or do anything --
A. No, none of that. Nah --
Q. You were just --
A. -- just mutual neighborhood, walked past friends and I mean, walk past, see him in the street, you know, and that's it. That's it.
Q. And so when you saw him in the hallway and he told you about the dead guy in the building, you knew to trust him because you -- did you feel like you could trust him?
A. It depends on what you mean by trust him because we are just talking. I seen him at the door taped up like that. I'm like, "Hey, what the hell happened now?" And he just said what happened. He gave me some news, what happened next door. So I said, oh, okay. It didn't have nothing to do with trusting.
Q. Was that the only time that you guys had talked about this -- about Chuck or Carl?
A. Yes. Yes. That's the -- yeah, that's the first time. Because he was like -- he never seen me in the building before so he was like, hey. When I stepped out, it was a chain reaction like, hey man, what's up? What are you doing? Like, hey -- that's when that -- yeah.

Page 105

Q. Okay. I want to ask you a couple more questions about when you got the keys, just if you remember. When you got the keys, and I know this was an old Maxima so I don't -- I don't know what car keys used to look like back then. Did the car key have a fob on it?
A. Nah. It ain't have no fob. I don't -- nah, no fob.
Q. Did it -- was it just a --
A. Not to my knowledge. I don't remember it having a fob.
Q. Was it just a metal key or did it have anything on it like black rubber or anything else on it?
A. I don't remember.
Q. You don't remember?
A. Yeah, I don't remember.
Q. Other than the papers that you found inside the car, did you find anything else inside the car?
A. No. Paperwork and -- no, that was -- that was it. Yeah, it was just -- it was a pretty clean car. Yeah.
Q. Was there anything in the trunk that you,

Page 106

like, checked for or looked at?
A. Spare tire, CD player, had a disc changer in the back.
Q. You said a disc changer?
A. A CD disc changer.
Q. Oh.
A. Old school cars, they had disc changers back then in the back. That -- a fairly clean car.
Q. Okay.
A. Yeah.
Q. And you said you were driving it around for about a day?
A. Yeah.
Q. And you said you didn't know anyone named Rodney?
A. No.
Q. You didn't tell the police that you were with someone named Rodney?
A. No, I don't know a Rodney. That's why I asked you a nickname.
Q. Yeah.
A. So I'm going to tell you, growing up in the hood, we go by nicknames. So I know your nickname. I might have known you 30 years and never met your mama but I know your nickname. That's just growing up in the

Page 107

hood, in the urban and Latino communities. We -- we go by nicknames. If the police pull you over, we're going to tell you the nickname. I don't know his name. Police got the nickname in the database because Rick Rock been in jail before so he going to pull up a picture of Ricardo Burns. That's how it goes. So I don't know Rodney, unfortunately. I'm sorry.
Q. No, that's okay. I'll show you something, maybe it'll bring back memories. I will now designate Exhibit -- I think we're on 6 of your deposition.
MS. ALZAMLI: Can I get a sticker for this one? Are we on six? Is that right?
THE REPORTER: Yeah.
(Exhibit 6 was marked for identification.)
MS. ALZAMLI: Thanks.
BY MS. ALZAMLI:
Q. And this is a General Progress Report, Bates stamped CD Reed 94 through CD Reed 98. There you go. Have you seen this document before?
A. No, I don't remember this and this.
Q. No. Okay. So this document on the first page says, Statement of Burns, Ricardo P., and the date of the report is 21st, July '01. Do you remember -- and it says that the time of the interview was 21st, July '01

Page 108

at 005 hours, which is like five after midnight. Do you have any memories of this or does that -- do you remember giving this interview?
A. Yeah, I don't remember.
Q. You do or you don't?
A. I don't.
Q. Okay.
A. I don't remember that.
Q. Okay. I just wanted to show you -- you're more than welcome to read the entire document. And if you want to read the whole document, you can. I just wanted to show you something on the first page and see if it brought back your memories of who Rodney was.
A. Okay.
Q. So why don't we start with the first page. So I can just -- I'll read it out loud and -- because I know it's handwritten so we can -- you can try to follow along and see if I'm reading it correctly.
A. Okay.
Q. "So Burns stated he knows Chuck from the area of Winthrop and Argyle and has" --
MS. SCHNIDT: And I'm sorry, what page? You said the first page?
MS. ALZAMLI: I'm on the first -- yeah, I'm on Page CD Reed 95.

Page 109

MS. SCHNIDT: So the second page of this exhibit.
MS. ALZAMLI: Yeah, the second page of the report. Yeah.
BY MS. ALZAMLI:
Q. "So Burns stated he knows Chuck from the area of Winthrop and Argyle and has known him for approximately four weeks. Monday, 16th, July, Burns stated Chuck approached him on" --
MS. SCHNIDT: Monday, 16th, July '01.
BY MS. ALZAMLI:
Q. "Monday, 16th, July '01, Burns stated Chuck approached him on the street by 5012 North Winthrop at approx 2345 hours. Burns was talking a couple of friends. Rodney, who stays on the south side about 500 South May. Rodney's girlfriend," and I can't make out those next two words. Like, something and then it kind of looks like clock, but I'm not sure if it says clock.
So does reading that section about Rodney and where he lives, does that bring back any memories of you knowing someone named Rodney?
A. Yeah, so Rodney, we ain't calling him Rodney. Like I said, his name is Ronney (phonetic). We call him Ronney. Lil Ronney.
Q. Lil Ronney.

Page 110

A. Lil Ron, yeah. Not Rodney.
**Q. Okay.**
A. So we shortened that up. It's -- yeah.
**Q. Okay.**
A. And 50th and May, that's -- yeah. So yes, that's -- that's a friend.
**Q. Okay. You know him?**
A. Yeah. Yeah, I know him. Yeah.
**Q. Okay.**
A. I just don't know the -- the Rodney, that kind of threw me off.
**Q. For sure. Do you know his girlfriend's name?**
A. I don't remember his girlfriend name. Yeah. I -- I -- that was his daughter's mom. I don't remember. Yeah.
**Q. Do you know what Rodney's last name was?**
A. No.
**Q. No.**
A. I told you I don't know any last names.
**Q. All right. Thank you. And would you say that you were treated well during all of your interactions with the police?**
A. Yes.
**Q. They made sure that you could use the bathroom?**

Page 111

A. Yes.
**Q. They made sure that you had food?**
A. Yes.
**Q. Did you have to ask to get food?**
A. No, he volunteered to ask on the way back. Yeah.
**Q. And they made sure you had your insulin when you told them that you had diabetes?**
A. Yes.
**Q. Did they -- were they mean to you in any way?**
A. No. Just police were just loud talking but not rough. Nothing abusive or anything, no.
**Q. Did you know the property manager of the SRO Building?**
A. No.
**Q. You've never seen that person before?**
A. Uh-uh. That was the first time seeing the lady at the desk but not the property. I don't know if she was the property manager but I never know about the property manager.
**Q. Do you know if the property manager is a man or a woman?**
A. I just met that lady. That's it. Yeah.
**Q. The lady at the front desk who signed you in --**

Page 112

A. Yes.
**Q. -- right? Okay.**
A. Yes.
**Q. Was the only time -- you said you interacted with the lady at the front desk twice when you went in to ask her about the document with the man's name on it and then also when you got signed in?**
A. Yes. I believe that was her at the -- the first time the interaction, yeah, if I'm not mistaken.
**Q. Were there any other times that you interacted with the lady at the front desk?**
A. Uh-uh.
**Q. And you said she was an older lady?**
A. Yeah, older lady. Yeah.
**Q. Did Lester tell you that he talked to the police?**
A. No.
**Q. Did you know?**
A. I don't -- I don't recall them telling me nothing like that. Yeah. I know that they said they were going to go get him because I told them I seen Lester in the hall. You asked my friend Lester. That was it. So I know they going to go get Lester.
**Q. Okay.**
A. Cover -- to see if I'm telling the truth.

Page 113

**Q. Okay. So you told the police I -- you can go ask Lester -- or sorry, do you remember exactly what you told them or like --**
A. Yeah, when I was in the hallway, I told them I was in the hallway talking to Lester and they said who's Lester? I said he live in the building. He's my friend from the neighborhood. And they went and got Lester. I'm pretty sure they went and got him.
**Q. Okay.**
A. To ask Lester, do you -- how you see Ricardo on the building?
**Q. Okay. Were you with them when they went to go get Lester?**
A. No.
**Q. But then you never talked to Lester about him talking to the police?**
A. No.
**Q. Okay. You never had any conversations with Lester and the police?**
A. No.
**Q. Did you talk to Carl when he was at the station?**
A. No.
**Q. There was no points where they took you into Carl's interview room or anything like that?**

Page 114

A. Uh-uh. There was -- like, it was like, this, like but it was wide and they had said he was over there, name was on the door or something. My name's on the door, I think. And then yeah, that was it. But no interactions with Mr. Reed.

**Q. Okay. Do you know someone named Delong Reed?**

A. No. That was -- I was trying to -- I don't know who that person is. I've never seen that person. I don't know him.

**Q. I'm sorry.**

A. Yeah, I don't know. Yeah, I don't know.

**Q. Okay. So you've never interacted with anyone named Delong Reed?**

A. Yeah, I don't know. I don't know.

MS. ALZAMLI: Okay. Those are all my questions for now and I think now the other attorneys will have some questions for you, too.

THE WITNESS: Okay.

MS. SCHNIDT: Okay, Mr. Burns, are you good to keep going?

THE WITNESS: Yes.

CROSS-EXAMINATION

BY MS. SCHNIDT:

**Q. All right. I know we've talked before and just to reiterate, my name's Emily Schnidt. I represent**

Page 115

**Detective Zuley in this case. I just want to talk a little bit. I'm going to go through some of what you've already testified to but I promise I will do my best to make it fast.**

**So basically, if I'm understanding you correctly, you were at the corner with your friend, Pistol and Up Washed Chuck, right?**

A. Yes.

**Q. All right. And that's an area that you regularly hung out at?**

A. Yes.

**Q. What was it, Winthrop and Argyle?**

A. Yes.

**Q. Okay. And Chuck says he's got a car to sell for two -- basically $250, right?**

A. Yes. Yes.

**Q. And you asked him for the papers, correct?**

A. Yes.

**Q. Now you say he drove up in the truck -- drove up in the car but I'll tell you back in 2001, the police documented that he took you to where the car was over on Margate. Does that sound accurate?**

MS. ALZAMLI: Objection, leading.

THE WITNESS: He drove up in the car.

BY MS. SCHNIDT:

Page 116

**Q. Okay. Your memory is he drove up in the car?**

A. Yeah. Yeah.

**Q. That's a yes for the record.**

A. Yes.

**Q. Okay.**

A. Yes.

**Q. And was it at that -- you looked over the car, right?**

A. Yes.

**Q. He had a set of keys, open the car for you, right?**

A. Yes.

**Q. You got into the driver's seat, fair to say?**

A. Yes.

**Q. Played with the radio, CD player?**

A. Yes.

MS. ALZAMLI: Objection. Leading.

BY MS. SCHNIDT:

**Q. Want to make sure the important things for a younger guy is working, right?**

A. Yes.

**Q. Okay. And is it at that point that you pay Chuck $30?**

A. Yes.

**Q. All right. So then you take possession of the**

Page 117

**car while still saying to him basically, I want those papers?**

A. Yes.

**Q. All right. And once you -- the next day after taking the car, is that when you run into the police officers?**

A. Yes. The -- the next day but before taking the car back. It was in the morning. It was daytime. It was early but --

**Q. Before giving --**

A. Yes.

**Q. -- Chuck the car back, right?**

A. Yes. Yes.

**Q. Okay. Chuck is Carl Reed, you now know, correct?**

A. Yes. Yes.

**Q. All right. So if I'm saying Chuck, we're in agreement, Chuck's Carl Reed?**

A. Yes.

MS. ALZAMLI: Objection. Misstates the record.

BY MS. SCHNIDT:

**Q. And so Chuck or Carl Reed gives you the car. You pay him $30 for it saying still give me the papers, right?**

Page 118

A. Yes.
**Q. The next morning you see the police and you ask them, "Hey, can you check this plate?"**
A. Yes.
**Q. All right. That's when they tell you it's not stolen, right?**
A. Yes.
**Q. But you're still suspicious, fair to say?**
A. Yes.
**Q. What about the whole exchange was making you suspicious?**
A. I think because it was, like, a street deal and the paperwork wasn't right there and I know like -- I know how crack heads are, when it come to, they want that fix. So you know, if it's his car, he let me -- because we used to rent cars, too, like from a crack head, you know. So he'd give him a couple dollars for it. We rent the car. You go past that 30 minutes, a crack head's reporting his car stolen, or you get a crack head what he want, he can still report this -- the car's stolen and you'd be like, (sound effect) get flashing like, damn, he beat me out of some money and now he got his car back.
So that's why I felt -- because I was -- the way the whole transaction took -- transpired with that

Page 119

so I asked the officers that.
**Q. Okay.**
A. Plus I didn't receive the paperwork so I'm like, ah. I know it's $30 but still it is just -- let me just make sure, so...
**Q. Yeah. Was Carl Reed a crack head?**
A. Yes.
MS. ALZAMLI: Objection.
BY MS. SCHNIDT:
**Q. All right. And how did you know him to be a crack head?**
A. From -- from the area and he's bought from other area people.
**Q. Dealers?**
A. Yes. Dealers, yes.
**Q. Dealers who you knew dealt crack, you saw him purchase crack from them?**
A. Yes. Yes.
**Q. Okay. Did you see him high on crack in the past?**
A. That night he looked a little, like can't see like a crack head.
**Q. The first night when he brought you --**
A. The vehicle.
**Q. -- the vehicle?**

Page 120

A. The radio, yeah. When he came with that radio stuff, yeah.
**Q. Oh, when he came with the radio first?**
A. Yeah. Yeah. That's -- that's -- his crack head moves.
**Q. How much time passed between when he first brought the radio and when he brought the car?**
A. I'd say probably about -- if I can remember maybe it wasn't that long, probably like 30 minutes or something I'd say. It wasn't that long.
**Q. Okay. So now we're on the next morning and you see the police. They tell you it's not a hot car, right?**
A. Yes.
**Q. But they warn you, now we know you have a car that has handicap plates and you, Burns, are not handicapped, right?**
MS. ALZAMLI: Objection.
THE WITNESS: Correct. Yes.
BY MS. SCHNIDT:
**Q. Okay. And then they -- but you said you're a young guy, you're willing to take the risk and you drive the car to a car wash, correct?**
A. Yes.
**Q. At the car wash is when you see something with**

Page 121

**somebody else's name on the document, right?**
A. Yes.
**Q. Okay. Did it have an Oriental name on it?**
A. I don't recall what name was on it.
**Q. And I don't mean that in a disrespectful term.**
A. Yes.
**Q. I'm reading from a document.**
A. Yes.
**Q. Okay?**
A. Yes.
**Q. Do you recall if it had any ethnicity to the name? If the name had any ethnic background?**
A. I don't remember the -- yeah, I don't remember.
**Q. But you do remember that the address on the paperwork was where that SRO building was, right?**
A. Yeah. Yes.
**Q. So up until this point, you haven't been to the SRO building with Carl Reed, right?**
A. Right.
**Q. You just then go after the car wash, go to the SRO Building and say, hey, do you know the name of this person?**
A. Yeah. Yes.
**Q. And when they said -- when the lady at the**

**desk said, what did she say?**
A. She said, "Nah."
**Q. Okay.**
A. When I asked her, "Do this person live here?" And she said, "No."
**Q. Had you ever --**
A. That was it.
**Q. -- gone to that building before and asked for confirmation as to whether other tenants live there?**
A. No. No.
**Q. So you don't know if she was at liberty to be able to disclose that, right?**
A. Yeah. Yeah. Yes.
**Q. Okay. And then you tossed this paperwork?**
A. Yes.
**Q. Then where did you park the car?**
A. After riding around for the rest of the day, then it started getting dark out. I parked the car on -- I had -- would always -- we would always park on side streets because Winthrop was kind of like, we didn't want our cars on the block like that due to gang activity and all that. So we would park away. So I would normally like park -- I had a Chevy and I would park it probably on Foster in a White neighborhood. Excuse my French, but in those nice neighborhoods over



there. So this area on Margate, I would park over there, one of my cars.
But after getting towed a couple of times because I ain't want no ticket, but I always used the area. So I parked it over on Margate right over there by the park. It's like at the tip. Once you come out the alley, and just park right there.
**Q. It's kind of a dead end street, right?**
A. Nah, it's not a dead end because when you come, you could -- if I could recall, you come through like a alley, then you turn and I -- I know park -- parked right there. And you could go straight up to Marine Drive. Yeah. That's -- that's where I -- I parked and that's where I took the officers to let them know that's where I parked the car when I was giving them -- taking to give them the keys.
**Q. Okay. Understood. Thank you for that explanation. So then the next time that you see Chuck is when -- that's the day you go to his house, right?**
A. Yes.
**Q. All right. And when we're saying house, we're talking about an apartment in the SRO Building, fair?**
A. Yes.
**Q. Okay. Was that the -- so we've talked about you bought the car evening one. Next morning, you see**



**the police. Is it the very next day that you see Chuck?**
A. It's the -- later on that night.
**Q. The same -- the night of -- the same day that you had seen the police in the morning?**
A. Yeah so -- because the first -- the initiative -- the -- the first time seeing Chuck was at night, that night. And then it was late, we was still outside. I went in. The next morning is when I came out to go ride in the car. It was nice, I think, you know. And that's when I seen the officers. And then we did that, cleaned the car, went to the SRO Building, still rode around in the car. Now I'm back outside and then that's when I seen him. He said, "Hey, I got the paperwork," and that's when my second time going into the SRO with him.
**Q. So the two times you went in the SRO Building were on the same day, right?**
A. Yes.
**Q. Okay.**
A. Yeah. Yeah. Yeah.
**Q. Did Chuck approach you that evening at Kenmore and Winona?**
A. Yes, it was in that area.
**Q. Is that --**
A. Because we were back and forth from Argyle and Winthrop. That was our -- our box. So it'll be --



probably I was walking up to Sheridan to the little mall or something. That's when I -- I seen him.
**Q. That's when he tells you he's got the title, come over to my place, basically?**
A. Yes.
**Q. All right. Go up to his room, he tells you sit tight, he's got to go to a different room to get the title to the car that he's trying to sell you?**
A. Yeah. From -- he said -- he would always say his -- his payee. Like, the first time he said, "Oh, my payee got the paperwork." So I think, like, okay. Payee. Payee. Okay, somebody -- then the second time, "Oh, my payee."
So I'm think -- you know, that's the person that take care of your things or whatever, payee, so. Okay. All right. And, "I'll be right back," and he went downstairs.
**Q. And you sat there for a few minutes and then went out into the hallway?**
A. Yeah. I'd say in the house, after we was in there, you know, he was saying, yeah, I got to run downstairs, a little small talk, and then he left out. And I sat in there for about -- I'd say no more than about five -- five, six minutes or something like that. Yeah.

Q. So when you go out into the hall, that's when you see Lester?
A. Yes.
Q. Did you know his name to be Lester at that time, or did you just know him from the area as an older guy that lived in that building?
A. No. Lester, yeah. Yeah. Yeah.
Q. That's when you relayed to him that you were buying a car from Chuck, right?
A. Yes.
Q. Okay. And he warns you. What does he warn you?
A. He told me he'd never seen him with a car before. And during the conversations, like, I don't know. Like, pretty much like, I don't know, be careful. Like, and then that's when I asked him about when I just -- because we were standing so tight and I was like, "Man, what happened right there?" And then that's when he explained that.
And during that course of explaining what had happened in that apartment, that's when Chuck, as Mr. Reed, was coming up the stairs. Kind of like -- I'll say his -- he was in a state of, like, damn, what are you doing in this hallway?
Q. His demeanor looked like he didn't want you



out there?
A. Yeah. It was just like -- because it wasn't like, hey, what's up man? I'm -- I got the paperwork. That's what he think. If I'm coming up to say, I see you in the hallway, hey, hey, I got the paperwork. Not what you doing in this hallway, man? Damn, dude. Like, right there was like -- and me, I'm yelling. I'm -- what you -- where the paperwork at? Where the paperwork?
Q. Yeah.
A. Oh, come back in. He want me to come back in the apartment, but I'm not -- I ain't going to agree to go back in the apartment, man. You ain't got the paperwork. Give me my money or bring the paperwork, you know where I'll be at. All right, I'll get it later.
Q. So you -- this -- does this exchange with Mr. Reed occur in the hallway?
A. Yeah, this was in the hallway. I never went back into his apartment.
Q. Was Lester standing there?
A. Lester walked off.
Q. Okay.
A. Yeah. Yeah.
Q. So as -- when Mr. Reed walked up, that's when Lester walks off?



A. Yeah. Yeah.
Q. And you tell -- Reed says -- Mr. Reed says, I don't have the paperwork. And you say to him, either give me my money or give me the paperwork, you know where to find me?
A. Yeah.
Q. Did you hand him back the keys then?
A. Yeah. I handed him the keys and told him your car parked across the street. I did say it's parked across the street.
Q. And did you mean on Margate?
A. Yeah. I just said it's parked across the street. I ain't say Margate, but I was like, your car parked across the street, man. Pretty much, find the car, man. Give me my motherfucking money.
Q. Yeah.
A. Or the paperwork, because now I'm like, you just -- just played me. You ain't got no paperwork. I just gave you something, and then now you talking about you ain't got no paperwork. So now it's like a -- a game. Like, you're trying to play or something. I don't know what's going on, like -- so you got the paperwork, you know where I'm at.
Q. Okay. Then you never see Mr. Reed again, correct?



A. Right. Yeah. Never seen him. Never talked to him about the car or nothing else after that.
Q. Then the police contact your parole officer. Your parole officer -- or I'm sorry, you wouldn't know that. Strike that.
A. Yeah.
Q. Your parole officer contacts your mom, and your mom calls you saying, hey, get to the house -- get to your sister's house, your parole officer said there's police coming, right?
A. Yeah.
Q. Okay. The first day that you're with the police, is it accurate that you -- hold on. Let me get my -- are -- the police talked to you at your sister's house, right?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. Okay.
A. Yes.
Q. Then you described for them that Chuck tried to sell you a car, right?
A. Yes.
Q. You show them where the car is parked on Margate, right?

Page 130

A. Yes.
Q. They stand outside the car as you described, talk about it?
A. Yes.
Q. You don't get into the car at that time, right?
A. No. No. No.
Q. Okay. That's correct, what I said?
A. Yes.
Q. All right. Then they take you to the -- you said police station, right?
A. Yes.
Q. Do you recall if it's Area 3?
A. Belmont and Western.
Q. Belmont and Western?
A. Yes.
Q. At Belmont and Western, you described to the police that Chuck tried to sell you a car for about $250, right?
A. Yes.
Q. And at that time, is that when they show you multiple photographs?
A. Not at that time. They asked me where I get the car from, and I told them Chuck. And they're like, what -- you know, well, they knew where the car was

Page 131

because they took me back. But they're like, how much, and Chuck? And I was like, "Yeah, Chuck." And they was like, "Carl Reed?" And I was like, "I know Chuck." And then he said, put out -- he put out the photographs on the paper and say, "Pick Chuck out." And I picked Mr. Reed out because that's how I knowed him. That was Chuck. I didn't know Carl Reed.
Q. Was it multiple photographs?
A. Yeah.
Q. I'm sorry, multiple people in the photo?
A. Yeah.
Q. Sorry.
A. Yeah. It was -- yeah, different --
Q. Multiple mugshots?
A. Yeah. Yes. Yes. Uh-huh.
Q. Okay. And one of those mugshots was Carl Reed, correct?
A. Yeah. Yes.
Q. Okay. If you don't mind, I'm going to just show you what's Bates marked CCSAO 000138. And I'm just going to walk up to you and show you; is that okay?
A. Yes.
Q. See if that's -- can you see that okay?
A. Yes.
Q. Okay. Is that -- who is that person, if you

Page 132

recognize him?
A. That's Carl Reed.
Q. Okay. When you described for the police having seen Lester in the hallway --
A. Yes.
Q. Did they then show you a photograph of Lester?
A. No.
Q. No?
A. Uh-uh. They're just talking to me, and then I told them about Lester and he lived in the building. And then, you know, I'll be right back. Hang -- hang tight.
Q. Is there any point -- okay. Was there -- is there any point in time in which you saw a photograph of Lester with any police officers or detectives?
A. I don't recall. Yeah. I'm sorry.
Q. That's okay. Obviously, it's been almost 24 years, right?
A. Yes.
Q. Okay. And you're testifying to the best of your recollection, correct?
A. Yes.
Q. There's -- might be some details that you might be mixed up on; is that accurate?
A. Yes.
Q. Okay. But there's -- are there some details

Page 133

that are very clear as day?
A. Yes.
Q. Okay. Has there been anything that you've testified to that you're uncertain about?
A. No.
Q. So everything you've testified to, you're certain about, right?
A. Yes.
Q. Okay. That you bought -- you gave $30 to Carl Reed for a car, right?
A. Yes. Yes.
Q. And I think you said it was a white Maxima?
A. Yes.
Q. Okay. Let me -- I'm going to show you a series of photographs. Again, do you mind if I stand over you?
A. That's fine.
Q. Okay. Beginning with Bates Stamp CD 338 through CD Reed 341. And then -- yeah, that's it. Okay. I'm just going to show these to you first, and then I'll come back and ask you questions, okay?
A. Okay.
Q. Can you see that okay?
A. Yeah.
Q. Okay.

Page 134

A. Yes. Yes. Yes.
**Q. Okay. Okay. I've shown you a series of photographs from CD Reed 338 to 341. Did you have an opportunity to look at those photographs?**
A. Yes.
**Q. Okay. And do you recognize what is in those photographs?**
A. Yes.
**Q. What is it?**
A. A Nissan Maxima.
**Q. And does that Nissan Maxima have any significance to you?**
A. That's the vehicle that I was going to purchase from Chuck, Mr. Reed.
**Q. And how do you know that's the vehicle?**
A. That's the -- that's the car I was driving in with the handicap plate. It looked like it still had the Armor-All on the tires
**Q. Still had the what?**
A. Looked -- looked -- it was clean, like it still had the Armor-All on the tires from the car wash.
**Q. Okay. You put that Armor-All on?**
A. Nah. The guy at the car wash did. Yeah.
**Q. All right. Let's see. So then, while you're talking to the police -- do you know if it was police or**

Page 135

**detectives?**
A. They was detectives. They had on --
**Q. Detectives? Okay.**
A. -- suit and tie and stuff. Yeah.
**Q. While you're talking to the detectives, you tell them that Pistol was there when you talked to Mr. Reed about buying the car; is that right?**
A. Yes.
**Q. Do you know what Pistol's name is?**
A. Duran, Duran, something like that. But yeah, we just call him Pistol. He was younger than us. Yeah.
**Q. Duran Watts, does that sound familiar?**
A. Sound -- yes.
**Q. Okay. Okay. As you're talking to the detectives -- oh, strike that. Did you go with the detectives to try to locate Pistol?**
A. Yes. During the time when they came back to get me after the first time taking me down, that's when I told them about the police and I was telling them my story. Then we went to 20th District. Then they asked me, was there anybody else? And I told them Pistol, he'd probably be on the block. So we rode through several times, circling one ways and turning back and forth, and no Pistol. So that's when they took me to get lunch, and then took me back to the station.

Page 136

**Q. When you were with the police and you go to try to find Pistol, after that, is that when you then tell them, hey, I just actually want you to know, I did give him money for the car and I did drive it, and I talked to the police and wanted to see if the car was hot?**
A. Yeah, I did, because I was still, like, unaware what was going on because they weren't telling me what was going on. You know, it was a pretty much stolen car. You know, like, okay. Like, damn. They ain't tell me who this person or what -- what was going on, you know? So I'm like, yeah, again.
So they're like, was it money or drugs, you know? Yeah. I'm not going to tell them it was drugs, I'm going to go to jail. But yeah. Yeah, I drove it. Yeah, I had the car. Yeah.
**Q. Okay. So -- and I'm not, like, making any commentary about whether it was right or wrong, so don't get me wrong. But basically, you weren't totally upfront with everything right away, but eventually you did tell the police everything?**
A. Yeah. Because my -- the initial story was true. It was just, like, shocking to me. Like damn, what the fuck going on? Like, hold on. Like, you guys get the police storming at your door, talking about

Page 137

stolen car, you in a stolen car, this that and this that, and not really in detail, which is not their job to tell me what is really going on, I don't believe, you know. But, you know, I knew my story was 100. So I said, "Man, look, this -- yeah, I gave him some money for the car."
**Q. And then, that's when you say, I gave him some money --**
A. Yeah.
**Q. -- I did actually drive it, but I talked to the cops --**
A. Yeah.
MS. SCHNIDT: -- because I wanted to know if this car was stolen?
THE WITNESS: Yeah.
BY MS. SCHNIDT:
**Q. Did you hear --**
A. That's when they -- that's when they went to the station, when they got me. The second time came, and I was talking to them. They actually -- when I told them that, they said, oh, well, how are we going to believe you if you freaking lied to us the first time? Now I was like, well, go to the police station to ask the -- the officer. So then he was like, yeah. All right. So -- all right. So they went over there, and

then that's when it was like his partner came and I was like, all right, he -- okay.
**Q. So before you come back now, after the police get you lunch and you've now told them, hey, FYI, I did drive the car. I did pay for -- I paid 30 bucks for it and I did drive the car, did you go with the police to the SRO building and show them where Carl Reed's apartment was?**
A. I don't -- I don't remember if they -- if they took me back, but -- I don't remember.
**Q. Do you remember bringing the police to Carl Reed's apartment?**
A. I don't remember.
**Q. And you're not saying that didn't happen, you're just saying it's been 24 years, I don't remember?**
A. Yeah. Just -- yeah. I just -- yeah, I don't remember. Yeah. I'm sorry.
**Q. That's fine. Now, according to this report, after being picked up at your sister's house, going to the area, going and getting lunch, bringing them to where the -- to try to find Pistol, according to this report, that's when they bring you back home and tell you stay here, we may need you again. Does that refresh your memory?**
**And then it's a second day that you're picked**


**up, the next day, and that's when you talk to the state's attorney and give the statement?**
A. Yeah. The state's attorney, because I remember talking to someone and then getting on the stand. I think -- I don't know what -- I don't remember what day that was, but I remember getting on the stand. It was like -- there was a judge or somebody --
**Q. Okay.**
A. -- and then there was some -- (coughs) excuse me -- there was some other people, and I had to give -- give -- yeah, that. They took me up -- I don't know. I think it was a courtroom or something. I don't remember.
**Q. Okay. We'll set that when you go to the courtroom aside. All right? I just want to -- what you said is the police pick you up; you talk to them for a while, they bring you home. They pick you up a second time. That's when you go home, you sleep. They pick you up then the next day, drive you around trying to find Pistol, get lunch. According to this report, all of that actually happened the first day, and then you go home.**
A. Uh-huh.
**Q. And then they bring you home. Okay? So I just want to be clear what I'm saying. According to the**


**police report, they pick you up at your sister's house, interview you. You confirm Chuck is Carl Reed.**
A. Yes.
**Q. Eventually, you leave with the police to try to find Pistol. Can't find Pistol. Go get the lunch, then you tell them, hey, I did pay 30 bucks for the car. I did drive it around, but I talked to police about it to see if it was a hot car. Eventually, they bring -- according to this report, they bring you home that first night, then the second day is when they pick you up again.**
**Does that refresh your memory as far as the sequence of events where what occurs on the first day and then you go home on that first day?**
A. But I recall the second day, they had -- I know they picked me up. They told me, don't go nowhere. Because, you know, the second day, I know they picked me up and that's with all the police. Like, going to talk to the police and telling them about Pistol, if I can recall. But --
**Q. Okay.**
A. -- I don't remember. But I remember that happening, but the days, like, and the hours and what time. I -- I don't remember. I'm probably mixing the days up when it happened, but I -- that's -- that's the


only thing. I don't remember that part.
**Q. Okay.**
A. Yeah.
**Q. That's fine. Now, I want you to -- actually, before I get to the statement, I want you to look at --**
MS. SCHNIDT: Can you pull up Exhibit 6 for me?
MS. ALZAMLI: That's this one.
THE WITNESS: It's this?
MS. ALZAMLI: Uh-huh.
MS. SCHNIDT: Okay. Thank you.
BY MS. SCHNIDT:
**Q. Obviously, you've never seen this before, right?**
A. No.
**Q. Okay. Do you remember, when you were talking to any officers or detectives, them taking notes?**
A. Yeah. They -- yeah. Yes. Yes.
**Q. Okay. I want to just go through a few points with you. Okay?**
A. Yes.
**Q. If you're on -- the number at the top is Number 2?**
A. Yes.
**Q. All right. Great. Go about one, two --**

Page 142

towards the middle of the page. The sentence reading, "Burns was talking." Do you see that?
A. Yes.
Q. Okay. "Burns was talking a couple of friends. Rodney, who stops on -- who stays on the south side About 5000 South May. Rodney's girlfriend," and then could that be -- same block? Did Rodney's girlfriend -- well, strike that. Do you remember Rodney having a girlfriend?
A. Rodney had a lot of girlfriends. I just remember his main. Like, his baby mama. But yeah, he had a -- he had a lot of girlfriends.
Q. Okay.
A. Yeah.
Q. It -- then the next sentence says, "Chuck walks up to them and asks if anyone wants to buy a car." That's consistent with your memory, right?
A. Yes.
Q. Okay. Go towards the end, and then along the right sides, it says, "Tells Burns." Do you see that?
A. Tells Burns? Yes.
Q. Okay. "Tells Burns the price of the car is 250 USC. Burns asks for papers. Chuck says he has the papers." That's consistent with your memory, right?
A. Yes.

Page 143

Q. That's what occurred, correct?
A. Yes. Yes.
Q. Go to the next page for me, please. It says, "Burns asks to check out the vehicle. Chuck and Burns walk from 5012 North Winthrop to 93 -- 932 West Margate, where the car is parked." Now, you believe Chuck drove up in the car, right?
A. Yes.
Q. That's your memory today?
A. Yes.
Q. Okay. "Chuck is in possession of a set of keys. He used the keys to enter the vehicle. Burns gets into the driver's side with Chuck standing outside the vehicle." That's consistent with your memory, correct?
A. Yes.
Q. "Burns plays with radio and CD. Chuck then opens up the trunk. Burns asks to see papers because he thinks the car may be hot." Is that correct?
A. Yes.
Q. That's what you told the police?
A. Yes.
Q. "Chuck then locks the vehicle, with Burns telling Chuck to get the title, we'll deal." Now, you've said -- is it -- oh, strike that. Is it at this

Page 144

point in time you give him actually the $30?
A. Yes.
Q. But that's not what you told the police right away, right?
A. First time, yes.
Q. Okay. Keep going to the next paragraph. "Doesn't see Chuck till Thursday 19th JUL 01. Sees Chuck at Kenmore/Winona about 9:30 p.m. Was with Correl, who lives about 5216 North Winthrop, third floor."
A. Yes.
Q. "Stays with aunt"?
A. Yes.
Q. All right. Is that -- well, is it correct that you told the police that you were with Correl at some point, right?
A. Yes.
Q. When you see Chuck, correct?
A. Yes.
Q. And you're saying you know that the person you were with, his name was Correl; am I right?
A. Yes. That's my friend. We went to high school together. So this is -- that other person, I'm thinking Correl is the other Jones or something, but that's not -- that's why I say Correl. Like, that first

Page 145

paragraph. I read up there with the other dude. I don't -- I don't know that. I know Correl that live on Winthrop because we went to school together. This who I know, right here. The other guy, I don't -- I don't recall the other guy. That's why I asked you about the nickname.
Q. Now, Correl, do you know what his full name is?
A. Correl, I think it's Jones or Johnson. One of those. Yeah.
Q. So your friend Correl -- or your friend who you know is Correl, you think his last name is something like Jones or Johnson?
A. Yeah. Correl Johnson. I think it's -- yeah.
Q. Do you -- is his aunt's name Shermaine?
A. I don't remember. Yeah, I think so. I don't remember, though.
Q. Is Correl about the same age as you?
A. I'm 46. Correl would've been 48. He would've been 48.
Q. 48?
A. Yeah.
Q. Uh-huh.
A. I think he's about -- he would've been a year or two older than me.

Q. Okay.
A. Yeah.
Q. Okay. And then go to the next page for me, please. Right at the top. "Also with Pistol, who lives on Bryn Mawr, and a," well, let's leave that there. "Also with Pistol, who lives on Bryn Mawr." Is that correct, that you told police eventually you were with Pistol --
A. Yes.
Q. -- when Mr. Reed came up, right?
A. Yes.
Q. Do you recall a female Black named Atonja who lives at 7200 South St. Lawrence?
A. Yes.
Q. Okay. Was she present for any of your interactions with Mr. Reed?
A. Yeah. We was all out there at the same time. All of us. Yeah. It was like -- like the crew out there, us and several others. Yeah.
Q. Okay. How old were you at the time of this, approximately? 2001?
A. I think in my 20s. Late 20s.
Q. You were born in XXXX?
A. Yeah, XXXX. Yeah.
Q. Okay. So about 23, about?



A. About 23.
Q. Would Pistol have been about 17 or 18 years old?
A. Yeah. He was younger than me. Yeah.
Q. All right. I'm going to go through Exhibit 2 with you now, if you can pull that up in front of you. All right. So the second day, after -- or yeah. Strike that. The second day, after the police pick you up after you've gone home to sleep, do you recall meeting with a state's attorney, a female state's attorney, and her handwriting this statement that's in front of you?
A. If I can recall, I -- I believe so. I -- but it's been a while. I don't remember, but yes --
Q. That's not a very clear memory?
A. Yes. Yeah.
Q. Do you remember meeting with a female state's attorney?
A. Yes.
Q. It's just whether -- what's fuzzy is the handwriting of the statement?
A. Well, not the handwriting of the statement, just the -- the -- the -- the time-lapse kind of got me right now. That's -- that's all. Yeah.
Q. Okay. Let me just ask you this question --
A. Yeah.



Q. -- leaving out the timing. At some point, do you remember meeting with a female state's attorney at the police department and she hand wrote a statement as you talked to her?
A. Yes.
Q. Okay. And did she write it as you were talking to her?
A. Yes.
Q. Okay. After she was -- you were done talking to her and she was done writing the statement, did you review this document?
A. No.
Q. No? Did she read to you what was in this document?
A. She -- she read it.
Q. She read it?
A. Yes.
Q. All right. I'm going to do the same thing, and I'll take a couple breaks to see if this is correct --
A. Okay.
Q. -- that I've read so far. Okay? So as I'm reading this, if there's anything that you're like, that's not true, stop me.
A. Yes.



Q. Okay? All right. So I realize the copying is not the best, but luckily I have great eyesight. So unlike my hearing, my eyesight is great.
MS. SULLIVAN: See, and I have terrible eyesight and good hearing.
MS. SCHNIDT: Thanks to the glasses.
BY MS. SCHNIDT:
Q. All right. It says on the top right, one of three, "Statement of Ricardo Burns taken 22nd July '01 at 2345 at 2452 West Belmont." Is that the location of the police department that you were at?
A. Yes.
Q. Okay. Oh, sorry. Wrong one that you have in front of you. It would be a different packet. Oh, here it is. We've got the mark on it, right here.
A. Oh.
Q. Hiding under there.
A. Sorry about that. Thank you.
Q. Okay. So I'll go through it again so that, you know, I'm not making anything up, or you stop me if I am. Okay?
A. Okay.
Q. All right. Top right, one of three. Then it says, "Typed Statement of Ricardo Burns taken 22nd July '01 23:45 at 2452 West Belmont." Is that the location

Page 150

of where you met with the state's attorney?
A. Yes.
Q. Okay. "Present, ASA Galassini; Detective -- "it says "DET -- Jin, J-I-N, 20814/630. This statement taken regarding the homicide of Kim Van Vo, which occurred" -- the word "on" is crossed out -- "between 14th July and 19th July '01 at 4946 North Sheridan at unknown." Did I read that correctly?
A. Yes.
Q. Okay. Do you recall her reading that portion back to you?
A. Yes.
Q. Then the next paragraph is crossed out, and then the line has a bunch of X's through it, right?
A. Yes.
Q. Okay. Then it's a handwritten remaining portion. Okay?
A. Yes.
Q. So I'll keep reading. "After being advised and stating that he understood that ASA Galassini," can't read that next word --
MS. ALZAMLI: I think it's "was."
MS. SCHNIDT: Huh?
MS. ALZAMLI: I think it's "was an assistant."
BY MS. SCHNIDT:

Page 151

Q. Maybe was? "An assistant state's attorney. A lawyer, a prosecutor, and not his or Carl Reed's attorney. Ricardo agreed to give the following statement in summary and not word for word." Ricardo, did you agree to give a statement to the state's attorney?
A. Yes.
Q. And did she warn you beforehand she wasn't your attorney?
A. Yes.
Q. Okay. Keep reading, "Ricardo States he is 23 years old and was born XX-XX-XXXX. Ricardo states he lives at maybe 850 West Argyle?"
A. Yes.
Q. "With his mother and sister. Ricardo states he attends Truman College for his GED. Ricardo can read and write English." Is that all true?
A. Yes.
Q. All right. And then, is that your signature on the bottom right of this page?
A. Yes.
Q. All right. The next page, Page 2 of 8. "Ricardo states that on 16th July '01 at night, a guy from the neighborhood that Ricardo now knows as Carl Reed, approached him and asked him if he wanted to buy"

Page 152

-- the next word is crossed out. And are your initials RPB?
A. Yes.
Q. Okay. Are those your initials there?
A. Yes.
Q. " -- a car." So asked him if he wanted to buy a car. "Ricardo states he asked how much and Carl stated $250. Ricardo asked to see what kind of car would sell for $250. And Carl agreed to show the car -- on" -- period. Is that correct?
A. Yes.
Q. All right. "On the way to the car, Ricardo asked the guy for a name and the guy said Chuck was his name." Is that true?
A. Yes.
Q. Okay. So you learned the guy's name was Chuck as you were walking to the car?
A. Yes.
Q. Your memory is what, the car wasn't far to walk to?
A. Yes.
Q. Because you think he drove it up?
A. Yes.
Q. Okay. "Ricardo," -- keep reading. "Ricardo identified as People's Exhibit 1." I'm sorry. Strike

Page 153

that. "Ricardo identifies People Exhibit number 1 as the guy who said he was Chuck and tried to show him a car." This does not have a photograph attached, but do you recall identifying Carl Reed while you were giving this statement?
A. Yes.
Q. Okay. Continuing reading, "Ricardo states the car for sale was a white Nissan Maxima. Ricardo checks out the car and asks Defendant if Defendant had any papers on the car." Is that correct?
A. Yes.
Q. Okay. Obviously you didn't call him Defendant, right?
A. Yes.
Q. But at the time you were giving the statement, did you know the defendant was Carl Reed?
A. Yes.
Q. Okay. "Defendant said, 'It's straight, Shorty. I got the papers.'"
A. Yes.
Q. Okay. He said that?
A. Yes.
Q. Okay. "Defendant said he'd have the papers in a few days. Ricardo states he told Defendant to come by when he had the papers." Is that correct?

Page 154

A. Yes.
Q. "The next day, Ricardo saw Defendant and again, Defendant pitched the car sale. Ricardo stated he told Defendant he only had $30. Defendant agreed to take the 30, give Ricardo the keys, and get the remaining money when Defendant delivered the papers." Is that correct?
A. Yes.
Q. So it's actually, the first day he shows you the car, the second day you see him and he -- you give him the $30?
A. Yes.
Q. Okay. Are you clear on that? Okay. Because I'm not trying to be rude. It's just we've heard, like, a couple different days --
A. No, it's --
Q. -- to when this occurred?
A. No, it's no -- it's the same -- everything is the same day. It wasn't -- no, it is the same day.
Q. Your memory today is everything occurred on the same day?
A. Yeah.
Q. But regardless, you know you gave Mr. Reed $30?
A. Yes.

Page 155

Q. And he gave you the keys to a Nissan Maxima?
A. Yes.
Q. Okay. And that Nissan Maxima is the same car I showed you the photographs --
A. Yes.
Q. -- of, right?
A. Yes.
Q. Okay. Continuing on, "Ricardo states he gave Defendant $30 and Defendant gave him the keys." That's correct, right?
A. Yes.
Q. All right. "Ricardo states he felt funny about the deal, so when he saw some police he knows in an alley, he asked them for help." Is that correct?
A. Yes.
Q. I think you said that you ran into the police in an alley, right?
A. Yes.
Q. "Ricardo asked the police officers to run the car to see if it was stolen. And if it was, Ricardo would hand over the keys." Is that true?
A. Yes.
Q. "Ricardo states, the police told him the car was not stolen and clear. However, the police told Ricardo to not drive the car because it had handicap

Page 156

plates and Ricardo had no" --
MS. ALZAMLI: Insurance?
BY MS. SCHNIDT:
Q. -- "insurance."
MS. SCHNIDT: Thank you.
BY MS. SCHNIDT:
Q. Is it correct that the police said, don't drive the car because it had handicap plates, and you don't have insurance?
A. Yes.
Q. All right. "They told him to straighten out the paperwork before driving the car." Is that correct?
A. Yes.
Q. "Ricardo states he took the car to a car wash and cleaned it and found a driver's permit and a credit type card in the car." Is that consistent with your recollection?
A. Yes.
Q. Or sitting here today, you just remember it was some type of paperwork?
A. That was paperwork, yeah.
Q. All right. You don't disagree with what's written here? It's just today you remember paperwork?
A. It's paperwork, yes.
Q. Okay. "Ricardo states, one of the cards had

Page 157

the name Larry Ling or Young and the address of 4946 North Sheridan." Do you have any memory of what the name was, sitting here today?
A. Yeah, I don't remember.
Q. Okay. But do you -- the address of 4946 North Sheridan, is that consistent with your memory?
A. Yes.
Q. "Ricardo states he parked the car because he wasn't sure Defendant owned the car." True, right?
A. Yes.
Q. "Ricardo states on the 19th of July, '01, he went to 4946 North Sheridan and asked if a Larry Ling or Young lived there." It's -- you do recall, at some -- on one of these days you went to 4946 North Sheridan, right?
A. Yes. Yes.
Q. And you do recall you talked to a lady at the front desk to confirm if the person whose name was on the paperwork lived there, correct?
A. Yes.
Q. Okay. Continuing on, "Ricardo states the lady at the desk told him no one by that name lived there, but maybe at the Major Jenkins." You see that beginning part?
A. Yes.

Page 158

Q. Okay. Your recollection is the lady told you no one lived there, correct?
A. Yes.
Q. Does this refresh your memory that she also said maybe they live at Major Jenkins?
A. No.
Q. No. Do you know what Major Jenkins is?
A. I think that's another SRO building. It was one on -- it was two -- well, three. It was, like, two on Winthrop where we hanged at, and then the one on Sheridan, the 4900.
Q. Okay.
A. But I don't know the names, which building or which name.
Q. Okay. Was the name Major Jenkins, or am I getting that wrong?
A. That's probably the name of one.
Q. Okay.
A. Yes.
Q. All right. Continuing on, "Ricardo was leaving when he saw Lester who lives at the building and Ricardo knows from the neighborhood. Ricardo states, he was told by Lester, they brought a dead Chinese guy out of the building."
Now it's correct that at some point when you

Page 159

had a conversation with Lester, he did tell you that there was a guy who was dead in the building, right?
A. Yes.
Q. Okay. Is it your recollection that that conversation happened in the hallway outside of Carl's apartment?
A. Yes.
Q. Okay. Do you recall talking to him, what, after you talked to the lady at the front desk about there being a dead guy in the apartment?
A. Talking to Lester about it?
Q. According to this statement you said, "I talked to Lester when I went to go check whose paperwork this was and if they lived at the building." I'm asking you, did that happen?
A. Yes.
Q. You talked to Lester about there being a dead guy in the building?
A. No, no, no.
Q. Okay. Not at that point in time?
A. Not at that point, period. Lester -- Lester told me when we went in the hall -- when I was in the hallway, that -- that conversation struck up and I said, hey, what happened right there? But the -- the door looked like somebody just threw flour on the door or

Page 160

something. I, like -- looked like something off a movie. And he was, like -- that's when Lester stated that. He told me that. I was like, "Oh, shit."
Q. Okay. Okay.
A. Yeah.
Q. That was outside of Carl's apartment?
A. Yeah. Yeah. Yeah. Yeah.
Q. All right. Continuing on, "Ricardo states, he asked if Lester knew Defendant and Ricardo described Defendant. Lester told Ricardo he knew Defendant and Ricardo told Lester that Defendant was trying to sell Ricardo a car." Did you have that conversation with Lester?
A. Yes.
Q. Was that in the hallway?
A. In the hallway, yes.
Q. Okay. "Ricardo asked Lester if Defendant owned a car and Lester said he didn't think so. Lester told Ricardo to be careful. Ricardo left."
MS. SCHNIDT: Take one second break. Are you okay to keep going?
THE REPORTER: Yeah. I'm so sorry. My wrist is a little --
MS. SCHNIDT: No, it's okay. I just don't want you to keep -- seeing you go like this, so I

Page 161

just checking that.
THE REPORTER: No, it usually it doesn't happen. This is the first time that's ever happened.
MS. SCHNIDT: Okay.
THE REPORTER: I'm so sorry about that.
MS. SCHNIDT: No problem. All right. I'm going to keep going on the statement.
BY MS. SCHNIDT:
Q. "Later that night, Ricardo was on the corner with friends and Defendant came and told Ricardo he had the papers. Ricardo states he went to -- he went with Defendant to 4946 North Sheridan." That -- is that correct?
A. Yes.
Q. Okay. The same day you see the police -- same day -- you see the -- go to the car wash and see the paperwork is the same day you go to Carl's apartment?
A. Yes. Yes.
Q. Okay. "Ricardo states they went to apartment 305."
A. Yes.
Q. And we're on Page 6 of 8 now in the top left corner?
A. Yes.

Page 162

Q. Okay, good. "Ricardo asked about the papers and Defendant said he'd be back. He was going to apartment 216 or 217." Is that correct, consistent?
A. I don't remember what apartment he said. I just know he said he was going downstairs. I don't recall.
Q. Then there's an arrow and something written along the right side, which I can only -- I can't make out the first word, but then it says, "Apartment with the papers." Do you know what that says?
A. Payee?
Q. Oh, you think -- yeah. I don't -- maybe a reference to the payee.
A. Yeah.
Q. Okay.
A. That's what he was saying.
Q. "Ricardo states, Defendant leaves and Ricardo walks into hallway after four to five minutes." Is that consistent with your memory?
A. Yes.
Q. "Ricardo saw Lester in the hall. Ricardo told Lester Defendant had the papers. Ricardo asked who lives in 216 or 217." Do you remember any portion of that -- strike that. Do you remember talking to Lester in the hallway, correct?

Page 163

A. Yes.
Q. And it's there in the hallway that you recall the entire conversation going on about Carl Reed selling you the car, right?
A. Yes. Yes.
Q. Okay. Would it be accurate to say you don't remember asking him who lives in 216 or 217?
A. Yeah. I don't remember
Q. Your memory --
A. Actually. I -- I remember telling him he said he was going downstairs to his payee apartment.
Q. Okay.
A. I was waiting for him to come back up.
Q. Okay. Continuing on, "Lester told Ricardo to be careful, that something wasn't right." Is that true?
A. Yes.
Q. "Ricardo then decided to leave, when Defendant came up the stairs. Lester leaves and Defendant gives Ricardo a dirty look." Is that true?
A. Yes.
Q. "Ricardo states he asked Defendant for the papers and Defendant said, the guy wasn't there who had the papers. Defendant asked for a few hours to get the papers and Ricardo said, no. Ricardo states he gave Defendant back the keys and told Defendant if he gets

Page 164

the papers, he knows where to find him." Is that accurate?
A. Yes.
Q. "The next day, Ricardo states he got a call from his parole officer who told him detectives wanted to talk to him about a homicide. Ricardo met with detectives and told them everything about Defendant and the car." Is that true?
A. Yes.
Q. Is that consistent with your memory?
A. Yes.
Q. "Ricardo states he was not threatened or promised anything in return for this statement." Is that true?
A. Yes.
Q. Did any police officer threaten you?
A. No.
Q. Did any police officer make you any promises --
A. No.
Q. -- at any point in time with anything related to Carl Reed?
A. No.
Q. Okay. "Ricardo states he was not under the influence of drugs or alcohol at the time of the

Page 165

statement." Is that true?
A. Yes.
Q. "Ricardo states he was given soda to drink and allowed to use the bathroom." Is that true?
A. Yes.
Q. "Ricardo states he was treated well by the police and ASA Galassini." Is it true that you were treated well by the police?
A. Yes.
Q. Were you treated well by the state's attorney as well?
A. Yes.
Q. "Ricardo states he can read English and demonstrated by reading out loud. Ricardo states he has read all eight pages of this handwritten statement and had a chance to make any additions, corrections, or changes that he wanted." When the state's attorney was reading to you, this document, were you following along?
A. Yes.
Q. Were you given the opportunity to make any additions, corrections, or changes?
A. Yes. She asked.
Q. Okay. "Ricardo states ASA Galassini read back" -- oh, no. "Ricardo states ASA Galassini read each line of this eight page statement out loud and it

is true and correct." And that's consistent with your memory?
A. Yes.
Q. Okay. Is that your signature on the next line by the X?
A. Yes.
Q. And if you can just flip through the pages for me and confirm, is that your signature on the bottom right side of each page?
A. Yes. Yes. Yes. Yes. Yes. Yes. Yes. Yes.
Q. Okay. Having looked through Exhibit 2, is that your signature on the bottom right side --
A. Yes.
Q. -- on each page?
A. Yes.
Q. Now you mentioned that you went to court and testified; is that right?
A. Yes.
Q. Was that at the grand jury proceedings --
A. Yes.
Q. -- if you know?
A. Yes.
Q. Did only one attorney ask you questions?
A. I don't remember.
Q. Okay. That's fine. When you testified, did



you testify truthfully?
A. Yes.
Q. Accurately?
A. Yes.
Q. To the best of your memory?
A. Yes.
Q. Did anybody tell you what to testify to?
A. No.
Q. Were you given any promises to testify?
A. No.
Q. Were you forced by the police to testify?
A. No.
Q. Were you threatened in any way to testify?
A. No.
Q. Was your testimony consistent with what you've told us today --
A. Yes.
Q. -- obviously with 24 years ago, probably having a better memory --
A. Yes.
Q. -- of the details?
A. Yes.
Q. Okay. When is the last time you saw or spoke or texted with Correl?
A. Passed away.



Q. What? I'm sorry?
A. I'm sorry. He passed away.
Q. Oh, I'm sorry. Okay.
A. Sorry.
Q. Yeah. That's too bad. I'm sorry to hear that. He was a good friend?
A. Yeah. I trying to hold it in when you was reading now. I'm sorry. Sorry.
Q. Yeah. Sorry about that. I did not know. I do apologize for that.
A. Sorry.
Q. Do you want -- we can take a break if you want.
A. No, I'm okay.
Q. You're good.
A. Yeah.
Q. Okay.
A. Yeah. I'm okay.
Q. I must -- I'm a little hesitant to ask this next question, but how about Pistol? When's the last time you saw or spoke to Pistol?
A. I haven't spoke to him in a -- man, a few years. Yeah. It was a brief conversation. I know he was speaking -- he was working at like CTA or something, but I haven't talked to him in a while. Yeah. I don't



know where he is or anything. Yeah.
Q. How about Lester Garner? An older gentleman.
A. I was told Mr. Lester passed away as well. That's what I was told.
Q. Did you see him again in the neighborhood after this interaction about Mr. Reed trying to sell you the car?
A. No. Really, like, after moving, I just -- just stayed away, because I was -- you know, I was -- it was kind of, like, hot for me over there. It was bad. So I knew it was either -- and I was going to get in trouble with -- you know, and I got a lot of breaks with drugs selling over there. I ain't -- I ain't ashamed to say that. And it was time for me to leave and start a new life. So I -- I left. I never went back. They got a stop one time over there, and I told them, I'll never come back over here. There's no need for me to be over here. I'm going to get in trouble. So I just -- I left.
Q. So you turned your life around, fair to say, right?
A. Yes.
Q. Okay. You had some mistakes in the past, right?
A. Yes. Yes.
Q. Some run-ins with the police. They knew you,

**you knew them?**
A. Yes.
**Q. Okay. And you said you turned your life around now, right?**
A. Yes.
**Q. How long ago?**
A. Man. My oldest son is 18, so little -- 18 years.
**Q. Good incentive?**
A. Yeah.
**Q. Yeah.**
A. Yeah.
**Q. Good for you. I -- did you -- you said you were a diabetic?**
A. Yes.
**Q. Did the officers or detectives bring you home to be able to get your insulin?**
A. Yes. Uh-huh. I had told -- I told them -- because I take it -- I took it at, like, 8:00 in the morning and at 5:00 at night, I took it. So they -- they did. They didn't -- they take -- they brought me back to take it. And then during that time, my mom cooks, they let me take the insulin, but I -- they wouldn't let me sit there and eat dinner. So that's when they said, I'll get you something to eat.



**Q. Okay.**
A. So that's when they bought me something to eat.
**Q. Do you remember what they got you?**
A. I think the close thing in that area was like Wendy's or something like that. I think when that area was some quick bite, Burger King, or Wendy's, one of those.
**Q. Not as good as your mom's cooking?**
A. No.
**Q. Good thing you said that, I mean. So did you go back home to take the insulin once or twice?**
A. I had my -- after the morning dose, then they took me home. I got the insulin, the bag, because I knew I was -- told me I'll be there. So I just took it with me. Even though I would've had to take it at 8:00 the next morning, I only took it twice a day, I still took it back with me.
**Q. I just realized we've been going for several hours. Are you okay to --**
A. Yeah.
**Q. -- keep going. You don't need any --**
A. Yeah. I'm not diabetic anymore.
**Q. Oh, you're not. Wow.**
A. It's been -- it's been three years now --



**Q. Wow.**
A. -- after my transplant.
**Q. Wow.**
A. So I haven't took insulin in three years.
**Q. I'm glad you brought that up. Did -- you said that -- and I, again, I don't want to get into your medication or medical condition. Is it -- have you noticed that your condition or medication currently impacts your short term memory?**
A. Yeah.
**Q. Yeah.**
A. I think it was all the anesthesia because I had -- in two days, I had to go down twice, because it was -- it was something wrong with the pancreas. So I had to go down twice and I was just -- it's a lot of anesthesia, and then testing after mild anesthesia. So at times I notice, like, my short term, it's like, I try to keep it strong, but it -- it -- yeah.
**Q. Yeah.**
A. So sometime I forget.
**Q. Okay. Okay. So -- oh, and then let me just finish this loop. When is the last time that you saw Mr. Reed or spoke to him?**
A. The night of the -- that I told him to give me the paperwork.



**Q. When you handed him back the car keys?**
A. Yeah.
**Q. Then I apologize for bringing this back up again. Can you estimate for me when Correl passed away?**
A. It's 2025, '24, '23. I think he passed away in 2022.
**Q. About three years ago?**
A. It's been about three years now, yeah.
**Q. Was he in Chicago?**
A. Yes.
**Q. So it's not -- it's not a problem, and if you were in the courtroom, a judge would give an instruction. It's not a problem for attorneys to speak to witnesses.**
A. Yes.
**Q. Okay?**
MS. SCHNIDT: Israa, I don't know if you've seen this or not, but I did produce during the deposition, a screenshot of my communications with Mr. Burns, as well, on Friday, just giving him the address. So I just want to --
MS. ALZAMLI: Okay. I don't know where my phone is, but was that it? It was just --
MS. SCHNIDT: It was just that and I'm happy to show it to you.

Page 174

MS. ALZAMLI: It's okay.
MS. SCHNIDT: Okay.
BY MS. SCHNIDT:
**Q. So the first time you and I spoke, I called you, right?**
A. Yes.
**Q. Okay. And at that point in time, you mentioned to me that you had given a statement, right?**
A. Yes.
**Q. And it was after that conversation that I sent you a statement, right?**
A. Yes.
**Q. You've testified to that?**
A. Yes.
**Q. Then this next time we talked, I believe you said you called me, correct?**
A. Yes.
**Q. Do you remember why you called me?**
A. Because I felt threatened by the -- Mr. Reed's attorneys. It's like, and I didn't really know, like, what way to go. Like, when I speak to the state's attorney and they say, I don't have to talk to him. And then I was like, well, let me talk to the police. And so then I called and then you clearly stated you're not my lawyer. You can't tell me what to do, what not to do.

Page 175

So that was it.
**Q. Okay. You mentioned when you were talking about that that you reached out to me because you had testified against Mr. Reed, right?**
A. Yes.
**Q. And I represent the police as I had told you in that first conversation, right?**
A. Yes.
**Q. One word you used that I just want to double check on, you said working with. You knew we're not working together, correct?**
A. Yes. Yes. Yes. Yes.
**Q. Okay. Did you ever work with the police?**
A. No. No. No.
**Q. All right. So are you under the impression that you were working with the police or any of their attorneys at any point in time?**
A. No. I -- I should have said, like, as a -- a key witness to a --
**Q. Prosecution?**
A. -- to prosecution. So that's why I even reached out to the state, like, hey, what -- I don't know what's going on, like, what to do. Like, I thought my part was done. I even called Belmont and Western. I was like, hey, can I speak to the head, like, homicide

Page 176

detective or somebody, because, I don't know what's going on, like, this guy's lawyer's reaching out to me. I don't -- I don't know. I had, like, before and I -- I didn't know if it was the state or not, but I had people I would meet at McDonald's, like, and talk to them badges and hey, I'm investigating this and this and that. Hey, so what's this? And I'm like, "Oh, okay." You give him the story, same thing, like, I'm doing now, and then I forgot their name. I think I got one of the guys, because I don't -- I don't remember, but it is then -- that's when they told me, oh, well, he's going to be released. And I was like, "Oh, shit, okay." Then I looked it up. And then that's when I seen a big article and all of this and I was like, "Oh, okay." Then that's when I started getting calls, asked if -- for -- to talk to you-all.
**Q. When you're talking about having met with some people with badges at McDonald's, was that in relation to this case?**
A. Yeah.
**Q. That was before Mr. -- well, they told you that was before Mr. Reed was released from prison --**
A. Yeah. He was going to -- to be released or something. Yeah.
**Q. -- or jail?**

Page 177

A. Yeah.
**Q. Okay. Did you recognize anybody, like, having -- were they -- was it anybody that you had seen before in -- while you were -- while this investigation was going on and you talked to the police and gave the statement?**
A. No.
**Q. No?**
A. I -- uh-uh.
**Q. I do want to show you. It is Bates stamped Plaintiff 000948. And this is -- I will tell you this is the page following your handwritten statement. Let me show it to you and then I'll come back and ask you questions, okay?**
A. Okay.
THE REPORTER: Sorry about that.
BY MS. SCHNIDT:
**Q. Okay. So just for the record, the page before, is your signature on that last page of your handwritten statement? You see that?**
A. Yes.
**Q. Okay. And then this next page, do you see that?**
A. Yes.
**Q. Along the right side, do you see it says**

Page 178

**People's Exhibit 1?**
A. Yes.
**Q. Okay. And then do you see along this left side right here at the top --**
A. Yes.
**Q. -- of the photograph?**
A. Yes.
**Q. Okay. Okay. I've just shown you what's been Bates stamped 00947, the page before, and 00948. Do you recognize what is depicted in 000948? I can turn it towards you again.**
A. Yes, Mr. -- I call him Chuck, Mr. Carl Reed, and my signature on the picture.
**Q. Okay. I just want to make sure we get that because it was pretty quiet.**
A. Yes. I see that.
**Q. What is that page?**
A. So that's a picture of Chuck. I call him Chuck, but that's Mr. Carl Reed with my signature on the side.
**Q. Was this the picture that you signed during your -- during the statement that you gave to the state's attorney, if you remember?**
A. Yes.
**Q. You remember being -- go ahead.**

Page 179

A. I don't remember.
**Q. Okay. You do remember being shown a photograph, right?**
A. Yeah. Yeah. Yeah. Yeah. Yeah.
**Q. And you identified that person in the photograph as being Chuck, right?**
A. Yeah.
**Q. And you remember signing that photograph, right?**
A. Yeah.
**Q. So if this was attached to your statement and your statement references People's Exhibit number 1, and this has People's Exhibit number 1 written along --**
A. Yes.
**Q. -- along the right-hand side --**
A. Yes.
**Q. -- you wouldn't disagree that this was the photograph you saw and signed, correct?**
A. Yes.
**Q. Now, when you and I talked on the phone -- strike that. Do you remember you called me a second time after Mr. Reed's attorney investigator came to your business a second time?**
A. Yes.
**Q. And what did you tell me in that second**

Page 180

**conversation?**
A. That they came to the coffee shop and they wanted to talk to me and I told them, I didn't want to talk, but they shouldn't came here like that, like popping up on me now. And that his attorney said she wanted to show me something before this deposition, this meeting, but I said, okay, just come back later about 5:00. I closed, just come back. But I -- I was -- I was -- I didn't show up. Yeah.
**Q. Did Mr. Reed's attorney ever tell you that if you spoke to an attorney for the police that we would be lying to you?**
A. I recall her saying one time, have I -- have I spoke with you because you-all might be calling. But I have -- I didn't speak with -- with nobody on -- on your team before that. And I think she told me that you asked, have she spoke with me, and she was just like, no, I haven't. But they're reaching out to me way before your team ever reached out to me. They're reaching out to me way before I -- that was, as far as I know, that was their team, probably reaching out to me, knocking on the doors and all of that.
**Q. Did you ever pull any surveillance video of when -- not surveillance, any security video from inside your business when they came to your business?**

Page 181

A. I have -- I have one, two -- I had the first time when her and her -- the other gentleman came with her, then left, and then returning back when I was closed. And then her asking the neighbor next door, she owns a barber shop, like, salon. Never stated who she was. She just was -- was like, hey, how long -- isn't he open, right? It's like, I don't -- I don't -- the little clarity of the -- of the audio is, like, oh, well, yeah, I don't know when he's open. He just left early.
And she's like, "Oh, okay." That's it. She never said, like, hey, I'm looking for him because of this or that. She never did that. I can't say she -- she didn't never do that. But then it really got -- like, got to me when I had called you that one time was because I had guests in the shop. And I'm still going to start looking into this. Because I had guests in the shop and the gentleman came in and he said, "Ricardo?"
And I was like, "He not here." And then he clearly said, "Well, he has my number. He has my number. I'm trying to get a hold of him. And tell him if he don't contact me, there will be a warrant out for his arrest."
And my guest was like -- and I'm like, oh, hell no. No he didn't just say that and these people in

Page 182

here. Like, why would you, like, do that? First of all, you are a detective, a private investigator. You can't tell me a warrant going to be -- you can't yell that out like that. What gives you the right to say, you under arrest. Put your hands behind your back? If I don't want to take nothing from you, I don't have to take nothing from you. But you don't have the right to yell out and say, you going to have a warrant out for your arrest. So right there put a stamp on the way -- I was like, oh, hell no. Because now, you just, like, tarnish, not only Ricardo Burns, but Urban Morning Cozy Cafe.

So now the guest that was sitting in there is a local and he's like, "Holy shit, what the hell he got going on? Warrant out for his arrest?" This guy -- I said, "What the hell? I ain't got nothing to hide, but that just wasn't right, you doing that. You should have said, okay, and went back to your -- the firm that told you to come and see me and say, this guy ain't -- I don't know. Maybe you could see somebody, talk to him or something -- something, but, you know, don't -- don't -- don't yell that -- don't yell that out, man. Don't yell that out. That's like me picketing, saying, no, no, no, no, hey, no. That's not right to do that, period. What give you the right to yell that out? Did

Page 183

they tell you to say that? No, they did not. No."

**Q. Did you get the video from each of those three times the --**

A. That main one -- that main one with --

**Q. -- secure video?**

A. Yeah. That main one with him saying that. Absolutely.

**Q. You have that?**

A. Yeah. I -- yeah, I got that. Yeah.

**Q. Would you be willing to share that?**

A. Yeah. No, not at this point.

**Q. Okay. Okay. All right --**

A. But I do have it.

**Q. Did you feel, in any of the conversations, threatened by any of Mr. Reed's attorneys or the investigator that they had?**

A. Not the conversation, but like I said, it was just all about that. I thought my -- I thought, like, by this popping up again, it's like, what is -- I don't know. Like I say, I don't know what is going on. There are attorneys and everybody knocking on the door, do, do, do, do, do. Hey, paperwork. Go here.

And I'm like, "Whoa, wait a minute, what's going on?" Like -- and then there is so much, like, scamming and stuff going on out here. You walking up,

Page 184

you ain't got no badges showing. You just pulling up to somebody house, talking about some -- put your name. Here's your name, buddy. Sign your name on this. You might sign my name on something, I done signed for something. I don't even know what it is.

**Q. Are you concerned about seeing Mr. Reed at all?**

A. To a -- to a certain extent, yeah, because I don't know what his mind state is.

**Q. What do you mean?**

A. It was a car deal and Mr. Reed tried to sell me a car. And after reading the information, it's like -- Mr. Reed is pretty much like, I don't know what the fuck you talking about. That's where I feel like, wait a minute. I'm telling the truth. Just say you tried to sell me the car, bro. That's it. That's it, man. I ain't lying. I don't -- I don't -- anything else? I don't know. It's the car. That's it, man. Just keep it 100. That means, keep it real and tell him about the car, bro. That's it. I -- you know anything else, the way the story was written and all that, I -- I don't have nothing to do with that. I'm just telling you my part. And if he is sitting here right now, I'll tell him right now, just tell them about the car, bro. What happened? That's it.

Page 185

**Q. You don't know the significance of what that car has?**

A. I don't know the significance about the car. All that was shocking. Like, damn, I got a stolen car now? Or who --

**Q. You just know he -- you want him to be honest that he tried to sell you the car?**

A. Yeah. That's it.

**Q. Okay.**

A. It ain't nothing personal. Ain't none of that. Just keep it -- that's it. I ain't got nothing personal. Well, I be -- you know, and after reading -- I was nervous one day in the coffee shop, because after reading their statement, what they putting in, the way I was reading, it was like, damn, this seem like they trying to put -- this don't even sound right. Whoa. So I'm looking at him and then I get an older guy comes in the shop. He came and he's just looking at me and I'm like, behind the counter, like, holy shit. This -- hopefully this thing -- because I don't remember how he looked if he walked past me now, unless you showed me -- updated -- I seen an updated picture on Google, but I don't know how he looked. And I was like --

**Q. Was that older guy who came into the shop with the cane the investigator who came with Mr. Reed's**

**attorney?**
A. No, no, they --
**Q. Oh, okay.**
A. I don't -- it was just like, this guy just, like -- and then I look up, like, an old picture or something, like, "Man, did he get this old or something?" Like, man, like, man. Like, and then the guy come and chill, but then I was like, "No, this ain't -- this ain't him." Like, I got, like, paranoid, like, yeah, this guy going to hurt me or something now, like, hey, motherfucker. You know, like, what's up?
**Q. Yeah.**
A. And I'm like, "Oh, man." You know, I ain't do nothing to -- to cause the situation that was -- oh, the pot that was boiled. I just put my part in saying, what kind of car and the car that I was fixing to buy. I -- I didn't know the car was stolen. That's it, man. You sold me a car. That's it, bro.
**Q. Okay.**
A. Maybe it was the -- the addiction or something. You know, whatever it was to make you sell me the car, that's it. Just keep it real. That's it.
MS. SCHNIDT: Well, I appreciate your time, Mr. Burns. I'm done with my questions for you.
MS. SULLIVAN: I only have a few questions.



THE WITNESS: Yes?
EXAMINATION
BY MS. SULLIVAN:
**Q. Did the gentleman who accompanied Mr. Reed's attorney, did he identify himself to you at the time that they went to your shop?**
A. The gentleman that -- that was with her?
**Q. Yeah.**
A. When they -- when they came in, like I said, I thought they were guests and I was like, oh, okay. I was like, "Hey, how you doing?" He had his -- his name and she was just, you know, regular. And then the guests was sitting there. And then I'm thinking they ready to buy some coffee or something, and I'm going to get my coffee sales filled and then he reached in and said -- said -- I -- I can't remember his name, but he was like, you want to talk about -- I just want to see if you want to talk about Carl Reed.
And I was like, "Oh, man." I just -- just looking at my camera footage, I was like -- like, "man, this -- this ain't the time. It's business hours, man. I don't want to talk about this, you know?" And that was it.
**Q. Okay. So I just want to confirm that he did not identify who he was.**



MS. ALZAMLI: Objection. Mischaracterizes his testimony.
BY MS. SULLIVAN:
**Q. You can answer.**
A. I didn't hear him clearly.
**Q. Did he give you a card?**
A. No card. No.
**Q. Were any cards left with you?**
A. No.
**Q. Do you know if Carl Reed is disabled? And by disabled, I mean, I guess first, physically disabled?**
A. No, I don't.
**Q. Do you know that -- do you know if he is mentally handicapped?**
A. No, I do not.
**Q. Did he ever give you any reason to believe that he was, for lack of better words, mentally retarded?**
A. No.
**Q. Do you have any recollection of Mr. Reed's apartment? For example, do any items that were in his apartment -- does anything -- do you have any independent recollection of what his -- what the apartment looked like?**
A. I just remember, like, walking through the



door. It's a bed, a little table. It's a window, table, bed, single bed. That's about all.
**Q. Any papers?**
A. The table had some on it, but just regular little scattered, little papers or something on the table.
**Q. Do you recall there being any books?**
A. Not to my knowledge. I don't remember. Yeah.
MS. SULLIVAN: That was all my questions.
MS. ALZAMLI: Okay. I have a couple questions. Just a few more.
THE WITNESS: Yes.
REDIRECT EXAMINATION
BY MS. ALZAMLI:
**Q. Okay. Mr. Burns, did I show up to your coffee shop more than one time?**
A. Just once.
**Q. Just once? Okay.**
A. Yes. All right.
**Q. When you testified earlier with Ms. Schnidt that the second time is when someone told you that I wanted to show you something, did you mean to say that it was that first time when I came down?**
A. Yeah. The first time you -- when you came in, and then when he -- the gentleman you were with, he said

that then you stated before leaving out the shop and I told you-all a time to come back, which I did state 5:00, and I wasn't there. And then you-all came back, and on camera footage, you were speaking with the lady next door. But entering inside the coffee shop physically with me and you and your -- the gentleman that was with you, you were only inside the coffee shop one time that -- that --

**Q. I understand. So you were talking about when I came back --**

A. Yes.

**Q. -- and we talked to you. Okay. And your memory is that you told me to come back at 5:00?**

A. Yeah. Like, 5:00. Yes.

**Q. Okay. Were you planning on being there at 5:00?**

A. No.

**Q. No. Okay. And did you talk to that lady next door about what I talked to her about?**

A. No. I actually seen it on camera. I heard you talking on camera.

**Q. Okay. You heard me talking on the camera?**

A. And then she -- it's my neighbor, she came in and she said, a lady -- a customer was looking and you closed early. I said, "Yeah, I had to leave."



**Q. Oh, okay. She didn't tell you that when I talked to her, I said that I was an attorney representing somebody --**

A. She didn't.

**Q. -- who was incarcerated --**

A. Yeah, she didn't say that.

**Q. -- wrongfully?**

A. Yeah, she didn't say that.

**Q. She didn't say that she didn't tell you that I was looking for you because you were a witness to something that happened in the investigation?**

A. No, she didn't --

MS. SCHNIDT: Object to form.

THE WITNESS: I said no, she didn't. She didn't say that.

BY MS. ALZAMLI:

**Q. She told you that I said I was a customer and I was asking why you closed early?**

A. She said that a customer came and you -- and was wondering why you were closed. I told her that, I don't know. He left early.

**Q. Okay. So at no point in the conversation between you two did she say that I was an attorney?**

A. No. And even on the -- the audio, clear audio, even though the cars was passing, I didn't even



hear you state you was an attorney. You asked, what time he closed?

**Q. Okay.**

A. And she clearly said, he closed early.

**Q. Okay. And you have that video recording?**

A. Yes, I have it.

**Q. You still have it? Would you be willing to produce that video recording?**

A. No.

**Q. Why wouldn't you be willing to produce that video recording?**

A. You know what, to be honest with you, yeah.

**Q. You will?**

A. Yeah. I'll be willing. You give me a subpoena and I'll give it to you.

**Q. Okay.**

A. I'll e-mail it to you.

**Q. Thank you.**

A. Any video you want. Absolutely.

**Q. Okay. Thank you. I wanted to also ask you about the video of the investigator who came back the other time and tell -- told you that he was going to have an arrest warrant for you?**

A. Yes.

**Q. Okay. So that investigator told me that you were not in the shop and that the person working the counter said that you were his boss?**

MS. SCHNIDT: Objection. Speculation. Foundation.

BY MS. ALZAMLI:

**Q. So --**

MS. SCHNIDT: I'm sorry.

BY MS. ALZAMLI:

**Q. Were you in the coffee shop when the investigator came by?**

MS. SCHNIDT: Form. Speculation. Foundation.

THE WITNESS: So I'm going to give it to you like this.

BY MS. ALZAMLI:

**Q. Okay.**

A. I said clearly, if you rewind the tape, there's a lot of spam and stuff going on. Just because you walk into a place and you ask for a person, hey, I want to speak to Ricardo Burns, there's a lot of owners of restaurants don't tell you they don't either, do they? I don't know who you are, because if he walked in and said he was a detective and walked to me and said, Mr. Burns? See, you got guests, but Mr. Burns, I'm such and such, I want to serve you these papers. Don't walk in the coffee shop and say, Mr. Burns, I'm looking to

speak to Ricardo Burns. Whether I was an employee, a janitor, or someone delivering pastries, he did not have the right to say, Ricardo Burns will get a warrant out for his arrest.

**Q. Okay. I'm trying to ask you a very specific question, which is, at any point --**

A. And I did tell him no. I didn't have to take nothing from him because I didn't know who he was. He didn't present himself properly.

**Q. Okay, but Mr. Burns --**

MS. SCHNIDT: Let him finish, Israa.

THE WITNESS: He --

BY MS. ALZAMLI:

**Q. Mr. Burns, I'm trying to ask you a very specific question.**

A. Yes.

**Q. So if you'll do your best to answer the question?**

A. Yes.

**Q. At any point when an investigator came by to try to serve you the papers, did you tell an investigator that you were not Mr. Burns?**

A. Absolutely.

MS. SCHNIDT: Objection. Asked and answered.

BY MS. ALZAMLI:



**Q. Okay. So you did tell the investigator that you were not Mr. Burns?**

A. I didn't know who he was.

**Q. Okay. And what happened after you told him that you weren't Mr. Burns?**

A. Unprofessionally, he said, "He has my number. He needs to call, or he will get a warrant out for his arrest, or there will be a warrant out for his arrest."

**Q. Okay. So that's when that happened?**

A. Yes.

**Q. Okay. Was there any other -- and that was -- did you know if that was with Mr. Larry?**

A. Yes. It's Mr. Larry, yes.

**Q. That was Mr. Larry? Okay. How did you know his name was Larry?**

A. Because previously he had left a text messages saying that he was going to be stopping by. How he got my phone number, I don't know. He's a detective. He gets -- he -- he can get a phone number. He could get a -- an address. He can get it.

**Q. Got it.**

A. But he did clearly say in the text message, this Mr. Larry. This -- my name's Larry. Okay.

**Q. Okay. And he was asking -- or he was telling you that he was going to come by to serve you these papers?**



A. (No verbal response.)

**Q. So it is -- it's scary when someone comes by to try to give you papers, right?**

A. If they don't serve them properly.

**Q. Okay. Do you remember, like, at the very beginning, when all of this started, when I called you on the phone to tell you, hey, we want to send someone to serve you papers so that you would be available to accept them?**

A. Okay.

**Q. Do you remember that?**

A. Yes, I remember.

**Q. And that worked out pretty well, because you knew someone was coming and you accepted the papers and we successfully served you, right?**

MS. SCHNIDT: Object to form.

THE WITNESS: Yes.

BY MS. ALZAMLI:

**Q. Okay. And I had tried to call you many times, or, like, I tried to call you a few times after your deposition was canceled, and I would leave a message every time saying, hey, we are trying to serve you, Mr. Burns. Can you call me so we can coordinate. Is that right?**



MS. SCHNIDT: Objection. Form. Leading. Counsel's testifying. Mischaracterizes prior testimony.

BY MS. ALZAMLI:

**Q. Did I do that?**

MS. SULLIVAN: Asked and answered. He has already testified to this at the beginning of his deposition, thoroughly.

BY MS. ALZAMLI:

**Q. Did I do that?**

A. I don't remember.

**Q. You don't remember?**

MS. SCHNIDT: The same objections. Israa, we have already gone through this. This is getting harassing for the witness.

BY MS. ALZAMLI:

**Q. You have to answer the question.**

MS. SULLIVAN: No, he doesn't.

MS. SCHNIDT: He -- if he feels harassed, he doesn't have to answer.

MS. ALZAMLI: You can't instruct him whether or not to answer --

MS. SCHNIDT: I'm not. I --

MS. ALZAMLI: -- the question.

MS. SCHNIDT: I didn't instruct him. I said -

- you said, you have to answer --
MS. ALZAMLI: Do not instruct the witness --
MS. SCHNIDT: And I said, that's not true. I have every right to correct it. If he feels harassed, he cannot answer. That's his choice.
MS. SULLIVAN: And if you have already answered the question, you don't have to answer it again.
MS. ALZAMLI: That's not true.
MS. SULLIVAN: Yes, it is. Yes, it is.
BY MS. ALZAMLI:
**Q. You testified earlier that you read my messages, right?**
MS. SCHNIDT: Object to form. Mischaracterizes his prior testimony.
BY MS. ALZAMLI:
**Q. You have to answer the questions that I'm asking you, sir.**
A. Yes, I testified earlier, yes.
**Q. Okay. Was it your understanding that I was trying to serve you with another subpoena for the next deposition?**
MS. SCHNIDT: Asked and answered.
THE WITNESS: Yes.
BY MS. ALZAMLI:



**Q. Okay. Now, when you came on to that first deposition, the one that was canceled, you had mentioned that you would be available to reschedule the deposition on any upcoming Monday. Do you remember that?**
MS. SCHNIDT: Leading.
THE WITNESS: Yes.
BY MS. ALZAMLI:
**Q. Okay. So you knew that we were going to reschedule the deposition, right?**
MS. SCHNIDT: Object to form.
THE WITNESS: On any upcoming Monday, yes. Not, what Monday, but any upcoming Monday, yes.
BY MS. ALZAMLI:
**Q. Exactly. Which is why it was so important for me to reach you so I can tell you which Monday, right?**
MS. SCHNIDT: Objection. Speculation as to your state of mind and your intentions.
MS. SULLIVAN: Right.
BY MS. ALZAMLI:
**Q. You have to answer the question.**
A. No.
**Q. Okay. So what was the -- what was your understanding of why I was trying to reach you?**
A. To get your point across, probably.
**Q. To get my point across?**



A. To get what -- just to get -- get ahold of me.
**Q. For what reason was I trying to get ahold of you?**
A. To get the -- the subpoena out to me, or whatever. Where you should just send the subpoena out. You don't have to contact me as a -- as Mr. Reed's lawyer to contact me and say, hey, I'm going to send this out to you. Hey, I'm going to do this for you. Just send it. If the judge stamped it, you send that detective or that sheriff out, and he gets it to me. You don't have to follow up. Once he gets back and he informs you that, hey, it was delivered properly, then, okay, that's your signed seal saying, okay. Mr. Burns got it. You don't have to follow up.
**Q. Mr. Burns, do you understand that a sheriff does not serve as subpoena in a civil lawsuit?**
MS. SCHNIDT: Objection. You are harassing the witness and you are definitely crossing the line.
MS. ALZAMLI: Emily --
MS. SCHNIDT: He has answered the questions multiple times.
MS. ALZAMLI: How --
MS. SCHNIDT: You are crossing the line, Israa. You are.



MS. ALZAMLI: If you have a problem, you can call the Court. Call the Court.
MS. SCHNIDT: I would love to not get the Court involved.
MS. ALZAMLI: Call the Court. If you have a problem, call the Court.
MS. SCHNIDT: I -- and I will.
MS. ALZAMLI: Genuinely, call them right now if you have a problem.
MS. SCHNIDT: If I will if you continue down this, because this is unfair to Mr. Burns --
MS. ALZAMLI: What is unfair about it?
MS. SCHNIDT: -- who has been sitting here -- excuse me?
MS. ALZAMLI: What is unfair?
MS. SCHNIDT: You have asked him this question -- these questions --
MS. ALZAMLI: I did not ask him this question.
MS. SCHNIDT: -- and now you are trying to instruct --
MS. ALZAMLI: I just asked him --
MS. SCHNIDT: Excuse me, are you going to let me -- or did you ask me a question? Would you like to know the answer?
MS. ALZAMLI: Please answer it.

Page 202

MS. SCHNIDT: Or do you want to just speak over me?
MS. ALZAMLI: Please answer it.
MS. SCHNIDT: Right now, you are instructing him on whether somebody, the Sheriff's Office, needs to serve a subpoena, when at the end of the day, Mr. Burns has testified extensively to what his recollection of the conversations were, what his belief was behind your intentions, and he is sitting here. So whether somebody else needs to serve him with a subpoena has absolutely no relevance, other than an attempt to intimidate the witness into just agreeing to your version of the events.
MS. ALZAMLI: Mr. Burns' characterization of our interactions and his refusal to be served after his first deposition was canceled is relevant to his credibility as a witness, is relevant to the story that he tells about you and his interactions with you. It's relevant to this case. I have the right to ask him these questions. I'm not asking him the same questions. I'm asking him different ones. If you have a problem, I welcome you to call the Court. Otherwise I'm going to continue asking the questions I want to ask.

Page 203

MS. SCHNIDT: I have a problem with you lecturing him on who needs to serve him with a deposition subpoena when he's sitting here right now. That is a pure intimidation tactic.
MS. ALZAMLI: Okay. How is that --
MS. SULLIVAN: And actually, I'd like to take -- let's take five minutes because I think that we do need to discuss whether or not we need to call the Court because this is ridiculous. So let's take five.
MS. SCHNIDT: Okay.
MS. SULLIVAN: And decide what we're going to do, but I'm not going to sit here and let him be subjected to harassment while we figure this out.
MS. SCHNIDT: Okay.
MS. ALZAMLI: Okay.
MS. SULLIVAN: Thank you.
THE VIDEOGRAPHER: We are now off record. The time is 1:55 p.m.
(A recess was taken.)
THE VIDEOGRAPHER: We are back on record for the deposition of Ricardo Burns. My name is Taylor Welsh. Today is February 3rd, 2025, and the time is 2:02 p.m.
MS. ALZAMLI: Okay. Thank you.

Page 204

BY MS. ALZAMLI:
**Q. Okay. Mr. Burns, can you please tell me all of the interactions that you've had with investigators that you believed were coming from my firm? Like, all of the -- like, how many times you saw them?**
A. The first time, three times.
**Q. So three times in total?**
A. Yeah, three times.
**Q. Was the first time -- well, what was the first time?**
A. The serving of the first subpoena.
**Q. Serving of the first subpoena? Okay.**
**Was the second time when I came to the shop with Mort Smith, the other investigator?**
MS. SCHNIDT: Object to form. Leading. Asked and answered.
THE WITNESS: Yes.
BY MS. ALZAMLI:
**Q. And was the third time when the investigator, Larry Beila, came to your office -- came to your coffee shop?**
MS. SCHNIDT: Leading.
THE WITNESS: Yes.
BY MS. ALZAMLI:
**Q. Okay. Thanks. I wanted to ask you a couple follow-up questions about some of your testimony with Ms. Schnidt. So first, I just want to make sure I fully understood this.**
**When you first interacted with Carl or Chuck for the car, when -- you said he drove it up, you said you were with a lot of people, right?**

Page 205

A. Uh-huh. Yes.
**Q. Okay. Yes. And then the second time, you were only with Pistol, known as Duran Watts, and Correl?**
A. I said it was a group of people outside. It all of us. We was outside. There was more than five of us outside. Everybody was outside.
**Q. Okay.**
A. Yeah.
**Q. Totally fair. I am just trying to make sure I understand exactly what happened. And Correl was with you that second time that you saw Carl?**
A. Yes.
**Q. And that second time that you saw Carl is when you went with Carl to the SRO building?**
A. Yes.
**Q. Did Correl go with you to the SRO building?**
A. No.
**Q. Did Pistol go with you to the SRO building?**
A. No.

Q. So you -- did you go alone with Carl to the SRO building?
A. Yes.
Q. Okay. When you saw Lester Garner in the hallway -- when you saw the door that was all taped up and you saw Lester, was that the first time that you had seen Lester during the course of this whole incident?
A. Yes.
Q. Okay. And when you saw Lester in the hallway, were there other people in the hallway?
A. No.
Q. It was just Lester?
A. Yes.
Q. Okay. And in your statement that Ms. Schnidt was reading for you, you said that you had asked the guy for a name and the guy said, Chuck. Do you remember that?
A. Can you re-say it?
Q. Yeah, if I can find it. I just have so many papers at this point in time. You -- do you remember testifying something along the lines of, when the guy who approached you to sell you the car, you asked him his name and the guy said Chuck?
A. Yes.
Q. Is that what happened?



A. Yeah.
Q. So at that point, you didn't know what he went by?
A. No.
Q. You didn't know that he went by Chuck?
A. No.
Q. But you knew him from the area?
A. Yes.
Q. So did you just know what he looked like?
A. Yes.
Q. But you didn't know that he went by Chuck --
MS. SCHNIDT: Asked and answered.
BY MS. ALZAMLI:
Q. -- until he told you when he came to sell you the car?
MS. SCHNIDT: Asked and answered.
THE WITNESS: Yes.
BY MS. ALZAMLI:
Q. Okay. Can you tell me more about that meeting that you had at McDonald's, with people with badges? When did that happen?
A. I don't remember. I think it happened, like, in 2022, '23. Maybe 2023 or something. It happened. I think it was 2022. 20 -- I don't remember, actually, but it was -- it was a little back before he -- I think



before he was released.
Q. It was a -- you think?
A. I think so.
Q. You think it was before he was released?
A. I think so, yeah.
Q. How did that meeting come to be? Did somebody call you?
A. I don't know. They said they was investigators. Would you like to meet? We'd like to talk about Carl Reed. I said, "Okay."
Q. I'm sorry. Can you please speak up?
A. They said they was investigators about the Carl Reed case, and they wanted to go over some things. So then we -- I said, "Okay, we'll meet at McDonald's." We met at the McDonald's right on Western.
Q. Were -- did they say they were, like, private investigators, or did they say they were, like, police investigators?
A. They said they was investigators. At least they had badges. You know, they had -- they said, you know --
Q. A police badge, or what do you mean by badge?
A. Like, star badges, like with a star badge. I don't know if they was police. I don't know what kind of -- they just had --



THE VIDEOGRAPHER: And I'm sorry --
THE WITNESS: -- badges.
THE VIDEOGRAPHER: Can you move your collar and your mic, just so I'm hearing -- hold on. It's, like, your collar. Yes. Perfect. Thank you. Perfect. Thank you.
THE WITNESS: Okay.
BY MS. ALZAMLI:
Q. Okay. And what did you guys talk about at the McDonald's?
A. Same thing we talking about here, my story. Like, what -- what happened, and -- and it was about -- and about the car. Same thing.
Q. And you don't know who those people were? Do you know their names?
A. I don't remember their -- remember their names, no. It was, like, four of them.
Q. There was four of them?
A. Yeah.
Q. Were they men or women?
A. Men. Men.
Q. Did they identify themselves as being from any particular precinct or area?
A. I think one of them said they was from the state, so --

**Q. And then how long was that meeting?**
A. About -- it couldn't have been no more than about 30 minutes. 30, 40 minutes. It wasn't that long.
**Q. And then after that meeting, did anyone else follow up with you?**
A. No. After that, I didn't hear anything else until I started hearing from -- from you-all. That was it.
**Q. Did you know the -- you said you knew the police. There was, like, a squad of them who kind of hung out around the area where you lived, right?**
A. Uh-huh.
**Q. And you said none of those officers are the ones who arrested or who took you in for questioning related to the Kim Van Vo homicide investigation, right?**
A. Uh-uh.
**Q. Did you know any of the people who took you in or talked to you about the Kim Van Vo investigation?**
A. No, I -- not -- none of them. The ones from the neighborhood was, like, tactical. They was plain clothes. Gang unit, robbery, them type of cats, you know. Police. The ones that came and got me, they was suit and tie.
**Q. Okay. So I want to ask you a couple questions about your memory, because earlier you testified that**



**you have some memory issues, and I want to make sure that I understand the scope of what your memory issues are. We can designate this portion of the deposition as confidential so that no one outside of the people working on this case will look at it, or we can continue the deposition at a later date, and I can go file something with the Court to allow me to ask you more questions about your medical condition, and we can come back and do this again once I have a court order. So --**
MS. SCHNIDT: Mr. Burns, what Counsel is suggesting is that you can voluntarily give your medical information, or she can seek a motion with the Court, and the judge may or may not grant it.
MS. ALZAMLI: Correct.
MS. SCHNIDT: It's not a foregone conclusion that you're going to have to -- that the Court will order you to disclose your medical information, okay? The decision is yours, but it is not something that she's just going to be granted by the judge automatically to disclose your medical condition.
MS. ALZAMLI: Right. And thank you, Emily, for making sure that that was clear for the witness. So I will have to file a motion with the Court and essentially give them my reasons for why.



And then if the Court responds, I'll have to find you again, and we'll have to bring you back and do everything.
MS. SULLIVAN: That's -- you just said that's not guaranteed.
MS. ALZAMLI: Right.
MS. SULLIVAN: What you're saying is that you're -- that the Court is going to grant your motion to continue his deposition, and that's just not true.
MS. ALZAMLI: Terrie, I said --
MS. SULLIVAN: It's not true.
MS. ALZAMLI: -- if the Court agrees with my motion, then we will come back and do the deposition again. I'm explaining to the witness the procedures that happen if my motion is granted.
MS. SULLIVAN: It's already been explained to him.
MS. ALZAMLI: I appreciate you clarifying for the witness.
BY MS. ALZAMLI:
**Q. Now, your memory is something I -- like, I want to ask you about. So maybe what you know -- we can either start and then you can decide if you want to stop, if there's a certain question you don't want to**



**answer, then we can go from there. But do you have any thought on what you want to do?**
A. You know what? I think the medical team would be able to explain a lot more better. So if that's what you want to do, you could pull all medical records, and then they'll explain the medicine and all that better than I can. All I know is I take the medicine and what side effects it might give me. But the -- the medical people, if you want to do that, then you could do that. But I -- I'd rather not disclose that.
**Q. Okay.**
A. Because --
**Q. Thank you for saying that. So I will not ask you about your medical conditions or any medications that you're on. What I'm going to ask you about is the effects that you experience, okay? So as you sit here today --**
MS. SCHNIDT: Again, sir, with the same caution that I'm not instructing you one way or another. I just want -- because you don't have an attorney here, we have an obligation as attorneys to accurately represent to you what the law is. And so it is your decision and your decision alone as to whether you want to testify and answer the questions that Counsel is going to be asking you.

Page 214

BY MS. ALZAMLI:
**Q. It is your decision if I'm asking you about, like, medical information, but if I'm asking you about your memory, you have to answer those questions, okay?**
MS. SCHNIDT: That's not true, because his medical condition impacts his memory. If that's what you're -- I mean, if you want to understand -- it --
Maybe it's my confusion here, Israa. Are you asking him about his memory about the incident, which he's already fully testified to, or are you asking how his memory is today in light of these medical conditions?
MS. ALZAMLI: I'm asking him about his personal experience and how he experiences events in his everyday life and his memory.
MS. SCHNIDT: Because of his medical conditions?
MS. ALZAMLI: I'm asking him about his experience, which he can testify to.
MS. SULLIVAN: He's already said that the impact has been on his short-term memory. He's already testified to this.
MS. ALZAMLI: Okay.
MS. SULLIVAN: So what is the point of your

Page 215

line of questioning?
MS. ALZAMLI: I am allowed to ask follow-up questions when a witness gives an answer. And again, if you have a problem, I welcome you to call the Court. I really do.
MS. SCHNIDT: Then I guess we'll have to -- I mean, that's what we're trying to clarify.
MS. ALZAMLI: Okay.
MS. SCHNIDT: Out of respect for Mr. Burns, we're not -- we want to be able to provide him the right caution. And so if you are -- if -- what I think you're questioning is couched in is related to his medical condition.
MS. ALZAMLI: Right.
MS. SCHNIDT: In which case, if you're not -- if you want to continue to press forward, and he's already said he doesn't want to testify to it, then we'll have to call the Court.
MS. ALZAMLI: Emily, I've stated several times that I'm not asking him about his diagnoses. I'm not asking him about what medications he's taking. I'm asking about his personal experiences with memory. For example, if you have breakfast on a Monday, is it hard for you to remember on a Tuesday what you ate for breakfast?

Page 216

MS. SCHNIDT: That seems reasonable.
MS. ALZAMLI: He can -- he can testify to that.
MS. SCHNIDT: Okay. That seems reasonable.
MS. ALZAMLI: Okay.
MS. SCHNIDT: Okay.
BY MS. ALZAMLI:
**Q. Okay. Mr. Burns, I'm going to ask you a couple questions so I can better understand how you experience memory, okay?**
A. Yes.
**Q. Now, for example, if you have a banana for breakfast on Monday, can you remember on Wednesday that you had that banana for breakfast?**
A. Yes.
**Q. Okay. If you had a banana for breakfast two weeks ago, can you remember that you had a banana for breakfast two weeks ago?**
A. Yes.
**Q. Okay. Can you tell me, what are the kinds of things -- no, strike that. So it's your understanding that it's your short-term memory that's affected, right?**
A. Yes.
**Q. Okay. So can you give me an example of the way in which your short-term memory is affected?**

Page 217

A. I would say maybe names sometimes. It's hard to program a lot of names, especially with customer service. And I might see you every day and then I don't even remember your name, or I might -- say I left my phone on the table or something. Where did I put it? Or, where's the remote, or something like that.
And it might not even be that. It might be because of old age as well. I'm 46 years old. So you know, as you get older, the terabyte up here starts to get a little weak to a certain extent, but it never stops holding the data.
**Q. Okay.**
A. Just takes a while to process it out a little bit. The way that it was programmed, it might come out a little different, but it's still accurate.
**Q. Okay. So names and maybe where you've left something. Like, a few hours later, you might have a hard time remembering where you left it?**
A. Yeah, honestly.
**Q. Is it possible that you would maybe, like, hang out with your sister, and then later, you know, a few weeks or months later, forget that that happened completely?**
A. No.
**Q. No. Okay.**

A. Depend on the situation. We might have went somewhere boring or something. Then I just didn't have too much interest in it. And then I'd shoot the breeze, but if we do something exciting or something, I will never forget that moment.

**Q. Okay. And so generally speaking, or -- strike that. Do you -- is there -- was there ever a time in your life where, after all of this happened that caused your memory to be affected, did someone say, hey, do you remember when this happened? And you're like, oh my God, no way. I have no idea what you're talking about. And they're like, oh, what? Like, I can't, like -- have you ever had an experience like that?**

A. No. And like I said, if it wasn't something I was interested in or something, then yes. No, because my mind wasn't really into it --

**Q. Okay.**

A. -- at that moment.

**Q. Do you have a problem remembering conversations that you had with people?**

A. Depends on what type of conversation it is.

**Q. Can you tell me more? What do you mean by that?**

A. I don't know. I don't know.

**Q. Okay. Do you mean, like, if the conversation is boring versus if it's interesting?**



A. Yeah.

MS. ALZAMLI: Okay. I have no more questions for you. Thank you, Mr. Burns.

RECROSS-EXAMINATION

BY MS. SCHNIDT:

**Q. Just a couple questions. After you gave this statement to the state's attorney and you talked to the police, did you have an understanding that the car that Mr. Reed tried to sell you connected him to a murder of the person who owned that car?**

A. Yeah, I was told. Yes.

**Q. Yeah. And you're not making a decision as to whether he did commit the murder or not.**

A. Yeah.

**Q. You just, back in 2001, knew this car --**

A. Yeah.

**Q. -- that you bought from Mr. Reed was connected to the murder of that same vehicle owner, right?**

A. Yes. Yes.

**Q. Is that something you ever forgot over the next 24 years?**

A. No. I'll tell you something. If you check my secretary of state track record when it come to cars, I could have probably owned my own car dealership. But if you look at the cars that I bought, I've never bought a Nissan Maxima. I worked at Nissan for over -- I'd say for the whole Autobarn Corporation for over 13 years. And I worked at Nissan. I can -- I can't -- I was a porter, and I moved a lot of cars, but I could tell you one thing. I don't think I ever sat in a -- in a -- in a Maxima. Yeah, they look nice, but it's just, I don't like Maximas.



Due to the -- the situation that I went through with that vehicle that was -- you know, that's sad, you know, to be put in that situation, you know? And it's, you know, that's sad about the -- the victim, but that vehicle had rid -- I don't want no -- no ties in that vehicle. And now I come to a point where I bought cars off Marketplace and all that. But it's straight secretary of state or you going to meet me at a police station or somewhere and show me the correct paperwork. I wouldn't -- I'm -- I'm not doing no more. So yeah. I -- to answer your question, yeah.

**Q. It's not something you ever forgot?**

A. No, I'd never forget that.

**Q. And then just that meeting that you talked about in -- at the McDonald's in 2022 or 2023, was that kind of like an information gathering meeting?**

A. Yeah. It was, like, so much, like, this, like, oh, so did you save -- when did you -- how much you paid for the car? How much -- do you remember this officer? Do you remember him? Do you -- and I was like, same thing. Like, I was like, "I remember he wore a trench coat," and then one of them said a name or something. Was that such and such? And I was like -- to each other -- amongst each other. And I was like, I just -- they was like, oh, okay. Well, you said you, da, da, da. And it was that little talk, and then, okay then. All right. Here's a card. And then they got in they truck and drove off.



**Q. Do you still have the card?**

A. I think I have one card. I think I seen a card on -- on my desk at home. I think I have it. I could --

**Q. Maybe take a picture and text it?**

A. Yeah. If you-all need it or whatever.

**Q. Yeah, that would be great.**

A. Yeah. All right.

**Q. Did anyone --**

A. I know they, like -- that's why I say, like, when you presenting something, and they was coming, they had, you know, badges and State Illinois on the badges and all this. And I was like, okay. Where, like, the other guy came in the shop, he was just saying, who you

is, man? You just look regular, like somebody off the street. I don't know who you is, talking about getting you some paperwork. At least the mailman got a fucking uniform on, excuse my French, delivering your government mail.
MS. SCHNIDT: Okay. All right, Mr. Burns, that's all the questions that I have.
THE WITNESS: Thank you.
MS. SCHNIDT: Anybody else?
MS. ALZAMLI: Nothing from me.
MS. HARRIS: No, I don't have any questions. Thank you, Mr. Burns, for your time.
THE WITNESS: Yes, ma'am. Thank you.
MS. SCHNIDT: Signature, Israa. Do you want me to do --
MS. ALZAMLI: Yeah.
MS. SCHNIDT: You have the option to reserve or waive your signature. Reserving means you want to take -- read what was taken down to make sure it's all truthful and accurate. You can't change the substance, but there might be a word that was taken down incorrectly. Waiving means you trust that the court reporter has taken down everything correctly. Obviously, we also have the video, too.
THE WITNESS: Yes.



MS. SCHNIDT: Most people choose to waive their signature. What would you like to do?
THE WITNESS: I'll waive. This is on camera and everything, so --
MS. SCHNIDT: Trust it because it's on video?
THE WITNESS: Yes. I'm good.
MS. SCHNIDT: Yeah. Waive, then. Okay.
THE REPORTER: Before we get off record, Ms. Alzamli, did you want a copy of the transcript today, or an order of the transcript?
MS. ALZAMLI: Not now. Thank you so much, though.
THE REPORTER: Sure. And then Ms. Schnidt, would you like a transcript?
MS. SCHNIDT: Yes, I'll order. Thank you.
THE REPORTER: And what would you like?
MS. SCHNIDT: Searchable PDF is fine.
THE REPORTER: Sure. Searchable PDF. And did you want a video as well?
MS. SCHNIDT: I don't need the video right now.
THE REPORTER: All right. And then Ms. Harris, would you like a transcript order?
MS. HARRIS: Not at this time, thank you.
THE REPORTER: Not at this time. All right.



And then, Ms. Sullivan, would you like a transcript order or a video?
MS. SULLIVAN: Not at this time. I will e-mail if I want to order.
THE REPORTER: Sure. And then, sorry, Ms. Harris, did you want no video either?
MS. HARRIS: No video either.
THE REPORTER: All right.
MS. HARRIS: Thanks.
THE REPORTER: Thank you. And then just one quick question before we get off record, too. Ms. Schnidt, did you want to mark those exhibits that you showed him on the record or were -- or were those just references?
MS. SCHNIDT: References are fine.
THE REPORTER: References. Great.
MS. SCHNIDT: Yeah. Thank you.
THE REPORTER: Thank you.
THE VIDEOGRAPHER: We are off record. The time is 2:26 p.m.
(Deposition concluded at 2:26 p.m. CT)



CERTIFICATE OF DIGITAL REPORTER
STATE OF ILLINOIS

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Stipulation page hereof, by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded digitally by me and then reduced to typewritten form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skill and ability. I certify that I am not a relative or employee of either counsel and that I am in no way interested financially, directly or indirectly, in this action.



JESSICA AUBREY GJERDE,
DIGITAL REPORTER/NOTARY
MY COMMISSION EXPIRES: 09/16/2028
SUBMITTED ON: 02/12/2025

EXHIBITS

EXHIBIT City Reed 110 - City Reed 128 32
EXHIBIT City Reed 94 - City Reed 98 107
EXHIBIT Friday, January 31st, 2025 46
EXHIBIT on Friday, January 17th, 2025 21
EXHIBIT Stamped City Reed 49 - City Reed 56 31
EXHIBIT Tuesday, January 28th, 2025 49

**Exhibit 1_ Burns** 21:11,15 152:25 153:1 178:1 179:12, 13
**Exhibit 2_ Burns** 31:22 32:4 92:18 147:5 166:11
**Exhibit 3_ Burns** 32:1,6 98:24 101:11
**Exhibit 4_ Burns** 46:7,17
**Exhibit 5_ Burns** 49:17,20
**Exhibit 6_ Burns** 107:14 141:6

**$**

**$250** 115:15 130:19 152:8,9
**$30** 86:21,24 89:1 116:23 117:24 119:4 133:9 144:1 154:4,11,24 155:9

**0**

**000138** 131:20
**000948** 177:11 178:10
**005** 108:1
**00947** 178:9
**00948** 178:9
**01** 93:19 107:24,25 109:10,12 144:7 149:9,25 150:7 151:23 157:11

**1**

**1** 21:11,15 51:25 52:17 152:25 153:1 178:1 179:12, 13
**10** 100:1
**10-year** 54:13, 14
**100** 137:4 184:19
**10:00** 7:7 46:14
**11** 100:2
**110** 31:25 98:23
**119** 100:2
**11:28** 89:22
**11:43** 90:2
**11:45** 93:20
**12** 100:2
**120** 32:22
**120-day** 60:2
**128** 31:25 98:23
**13** 56:18 100:2 101:9,11 220:3
**14** 56:18 61:24
**14th** 150:7
**16th** 109:8,10, 12 151:23
**17** 147:2
**17186** 7:15
**17th** 21:12 51:25
**18** 61:24 100:3 147:2 170:7
**19** 23:9 101:11
**1987** 54:4
**1999** 55:5
**19th** 144:7 150:7 157:11
**1:55** 203:19

**2**

**2** 31:22 32:4 38:14 92:16,18 141:23 147:5 151:22 166:11
**20** 15:2 24:2 51:24 55:4 207:24
**2000** 55:4,5
**2001** 21:25 56:24 57:3 63:10 115:20 146:21 219:16
**2002** 60:13,15
**2022** 173:6 207:23,24 220:23
**2023** 207:23 220:23
**2025** 7:6 90:1 173:5 203:23
**20814/630** 150:4
**20s** 146:22
**20th** 48:13 57:17,19 76:7 135:20
**216** 162:3,23 163:7
**217** 162:3,23 163:7
**21st** 11:21 107:24,25
**22nd** 21:25 93:19 149:9,24
**23** 7:15 146:25 147:1 151:12 173:5 207:23
**2345** 93:19,20 109:14 149:10
**23:45** 149:25
**24** 23:9 132:16 138:15 167:18 173:5 219:22
**2452** 149:10,25
**250** 86:15,16 142:23
**28th** 49:18 50:8,20,23 51:24
**2:02** 203:24
**2:26** 224:20,21

**3**

**3** 32:1,6 98:24 99:14 101:11 130:13
**30** 16:16 86:21 106:24 118:18 120:9 138:5 140:6 154:5 210:3
**305** 161:21
**31st** 46:9,10 48:20 50:8,19, 23 51:25
**338** 133:18 134:3
**341** 133:19 134:3
**3rd** 7:6 90:1 203:23

**4**

**4** 46:7,17 51:25 52:17
**40** 210:3
**46** 145:19 217:8
**48** 145:19,20,21
**49** 31:21 92:12
**4900** 158:11
**4946** 150:7 157:1,5,12,14 161:13
**4:00** 41:16

**5**

**5** 49:17,20 51:24 52:17
**500** 109:15
**5000** 142:6
**5012** 109:13 143:5
**5026** 54:19
**50th** 110:5
**5216** 144:9
**56** 31:21 92:12
**5:00** 76:22 170:20 180:8 190:3,13,14,16
**5:30** 17:4

**6**

**6** 107:10,14 141:6 161:23
**61** 60:1

**7**

**7200** 146:13

**8**

**8** 151:22 161:23
**850** 151:13
**89** 54:4
**8:00** 170:19 171:16

**9**

**9** 54:14
**93** 143:5
**932** 143:5

**94** 107:19
**95** 108:25
**98** 107:19
**9:30** 144:8

**A**

**a.m.** 7:7 46:14 89:22 90:2
**absolutely** 12:19 23:24 82:16 183:7 192:19 194:23 202:11
**abusive** 111:12
**accept** 16:23 196:10
**accepted** 35:13 196:15
**accompanied** 187:4
**accurate** 25:4 115:22 129:13 132:23 163:6 164:2 217:15 222:20
**accurately** 167:3 213:22
**activity** 122:22
**actual** 92:4
**addiction** 103:12,14,25 186:20
**additions** 165:16,21
**address** 121:15 157:1,5 173:21 195:20
**addresses** 95:23
**Adduci** 7:12,22 92:11
**advised** 150:19
**affect** 24:23 26:18,21 28:7, 10,13
**affected** 27:4, 18,21,25 216:22,25 218:9
**affects** 28:5
**affirm** 8:6
**age** 61:2 145:18 217:8
**agree** 14:12,14 127:12 151:5
**agreed** 14:10 16:9 46:13 151:3 152:9 154:4
**agreeing** 202:13
**agreement** 117:18
**agrees** 212:13
**ahead** 12:20 17:23 25:20 29:1 51:14 178:25
**ahold** 200:1,2
**alcohol** 164:25
**alley** 123:7,11 155:14,17
**allowed** 165:4 215:2
**Alzamli** 7:17 8:12,14 11:12 12:3,5,15,21,22 13:9,20 14:4,9, 17,22 15:6,13, 22 16:4,20 17:1,8,18 18:4, 14 19:5,12,14, 16,17 21:6,18 23:2,22 24:10 25:6,11,16,23 26:2,17 27:8 28:24 29:3,23 31:5 32:11,13, 18 33:22,24 35:8,12,15 36:8,18 37:10 39:8 40:4,10, 16,24 41:4,9,23 43:13,19 44:19, 21 47:2 48:5 49:3,23,25 50:13 51:12,17, 19,22 52:1,4 53:20 55:16 62:20 63:1,9,23 64:5,11 65:1, 15,22 66:6,9 67:14 75:3 77:10 82:12 89:19 90:3,15 92:15,17 93:4 95:4,12 98:10 99:1,4,7,11,13, 15 101:16 102:11 107:11, 16,17 108:24 109:3,5,11 114:15 115:23 116:17 117:20 119:8 120:18 141:8,10 150:22,24 156:2 173:22 174:1 188:1 189:10,14 191:16 193:5,8, 14 194:13,25 196:19 197:4,9, 16,21,24 198:2, 9,11,16,25 199:7,13,19 200:20,23 201:1,5,8,12, 15,18,21,25 202:3,15 203:5, 16,25 204:1,18, 24 207:13,18 209:8 211:14, 22 212:6,11,13, 19,21 214:1,14, 19,24 215:2,8, 14,19 216:2,5,7 219:3 222:10, 16 223:9,11
**anesthesia** 26:24 172:12, 16
**anymore** 42:22 171:23
**apartment** 54:24 55:1 68:20 71:23,24 72:7 84:10 88:2 123:22 126:21 127:12,13,19 138:8,12 159:6, 10 160:6 161:18,20 162:3,4,9 163:11 188:21, 22,24
**apologize** 63:24 168:10 173:3
**appeared** 11:18
**approach** 124:20
**approached** 39:12 109:9,13 151:25 206:22
**approx** 109:14
**approximately** 109:8 146:21
**area** 54:3 60:19 85:13 108:20 109:6 115:9 119:12,13 123:1,5 124:22 126:5 130:13 138:20 171:5,6 207:7 209:23 210:11
**Argumentative** 14:21 18:13 19:2 35:22
**Argyle** 85:11, 12 108:21 109:7 115:12 124:24 151:13
**Armor-all** 134:18,21,22
**arrangements** 53:1
**arrest** 57:15 181:23 182:5,9, 15 192:23 194:4 195:8
**arrested** 57:4, 9 59:12,15 60:5 70:18,24 210:14
**arrow** 162:7
**article** 176:14
**ASA** 92:11 93:14 150:3,20 165:7,23,24
**ashamed** 169:13
**asks** 142:16,23 143:4,18 153:9
**ass** 71:9 86:9 87:9
**assistance** 42:19
**assistant** 150:24 151:1
**assume** 10:11
**ate** 215:25
**Atonja** 146:12
**attached** 21:23 153:3 179:11
**attempt** 202:12
**attends** 151:16
**attorney** 7:11 8:17 21:25 24:3 37:23,25 42:6, 12,13,17 44:4 65:14 139:2,3 147:10,17 148:2 150:1 151:1,3,6,9 165:10,17 166:23 174:22 178:23 179:22 180:5,10,11 186:1 187:5 191:2,23 192:1 213:21 219:8
**attorneys** 10:1 19:23 29:13 114:17 173:13 174:20 175:17 183:15,21 213:21

**audio** 181:8 191:24,25

**aunt** 144:12

**aunt's** 145:15

**Autobarn** 56:17 220:3

**automatically** 211:20

**aware** 56:25

B

**baby** 142:11

**back** 22:5 33:3, 4 36:12 38:6 39:24 41:16 43:7,15 48:23 52:8 69:20,21, 23,24 70:2 75:21,23 76:3, 12,19,20,24 80:8,13,15,16 82:4 83:13,22 84:9,10 85:16 86:7 87:24 88:2,7 89:2,24 92:5 96:12 105:8 106:3,7,8 107:9 108:13 109:20 111:5 115:20 117:8, 12 118:23 124:12,24 125:16 127:11, 13,19 128:7 131:1 132:11 133:21 135:17, 23,25 138:3,10, 22 150:11 162:2 163:13, 25 165:24 169:15,17 170:22 171:12, 18 173:1,3 177:13 180:7,8 181:3 182:5,18 190:2,3,10,13 192:21 200:11 203:21 207:25 211:9 212:2,14 219:16

**background** 121:12

**backtracked** 60:18

**backwards** 36:10

**bad** 168:5 169:10

**badge** 208:22, 23

**badges** 176:6, 18 184:1 207:20 208:20, 23 209:2 221:23

**bag** 171:14

**banana** 216:12,14,16, 17

**barber** 181:5

**barred** 58:7

**basically** 31:25 115:5,15 117:1 125:4 136:19

**basis** 19:5,13, 14

**Bates** 92:12 98:23 100:1 107:18 131:20 133:18 177:10 178:9

**bathroom** 110:25 165:4

**beat** 70:15 118:22

**bed** 189:1,2

**begin** 8:11

**beginning** 62:24 133:18 157:23 196:7 197:7

**behalf** 7:23

**Beila** 204:20

**belief** 202:9

**believed** 204:4

**Belmont** 130:14,15,17 149:10,25 175:24

**big** 60:8 85:17 176:13

**birthday** 54:14

**bit** 10:10 11:13 27:15 60:17,18 61:25 73:22 84:16,18 103:19 115:2 217:14

**bite** 171:7

**black** 82:16 105:16 146:12

**block** 85:4,9,10 86:11 96:3,25 97:1,7 98:12 104:3 122:21 135:22 142:7

**blood** 69:7

**boiled** 186:15

**books** 189:7

**bootcamp** 59:14,15 60:2,4

**boring** 218:2 219:1

**born** 54:2,6 146:23 151:12

**boss** 193:2

**bottom** 151:20 166:8,12

**bought** 119:12 123:25 133:9 171:2 219:18 220:1,15

**box** 124:25

**boys** 70:15

**break** 10:15, 19,21 53:21 89:20 160:20 168:12

**Breakers** 55:23,24 56:4

**breakfast** 215:23,25 216:13,14,16, 18

**breaks** 10:14 148:19 169:12

**breeze** 218:3

**breezing** 84:18

**Bricardo20@ yahoo.com.** 21:13

**bring** 22:5 48:23 69:7 107:9 109:20 127:14 138:22 139:17,24 140:8,9 170:16 212:2

**bringing** 138:11,20 173:3

**bro** 184:16,20, 24 186:18

**Broadway** 72:9

**brother** 90:23, 25

**brothers** 58:8, 9

**brought** 86:10, 11 108:13 119:23 120:7 158:23 170:21 172:5

**Bryn** 146:5,6

**bucks** 86:21 138:5 140:6

**buddy** 184:3

**building** 57:11 67:22,23 72:3, 4,25 73:1 75:9 76:8 101:2 104:12,25 111:14 113:6, 11 121:16,19, 22 122:8 123:22 124:11, 15 126:6 132:10 138:7 158:8,13,21,24 159:2,14,18 205:20,22,24 206:2

**buildings** 68:4

**bum** 74:1

**bunch** 150:14

**Burger** 171:7

**Burns** 7:9 8:2, 15 10:25 11:16 12:23 26:6 30:23 31:6,22 37:5 38:9,24 40:11 41:15 42:25 46:13 47:22 48:1,3,21 49:1,17 55:10 58:17,18,19 66:7 71:11 76:15 89:25 90:4 107:6,23 108:20 109:6,8, 12,14 114:19 120:16 142:2,4, 20,21,22,23 143:4,12,17,18, 23 149:9,24 173:20 182:11 186:24 189:15 193:19,23,25 194:1,3,10,14, 22 195:2,5 196:24 200:13, 15 201:11 202:7 203:22 204:2 211:10 215:9 216:8 219:4 222:6,12

**Burns'** 202:15

**business** 38:1, 10 56:16 179:23 180:25 187:21

**buy** 39:18 69:8 71:3,8 86:8 142:16 151:25 152:6 186:16 187:14

**buying** 76:16 126:9 135:7

**buzzed** 68:14

### C

**cafe** 33:15,17 34:1 56:9 182:12

**call** 16:1,21 18:20 19:21 25:8 30:14 33:11,25 34:19, 22,24 35:1,2 36:12 38:2 39:24 42:13 43:20 45:9 46:25 47:9 58:16,17 81:18 97:23 98:4 109:23 135:11 153:12 164:4 178:12,18 195:7 196:20, 21,24 201:2,5, 6,8 202:23 203:8 208:7 215:4,18

**called** 11:3 16:12 31:24 35:3 36:13 37:23 41:24 42:6,8,11 43:7, 15 58:1,3,12,23 70:16 81:13,15, 16 96:1 102:2 174:4,16,18,24 175:24 179:21 181:15 196:7

**calling** 37:13 79:18 81:17 109:22 180:14

**calls** 11:9 35:21 46:16 129:8 176:15

**camera** 187:20 190:4,20,21,22 223:3

**cameras** 101:2

**canceled** 13:11 35:19 36:12 196:22 199:2 202:17

**cane** 185:25

**car** 15:19 56:6, 16 64:19,22,24 65:9,10 66:22, 25 67:4,5,6,18, 19 69:8,10,11 70:7,8,11,21 71:1,3,8,9 72:8, 10 73:7 74:10, 11,12,15 75:12, 20 76:1,16,19 78:9 79:12,16, 18 81:5,8,10,14 82:13 83:5,6,8, 10,11,14,23,24 84:4,5,19,24 86:8,10,11,12, 13,14,22,24 87:3,5,7,9,19 89:1,8 91:1,23 94:1 96:4,23 97:4 105:7,8, 21,23 106:8 115:14,20,21, 24 116:1,7,10 117:1,5,8,12,23 118:15,18,19, 23 120:7,12,15, 23,25 121:21 122:16,18 123:15,25 124:9,11,12 125:8 126:9,13 128:9,13,15 129:2,22,24 130:2,5,18,24, 25 133:10 134:16,21,23 135:7 136:4,5, 10,16 137:1,6, 14 138:5,6 140:6,8 142:16, 22 143:6,7,19 152:6,7,8,9,12, 17,19 153:3,8, 9,10 154:3,10 155:3,20,23,25 156:8,12,14,16 157:8,9 160:12, 18 161:17 163:4 164:8 169:7 173:1 184:11,12,16, 18,20,24 185:2, 3,4,7 186:16, 17,18,22 205:5 206:22 207:15 209:13 219:9, 11,16,25 221:2

**car's** 118:21

**card** 156:16 188:6,7 221:10, 12,13,14

**cards** 156:25 188:8

**care** 74:2 91:6, 7 125:15

**careful** 9:13,18 69:19 76:2 126:15 160:19 163:15

**Carl** 7:9,17 8:17 14:1 15:8, 18 62:10,12,13 63:18 64:1 74:23 84:10 104:22 113:21 117:14,18,23 119:6 121:19 131:3,7,16 132:2 133:9 138:7,11 140:2 151:2,24 152:7, 9 153:4,16 163:3 164:22 178:12,19 187:18 188:10 205:4,17,19,20 206:1 208:10, 13

**Carl's** 14:6 113:25 159:5 160:6 161:18

**Carr's** 56:15

**carried** 103:13 104:2

**carrying** 85:2

**cars** 56:16,17 82:6,10 106:7 118:16 122:21 123:2 191:25 219:24 220:1,5, 15

**case** 7:14 9:5 11:17 14:6 16:7 18:1,9,21 19:24 20:20,22,24 21:1 22:4,8,24 24:4 25:24 26:4 28:19,20 29:14, 20 30:8,11 31:24 33:5 34:8 42:19 46:10 90:6 94:25 115:1 176:19 202:20 208:13 211:5 215:15

**cat** 96:6

**catch** 47:12 59:1 66:15

**cats** 210:21

**caused** 218:8

**caution** 213:19 215:11

**CCSAO** 131:20

**CD** 31:21,25 32:22 92:12 98:23 100:2 106:2,5 107:19 108:25 116:15 133:18,19 134:3 143:17

**Central** 7:7

**chain** 105:1

**chance** 165:16

**change** 56:4 60:6,8 77:21 222:20

**changed** 60:10

**changer** 106:2, 4,5

**changers** 106:7

**Channel** 38:14

**character** 38:17

**characterization** 202:15

**charged** 59:13

**charges** 59:22

**check** 69:11 70:11 99:22 100:24 118:3 143:4 159:13 175:10 219:23

**checked** 67:7 100:17 106:1

**checking** 161:1

**checks** 153:8

**Chevy** 122:23

**Chicago** 7:11, 24 42:6,8,23 53:24 54:1,3 173:9

**child** 57:12

**chill** 186:8

**chilling** 84:15

**Chinese** 158:23

**choice** 26:8,10 198:5

**choose** 223:1

**Chuck** 58:1,2 64:15,18 65:10 69:7,16 72:13, 14,17,25 75:7 78:5,6,7,8,10, 22,25 79:6,10, 13,17,21,22,23, 24,25 80:3 83:9 84:22 89:13 94:13 104:22 108:20 109:6,9, 12 115:7,14 116:23 117:12, 14,17,23 123:18 124:1,6, 20 126:9,21 129:21 130:18, 24 131:2,3,5,7 134:14 140:2 142:15,23 143:4,6,11,13, 17,23,24 144:7, 8,18 152:13,16 153:2 178:12, 18,19 179:6

205:4 206:16, 23 207:5,11
**Chuck's** 73:1 74:13 117:18
**chuckled** 83:8
**cigar** 83:18
**circling** 135:23
**City** 7:10,24
**civil** 200:16
**clarify** 27:9 38:9 47:19 92:10 215:7
**clarifying** 212:19
**clarity** 181:8
**class** 59:10
**clean** 73:25 74:1 75:12 105:23 106:8 134:20
**cleaned** 87:9, 11 124:10 156:15
**cleaning** 72:10
**clear** 9:19 18:18 31:20 44:24 133:1 139:25 147:14 154:13 155:24 191:24 211:23
**client** 37:21 38:5 41:3
**clock** 109:18
**close** 171:5
**closed** 180:8 181:4 190:25 191:18,20 192:2,4
**clothes** 210:21
**clown** 59:10
**coat** 83:16 221:5
**Cody** 102:2
**coffee** 11:18 38:12 39:1,9, 17,18 41:19 45:1,4 46:11 48:10,12,14,15 180:2 185:13 187:14,15 189:15 190:5,7 193:9,25 204:20
**collar** 209:3,5
**College** 151:16
**comfortable** 37:17,19,21 38:4,5 43:4
**comment** 47:7
**commentary** 136:18
**commit** 219:14
**communicate** 95:23
**communications** 173:19
**communities** 107:1
**completely** 63:20 217:23
**concern** 90:25
**concerned** 91:18 184:6
**concluded** 224:21
**conclusion** 211:15
**condition** 25:10 26:7 172:7,8 211:8, 21 214:6 215:13
**conditions** 26:18,21 28:9 213:14 214:13, 18
**conducts** 57:10
**confidential** 211:4
**confirm** 140:2 157:18 166:8 187:24
**confirmation** 122:9
**confirmed** 100:17
**confused** 97:21
**confusing** 24:12 44:11 47:19,20,21
**confusion** 214:9
**connected** 219:10,18
**consistent** 142:17,24 143:14 156:16 157:6 162:3,19 164:10 166:1 167:15
**contact** 34:9, 19 37:11 42:22 45:20 81:12 129:3 181:22 200:6,7
**contacts** 129:7
**continue** 201:10 202:24 211:5 212:9 215:16
**Continuing** 153:7 155:8 157:21 158:20 160:8 163:14
**controlled** 57:8 59:16,21
**conversation** 15:1,7,16 16:6, 16,17 17:13,22 28:16 29:7,16, 25 33:6 34:10 45:19 159:1,5, 23 160:12 163:3 168:23 174:10 175:7 180:1 183:17 191:22 218:21, 25
**conversations** 33:4 48:24 65:7 113:18 126:14 183:14 202:8 218:20
**convicted** 15:9 59:18
**Cook** 7:11,12 43:2
**cooking** 171:9
**cooks** 170:23
**cool** 10:25 67:18 69:5
**cooperate** 43:10,16,22 44:1 53:15
**cooperative** 11:6
**coordinate** 11:4 16:22 17:9 35:4 43:8 196:24
**coordinated** 19:21
**cop** 70:13
**copies** 32:2
**copped** 59:25
**cops** 137:11
**copy** 21:23 31:8 98:21 99:2,5 223:9
**copying** 149:1
**corner** 115:6 161:10,24
**Corporation** 220:3
**correct** 11:24 29:20 33:8 115:17 117:15 120:19,23 128:25 130:8 131:17 132:20 143:1,15,19 144:14,18 146:7 148:20 152:10 153:10, 25 154:7 155:10,14 156:7,12 157:19 158:2, 25 161:14 162:3,25 166:1 174:16 175:11 179:18 198:4 211:14 220:17
**corrections** 165:16,21
**correctly** 34:18 108:18 115:6 150:8 222:24
**Correl** 97:19, 21,23,24,25 98:4,6 101:13, 15,18,19,21,22, 24 102:6,14,16 144:9,15,21,24, 25 145:2,7,9, 11,12,14,18,19 167:24 173:4 205:9,16,22
**corroborate** 95:6 102:6
**couched** 215:12
**coughs** 10:9 139:9
**counsel** 7:15 8:10 12:3 46:13 211:10 213:25
**Counsel's** 197:2
**counter** 39:10 185:19 193:2
**County** 7:11, 12 43:3
**couple** 9:25 54:23 56:6 58:11 59:12 82:20 105:4 109:14 118:17 123:3 142:4 148:19 154:15

189:10 204:25 210:24 216:9 219:7

**court** 7:5,13 8:3 9:8,9,12,17 43:9,10,12,21 44:1 51:10 166:16 201:2,4,5,6 202:24 203:9 211:7,9,13,16,25 212:1,8,13 215:5,18 222:23

**courtroom** 139:12,15 173:12

**courts** 52:21

**Cover** 112:25

**Cozy** 182:11

**crack** 73:16,17,19 118:14,16,19,20 119:6,11,16,17,19,22 120:4

**credibility** 202:18

**credit** 156:15

**crew** 146:18

**crib** 81:20

**CROSS-EXAMINATION** 114:22

**crossed** 150:6,13 152:1

**crossing** 200:18,24

**CT** 224:21

**CTA** 168:24

**cup** 39:18

**customer** 190:24 191:17,19 217:2

**cut** 9:14,15

**D**

**da** 77:1 221:9

**daddy** 103:4

**damn** 69:14 81:22 86:14 88:18 118:22 126:23 127:6 136:10,23 185:4,15

**dark** 85:22,23 92:7 94:1,9 122:18

**data** 217:11

**database** 107:4

**date** 50:18 107:23 211:6

**daughter's** 110:14

**day** 7:6 17:2 19:23 22:19 47:8 48:17,18 50:25 51:1 72:8 75:8,23 76:24 77:12,13,17,20,23 84:18 86:21 87:5 89:8,11 92:1,2 93:24 97:1 106:12 117:4,7 122:17 123:19 124:1,3,16 129:12 133:1 138:25 139:1,6,19,21 140:10,13,14,15,17 147:7,8 154:2,9,10,19,21 161:16,17,18 164:4 171:17 185:13 202:7 217:3

**daylight** 92:3 94:8

**days** 60:1 77:5 140:23,25 153:24 154:15 157:14 172:13

**daytime** 92:3 117:8

**dead** 48:4 81:8 104:12 123:8,9 158:23 159:2,10,17

**deal** 118:12 143:24 155:13 184:11

**Dealers** 119:14,15,16

**dealership** 219:25

**dealt** 119:16

**decide** 203:12 212:24

**decided** 163:17

**decision** 43:6 211:18 213:23 214:2 219:13

**defendant** 7:19,21 19:24 153:9,13,16,18,23,24 154:2,3,4,6 155:9 157:9 160:9,10,11,17 161:11,13 162:2,17,22 163:17,18,21,22,23,25 164:7

**defendants** 29:13

**define** 22:12

**delivered** 154:6 200:12

**delivering** 194:2 222:4

**delivery** 59:16,19

**Delong** 114:6,13

**demeanor** 126:25

**demonstrated** 165:14

**dep** 32:1

**department** 42:7,9,23 148:3 149:11

**Depend** 218:1

**depends** 104:15 218:21

**depicted** 178:10

**deposed** 8:18,20

**deposition** 7:9 9:1,4 11:4,17 12:24 13:2,10,15 16:7,9 20:8,11 21:11 31:23 35:17,19 36:11,12 37:6,12,15 38:10,20,25 40:13,18 41:1,2,6 43:8 44:14,25 46:8,14 47:16 49:17 53:16 61:16 65:19 89:25 92:13 98:24 107:10 173:19 180:6 196:22 197:8 198:22 199:2,3,9 202:17 203:3,22 211:3,6 212:9,15 224:21

**designate** 107:9 211:3

**designated** 92:12

**desk** 68:3,11 75:10 100:9,10 111:18,24 112:5,11 122:1 157:18,22 159:9 221:14

**DET** 150:4

**detail** 137:2

**details** 26:13 132:22,25 167:21

**detective** 17:3 115:1 150:3 176:1 182:2 193:22 195:18 200:10

**detectives** 132:14 135:1,2,3,5,15,16 141:17 164:5,7 170:16

**Dexter** 58:9

**Dhaviella** 7:23

**diabetes** 111:8

**diabetic** 170:14 171:23

**diagnoses** 215:20

**Dick** 70:15

**dicks** 70:15

**difference** 41:14 83:17

**differently** 23:17 60:5

**difficult** 12:16

**dinner** 170:24

**DIRECT** 8:13

**dirty** 163:19

**disabled** 188:10,11

**disagree** 156:22 179:17

**disc** 106:2,4,5,7

**disclose** 25:2 26:6,9,13 122:12 211:17,20 213:10

**discover** 26:5

**discuss** 203:8

**disorderly** 57:10

**disrespectful** 121:5

**district** 7:13,14 57:17,20 60:22, 23 76:6,7 135:20
**Division** 7:14
**document** 31:18 32:8,15, 20 46:20 92:19, 21 93:7,11 107:20,22 108:10,11 112:6 121:1,7 148:11,14 165:18
**documented** 115:21
**documents** 30:19 31:6 32:23,24 33:7 40:19 41:5
**dollars** 118:17
**door** 36:5 39:14 68:22 69:13 82:18,19 91:2 104:16,19 114:3,4 136:25 159:24,25 181:4 183:21 189:1 190:5,19 206:5
**doors** 180:22
**dose** 171:13
**double** 175:9
**downstairs** 68:19 125:17, 22 162:5 163:11
**drink** 165:3
**drive** 120:22 123:13 136:4 137:10 138:5,6 139:19 140:7 155:25 156:8
**driver's** 116:13 143:13 156:15
**driving** 15:19 66:23 76:20,23 87:19 97:4 106:11 134:16 156:12
**drove** 76:7,8 86:12,13,14,23 87:11 115:19, 24 116:1 136:15 143:6 152:22 205:5 221:11
**drugs** 136:13, 14 164:25 169:13
**dude** 80:19 127:6 145:1
**due** 42:19 122:21 220:9
**Duran** 101:6 135:10,12 205:9
**dust** 69:13

**E**

**e-** 21:11 49:4,18 224:3
**e-mail** 21:13, 14,17,19 31:7 45:17 46:8,10, 12,24 47:3,6,17 48:19 49:2,11, 13,17 50:11,15, 22 51:6,20 192:17
**e-mails** 50:2 51:23 52:5,13, 18
**earlier** 50:15 62:5 92:13 103:16 189:20 198:12,19 210:25
**early** 19:21 55:4 70:8,14 85:20 87:6 94:6 117:9 181:10 190:25 191:18, 21 192:4
**easier** 31:1 51:15 52:2
**Eastern** 7:14
**eat** 76:24 80:16 170:24,25 171:3
**Edgewater** 55:23,24
**effect** 118:21
**effects** 213:8, 16
**elders** 103:23
**else's** 121:1
**Emily** 7:19 20:3 25:6,11 114:25 200:20 211:22 215:19
**employee** 39:3 194:1
**end** 11:23 13:11 16:5 31:2 123:8,9 142:19 202:6
**ending** 66:3
**English** 151:17 165:13
**enter** 143:12
**entering** 190:5
**entire** 49:2,4 108:10 163:3
**Envarsus** 24:24
**environment** 60:9,10,11
**essentially** 9:8 44:2 211:25
**estimate** 173:4
**ethnic** 121:12
**ethnicity** 121:11
**Evanston** 42:22 56:17
**evening** 123:25 124:20
**events** 140:13 202:14 214:15
**eventually** 54:25 136:20 140:4,8 146:7
**everyday** 214:16
**EXAMINATION** 8:13 187:2 189:13
**exchange** 118:10 127:16
**exciting** 218:4
**excuse** 122:25 139:9 201:14, 22 222:4
**exhibit** 21:11, 15 31:22 32:1, 4,6 46:7,17 49:16,17,20 51:15,19 92:13, 15,18 98:24 101:11 107:10, 14 109:2 141:6 147:5 152:25 153:1 166:11 178:1 179:12, 13
**exhibits** 52:17 224:12
**experience** 213:16 214:15, 20 216:10 218:13
**experiences** 214:15 215:22
**explain** 213:4, 6
**explained** 42:21 61:20 126:19 212:17
**explaining** 38:8 126:20 212:15
**explanation** 123:18
**extensively** 202:7
**extent** 24:15 184:8 217:10
**eyesight** 149:2,3,5

**F**

**fact** 53:15
**fair** 26:14,15 65:13 116:13 118:8 123:22 169:19 205:15
**fairly** 106:8
**familiar** 20:5 37:6 135:12
**family** 90:20 91:5,7
**fast** 115:4
**Fat** 58:3
**father** 69:5 103:21
**February** 7:6 90:1 203:23
**feel** 23:13 34:3 37:17 43:3 52:16 66:13 104:13 183:14 184:14
**feels** 197:19 198:4
**felt** 34:2 36:9 37:19,21 38:4,5 42:2 118:24 155:12 174:19
**female** 146:12 147:10,16 148:2
**fighting** 24:4
**figure** 40:12 69:5 103:22 203:14
**file** 211:6,24
**fill** 38:2
**filled** 187:15
**final** 92:9,10
**find** 54:24 67:2 69:15 83:19

95:8 96:8,14 98:21 105:21 128:5,14 136:2 138:21 139:20 140:5 164:1 206:19 212:1

**fine** 10:5 19:4 133:17 138:18 141:4 166:25 223:17 224:15

**finish** 10:19 12:6,17 172:22 194:11

**finished** 12:8, 19

**firm** 182:18 204:4

**fix** 118:15

**fixing** 70:9 186:16

**flashing** 118:22

**flip** 166:7

**flipped** 47:16

**floor** 68:15 144:10

**flour** 159:25

**fob** 105:8,10, 11,14

**follow** 42:25 44:5 51:16 101:10 108:17 200:11,14 210:5

**follow-up** 205:1 215:2

**food** 104:4 111:2,4

**foot** 38:1 39:16 85:1,3

**footage** 187:20 190:4

**force** 26:4

**forced** 167:11

**Ford** 56:7,8

**foregone** 211:15

**forget** 55:10 66:13 83:15 172:20 217:22 218:5 220:21

**forgot** 66:12 74:19 176:9 219:21 220:20

**form** 11:11 12:1 13:4 14:7 15:21 16:18,25 17:6 18:12 21:5 27:6 29:1 35:10,22 36:15 37:7 39:5,25 40:8,14,20 41:22 43:17 49:1 53:18 62:16,23 63:5, 19 67:12 82:8 90:13 95:3,9 191:13 193:11 196:17 197:1 198:14 199:10 204:15

**forward** 27:5 215:16

**Foster** 76:8 122:24

**found** 27:3 72:18 74:12 101:7 105:20 156:15

**Foundation** 82:8 193:4,11

**frame** 62:17 63:6

**freak** 10:7

**freaking** 83:19 137:22

**free** 52:16 66:13

**French** 122:25 222:4

**Friday** 11:1 21:12 29:8,17 43:7,15 44:24 46:10 50:19 173:20

**friend** 61:11 68:23,25 95:10, 13 96:16 101:5 103:18 110:6 112:22 113:6 115:6 144:22 145:11 168:6

**friends** 58:24 59:5 61:6 85:17,19 96:1 103:17 104:9 109:15 142:4 161:11

**friendship** 103:20

**front** 30:13 39:10 52:5 57:11 81:22 82:5 111:24 112:5,11 147:6, 11 149:14 157:18 159:9

**fuck** 68:21 74:17 83:6 136:24 184:14

**fucking** 222:3

**full** 145:7

**fully** 205:2 214:11

**funny** 155:12

**fuzzy** 147:19

**FYI** 138:4

**G**

**Galassini** 7:12 150:3,20 165:7, 23,24

**game** 128:21

**gang** 57:10 122:21 210:21

**Garner** 169:2 206:4

**gathering** 220:24

**gave** 30:7,11, 12,17 44:8 57:23,24 64:18, 23,24 70:2,3 83:13,21 84:9 86:20,24 87:21, 23 88:2,4 89:1, 2 92:9 93:12 104:18 128:19 133:9 137:5,7 154:23 155:1,8, 9 163:24 177:5 178:22 219:7

**gay** 78:2

**GED** 151:16

**General** 107:18

**generally** 10:4 218:6

**gentleman** 39:16 68:3 169:2 181:2,18 187:4,7 189:25 190:6

**Genuinely** 201:8

**girlfriend** 109:16 110:13 142:6,7,9

**girlfriend's** 110:12

**girlfriends** 142:10,12

**give** 8:7,25 9:20 21:13 25:17 26:4 31:7 39:24 45:12 50:18 67:21 68:5 70:5 76:19 86:15,19 88:18 95:22 99:4 101:3 117:24 118:17 123:16 127:14 128:4, 15 136:4 139:2, 10,11 144:1 151:3,5 154:5, 10 172:24 173:12 176:8 182:25 188:6, 16 192:14,15 193:12 196:4 211:11,25 213:8 216:24

**giving** 93:14 108:3 117:10 123:15 153:4, 15 173:20

**Gjerde** 7:5

**glad** 8:22 172:5

**glasses** 149:6

**God** 218:11

**good** 8:22 17:10 18:9,22 22:11 31:3 89:19 96:16 114:19 149:5 162:1 168:6,15 170:9,13 171:9, 11 223:6

**Google** 36:2 42:15 185:22

**Googled** 42:15

**Goudy** 70:11

**government** 67:22 222:4

**graduate** 55:17

**grand** 166:19

**grant** 211:13 212:8

**granted** 211:19 212:16

**great** 33:3 99:13,14 141:25 149:2,3 221:18 224:16

**greet all** 39:15

**grew** 61:10

**group** 61:6 85:17 205:10

**grow** 53:24 54:1

**growing** 57:12 106:22,25

**guaranteed** 212:5

**guess** 188:11 215:6

**guest** 181:24 182:13

**guests** 38:12 39:15,17 181:16,17 187:10,13 193:23

**guy** 43:1 58:2,6 59:8,11 64:14 69:5 73:25 74:21 75:5 83:9 87:17 103:2,9, 15 104:1,12 116:20 120:22 126:6 134:23 145:4,5 151:23 152:13 153:2 158:23 159:2, 10,18 163:22 182:15,19 185:17,24 186:4,8,10 206:15,16,21, 23 221:25

**guy's** 152:16 176:2

**guys** 20:16 45:8 58:5 74:9 85:9 101:7 102:18,24 103:5,16,17 104:21 136:24 176:10 209:9

**H**

**habit** 59:4

**half** 47:4 49:11 84:18

**hall** 112:22 126:1 159:22 162:21

**hallway** 68:23 69:17,20 88:5, 6,15 104:11 113:4,5 125:19 126:24 127:5,6, 17,18 132:4 159:5,23 160:15,16 162:18,25 163:2 206:5,9, 10

**hand** 8:3 17:3 31:21,24 85:1 128:7 148:3 155:21

**handed** 128:8 173:1

**handicap** 67:3 71:11 83:20 120:16 134:17 155:25 156:8

**handicapped** 120:17 188:14

**hands** 42:22 182:5

**handwriting** 31:11,12 147:11,20,21

**handwritten** 21:23 92:11 108:17 150:16 165:15 177:12, 20

**hang** 61:6 74:7 78:5 85:4 102:24 103:1,5 132:11 217:21

**hanged** 158:10

**hanging** 81:20 104:3

**happen** 26:25 66:13 82:25 138:14 159:15 161:3 207:21 212:16

**happened** 11:7 18:10,23 27:4,5 28:1,6 69:14 86:5 90:21 91:17,19 95:19 104:18, 19 126:18,21 139:21 140:25 159:5,24 161:4 184:25 191:11 195:4,9 205:16 206:25 207:22, 23 209:12 217:22 218:8, 10

**happening** 63:10 77:12,13 83:1 140:23

**happy** 25:8 173:24

**harassed** 34:2, 3 36:9 57:13 197:19 198:5

**harassing** 14:19 17:16 19:10 42:3 45:10 51:4 197:15 200:17

**harassment** 36:6 47:7 203:14

**hard** 9:14,15 13:22 30:24 87:8,9 215:24 217:1,18

**Harris** 7:23 13:8 19:3 222:11 223:23, 24 224:6,7,9

**haven** 97:3

**He'll** 80:15

**head** 9:21,23 58:3 87:9 118:17,20 119:6,11,22 120:5 175:25

**head's** 118:19

**heads** 118:14

**hear** 9:25 10:4, 10 13:22 93:1 137:17 168:5 188:5 192:1 210:6

**heard** 154:14 190:20,22

**hearing** 20:10 30:24 31:3 149:3,5 209:4 210:7

**hell** 81:22 104:17 181:25 182:10,14,16

**hesitant** 168:19

**hesitated** 86:18

**hey** 10:18 25:16 37:5 70:11 72:5 74:19 75:5 86:7 87:6,8,14,17 91:1 104:17,25 105:1,2 118:3 121:22 124:13 127:3,5 129:8 136:3 138:4 140:6 159:24 175:22,25 176:6,7 181:6, 12 182:24 183:22 186:11 187:11 193:18 196:8,23 200:7, 8,12 218:9

**hide** 38:14 182:16

**Hiding** 149:17

**high** 55:8,9,14, 15,17,19 56:3 61:4,5 74:4 119:19 144:22

**Hispanic** 58:6

**history** 25:3

**hmm** 9:19 74:16

**hold** 32:2 129:13 136:24 168:7 181:21 209:4

**holding** 217:11

**holds** 58:7

**holy** 182:14 185:19

**home** 16:23 17:5 38:1 66:21 77:8 80:7,8,11 81:17,18 82:2 91:11 138:22 139:17,18,22, 24 140:9,14 147:9 170:16 171:12,14 221:14

**homework** 35:25 100:20, 24 101:4

**homicide** 150:5 164:6 175:25 210:15

**Honda** 56:15

**honest** 185:6 192:12

**honestly** 217:19

**hood** 70:7 73:15 106:23 107:1

**hot** 87:5 120:12 136:6 140:8 143:19 169:10

**Hotel** 7:8

**hour** 86:7

**hours** 108:1 109:14 140:23 163:23 171:20 187:21 217:17

**house** 66:19 67:13,16,21 68:17 69:21,24 71:15,17,19 75:23 81:17,22 82:5 84:4 88:7, 16,17 89:7 91:12,13 123:19,21 125:20 129:8,9, 15 138:19 140:1 184:2

**hovering** 83:14

**hung** 74:6 85:9 115:10 210:11

**hungry** 76:20, 21
**hurt** 186:10

**I**

**ID** 67:21 68:5
**ID'D** 94:24
**idea** 218:11
**identification** 21:16 32:5,7 46:18 49:21 107:15
**identified** 152:25 179:5
**identifies** 153:1
**identify** 7:15 187:5,25 209:22
**identifying** 153:4
**Illinois** 7:14 221:23
**immediately** 83:2
**impact** 26:11 214:22
**impacts** 25:5 172:9 214:6
**impatient** 68:21
**important** 23:13,25 116:19 199:14
**impression** 175:15
**incarcerated** 191:5
**incentive** 170:9
**incident** 206:7 214:10
**included** 32:20
**incorrectly** 222:22
**independent** 22:13,14,22 28:19 30:10 62:1,4 63:25 90:6 93:14 188:23
**indicating** 50:17,22
**influence** 103:10 164:25
**information** 26:5 184:12 211:12,17 214:3 220:24
**informs** 200:12
**initial** 16:1 136:22
**initials** 152:1,4
**initiative** 124:5
**inside** 105:20, 21 180:24 190:5,7
**instruct** 197:21,25 198:2 201:20
**instructing** 19:6 202:4 213:19
**instruction** 173:13
**insulin** 76:22 111:7 170:17, 23 171:12,14 172:4
**insurance** 156:2,4,9
**intentions** 199:17 202:9
**interacted** 112:4,10 114:12 205:4
**interacting** 66:18
**interaction** 112:9 169:6
**interactions** 89:13,16 110:21 114:5 146:16 202:16, 19 204:3
**interest** 218:3
**interested** 218:15
**interesting** 219:1
**interject** 66:14
**interrupt** 25:1
**interview** 9:4 21:24 77:12,13, 22 94:3 107:25 108:3 113:25 140:2
**interviewed** 77:19
**interviews** 32:21 80:10
**intimidate** 202:12
**intimidation** 203:4
**introduced** 13:25
**investigating** 176:6
**investigation** 56:25 57:3 62:1,9,21 63:2, 4,10,17,25 64:3,8 65:8 89:17 177:4 191:11 210:15, 18
**investigator** 41:20 179:22 182:2 183:16 185:25 192:21, 25 193:10 194:20,22 195:1 204:14, 19
**investigators** 204:3 208:9,12, 17,18,19
**involved** 43:9, 21 44:2 63:4 201:4
**Israa** 7:17 8:17 25:8 32:8 35:14 173:17 194:11 197:13 200:25 214:9 222:14
**issue** 38:15
**issues** 11:24 13:12 211:1,2
**Itchhaporia** 8:1
**items** 188:21

**J**

**J-I-N** 150:4
**jail** 90:25 107:5 136:15 176:25
**janitor** 194:2
**January** 11:21 21:12 46:9,10 48:13,20 50:19, 20
**Jenkins** 157:23 158:5,7, 15
**Jessica** 7:5
**Jin** 150:4
**job** 36:5 56:9 137:2
**jobs** 55:19 56:5,13
**Johnson** 97:11 145:9,13,14
**Join** 13:6,8,19 17:17 35:11,23 40:1
**Joined** 19:3 66:8
**Jones** 97:10 101:12,24 144:24 145:9, 13
**judge** 25:9 36:1,3 42:24 44:4,7,8,15 45:11 139:7 173:12 200:9 211:13,20
**JUL** 144:7
**July** 21:25 93:19 107:24, 25 109:8,10,12 149:9,24 150:7 151:23 157:11
**jury** 166:19

**K**

**Kenmore** 124:20
**Kenmore/ winona** 144:8
**key** 105:8,15 175:19
**keys** 69:25 70:2 83:12,13, 14,20,21 84:7, 8,9,12,13,14 86:25 87:2,21, 24 88:2,4,9,10, 13 89:2 105:5, 6,7 116:10 123:16 128:7,8 143:12 154:5 155:1,9,21 163:25 173:1
**kidney** 24:25 26:23
**kids** 56:22 61:21,23 91:6
**Kim** 56:25 57:4 150:5 210:15, 18
**kind** 8:25 9:2,4, 16 10:21 61:1 74:16 76:15 77:13 84:15 85:20 93:23 94:3 109:17 110:10 122:20

123:8 126:22 147:22 152:8 169:10 186:16 208:24 210:10 220:24

**kinds** 216:20

**King** 171:7

**knew** 30:12 39:3 58:13,14 70:7 72:4 73:6, 13,15,20 77:17 81:5 100:22 104:12 119:16 130:25 137:4 160:9,10 169:11,25 170:1 171:15 175:10 196:15 199:8 207:7 210:9 219:16

**knocked** 82:18

**knocking** 36:5 82:19 180:22 183:21

**knowed** 72:14 73:9 131:6

**knowing** 109:21

**knowledge** 53:12 105:13 189:8

**Korean** 58:6

**Kornell** 97:10, 12,13,19,20 98:1 101:12,23, 24,25 102:4

**L**

**lack** 188:17

**lady** 68:3,12, 13,14 74:19,20 75:5,10 100:7 101:1 111:18, 23,24 112:5,11, 13,14 121:25 157:17,21 158:1 159:9 190:4,18,24

**Larry** 42:10,11 157:1,12 195:12,13,14, 15,23 204:20

**lasted** 15:2

**lasts** 15:4

**late** 55:4,5 84:16 85:20 86:21 93:23,24, 25 94:3 96:6 124:7 146:22

**Latino** 107:1

**law** 213:22

**Lawrence** 146:13

**lawsuit** 200:16

**lawyer** 43:4 45:21 91:8 151:2 174:25 200:7

**lawyer's** 176:2

**lawyers** 39:19

**leading** 11:11 13:5,18 14:2,7 15:3,11,21 16:2,18,25 17:6 18:12 37:7 40:3,8,14,20 41:22 43:11,17 115:23 116:17 197:1 199:5 204:15,22

**learn** 43:25

**learned** 152:16

**leave** 23:10 36:13 38:11 44:13 68:22 72:23 74:15 80:18 140:4 146:5 163:17 169:14 190:25 196:22

**leaves** 162:17 163:18

**leaving** 84:3 148:1 158:21 190:1

**lecturing** 203:2

**left** 36:13 37:13 41:19,24 48:14, 15 49:10 50:10 60:15 80:9 86:6 125:22 160:19 161:23 169:15, 18 178:3 181:3, 9 188:8 191:21 195:16 217:4, 16,18

**legal** 38:15

**Lester** 68:23 69:18 71:5 72:4 102:19 103:7,9 112:15,22,23 113:2,5,6,7,10, 13,15,19 126:2, 4,7 127:20,21, 25 132:4,6,10, 14 158:21,23 159:1,11,13,17, 21 160:2,9,10, 11,13,17,18 162:21,22,24 163:14,18 169:2,3 206:4, 6,7,9,12

**letting** 37:13

**liberty** 122:11

**lied** 137:22

**life** 56:13 60:6 61:16 169:15, 19 170:3 214:16 218:8

**light** 214:12

**Lil** 109:24,25 110:1

**lines** 37:5 39:23 79:4 206:21

**Ling** 157:1,12

**listen** 36:19

**lit** 83:17

**live** 54:17 56:19,21 74:21 75:5 87:16,18

113:6 122:4,9 145:2 158:5

**lived** 54:19 73:2,3,13 126:6 132:10 157:13, 19,22 158:2 159:14 210:11

**lives** 87:14 109:20 144:9 146:4,6,13 151:13 158:21 162:23 163:7

**local** 182:14

**locate** 135:16

**location** 40:12 149:10,25

**locks** 143:23

**log** 100:8,18

**long** 10:20 15:4 18:2 24:4 26:24 27:1 28:7 67:6 68:20 69:2 87:22 88:3,25 89:3 92:6 120:9,10 170:6 181:6 210:1,3

**long-term** 28:5

**longer** 42:21 69:4

**looked** 32:21 52:9 58:2,3 70:25 72:17 76:12 106:1 116:7 119:21 126:25 134:17, 20 159:25 160:1 166:11 176:13 185:21, 23 188:24 207:9

**loop** 172:22

**losing** 10:9

**lot** 24:18 59:5 61:7 71:2 82:9, 11 85:14,15,16 91:5 97:6 142:10,12 169:12 172:15

193:17,19 205:6 213:4 217:2 220:5

**lots** 56:6

**loud** 108:16 111:11 165:14, 25

**love** 201:3

**luckily** 149:2

**lunch** 10:20 96:12 135:25 138:4,20 139:20 140:5

**lying** 180:12 184:17

**M**

**made** 52:25 63:3 74:16 110:24 111:2,7

**Magnus** 97:2

**mail** 21:12 49:5 222:5 224:4

**mailman** 222:3

**mails** 49:18

**main** 142:11 183:4,6

**major** 23:10 157:23 158:5,7, 15

**make** 10:15,23 12:9 22:20 28:3 30:25 34:17 43:5,21 44:2, 11,23 48:25 52:2 56:23 109:16 115:4 116:19 119:5 162:8 164:18 165:16,20 178:14 186:21 205:2,15 211:1 222:19

**making** 38:3 118:10 136:17 149:20 211:23 219:13

**mall** 125:1

**mama** 81:15,16 90:23 91:1 106:24 142:11

**man** 65:10 68:10 69:7,15, 18,20,22,25 78:3,11 81:9,10 82:16 83:8,21 86:9,19,20 87:12,20,21 88:18 105:1 111:21 126:18 127:3,6,13 128:14,15 137:5 168:22 170:7 182:22 184:16,18 186:6,7,13,17 187:19,20,21 222:1

**man's** 81:8 112:6

**manager** 111:13,19,20, 21

**Margate** 115:22 123:1,5 128:11,13 129:25 143:5

**Marine** 123:13

**mark** 21:11 31:21 32:1 41:20 46:7 49:16 51:14 149:15 224:12

**marked** 21:15 32:4,6 46:8,17 49:20 98:24 107:14 131:20

**Marketplace** 220:15

**matter** 7:9 44:20

**Mawr** 146:5,6

**Maxima** 66:23 83:7 105:7 133:12 134:10, 11 153:8 155:1, 3 220:2,7

**Maximas** 220:8

**Mcdonald's** 176:5,18 207:20 208:14, 15 209:10 220:23

**meaning** 39:23

**means** 22:14 73:23 184:19 222:18,22

**meant** 10:12

**medical** 25:3, 10 26:7 172:7 211:8,12,17,20 213:3,5,8,14 214:3,6,13,17 215:13

**medication** 25:5,18 172:7,8

**medications** 24:19,22 25:12 26:9 28:12 213:14 215:21

**medicine** 24:24 80:11,14 213:6,7

**medicines** 23:9

**meet** 176:5 208:9,14 220:16

**meeting** 147:9, 16 148:2 180:7 207:19 208:6 210:1,4 220:22, 24

**memories** 48:23 107:9 108:2,13 109:20

**memory** 18:9, 22 22:19 23:12, 14 24:1,16,17, 23 25:5 26:11, 19,22 27:4,11, 18,23,25 28:6, 10,13,19 52:12 93:14,21 116:1 138:24 140:12 142:17,24 143:9,14 147:14 152:19 154:20 157:2,6 158:4 162:19 163:9 164:10 166:2 167:5,19 172:9 190:13 210:25 211:1,2 212:22 214:4,6, 10,12,16,22 215:23 216:10, 22,25 218:9

**men** 209:20,21

**mentally** 188:14,17

**mention** 24:19

**mentioned** 24:18 43:8 94:12 95:18 100:6 102:19 103:16 166:16 174:8 175:2 199:2

**message** 36:17 37:13 49:14 51:3 195:22 196:22

**messages** 11:9 195:16 198:13

**met** 73:14 106:24 111:23 150:1 164:6 176:17 208:15

**metal** 105:15

**mic** 209:4

**middle** 142:1

**midnight** 108:1

**mild** 172:16

**mind** 62:6 131:19 133:15 184:9 199:17 218:16

**mine** 95:10

**minute** 76:11 86:18 88:21 98:16 183:23 184:15

**minutes** 15:2 16:17 76:9 118:18 120:9 125:18,24 162:18 203:7 210:3

**mischaracterize** 28:25

**Mischaracterizes** 15:10 23:19 24:9 28:22 29:21 41:7 46:19 53:19 63:20 64:6 74:24 77:6 98:9 101:14 102:8 188:1 197:2 198:14

**mischaracterizing** 65:12 66:3

**Misha** 7:25

**misheard** 79:3

**mispronounced** 97:18

**misspelling** 98:13

**Misstates** 117:20

**mistaken** 112:9

**mistakes** 169:22

**mistype** 101:12

**Mitch** 58:9

**mixed** 132:23

**mixing** 140:24

**mom** 54:4,20 60:12 75:24 80:14 110:14 129:7,8 170:22 171:9

**mom's** 91:12 171:9

**moment** 22:12 38:7 218:5,18

**Monday** 46:14 52:23 109:8,10, 12 199:4,11,12, 15 215:24 216:13

**money** 88:19 118:22 127:14 128:4,15 136:4, 13 137:5,8 154:6

**months** 54:24 217:22

**morals** 103:13

**morning** 19:21 29:9 70:14 76:22 117:8 118:2 120:11 123:25 124:4,8 170:20 171:13, 17 182:11

**Mort** 204:14

**mother** 151:15

**motherfucker** 86:16 186:11

**motherfucking** 128:15

**motion** 211:12, 24 212:9,14,16

**move** 44:19 54:25 60:8,9,11 209:3

**moved** 54:3,4, 8,12,22 60:7,12 220:5

**moves** 120:5

**movie** 160:2

**moving** 54:22 169:8

**moving-type** 54:21

**mugshots** 131:14,16

**multiple** 19:9 78:13,15 130:22 131:8, 10,14 200:22
**murder** 56:25 81:1 219:10,14, 19
**mutual** 104:8

**N**

**nah** 69:21 72:5 73:15 78:3 83:12 87:12 88:20 89:18 101:8 104:6 105:10 122:2 123:9 134:23
**name's** 114:3, 25 195:23
**named** 61:11 65:10 97:10 98:6 106:14,18 109:21 114:6, 13 146:12
**names** 26:9 70:22 80:4 83:17 95:22 110:19 158:13 209:15,17 217:1,2,16
**Nancy** 7:11,22
**narcotics** 103:10
**needed** 36:1 42:19
**neighbor** 181:4 190:23
**neighborhood** 57:12 59:6 60:8 61:10 68:24 69:1,4 73:8,9, 16,20,22 74:3 85:18,19 103:2, 9 104:8 113:7 122:24 151:24 158:22 169:5 210:20
**neighborhoods** 122:25
**nervous** 75:25 185:13
**news** 38:14 104:19
**nice** 70:8 75:12 84:17 103:15 104:1 122:25 124:9 220:7
**nickname** 58:19 61:12,13 106:20,23,25 107:3,4 145:6
**nicknames** 57:23,24,25 106:23 107:2
**night** 71:15 75:22 76:23 80:8 84:14,19 86:23 87:21 88:1 89:4,6 91:12,16 96:3,6 119:21,23 124:2,3,6,7 140:10 151:23 161:10 170:20 172:24
**Nissan** 134:10, 11 153:8 155:1, 3 220:2,4
**nod** 9:21
**nodding** 9:23
**nonchalant** 76:5
**normal** 10:1 57:12
**Norris** 58:2
**North** 54:19 55:1 109:13 143:5 144:9 150:7 157:2,5, 12,14 161:13
**Northern** 7:13
**Northside** 56:7,8
**notes** 24:5,6, 14 141:17
**notice** 172:17
**noticed** 172:8
**number** 7:15 42:14 141:22, 23 153:1 179:12,13 181:20,21 195:6,18,19

**O**

**oath** 9:6
**object** 11:11 12:1,7,10,17 13:4,17 14:20 18:17 35:14 36:15 37:7 39:5,25 40:8,14 43:17 49:1 62:16,23 63:5 67:12 82:8 90:13 95:3,9 191:13 196:17 198:14 199:10 204:15
**objection** 10:5 14:16,20 15:3, 10,21 16:18 17:15 18:11,25 21:5 23:19 25:17 28:22 29:1 35:6,22 41:7,22 43:11 44:17 46:19 53:18 63:19 64:4 65:11 98:9 102:8 115:23 116:17 117:20 119:8 120:18 188:1 193:3 194:24 197:1 199:16 200:17
**objections** 10:1 12:9 197:13
**obligation** 213:21
**obstruct** 65:18
**obstructed** 66:2
**obstructing** 65:22
**occur** 127:17
**occurred** 143:1 150:6 154:17,20
**occurs** 140:13
**offer** 45:24
**offhand** 37:2
**office** 8:1 202:5 204:20
**officer** 30:13 66:18 67:1 77:24,25 81:13 96:11 129:3,4, 7,9 137:24 164:5,16,18 221:3
**officer's** 81:17
**officers** 15:18 57:14 60:20 66:20 76:4 77:19 80:17 81:19 87:7 91:24 117:6 119:1 123:14 124:10 132:14 141:17 155:19 170:16 210:13
**older** 68:12,13, 14 69:4,5 103:2 112:13,14 126:5 145:25 169:2 185:17, 24 217:9
**oldest** 170:7
**one's** 99:8
**open** 68:22 116:10 181:7,9
**opened** 31:9
**opens** 143:18
**opportunity** 134:4 165:20
**option** 222:17
**order** 43:10,12 68:4 211:9,17 223:10,15,23 224:2,4
**ordering** 57:11
**Oriental** 121:3
**overheard** 96:3
**overnight** 77:5
**overview** 9:1
**owned** 39:1,4 157:9 160:18 219:11,25
**owner** 219:19
**owners** 193:19
**owns** 181:5

**P**

**p.m.** 41:16 93:20 144:8 203:19,24 224:20,21
**packet** 149:14
**pages** 99:23 165:15 166:7
**paid** 65:9 138:5 221:2
**pancreas** 24:25 26:23 172:14
**paper** 22:15, 16,18 47:16 80:3,4 101:1 131:5
**papers** 72:18 74:12,15 75:14 88:3,12 105:20 115:17 117:2, 24 142:23,24 143:18 153:10, 23,25 154:6 161:12 162:1, 10,22 163:22, 23,24 164:1 189:3,5 193:24 194:21 196:1,4,

9,15 206:20

**papers.'** 153:19

**paperwork** 67:18,20 69:22 70:5 71:4,8,11, 14 72:11 75:8, 11 76:16,19 83:22 86:17,18, 20 87:10,11,20, 22,23 88:17,18 105:22 118:13 119:3 121:16 122:14 124:13 125:11 127:3,5, 8,9,14 128:3,4, 17,18,20,23 156:12,20,21, 23,24 157:19 159:13 161:18 172:25 183:22 220:18 222:3

**paragraph** 144:6 145:1 150:13

**paranoid** 186:9

**park** 60:12 87:19 122:16, 19,22,23,24 123:1,6,7,11

**parked** 69:25 70:11 71:2,13 83:8 122:18 123:5,12,14,15 128:9,12,14 129:24 143:6 157:8

**parking** 71:2

**parole** 66:18 81:13,16,25 129:3,4,7,9 164:5

**part** 45:19 46:21 56:13 83:15 141:1 157:24 175:24 184:23 186:15

**partner** 76:12 138:1

**passed** 120:6 167:25 168:2 169:3 173:4,5

**passing** 191:25

**past** 43:15 104:8,9 118:18 119:20 169:22 185:21

**pastries** 194:2

**patrol** 60:20 82:6

**pause** 12:10,18

**pay** 116:22 117:24 138:5 140:6

**payee** 68:16, 17,19 125:10, 11,12,13,15 162:11,13 163:11

**PDF** 223:17,18

**pending** 7:12 9:5

**people** 46:9 52:22 57:15 58:24 74:2 78:18,20 85:14, 15,16,17 94:16 95:18,22,24 97:6,9 119:13 131:10 139:10 153:1 176:4,18 181:25 205:6, 10 206:10 207:20 209:14 210:17 211:4 213:9 218:20 223:1

**People's** 152:25 178:1 179:12,13

**Perfect** 49:8 209:5,6

**perfectly** 26:8

**period** 11:8,14 26:24 60:25 72:3 75:9 152:10 159:21 182:25

**permit** 156:15

**person** 54:21 70:20 78:15 80:4 82:19 103:25 111:16 114:8 121:23 122:4 125:14 131:25 136:11 144:20,23 157:18 179:5 193:1,18 219:11

**personal** 185:10,12 214:15 215:22

**phone** 13:3,14, 25 14:14,25 16:1,13 18:6,8, 20 19:21 33:11 34:19 35:1,20 36:11 39:21 43:20 46:16 76:15 173:23 179:20 195:18, 19 196:8 217:5

**phonetic** 109:23

**photo** 94:13, 16,25 131:10

**photograph** 132:6,13 153:3 178:6 179:3,6, 8,18

**photographs** 130:22 131:4,8 133:15 134:3,4, 7 155:4

**photos** 94:15

**physically** 68:1 72:6 86:11 188:11 190:6

**pick** 35:2 131:5 139:16,17,18 140:1,10 147:8

**picked** 16:13 31:16,17 92:1 94:5,13 96:10 131:5 138:19, 25 140:16,17

**picketing** 182:23

**picture** 78:7 79:22 107:5 178:13,18,21 185:22 186:5 221:16

**pictures** 78:10, 13,15

**piece** 22:16

**Pistol** 96:1,2,5, 8 97:5 101:6 102:10,13,15 115:7 135:6,11, 16,21,24 136:2 138:21 139:20 140:5,19 146:4, 6,8 147:2 168:20,21 205:9,24

**Pistol's** 135:9

**pitched** 154:3

**place** 38:9,18 54:17 125:4 193:18

**plain** 210:20

**Plaintiff** 7:17 177:11

**planning** 190:15

**plate** 67:3 71:12 83:20 118:3 134:17

**plates** 120:16 156:1,8

**play** 128:21

**played** 116:15 128:18

**player** 106:2 116:15

**playground** 71:1

**plays** 143:17

**point** 19:10 27:19,20 52:10 63:2 70:2 80:25 84:6 91:8 92:22 98:20 116:22 121:18 132:12, 13 144:1,16 148:1 158:25 159:20,21 164:21 174:7 175:17 183:11 191:22 194:6, 20 199:24,25 206:20 207:2 214:25 220:14

**points** 113:24 141:19

**police** 23:14 30:13 32:21 38:2,6 42:7,8, 22,23 57:4,13 62:14,18,22 63:3,8 64:2 65:8 66:19 67:4 70:6,21 71:5,6, 7 74:17 77:16 81:13,24 82:2 83:24 84:2 86:22 87:25 89:16 91:2 95:5,21,23 96:7,11 100:16 101:21 102:5, 12,15 106:17 107:2,3 110:22 111:11 112:16 113:1,16,19 115:20 117:5 118:2 120:12 124:1,4 129:3, 10,13,14 130:11,18 132:3,14 134:25 135:19 136:1,5,21,25 137:23 138:3,6, 11 139:16 140:1,4,7,18,19 143:21 144:3, 15 146:7 147:8 148:3 149:11 155:13,16,19, 23,24 156:7 161:16 164:16, 18 165:7,8

167:11 169:25 174:23 175:6, 13,16 177:5 180:11 208:17, 22,24 210:10, 22 219:9 220:17

**popping** 180:5 183:19

**porter** 220:5

**portion** 150:10,17 162:23 211:3

**portions** 32:19

**possession** 57:8 59:14 116:25 143:11

**pot** 186:15

**precinct** 90:25 209:23

**present** 7:25 146:15 150:3 194:9

**presenting** 221:22

**presently** 65:7

**press** 215:16

**pretty** 24:4 31:3 59:9 91:23 101:1 105:23 113:8 126:15 128:14 136:9 178:15 184:13 196:14

**previously** 34:5 195:16

**price** 142:22

**prior** 197:2 198:15

**prison** 176:22

**private** 182:2 208:16

**problem** 161:7 173:11,13 201:1,6,9 202:23 203:1 215:4 218:19

**procedure** 24:20

**procedures** 212:16

**proceedings** 7:1 166:19

**process** 217:13

**produce** 173:18 192:8, 10

**program** 217:2

**programmed** 217:14

**Progress** 107:18

**promise** 115:3

**promised** 164:13

**promises** 164:19 167:9

**pronouncing** 98:3,4

**properly** 194:9 196:5 200:12

**property** 111:13,18,19, 20,21

**prosecution** 175:20,21

**prosecutor** 151:2

**provide** 215:10

**public** 42:14

**pull** 107:2,5 141:6 147:6 180:23 213:5

**pulling** 184:1

**punishment** 60:2,4

**purchase** 119:17 134:14

**pure** 203:4

**purpose** 44:14

**pushing** 34:4,7

**put** 50:16 67:3 83:23 98:21,25 131:4 134:22 182:5,9 184:2 185:16 186:15 217:5 220:11

**putting** 99:9 185:14

**Q**

**question** 10:4, 8,11 12:6,7,17 13:21 14:23 17:19 18:15 19:1,7,9,16,18 24:11 32:13 40:22 44:18 47:11,19,23,24 48:22,25 52:9 55:14 65:16 66:1,4 147:24 168:20 194:6, 15,18 197:17, 24 198:7 199:20 201:16, 18,23 212:25 220:19 224:11

**questioning** 10:16,19 210:14 215:1, 12

**questions** 9:6, 16 25:13 26:11 65:19,24 76:25 77:14 80:18 105:5 114:16, 17 133:21 166:23 177:14 186:24,25 189:9,11 198:17 200:21 201:17 202:21, 22,25 205:1 210:24 211:8 213:25 214:4 215:3 216:9 219:3,7 222:7, 11

**quick** 9:1 171:7 224:11

**quickly** 99:22

**quiet** 59:9 74:4 178:15

**R**

**radio** 84:20,22, 24 85:24 116:15 120:1,3, 7 143:17

**radios** 85:7

**raise** 8:3

**raised** 54:2

**ran** 155:16

**range** 61:2

**re-say** 206:18

**reach** 199:15, 23

**reached** 175:3, 22 180:19 187:15

**reaching** 37:17,24 176:2 180:18,20,21

**reaction** 105:1

**read** 31:10,13, 16,17 32:22 36:22,24 41:12 49:2,4,6,8,18 50:1,4,7 98:16 108:10,11,16 145:1 148:13, 15,16,22 150:8, 21 151:16 165:13,15,23, 24 198:12 222:19

**reading** 22:2,5, 9,10 46:15 48:23 108:18 109:19 121:7 142:1 148:23 150:10,19 151:11 152:24 153:7 165:14, 18 168:8 184:12 185:12, 14,15 206:15

**ready** 187:14

**real** 76:5 79:18 184:19 186:22

**realize** 149:1

**realized** 171:19

**reason** 37:14, 19 57:5 74:7 188:16 200:2

**reasonable** 216:1,4

**reasons** 211:25

**recall** 46:6 61:12 94:6 112:19 121:4, 11 123:10 130:13 132:15 140:15,20 145:5 146:12 147:9,12 150:10 153:4 157:13,17 159:8 162:6 163:2 180:13 189:7

**receive** 21:19 119:3

**receiving** 29:18

**recently** 26:25

**recess** 89:23 203:20

**recognize** 21:14 132:1 134:6 177:2 178:10

**recognized** 39:12

**recollection** 22:3,14,23 30:10 37:4 46:15 52:15 62:1,4 63:25 90:6 132:20 156:17 158:1

159:4 188:20, 23 202:8

**record** 7:3,16 10:2 25:14 44:4,24 46:20 50:16 89:21,24 116:3 117:21 177:18 203:18, 21 219:24 223:8 224:11, 13,19

**recording** 192:5,8,11

**records** 213:5

**RECROSS-EXAMINATIO N** 219:5

**REDIRECT** 189:13

**Reed** 7:10,18 31:21,25 32:22 34:8 62:10,13 63:18 64:2 67:17 78:5,24 79:5,9,11,14, 16,25 80:3 92:12 98:23 100:2 107:19 108:25 114:5,6, 13 117:14,18, 23 119:6 121:19 126:22 127:17,24 128:2,24 131:3, 6,7,17 132:2 133:10,19 134:3,14 135:7 140:2 146:10, 16 151:25 153:4,16 154:23 163:3 164:22 169:6 172:23 175:4 176:22 178:12, 19 184:6,11,13 187:18 188:10 208:10,13 219:10,18

**Reed's** 8:17 67:13,15 138:7, 12 151:2 174:19 179:22

180:10 183:15 185:25 187:4 188:20 200:6

**refer** 52:3

**reference** 162:13

**references** 52:14 179:12 224:14,15,16

**referring** 12:4 78:25 79:10

**reflect** 9:23

**refresh** 22:2 23:12,14,25 24:16 37:3 46:15 52:15 93:20 138:23 140:12 158:4

**refusal** 202:16

**registration** 72:12 75:2

**regular** 187:12 189:4 222:1

**regularly** 115:10

**Regus** 7:8

**reiterate** 114:25

**rejection** 24:24

**relate** 49:14

**related** 89:16 164:21 210:15 215:12

**relation** 176:18

**relax** 76:1

**relayed** 126:8

**released** 176:12,22,23 208:1,4

**relevance** 39:6 202:12

**relevant** 202:17,18,20

**rely** 51:3

**remaining** 150:16 154:6

**remember** 11:4,16,21 12:25 13:3,7,23 14:1 15:1,8,14, 17,23 16:7,23 18:2,5,8 19:19 20:1,2,25 21:9 22:15 23:9,11 24:2,14 28:21 37:1 39:1,20,22 40:2,6,9,11,15, 17,19 41:17 43:14,18 45:3, 6,20 50:14 51:11 53:3,6, 11,12,17 54:11 55:3,7 57:7 58:7,11 61:1 62:5,8,12,14,22 63:17 64:1 65:3,6,7 66:5, 10 67:11,15,16, 17 68:10 70:19 72:21,22,24,25 74:17 75:18 77:1,11 78:19 80:22 82:9,10, 25 84:13 88:23, 25 89:7,11,12, 14,15,18 90:11 91:21,25 92:2, 4,19,20,21,23, 24 93:3,11,12, 16 94:7,10 101:20 102:5 105:6,13,17,18, 19 107:21,24 108:3,4,8 110:13,14 113:2 120:8 121:13,14,15 138:9,10,11,13, 15,17 139:4,5, 6,13 140:22,24 141:1,16 142:8, 11 145:16,17 147:13,16 148:2 156:19, 23 157:4 162:4, 23,24 163:7,8, 10 166:24 171:4 174:18

176:10 178:23, 25 179:1,2,8,21 185:20 187:16 188:25 189:8 196:6,12,13 197:11,12 199:4 206:16, 20 207:22,24 209:16 215:24 216:13,17 217:4 218:10 221:2,3,4

**remembering** 27:11 217:18 218:19

**remote** 217:6

**rent** 118:16,18

**repeat** 29:5 55:13 64:20 95:15

**repetitive** 59:17

**rephrase** 10:9 24:12,13 27:16 43:14 47:23 63:24 93:13

**report** 31:24 38:2 98:15,22 107:18,24 109:4 118:20 138:18,22 139:20 140:1,9

**reporter** 7:5 8:4,6,10 9:9,12, 17 55:13 92:16 99:8,12 107:13 160:22 161:2,6 177:16 222:23 223:8,13,16,18, 22,25 224:5,8, 10,16,18

**reporting** 118:19

**reports** 98:1

**represent** 14:1 19:23 29:13 114:25 175:6 213:22

**representing**

25:23 41:3 45:22 191:3

**request** 22:7 30:6

**requested** 21:23 22:3,17, 23

**requesting** 22:19 28:20 29:18

**required** 25:2

**reschedule** 37:5,15 199:3,9

**research** 36:2 44:6

**reserve** 222:17

**Reserving** 222:18

**respect** 103:11,23 104:2 215:9

**responding** 11:8 35:20

**responds** 212:1

**response** 30:5 196:2

**rest** 88:19 122:17

**restaurants** 193:20

**retarded** 188:18

**return** 164:13

**returning** 181:3

**review** 30:19 148:11

**reviewed** 100:3

**reviewing** 99:19

**rewind** 193:16

**Ricardo** 7:9

31:22 58:16 89:25 107:6,23 113:10 149:9, 24 151:3,4,11, 12,15,16,23,24 152:7,8,12,24 153:1,7,8,24 154:2,3,5 155:8,12,19,20, 23,25 156:1,14, 25 157:8,11,21 158:20,22 160:8,9,10,11, 12,17,19 161:10,11,12, 20 162:1,17,21, 22 163:14,17, 19,21,24 164:4, 6,12,24 165:3, 6,13,14,23,24 181:18 182:11 193:19 194:1,3 203:22

**Richard** 7:10

**Rick** 58:20,21, 22 107:4

**Ricky** 58:20, 22,23

**rid** 220:13

**ride** 71:12 96:5, 7 124:8

**ridiculous** 203:9

**riding** 70:3 72:8 86:22 122:17

**right-hand** 179:15

**risk** 120:22

**Road** 55:25

**robbery** 210:21

**Rock** 58:20,21, 22 107:4

**rode** 124:11 135:22

**Rodney** 61:11, 12,14 106:15, 18,19 107:7 108:13 109:15, 19,21,22 110:1, 10 142:5,8,10

**Rodney's** 109:16 110:16 142:6,7

**Rogers** 60:12

**Ron** 110:1

**Ronney** 109:23,24,25

**room** 76:24 113:25 125:6,7

**rough** 111:12

**row** 77:5

**RPB** 152:2

**rubber** 105:16

**rude** 154:14

**rules** 9:2 42:25 44:5

**run** 117:5 125:21 155:19

**run-ins** 169:25

**running** 81:20

## S

**sad** 220:11,12

**safe** 97:2

**sale** 153:8 154:3

**sales** 187:15

**salon** 181:5

**sat** 8:23 30:12 76:24 125:18, 23 220:6

**save** 221:1

**scamming** 183:25

**scared** 15:20

**scary** 18:10,23 82:15,17 196:3

**scattered** 189:5

**scheduled** 11:17 12:24 35:17

**Schnidt** 7:19, 25 11:11 12:1, 4,8,13,19 13:4, 17 14:2,7,16,19 15:3,10,21 16:2,18,25 17:6,15,23 18:12 19:2 20:3,7,13 21:5, 12 22:4,7,23,25 23:19 24:9 25:1,8,15,19,25 26:3,16 27:6 28:16,22 29:1, 8,10,17,21 30:7,20,23 31:4,7 32:8,12, 14 33:6,10,20 35:6,10,14,22 36:15 37:7,18, 20 39:5,25 40:3,8,14,20 41:5,7,22,25 43:11,17 44:17, 23 45:17 46:3, 8,12,16,19 48:2,7,20 49:1, 22 50:1,7,16,21 51:14,18,24 52:2,11,14,16, 18 53:5,14,18 55:10 62:16,23 63:5,19 64:4,6, 20,23 65:11,15, 21,25 67:12 74:24 77:6 82:8 90:13 93:1 95:3,9 98:9,25 99:3,6 101:14 102:8 108:22 109:1,10 114:19,23,25 115:25 116:18 117:22 119:9 120:20 137:13, 16 141:6,11,12 149:6,7 150:23, 25 156:3,5,6 160:20,24 161:5,7,9 173:17,24 174:2,3 177:17 186:23 189:20 191:13 193:3,7, 11 194:11,24 196:17 197:1, 13,19,23,25 198:3,14,23 199:5,10,16 200:17,21,24 201:3,7,10,13, 16,19,22 202:1, 4 203:1,11,15 204:15,22 205:2 206:14 207:12,16 211:10,15 213:18 214:5, 17 215:6,9,15 216:1,4,6 219:6 222:6,9,14,17 223:1,5,7,13, 15,17,20 224:12,15,17

**school** 55:7,8, 9,14,15,17,20 56:3 61:4,5 70:12 103:21 106:7 144:23 145:3

**scope** 211:2

**screenshot** 173:19

**seal** 200:13

**Searchable** 223:17,18

**seat** 116:13

**secretary** 219:24 220:16

**section** 99:16 109:19

**secure** 183:5

**security** 180:24

**seek** 211:12

**Sees** 144:7

**selections** 94:16

**sell** 74:10 81:10 83:9 115:14 125:8 129:22 130:18 152:9 160:11 169:6 184:11, 16 185:7 186:21 206:22 207:14 219:10

**selling** 163:3 169:13

**send** 16:22 20:19,23 21:1, 3,7 22:4,8,23 23:3,6 32:24 51:10 196:8 200:5,7,9

**sending** 49:9

**sends** 42:25

**Senn** 55:9,15, 17

**sense** 10:23 22:20 48:25

**sentence** 21:21 22:2,5,9, 10 142:1,15

**sequence** 140:13

**series** 133:15 134:2

**serve** 193:24 194:21 195:25 196:5,9,23 198:21 200:16 202:6,11 203:2

**served** 17:2 196:16 202:16

**service** 19:22 35:5 217:3

**serving** 20:10 204:11,12

**set** 116:10 139:14 143:11

**shake** 9:21

**shaking** 9:22

**share** 183:10

**she'd** 54:24
**sheet** 100:22
**Sheridan** 55:24 73:3 125:1 150:7 157:2,6,12,14 158:11 161:13
**sheriff** 43:2,3 45:11,13 200:10,15
**Sheriff's** 202:5
**Shermaine** 145:15
**shit** 71:12 75:13 84:20 85:3,6 160:3 176:12 182:14 185:19
**shocking** 136:23 185:4
**shoot** 218:3
**shop** 11:18 38:12 39:1,4,9, 17 41:19 45:1,4 46:11 48:10,12, 14,15 180:2 181:5,16,18 185:13,18,24 187:6 189:16 190:1,5,7 193:1,9,25 204:13,21 221:25
**short** 27:22 28:1,8 53:21 74:20 172:9,17
**short-term** 27:23 214:22 216:22,25
**shortened** 110:3
**shortly** 16:15
**Shorty** 153:19
**show** 21:10 36:11 38:20,21 40:19,23 41:2, 11 44:2 47:4,5, 16 53:16 66:25 78:7,13 83:10 100:8 107:8 108:9,12 129:24 130:21 131:20,21 132:6 133:14, 20 138:7 152:9 153:2 173:25 177:10,13 180:6,9 189:15, 22 220:17
**showed** 35:16 38:21,22 41:5 47:10 48:19 50:14 70:1 75:10 78:9,12 79:22 80:4 83:11 94:1,15, 18,19,21 155:4 185:21 224:13
**showing** 47:21 66:25 75:20 90:24 184:1
**shown** 52:13 134:2 178:8 179:2
**shows** 154:9
**sic** 51:3
**side** 54:2 109:15 122:19 142:5 143:13 162:8 166:9,12 177:25 178:4, 20 179:15 213:8
**sides** 142:20
**sign** 36:1,3 44:7,15 67:22 68:1,2,5 100:8, 22,23 184:3,4
**signature** 151:19 166:4,8, 12 177:19 178:13,19 222:14,18 223:2
**signed** 44:8 67:21,23,24 68:6,7 72:4 100:7,17,25 101:1 111:24 112:7 178:21 179:18 184:4 200:13
**significance** 134:12 185:1,3
**signing** 75:9 179:8
**signs** 44:5
**similar** 33:1,2
**single** 65:25 189:2
**sir** 17:24 19:20 198:18 213:18
**sister** 54:23 81:21 82:4 84:4 90:21 91:14,15 151:15 217:21
**sister's** 66:21 91:13 129:9,14 138:19 140:1
**sit** 16:6,9 46:14 59:23 125:7 170:24 203:13 213:16
**sitting** 20:3 68:20 90:4 93:16 156:19 157:3 182:13 184:23 187:13 201:13 202:10 203:3
**situation** 96:19 186:14 218:1 220:9,11
**size** 68:18
**sleep** 139:18 147:9
**small** 69:12 125:22
**Smith** 204:14
**smoked** 73:16, 17,19
**Smoking** 83:18
**smooth** 35:5 59:10
**smoothly** 9:2
**social** 59:8
**soda** 165:3
**sold** 73:6 79:16,17 96:4, 24 186:18
**solemnly** 8:6
**son** 170:7
**sound** 37:6 43:23 115:22 118:21 135:12, 13 185:16
**Sounds** 20:5
**south** 54:2 109:15,16 142:5,6 146:13
**spam** 193:17
**Spare** 106:2
**speak** 14:5,10, 12,15 15:5 17:14,25 19:23 27:15 33:10,13 38:15 42:20,24 45:7 48:17 64:8 173:13 174:21 175:25 180:15 193:19 194:1 202:1 208:11
**speaking** 12:11 21:22 22:6 29:9,12 34:8 38:4 52:14 53:3 168:24 190:4 218:6
**specific** 47:23 194:5,15
**Speculation** 21:5 39:5 193:3,11 199:16
**spoke** 13:24 14:24 15:25 16:5 20:1 29:7 33:16 39:21 44:24,25 45:2 46:3,12,13 48:9,13,16,18, 21 49:10 50:10, 24,25 52:15 53:2,5,10,13 70:5 167:23 168:21,22 172:23 174:4 180:11,14,17
**spoken** 44:23 45:5 48:7 52:10
**squad** 210:10
**SRO** 68:4 72:1 73:3,13 74:23 75:1,7 111:13 121:16,19,22 123:22 124:11, 14,15 138:7 158:8 205:20, 22,24 206:2
**St** 146:13
**stairs** 69:16 126:22 163:18
**stamp** 92:12 133:18 182:9
**stamped** 98:23 100:2 107:19 177:10 178:9 200:9
**stand** 130:2 133:15 139:5,6
**standing** 95:11,13 126:17 127:20 143:13
**star** 208:23
**start** 29:7 108:15 169:14 181:17 212:24
**started** 38:3 60:7 79:13 87:25 122:18 176:15 196:7 210:7
**starting** 94:9
**starts** 217:9
**state** 44:6 45:22 46:24 126:23 175:22

176:4 184:9 190:2 192:1 199:17 209:25 219:24 220:16 221:23

**state's** 7:11 21:24 37:22,24 42:6,11,13,16 44:4 139:2,3 147:10,16 148:2 150:1 151:1,5 165:10, 17 174:21 178:23 219:8

**stated** 28:2 38:19 40:21 44:3 66:24 108:20 109:6,9, 12 152:8 154:3 160:2 174:24 181:5 190:1 215:19

**statement** 21:24 24:8 30:15 31:22 92:9,10,11 93:13,14,18 107:23 139:2 141:5 147:11, 20,21 148:3,10 149:9,24 150:4 151:4,5 153:5, 15 159:12 161:8 164:13 165:1,15,25 174:8,11 177:6, 12,20 178:22 179:11,12 185:14 206:14 219:8

**statements** 20:23 21:1,3,8 22:4,8,19,24 23:4,7 28:20 29:19 30:6,7, 11,12,16 95:17

**states** 7:13 151:11,12,15, 23 152:7 153:7, 24 155:8,12,23 156:14,25 157:8,11,21 158:22 160:8

161:12,20 162:17 163:21, 24 164:4,12,24 165:3,6,13,14, 23,24

**stating** 150:20

**station** 15:18 67:4 75:21 77:4 80:9 82:23 83:1,3,25 84:3, 6 92:5,6 93:21 94:17 96:13 113:22 130:11 135:25 137:19, 23 220:17

**stay** 54:23 75:21,22 77:9 138:23

**stayed** 91:12 169:9

**staying** 91:14

**stays** 109:15 142:5 144:12

**step** 38:1 39:15

**stepped** 36:4 104:25

**steps** 38:3

**stereo** 85:24

**sticker** 98:25 107:11

**stickers** 51:19

**stolen** 81:5,6 86:16,17 118:6, 19,21 136:10 137:1,14 155:20,24 185:4 186:17

**stop** 36:6 60:5 148:24 149:20 169:16 212:25

**stopped** 35:20

**stopping** 195:17

**stops** 142:5 217:11

**storming**

136:25

**story** 91:23 95:6 100:17 102:7 135:20 136:22 137:4 176:8 184:21 202:19 209:11

**straight** 123:12 153:18 220:16

**straighten** 156:11

**street** 72:16 80:21 85:4 96:2 102:25 103:1 104:9 109:13 118:12 123:8 128:9,10,13,14 222:2

**streets** 122:20

**strike** 129:5 135:15 142:8 143:25 147:7 152:25 162:24 179:21 216:21 218:6

**strolled** 31:14

**strong** 172:18

**struck** 159:23

**struggle** 25:21

**stuff** 10:21 120:2 135:4 183:25 193:17

**subjected** 203:14

**subpoena** 16:22 17:4 19:22 20:11,19, 21 28:17 29:18 35:5 36:1 42:25 44:1,5,7,8,15 45:12 192:15 198:21 200:4,5, 16 202:6,11 203:3 204:11, 12

**substance** 57:8 59:16,21 222:21

**successfully** 17:2 196:16

**suggesting** 211:11

**suit** 135:4 210:23

**Sullivan** 7:21 13:6,19 14:20 17:17 18:11,13, 25 19:8,13,15 26:15 31:3 35:11,23 39:6 40:1 66:8 149:4 186:25 187:3 188:3 189:9 197:6,18 198:6, 10 199:18 203:6,12,17 212:4,7,12,17 214:21,25 224:1,3

**summarizing** 21:24 66:11

**summary** 32:20 151:4

**sun** 85:21 92:7, 8

**supplemental** 98:22

**supposed** 11:20 34:16 101:13

**surgery** 23:10 27:7,18 28:1,6

**surveillance** 180:23,24

**suspect** 81:1,3

**suspicious** 118:8,11

**swear** 8:6

**T**

**table** 31:2 94:20 189:1,2, 4,6 217:5

**tactic** 203:4

**tactical** 210:20

**takes** 25:4 217:13

**taking** 68:20 117:5,7 123:16 135:18 141:17 215:21

**talk** 9:13 20:6, 12 24:17 34:11, 16,21,24 37:25 38:10 40:18 41:16 45:8,15, 18,21 46:22,23 47:24 49:19 50:2 51:2 53:14 56:24 61:15,18 62:18 63:3,11 69:12 90:20 96:11,18 113:21 115:1 125:22 130:3 139:1,16 140:18 164:6 174:22,23 176:5,16 180:3, 4 182:20 187:17,18,22 190:18 208:10 209:9 221:9

**talked** 10:25 12:23 13:3,14 18:21 19:22 20:16,18 29:6, 8,18,25 30:1,4, 13 33:6,7 36:10 48:1,25 63:7 64:2 65:16,17 66:17 74:9,23 76:14 90:12 91:16 95:18 104:22 112:15 113:15 114:24 123:24 129:1, 14 135:6 136:5 137:10 140:7 148:4 157:17 159:9,13,17 168:25 174:15 177:5 179:20 190:12,19 191:2 210:18 219:8 220:22

**talking** 28:15

33:4 37:22 38:6 62:14,22,25 66:23 79:12 83:6,15 93:16 94:23 99:14 104:16 109:14 111:11 113:5, 16 123:22 128:19 132:9 134:25 135:5, 14 136:25 137:20 139:4 141:16 142:2,4 148:7,9 159:8, 11 162:24 175:2 176:17 184:2,14 190:9, 21,22 209:11 218:11 222:2

**tape** 193:16

**taped** 69:13 104:17 206:5

**tarnish** 182:11

**taught** 103:22

**Taylor** 7:4 89:25 203:22

**team** 37:24 57:16,17,19 180:16,19,21 213:3

**tears** 38:17

**technical** 11:24 13:12

**Teenage** 61:4

**teenager** 67:19

**telling** 15:8,17, 23 18:8 29:19 40:11,17 84:4 101:20 102:5 112:19,25 135:19 136:8 140:19 143:24 163:10 184:15, 22 195:24

**tells** 10:3 125:3,6 142:20, 21,22 202:19

**ten** 16:16 69:3 102:19

**tenants** 122:9

**tended** 61:7

**terabyte** 217:9

**term** 22:12 27:22 28:1,7,8 121:5 172:9,17

**terrible** 149:4

**Terrie** 7:21 19:5 26:14 212:11

**Terrie's** 31:1

**testified** 37:20 38:5 42:20 52:10 66:1 115:3 133:4,6 166:17,25 174:13 175:4 189:20 197:7 198:12,19 202:7 210:25 214:11,23

**testify** 24:7 25:14 65:17 167:1,7,9,11,13 213:24 214:20 215:17 216:2

**testifying** 28:5 44:17 132:19 197:2 206:21

**testimony** 8:7 14:18 17:12 18:21 23:20 24:9 28:23,25 34:13,15,18,23 40:5,6 48:14 63:16,20 64:6 65:12 66:3 74:24 102:9 167:15 188:2 197:3 198:15 205:1

**testing** 172:16

**text** 36:16 195:16,22 221:16

**texted** 167:24

**theirselves** 74:2

**thing** 20:18 51:7 63:16 77:2,15,18 99:14 141:1 148:18 171:5, 11 176:8 185:20 209:11, 13 220:6 221:4

**things** 9:18,25 22:14 27:4,5, 12,25 28:6 29:17 30:3 33:6 48:21 60:17 62:5 64:1 65:6 66:11 116:19 125:15 208:13 216:21

**thinking** 81:24 144:24 187:13

**thinks** 143:19

**Thompson** 7:10

**thought** 18:1 36:1 39:17 99:17 175:23 183:18 187:10 213:2

**threaten** 164:16

**threatened** 164:12 167:13 174:19 183:15

**threw** 75:13, 14,15 110:11 159:25

**Thursday** 144:7

**ticket** 123:4

**tie** 135:4 210:23

**ties** 220:13

**tight** 125:7 126:17 132:11

**till** 144:7

**time** 7:6 11:8, 14 13:24 14:13, 14,24 16:12 23:10 25:13 26:24 27:1 29:9,12 30:24 33:16 36:13 37:11 38:13,18, 23 44:22,25 45:2,3,4 46:12 48:9 53:4,13 57:9 62:17 63:6 66:18 69:16 71:16,18,22,25 72:6 73:14 74:9,25 75:1,7, 9 80:9 81:24 84:2 87:2,4 89:19,22 90:1 91:25 92:4,22 93:8,10,21,22 94:1,5,6,17,20, 24 96:9,10,12 104:21,24 107:25 111:17 112:4,9 120:6 123:18 124:6, 14 125:10,12 126:5 130:5,21, 23 132:13 135:17,18 137:19,22 139:18 140:24 144:1,5 146:17, 20 153:15 159:20 161:3 164:21,25 167:23 168:21 169:14,16 170:22 172:22 174:4,7,15 175:17 179:22, 23 180:13 181:2,15 186:23 187:5, 21 189:16,21, 23,24 190:2,8 192:2,22 196:23 203:19, 23 204:6,9,10, 13,19 205:8,17, 19 206:6,20 217:18 218:7 222:12 223:24, 25 224:3,20

**time-lapse** 147:22

**times** 19:9 28:8 46:2 53:4,10 59:12 112:10 123:3 124:15 135:23 172:17 183:3 196:20, 21 200:22 204:5,6,7,8 215:19

**timing** 148:1

**Timothy** 7:10

**tip** 123:6

**tire** 106:2

**tires** 134:18,21

**title** 69:8 125:3, 8 143:24

**today** 7:4,5 11:4 17:12 21:22 23:17 56:9 61:16 90:1,5 143:9 154:20 156:19, 23 157:3 167:16 203:23 213:17 214:12 223:10

**told** 13:25 14:25 15:18 17:4 18:5 20:14,20,21 25:25 28:16,17, 18 34:5,11,19, 21,23 37:23,25 38:17,22,24 42:2,18 43:20 44:4 47:25 48:6 49:10,14 51:1,7 52:20 64:10,14, 17,18 65:9 66:11,18,22,24 67:5 70:6 71:2, 5,6,7,14 75:19, 22 76:4 77:16, 18 79:4 80:14, 21 81:14 87:7,8 90:16,17 91:21, 24 95:21,25 100:19,23 102:12,15 104:12 110:19

111:8 112:21 113:1,3,4 126:13 128:8 130:24 132:10 135:19,21 137:20 138:4 140:16 143:21 144:3,15 146:7 153:24 154:4 155:23,24 156:11 157:22 158:1,23 159:22 160:3, 10,11,19 161:11 162:21 163:14,25 164:5,7 167:16 169:3,4,16 170:18 171:15 172:24 175:6 176:11,21 180:3,16 182:18 189:21 190:2,13 191:17,20 192:22,25 195:4 207:14 219:12

**ton** 97:9

**tonight** 39:24

**top** 93:19 101:9,11 141:22 146:4 149:8,23 161:23 178:4

**tossed** 122:14

**total** 204:7

**totally** 44:24 60:21 136:19 205:15

**towed** 123:3

**track** 219:24

**transaction** 118:25

**transcript** 223:9,10,14,23 224:1

**transpired** 118:25

**transplant** 23:10 24:25 26:23 172:2

**treat** 103:11

**treated** 110:21 165:6,8,10

**trench** 83:16 221:5

**trespassing** 57:11

**trial** 59:23,24, 25

**trouble** 43:22 52:21 60:19 61:1,3,7 169:12,18

**truck** 115:19 221:11

**true** 136:23 148:24 151:17 152:14 155:21 157:9 163:15, 19 164:8,14 165:1,4,7 166:1 198:3,9 212:10, 12 214:5

**Truman** 151:16

**trunk** 105:25 143:18

**trust** 104:13, 14,15 222:22 223:5

**trusting** 104:20

**truth** 8:8 90:17, 18 112:25 184:15

**truthful** 222:20

**truthfully** 167:1

**Tuesday** 50:20 215:24

**turn** 65:20,24 123:11 178:10

**turned** 169:19 170:3

**turning** 135:23

**type** 156:16,20 210:21 218:21

**typed** 98:18,19 149:24

**typically** 57:15

**typing** 9:12,17, 23

**U**

**uh-huh** 9:7,19 18:19 33:9,18 35:7 36:25 51:21 53:17 57:21 58:25 59:2 60:16 61:22 62:7 63:15 65:4 69:1 72:20 94:14 95:20 96:17 102:21 129:16 131:15 139:23 141:10 145:23 170:18 205:7 210:12

**uh-uh** 53:22 56:2 68:2 75:6 111:17 112:12 114:1 132:9 177:9 210:16

**unaware** 136:8

**uncertain** 133:4

**understand** 10:7 44:11 79:2 190:9 200:15 205:16 211:2 214:7 216:9

**understanding** 34:17 44:12 115:5 198:20 199:23 216:21 219:9

**understood** 10:12 28:4 123:17 150:20 205:3

**unfair** 201:11, 12,15

**unfortunate** 36:3 81:7

**uniform** 222:4

**unit** 210:21

**United** 7:13

**unknown** 150:8

**unlike** 149:3

**Unprofessionally** 195:6

**upcoming** 199:4,11,12

**updated** 185:22

**upfront** 136:20

**uptown** 54:3,9, 12,18 60:15,25

**urban** 57:12 107:1 182:11

**USC** 142:23

**V**

**Vague** 62:16 63:5

**Van** 56:25 57:4 150:5 210:15, 18

**vehicle** 64:9 66:17 67:1 119:24,25 134:13,15 143:4,12,14,23 219:19 220:10, 13,14

**verbal** 9:20 30:5 196:2

**version** 202:13

**versus** 219:1

**victim** 220:12

**victim's** 15:19

**video** 180:23, 24 183:2,5 192:5,8,11,19, 21 222:24 223:5,19,20 224:2,6,7

**violated** 81:25

**violating** 81:23

**visit** 72:5

**visited** 102:22

**Vo** 56:25 57:4 150:5 210:15, 18

**voice** 10:9 30:25 55:11

**voicemail** 36:14,16

**voicemails** 36:19,24 37:1

**voluntarily** 211:11

**volunteered** 111:5

**W**

**wait** 12:15 86:23 88:20 98:16 183:23 184:14

**waiting** 69:7 163:13

**waive** 222:18 223:1,3,7

**Waiving** 222:22

**walk** 56:12 69:18,19 71:1 87:17 104:9 131:21 143:5 152:20 193:18, 24

**walked** 39:14 104:8 127:21, 24 185:21 193:21,22

**walking** 70:13 73:9,24,25 125:1 152:17

183:25 188:25

**walks** 127:25 142:16 162:18

**wanted** 28:3, 18 29:20 40:23 61:19 64:8 78:4 84:3 90:22 96:4 108:9,12 136:5 137:13 151:25 152:6 164:5 165:17 180:3,6 189:22 192:20 204:25 208:13

**wanting** 88:16

**warm** 59:10 70:8

**warn** 120:15 126:11 151:8

**warns** 126:11

**warrant** 181:22 182:3,8,15 192:23 194:3 195:7,8

**wash** 72:8,10 120:23,25 121:21 134:21, 23 156:14 161:17

**Washed** 115:7

**water** 77:3

**Watts** 101:6 135:12 205:9

**ways** 135:23

**weak** 217:10

**Wednesday** 216:13

**weeks** 109:8 216:17,18 217:22

**Welsh** 7:4 90:1 203:23

**Wendy's** 171:6,7

**West** 143:5 149:10,25 151:13

**Western** 130:14,15,17 175:24 208:15

**What'd** 61:18

**what's-her-name** 50:12

**When's** 168:20

**Where'd** 55:22 102:24

**white** 66:23 83:7 122:24 133:12 153:8

**Who'd** 103:7

**Whoa** 183:23 185:16

**wide** 114:2

**wife** 56:22 61:17,18

**window** 189:1

**Winona** 124:21

**Winthrop** 54:19 55:1 85:11 97:2 108:21 109:7, 13 115:12 122:20 124:25 143:5 144:9 145:3 158:10

**witnesses** 173:14

**woman** 68:10 111:22

**women** 209:20

**wondering** 191:20

**word** 150:6,21 151:4 152:1 162:9 175:9 222:21

**words** 109:17 188:17

**wore** 221:4

**work** 36:10 55:19,22 56:1,4 175:13

**worked** 55:23 56:6,7,15,17 196:14 220:2,4

**working** 38:6, 16 39:10 56:4, 16 60:7 68:11 116:20 168:24 175:10,11,16 193:1 211:5

**workplace** 38:1,16

**works** 9:16 68:3

**worried** 23:15 76:16 81:3

**worry** 80:14

**would've** 103:4 145:19, 24 171:16

**wow** 54:20 69:3,15 171:24 172:1,3

**wrapped** 18:24

**wrestler** 58:4

**wrist** 160:22

**write** 80:2 148:6 151:17

**writing** 9:9 30:14,15 31:11 148:10

**written** 156:23 162:7 179:13 184:21

**wrong** 44:18 90:24 97:16,17 98:4 99:6,7 136:18,19 149:13 158:16 172:14

**wrongfully** 15:9 191:7

**wrote** 98:1 148:3

**X**

**X's** 150:14

**XX-XX-XXXX** 54:7 151:12

**XXXX** 54:7 146:23,24

**Y**

**y'all** 39:18 42:24

**year** 145:24

**years** 23:9 24:2,15 27:2,3, 5 56:18 61:4,5 69:3 102:20 106:24 132:17 138:15 147:2 151:12 167:18 168:23 170:8 171:25 172:4 173:7,8 217:8 219:22 220:3

**yell** 182:3,8,22, 23,25

**yelling** 127:7

**you-all** 38:1 176:16 180:14 190:2,3 210:7 221:17

**young** 68:18 69:6 82:16 120:22 157:1, 13

**younger** 55:8 116:20 135:11 147:4

**Z**

**Zoom** 11:18 38:25

**Zuley** 7:10,20 19:24 115:1