STATE OF ILLINOIS )
) SS:
COUNTY OF COOK )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT-CRIMINAL DIVISION

THE PEOPLE OF THE )
STATE OF ILLINOIS, )
)
)
)
vs. ) 01 CR 20237
)
)
CARL REED )

REPORT OF PROCEEDINGS HAD at the hearing of the above-entitled cause, before the Honorable JUDGE MARJORIE C. LAWS, one of the Judges of said Division, on the 22nd of APRIL, 2005.

PRESENT:

HON. RICHARD A. DEVINE,
STATE'S ATTORNEY OF COOK COUNTY, by
MR. GEORGE CANELLIS,
Assistant State's Attorney,
Appeared on behalf of the People;

MR. EDWIN BURNETTE,
PUBLIC DEFENDER OF COOK COUNTY, by
MS. MARY JANE PLACEK and MS. RUTH MC BETH,,
Assistant Public Defenders of Cook County,
Appeared on behalf of the Defendant.

*****

Peter J. Paris
Official Court Reporter
Circuit Court of Cook County, Illinois
Criminal Division #084-002875

# I N D E X

PETER PARIS
April 22, 2005
PAGE 1 TO 69


| LIST OF WITNESSES | DX | CX | RDX | RCX |
|---|---|---|---|---|
| Paul Zacharias | 6 | | | |
| Timothy Thompson | 17 | 41 | 64 | 65 |
| | | | 65 | 66 |

THE COURT: Carl Reed?

MS. PLACEK: Your Honor, we had a bit of an incident involving Mr. Reed.

As the Court may or may not know, Mr. Reed is a diabetic and I believe he is all right now. But he wasn't -- he was supposed to get his insulin at 1:00 and the sheriffs were very, very, very kind and helpful to Mr. Reed in this instance.

But considering that we have the next court date at a late date, I am wondering if we just shouldn't put on his mittimus that he be brought over later because his insulin shot is normally at 1:00.

Right?

MR. REED: Yes.

THE COURT: I will sign the order for orange juice.

Are you telling me that he doesn't feel well right now?

MS. PLACEK: I asked him several times. He says he will try to go through, yes. But I am just telling you, at the next court date, it might be better to bring him over later.

THE SHERIFF: He also just had a sandwich we brought up for him.

MS. PLACEK: That's what I was just saying.

THE COURT: Just remind me at the end of today. If they will bring him over later, I don't know. That's another thing.

MS. PLACEK: We will try, but we will work on it.

THE COURT: He can't bring his medication with him?

THE SHERIFF: If he brings his prescription.

MS. MC BETH: For the record, Ruth McBeth and Mary Jane Placek, on behalf of Mr. Reed.

Because we did have a break over the lunch hour, I put in writing the specificity the State asked for. I gave him a copy and asking leave to file a copy.

MR. CANELLIS: That's correct. Counsel did in fact state that Miranda was an issue, as well as she informed of a threat that officers made. And counsel also told me that was the basis of the psychological threats, the mental coercion, as well as the physical coercion that they were alleging in the motion.

Additionally, Judge there was an additional question as to an issue they raised regarding material misrepresentations and --

MS. MC BETH: And those are, Judge, that Mr. Reed was informed by the detectives that -- falsely, that his fingerprints had been found on objects at the crime scene. That was an additional inducement, improper inducement to give a statement.

MR. CANELLIS: I would ask the defendant be sworn to the motion.

THE COURT: Mr. Reed, do you want to stand and raise your right hand?

(Defendant duly sworn)

THE COURT: All right. You may be seated.

All right. This is a motion to suppress statements.

Are there any preliminary motions before we start?

MS. PLACEK: Just a motion in liminae, Judge.

THE COURT: And what is that motion?

MS. PLACEK: A motion dealing with the motion to exclude, Judge.

THE COURT: Motion to exclude is granted.

MR. CANELLIS: State would join in that motion.

THE COURT: All right. It's the State's burden.

Any opening remarks?

MR. CANELLIS: State would waive.

THE COURT: On behalf Mr. Reed?

MS. MC BETH: We will waive also.

THE COURT: Call your first witness.

Go right ahead.

PAUL ZACHARIAS,

called as a witness, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY

MR. CANELLIS:

Q Sir, in a loud voice, could you please state your name, spelling your first and last name for the court reporter?

A Paul Zacharias, Z-a-c-h-a-r-i-a-s

Q Sir, your employed by the Chicago Police Department?

A That is correct.

Q What is your star number?

A 60094.

Q How long have you been employed by the Chicago Police Department?

A In excess of 25 years.

Q What is your current assignment?
A I am assigned in Area 3 Violent Crimes, Chicago Police Department, which is part of the detective division.
Q And how long have you had that assignment?
A Approximately five years.
Q I would like to direct your attention to July 20th of 2001. Did you work on that day?
A Yes.
Q And where were you assigned on that date?
A Area 3 violent crimes.
Q Do you recall what time you started work?
A 4:30 in the afternoon.
Q And what shift would that be?
A That would be the third watch.
Q And how far into the next day does the third watch go?
A 1:00 o'clock in the morning. So, about an hour into the next day.
Q Were you working on a particular assignment on that day and time?
A Yes.
Q What was the nature of that case?
A It was a homicide investigation.

Q And did that involve the victim by the name of Kim Van Vo?
A Yes.
Q Were you working alone or with a partner?
A I actually I had two partners that day.
Q Who were they?
A Gang specialist Michael Cusack and Detective James Gildea.
Q And Cusack, is that C-u-s-a-c-k?
A That's correct.
Q And Gildea, is that G-i-l-d-e-a?
A That's correct.
Q Did you have an opportunity to go to the area of 4946 North Sheridan in Chicago in the evening hours?
A Yes.
Q At about 8:00 o'clock in the evening, did you meet with anybody there?
A Yes.
Q Who did you meet with?
A And individual by the name of Carl Reed.
Q Do you see him in court today?
A Yes.
Q Can you point to him and describe something he is wearing?

A The male black sitting at defense stable wearing khaki uniform.

MR. CANELLIS: Can the record reflect the in-court identification of the defendant?

THE COURT: Yes.

BY MR. CANELLIS:

Q After you met with the defendant on that date, did you have an opportunity to go anywhere with him?

A Yes.

Q Where did you go?

A Area 3 Violent Crimes, which is located at 2452 West Belmont, Chicago.

Q What did you do when you got to Area 3?

A I walked upstairs and I directed Mr. Reed to an interview room.

Q Once the defendant was placed in one of the interviews rooms, what did you do next?

A Next, I asked him if had to use the bathroom or wanted something to eat or drink.

Q Did the defendant need to use the washroom at that time?

A No.

Q Did he want anything to eat or drink at that

time?

A In fact did.

Q Did you give him anything?

A Yes.

Q What did you give him?

A Bag of potato chips and a Diet Pepsi.

Q What happened next?

A He was in the interview room and we proceeded with the investigation.

Q Did you leave him in the interview room?

A I don't.

Q Did you talk to him at that time?

MS. PLACEK: Judge, leading and suggestive.

THE COURT: Sustained.

Don't answer.

BY MR. CANELLIS:

Q Once you left him in the interview room, was he cuffed or uncuffed?

A He was not handcuffed.

Q I would like to direct your attention now to about 1:00 o'clock in the morning on July 21st 2001. It would be later that shift. Did you meet with the defendant again?

A Yes.

Q Where did you meet with him?
A Same interview room.
Q Who were you with when you met with him?
A Cusack and Gildea.
Q Did you have an opportunity to speak with the defendant at that time?
A Yes.
Q How did the conversation begin?
A It began by my reading Mr. Reed his Miranda Warnings.
Q How did you do that?
A From our preprinted form in the 2001 FOP book.
Q Can you briefly describe what an FOP handbook is?
A An FOP book is a booklet put out through the police by Fraternal Order of Police. It contains information that's pertinent to the police including Miranda Warnings.
MR. CANELLIS: Judge, if I may approach?
THE COURT: Yes.
BY MR. CANELLIS:
Q Showing you what has been previously marked as People's Exhibit Number 1 for identification, do you

recognize what that is?

A Yes.

Q What is it?

A It's a photostatic copy of the Miranda Warnings as they would appear in the FOP book.

Q And those Miranda Warnings are actually, -- that's actually half the page of what is on the FOP book, correct?

A Correct.

Q And in terms of those Miranda Warnings, that's actually a blown-up copy, correct?

A That is correct.

Q Are those the Miranda Warnings you gave the defendant back on July 21st, 2001?

A Yes.

Q Can you read those Miranda Warnings?

MS. PLACEK: For the purpose of time, we stipulate that if he was to read the Miranda Warnings, he would read then at this time from that sheet.

MR. CANELLIS: Thank you.

MS. PLACEK: Again, it's for the limited purpose in court, not that he actually did it.

BY MR. CANELLIS:

Q When you read the defendant his Miranda

Warnings, did he state whether or not he understood then?

A He stated he did.

Q How was it that the defendant stated he understood his Miranda rights? Was that during the course of all of the rights or after all of the rights?

A It was both after each right. I told him that he must answer me either yes or no as to the understanding of then. If he had any questions, I would explain to him his rights. And then when I was all done reading his rights, after he stated that he understood each one of the rights individually, I asked him if he had any questions concerning any of the rights and he stated he did not.

Q Did he in fact state that he understood all his rights?

A He stated he did.

Q And at any point during your conversation, did the defendant have any questions?

A No.

Q Did the defendant agree to speak with you after receiving his Miranda Warnings?

A Yes.

Q Did you speak with him?

A Yes.

Q Approximately how long did the conversation last?

A Approximately ten minutes.

Q After the conversation, what did you do with regard to the defendant?

A I asked him if he had to use the washroom or wanted anything else to eat or drink.

Q Did the defendant need to use the washroom?

A He stated he did.

Q Did you take him to the washroom?

A Yes.

Q Did you give him anything else to eat or drink?

A No. He declined that.

Q Can you briefly describe the defendant's behavior during the course of the time that you spent with him back on July 20th and 21st of 2001?

A His demeanor was calm. He appeared normal. He appeared understanding. He was lucid. Did not appear intoxicated.

Q When you spoke with the defendant, did he ever tell you that he wished to remain silent?

A No.

Q Did he ever tell that you he wanted a lawyer?
A No.
Q Did you ever physically coerce the defendant?
A No.
Q Did you ever see psychologically coerce the defendant?
A No.
Q Did you ever mentally coerce him?
A No.
Q And when I say physically or psychologically or mentally coerce him, did you or anybody in your presence ever threaten to beat up the defendant if he didn't give a statement?
A No.
Q Did you ever make any material misrepresentations to the defendant?
MS. PLACEK: Objection, form.
THE COURT: I will allow him to answer that.
THE WITNESS: No.
BY MR. CANELLIS:
Q Did you ever tell the defendant his fingerprints were found at the crime scene?
A No.
Q Did you ever confront the defendant with any

illegally obtained evidence?

A No.

Q Did anybody else ever make any of these representations or statements to the defendant while in your presence?

A No.

MS. PLACEK: Objection, foundation.

THE COURT: Sustained.

BY MR. CANELLIS:

Q During the course of your conversations with the defendant, you were always with other detectives?

A Yes.

Q Did any of these detectives ever make any statements regarding threats or material misrepresentations to the defendant while you were present?

A No.

MR. CANELLIS: No further questions.

THE COURT: Cross examination?

MS. MC BETH: Your Honor, we have no cross examination of Officer Zacharias.

THE COURT: Thank you. You may step down.

TIMOTHY THOMPSON,

called as a witness, having been first duly sworn, was

examined and testified as follows:

DIRECT EXAMINATION

BY

MR. CANELLIS:

Q Detective, in a loud voice, can you please state your name, spelling your first and last name and also giving your star number?

A Timothy Thompson. T-i-m-o-t-h-y, T-h-o-m-p-s-o-n. My star number is 20950.

Q Detective, your a member of the Chicago Police Department?

A Yes, sir.

Q How long have you been a member of CPD?

A In my 15th year.

Q What is your current assignment?

A Area 3 violent crime, detective division.

Q How long have you been assigned to Area 3 violent crime detective division?

A Ten years.

Q I would like to direct your attention to July 21st of 20:01 in the morning hours. Did you work on that date?

A Yes.

Q Were you working alone or with a partner?

A With a partner.

Q And who was the partner you were working with?

A Detective Richard Zuley.

Q Is that spelled Z-u-l-e-y?

A That's correct.

Q Approximately at 8:30 in the morning, were you working on a particular case?

A Yes.

Q What was the nature of the case you were working on?

A A homicide investigation.

Q And was the victim in that case an individual named Kim Van Vo?

A Yes.

Q At approximately 9:00 o'clock in the morning, did you meet a person named Carl Reed?

A Yes.

Q Do you see him in court today?

A Yes, I do.

Q Can you point to him and describe something he is wearing?

A The gentleman in the brown IDOC uniform.

MR. CANELLIS: If the record could reflect

the in-court identification of the defendant, your Honor?

THE COURT: Yes.

BY MR. CANELLIS:

Q Where was it that you met the defendant?

A An interview room in Area 3 detective division.

Q Who were you present with when you met the defendant?

A Detective Zuley.

Q When you went and met the defendant, how did the introduction begin?

A I introduced myself and I also introduced Detective Zuley.

Q Once you introduced yourself, what happened next?

A I asked the defendant if he needed to go to the bathroom.

Q Did he need to go to the bathroom?

A Yes.

Q Did you take him to the bathroom?

A I did.

Q After taking the defendant to the bathroom, what happened next?

A I asked him if he wanted some water and if there is anything else I could give him. I gave him some cigarettes as well.

Q You gave him cigarettes as well as what else?

A Water.

Q Did you have a conversation with the defendant?

A I did.

Q How did the conversation begin with subsequent to you giving him the water and the cigarettes?

A I advised him of his constitutional rights.

Q How did you do that?

A Per my FOP book.

MR. CANELLIS: I believe at this time there would be a stipulation that the Miranda Warnings that had been previously shown to Gang Specialist Zacharias, which were marked as People's subject Number 1, are the same Miranda Warnings that were given by Detective Thompson in this case.

MS. PLACEK: That's not the stipulation.

MS. MC BETH: If he were asked to recite then, he would recite the ones that are on Exhibit 1. We are not conceding that he gave then.

MR. CANELLIS: I apologize for making that misrepresentation to the Court.

BY MR. CANELLIS:

Q During the course of your advisement of the defendant of his rights, did he state whether or not he understood then?

A He did.

Q And did he do this during the course of your giving him his rights or after you gave him all of his rights?

A After each individual right.

Q After you gave the defendant all of his rights, did he state whether or not he would waive those rights?

A Yes, he did.

Q What did he state?

A He said he would waive his rights and agreed to talk.

Q Did you proceed to have a conversation with the defendant?

A Briefly.

Q How long did that conversation last?

A Approximately 15 minutes.

Q I would like to direct your attention now to

12:30 in the afternoon later on that date. Did you have an opportunity to see the defendant again that day?

A Yes, I did.

Q Where were you?

A Same place, Area 3 detective division.

Q And was the defendant still in an interview room?

A Yes, he was.

Q What did you do when you saw the defendant at that time?

A Brought him to the bathroom.

Q Did you do anything else besides that?

A I gave him lunch.

Q Do you remember what you gave him for lunch?

A McDonald's.

Q Did you talk with the defendant at that time regarding the case?

A No.

Q I would like to direct your attention now to about 7:00 o'clock that evening. Did you have an opportunity to speak with the defendant again?

A Yes.

Q Who was present at this time?

A Detective Zuley.

Q When you met with the defendant this time, how did that begin?

A I believe I took him to the bathroom again.

Q After taking him to the bathroom, what happened next?

A I advised him of his constitutional rights.

Q Did you give him anything else during the course of your conversation with him at that time?

A Cigarettes.

Q Did you give him anything else besides cigarettes?

A Dinner.

Q Do you recall what you gave him for dinner?

A I believe it was McDonald's again.

Q Now, you stated you advised him of his Miranda Rights. How did you do that?

A Per my FOP book.

Q Did anything unusual happen while you were advising the defendant of his Miranda Rights?

A The defendant told me it wasn't necessary to re-advise him, that he was aware of his rights. I in turn advised him any ways.

Q When you advised the defendant of his rights

again at that time, did he state whether or not he understood his rights?

A Yes.

Q After stating that he understood his rights, did he state whether or not he waived these rights?

A Yes.

Q What did he state?

A He said I understand my rights and he agreed to talk.

Q Did you then proceed to have a conversation with him again?

A Yes.

Q Approximately how long did this conversation last?

A 45 minutes to an hour.

Q I would like to next direct your attention to the next day, July 22nd, 2001, at about 8:30 in the morning. Did you work on that date and at that time?

A Yes.

Q Were you still working on this particular case?

A Yes, I was.

Q Did you have an opportunity to speak with the defendant again?

A Yes, I did.
Q Where was this conversation at?
A The same place.
Q And who was present during this conversation?
A Detective Zuley.
Q How did it begin when you saw the defendant at this time?
A I took him to the bathroom again.
Q Once you brought him back from the bathroom, what did you do next?
A I believe I gave him some cigarettes.
Q Did you give him anything else besides cigarettes?
A I gave him some donuts, some cranberry juice.
Q After giving the defendant those items, did you have an opportunity to speak with him?
A Yes.
Q How did your conversation begin at this time?
A I again advised him of his constitutional rights.
Q Once again, how did you do this?
A Per my FOP book.
Q After advising the defendant of his Miranda Rights again, did the defendant state whether or not he

understood his rights?
A Yes, he did.
Q After stating that he understood his rights, did he state whether or not he would waive those rights?
A Yes.
Q Did he state whether or not he wished to have a conversation with you?
A Yes, he did.
Q Approximately how long did this conversation last?
A 45 minutes to an hour.
Q How would you describe the defendant's behavior at this point?
A He was lucid. He was responsive to the questions.
Q Did the defendant answer your questions responsively?
MS. PLACEK: Objection, conclusion.
THE COURT: Sustained.
BY MR. CANELLIS:
Q In terms of the questions that you asked, did the defendant answer then?
A Yes.

Q And were his answers responsive to the questions you were asking?

MS. PLACEK: Objection, conclusion.

THE COURT: Sustained.

BY MR. CANELLIS:

Q Did the defendant appear to not understand your questions?

MS. PLACEK: Conclusion.

THE COURT: Overruled.

THE WITNESS: No.

BY MR. CANELLIS:

Q Did the defendant ever ask you any questions or ask you to clarify any questions you were asking him?

A No.

Q Directing your attention now to approximately 11:30 in the morning, did you see the defendant again at that time?

A Yes.

Q And where was it?

A Area 3 detective division in the interview room.

Q What did you do when you first saw him at 11:30?

A Took him in the bathroom.
Q After the bathroom, did you do anything else with the defendant?
A Gave him lunch.
Q What did you give him for lunch?
A I believe it was McDonald's again.
Q Did you give him anything else besides lunch at that time?
A A pack of cigarettes.
Q Approximately 15 minutes later, did you have an opportunity to see the defendant again?
A Yes.
Q I would like to direct your attention to approximately 12:00 o'clock in the afternoon. Did you have an opportunity to have an additional conversation with the defendant?
A Yes.
Q Who was present for this conversation?
A Detective Zuley.
Q How did this conversation begin?
A Detective Zuley advised the defendant of his constitutional rights per memory.
Q Did the defendant state whether or not he understood his rights?

A Yes, he did.

Q Did the defendant state whether or not he would waive those rights?

A Yes, he did.

Q Did the defendant in fact waive these rights?

A Yes, he did.

Q Did you and Detective Zuley then proceed to have a conversation with the defendant?

A Yes.

Q Approximately how long did this conversation last?

A An hour.

Q Did the defendant make what is commonly referred to as an incriminating statement during this conversation?

MS. PLACEK: Objection.

THE COURT: Sustained.

BY MR. CANELLIS:

Q Did the defendant speak with you during this conversation?

A Yes.

Q Directing your attention now to approximately 8:00 o'clock later that evening, did you have an opportunity to speak with the defendant again?

A Yes.
Q Who was present when you spoke to the defendant this time?
A The assistant state's attorney.
Q Is that Nancy Galassini?
A Yes, it is.
Q G-a-l-l-a-s-i-n-i?
A Yes.
Q Actually, I apologize. G-a-l-a-s-s-i-n-i.
Where did this conversation take place?
A Area 3 interview room.
Q And how did that conversation begin?
A The assistant state's attorney introduced herself to the defendant and advised him of his constitutional rights.
Q After introducing herself, did the defendant state whether or not he understood Assistant State's Attorney Galassini's position?
A Yes.
Q After that, you stated that she advised him of his rights?
A Yes.
Q How did she do this, by memory or some sort

of preprinted form?
A Memory.
Q When she advised the defendant of his Miranda Warnings by memory, did the defendant state whether or not he understood these rights?
A Yes.
Q After stating that he understood these rights, did he state whether or not he wished to waive these rights?
A Yes.
Q Was a conversation had with the defendant at that time?
A Briefly.
Q Approximately how long was that conversation?
A 15 minutes.
Q Directing your attention to about 9:30, did you meet with the defendant again?
A Yes.
Q And again with the Assistant State's Attorney Galassini?
A Yes.
Q And did you have a brief conversation with the defendant at that time?
A Yes.

Q Approximately how long was that conversation?
A Half an hour.
Q Directing your attention now to approximately 2:00 o'clock in the morning on July 23rd, 2001, did you have an opportunity to meet with the defendant again?
A Yes.
Q And who was present at this time?
A The assistant state's attorney.
Q And again, is that Assistant State's Attorney Galassini?
A Yes, it is.
Q And where did this conversation take place?
A In the Area 3 detective division conference room.
Q Was a conversation in fact had with the defendant?
A Yes.
Q What was stated during that conversation?
A The state's attorney had explained the different ways to memorialize the statement.
Q In what ways were those?
A An oral, a handwritten, a court reported and a videotaped statement.
Q Did the defendant in fact choose one of those

ways to memorialize his statement?

A Yes, he did.

Q Which one did he choose?

A The handwritten statement.

Q After the defendant chose to give a handwritten statement in this case, what did you do?

A I had excused myself for a couple of minutes to get some refreshments.

Q Approximately how long would you say you excused yourself for?

A Five minutes.

Q Did you in fact return to the room where ASA Galassini and the defendant were?

A Yes.

Q What happened when you returned?

A We conducted a handwritten statement.

Q Was the defendant advised of his Miranda Warnings during the handwritten statement?

A Yes.

Q Did the defendant subsequently sign underneath a portion on his statement that contained his --

MS. PLACEK: Well, Judge, now we were getting into leading into substantial matters.

THE COURT: You can't lead.

BY MR. CANELLIS:

Q When the defendant -- you stated a handwritten statement was done?

A Yes.

Q How did that handwritten statement proceed?

A Proceeded by the state's attorney showing him the first paragraph and having him read it back.

Q Was this before or after the statement had been written out?

A This was before.

Q When you say -- what do you mean by first paragraph?

A There is -- the first paragraph on top, it's preprinted. And then there is -- then there is the section where the defendant wrote himself.

Q Showing you what has been marked as People's Group 2 and 2A, you mentioned a portion that the defendant was shown that was read to him. What portion is that?

A It would be this paragraph here.

Q And is that a handwritten -- wait. That's part of the handwritten portion?

A Yes, it is.

Q Is there a portion on that statement that has the defendant's signature?

A Yes.

Q And what is contained in that portion?

A The handwritten statement.

MS. PLACEK: Can we see what the detective pointed to?

THE COURT: You may approach.

MS. PLACEK: Before the next question was asked.

THE COURT: All right. You need the question read back?

THE WITNESS: I believe the defendant read this first paragraph here to show that he could read and write English. And then this was read. This written portion was read out loud.

BY MR. CANELLIS:

Q Was that read out loud by the defendant?

A Yes.

THE COURT: Could you indicate, for the record, what the witness pointed to?

MR. CANELLIS: If the record could reflect the first portion that the defendant pointed to was in fact the Miranda Warnings? The second portion that he

pointed to was what would be considered the first paragraph of the body of the handwritten statement which begins with the words after being advised.

THE COURT: Is that a correct representation?

MS. MC BETH: Yes, except he referred to this gentleman as the defendant and he is the detective.

MR. CANELLIS: I apologize.

THE COURT: Okay.

BY MR. CANELLIS:

Q You stated there was a signature of the defendant on this page as well?

A Yes.

Q And is that directly below the Miranda portion?

A Yes.

Q There is also additional signatures on the bottom of the first page, correct?

A Yes.

Q Can you take a look through the other pages and let me know if there are signatures on the bottom of each page?

A Yes, there is.

Q Whose signatures are those?

A It would be mine, the defendant and the

assistant state's attorney.

Q And that's Assistant State's Attorney Galassini?

A Yes.

Q When were those signatures affixed to the bottom of each page?

A After each page was written out.

Q After the statement in this case was written out, did the defendant have an opportunity to review that statement?

MS. PLACEK: Leading and suggestive.

THE COURT: He can answer that question.

THE WITNESS: Repeat it, please.

BY MR. CANELLIS:

Q After the handwritten statement was completed, did the defendant have an opportunity to review that statement?

A Yes, he did.

Q And was it during this review that those signatures were affixed at the bottom of each page?

MS. PLACEK: Objection.

THE COURT: Sustained.

BY MR. CANELLIS:

Q When were the signatures affixed?

MS. PLACEK: Asked and answered.

THE COURT: Overruled.

Go ahead.

THE WITNESS: After each page was reviewed, the signatures were affixed.

BY MR. CANELLIS:

Q Taking a look at the statement, were there also changes or corrections made to the statement?

MS. PLACEK: Objection, leading and suggestive, Judge.

THE COURT: I will allow it.

Go ahead.

THE WITNESS: It would appear that there is some spelling errors that were corrected.

BY MR. CANELLIS:

Q And are there initials by those corrections?

A Yes.

Q Whose initials would those be?

A Myself, the defendant and the assistant state's attorney.

Q There is also a Polaroid photograph?

A Yes, there is.

Q Who took that?

A I did.

Q And that's signed?
A Yes.
Q Who is it signed by?
A Myself, the defendant and the assistant state's attorney.
Q The handwritten statement that appears in front of you, as well as the Polaroid photograph, are they in the same or substantially the same condition as they were when you last saw then on July 23rd of 2001?
A Yes.
Q Detective, during the course of your conversation with the defendant, did he ever tell you he wished to remain silent?
A No.
Q Did he ever tell you he wanted a lawyer?
A No.
Q Did you ever physically coerce the defendant?
A No.
Q Did you ever psychologically coerce him?
A No.
Q Did you ever mentally coerce him?
A No.
Q Did you ever threaten to beat him up or give him a beating if he didn't give a handwritten statement

in this case?

A No.

Q Did you ever make any material misrepresentations to the defendant?

A No.

Q Did you ever tell the defendant his fingerprints were found at the scene?

A No.

Q Did you ever confront the defendant with any illegally obtained evidence?

A No.

Q Did the defendant ever tell you he didn't know what you were talking about?

A No.

Q During the course of your conversations with the defendant, at times, you stated other detectives were present?

A Yes.

Q Did anybody else ever make any threats or misrepresentations to the defendant in your presence?

A No.

MR. CANELLIS: I have no further questions, Judge.

THE COURT: Cross examination?

MS. PLACEK: Just very briefly.

CROSS EXAMINATION

BY

MS. PLACEK:

Q Detective, do you know whether Mr. Reed was infirmed in any way?

A Can you explain that?

Q Sure. Do you know that he is diabetic?

A No.

Q You didn't know.

So, in other words, he was given no medication, correct?

A Not that I am aware of.

Q Not that your aware.

Are you in fact aware that diabetics need -- by the way, let's start here. When did you first speak to Mr. Reed?

A The 21st of July.

Q And how long had he been in custody before the 21st of June?

MR. CANELLIS: Objection, Judge.

THE COURT: Sustained.

MS. PLACEK: If he knows.

THE COURT: It assumes --

MS. PLACEK: He said June.

THE COURT: Hold on.

THE WITNESS: I believe it was from the previous night, Judge.

MS. PLACEK: I am sorry. I didn't hear the detective.

THE COURT: Was there an objection?

MR. CANELLIS: I objected as to June, Judge.

MS. PLACEK: He said June.

THE WITNESS: It was July.

BY MS. PLACEK:

Q Are you sure of the month as you are of everything you testified to today?

MR. CANELLIS: Objection.

THE WITNESS: I am sure it was July.

BY MS. PLACEK:

Q Okay. Let me ask you this detective. Specifically, let me ask you whether or not you inquired how long Mr. Reed had been in custody before you spoke to him?

A I was aware that he was brought in the previous night.

Q The previous night? What time the previous night?

A I don't recall.

Q Well, let me ask you this. Was it in the earlier part of the evening or the later part of the evening?

A I don't recall specifically.

Q That didn't bother you how long he was in custody, correct?

MR. CANELLIS: Objection.

THE COURT: Sustained.

BY MS. PLACEK:

Q Well, specifically, how long when you first -- after you first started questioning Mr. Reed was he in custody until in fact the statement was taken?

MR. CANELLIS: Objection.

THE COURT: Overruled.

THE WITNESS: The statement was taken on the early morning hours of the 23rd, if your referring to the handwritten statement.

BY MS. PLACEK:

Q How long was he in custody?

A He was in the area from I believe it was the 21st of July.

Q And that's approximately how long?

A It would have been the previous night before I spoke to him.

Q Approximately how long had he been in the area?

A I don't recall exactly what time he came in.

Q Would it be over 24 hours?

A I don't know.

Q Would it be over 48 hours?

A I don't think so.

Q Specifically, you said you didn't know whether it was over 24 hours when you in fact testified for the state's attorney that you had seen him at what time in July 22nd?

A I first spoke to him on the 21st.

Q Yet, you don't realize that he had been in the station over 24 hours?

A I know he was there from the previous night.

Q In total, do you believe he had been over 48 hours?

A I don't know.

Q And you also don't know whether that would be 24 hours? He had been in total there 24 hours, correct?

A I don't know.

Q Even though you yourself had seen him for spans of time that were in fact over 24 hours, correct?

A Yes.

Q But you don't know how long -- well, strike that.

You don't know whether it's been 24 hours that he was at the station, correct?

MR. CANELLIS: Objection.

MS. PLACEK: Goes as to bias.

THE COURT: Overruled.

BY MS. PLACEK:

Q Correct?

A Can you repeat that, please?

Q Sure.

Even though you saw him for spans that in fact encompassed over 24 hours, you don't know whether he was at the station for 24 hours, correct?

A No. He was there.

Q Well, let's talk about that for a moment.

He was always kept in that room, correct?

A Yes.

Q How large is the room?

A It's an interview room. It's approximately 8

feet by 15 feet.

Q Was he allowed to leave that room outside of the presence of the police officer?

A No.

Q So, in other words, would it be correct in saying that when you said he was allowed to go to the washroom or when you walked in and said may I go to the washroom -- he had to ask you whether he had to go to the washroom, correct?

A I asked him.

Q He couldn't have just left by himself as we previously stated, correct?

A Correct.

Q And every time in fact you saw him or talked to him, you specifically asked him if he had to go to the washroom, correct?

A Yes.

Q And what -- and he always said yes, correct?

A That I can recall.

Q And how many times did you see him?

A From what period of time?

Q From the time you first saw him to the time he was finally shipped off to the county jail.

A Approximately 10 or 12 times.

Q And each time you took him to the bathroom?
A Each time he asked to go to the bathroom and each time that I first stopped him to talk to him, yes.
Q Now, you also said the first time you gave him his Miranda Warnings, correct?
A Yes.
Q And you were sure he understood, correct?
A He said he understood.
Q Yet each time you gave him -- you saw him again, you gave him his Miranda Warnings again, correct?
A Yes.
Q Why?
A It's just a standard procedure that I do.
Q So, even though he said he understood the first time, you still gave then to him over and over again?
MR. CANELLIS: Objection.
BY MS. PLACEK:
Q Correct?
THE COURT: He can answer that.
THE WITNESS: Yes.
BY MS. PLACEK:
Q Because you follow standard procedure,

correct?

A With Miranda Warnings, yes.

Q But with other things, you don't?

A I didn't say that.

MR. CANELLIS: Objection.

THE COURT: Sustained.

BY MS. PLACEK:

Q Isn't there a standard procedure for a prisoner being held for over 30 hours in a police station?

A In custody or --

Q In custody. Yes.

A 72 hours.

Q Are you saying the procedure is 72 hours?

A That's the standard.

Q And in fact, how long was Mr. Reed at the police station in total?

A I don't know exactly what time he came in, as I told you before.

Q You would have in fact enforced that 72-hour procedure, correct?

MR. CANELLIS: Objection.

THE COURT: Calls for speculation.

BY MS. PLACEK:

Q Let me ask you this. You said you follow all regulations, correct?
A Yes.
Q How could you in fact in Mr. Reed's case follow that 72 hours if you didn't even know how long had he been in the station previous to you speaking to him?
MR. CANELLIS: Objection.
THE COURT: Sustained.
BY MS. PLACEK:
Q Well, let me ask you this. In order to follow the 72 -- what you say is the 72-hour regulation, you have to know how long a prisoner has been there, correct?
A Yes.
Q You never checked how long Mr. Reed had been in the station, correct?
A I don't recall what time it was, no.
Q I beg your pardon?
A I don't recall the specific time.
Q Do you remember me asking you whether it was over 24 hours and you said you didn't know?
A Yes.
MR. CANELLIS: Objection.

THE COURT: Sustained.

BY MS. PLACEK:

Q Do you recall me asking you specifically whether or not you made inquiry as to how long he had been at the station and you said you didn't know?

MR. CANELLIS: Objection.

THE COURT: He can answer.

THE WITNESS: Could you repeat that, please?

BY MS. PLACEK:

Q Do you remember me asking you specifically when you began your questioning of Mr. Reed whether you inquired as to how long he was at the station and you said you didn't know?

A Yes.

Q So, let me ask you this, officer. How would you enforce the 72-hour rule if you never do any kind of time checks?

MR. CANELLIS: Objection.

THE COURT: Overruled.

THE WITNESS: The supervisors are normally responsible for telling us.

BY MS. PLACEK:

Q Who was responsible for Mr. Reed? What supervisor that evening was responsible for Mr. Reed?

A I don't recall what supervisor was there.
Q Is it on your reports?
A I don't know.
Q How long have you been a police officer?
A 15 years.
Q You know supervisors have to sign off on reports, correct?
A When they sign off on a report is not the same time that they may have been working.
Q So, you don't know who the supervisor was?
A I don't recall.
Q You don't recall?
A No.
Q Specifically, let's talk for a while. Are you familiar at all with diabetes?
A Briefly.
Q You know sugar isn't good?
A Good for what?
Q A diabetic.
A I don't have any medical background.
Q So, am I correct in saying because you have no medical background, you gave Mr. Reed Crispy Kremes?
A I offered him donuts. Yes.
Q And according to you, he took then?

A Yes.
Q And he ate then?
A I don't recall if he ate then or not.
Q Well, according to you, do you know whether McDonald's is good for diabetics?
MR. CANELLIS: Objection.
THE COURT: I am going to sustain the question.
BY MS. PLACEK:
Q Let me ask you this. Are you aware that in fact diabetics, when deprived of their insulin, can have certain mental faculties skewed or they can misinterpret things?
A I don't have any specific knowledge.
Q Specifically, sir -- so, when you said Mr. Reed was acting normal, that's your conclusion, correct?
A I said he was acting lucid and responsive.
Q Let me ask you this. Had you ever talked to him before that date and time?
A No.
Q So, in other words, when you say lucid and responsive, what your essentially is saying he looked okay to you, correct?

A Yes.
Q You of course -- again, let's go one step further.
When you spoke to Mr. Reed, you spoke to him approximately ten times, correct?
A Approximately.
Q And would it be correct in saying that you were the lead detective on this matter?
A Yes.
Q And would it be correct in saying that Mr. Reed received no medication during the time in custody?
A Not that I am aware of.
Q Do you know Sergeant O'Meara?
A Yes.
Q Is that the supervisor you referred to?
A No. He is a patrol sergeant.
Q What about Lieutenant Chasen?
A Do I know him? What is the question?
Q No. Is that the supervisor you referred to who talks about the time limits, as you spoke of?
A No. He is the lieutenant. No.
Q Do you remember any name of any supervisor of that date and time?
A Not specifically. I don't recall who was

there.

Q Would it be correct in saying you never inquired of time from anybody?

A Relative to what?

Q Relatively as to how long -- who is Sergeant Janis (Phonetic)?

A He is a property crimes sergeant.

Q Was he at that -- was he a property crime supervisor at that time?

A I believe he was.

Q So, he wouldn't in fact assign you a case, correct?

A I think he originally assigned me the scene.

Q You wouldn't refer to it in your report as a death investigation, would you, if it was just a property crime, correct?

A I don't understand your question.

Q Well, isn't it correct in your report, you state that Sergeant Janis of this command assigned RDs, that's yourself and your partner, to conduct a death investigation at 4926 North Sheridan?

A And the question is?

Q Did in fact Sergeant Janis assign you to do a death investigation?

A Yes, he did.

Q Sir, you said you were present for the statement, correct?

A What statement? Which one?

Q The statement taken of Carl Reed. The handwritten statement.

A Yes.

Q And you said that the errors that were corrected were spelling errors, correct?

A I said they have may have been spelling errors.

Q What other kind of errors were there?

A I would have to look at the --

Q When was the last time you looked at this statement?

A I just looked at it briefly, a couple of minutes ago.

Q And let me ask you this. Specifically, who corrected the errors?

A No. I initialed the errors.

Q Who corrected then?

A It would have been the assistant state's attorney along with the defendant.

Q Who discovered the errors?

A Probably the assistant state's attorney or the defendant.

Q Well, when you say with it, did the defendant read the statement?

A Yes.

Q Did he hold it in his hand?

A I don't know if he held it in his hand or it was in front of him. I don't recall. I know he reviewed it.

Q When you say he reviewed it, would that be similar to somebody sitting there and reading it?

A He read the statement.

Q Like I am more or less doing it now, to himself, correct?

A Out loud.

Q When you say out loud, did he read the entire statement out loud?

A No. The assistant state's attorney read it, along with the defendant.

Q So, they both read it in sort of a chorus together out loud?

A No. I believe they -- the defendant read along with the assistant state's attorney.

Q So, he read it out loud along with her

reading it out loud?

A I believe the assistant state's attorney read it out loud and he followed along.

Q Reading it out loud?

A I don't recall specifically him reading it out loud.

Q You never heard him read anything out loud, did you?

A The first paragraph.

MR. CANELLIS: Objection.

THE COURT: I am sorry?

MR. CANELLIS: Withdrawn.

THE COURT: All right.

BY MS. PLACEK:

Q Did the defendant in fact eat three-dozen glazed donuts?

A Not that I am aware.

Q Did you get three-dozen glazed donuts?

A I don't recall getting three-dozen glazed donuts.

Q Did you put in for billing of three-dozen glazed donuts?

A I believe there is a receipt for donuts that were picked up, but he certainly didn't get three-dozen

donuts for himself.

Q What about the other food, did you in fact go out and get that food?

A Yes.

Q Did you in fact get the food that you billed for and give it to the defendant?

A Yes.

Q So, in other words, am I correct in saying that the defendant ate a Big Mac meal, a quarter pounder and a quarter hamburger, right?

A At the same time?

Q Yes.

A No.

Q Did you in fact put in billing for it for Carl Reed and signed the receipts?

A I put the receipt in. I didn't bill anything.

Q Well, specifically, what was the purpose for putting in the receipt?

A Just so we knew that it was accounted for that we provided lunch for him.

Q So, he ate those three hamburgers?

A No. It might have been my lunch, Detective Zuley's lunch and the defendant's lunch all on the same

receipt.

Q Let me ask you this. Specifically, is there a bed in the room where the defendant was?

A A traditional bed? Is that what your saying?

Q Yes.

A No.

Q As a matter of fact, would it be correct in saying that there is a bench, correct?

A Yes.

Q The bench is less than 18 inches wide, correct?

A I never measured it.

Q Would it be about correct?

A Perhaps. I couldn't give you specifics.

Q But no larger than 18 inches?

A I couldn't give you anything specific.

Q Is there a ring on the wall?

A Yes.

Q And that's for a hand-cuffed defendant, correct?

A Yes.

Q And specifically, not only is there a ring on the wall, but that bench is made of stainless steel, correct?

A Yes.
Q The defendant was left in that room for over three days, correct?
MR. CANELLIS: Objection.
THE COURT: Sustained.
BY MS. PLACEK:
Q Well, how long was the defendant left in that room?
A From the evening of the --
Q The 20th.
A Until the early morning hours of the 23rd, I believe.
Q How many days is that?
A Two and a half days, depending on what time he came in.
Q Let's go one step further. Detective, which specific interview room was he in?
A The one next to the office.
Q Whose office is that, the commander's office?
A The violent crimes office.
Q Thank you.
Detective, would it be correct in saying that handwritten statements were taken from all parties in this case?

MR. CANELLIS: Objection.

THE COURT: Sustained.

BY MS. PLACEK:

Q Is there anything in your report that specifically deals with the -- that the defendant chose to give a handwritten statement?

A What do you mean?

Q Did you write in the report that the defendant chose to take -- to give a handwritten statement?

A It may be reflected in my supplemental. I don't recall.

Q You would put something as important as that in your supplemental, correct?

A Perhaps.

Q You would also put in the way the different ways he was offered, correct?

A Not necessarily.

Q Why not?

A I probably put in there the actual method that he chose, if I put any in at all.

Q There is nothing in there about him choosing, correct?

A I don't know.

MS. PLACEK: Nothing further --

BY MS. PLACEK:

Q Did the defendant sign anything else for you besides the handwritten statement?

A Yes.

Q When was this?

A The 22nd.

Q At what particular time?

A I would say approximately 4:30 in the afternoon.

Q Was he given a chance to in fact record any of his other statements, by the way?

A I don't understand what your saying.

Q Well, he gave you a statement at 4:30 in the afternoon, correct?

MR. CANELLIS: Objection.

THE COURT: Sustained.

BY MS. PLACEK:

Q How many statement did the defendant give you?

A I would have to review my report and give you a specific --

Q You know he gave you more than one, correct?

A Correct.

Q You know that he gave you more than three?
A I know I spoke to him on more than three occasions, yes.
Q Other than the last one, were any of those memorialized?
A Maybe in the GPR. I don't recall making one out.
Q Was the defendant -- when we speak about the defendant signing something, that was a consent to search his house, correct?
A Yes.
Q And that was in the afternoon, correct?
A Yes.
Q And that was when you first spoke to him, correct?
A No.
Q Well, how long before your first conversation did he sign the consent to search his house?
A He signed the consent to search approximately 4:30 in the afternoon on the 22nd.
Q And how long was that from the time you first spoke to him?
A I first spoke to him on the 21st.
Q What time?

A Approximately 9:00 in the morning.

MS. PLACEK: Nothing further, Judge.

THE COURT: Redirect?

MR. CANELLIS: Just briefly, Judge.

REDIRECT EXAMINATION

BY

MR. CANELLIS:

Q Detective, counsel asked you regarding a death investigation. Is that how this case started?

A Yes.

Q And it subsequently turned into a homicide investigation?

MS. PLACEK: Objection, Judge.

THE COURT: How is that relevant?

MR. CANELLIS: Counsel brought up the discrepancy between this case and a death investigation.

MS. PLACEK: Judge, the discrepancy was because he said he was a property --

THE COURT: Sustained.

Ask your next question.

BY MR. CANELLIS:

Q Did he ever tell you he was a diabetic?

A No.

Q Did he ever appear to have any sort of medical condition?

A No.

Q Did the defendant ever appear to have any sort of problem whatsoever while you saw him?

A No.

MR. CANELLIS: No further questions.

RECROSS EXAMINATION

BY

MS. PLACEK:

Q What problems do diabetics have?

A I have no medical background, counsel.

Q So, in other words, if the defendant was having problems with his diabetes or anything forming from that, you wouldn't be able to recognize it, correct? Correct?

A Not unless it was obvious.

Q Right. Right. Like you said, unless it was obvious?

MR. CANELLIS: Objection.

BY MS. PLACEK:

Q Correct?

THE COURT: He answered it.

MS. PLACEK: That's all, Judge.

RE-REDIRECT EXAMINATION

BY

MR. CANELLIS:

Q Did the defendant ever tell you he was suffering from any problem related to diabetes?

A No, he did not.

MR. CANELLIS: Nothing else.

RE-RECROSS EXAMINATION

BY

MS. PLACEK:

Q Is your memory as good as that as the month that you thought you questioned the defendant when we first started this matter?

MR. CANELLIS: Objection.

THE COURT: Sustained.

BY MS. PLACEK:

Q Well, let me ask you this, detective. Do you remember in fact saying you didn't remember several times?

MR. CANELLIS: Objection.

BY MS. PLACEK:

Q During questioning?

MR. CANELLIS: Objection.

THE COURT: He can answer that.

THE WITNESS: The question is?

BY MS. PLACEK:

Q Do you remember during cross examination you saying you didn't remember several times or had no recollection?

A Yes, I remember that.

Q Would you say that your memory of your conversations with the defendant is as good as the memory that you have shown us on the stand?

MR. CANELLIS: Objection.

THE COURT: Sustained.

MS. PLACEK: That's all, Judge.

MR. CANELLIS: Nothing else.

THE COURT: Thank you. You may step down.

Any more witnesses for today?

MR. CANELLIS: Not today, Judge.

THE COURT: All right. What date did we say?

MS. MC BETH: Wednesday, the 27th.

Can the mittimus also reflect 3:00 o'clock?

THE COURT: You may need to write up an order we don't need him until then, the reason, so he can receive his medication.

MS. PLACEK: Do you know what I might do? I

might call the jail and maybe see the Court Monday and find out exactly what they need, if that's all right?

THE COURT: That's fine.

Motion commenced and continued until 4/27 at 3:00 in the afternoon.

(WHICH WERE ALL THE PROCEEDINGS HAD)

*****

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT-CRIMINAL DIVISION

I, Peter J. Paris, an Official Court Reporter in the Circuit Court of Cook County, County Department, Criminal Division, do hereby certify that I reported in shorthand the proceedings had at the hearing of the aforementioned cause; that I thereafter caused the foregoing to be transcribed, which I hereby certify to be a true and accurate transcript taken to the best of my ability of the proceedings had before the Honorable JUDGE MARJORIE C. LAWS, Judge of said Court.

Official Court Reporter

Dated this 25th day of April, 2005.

CSR# 084-002875