LOUISVILLE LEXINGTON LONDON FLORENCE CINCINNATI INDIANAPOLIS ORLANDO JACKSONVILLE TAMPA

KENTUCKIANA
COURT REPORTERS

**CASE NO. 23 C 17186**

**CARL REED**

V.

**RICHARD ZULEY, ET AL.**

**DEPONENT:**

**NANCY GALASSINI ADDUCI**

**DATE:**

**April 17, 2025**

a courtroom powerhouse

schedule@kentuckianareporters.com

877.808.5856 | 502.589.2273

www.kentuckianareporters.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
JUDGE JOHN F. KNESS
MAGISTRATE JUDGE HEATHER K. MCSHAIN
CASE NO. 23 C 17186

CARL REED,
Plaintiff

V.

RICHARD ZULEY, TIMOTHY THOMPSON, THE CITY OF CHICAGO, COOK COUNTY STATE'S ATTORNEY NANCY GALASSINI ADDUCI, AND COOK COUNTY,
Defendants

DEPONENT: NANCY GALASSINI ADDUCI
DATE: APRIL 17, 2025
REPORTER: TALIA JACKSON

APPEARANCES

ON BEHALF OF THE PLAINTIFF, CARL REED:
Israa Alzamli, Esquire
Loevy & Loevy
311 North Aberdeen Street
3rd Floor
Chicago, Illinois 60607
Telephone No.: (312) 243-5900
E-mail: Israa@loevy.com

ON BEHALF OF THE DEFENDANT, TERRIE SULLIVAN:
Terrie Sullivan, Esquire
Michele Braun, Esquire (Appeared via videoconference)
O'Connor & Battle, LLP
111 West Jackson Boulevard
Unit 1700
Chicago, Illinois 60604
Telephone No.: (312) 786-4612
E-mail: Tsullivan@mokblaw.com
Mbraun@mokblaw.com



APPEARANCES (CONTINUED)

ON BEHALF OF DEFENDANT, THE CITY OF CHICAGO:
Elizabeth Ekl, Esquire
Burns Noland LLP
311 South Wacker Drive
Suite 5200
Chicago, Illinois 60606
Telephone No.: (312) 878-1297
E-mail: Eekl@burnsnoland.com

ON BEHALF OF THE DEFENDANT, RICHARD ZULEY:
Misha Itchhaporia, Esquire
Borkan & Scahill, Ltd.
20 South Clark Street
Suite 1700
Chicago, Illinois 60603
Telephone No.: (312) 580-1030
E-mail: Mitchhaporia@borkanscahill.com
(Appeared via videoconference)

Also Present: Sydney Little, Videographer; Fatima Ladha, Observer from Loevy & Loevy



INDEX


| | Page |
|---|---|
| PROCEEDINGS | 6 |
| DIRECT EXAMINATION BY MS. ALZAMLI | 7 |
| CROSS-EXAMINATION BY MS. ITCHHAPORIA | 190 |
| EXAMINATION BY MS. EKL | 195 |
| RECROSS-EXAMINATION BY MS. ITCHHAPORIA | 208 |
| REDIRECT EXAMINATION BY MS. ALZAMLI | 210 |
| FURTHER CROSS-EXAMINATION BY MS. ITCHHAPORIA | 217 |
| REEXAMINATION BY MS. EKL | 217 |


EXHIBITS


| Exhibit | Page |
|---|---|
| 1 - Dorothy Soukup's Handwritten Statement | 76 |
| 2 - Lester Garner's Handwritten Statement | 88 |
| 3 - Ricardo Burns' Handwritten Statement | 97 |
| 4 - DeLong Reed's Handwritten Statement | 109 |
| 5 - Carl Reed's Handwritten Statement | 138 |
| 6 - Felony Review Folder | 161 |
| 7 - Polaroid Photograph of Carl Reed | 197 |
| 8 - Photograph (CITY-REED-000057) | 203 |
| 9 - Photograph (PLAINTIFF 000948) | 218 |




STIPULATION

The VIDEO deposition of NANCY ADDUCI was taken at LOEVY & LOEVY, 311 NORTH ABERDEEN STREET, 3RD FLOOR, CHICAGO, ILLINOIS 60607 on THURSDAY the 17TH day of APRIL 2025 at approximately 10:02 a.m. (CT); said VIDEO deposition was taken pursuant to the FEDERAL Rules of Civil Procedure.

It is agreed that TALIA JACKSON, being a Notary Public and Digital Reporter for the State of ILLINOIS, may swear the witness.

PROCEEDINGS

THE VIDEOGRAPHER: We are on the record. My name is Sydney Little. I'm the videographer for today, and Talia Jackson is the court reporter. Today is the 17th day of April 2025. The time is 10:03 a.m. Central. We're at the law offices of Loevy & Loevy, 311 North Aberdeen, Chicago, Illinois, to take the deposition of Nancy Adduci in the matter of Carl Reed v. Richard Zuley, Timothy Thompson, the City of Chicago, Cook County State's Attorney Nancy Galassini Adduci, and Cook County, Case number 23C17186, pending in the United States District Court for the Northern District of Illinois Eastern Division. Will the counsel please identify themselves for the record?

MS. ALZAMLI: Israa Alzamli, on behalf of the plaintiff, Carl Reed. And with me is Fatima Ladha, who is observing the deposition today.

MS. SULLIVAN: Terrie Sullivan for Defendant Nancy Adduci.

MS. EKL: Elizabeth Ekl for the City of Chicago.

MS. ITCHHAPORIA: Misha Itchhaporia for the individual defendant officers.



THE VIDEOGRAPHER: Is that all that's on here? I thought I heard someone else.

MS. SULLIVAN: That was me.

THE VIDEOGRAPHER: Oh. That was you. Okay. Thank you. All right. Ms. Adduci, will you please raise your right hand for the court reporter to swear you in?

THE REPORTER: Do you solemnly swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE REPORTER: Thank you. Counsel, you may begin.

DIRECT EXAMINATION

BY MS. ALZAMLI:

**Q. Hi. Good morning, Ms. Adduci.**

A. Good morning.

**Q. Could you please state and spell your name for the record?**

A. Certainly. Nancy Galassini Adduci, G-A-L-A-S-S-I-N-I A-D-D-U-C-I.

**Q. Thank you. And have you sat for a deposition before?**

A. I have.

**Q. Okay. So I'm going to state the ground rules just to save us all some time, but if I ask anything and if it doesn't make sense, just let me know and I'll do my best to rephrase it. And if you at any point need to take a break, just let me know. I just ask that you answer any questions that are pending. And then we can get right into it, unless you have any questions?**



A. I do not.

**Q. So how many times did you meet with your attorney to prepare for your deposition today?**

A. Twice.

**Q. And how long were each of those meetings?**

A. The first meeting was approximately 2 hours, maybe a little bit less. And the second meeting was approximately 20 minutes.

**Q. And did you review any documents when you prepared for this deposition?**

A. I did.

**Q. What did you review?**

A. There were 18 documents that I reviewed. I don't know them all by name, but they included prior transcripts of deposition testimony that I had given the handwritten statements that I took on this case, the felony review folder, as well as a previous transcript from a motion regarding the matter of the People v. Carl Reed, including other interrogatory answers, et cetera.



**Q. And when you say prior deposition transcripts, do you mean -- just to clarify, transcripts that you -- of depositions that you gave in other matters?**

A. Correct.

**Q. And was anyone else present during the meetings where you met with your attorney?**

A. There was another attorney, Michele, and Ms. Sullivan. And Michele is -- I forgot her last name all of a sudden.

MS. SULLIVAN: Braun.

THE WITNESS: Braun. That's right.

BY MS. ALZAMLI:

**Q. Did you speak to anyone else other than your attorney about your deposition today?**

A. No.

**Q. Have you spoken to any of the other defendants in this case?**

A. No.

**Q. Have you spoken to Richard Zuley?**

A. No.

**Q. At any point in your life since the investigation of Kim Van Vo have you ever had a conversation with Mr. Zuley?**

A. No. I don't believe I've ever met him. I have no recollection of ever speaking with him and I

don't know who he is.
Q. Did you take any notes in preparation for today?
A. I did not.
Q. Have you read the complaint in this case?
A. No.
Q. Do you have any independent memories of this investigation?
A. Vague bits I do.
Q. We'll get more into that later. So you haven't read the complaint, but do you know what this case is about?
A. I do.
Q. Do you think that the case has any merit?
MS. EKL: Objection. Form. Calls for legal conclusion.
THE WITNESS: I would be speculating, and I don't think I have all the parameters. I've read 18 documents. I have not read the complaint. I -- don't have enough information to be able to form an opinion regarding the -- to answer that question.
BY MS. ALZAMLI:
Q. Why didn't you read the complaint in this case?
A. I don't remember. I -- don't -- I don't



remember seeing it in the documents that I had. And if I did, I skimmed it. But I -- I just -- if I had read it previously -- I read the interrogatories, so I got a -- a flavor of what it was all about, so perhaps I felt that that was sufficient and I didn't need to read the - - the complaint.
Q. And this question might sound silly because it's something that I should know, but I came onto this case later. So when this complaint was filed, were you served personally in that, or did an attorney accept service on your behalf?
A. An attorney accepted service on my behalf.
Q. Okay. When you learned that you were being named as a defendant in this case, did you have any sort of reaction to that?
A. No.
Q. Were you upset?
A. No.
Q. Were you concerned?
A. No.
Q. Did you ever question your involvement with the Kim Van Vo investigation?
A. I don't understand your question.
Q. Sure. Let me rephrase it. Once you were served of this complaint -- once you became aware that



this lawsuit existed, did you ever, you know, think about the investigation again, have second thoughts about it, have any concerns about your involvement in the investigation?
MS. EKL: Objection. Form.
THE WITNESS: No.
BY MS. ALZAMLI:
Q. All right. Did you go to law school in Chicago?
A. I did.
Q. Okay. Where'd you go to law school?
A. DePaul University.
Q. Did you grow up in Chicago?
A. I grew up in the suburbs of Chicago.
Q. And do you have any other schooling past DePaul University for law school?
A. No.
Q. When did you graduate?
A. 1996.
Q. What was your first job after you graduated?
A. U.S. -- or sorry. The state's attorney's office.
Q. Can you just give me, like, a very brief overview of, like, your legal career in two seconds?
A. Since I graduated?



Q. Yeah.
A. Okay. I graduated, I worked at the state's attorney's office. I started in appeals in 1996 and then went to traffic court. That was approximately 1997 and 1998. Between approximately '98 and 2000, I was in the misdemeanor division, and went on felony review from 2000 to 2001. From 2001 to approximately 2003, I was in preliminary hearings at the Grand Jury, Branch 66, which is the Homicide Sex Unit, or was. I don't know if it's still called that. And then from 2003 until approximately 2012, I was in the felony trial division. And I was in -- from approximately 2012 to 2014, I was in the -- I was the domestic violence target abuser attorney, so I did DB cases exclusively. And from 2014 to 2023, I was in the Conviction Integrity Unit.
Q. Can you go through your roles at the Conviction Integrity Unit, if you remember them?
A. Sure. I was a supervisor from 2014 to 2019. I was the director from 2019 to 2023.
Q. Okay. So when you were the felony review attorney from 2000, 2001, did you always work the same shift?
A. Well, what do you mean? I don't understand.
Q. Sure. Yeah. Let me rephrase that. So was there -- were there different shifts that felony review

**attorneys worked? Was it always 9:00 to 5:00? Was it different hours?**
A. So there are different shifts. So the way it worked back then is you were either days or nights. And you needed a month of days and a month of night,. So they alternated every month. And then days were 4:00 a.m. to 4:00 p.m., and nights were 4:00 p.m. to 4:00 a.m., three days on, three days off. So there were different shifts. The answer to your question is yes, based on those parameters.
**Q. Okay. And so, there was always a felony review attorney available 24/7?**
A. Correct.
**Q. And what shift that you worked varied based on the month because your shift kind of -- it alternated, like you described?**
A. Yes. Month of days, month of nights, three days on, three days off. So you could work three days -- so you -- three days on, Monday, Wednesday -- Monday, Tuesday, Wednesday, off. Thursday, Friday, Saturday, on. So you worked weekends, you were just three days on, three days off, regardless of holidays or whatever.
**Q. Got it. Do you know what schedule you were working the month of July in 2001?**
A. Based on reviewing the notes, I was working


nights.
**Q. So help me understand this: As a person who worked in CCSAO, you told me that you've been through all these work divisions like appeals and traffic. Is it, like, a rotating system? Do you get to choose where you go?**
A. It's more militaristic. You cannot choose where you go. You're assigned. But there is definitely a path through the office. And -- and some people's paths take different routes. For example, I never went through juvenile. That would be a -- well, it used to be a -- sort of a lateral to first municipal. So there was branched off. You can go to juvenile or first muni. I went to first muni, so -- and someone else decided that. Not me.
**Q. Okay. At any point do you get to decide what division to go to?**
A. Not really. You can have input. You can make requests. But it's really supervisors assign people.
**Q. Okay. And when you start with a new division, do you have to go through some sort of training?**
A. There's always training depending on what it is. And it -- it varies based on where you're assigned.
**Q. Okay. And is the training more similar to, like, attending a CLE, or is there, like, a structured**


**like supervisor who tells you how to run the tasks of your specific job?**
A. It runs the gamut, but a lot of it's on-the-job training.
**Q. So when you started in the FRU in 2000, were you training for some period of time that you can distinguish?**
A. There is a training for felony review because it's so different than everything else.
**Q. Okay.**
A. So yes, there is a training.
**Q. Okay. Let's go through the training. So whatever you remember, why don't you just walk me through it?**
A. Okay. This -- I don't remember much except it -- it was -- I don't know if it was several days, but you're -- all the new people are there. And it's hard because of schedules. So it's -- it wasn't long. It wasn't days. It wasn't weeks for sure, for certain, but you're definitely trained. And, I mean, you go through all the different aspects of felony review, you go through sort of hypotheticals, you go through what to expect, what not to expect, how -- how to -- to run things up the chain, for lack of a better term. It -- so there's definitely a training. You're given forms.


You're showed how to use the forms. You're showed how to use different systems. There weren't a lot of systems back then for us to use, but there were some systems. You're -- showed how to fill up a folder. You're shown how -- and then what they do is you learn -- you do the training, which is just a classroom-like experience, and then you go out and you're sort of like a newbie or a plebe or a rookie. I'm not sure what the right word is. And you go out with a seasoned trial supervisor and you're basically shadowing them. You're not really doing anything. You're just shadowing them and watching them, and you do that for a while.
**Q. And so, by the time that you had taken the statements in this case in July 2001, were you still shadowing someone, or was it you were on your own?**
A. No. I started in November of 2000, so by July, I'd been on review for nine months.
**Q. Okay.**
MS. EKL: Do you want to take a quick break?
MS. ITCHHAPORIA: Sorry.
MS. ALZAMLI: Yep.
MS. EKL: Okay.
MS. ALZAMLI: We can go off the record.
THE VIDEOGRAPHER: Oh. We can go off? Okay. One second. All right. We're off the record. The

time is 10:15.
(A recess was taken.)
THE VIDEOGRAPHER: Okay. We are back on the record for the deposition of Nancy Adduci. Today is April 17th, 2025, and the time is 10:17.
MS. ALZAMLI: Thank you.
BY MS. ALZAMLI:
**Q. All right. So right before we had the break, you were telling me that by the time of this investigation, July 2001, you had been on felony review for nine months?**
A. Yes.
**Q. And so, at that point, did you feel like you were relatively experienced, and you knew how to do the duties of your job --**
A. Yes.
**Q. -- without assistance?**
A. Yes.
**Q. Okay. So as a felony review attorney, can you walk me through -- if this is a possibility, can you walk me through what kind of, like, a typical process that would happen when you go in to take a statement?**
A. Okay. So start with that's a personal case. Well, there's two types of cases. There's phone cases and personal. Personal is where you go out to the area



district or location. Could be a hospital. It could be anywhere. It could be a correctional facility. And the purpose of a personal is to interview witnesses and to memorialize their statements. So back then, there were different ways to memorialize a statement. There was a handwritten, there was a court reported, and there's a video.
**Q. When did felony review attorneys start using court reported and video recorded statements?**
A. I -- I can't answer the question as to when it started. I know I've read transcript of court reported statements from the '80s. So as far as I know, before I was in the office. But again, I -- don't have any -- I've just seen it, so I -- we always had the options court reported, handwritten, or video when I was on review.
**Q. Okay. So the entire time that you were on felony review, video recording was always available to you?**
A. Well, okay. You -- it was an option, but availability is a different question, so I -- I can't answer that as stated, as -- availability was different. There wasn't always a videographer available.
**Q. Okay.**
A. But could we request one? Yes.



**Q. Okay. Thanks for clarifying that. So let's talk about that a little bit more. What do you mean by -- well, let's just start with the basics. So was it Chicago Police Department's responsibility to kind of acquire the video recorder, or was that, like, part of the state's attorney's responsibility to acquire the video recorder?**
MS. EKL: Objection. Form.
THE WITNESS: So the --
MS. EKL: Foundation.
THE WITNESS: -- videographers and court reporters were just like they are here today. They were independent contractors, for lack of a better term, that were requested when needed.
BY MS. ALZAMLI:
**Q. Yeah. Sorry. My question might sound silly because I should know a lot about this. So I'm trying --**
A. Okay.
**Q. But I'm trying to better understand.**
A. Okay.
**Q. So I guess what I'm trying to understand is, like, who had the, like, authority to, like, call the -- a videographer? Was it the prosecutor or was it, like, the police who did that?**



MS. EKL: Objection. Form.
BY MS. ALZAMLI:
**Q. If you know.**
A. You know what?
MS. EKL: Same objection.
THE WITNESS: I don't ever remember calling them myself. So that's all I can say. I don't remember having the number of who was on call or doing. I'm guessing and I'm -- I'm -- and I'm speculating right now, and I hate to do that. It was the dispatcher for felony review who maybe contacted the court reporter. So maybe I called dispatch and said, "We need a court reporter," or maybe the detective said. I don't remember.
BY MS. ALZAMLI:
**Q. Okay.**
A. I never did it myself, so I don't know the form -- I don't know how it happened.
**Q. Okay. So in your entire time as a felony review attorney, you had never used a video recorded statement?**
A. No, that's incorrect.
**Q. Okay.**
A. I had never contacted the videographer myself. I had never called them. I had never brought them in.

Page 22

**Q. Understood.**
A. So I -- I don't know the process of how they came in or how they were requested.
**Q. Understood. Okay. Thank you for clarifying.**
A. But yes, I -- in my career, I had -- as a -- I had definitely taken court reported and videotaped statement. I took a court reporter -- I've taken videotaped statements.
**Q. So did you receive training related to videotaped statements?**
A. Yes.
**Q. Okay. What was the training that you received?**
A. Similar to as I described earlier, both classroom-type training as well as in the field training.
**Q. So when you say classroom-type training, would that consist of something like directing you on how did -- I guess if there's a videographer, you're not turning on the camera, so --**
A. We would just watch.
**Q. You would just watch?**
A. Or we would just watch other ones and sort of get an idea and talk about it with people who've done it.

Page 23

**Q. And were you ever trained on when you should -- well, before I ask you that. Did you have discretion to use a video recorder for a statement without the consent of the witness or a suspect?**
A. My recollection is during the time I was on felony review from 2000 to 2001, no, that was not the law. And that was not available. We had to have consent.
**Q. Okay. So your understanding is that it was a law at the time that you needed consent from the witness or suspect in order to video record a statement?**
A. Or it was a policy, because we didn't do it otherwise.
**Q. Okay. And did you receive any training about certain groups of people in which a statement had to be video recorded? For example, like a minor.**
A. I -- I don't recall. I -- there may have been. I just don't recall.
**Q. So in your experience, did you ask every witness or suspect if they wanted their statement to be video recorded?**
MS. EKL: Objection. Form. Compound as to statements though.
MS. ALZAMLI: Sure.
BY MS. ALZAMLI:

Page 24

**Q. Let me strike that. Let me start by first asking you: Did you treat statements from witnesses and suspects differently?**
A. Somewhat, yes.
**Q. Okay. How did you treat them differently?**
A. Sometimes witness statements were taken in places where it would just not be conducive to bring in a videographer or a court reporter, so we were just going to offer a handwritten statement. And that's just a practicality.
**Q. Okay. If a suspect is giving a confession, would you always offer a court reported or video statement?**
A. Can -- can you define confession, please?
**Q. Yeah. That's a good question. If you are taking a statement where it's your understanding that the suspect is stating that he committed the crime, that is the subject of the investigation, would you always offer a court reported or a video recorded statement?**
A. We would try to, yes.
**Q. Can you tell me more about what you mean by you would try to?**
A. So if someone is making an inculpatory statement, I want to document that. There's three ways to document it. Again, handwritten, court reported, or video. The video at that time was more available as time progressed on my time on felony review, and it was a preferred method because it's just all there. You can see the person. You can see their demeanor. It's all there for the viewer to see. So that is something that we did try to do.

Page 25

**Q. When you say it's the preferred method, is it, like, the preferred method of the prosecutor's office?**
A. It was my preferred method, I guess. I liked it. I don't remember the policy. I just preferred it.
**Q. Okay. You said it -- sorry. Can I assume that it was your personal preference because of what you said earlier, where it's all there for the person to see?**
A. Right. There's no -- there's -- there's no issue. Can you read my handwriting? Did I write this down right? Did I miss something? The person's there, telling their story. Just like they told it to me, now they can tell it to the videographer, and now it's preserved. And it's their words, their emotional responses, their answers to the questions.
**Q. Did you find that video confessions were more compelling than handwritten ones?**
MS. EKL: Objection. Form. Foundation.
THE WITNESS: I -- I would not say more

Page 26

compelling, no. I disagree with that.
BY MS. ALZAMLI:
**Q. Okay. Would you find them to be more accurate?**
A. I do. I would think they would be, just because I'm a scrivener and there's -- I'm a human. You're taking down something. It's a summary. The video's just more fulsome.
**Q. Do you find them to be more accurate because they also allow the viewer to see the suspect's demeanor, body movements, and other things like that?**
A. Exactly.
**Q. In your career, was there ever a situation where a suspect requested a video recorded statement and for one reason or another, you weren't able to provide one?**
A. I don't remember encountering that, but I've heard of that. And it simply had to do with they were all busy at the time and there was a long delay. That's the only time I've ever heard of it, like you had to wait three hours to get a videographer, and that some people chose to not wait and do a handwritten or et cetera. And by the way, back then, the videographer and the court reporter were the same person. So you -- you couldn't go, "Oh, I don't have a videographer. Oh, I'll

Page 27

do a court reporter." They were the same person.
**Q. Was there ever a concern that if you waited to take a statement too long, that the suspect would change their mind and detract their confession or something like that?**
A. It's not fun being there, so we didn't want to delay or -- or keep people there unnecessarily long. So an option to take a handwritten, it -- it never came up in my experience, but I'm certain that it could have. So I don't know.
**Q. When you say you don't want to keep people there unnecessarily long, what -- like, what in your -- like, what is your definition of, like, long? Like, how long would you not want a witness to be waiting to take their stand?**
A. I wouldn't want a witness to wait more than a -- you know, a day, an 8-hour period. I think that would be a long time. But sometimes there are situations beyond your control. It's -- it's a -- it's an investigation. It's a criminal investigation, and they -- they take time sometimes.
**Q. Got it. And to clarify, you said a day and then you also said 8-hour period. When you say a day, do you mean 24 hours, or did you just mean, like, 8-hour workday?**

Page 28

A. I'm thinking, like, an 8-hour workday. Right. You would think in eight hours, you could maybe, you know, get something done, but not always.
**Q. And typically when you go in to take a statement, do you ask the witness how long they had been there?**
A. I don't recall.
**Q. Is it important to you to know how long a witness had been there?**
A. Yes.
**Q. Why is it important?**
A. I think it's only important depending on if their demeanor is one that's agitated. That would be an explanation.
**Q. Why do you want to have an explanation for an agitated demeanor?**
A. Are they agitated because they've been sitting there and they're just -- or they -- or are they agitated for another reason? Something else bothering them. What's going on?
**Q. If something else is bothering them, is that something you'd want to know?**
A. Yes.
**Q. Why would you want to know that?**
A. Because I'm trying to search for the truth.

Page 29

**Q. Is that how you would describe your -- the duty of your job as a felony review attorney, to search for the truth?**
A. Somewhat. That's more global. Really, our job is just to memorialize statements and decide whether to approve or reject charges.
**Q. So in the process where you're deciding whether to approve or reject charges, are you making credibility determinations about statements that you've taken?**
A. Yes and no.
**Q. Can you tell me more?**
A. So I'm -- if someone says something that I don't find credible, I'm still going to document it. If someone says something that maybe I personally think is not believable, I'm not the person to decide that at that point, so it doesn't really matter to a certain extent. If I find something so incredible that it's strange credulity, that it's, like, impossible, that might cause me to ask more questions.
**Q. I'm going to try to summarize what you said, just so that I can make sure I'm clear on it. So let me know if I misrepresent it. So in terms of memorializing statements, you're going to write everything down someone tells you, whether you think it's credible or**

Page 30

**not?**
A. Yes.
**Q. Okay. What are things -- was there a time in your career where you took a statement, you wrote everything down, you didn't think it was particularly credible, but not incredulous enough that you were going to ask more questions?**
A. Yes. Many times.
**Q. Could you describe, like, some of those instances for me?**
A. Well, in this case.
**Q. Okay. Tell me more about in this case.**
A. He said he stabbed someone with a handleless knife. I find that incredible.
**Q. Okay.**
A. And he received no injuries. I find that incredible.
**Q. What do you find incredible about that?**
A. I think it's almost impossible to stab somebody with a handleless knife and not injure yourself.
**Q. Okay. Did you feel that way at the time that you were taking the confession?**
A. I don't remember how I felt then.
**Q. Fair enough. But upon reading the confession**

Page 31

**now, you find that incredible?**
A. I do.
**Q. Okay. So then you talk about a category of statements that you've taken where someone will say something so incredulous that you want to ask more follow-up questions?**
A. Yes.
**Q. Is there a time in your career where that happened that you remember?**
A. I do.
**Q. Okay. Can you describe one for me?**
A. A gentleman stated that he -- it was a case where the victim had gasoline thrown on them and they were lighted, so they were burnt. And the suspect I was talking to and I asked him what was going on before that. And he stated he had been sitting on a chair while someone was working on a car on the street, and smoking cigarettes and drinking beer with the victim who was sitting on a fire stump. They got in an argument, so he grabbed a glass or a -- a cup of gas that was under his chair and threw it on him. And so I found that -- I asked him what kind of cup it was. A Styrofoam cup. I said, there was just a Styrofoam cup of gas sitting there while you were smoking. Obviously, the fumes, the Styrofoam would've eaten through -- the

Page 32

gas would've eaten through the Styrofoam. It just seemed so -- I -- there was some follow-up on that, where'd the gas come from. Now, if he had told me that someone was working in the car and had a coffee can of gas over on the -- the curb, that wouldn't have been as incredible to me. But the idea that there was -- just happened to be a Styrofoam cup of gas underneath him while he was smoking and drinking and then he happened to toss it, I -- I asked some follow-up questions on there.
**Q. Got it. Okay. And so, when you're in the situation where you're asking these follow-up questions about something that you find incredulous, if the follow-up question -- if the answers to the follow-up questions don't satisfy you, what is your next step?**
A. Well, it's not about satisfying me, so we're clear. They could -- he could keep insisting. "It was in a Styrofoam cup. It was there. I don't know who put it there, and I threw it on him." Okay. It's not implausible. I mean, really, maybe that is what happened, but -- I don't know. So it -- a follow-up, they can say -- they can say whatever they want. Whatever they say, I'm writing down.
**Q. Understood. Yes. So that's good. So let's go back to that, the two-phase process I wanted to talk**

Page 33

**about. So in terms of memorializing a statement, you will always write down everything that somebody tells you?**
A. Yes.
**Q. But then when it comes to the decision to issue charges, is that where you are taking into account the incredulousness of a statement?**

A. No.
**Q. Okay. So why don't you describe for me the charge process a little bit more?**
A. So charging is just sort of math, for lack of a better term. Here's the statute. Here's the elements of the crime. Is there evidence that fits those elements?
**Q. So when you're weighing the evidence, do you consider the credibility of the evidence?**
A. Not really.
**Q. Okay. Why don't you consider credibility of the evidence?**
A. I'm not the trier of fact.
**Q. Okay.**
A. So I'm not going to charge -- put it this way: I'm not going to charge someone. I'm not going to

approve charges if the evidence is -- is not of such a conclusive character. So there is a credibility determination, but what I want to make clear is I'm not deciding whether there's proof beyond a reasonable doubt or whether this person's guilty or not. So I think that's a better way to answer the question. Of course credibility. I'm not just charging someone willy-nilly that says, "Oh, that person did A, B, or C, and I don't believe them and there's nothing to support it." So yes, it's a factor. But the inclusivity of it, it doesn't have to be proof beyond a reasonable doubt. It doesn't -- I don't have to feel that this person is guilty to charge them. I can feel that the evidence supports the charges based on the elements of the crime.

**Q. Understood. And then it's the job of a jury to determine the credibility of the evidence?**

A. Basically. Yes. So it's -- of course I'm not going to just approve charges on something that's -- has no basis whatsoever. So yes, it factors in, but not in the sense that I'm making a final determination, if that distinction is clear.

**Q. Yeah. I -- yeah, I think that distinction's clear. Thank you. And I appreciate you explaining so much to me about this process. I am a new attorney and also don't know very much about criminal law, so very**



**helpful. Okay. So other than the taking witness statement, are there any other duties that a felony review attorney has?**

A. Approving or rejecting charges. Taking statements. I'm sure there's other things. We used to phone cases. It's just approving or rejecting, basically. Yeah, that's pretty much it.

**Q. Okay. And you mentioned at the beginning that when you -- when taking a statement, you can take it by phone or you can take it by person?**

A. Right. Personal or phone, right.

**Q. Right. And when you take it in person, you might be at the police station or you might be somewhere on location, like a hospital or correctional facility?**

A. Yes.

**Q. When might you not take a statement at a police station?**

A. When the person isn't in the police station.

**Q. Okay. Is it more often than not that you're taking statements not at a police station?**

A. I can't give you an answer to that.

**Q. Okay. Was it usual for you to take a statement in the police station?**

A. Most of the time. But it wasn't unusual to not either.



**Q. Okay. And when you weren't taking statements from the police station, what were, like, the typical locations that you were going to?**

A. We'd go to someone's work if they couldn't get to the police station. We'd go to someone's home. We would go to wherever the witness was located if it was inconvenient for them to come to the police station. Or we didn't need them to come to the police station, we could easily go to them.

**Q. And when you would do that -- I guess strike that. So when you go to take a statement in person, whether that's at the police station or you've gone to a different location, who is with you?**

A. A detective.

**Q. Okay. Are they with you throughout the entire process?**

A. Yes.

**Q. Are they with you at every point in which you are talking to a witness?**

A. No.

**Q. Okay. Tell me a little bit more about that.**

A. There's a couple different scenarios. The biggest scenario is that especially if we're taking an offender statement, that there's going to be a time where we want to talk to that person outside the



presence of the police.

**Q. Why is that?**

A. I want to make sure that if there's anything they want to tell us outside of the presence of the police, they have an opportunity to do so.

**Q. Is that because you have, like, a concern that they were being pressured by the police or something like that?**

A. It's just a standard practice.

**Q. Okay. When you go on location to take statements, what are you taking with you?**

A. Personally, if I'd be able to backpack, I would take pen, paper, felony review folders, and a Polaroid camera, and car keys, water.

**Q. And --**

A. We didn't have -- we didn't have cell phones back then. We had pagers. Oh my God, I just remembered that.

**Q. When you say felony review folder, I just want to make sure I'm understanding what we're talking about.**

A. Certainly.

**Q. Is it this document here, which I'm not going to designate as an exhibit yet, but I am showing you a document Bates Stamped Def Adduci 1 through Defendant Adduci 6.**

Page 38

A. That's the inside of the folder --
Q. Okay.
A. -- which you're showing me.
Q. Oh, when you say the inside of the folder, you mean there would be a cover on it or you mean there's other documents in here?
A. Let me explain the folder to you. There's three parts to a folder.
Q. Okay.
A. The outside folder is manila hard and it's legal sized, so it's bigger than this. So it's this big. And on the outside of that folder is court information. So it'd be like when it goes to court, you open up that folder, now you're going to turn it this way, you're opening it up and now inside of that folder, it's now on the outside. It's a big legal sized manila folder. Inside are three or two pieces of paper, carbon paper, if you will. I don't know how it works, but it's carbon based, whereas there's a yellow sheet and on top of the white sheet and that's what you write on. And those pieces of paper are detachable when you're done with the folder. So they rip off. This is inside the folder, pages inside the folder and then outside of the folder. And if you need more than two pages, you just get a separate folder. So you can have several folders

Page 39

stacked up and if you see it, one of three, means there were three separate folders in this case. And that was because I had to put the witness information in. You have to get another folder to add more witnesses.
Q. Understood. So when you went to take a statement from a witness or a suspect, you would have this document, this blank document with you to fill out?
A. That folder? Yes. The folder comes with us for anything, any personal, any case. That's how the case, that's how it works. That's what we use.
Q. Okay.
A. So any case has a folder.
Q. Okay. And did you also take with you that blank form where you take down a handwritten statement?
A. Yes. Those pieces of paper? Yes.
Q. Okay. And typically, are you completing the quality review folder on site or are you completing that when you go back to your office?
A. It depends on where we are. You know, if I can have time to write or somewhere to sit and write, I tried to keep up with the folder as I went, but sometimes you'd have to end your shift and go back and finish filling out your folder.
Q. Okay. And other than the new folder that we just talked about and those blank sheets where you take

Page 40

down a handwritten statement, did you take notes on any other kinds of pieces of paper?
A. So any notes, anything I noted, would be noted on something that we just described. It'd be on the felony review folder. It would be on a piece of paper that's attached to the felony review folder. It's going to be an exhibit to a handwritten or it's going to be on the handwritten. It's all encapsulated in those documents.
Q. Okay.
A. The only odd document that wouldn't be is if I wrote a memo to my supervisors if it was a media case or something else. That's a separate entity that is separate and that's just an internal document. Say when I'm working nights, the bosses on days need to know this might be in the media, I'm going to write a quick memo. That's the only other document I recall generating. I don't recall generating it in this case, by the way. I just in general recall generating those documents when I was on felony review.
Q. Okay. Did you ever take notes, like. In a notepad?
A. No.
Q. Okay. All right. So when you get to the police station to take the statement of a witness, let's

Page 41

start with just a witness, not a suspect. What information are you expecting to receive once you arrive?
A. So any -- any paperwork that's done by the police, I'd want to review. And then I'd get an oral rundown of the case from the detectives. Why am I talking to this witness? How many witnesses are there? What did they tell you?
Q. And would you spend time reading all of the documents that were related to that witness?
A. If there were any.
Q. If the witness had given a prior statement, would you read them?
A. If they had been recorded in some way, shape, or form.
Q. Why did you read these documents before you went in to take a statement?
A. So I knew what to ask the person.
Q. Now similarly, when you go in to take a statement from a suspect, are you expecting the same information to be available?
A. Exactly. It's a very similar process.
Q. So would you say that you're relying on the investigative work that the police officers are doing to inform you of what to ask the witness?

Page 42

A. Right, I don't --
MS. ITCHHAPORIA: Object to form.
THE WITNESS: I don't know anything until they tell me. So when I show up, I don't know anything about the case. So I have to get that information from somewhere. It's from the police.
BY MS. ALZAMLI:
**Q. How long -- if this is a question, you can give me a number too. How long do you typically spend reviewing documents or talking to police officers about a witness before you go in to talk to them?**
A. It varies com -- by the complexity of the case, how long the case has been investigated, if the case is a CI. So if it's a continuing investigation, there's a whole bunch of other work that's been done prior. It's a lot of reviewing. So it just absolutely depends on the facts of the case.
**Q. Similarly, did you -- was there like a typical time frame that you would spend reading or talking to police officers before you went in to talk to a suspect?**
A. It's -- it's not typical, it depends on the facts of the case.
**Q. Okay. Do you remember in this case how long you spent talking to police officers reviewing documents before you took a statement from Carl Reed?**

Page 43

A. I don't.
**Q. But once you review any documents that are relevant and once you talk to police officers, what are your next steps?**
A. So in this case or in general?
**Q. Let's start with just in general.**
A. Okay. So if we're reviewing documents, then it's interviewing witnesses and seeing what they have to say.
**Q. Is there an order in which you talk to witnesses?**
A. No. I mean if somebody's not there, maybe we'll go talk to them first. We'll leave the station and go talk to them. But it -- it's just if someone has to go to work, maybe I'll talk to them first. So it's again, it's case specific. If someone has to leave, I might talk to them first.
**Q. Are there any considerations at all that impact your decision on who you want to talk to first?**
A. Like I said, if someone has to leave, if we have to go out into the field, I try to do that earlier in the night rather than later in the night.
**Q. Sure. Let me clarify. Other than logistical reasons that include the availability of a witness at a certain time, are there any other reasons that impact**

Page 44

**your decision on who you want to talk to first?**
A. No, the only thing is I'd probably want to talk to the defendant last, or the suspect last.
**Q. Why would you want to talk to the suspect last?**
A. Because I want to get as much information as I can to be able to have a fulsome conversation.
**Q. When you talk to a witness, is it typically one interaction and then the statement is taken and then you don't interact with them again? Or can it be several interviews before a final statement is taken? Does it vary wildly across the board?**
A. The answer --
MS. EKL: Object to form.
THE WITNESS: The answer's all the above.
BY MS. ALZAMLI:
**Q. Okay. Could you give me any sort of insight on how typical it is that you're going to talk to somebody more than once in several interactions of going in and out of the room?**
A. Are we talking about a witness or a suspect?
**Q. Let's start with just witnesses.**
A. Okay. So if I talk to a witness and they tell me something and then I talk to another witness and they tell me something inconsistent and we're all still in

Page 45

the same place, I might go back and be like, "Okay, I heard this, now to clarify." That's pretty much the only time. Otherwise, it's just documenting what they tell me.
**Q. In that case, if you talk to a witness and you go talk to another one who tells you something inconsistent and then you can go back, is there ever a situation where you have to take a new written statement or maybe offer a supplemented written statement?**
A. No. No, I write down what people say to me. If that's what they say to me, then I'll -- I'll say that I asked them this question and this is what their answer was.
**Q. Yeah. I guess to clarify, do you have to create a supplemental record of the follow-up conversation that you had with that person?**
A. I think you're misunderstanding my answer, so I apologize. I'm not taking a handwritten statement necessarily if I'm still talking to people. It's one of the last things we do. And once we do that, it's done, for lack of a better term. There's -- there's a -- it's -- felony review is just part of a process. There's then, you know, a preliminary hearing, a grand jury, et cetera, et cetera. So it's going to go through the system. So it doesn't have to be perfect for lack of a

better term. If there's something unanswered, we'll answer it down the road. So it's really just, it's not for me to satisfy every curiosity. So if someone tells me something that later on I find out someone said something inconsistent, I'm still documenting what they tell me.

**Q. Got it. And thank you for clarifying that. So just to make sure I'm understanding, once you take a handwritten statement, that indicates the end of the interview process?**

A. Pretty much, yes.

**Q. Okay. All right. So I'm going to ask you some more questions now about your interaction with the suspect. Not talking about this case specifically, but generally do you, when you interact with a suspect -- when you interview suspects before you take a handwritten statement, are you speaking to them on multiple separate occasions where you are going in and out of the room?**

A. That's typical.

**Q. Okay. Is there a typical duration of time that you're talking to a suspect?**

A. That is not typical.

**Q. Okay. Do you remember in this case how many times you spoke to Carl Reed?**



A. I don't remember, but I read a transcript where I apparently did remember at that time and I talked to him, I believe, three times.

**Q. Okay. So you did give testimony in this case?**

A. In a motion, correct.

**Q. Yeah. And at the time that you testified, did you testify truthful?**

A. Yes.

**Q. Okay. And you said that you reviewed your testimony?**

A. I did.

**Q. Is there anything that you reviewed upon reading it now that you think of inaccurate for any reason?**

A. None, that I can think of.

**Q. Okay. So what do you independently remember today about your involvement with Carl Reed's interview and statement?**

A. So I have a vague recollection of him. I -- not necessarily what he looked like, but I remember he was older than me. I remember when I introduced myself, he seemed eager, at first, I thought he was just eager to talk to me and then I realized he was eager to ask me questions. And in asking me questions I realized what he, sort of in a slick way was trying to figure out what



was happening outside behind that door. He wanted to know what was happening with the investigations.

**Q. So what questions did he ask that led you to believe that?**

A. I don't remember the questions. I just remember that I remember him being eager to talk to me and then asking me questions and me realizing, it took me a minute to realize he was trying to figure out what other people were saying or what was going on with the investigation. That's all I remember.

**Q. Okay. So you don't remember anything. Do you remember anything that you just spoke about? Do you have any independent memory of anything that you spoke about?**

A. No, I just remember him being curious.

**Q. Okay. When you went in to talk to Carl, did you know how long he was in the station for?**

A. I don't remember.

**Q. Did you -- is it your typical practice to ask how long someone was in the station for?**

A. So I would have asked what time he was arrested, which is important.

**Q. Why is that important?**

A. Because we have to, within certain hours of the arrest, we have to get someone to a judge, so. My,



from looking at my notes, he was arrested at noon on the day I was there.

**Q. Do you know if typically suspects are brought into the station hours or days before they're actually arrested?**

MS. EKL: Objection. Form. Foundation. Vague.

MS. ITCHHAPORIA: Join.

THE WITNESS: So a suspect only becomes a suspect when evidence presents itself. So that is a fluid linear process. So calling someone a suspect now doesn't mean they were a suspect then. So I can't really answer the question because I don't know when he became a suspect.

BY MS. ALZAMLI:

**Q. So it's a really good clarification actually. When you went to talk to Carl, was it your understanding that he was a suspect in this murder?**

A. Yes. Yes. Because he had been arrested. Yes.

**Q. Okay. And so, who decides if somebody is a suspect? Is it the police?**

A. Yes.

**Q. And so, you're relying on their determination?**

A. Yes.

**Q. Do you make any determination on your own as**

**to whether someone should be suspected for having committed the crime?**
A. No, I'm there to decide if the evidence is to prove or object charges. So they decide he's a suspect, they're presenting -- they're presenting him to me as a suspect. "Here we go, this is what we have, we want charges."
**Q. Okay.**
A. I'm there to say yes or no to that.
**Q. So in this investigation, you spoke to five people, and I'll refresh your recollection.**
A. Yeah.
**Q. Dorothy Soukup, Lester Garner or Ricardo Burns, DeLong Reed, and Carl Reed. Do you remember if you were told that any of these people were suspects to the crime other than Carl Reed?**
A. Previously to Carl Reed being sort of, you know, narrowed down as a suspect? No, I don't.
**Q. Okay.**
A. I don't recall. I don't remember.
**Q. Okay. I really sorry, I might just be misunderstanding, but when you say previous to Carl being narrowed down, can you just tell me what you mean by that?**
A. I don't know who the whole range of suspects


were after they found the body and they realized it was a homicide. So the way I'm -- the, I don't know if -- they realized it wasn't natural causes because they had a medical examiner report. So I know it's a homicide, it's death at the hands of another. So now who did it? I don't -- and -- and everyone's a suspect, I guess, till they're not. So I don't know.
**Q. Okay. I guess, let me try to ask something maybe that you would be more able to answer. When you interviewed DeLong Reed, did you believe that he was a suspect?**
A. At that point? No. Remember I get there after Mr. Carl Reed's arrested. So it was very clear to me, I was looking at this case with Mr. Reed, Carl Reed, as the suspect, and everyone else is a witness. That was my -- the parameters that I came in on. Now that could have changed, but those are the parameters I came in on.
**Q. Understood. Okay. Is there any document what information the police provided to you before you speak to a witness or a suspect?**
A. The only documentation is going to be in that felony review folder.
**Q. Okay. What is the purpose of the conversations that you have with a witness before you take the statement?**


A. I, first of all, I don't know what they know, so I'm asking them what they know. We don't always need to take a formal statement, if you will, for lack of a better term, formal meaning handwritten, court reporter or video from a witness. So sometimes it's just a resource decision. Do I want to take a statement from this person? It does take time. What do they have to say? What do they have to offer? It might be so inconsequential that I decide, or I just don't think it's important. I make that decision. I talk to a supervisor, they agree. So I just need to know what they know and how does it fit into the whole puzzle I'm trying to put together.
**Q. Do you ever show witnesses documents that were created that were relevant to them during the course of the investigation?**
A. Sometimes we show them pictures so we know who they're talking about, especially if they're using nicknames. So is this the nicknamed person you are referring to? Is this the picture of them? So we know that that person is that nickname.
**Q. How do you determine, like, the picture or the identity of a person if someone is using a nickname?**
A. Usually the police have figured that out.
**Q. Okay. So that's something, like, would you go**


**and --**
A. No.
**Q. Do you have any role in finding a photo or finding the identity of the nicknamed person?**
A. No, I have no way of doing that.
**Q. Okay. So you just mean that you might physically show someone a photo, but the photo was given to you by the police?**
A. Correct. So let's say someone only knows this person by a nickname and let's just use the nickname of, you know, they call him Petey, but his real given name is, you know Richard something. So he calls him Petey. "Do you know Petey's real name?" "No, I'm just calling him Petey." "Is his name Peter?" "I don't know, it's Petey." So we show, we figure out who Petey is and we show a picture. "Is this the Petey you're talking about in this handwritten statement or in your statement to me?" "Yes, that's the Petey I'm talking about." So we're all clear, we're talking about the same Petey, and I'm just using that as an example because I couldn't think of another name.
**Q. So when you show somebody a photograph, is that something that you document in a statement?**
A. It should be attached to the handwritten statement as an exhibit.

**Q. Okay. So other than showing a photograph, are there any other documents that you might show a witness?**
A. I can't think of any right now. I'm sure there are situations where maybe we do, we show them a map or a picture, or we maybe show them something that -- it's a handwriting to see if they recognize. But I can't think of a specific example. We're going to show them anything we need to clarify. Something's not clear. Where were they standing? Maybe we'll draw a map or where was the knife found? Where were you in the bedroom when this happened? Draw me -- draw me a little map and I'll attach that.
**Q. If the police previously took a written interview with the witness, would you show the witness that document?**
A. Probably not. And that would of -- the reason I say that is because at that point just logistically the only type of written document that the police would have would probably what's called a general progress report or GPRs, which is their notes, which most people can't read. So I would never show that to a witness. It's a police report basically. So I don't think so because I don't think anything would exist. But I'm not saying it's beyond the pale, it may have happened.
**Q. Okay. And just to clarify, when you say you**



**would never show a GPR to a witness, is it because it's a police report?**
A. Yes, and because most people can't read them. But yes, mostly because it's a police report and we don't want to put any facts from a police report into a witness's head. So I'm not showing witnesses that.
**Q. Okay. Would you ever read from an interview that was documented in the GPR to a witness?**
A. The only time I would ever do that that I can, and this is me sitting here right now just telling you as a practitioner, so this isn't anything I remember, is if I'm trying to make sure I have something clear or I'm trying to make sure we're -- there's some impeachment. There's something there that's not cleared. So I want to make sure you said this and I might just look at it until I'm perfectly clear that this is, we're on the same page. But that would, that to me is something I don't ever remember doing and would be rare. But I'm not saying it never happened or that wouldn't happen.
**Q. Okay. And when you talk about, like, to see if there's impeachment, do you mean by that to see if they're giving a statement that contradicts an earlier statement that they gave?**
A. Correct. You want to clarify things. Sometimes things are just misunderstandings or it's just



a failure to communicate or it's something like I didn't understand what they meant. I can think of an example of that. But I want to clarify.
**Q. Can you give me an example of what you were just talking about?**
A. This woman said she didn't know a guy and she's like, "I don't know him like that." And so I thought she doesn't know him, like she can't identify him. It turned out she actually had a child with him, but when she said she didn't know him like that, it meant she wasn't friends with him and I just didn't understand that. But later on, after asking a bunch of questions, I realized, oh, she did know him because they actually have a child in common. But when she said she didn't know him like that, she meant they weren't friends anymore. Little things like that. So that's, "What did you mean when you say you don't know him like that?"
**Q. Right.**
A. That's -- that's -- so like, because then I'm reading maybe something that says they have a child in common, what does she mean by that? So that, just, it's a failure to communicate.
**Q. Right. Like, language differences that might create this miscommunication?**



A. Yes.
**Q. Okay.**
A. Those -- that's what I mean by something like that could be really impeaching. You know, she's saying I don't know this guy, but she has a child with him. Like, that's a -- that's a credibility thing. Like, is she lying to me? Or, oh wait, I just don't understand what she meant.
**Q. So why is it important for you, as the felony review attorney, to know if someone is giving a statement that was inconsistent with a statement they have previously given to police?**
A. I just want to make sure I'm getting it straight. And -- and straight doesn't mean I believe it or straight, that my narrative is satisfied. Straight, that I'm communicating on paper or into a folder what that person meant, because they might say something but mean something else, so I'm trying to get that all clear.
**Q. So --**
A. And I think that that example I used was global. That miscommunication based on what people meant. I mean, for years I thought hooking up meant someone was just, like, going to have coffee together and I found out it meant something else from somebody

and I didn't know that. So that's just a personal example where I didn't know what that meant, so I found out what it meant, so --

**Q. Okay. Other than kind of like a misunderstanding based on language that someone might use or phrases that someone might use, is there a situation in which a witness gives information that substantively is clear to you but contradicts a statement that he gave to police before. So I -- there is no question there, but I guess I'm just trying to set the stage. I'm talking about a different circumstance than just, I'm not understanding the language that they're using. So in that circumstance, are you also flagging in your mind, things for impeachment?**

A. No.

**Q. Okay. Why is that?**

A. I'm just writing down what they're now saying.

**Q. Okay. So if you are holding the police report where they gave a previous statement and they're telling you something different, are you going to confront them with it or are you just going to write down exactly what they say, or are you going to ask them any follow up questions about it?**

A. Probably asking follow up questions.

**Q. Okay. What would the follow-up questions look like?**



A. You said this before, what did you mean?

**Q. Okay.**

A. You're saying this now, what do you mean?

**Q. Got it. Okay. And why is that important to do?**

A. We're trying to figure out what's going on. Is it a miscommunication or did they change their story?

**Q. If a witness changes their story, is that something that is important from a perspective of making a decision to charge?**

A. It can, yes, it can be a factor.

**Q. How can it be a factor?**

A. If someone's not consistent and they're the only witness, it's not a really good basis for charging someone.

**Q. So other than witnesses giving consistent and inconsistent statements, are there other factors that you consider about an individual witness when making credibility determinations?**

A. So I can't --

MS. ALZAMLI: Objection to form.

THE WITNESS: Yeah, I can't really answer the question the way you phrased it.

BY MS. ALZAMLI:



**Q. Sure. Maybe I'll ask it in more detail. So for example, when you go to talk to a witness, do you make any inquiries about their state of mind? If they have addictions? If they have -- if there's anything going on that would make them maybe give you an unreliable statement?**

A. I make observations about people. I don't pry into their medical history. They can volunteer certain things, but if I see something, I'll say something. If I don't see something and they seem to be cogent, they seem to be lucid, they seem to be sober, they seem to be articulate, they seem to be understanding who I am, my role, and what I'm asking. I'm probably not going to make any further inquiry.

**Q. Do you feel like it's -- is it important to you to know that a witness is comprehending what's going on?**

A. It is.

**Q. Okay. Why is it important to you?**

A. Because I'm documenting something they're telling me, and if we're not communicating and they're not comprehending, that's not good. And if I have outward signs of that -- that they're not comprehending, I'm not taking a statement. But I can't tell you what they subjectively are feeling. I can only tell you just



like anyone's observations of people. So I only know what I observed, which is objective and not subjective.

**Q. As a felony review attorney, did you receive any kind of training about how to tell if somebody is comprehending you or if they're lucid?**

A. I don't remember receiving training. We, you know, it's definitely as ASA's talk, everyone on your team, you get together and talk. And so I heard stories about what withdrawal looks like, what people being on certain drugs might act like or smell like. Just for my own edification, for lack of a better term, things to look for. But usually those things are flagged long before we would be out there on a personal case, if someone's having a medical issue or is under the influence of something or something else is wrong with them.

**Q. Can you tell me more about that? When you say flagged, do you mean flagged by the police?**

A. Yeah, I mean because they're in their custody and their care, so and they -- they have commanders and sergeants and people that are making sure that those people are taken care of. If they're -- if they're in custody. If they're not in custody, they're a witness. I mean, they're treating them like human beings. They're like, you know, if they're not feeling well, they're

going -- they're calling an ambulance. If something's wrong with them or they are mentally unstable, they're going to take a break and go find a relative or see what this person's issue is. Is this person competent? They're going to get more information about that, what they're objectively seeing.
**Q. As a voluntary review attorney, did you rely on the police to give you information on if a witness or suspect had some sort of limitation in their ability to comprehend?**
A. I would hope they would tell me if they knew of one that they felt factored in, but then I would also see if I observed one.
**Q. Did you feel that it was your responsibility to make sure that a witness or suspect was comprehending what was happening?**
A. Yes.
**Q. How -- what are the steps that you took to make sure that a witness was comprehending or that a witness or suspect was comprehending?**
A. So there's certain questions I would ask. There's certain things I would explain and I would explain them more than once. I would sometimes ask people to explain back to me what I just said in their own words, so I understood they comprehended.


**Q. Okay. Do you have an independent memory of explaining to Carl Reed during the course of this investigation what was happening and having him explain it back to you in his own words?**
A. No, I don't have an independent recollection of that.
**Q. In talking to a witness or suspect, do you decide that you're ready to take a formal statement?**
A. It varies greatly.
**Q. Would you give me any sort of factors that you might consider?**
A. If we -- if I've talked to everybody, there's nothing else to do. We've wrapped up the case and take a statement if they want to give one.
**Q. So yeah. So a witness can refuse to give a statement?**
A. Absolutely.
**Q. And a suspect can also refuse to give a statement?**
A. Absolutely.
**Q. And when they refuse, what happens in that circumstance?**
A. Nothing.
**Q. Okay. And when you take a formal statement, is the police detective always present?**


A. There's someone always present when we're taking statements. Correct. It's usually a detective.
**Q. If it's not a detective, who might it be?**
A. It might be an investigator, but that's pretty rare.
**Q. And why are they always present?**
A. That's a witness.
**Q. Okay. What is their duty in the room with you when you are taking that formal statement?**
A. They're going to testify regarding that statement. They're a witness.
**Q. Okay. I guess if you can provide some more information for me, again, I don't have as much knowledge about this process. So when you say they're a witness, is it for the purposes of testifying, so the circumstances in which this statement was taken?**
A. Yes.
**Q. Okay. So for example, the statement was not taken under duress or something like that?**
A. Just that whole statement itself. I'm a witness. They're a witness. And so one of the reasons that, and I don't know the reason why there's -- there's just always has been a detective in there with us when we take the statement, but sometimes the detective's going to get on the stand and they're going to testify


about myriad different things and the statement, it's just something they can testify to then, as a witness.
**Q. Okay. Other than being a witness, do they have any other duties or responsibilities?**
A. No.
**Q. Do they ever speak during the duration -- is there any reason they would speak during the duration of you taking the statement?**
A. The only thing I can think of is if I screw up something, they may call me and say, "Hey, you got that wrong." But no, I can't even -- I can't, I mean, I don't think they'd let you do something wrong. They'd say something, but usually they say nothing. They have no involvement whatsoever.
**Q. What do you mean by if you had screwed something up?**
A. Like, I had the wrong name. Like, I had the wrong case. I was screwing things up. I was, "Wait, this isn't, this is DeLong Reed, Nancy, this isn't Carl Reed." I don't know. I would think they would stop you and tell you no, you've got the wrong Reed. But that's -- that's the only example I can think of and I'm speculating. They don't have anything to do with it. That's the handwritten, but they sit there as a witness. That's it.

Page 66

**Q. Okay. I'm going to ask you a bit more about comprehension of a witness or suspect when you're taking one of these exams. So what do you do -- well, first, have you ever been in a situation where you are going to take a written statement and you feel that the witness or the suspect is confused?**

A. That would probably happen before I had made that, asked them to take a statement. So that, probably the statement wouldn't be on the table, that would have happened when I first talked to them.

**Q. Okay. So if you had interviewed a witness or suspect and you determined, based on your observations that they seemed confused, you would have not brought forward a statement?**

A. Right.

**Q. And why is that?**

A. Because there's no reason to document something if it's unsure. The reason to document something is to clarify and to give something for the grand jury assistance to review that's consistent and credible that witness's understanding of what they bring to the elements of the case. And if this person is unclear why I'm there, what I'm doing, what they're saying, what they saw, their ability to perceive or narrate is off, they're not going to be able to do that.

Page 67

And so, I would not memorialize the statement. There's other opportunities to memorialize statements during the course of a prosecution. So if there's an inconsistency on clarity or there's anything that's not right, just not going to take it.

**Q. Has that ever happened during the two years that you were with that --**

A. So I was only there for a year, November to November, so it was 12 months. And yeah, I did have situations where I just didn't feel like the person was -- was emotionally, physically, mentally available to really talk to and get anything that I wanted to say, okay, we're going to put this on paper and feel that later on that that would be a good rendition of what they were able to perceive or narrate.

**Q. Could you describe some of the observations that you made that led you to that decision in those cases?**

A. I had a woman who couldn't stop crying. She just couldn't stop, she couldn't breathe. Her crying was so -- it was -- she couldn't even get words out. We're not -- we're done. So she needs time. I had someone who wasn't on pain medication, who probably should have been, who was in the hospital after an injury. A person that was on pain medication that

Page 68

didn't really, you know, have you ever seen those videos of people that say funny things after they've had their teeth pulled? So I'm not -- he didn't know who he was. That's not a statement I'm going to take. He had some, you know, but you got to come back and talk to that person or not do it. So some people aren't emotionally, they just can't do it or they just can't narrate. Maybe they perceive something, maybe they have something that they can add, but they are not able to narrate it in a way that you feel comfortable documenting what they're saying.

**Q. Will you ask witnesses or suspects before you decide to make a formal statement whether they are under the influence of drug or alcohol?**

A. Yes.

**Q. Will you ask them whether they have any medical conditions that impact their ability to, like reply truthfully?**

A. I usually do not ask that question.

**Q. Are there any other questions that you ask along those lines?**

A. I've asked if they've been treated. I've asked if they've been, you know, able to rest, have food, ability to use the bathroom, you know? Unfortunately, sometimes it's too hot or too cold in

Page 69

those buildings, so that's something that the temperature can be uncomfortable. Especially in the summer, it gets very cold. The air conditioners. That's about it, me asking that, I -- yeah.

**Q. Have you had a situation where a suspect had told you that they were held for a duration of time that you felt was inappropriate and then you chose not to take a statement?**

A. No. No, not that I can recall.

**Q. Have you ever had a witness or suspect where you have a language barrier with him?**

A. Yes.

**Q. What do you do in those situations?**

A. There's a couple of things you can do. You can have a translator, an interpreter. You can have someone who speaks their language on review, take the statement, or you just don't take a handwritten statement. You do a video with an interpreter, or they just go to the grand jury with a formal court -- court-sponsored interpreter.

**Q. Why would you treat a witness who -- or a suspect who you have a language barrier with differently that way?**

A. I don't know what they're saying.

**Q. Do -- well, yes, so you don't know what**

Page 70

they're saying? Is it also important that they don't know what you're saying?
A. Exactly, yeah. We can't communicate.
Q. And you wouldn't take a statement with somebody if they couldn't understand what you were saying or if you couldn't understand what they were saying?
A. Exactly.
Q. Okay. Did you receive any training as an FRU attorney about how to approach a witness with disabilities?
A. I'm sure I did, but I don't recall it right now.
Q. Okay. In your time at the FRU, did you ever take a statement from anybody who had a disability.
MS. ITCHHAPORIA: Object to form.
THE WITNESS: I -- I interviewed people who were deaf and mute with the -- with the help of an interpreter, but I don't believe we took statements from those. I don't remember taking statements. And I've interviewed people who did not speak English. They spoke different languages and with the help of an interpreter, perhaps, I spoke with them, or I spoke with them in the broken English they may have spoken, but that was -- there was no

Page 71

statements usually recorded because of the communication barrier.
BY MS. ALZAMLI:
Q. Okay. Just to clarify, in the situation where you have interviewed the person who was deaf and mute, you did not take a statement because of the communication barrier?
A. Because of the -- yeah. So we had someone interpreting, but we just -- we didn't -- we decided to do it more formally with a formal court-reported -- court-appointed sign language interpreter.
Q. Okay. Have you ever taken a statement from somebody who's blind?
A. I think I have, but I think it was a -- it was a witness, and I think they were legally blind, so they weren't completely blind and I don't -- I think that was a video, but I don't recall. I remember talking to someone that was legally blind once in my career, at least once.
Q. Do you remember if you made a determination that that statement had to be over video because of their blindness?
A. I think, and I'm -- I'm digging right now. If they can -- legally blind people can read and write and see usually, so I don't know the level of the blindness.

Page 72

I don't remember, but I do remember talking to people who were legally blind.
Q. Okay. If somebody couldn't read and write, would that be a reason not to take a written statement?
A. Yeah, absolutely.
Q. So if somebody couldn't read or write, would you hold off on taking a statement until you could get a court reporter or a videographer?
A. If someone could not read and write we do not do a handwritten statement.
Q. What if a videographer wasn't available at the time?
A. Then -- then that's that.
Q. You would just hold off --
A. Yeah.
Q. Why is it important to make sure that make somebody can read and write?
A. Oh, are we -- what are we talking about?
Q. When you want to take a formal statement. Like, why is that a question that you ask -- I mean well, sorry. Let me backtrack. Let me establish this first. When you take a formal written statement, do you ask the person, if they're a witness or a suspect, if they can read and write?
A. Yes.

Page 73

Q. Why do you do that?
A. Because they're going to read the statement with me. They're going to make a -- corrections or changes that they want because it's their statement.
Q. Okay. And when you say they're going to read it with you, was it your typical practice that a witness or a suspect would read some on their own and then you would also read it together?
A. No.
Q. So how would it typically go?
A. So if it was a witness, I would scratch out -- if the first page of a handwritten statement form has the Miranda warnings preprinted, I would scratch that out. I would then write the first paragraph of the statement. I would ask the person before I continue to -- to read that so I could be assured they can read or write. If it's a suspect, I would show them the pre-printed Miranda. I would ask them to read that and to initial or sign that they understood their rights, and in understanding their rights, they were still willing to participate in the handwritten statement. I then would proceed with the handwritten statement on a suspect and at some point would ask them to read a portion of my handwritten statement that I had written, out loud to me to determine three things. One that they

actually could read and write English, because sometimes people don't -- they say they can, but they really can't, or they can't well. Two, that they could read my handwriting, and three, that they were able to then follow along while I read the statement out loud to them and follow along and see that the words I were using, that I was reading out loud to them, were the same words that were written on the paper.

**Q. Okay. And did you do this exact process with every suspect's statement you have taken?**

A. As far as I know, I tried to, yes.

**Q. Okay. And just to clarify because I might have missed this. Do you also do this process with every witness statement that you have taken?**

A. The only difference between witness statements is that that Miranda part, I do not have them read that. I cross it out so they're not reading any pre- printed part of the statement. They're only reading my handwritten part.

**Q. Understood. And then so, with a suspect, they would read the typed on the top and then you would also later have them read your own handwriting to ensure they could read your handwriting?**

A. Correct.

**Q. Do you ever have a situation where someone**



**couldn't read your handwriting?**

A. Yes.

**Q. How -- what would you do in that case?**

A. So you do a court reported -- or you -- I mean, I never rewrote anything. I read it out loud to them. I just had someone that had trouble with cursive and they just struggled through it. But I've -- that's why with witnesses, I try to have them read it right away and then if we have to do a court reporter, we have to -- I've never had that happen that I recall, though. Everyone was pretty much able to get through it.

**Q. Okay. So just to clarify, in your time as an FRU you don't remember a time when someone could not read your piece of handwriting and then you had to call a court reporter?**

A. Correct. And usually I would try to determine their ability to read. Like an example, someone's not - - English is not a first language. We're going to figure that out sooner rather than later, because a lot of people say they understand, but they really don't, and it's not uncommon. So that might be something I might ask them to read something and I realize, yeah, they can't do a handwritten. They don't have a good enough grasp.

**Q. Okay. So I just want to go through the**



**statements briefly. For my own benefit, I'm going to ask you to read them all, so I apologize in advance. We can start with Dorothy Soukup's statement. So I'm going to mark this as Exhibit 1 to your deposition.**

(Exhibit 1 was marked for identification.)

MS. ALZAMLI: This is Exhibit Reed 45. Exhibit Reed 48. Do you need a copy of it?

MS. EKL: Yeah, actually you could just take that one, I think.

THE WITNESS: Okay.

MS. ALZAMLI: I only have four copies, so I actually made --

MS. EKL: Uh-huh. That's okay.

MS. ALZAMLI: Are you sure? Okay.

BY MS. ALZAMLI:

**Q. So before we read the entire statement together, I would like to just direct your attention to Page 3 of 3, which is CITY-REED 47 of Ms. Soukup's statement. And the final paragraph of the statement, which says, "Dorothy states she can read English and demonstrated by reading out loud. Dorothy states, she has read all three pages of this handwritten statement and had a chance to make any additions, corrections or changes that she wanted. Dorothy states ASA Galassini**



**read each line out loud and the statement is true and accurate." Did I read that correctly?**

A. Yes.

**Q. Okay. And this paragraph, is that essentially just summarizing the process that you just described to me?**

A. Yes.

**Q. Okay. And to clarify, when you write, "Dorothy states that she has read all three pages of the statement," and then following that, you write, "Dorothy states ASA Galassini read each line out loud," are those two different processes that are happening?**

A. Yeah. Well, yes, usually. I -- I don't remember with this one because I believe we're interviewing her and she's at work, right, so I don't remember if I just handed it to her and had her read it and then had her read out loud so I knew she could read, and then I read it to her or if -- because usually I sit next to the person and I think she was working like at a desk, so I don't know if I was able to come behind and read with her. I don't remember. I just remember the place looked like something out of Blues Brothers. It's all I remember.

**Q. So when you write, "Dorothy read the statement," when you also write, "Adduci read the**

Page 78

**statement out loud" --**
A. Correct.
**Q. -- do you have an independent recollection today on whether Dorothy actually read the statement or whether you read it out loud or are you speculating on what happened?**
A. No, no, no. The statement speaks for itself. She read the statement because I -- after I write it out, again, there's three things I need to know. I need to know that it's correct, right? So she needs to read it and make any corrections or changes she wants. I then read it out loud while she follows along, again, to make additions or corrections or changes, but also that she knows the words that I'm saying are the words on the paper to -- it's -- it's -- so there -- there is -- it -- it's a two-part process. I just don't remember, as I sit here right now, if I handed the piece of the handwritten to her and had her read silently and tell me if she needed changes, or I had her read it out loud. I don't remember that.
**Q. Okay. Understood. I'm going to try to summarize what you just told me to make sure I'm understanding.**
A. Okay. Yeah.
**Q. And so, in the case of Dorothy's statement,**

Page 79

**you have an independent memory that you handed the paper to Dorothy, she either read it silently or out loud, that you're not sure?**
A. I don't have an independent recollection of handing it to her.
**Q. Okay.**
A. All I know is that I remember it was -- we were there. She was working. That's what I remember and I don't know if I read this entire thing out loud to her or just handed it to her and said, here you go for the corrections or changes, and then I read it out loud or if she read it out loud to me. I guess the distinction -- let me just go -- I don't know if she actually went and did what you just did out loud.
**Q. Okay.**
A. After reading it, I might have just handed to her and she read it silently. So that's the question I have in my head.
**Q. Okay.**
A. Not that she read it, but did she read it out loud or silently?
**Q. I understand.**
A. Okay.
**Q. Okay. So let's zoom out from Dorothy's specific statement. I'm going to ask you about your**

Page 80

**general practice. Was it -- just to make sure I'm understanding and I'm completely clear. So your general practice, whether it was a witness or suspect, was that the actual document would be handed over to them for them to read either silently or out loud, and then after they make corrections, you would also on a second run, read it out loud to them?**
A. I don't know if I did that every time. It would -- it would be written in the handwritten statement what I did.
**Q. Okay. So going back to the paragraph on CITY-REED 47, where it describes what you did with Dorothy, this paragraph would change based on what happened with that particular witness?**
A. It might, correct.
**Q. Okay. And what do you mean by it might?**
A. Again, I think the perfect example here is, and I didn't note it, did she read it out loud to me or silently? I didn't note that, so you -- what -- what I would do is write down this -- statement is -- this summary -- it's a summary to memorialize what was going on when I was talking to Dorothy. So I tried to do it as contemporaneously as possible. However I did a statement, and it generally took the form you're talking about, but I can't say every time I did it every time

Page 81

the exact same way, that I handed the piece of paper, I told him to read it silently, then I came and I read it out loud, and then -- correct, you know, it's a little bit -- it's all in there but it's not necessarily always in the same order or in the same exact way?
**Q. Yes. So --**
A. The handwritten should, though, tell me what I did.
**Q. Okay. That's really helpful. So would there ever be a situation where you would write in this form that somebody read something on their own, because that was kind of the standard paragraph?**
A. But they hadn't?
**Q. But they hadn't?**
A. No, never.
**Q. Okay. So this paragraph is always reflecting what happened exactly at the time that you had taken the statement?**
A. Correct.
**Q. Okay. All right. So why don't we just, if you don't mind, read the whole statement for me into the record?**
A. Do you want me to start at the top with the whole, like, statement of or just where it starts where I --

Page 82

Q. You can read that fine, so why don't we just start with --
A. "After being" --
Q. -- "after being advised."
A. "After being advised and stating that she understood that ASA Galassini was an assistant states attorney, a lawyer, a prosecutor, and not her" -- "not" -- "not her, Carl" -- "her, Carl Reed's, or Kim Van Vo's attorney, Dorothy Soukup agreed to give the following statement in summary and not word for word. Dorothy states she is 57 years old and her birthdate is 28th June, '44. Dorothy states she lives at 4946 North Sheridan and had some high school. Dorothy states she can read and write English. Dorothy states she works for Lakefront SRO," and there's signatures at the bottom of the page. Don't know if you want me to read those?
Q. No, that's okay.
A. Okay.
Q. If you'll just read the text --
A. "Since 1988, Dorothy states she works the desk at 4946 North Sheridan. Dorothy states working the desk means checking in all visitors, logging everything that happens in the building, either that she sees or someone reports, and reporting any disturbances. Dorothy states that on 19th July 2000" -- or "'01 at around 2215 hours,

Page 83

she saw resident Carl Reed whom she has known since he moved in. Dorothy states she saw Carl leave the building carrying an object that was about four feet long and two feet wide and wrapped in a white or beige blanket. Dorothy states she wrote this in the SRO security log, which Dorothy identified as people's Exhibit Number 1. Dorothy states she was not threatened or promised anything in return for this statement. Dorothy states she was not under the influence of drugs or alcohol at the time of this statement. Dorothy was treated well by the police and ASA Galassini. Dorothy states she can read English and demonstrated by reading out loud. Dorothy states she has read all three pages of this handwritten statement and had a change to make" -- "had a chance," excuse me, "to make any additions, corrections or changes that she wanted. Dorothy states ASA Galassini read each line out loud and the statement is true and accurate."
Q. Thank you so much. So -- sorry, I should have asked you before I had you read it, but did you have an independent recollection of this interview before reading the statement?
A. No.
Q. Since reading the statement and reviewing things with your attorney, did that bring back any

Page 84

memories for you?
A. No.
Q. Okay. Do you have any memory on -- actually, before I ask you that, you would have written -- based on, you know, your testimony today, you would have written down everything that Dorothy told you, correct?
A. No, not necessarily.
Q. Okay. So why don't you tell me -- expand on that. Like what are things that you would not have written down?
A. I don't know. I -- I don't know what she -- I don't remember what she told me. She could have talked about something that was irrelevant. I wouldn't have written it down.
Q. Sure. Yeah. My question was a little too broad. If Dorothy told you something that was relevant to this investigation, is that something that would've made it into the statement?
A. It would have.
Q. Okay. Is there any reason that Dorothy might have told you something that was relevant to this investigation and that wasn't included in this statement?
A. That I can think of.
Q. Okay. So as we just read, Dorothy discusses

Page 85

in the statement, the security log that she makes notes of, and it's attached to the back of the statement?
A. Yes.
Q. Did you have the security log before you went to take her statement?
A. I don't remember.
Q. Okay. And, sorry, these might sound a little repetitive, but I'm just going to ask you a couple more questions about that. Do you remember when you went to talk to the police about this investigation, if the security log was one of the documents that you reviewed?
A. I don't remember.
Q. Okay. Do you have any memory as to whether Dorothy handed you the security log when you took her statement when you went to the SRO?
A. I don't remember.
Q. Okay. Do you have any reason to believe that this document was not in police custody before you went to take her statement?
A. I don't remember.
Q. Okay. Do you remember talking to the police about Dorothy?
A. No.
Q. Okay. Do you remember the drive over --
A. No.

Page 86

Q. -- to (Inaudible)? I know we talked about this a little bit earlier, but you said it was typical for you to take statements down at the police station?
A. We did that sometimes, yes.
Q. Yeah. And one of the reasons that you would do that is if somebody couldn't leave work?
A. One of the reasons, yes.
Q. And do you know that -- in this case was it that Dorothy couldn't leave work and that's why you went -- took the statement on site?
A. I don't remember.
Q. Okay. Did you on any occasion, other than when you took Dorothy's statement, visit 4946 North Sheridan Road?
A. Not that I recall.
Q. Okay. Other than going on site to interview Dorothy, was there any time during the course of this investigation that you went to any location for the purpose of learning more about this case?
A. Can -- can you be a little more specific? I --
Q. Yeah.
A. I'm sorry.
Q. Sure. My question was confusing. So during the course of this investigation, in your role as an FRU

Page 87

attorney, you went to the police station to take statements and you also went to the SRO to take this statement. Are there any other locations that you went to for any reason during the course of this investigation?
A. Since I don't remember this, my answer's no, but from looking at the notes, I don't think so.
Q. Okay.
MS. SULLIVAN: Can we take a --
MS. ALZAMLI: You want a break?
MS. SULLIVAN: -- five-minute break --
MS. ALZAMLI: Yeah.
MS. SULLIVAN: I just need to use the bathroom.
MS. ALZAMLI: For sure.
THE VIDEOGRAPHER: Off record. Time is 11:30.
(A recess was taken.)
THE VIDEOGRAPHER: We are back on the record for the deposition of Nancy Adduci. Today is April 17th, 2025, and it is 11:45.
BY MS. ALZAMLI:
Q. Okay. So before the break, we were just talking about the statement that Ms. Soukup had given in this case. And it is your testimony that you don't have any independent recollection of the statement is that

Page 88

correct?
A. Correct.
Q. Okay. On -- is that your signature on the bottom of each one of these pages?
A. Yes.
Q. Okay. Do you have any reason to believe that you did not take this written statement?
A. It was my handwriting.
Q. Okay. All right. So we can set this one aside on note and move on. And Mr. Lester statement. And I'm going to mark this as Exhibit 2 of your deposition, which is Bates stamp CITY-REED 39 through CITY-REED 42. You reviewed any documents in this case. Did you have any independent memory of your interview with Lester Garner?
(Exhibit 2 was marked for identification.)
A. No.
BY MS. ALZAMLI:
Q. Okay. After reviewing the documents with your -- and preparing for this deposition with your attorney, did that jog any of your memories?
A. No.
Q. Okay. Would you do me a favor of this reading through the narrative portion of this statement?

Page 89

A. Certainly.
Q. Thank you.
A. "After being advised in sitting that he understood that ASA Galassini was an assistant state's attorney, a lawyer, or prosecutor or not, his or Carl Reed's attorney, Lester Garner agreed to give the following statement in summary and not word for Word. Lester states he's 47 years old, and he was born 31 December, '53. Lester states he lives at 4946 North Sheridan. Lester states he received his GED and can read and write English. Lester states the day after Mr. Van Vo's body was found, a boy from the neighborhood that Lester knows as Ricky came by the SRO looking for Carl. Lester states, Ricky wanted to give Carl back keys to a car. Lester states that he didn't think Carl had a car, and asked Ricky the car's color. Lester states when Ricky told him the car was white, Lester thought the car might be Mr. Van Vo's. Lester states, he told Ricky that the car could be Mr. Van Vo's, and Ricky should be careful. Lester states Ricky left. Lester states the night he" -- "that night, he was at home on the third floor, talking to a" -- "a neighbor Ed when he saw Ricky in the hallway. Lester states, he asked Ricky who signed him in. Lester States Ricky said it was Carl. Lester states Ricky said Carl was

Page 90

downstairs, getting some paperwork so Ricky could buy the car. Lester states he told Ricky to be careful. Lester states then Carl came upstairs and Lester left because Lester likes to avoid Carl because Carl has a reputation of conning people out of money. Lester states later that night, Lester saw Carl leave Carl's apartment with an object about four feet long wrapped in a blanket" -- and wow the copying gets bad here. Okay. Hold on a second. "Wrapped in a blanket and a bag. Lester states Car" -- do you have a better copy?
MS. EKL: There is a better copy.
MS. ALZAMLI: There is?
MS. EKL: Yeah. Do you want me to give you the -- I can send it to you.
MS. ALZAMLI: I didn't know there was a better copy.
THE WITNESS: It just seems like I -- my pen ran out or I switched pens. That one paragraph is like -- I can't read it. I think it says, "Carl, go downstairs," but I -- I don't know.
BY MS. ALZAMLI:
**Q. "Lester saw Carl go downstairs."**
A. Does it say go -- yeah, I -- that's what I think it says. I don't know. It was my copy the same. Like, it's -- do you see that --

Page 91

**Q. Yeah.**
A. -- one paragraph is really --
**Q. Maybe --**
MS. EKL: Do we want to take a break? There's copies from --
THE WITNESS: I can read --
MS. EKL: -- the state committee's office that are better.
THE WITNESS: I mean, I can read the -- it -- is that one word? It says, "Lester saw Carl something downstairs." That's the one word I can't -- just so we're clear, I can't read. I think it says go. And I can think I can read the rest.
BY MS. ALZAMLI:
**Q. Okay. Why don't we just continue and then, like --**
A. Okay.
**Q. -- we can -- I can print you a copy of it during another break we --**
A. "Lester states about a half hour after Lester was in his apartment with the door open and saw Carl leave Carl's apartment" -- something scratched out. My initials.
MS. EKL: Do you -- I could put it on screen.
THE WITNESS: With -- yeah, "with a bag long over his shoulder."

Page 92

BY MS. ALZAMLI:
**Q. Yeah. Let looks see if it's closed.**
A. It's just that one paragraph.
MS. EKL: We should be able to screen-share. Let me see.
THE WITNESS: Can I put my glasses on top of my head? Is that okay? Okay. I don't want to -- I don't -- okay. This I can see. Oh, yeah. Yeah. Okay.
BY MS. ALZAMLI:
**Q. Okay. Well, let me -- where should --**
A. Let's start with --
**Q. "Wrapped in a blanket --"**
A. Yeah. "Lester saw Carl go" -- that is go -- "downstairs." And then if -- yeah, "Lester states about a half an hour later, Lester was in his apartment with the door open and saw Carl leave Carl's apartment" -- something scratched out with initials -- "with a bag slung over his shoulder. Lester saw Carl go downstairs." Again. "Lester states he was not threatened or promised anything in return for this statement." And I think I can read the rest from here. "Lester states he was not under the influence of drugs or alcohol at the time of this statement." Thank you,

Page 93

Beth. "Lester states he was given coffee to drink and allowed to use the bathroom. Lester states he was treated well by the police and ASA Galassini. Lester states he can read English and demonstrated by reading out loud. Lester states he has read all four pages of this handwritten statement and has a chance to make any additions, corrections, or changes that he wanted. Lester states that ASA Galassini read each line of this four-page statement out loud and is true and accurate."
MS. EKL: And just for the record, the page that I put up on the screen that you read the CCSAO403, and it's also date stamped DS38 45th.
MS. ALZAMLI: Thank you.
BY MS. ALZAMLI:
**Q. Okay. Thank you so much for reading that. And okay. It's your testimony that you don't have an infinite recollection of this interview, right?**
A. No.
**Q. Okay. Do you have any reason to doubt that you took the statement?**
A. No, it looks like my handwriting.
**Q. Okay. And just going to direct your attention to CITY-REED 42, the final page of the statement, where you have that paragraph that similarly states the Dorothy statement that Lester states you can read**

English and demonstrated by reading out loud. Lester states you read all four pages of this handwriting statement and had a chance to make any additions corrections or changes. Lester states that ASA Galassiniread each line of the four-page statement out loud and it's true and accurate.
A. Yes.
Q. Does reading that refresh your memory about whether you did your same procedure that you described earlier with Lester [sic]?
A. No, it doesn't really.
Q. Okay. Do you have any reason to doubt that you did
A. No.
Q. Do this --
A. No. And just so we're clear, so if you look at the -- it's -- it is this last Page 4 of 4, there's a paragraph in here that says it ends with my name, Lester -- ASA Galassini, and then it goes on, "Lester states." What would've happened typically, and I don't know. I don't remember, but just so we're clear because I'm trying to answer your questions. I would've stopped at this point when after use the bathroom, "Lester states was true to well by the police." And they say Galassini. That's when I would've stopped. And that's


when I would've had them demonstrate. Then I go back and write this last paragraph. So that finishing paragraph for lack of a better term is after they've demonstrated those abilities. So that paragraph comes after that. So there is a pause in between the treatment. Then we go back and we look at anything, any corrections or changes. Then I write that last paragraph.
Q. Okay. That's --
A. So it's not all written at the same time.
Q. Got it. Okay. That's helpful. I think I might ask a couple of clarifying questions just to make sure I understand how this all works. So in the beginning, before you start taking the written statement, do you ask if they can read and write?
A. Yes.
Q. Okay. So before you start with the process, you're going to determine just generally, can you read and write?
A. Yes.
Q. And then after you go through the process of taking this statement, you're going to ask them to demonstrate that by reading what are the paragraphs that you that you've written?
A. Yes.


Q. Is there like a typical paragraph that you choose? Is it usually the first one, or somewhere in the middle?
A. Usually, I -- I thought I would say what they wrote -- what they read. So I didn't here. So I don't know. I don't remember. I think I maybe would change it up. I just want to make sure they could read and that they understood.
Q. Okay. When you say usually, you would say what they read?
A. I -- I remember they read the following paragraph out loud. They read the above paragraph out loud. I thought I used to say that, but I guess I didn't here.
Q. Okay.
A. I read the first paragraph out loud. I -- vaguely remember doing that in other cases. I didn't do it here. And at least not with this one.
Q. Okay. And do you have any memory how long you talked to Lester before you took this formal statement?
A. No.
Q. Okay. And do you remember any of the conversations that you had with the police about Lester before you took this statement?
A. No.


Q. Do you remember any of the documents that you reviewed about Lester before you took the statement?
A. No.
Q. All right. You can put this one aside for me now. And now let's go to -- when I'm going to designate as Exhibit 3 to your deposition, which is a statement of Ricardo Burns, which is Bates stamp CITY- REED 49 through CITY-REED 56. And I have a feeling we're going to have a problem with some of the ink on this one.
(Exhibit 3 was marked for identification.)
A. Let me see if I --
BY MS. ALZAMLI:
Q. So just let me know.
A. Okay. Let's -- let me just give a quick look and see if -- yeah. Oh, yeah. And there's no way I'm going to be able to read the notes.
Q. Okay.
MS. SULLIVAN: Are you -- be able to read from the computer?
THE WITNESS: Yeah. So just so we're clear, that the reason I'm saying that with -- if you look at it's marked Reed 00054, it's page -- it says 21. That's not -- doesn't look like my handwriting. It says 6 of 8, which is my handwriting. There's like

Page 98

a little note off to the side. I can't read that. So I would just as soon read the whole exhibit from the computer, if that's okay.
BY MS. ALZAMLI:
**Q. Yeah, let's do that.**
A. Okay.
MS. ALZAMLI: Beth, do you have it up?
MS. EKL: Yeah, I do. And the only thing I'll say is there is one redaction in here that was made up by the State Attorney's office that so we might have to go back to it.
THE WITNESS: Okay.
MS. ALZAMLI: I'm sorry. Did I not give you that?
THE REPORTER: No, you didn't. I didn't know if you had an extra for me for that one.
MS. EKL: So just let me know --
THE WITNESS: Okay. Oh, it's the birthdate of mister -- okay. Yeah, I got it. Okay. So "After being advised in stating that he understood that ASA Galassini was an assistant state attorney, a lawyer, or prosecutor and not his or Carl Reed's, Attorney Ricardo agreed to give the following statement. In summary and not word for word, Ricardo states, he's 23 years old and was born 9th

Page 99

June '78, Ricardo states he lives at 8" -- oh, this is on the original exhibit. It looks like 850 West Argyle. It's redacted on the other exhibit, "with his mother and sister. Ricardo states he attends Truman College for his GED. Ricardo can read and write English." Okay. Next page. "Ricardo states that on 16th July 2001, at night, a guy from the neighborhood that Ricardo knows is Carl Reed approached him and asked him if he wanted to buy," scratch out, initials, "A car. Ricardo states, he asked, 'How much?' And Carl stated $250. Ricardo asked to see what kind of car would sell for $250. And Carl agreed to show the car. On the way to the car, car -- Ricardo asked the guy for a name and the guy said Chuck was his name. Ricardo identifies people's Exhibit Number 1 as the guy who said he was Chuck, and tried to sell him a car. Ricardo states the car for sale was a white Nissan Maxima. Ricardo checks out the car and asked Defendant if Defendant had any papers on the car. Defendants stated, 'It's straight, Shorty'" -- no. "'It's straight Shorty. I got the papers.'" Excuse me. "Defendant said he'd have" -- next page. "He'd have the papers in a few days. Ricardo states he told Defendant to come by when he

Page 100

had the papers. The next day, Ricardo saw Defendant and again, Defendant pitched the car sale. Ricardo stated he told Defendant he only had $30. Defendant agreed to take the $30, give Ricardo the keys, and get the remaining money when Defendant delivered the papers. Ricardo stated he gave Defendant $30 and Defendant gave him the keys. Ricardo states he felt funny about the deal. So when he saw some police, he knew in the alley, he asked them for help. Ricardo asked the police officers to run the car to see if it was stolen, and if" -- "and if it was Ricardo" -- that's okay. "And if it was, Ricardo" -- where was I? "If Ricardo wanted to hand over the keys? Ricardo states the police told him the car was not stolen and clear. However, the police told Ricardo to not drive the car because it had a candy -- handicap plates and Ricardo had no insurance. They told him to straighten out the paperwork before driving the car. Ricardo states he took the car to a car wash and cleaned it out and found a driver's permit and a credit card type car [sic] in the car. Ricardo states one of the cards had the name Larry Ling or Young, and the address of 4946 North Sheridan. Ricardo states he parked the car because he wasn't

Page 101

sure Defendant own the car. Ricardo states in 19th July 2000" -- or excuse me, "'01, he went to 4946 North Sheridan and asked if Larry Ling or Young lived there. Ricardo states the lady at the desk told him no one by that name lived there, but maybe" -- next page, "at the major Jenkins. Ricardo was leaving when he saw Lester who lives in the building and Ricardo knows from the neighborhood. Ricardo states, he was told by Lester they brought out a Chinese guy" -- "a dead Chinese guy," excuse me -- "that they brought a dead Chinese guy out of the building. Ricardo states he asked if Lester knew Defendant and Ricardo described Defendant Lester told Ricardo he knew Defendant, and Ricardo told Lester that Defendant was trying to sell Ricardo a car. Ricardo asked Lester if Defendant owned a car, and Lester said he didn't" -- "he didn't think so. Lester told Ricardo to be careful. Ricardo left. Later that night, Ricardo was on the corner with friends and Defendant came and told Ricardo he had the papers. Ricardo stated he went with Defendant to 4946 North Sheridan. Ricardo states they went to Apartment 305, and Defendant told Ricardo to sit down. Ricardo asked about the papers and Defendant said he'd be back.

He was going to apartment 216 or 217." And there's an arrow.

MS. EKL: (Inaudible).

THE WITNESS: I got it, I think 212. This says to his -- pays apartment, which had the papers.

BY MS. ALZAMLI:

**Q. Could it be payee, like, payees?**

A. There's no way that says it. Hold on a second. Payees.

MS. EKL: That's what it looks like, though.

BY MS. ALZAMLI:

**Q. Yeah.**

A. To his --

**Q. Payees.**

A. It's crazy.

**Q. I don't think that it says --**

A. I just -- I mean, it's not just a term they would -- that I think they would use. Partner's apartment? I don't know what that says it, but anyway, it -- I -- added it because he wanted -- that's where the papers were. So that got added, and that's off to the side. So we're clear. Okay.

**Q. So sorry. Just before you continue, do you -- are you disputing that word says, "Payee"?**



A. I think it does.

**Q. Okay. All right. You can keep reading.**

A. Yeah. Okay. Yeah. I -- I -- yeah. Okay. That is what it looks like. Okay. "Defendant said he'd be back. He was going to apartment 216 or 217 to his payees' apartment, which had the papers. Ricardo states Defendant leaves and Ricardo walks into the hallway after four or two five minutes. Ricardo saw Lester in the hall. Ricardo told Lester Defendant had the papers. Ricardo asked, 'Who lives in 2116 or 217?' Lester told Ricardo to be careful, that something wasn't right. Ricardo then decided to leave. When Defendant came up the stairs, Lester leaves and Defendant gives Ricardo a dirty look. Ricardo states he asked Defendant for the papers, and Defendant said the guy wasn't there who had the papers. Defendant asked for a few hours to get the papers and Ricardo states, 'No.' Ricardo states he gave Defendant back his keys, and told Defendant if he gets the papers, he knew where to find him. The next day, Ricardo states he got a call from his parole officer who told him detectives wanted to talk to him about a homicide. Ricardo went with detectives and told them everything about Defendant in the car. Ricardo states he was not threatened or promised anything in return for this statement. Ricardo states he was not under the



influence of drugs or alcohol at the time of this statement. Ricardo states he was given soda to drink and allowed to use the bathroom. Ricardo states he was treated well by the police and ASA Galassini. Ricardo states he can read English and demonstrated by reading out loud. Ricardo states he read all eight pages of his handwritten statement and had a chance to make any additions, corrections, or changes that he wanted. Ricardo states ASA Galassini reached each line" -- "read each line of this eight-page statement out loud and it's true and accurate."

**Q. Okay. Thank you for reading that. And I should have -- again asked this before, but did you have any independent recollection of this interview before of review -- before preparing for this deposition?**

A. No.

**Q. Okay. Now that you've read it, does that jog any memories for you?**

A. I kind of remember him, but not really. I -- I talked to him a long time. I -- that's -- I just remember that.

**Q. Okay.**

A. I talked to him because there was a lot of little things like different things.

**Q. Yeah.**



A. We would hear, you and -- there were different days involved. That's all I remember. I remember I talked to him a while.

**Q. Okay.**

A. Because there were many moving parts.

**Q. And at the -- so at the top of the statement, at the -- like that Miranda box is like cross out. So that means that he wasn't Mirandized, correct?**

A. Correct. Yeah.

**Q. Okay. And that's because he was a witness and not a suspect?**

A. Yes.

**Q. Okay. And do you remember how old he was at the time that you were talking to him?**

A. Well, it says here he is 23 years old. That's all I know.

**Q. Oh. Forgot the '76.**

A. Sorry.

**Q. He was 23. In your experience as, like, an FRU attorney, did you treat people who were in different age groups differently?**

A. It depends on the ages, I suppose, but yeah, sure. Older people you treated -- you try to treat with the deference. They deserve as being an elder. Younger people, you maybe explain things more because of their

lack of experience, especially if they're new to the system. So if someone's super young, obviously, you know, you want someone there with them, that's protecting their rights. I mean, so yeah, age does matter.
**Q. Okay. In your experience is 23 and years that you would feel is young enough where you would want to be explaining things more or what was your -- what is your experience separate from this specific interview with people who are in their early 20s?**
A. 23 is an adult.
**Q. Okay.**
A. So unless they're demonstrating something that shows me some other reason to treat them differently, they're an adult to me.
**Q. Okay. When you interviewing Ricardo -- so again, you don't have any independent memory of this?**
A. No.
**Q. But I'm just going to ask you to see if this will jogging memories for you. But do you have -- did you have any feelings or observations about his credibility as a witness?**
A. I don't remember.
**Q. Okay. Is there -- does it evoke any kind of emotion in your when you think about that interview?**



A. No.
**Q. Okay. Now reading the statement, now, do you have any concerns about this witness's credibility?**
MS. EKL: Objection. Form, foundation.
THE WITNESS: I -- I can't answer that question.
BY MS. ALZAMLI:
**Q. Yeah, let me -- yeah. Let me give you a more like specific example, what I'm talking about. Like, for example, earlier you mentioned that you felt like the story of the knife from Carl's Confession was in incredulous. Is there anything, when you read this confession of a about a similar feeling for you?**
A. Not really.
**Q. Okay. And before taking this statement, do you remember what documents you reviewed with the police?**
A. I do not.
**Q. Do you remember what the police told you?**
A. No.
**Q. Do you know, sitting here today, that Mr. Burns had given several statements to police that were documented in GPR before he had given the statement?**
A. I don't recall.



**Q. As you sit here today?**
A. Correct.
**Q. Okay. You don't recall you sit here. Did you review any of the GPR in this case before?**
A. I don't know. I may have I have no idea.
**Q. Okay.**
A. I mean, before today, no, I apologize. I have not reviewed any police reports before today. Did I back then? I don't recall.
**Q. Yeah. Sorry. Maybe I -- my purse wasn't clear. I'm -- so I was specifically asking about in preparation for your deposition.**
A. I have not seen any GPRs --
**Q. Okay.**
A. -- in preparation for this deposition.
**Q. Okay. Oh, I'm just going to quickly ask you again. Do you have any reason to believe that you did not take the statement?**
A. I don't understand your question.
**Q. Do you have any reason to believe that, like, this is --**
A. Oh, it is my handwriting. I'm sorry. Now I understand. Yes. This is my handwriting. I have no reason to believe it isn't. It looks exactly like my handwriting.



**Q. Okay.**
A. Yeah.
**Q. And again, if we just look at that paragraph that starts at the end of 55, which is Page 7 of 8, where you say that Ricardo safety can read English and demonstrated by reading out loud. Does this paragraph indicate that you went through that normal process that you described earlier where you would have the witness read a paragraph in the statement and demonstrate it to you that you can read?**
A. Yes.
**Q. Okay. And do you have any independent memory of doing that in this -- for this witness?**
A. I don't.
**Q. All right. Well, we can put this aside. Let's move on to Exhibit -- what will be Exhibit 4 of your deposition. Which is the statement of DeLong Reed, with stamp CITY-REED 63 through 69.**
(Exhibit 4 was marked for identification.)
MS. ALZAMLI: 1, 2, 3 --
THE WITNESS: This one looks good. This one's darker, you know?
BY MS. ALZAMLI:
**Q. Yeah. I think you can read it.**

Page 110

A. Okay. Yeah. This one's good.
Q. All right. So why don't you -- actually, let me -- I forgot to ask you about all of these, which I do want to ask you about. You had mentioned that a part of the process was that you would have them, like, initial by a paragraph that they read. Could you point to me --
A. I --
Q. -- in Exhibits 1 through 3, where that is.
A. I don't remember saying that because I don't remember doing that.
Q. Okay. And maybe I mischaracterizing those?
A. Initial?
Q. I thought you had said --
A. Initial, corrections or changes.
Q. Yes. You did mention that, but I thought I had remembered you saying that you would have demonstrate that they could read and then they would just like sign next to the paragraph that they read.
A. You're conflating the statement of Miranda with an offender versus a witness. I did say that regarding an offender.
Q. Okay. I'm going to go back for a minute. So basically, when there's an offender, you would have them sign next to the paragraph at the top of the statement that says, "I understand I have the right to remain

Page 111

silent"?
A. Yeah. And so if you see, I'm looking at -- it's Exhibit 4 for this deposition where it's all scratched out and there's Xs because they are not the suspect, they wouldn't do that. So that, when I was regarding the paragraph being read and signed, or initially this is the paragraph I was talking about.
Q. And the signature would be on this short Line --
A. Correct.
Q. -- that's the first line that appears in statement?
A. It would only apply to a suspect not to a witness.
Q. Understand. Okay. And really quickly, just going back to Exhibit 3, which was the statement of Recorded Burns. In the statement, Carl is referred to as the defendant.
A. Correct.
Q. Is that -- was that your typical practice as once -- or what do you start referring to a defendant as a defendant?
A. You know, I -- I think we used to always say Defendant or suspect, or sometimes we'd just use their name. It was interchangeable.

Page 112

Q. It was? Okay. So it was all interchangeable to you, whether it was name, suspect, Defendant, offender?
A. Correct.
Q. Okay. All right. So back to Exhibit 4. So we read 63 through CITY-REED 69. If you could just go ahead and read the narrative portion of that out loud for me.
A. Okay. "After being advised and stating that he understood that ASA Galassini was an assistant state attorney, a lawyer, a prosecutor, and not his or Carl Reed's attorneys, DeLong Reed agreed to give the following statement in summary and not word for word. DeLong he's 35 years old. And his birthdate is 19th November '65. DeLong states he lives at 4946 North Sheridan, Apartment 309. DeLong states he went to 11th grade and can read and write English." Should -- initials. The word "write" was inserted. "DeLong states he saw his neighbor and friend, Mr. Van Vo on 12th July '01. Mr. Van Vo and DeLong share a bathroom and DeLong states Mr. Van Vo always kept the bathroom door open. DeLong states on 13th July '01, he left to go to his grandma's and DeLong returned home on July 5th" -- or excuse me, "15th July '01, in the evening. DeLong noticed Mr. Van Vo's bathroom door and front door

Page 113

were closed, which was unusual. DeLong knocked on the bathroom door with no response. The next day, DeLong states he knocked on the front door of Mr. Van Vo's apartment with no answer. DeLong states that day, Cornell Carter wanted to sell his air conditioner to buy some crack. DeLong states Carter lives in Apartment 210. DeLong states he carried the air conditioner downstairs and saw Carl Reed outside. DeLong states Carl stays in Apartment 305. That night, DeLong states Cornell gave him some crack and Lester, Carl Reed, Lest" -- "crack and later Carl Reed smoked some with DeLong. DeLong states they were in Cornell's apartment when Carl gave DeLong the keys to Carl's apartment and told DeLong to go sit there while Carl got beer. DeLong states he went to Carl's apartment, but left a short time later to go to DeLong's apartment to turn off the lights. DeLong states he got a glass of water at his place, turned off the lights, and went into the hall. DeLong states he saw Carl in Mr. Van Vo's apartment with the door open a crack. DeLong states Carl saw him and shut Mr. Van Vo's door. DeLong states he waited and two seconds later, Carl came out" -- or excuse me, "20 seconds later, Carl came out of Mr. Van Vo's apartment with a big, tall speaker and asked DeLong, 'Why can't you do what you're told?' Meaning staying in

Carl's apartment. DeLong asked Carl why was he in Mr. Van Vo's apartment? Carl told DeLong to go back to Carl's apartment and wait. DeLong states Carl told him Mr. Van Vo was out of town. DeLong states he went back to Carl's apartment and later Carl came back with crack, which they smoked. DeLong states later that night, Carl went and got another speaker from Mr. Van Vo's apartment and brought it back to Apartment 305. DeLong states the next day he noticed a smell in his bathroom. DeLong states he tried to open Mr. Van Vo's bathroom door, but it was latched on the inside. DeLong noticed the bathroom doorknob lock seemed broken. DeLong states after he noticed the smell, he asked Carl if Carl saw Mr. Van Vo in the apartment when he was in there. DeLong states Carl told him Mr. Van Vo wasn't in there. DeLong states he didn't report Carl to the police because he didn't want to be a snitch, and DeLong wasn't sure what happened. DeLong states on 19th July '01, the smell was so bad that he went to social services and asked them to look into Mr. Van Vo's apartment. DeLong states he believed Mr. Van Vo was dead. DeLong states someone came up and found Mr. Van Vo's body. DeLong states someone told him it looked like Mr. Van Vo fell. DeLong states he didn't tell the police about Carl in Mr. Van Vo's apartment, because he thought Mr. Van Vo



died of natural causes, and Carl was just taking advantage of an opportunity. DeLong didn't want to tell on Carl because DeLong smoked crack with Carl because of Mr. Delong's speakers and DeLong felt guilty Because Mr. Van Vo was his friend. DeLong stated, states that when the detectives told him Mr. Van Vo was murdered, DeLong told them everything he saw. DeLong states he was not threatened or promised anything in return for the statement. DeLong states he is not under the influence of drugs or alcohol at this time of the statement, but did take his Haldol this month to be kept lucid. DeLong states he was given soda to drink and McDonald's to eat and allowed to smoke cigarettes and use the bathroom. DeLong states he was treated well by the police on ASA Galassini. DeLong states he can read English and demonstrated by reading out loud. DeLong states he has read all initials," all scratch out, "seven pages of his handwritten statement and had a chance to make any additions, corrections, or changes that he wanted. DeLong states ASA Galassini read each line of the seven-page statement out loud and he followed along and it is true and accurate."

**Q. Okay. Thank you for reading that. Before we --**

MS. EKL: Point out to Mr. Van Vo's speaker. I



wasn't clear if there was more than one speaker.

THE WITNESS: What did I -- where --

MS. ALZAMLI: What page?

MS. EKL: Page 6.

MS. ALZAMLI: Which paragraph?

THE WITNESS: "DeLong smoke crack with Carl because of Mr. Van Vo speakers, and DeLong felt guilty." I didn't read that right? Okay. Okay. Sorry.

BY MS. ALZAMLI:

**Q. All right.**

A. Thank you.

**Q. Do you have an independent memory of the interview with DeLong Reed?**

A. No.

**Q. Okay. Do you remember anything about DeLong Reed?**

A. No.

**Q. Okay. So on Page -- on Page 6 of 7, which is CITY-REED 68, in the bottom paragraph line 5 from the bottom, --**

A. Yeah.

**Q. You write, "He's not under the influence of drugs and alcohol at the time of the statement, but he did take his Haldol this month. What -- do you know**



**what Haldol is?**

A. I do.

**Q. What is Haldol?**

A. It's a medication. And I believe it's for psychological or psychosis disorders, but I'm not 100 percent sure.

**Q. Okay. And at the time that this statement was given, was that, like, a point of inquiry that it happened if you had psychological disorders?**

A. I asked him, "Are you taking anything?" I ask everybody, "You got anything? What are you taking? Or do you need to take medicine? Are you on your required medication? Yes or no?" "I'm fine. I'm good." He said, "No, I take" -- "I have this. I take this."

**Q. Okay.**

A. So I asked people if they are under the influence and he obviously volunteered that he does take a medicine.

**Q. Okay. Why do you ask people if they're on any medications?**

A. Well, I usually ask them if they're under the influence of alcohol or drugs. That's the standard question. I'm not asking for necessarily prescription drugs. I'm just saying drugs. I'm probably more eliciting -- illicit drugs in -- in that's the reason

because then they're not -- if they're they haven't been taking them, they might not be right. Or if they have been taking them, they might not be right. It -- it's -- it can be either or -- or both. So I must have asked and I don't recall.

**Q. Okay.**

A. I must have asked him this and he told me he's taking this.

**Q. Okay.**

A. He -- he interpreted when I asked him, are you on any drugs or alcohol? He is like, "Yeah, I am. I'm taking this."

**Q. Okay.**

A. And I don't know. I don't remember, but I can see what's in the handwritten and it's right after I asked him, "Are you on the" -- I -- wrote down, he's not on the influence of drugs or alcohol, meaning illicit drugs or alcohol, but he is taking medication.

**Q. Okay. So just to be super clear, you don't have an independent recollection of this?**

A. No.

**Q. But your understanding from the reading is because of the -- how this line follows, where you said, "Are you under" -- he's on the influence of drugs or alcohol? That probably what happened was you asked him,**


**"Are you under anything that can, you know, impact your ability?"**

A. I just probably asked him, "Are you on any drugs or alcohol?"

**Q. And his response was on Haldol?**

A. Yes.

**Q. Okay.**

A. That's my guess.

**Q. Okay. And the reason why you asked that question is because you want to know if someone's lucid essentially?**

A. Yeah. And if the I want to know, right. I asked them that when I first started talking to them, and then I want to document that I asked that because that's important.

**Q. Right. Okay. And it's important because you want to make sure the statement is accurate?**

A. Alcohol and drugs can affect your ability to narrate, perceive, remember. All those can have effects on your executive core function. So yeah, we want to know what someone's on.

**Q. Is the reason -- yeah. So do -- we don't understand it. If someone is -- tells you, "Yeah, I've had some alcohol," would you cease taking a formal statement?**


A. How long ago?

**Q. Okay. So you would ask the follow up questions?**

A. Absolutely.

**Q. Okay. So is there, like, a time from the time they consume alcohol that you would deem, okay, they're now ready to do this?**

A. There'd be lots of circumstances that went into that, but yes.

**Q. Can you give me examples of some of those circumstances?**

A. So -- it's legal to drink and drive in Illinois, right? You just can't be under the influence, right? So I'm not a breathalyzer, but we know that, you know, two drinks an hour, you know, equals X amount. I was in traffic. There used to be a way to figure this out, and I kind of still remember it. Long story short is, if someone was drinking the day before and they hadn't had a drink in eight hours, I'm not going to worry about it, probably. But if they had a drink an hour ago or two hours ago and they still appear to be under the influence, and you can tell because I've experienced that in my personal life, I've seen people under the influence of alcohol and I know what it looks like, I'm not going to take a statement. I'm not putting


them on the stand.

**Q. Okay. So you're going to ask all of questions until you feel that you were able to ascertain the level of --**

A. Sobriety.

**Q. -- soberness?**

A. Right.

**Q. Yeah. Sobriety. Okay. And is the same true for something like Haldol? Like, are you familiar with the effects of Haldol?**

A. I'm not familiar with that, which is probably why I documented it, because he seemed fine to me, but I'm not a doctor. So I put it in there, and if someone wants to say, "You know what? When you're on this stuff, you're" -- "you can't narrate, you can't perceive, you can't be whatever." I don't know, so I documented it.

**Q. Okay.**

A. I wasn't sure.

**Q. So again, your purpose was to simply write out all the information, and then later down the line, somebody could look at this and make whatever determination that it was within their field of expertise?**

A. Yeah. He told me that, so -- but he seemed --

put it this way. I don't remember how he seemed, but I wouldn't have taken -- this wouldn't exist if he didn't seem fine to me.
**Q. Okay. So --**
A. "This" meaning the -- I just held up -- just so we're clear, I just held up the handwritten statement.
**Q. Yeah. And so, just to put that in a sentence you can understand, you would not take a written statement if a witness appeared that they were not sober or lucid?**
A. Correct.
**Q. Okay. And again, I was going to ask you a similar question, which is on Page 7 of 9, CITY-REED 69, there is that paragraph that says you can read English and demonstrate this by reading. Do you have an independent memory of going through this process with DeLong?**
A. 7?
MS. SULLIVAN: It's 7 of 7.
THE WITNESS: It's 7 of 7. I know it looks like a 9, and I don't know why.
BY MS. ALZAMLI:
**Q. Oh.**
A. But I think it's 7, because I don't -- I'm



pretty sure it should be 7, because it's 1 of 7 on the front.
**Q. Yep. Yep. You're right.**
A. So I -- I don't know if that's, like, something hit it later in copying or I made a boo-hoo. I don't know. Say that again -- question again. I apologize.
**Q. Yeah. So here's that same paragraph that says, "DeLong states he can read English and demonstrate it by reading out loud. DeLong states he has read all seven pages of this written statement," et cetera, et cetera. Do you have an independent memory of going through that process with DeLong where you asked if he could read had him demonstrate it reading?**
A. I don't.
**Q. Okay. But do you have -- and is it your understanding that, if this paragraph is in the statement, that means that you went through this process?**
A. Yes. It speaks for itself, yes.
**Q. All right. I want to ask you a couple more questions about Exhibit 3, which was the statement of Ricardo Burns. So you knew that this was a murder investigation of an individual named Kim Van Vo, right?**
A. Yes.



**Q. Okay. Did you know, before going into these witness interviews, about the stolen car and how that kind of tied into everything?**
A. Can you please give me a foundation for when I would've -- can you -- it's not clear. There's -- it's -- it's -- I was there for nine or whatever hours. Three, four, five -- I don't know how long I was there.
**Q. That's a good point. And --**
A. So you got to give me some foundation.
**Q. Yeah. Let's backtrack. So do you know when you first arrived at the police station?**
A. 7:30 at night.
**Q. Okay. And do you have an independent recollection of that or is that based on documents that you've reviewed?**
A. It's based on documents I reviewed.
**Q. Okay. And do you remember, when you arrived at 7:30 at night, before speaking to anyone and before looking at anything, what did you know about the investigation?**
A. Nothing.
**Q. Okay. Do you remember, once you arrived at the station at 7:30 at night, what was the first thing that happened?**
A. So I don't remember.



**Q. That's totally fine. Do you have reason to believe that you would've spoken to the detectives on this case and also reviewed documents -- regarding this case?**
A. I have reason to believe --
MS. EKL: Object to form.
THE WITNESS: I'd be speculating, but yes, I -- I had to. I didn't know anything, that I can recall.
BY MS. ALZAMLI:
**Q. Okay.**
A. And I don't remember ever -- that's not -- the cases came in. You just you got assigned, you went out. I don't remember knowing anything about this case. I have no documentation that suggests this wasn't just -- it was a -- it was a case. It was a personal. I got assigned it. I got there at 7:30. That's all I can tell from the documents.
**Q. Okay. So it -- yeah, it's good to be clear. So you don't have -- again, you don't have any personal recollection of what you knew or you didn't know or what happened, but you're piecing it together from the documents and from your own experience in practice of doing that for you?**
A. Yes.

**Q. And you knew nothing about this, you showed up, you probably talked to the police, and then you did your process?**
A. Yes.
**Q. Okay. And again -- so in the beginning you mentioned you have, like, vague memories of this night. Have we gone through whatever memories you do have?**
A. Let me think. I remember going to the -- when I talked to Dorothy, I remember that -- what the place looked like. It looked like something out of a movie. I remember vaguely that Ricky talked to -- talked to Mr. Burns a long time. Like -- I remember that first conversation I remember, with Mr. Reed, Carl Reed, and that's all I remember from Mr. Carl Reed. I don't remember anything else. I don't remember the handwritten. I don't remember the conference room. I know that from the notes. But I remember the first time I met him.
**Q. You remember -- and that was the conversation that you described earlier?**
A. Yes. That's all I remember. Yes.
**Q. So other than these three things that you just laid out for me, you don't have any other independent memories of this investigation?**
A. No.



**Q. Okay. So presumably, you knew this was -- that was the investigation for the murder of Kim Van Vo?**
A. Yes.
**Q. Okay. When you took the statement of Ricardo Burns, you knew that it was -- Kim Van Vo was then presumed as murdered?**
A. Yes.
**Q. Okay. And is it fair to say that you would've known the police's theory of the case?**
MS. EKL: Objection. Form. Foundation.
THE WITNESS: I don't understand your question.
BY MS. ALZAMLI:
**Q. Sure. So I think there was actually, and you could help inform me about -- so how -- when you go in to take these statements and, you know, you're talking to the police beforehand and you're reading the file, was there any kind of discussion about the police's idea of what happened here, of who murdered who, how everything got kind of -- or is it, like, you're reading it and you're making your own impressions based on those documents?**
MS. SULLIVAN: Objection. Form.
THE WITNESS: There's no -- they're calling it in because they want charges. So it's not, like, a



real mystery as to why we're there. They're saying, "There was a murder. We think this person did it. We'd like charges." So it's not like there's any theory to discuss. It's kind of plain. They're calling us for charges. They think this person did it. So it's kind of an assumption that we're seeking charges on Mr. Carl Reed because we believe the evidence supports that he's guilty, possibly, of murder. Or he should be charged with murder.
BY MS. ALZAMLI:
**Q. And when they tell you, like, "Hey, we're calling in because we think this person needs to be charged, they committed murder," do they give you, like, the -- do they run you through the reasons or the evidence they found, or is that on you to go through and look at it?**
A. Right.
MS. SULLIVAN: Objection. Form. Again, are you talking generally, or are you talking about this specific case?
MS. ALZAMLI: I'm talking -- she doesn't -- she says she doesn't have any memory about this case, so I'm just asking generally.
MS. SULLIVAN: Same objection.



THE WITNESS: So it's kind of an inherent in calling it in what their theory of the case is as far as, like, they think this person did it. Then when it comes down to whether I'm approving or rejecting charges, I'm looking at the evidence independently. I'm looking at the evidence they've generated through their investigation, I'm analyzing it based on what the law and the facts are, what the law -- what I need to support a conviction or sustain my burden to charge.
BY MS. ALZAMLI:
**Q. Yes, totally. And that, I really understand. I think maybe where we're getting lost in translation is I'm trying to understand, when you're preparing to take a formal statement, do you take the formal statement, do you determine what questions to ask based on your independent review of the investigative file and the things that the police told you?**
A. They're my questions, correct.
**Q. Okay. So is there a process in which the police contribute to the questions? Is it, like, a collaborative process, or is it very much you are doing this on your own?**
A. It's me. There's no collaboration. The only thing, I might ask them a question if I don't understand

Page 130

something or I need something. Do you have a copy of that? The thing that Dorothy whatever was talking about, do you have a copy of that? I need a copy of that. Do you have a copy of a pic? That's it. That's -- they're out there to help me, assist me, perhaps give me copies or -- or if I have a question or I need something or I have a question, I might ask them, what do you have that can answer my question? Do you have a soft? Do you have a lab? Do you have something? That's it. I'm running this -- part of it, this approval or denial.
**Q. Okay. And so you are completely relying on the police for the facts?**
A. Except for what I'm getting from the witnesses.
**Q. Okay. Right. So you know, if the witnesses tell you something new that's -- that the police had known before, so that's something new that you might be getting?**
MS. SULLIVAN: Objection. Form.
MS. EKL: Join.
THE WITNESS: The -- the facts come from the witnesses.
BY MS. ALZAMLI:
**Q. Yes. I -- yeah. I'm not going to be tricky.**

Page 131

**I'm genuinely just trying to understand how this process works. And so maybe, if my questions don't make sense, if they're -- if you want to respond to them in a way where you're like, no, the way you that you're asking this is totally wrong, like, you're not getting the process, like, feel free to correct me. I guess what I'm trying to understand is like, when you show up to the police station, presumably, you're reviewing the investigative file, correct?**
A. Yes.
**Q. Okay. So do you consider those as, like, the facts of the investigation that you then take to produce your questions?**
A. Yes.
**Q. Okay. And then when you go into the interview room, if a witness gives you a new fact that you didn't know before, you might take that and incorporate it into later questions?**
A. Yes.
**Q. Okay. Got it. And nowhere in that process is there kind of a collaboration between you and the police about what questions to ask or what to say to the witness to get them to a formal statement?**
A. When I'm there and I'm interviewing the witness, it's my interview.

Page 132

**Q. So what does it mean that it's your interview?**
A. I'm asking the questions, and they're giving me the answers, the witness. The police are observers, or witnesses at best. If there's a question that a witness statement arises, I look for answers. The police might have something that can help me get that answer, or another witness. Such as an example in this case, "Oh, was the car" -- "it was" -- "it was clean? It was clear, right? It wasn't stolen. How do you know that? Who ran it? Who's the officer that ran it? Where's the paperwork on that? Why wasn't it reported stolen?" Oh, because they didn't know he was dead yet. I might have a question about, "Why was it not reported stolen?" Well, the timing, right? But I can figure that out for myself from looking at the police reports and talking to the witnesses.
**Q. Okay. So if a witness tells you something that, like, confuses you, like, for example, how, you know, Ricardo Burns mentions that the stolen car had the license plate with the name of Larry Ling, right?**
A. No. The --
**Q. Or Larry Ling or Young, that was in the statement.**
A. They found something with a name of Larry Ling or Larry Young in the car when he was cleaning it.

Page 133

**Q. Okay.**
A. The license plate was a handicapped plate, and I believe it -- I don't know who it was registered to, but it wasn't stolen. It was coming clear.
**Q. Yes. Sorry if I misspoke. I'm not saying that the license plate said Larry Ling or Young, but I believe the statement says that it was either a driver's license or a credit card -- I kind of -- it says, "Ricardo states" -- I'm reading off of Page 352, which is 4 of 8 of Exhibit 4. I'm sorry. Exhibit 3. Ricardo Burns's statement. "Ricardo states one of the cards" -- okay. Let's start from the top paragraph. "Ricardo states he took the car to a car wash and cleaned it and found a driver's permit and a credit check card in the car. Ricardo states one of the cards had the name Larry Ling or Young, and the address of 4946 North Sheridan. Ricardo states he parked the car because he wasn't sure the defendant owned the car." Okay. So he found either with the driver's permit or a credit card that had the name Larry Ling or Young?**
A. Yes.
**Q. Okay. That is not the name of the victim in this case?**
A. Correct.
**Q. Was -- is that something that you would maybe,**

Page 134

**like, go ask the police about like, "Hey, where's this card?" Like, just --**
A. I'm going to tell you right now, as sitting here right now, in that fact, I'd be like, "Is that an alias for Van Vo? Who's this guy, Larry Young? Anybody know who Larry Young is? Who's Larry Ling?" I would ask them that.
**Q. Okay.**
A. Did you figure it out? That -- no. Okay. Did you figure it out? Yeah, it's an alias. Yeah, it was his paramour. It -- and I'm speculating. I don't know. I don't know. I'm just throwing out possibilities. I don't know.
**Q. Right.**
A. So I just want to make that clear. I don't know. But it could have been a friend of his. So it could have been, you know, someone he used to live with, or it could have been who the original owner of the car and he never cleaned it.
**Q. It could have been a --**
A. Right. So I'm sure I would've asked, "Who's Larry Young? Who's Larry Young? What's the deal with this?" But I'm guessing I did ask that. I'm guessing, because I don't remember, and that nobody knew, so it became a non-starter and a -- a non-fact.

Page 135

**Q. Okay. So if there's something that kind of sparked your interest and then you ask the police about it and they don't know, that's kind of the end of it in terms of your participation in the process?**
A. As far as I can say, from what I'm seeing in front of me -- remember, these are summaries. I can't remember this. There's a lot that goes on in an investigation. That's just -- it's -- these are summaries. So there -- there's questions that are maybe never asked that should be, or that are asked and we can't get answers.
**Q. In your experience as an FRU attorney, was there ever a case where you know, when you -- saw something that spark your interest, you asked a police officer, "Hey, do you have anything on this" and they were able to go find some more information and be like, "Oh, yeah, here you go. I found out this was the alias"?**
A. That happens.
**Q. Okay. And is that something that you would make a note of in, like, a written statement, or maybe the FRU folder?**
A. I think that, if we knew who Larry Ling or Young was, I would've -- and I thought -- we were able to figure it out and I asked -- I'm assuming I asked.

Page 136

Maybe I didn't. Maybe I was tired and I just didn't ask because it didn't factor in. I would like to think I would have asked. I would've documented it.
**Q. Okay. So if you asked, you would've documented it?**
A. I think so, yes.
**Q. Okay.**
A. Because it's not that hard. It's a one-sentence documentation. "Larry Ling was found to be whatever."
**Q. Would you have documented it in this statement, or in the FRU folder?**
A. I probably would've documented it in the FRU folder.
**Q. Okay.**
A. Because it wouldn't have come from this witness, right? So this is the witness's statement. So if it's -- it's a fact that's not coming from the witness, I'm not putting it in the handwritten. I would try not to. I don't want to mix sources.
THE REPORTER: Off the record.
THE VIDEOGRAPHER: Hold, please. Sorry to interrupt you.
THE WITNESS: It's okay.
THE VIDEOGRAPHER: Okay. We're off the

Page 137

record. The time is 12:33.
(A recess was taken.)
THE VIDEOGRAPHER: We're back on record and the time is 12:33. Thank you. Sorry.
MS. ALZAMLI: That's all right.
THE WITNESS: I was saying that I try to only put what witnesses tell me in here. So if there's another fact like the police telling me who Larry Ling or Young was, that would be somewhere on the phone review folder, or in a narrative explanation or something.
BY MS. ALZAMLI:
**Q. Got it. Okay. Okay. The other thing I wanted to ask you about in this exhibit was -- oh, yeah, Page 6 of 8, CITY-REED 54. This is where there was that handwriting off to the side of the arrow that's faded and difficult to read. And then upon reading a more clear copy from the CCSAO, we had determined that it -- said something along the lines of, like, to his payee's apartment. And that language, like, puzzled you a little bit?**
A. It still does.
**Q. And what -- why does it puzzle you?**
A. Well, payee is, like, a legal term. And I tried -- and I don't -- I don't -- I try not to use my

Page 138

own legal terms. Well, I think sometimes they creep in because you can't help it -- in any of these documents. We're trying to use the language and the words that were used by the witness. So I don't know what that says. Partner? Payers? I don't know.

**Q. Yeah. And I guess, just to make it clear, you -- it's your goal to use the language of the witness. Like, what -- why is it your goal to, kind of, use the language that the witness -- gives you?**

A. This is their statement.

**Q. Okay. And is that for clarity, or the -- for -- what is the reason that you would do that?**

A. It's their statement. It's their words.

**Q. Let's move on. I'm now going to give you what I'm going to designate as Exhibit 5 to your deposition. And this is the statement of Carl Reed. It's Bates stamped CITY-REED 74 through CITY-REED 80. It -- I believe the ink on this one is pretty dark, so we should be okay.**

(Exhibit 5 was marked for identification.)

A. Yeah, this looks good. Yeah, this looks fine. This is much better.

BY MS. ALZAMLI:

**Q. Okay. And before we get started, we've gone**

Page 139

**through what independent memories you have. Do you have any other memories about your interview with Carl?**

A. So just so we're clear, on all these exhibits, there's these -- numbers at the bottom. They're in the 20s with two lines on either side. I -- I -- those aren't mine. Just -- I -- I don't remember. That doesn't look like my handwriting and I don't remember writing those, so I just want to make that clear. I've noticed them on every copy, pretty much.

**Q. The hyphen 23 hyphen?**

A. Yes. There's -- there's -- this one's 0-19-21-- This one's 23. I don't recognize -- that doesn't look familiar to me.

**Q. Okay.**

A. So just so we're clear. This is the -- it looks like my handwriting statement of Carl Reed.

**Q. Uh-huh. And if you could go ahead and just read the whole thing to me, I'd really appreciate it.**

A. "After being advised of his constitutional rights and stating that he understood each of those rights, and after being advised and stating that he understood that ASA Galassini was an Assistant State's Attorney, a lawyer, a prosecutor, and not his lawyer, Carl Reed agreed to give the following statement in summary and not word for word. Carl states he's

Page 140

41 years old and was born 27th June '60. Carl states he lives at 4946 North Sheridan in Apartment 305. Carl states he got his high school diploma and can read and write English. Carl states one day, in the middle of July, the exact date, Carl cannot recall, he and DeLong Reed, a friend, a neighbor, and not" -- scratched out -- "a relation went to Mr. Van Vo's apartment to deliver a fish tank that DeLong sold Mr. Van Vo. Carl states after they delivered the fish tank, DeLong and he got to talking about Mr. Van Vo. Carl states DeLong told him Mr. Van Vo liked young men for sex and would pay $400 for sex. Carl states without telling DeLong, Carl decided to go to Mr. Van Vo's apartment. Carl states he decided to go to Mr. Van Vo's apartment to rob him. Carl states he was going to pretend to want to have sex for money, and when Mr. Van Vo produced the money, Carl would snatch the money and run. Carl states he was bigger than Mr. Van Vo, so he didn't intend to use a weapon. Carl states, later that day, he knocked on Mr. Van Vo's apartment and Mr. Van Vo let" -- scratch out. Initials -- "Carl in. Carl states he told Mr. Van Vo that he knew Mr. Van Vo liked men. Mr. Van Vo told Carl he had money. Carl states Mr. Van Vo offered Carl $400 for Mr. Van Vo to have anal sex with Carl. Carl states he never intended to have sex with Mr. Van Vo.

Page 141

Carl states he tells Mr. Van Vo okay and asks to see the money. Carl states Mr. Van Vo said he had the money, but it would be" -- "but wouldn't produce it. Carl states he was angry that Mr. Van Vo was playing games and not producing the money. Carl states Mr. Van Vo was standing in front of the bed and Carl was near the door. Carl states the apartment was small and crowded. Carl states they went back and forth about the money, and now Carl was upset he was being played. Carl states then Mr. Van Vo grabs Carl's right shirt sleeve of Carl's T-shirt and insists that he will pay. Carl states he pushed Mr. Van Vo away and Mr. Van Vo fell. Carl states Mr. Van Vo was clutching Carl's shirt and Carl fell with Mr. Van Vo. Carl states he sees a knife without a" -- crossed out -- "handle on the floor near Mr. Van Vo. Carl states the knife looked like a kitchen knife. Carl states he picked up the knife and stabbed Mr. Van Vo three times. Carl states Mr. Van Vo then let go of Carl's shirt. Carl states Mr. Van Vo was moving around and Carl stabbed Mr. Van Vo again, but Carl's not sure how many times or where he stabbed Mr. Van Vo. Carl states there was no blood on Carl, so Carl dropped the knife and left the apartment. Carl states that day, he told DeLong. He stabbed Mr. Van Vo. Carl states he didn't call the police because he was afraid. Carl

Page 142

states, during the next four days, Carl worked with DeLong to sell Mr. Van Vo's car to some young guy. Carl states he never had the car keys. Carl states he was just helping DeLong fix up the sale so Carl could get a few dollars. Carl states he never took anything out of Mr. Van Vo's apartment and never went back into Mr. Van Vo's apartment. Carl states a few days later, he smelled something, but he thought it was just the garbage. Carl states, a few days later, he heard Mr. Van Vo was dead from someone in the building. Carl states he didn't go to the police because he was afraid because he had killed Mr. Van Vo and" -- crossed out and initialed. "Carl states he was not made any promises in return for his statement, nor was he threatened in any way. Carl states he was not under the influence of drugs or alcohol at the time of his statement. Carl states he had" -- "he wants McDonald's to eat as well as donuts and chips. Carl states he was given soda to drink. Carl states he was allowed to smoke and use the bathroom whenever he wanted. Carl states he was treated well by the police and ASA Galassini. Carl states he did not wish to take a videotaped statement and agreed to a handwritten statement. Carl states he did not wish to do a court reported statement. Carl states he can read English and demonstrated it by reading out loud.

Page 143

Carl states he has read all seven pages of this handwritten statement and had a chance to make any additions, corrections, or changes that he wanted. Carl states that ASA Galassini read each line of this statement out loud and Carl followed along and it is true and accurate."

**Q. Okay. Thank you for reading that. Do you remember how long you talked to Carl for?**

A. At which time?

**Q. Like, either in total or any of the three times, like, whatever you remember?**

A. According to my notes and the testimony I gave in the motion, I talked to him, and this is from the motion testimony I gave, he -- I talked to him once in the beginning for 15 minutes, another time for a half an hour later in the evening, and then I did the handwritten statement, which I estimated took 45 minutes to an hour in my testimony from the motion.

**Q. Right. And other than -- like, aside from your testimony from the motion today, you don't have an independent memory of how long you talked to him?**

A. No.

**Q. Okay. And when you are interviewing a suspect and -- like in Carl's case, where you went in the room and out of the room, was it allowed for a police officer**

Page 144

**to go in and speak with the witness? Like, I guess my question is: Like, once you start your positive interview, does that kind of walk off the individuals who they've spoken to by the police?**

MS. SULLIVAN: Objection. Form.

THE WITNESS: It doesn't --

MS. SULLIVAN: And foundation.

THE WITNESS: There's -- there's no real, like, policy on that, but they're usually then working to -- they're -- kind of done with their aspect of it. Like, I've kind of -- now I'm reviewing, so I don't see why they'd go in there except to make sure they're fed, water, and using the bathroom. I wouldn't think they would need to because the case should be ready, which means that's why it's called in for charges.

BY MS. ALZAMLI:

**Q. Got it. Okay. So by the time that you get there -- just strike that. It's not -- yeah. Okay. I know you don't have a memory, so of course, it's difficult to answer these questions, but if you could answer what your typical practice was when you were going to interview, specifically, a suspect in a case, did you ask about whether they had had -- other than when you asked them in the statement, "Have you been**

Page 145

**fed, water, used the bathroom, are you comfortable," did you ask the police about if they had fed, water, and taken them to the bathroom?**

A. Yes. And then I would observe it, because I'm in there, and Area 3 is not that big, so you could pretty much see everything that's going on in there. And then -- I can't remember. Sometimes some of the areas had, like, a chart on the door, so they would document it. But I don't -- I don't know if they did that here. I don't remember that really that well.

**Q. Okay. Are there any other questions that you would ask, like, if an individual had a medical condition, or a specific limitation, or disability, or anything like that?**

A. If I saw something that made me think they had a problem with something, emotional, physical, mental, spiritual, psychological, something objective that I saw, I would ask the question. Without anything objective, I would not, except, "Are you under the influence of drugs or alcohol at this time?"

**Q. Got it. So earlier in your deposition, you testified that you found the story about the murder weapon and Carl's confession to be, I think you used the word incredulous or implausible.**

A. Incredible was the word, I think.

**Q. Incredible. Thank you. Did you explore -- first, let me clarify. Is that what you felt at the time that you took his confession?**
A. I don't remember how I felt.
**Q. You don't remember how you felt. But you were saying, as you sit here today after reading it, that's how you feel?**
A. Yeah.
MS. SULLIVAN: Objection. Form.
BY MS. ALZAMLI:
**Q. Okay. Do you feel -- do you -- so if you had felt that way at the time, is that something that you would've explored, like, why was an individual giving a confession that you believed was incredible?**
MS. SULLIVAN: Object to form. Foundation.
THE WITNESS: No.
BY MS. ALZAMLI:
**Q. Why?**
A. I mean, I wouldn't have explored it. This is his statement. I -- I would ask some follow-up questions, like, again, the gasoline with the cup. "Is that really where the gas was? And was it a cup? Was the cup falling apart? Like, how put the cup there?" I might say, "You just found a knife, what do you mean? You know, you picked it up, didn't hurt your hand?" I



think I might've asked him that based on his answer, there was no blood. You know, I might have asked him, "Did you cut your hand? You're holding a blade, basically, and stabbing someone, going through human flesh with a" -- "with a sharp object that's in your hand also," so the same thing that's happening here could be happening here. I'm sure I explored that, but I don't remember.
**Q. Right. And so, what is the reason that you're exploring that?**
A. Well, I'm -- I'm trying to figure out, is -- this is all hypothetical and speculative, but is he telling me something to -- you know, he knows it wasn't the knife. I don't know. Maybe he knows that wasn't the knife that was used, right? So he is trying to get everyone off the scent of the knife that was used. I don't know.
**Q. So how would he know about the handle of this knife if it wasn't the knife that was used?**
A. Because he was --
MS. SULLIVAN: Objection. Form, foundation.
THE WITNESS: Because he did it and he was there. So he knows it's not the knife that's used. So he's putting in a -- what I call a Rollo Tomassi, a fake fact, a false flag. He's putting



in something that he knows it can't be true because maybe he took the knife and again, wildly speculating here, he took the knife and got rid of it and he doesn't want anyone to go look for it so he is going to say, "Oh, no, you don't need to look for the real murder weapon. It's right there next to his body. It's the one without the handle." And maybe the police thought he was telling the truth because lots of times, when you stab someone, the knife handle breaks off. But he said it was handleless from the get go. Who has a handleless knife sitting around their apartment? Well, maybe Mr. Van Vo did, because he -- he -- maybe he was messy. I don't know. It just seems kind of difficult for me for you to stab a human being with a knife with no handle because the blade's in your hand too. But that's what he told me, so that's what I wrote down.
BY MS. ALZAMLI:
**Q. Totally. And I understand. So you testified to this a few times is that your goal, when you're taking a statement is you're going to write down everything that's relevant to this person being charged, and it's not really your job to try to make them satisfy you with a story that makes sense. It's like --**



A. Exactly.
**Q. -- if they're telling you something, you're going to write it down.**
A. Yes.
**Q. Right? But I'm trying to understand a little bit more about what you just told me about exploring something that might seem incredible to you. And it doesn't mean you're going to write it down. It just means, you know, for your own understanding, you're going to explore this question, right?**
A. Yes.
**Q. One of the things that you mentioned was he might be trying to throw the scent off the knife. I think I'm just a little bit confused by that. And if you could maybe just explain it again in a -- different words, that would just help me understand what you're saying about the reason why he might have given this incredulous story.**
MS. SULLIVAN: Objection. Form.
THE WITNESS: So based on my experience, I've taken statements from people where everything they tell me was 100 percent a lie. When we went down and -- later on in the grand jury, every single thing they tell me was inaccurate or fudged. And -- and I -- I've experienced it before because

they're either protecting themselves or they're protecting someone else. And remember, Mr. Reed gave me -- this is an exculpatory statement. This is not an inculpatory statement. Mr. Reed's statement states he acted either justified or excused. He either acted in self-defense or reasonable belief or unreasonable belief, which is second degree, or his actions were completely excused because he was thwarting in the forcible felony of aggravated criminal sexual assault. His actions that I write down here are completely -- could be viewed by someone as justified because you have every right to use deadly force to thwart a forcible felony. And Mr. Reed -- describes Mr. Van Vo as committing a forcible felony against him.

BY MS. ALZAMLI:

**Q. Could you explain that? Sorry. I don't -- I just want to try and follow what you're saying. So based on this -- written statement, you think it -- it's like the implication is that Van Vo was going to sexually assault Carl, and so he was acting in self-defense?**

A. That's what he said to me, that -- he says Mr. Van Vo grabs him by the shirt. I'm going to read it. It's Page 4 of 7. "Carl states Mr. Van Vo grabs



Carl's right shirt sleeve, T-shirt, and insists he will pay. He pushes him away and they fall down together." He's attempting he's describing here that Mr. Van Vo is not taking no for an answer. He's grabbing him and saying, "I'll give you the money after we have anal inter" -- "intercourse." He pushes him away. He was clutching his shirt. Now he's falling with him, right? So now they're both on the ground, Mr. Van Vo is right next to his body, he sees a knife and he takes it and he -- as he describes, he stabs him. That describes as either a self-defense act or a reasonable belief of -- and reasonable belief, which is either excused or justified under the law.

**Q. Was --**

A. It also could be homicide, right?

**Q. Okay. So it could be --**

A. It could be all three. It could be first degree, second degree, or not guilty.

**Q. Was that your impression at the time, that this was a, like, a self-defense act?**

A. Yeah.

**Q. Okay.**

A. That's not for me to decide which of the three it was.

**Q. Okay. Why don't you -- I actually -- it's a**



**little embarrassing for me. I don't know a lot about criminal law. I've only been an attorney for six months, so I'm going to ask you some questions that are easy.**

A. Sure.

**Q. So in your capacity as, like, the prosecutor that's bringing charges, can you help me understand, like, what that means in terms of -- what is this, like, charge that you're bringing? Are you deciding to bring, like, a homicide charge? Are you deciding to bring -- like, what -- do you recommend a certain thing, or?**

A. Okay. So that's a really -- that's a complicated question.

**Q. Okay.**

A. Okay. First of all, murder can be charged different ways in -- Illinois. We only -- on felony review, we charge first, okay? If we're going to go down to second or manslaughter or reckless, or it might be reckless, it's a different -- so we charge first, okay?

**Q. Okay.**

A. Like I said, it's a long process. It can be going through different things. But basically, what you have here is you have an act that was performed.

We know that Mr. Van Vo was stabbed. That's



the definition of a homicide is the death at the hands of another. Whose hands? Carl said it was his hands. So that means that Carl told me it was his hands that caused the acts. Now the question is: Are those acts illegal, justified, or excused? And that's the question for this case. So we charge first degree and then a jury or trier of fact or someone else will decide, is it second degree? Is it first degree? Or is he not guilty because he was thwarting a forcible felony and you're allowed to use deadly force in defense of self to thwart a forcible felony. All three of those scenarios exist in this statement.

**Q. Okay. I understand. So in terms of your charging, it would always go to, like, homicide, and then later in the process, that's when, like, these distinctions appear?**

A. So if I can explain a little bit about second degree, that is not a charge. That is a defense. It's an affirmative defense. We don't charge affirmative defenses. So second degree isn't something I can charge. I might think Carl might be -- I might, and I'm not saying I did or I do. I'm giving you -- I might think, someone might think, a prosecutor, not me, might think this is a secondary case. You have to charge first. And then the affirmative defense of second comes

in, which reduces or mitigates first to second. That's how it works in Illinois.

**Q. Okay. Thank you. That's super helpful. Okay. So just some other things that I want to ask you about. Like, I don't know if you're aware of the, like, the allegations in this case. I know you mentioned that you hadn't read the complaint, but you had skimmed it.**

A. I -- I read the interrogatory so I'm aware of what Mr. Reed was alleging against me.

**Q. Okay. So I want to start first with, did you know that Carl was diabetic?**

A. No.

**Q. Okay. Did you know that he had been held for over 50 hours by the time that he was giving his statement?**

A. No.

**Q. Okay. Did you know that he had not been given insulin since he had been taken in that -- and that he was a type one diabetic, which I'll represent to you they have to take insulin regularly in order to regulate their blood sugar?**

A. I understand what type one diabetes is, yes.

**Q. Okay.**

A. And I did not know that.

**Q. Okay. And I know you -- so you don't have a**


**memory of the actual interrogation. So I guess I won't ask you about what you observed. But you know, if someone is diabetic, has not received insulin for several days, is that something that you would consider when deciding whether to do a formal statement?**

A. If I knew it.

**Q. Okay.**

A. Yes.

**Q. So if you knew that Carl was diabetic, he hadn't received insulin, and had been held for 55 hours without his medication, and you knew that information, would you have not taken the statement?**

A. Correct.

**Q. Okay. So my next question is, you know, in his confession, there's that paragraph on Page 7 of 7, CITY-REED 80. And it states, you know, similar to the other confession, "Carl states he can read English and demonstrated by reading out loud. Carl states he's read all seven pages of his memories. He then had a chance to make any additions, corrections, or changes that he wanted. Carl said the ASA Nancy Aducci read each line of the statement out loud, and Carl followed along, and that it's true and accurate." Do you have an independent memory of going through the process that we talked about several times and how you determined that**


**someone was able to read?**

A. With Mr. Reed?

**Q. With Mr. Reed.**

A. I don't have an independent recollection.

**Q. Okay. But based on this paragraph, it's your understanding that you did go through that process?**

A. Yes.

**Q. Okay. And so you have no reason to believe that you did not ask him to read, demonstrate that he could read, and that you believed that he could read?**

A. Yeah. And there's two reasons I'm saying yes to that. The first is this speaks for itself, and I wouldn't have written this but for him doing that. That would not exist in this Handwritten without him telling me that -- and me seeing this. So I'm writing what I'm observing at the time. It's a contemporaneous writing down of what he did, which is I -- he says he can and he demonstrated it, and I observed that, so I noted that. The second thing is, when I testified in the Motion to Suppress, when my memory was fresher, I apparently recalled then, but I don't now, that he demonstrated his ability to read and he was able to read and write. I don't -- I didn't see him write, so let me just -- at least read. I -- I shouldn't say write. I don't know why I said that. I -- I don't remember seeing him write


anything except his -- his signature. So I don't know if that's fair to say I could -- he could write, but I have his signature to say that. But it was the reading part that he demonstrated.

**Q. Since -- demonstrated that he could -- so some of your statements say, like, "They can read and write", but it doesn't say here that he could write. Is -- do you know why that's omitted?**

A. What's that?

**Q. So some of -- sorry.**

A. I don't -- I -- I don't -- I -- tell me where you're -- where you're talking about, because I don't --

MS. SULLIVAN: Yeah, it says he can write.

MS. ALZAMLI: In Carl's --

THE WITNESS: Oh, yeah, it does.

MS. SULLIVAN: Yes.

THE WITNESS: Okay. Yeah.

MS. SULLIVAN: It's the top of the second page, 2 of 7.

MS. ALZAMLI: Oh, sorry. I was reading up here on 7 of 7. I kind of forgot to go back to the beginning. I forgot it's asked.

THE WITNESS: And let me just clarify. I didn't see him demonstrate his ability to write. I didn't see him write anything except his name.

Page 158

BY MS. ALZAMLI:
**Q. Okay.**
A. So that's why I'm taking that back. I did see him, apparently, according to the documents and my testimony in the motion, I did seem him demonstrate the ability to read.
**Q. Okay. Do you have any reason to doubt today that any of this happened and that Carl couldn't actually read?**
A. I don't -- can you rephrase that?
**Q. Yeah. Do you -- is there anything that's, like, coming back to you, any memories that you have, anything that could have happened in this situation in which, like, there was some, like, horrible misunderstanding and that Carl could not read?**
MS. ITCHHAPORIA: Objection. Form. Foundation.
THE WITNESS: No, because if he couldn't demonstrate his ability to read -- and no -- no, he did. So it's -- that's why it's documented. He could read. He understood. He told me he understood. And I felt, from what I was observing objectively, that he did.
BY MS. ALZAMLI:
**Q. Okay. In the situation where Mr. Reed was not**

Page 159

**able to read, would you have taken either a court-reported or video-recorded statement?**
A. Oh, yeah. That would've been preferred, yes.
**Q. Okay. Would it have been preferred or would that have been, like, the only course of action?**
A. That probably would've been the only course of action, yeah.
**Q. Okay. I want to ask you one more thing, and then maybe we can take a lunch break, if people are okay with that, because we're getting close to 1:00. So one thing I wanted to ask you about was on Page 7 of 7, CITY-REED 80, where it says, "Carl states he did not wish to take a videotaped statement and agreed to a handwritten statement, and Carl states he did not wish to do a court-reported statement." Do you have an independent recollection of asking Carl, did you -- do you want to take a videotaped statement or do you want to take a court-reported statement?**
A. I don't remember.
**Q. Okay. Was it your typical practice to ask every single suspect that you were interviewing, do you want to take a video-recorded or court-reported statement?**
A. If we're to going to memorialize a statement, yes.

Page 160

**Q. Okay. So there's -- do you remember any interview of a suspect across your career as an FRU attorney where you did not offer video or court-reported?**
A. If they weren't agreeing to take a statement.
**Q. Of course. In this case, where they were agreeing to take a statement?**
A. Oh, I don't remember. I can't -- I just don't know.
**Q. Sure. Okay. So I did want to ask you about the sentence, "Carl states he did not wish to do a court-reported statement," and then there's the initials around it, and it looks like it was kind of added in later because it's in smaller font and it flows off. Is that what you think happened here?**
A. It was, according to my testimony in the Motion.
**Q. Okay. And like you testified earlier, everything that you testified in the Motion to Suppress hearing was true?**
A. Yes.
**Q. Okay. You have no reason to believe that anything that you testified at that time wasn't accurate?**
A. Correct.

Page 161

MS. ALZAMLI: Okay. I would not mind taking a short lunch break, if people are okay with that?
MS. SULLIVAN: How long are we talking about?
THE VIDEOGRAPHER: Do you want to go off the record --
MS. ALZAMLI: Oh yeah. Let's go off the record.
THE VIDEOGRAPHER: Okay. We're off record. The time is 12:58.
(A recess was taken.)
THE VIDEOGRAPHER: We are back on the record for the deposition of Nancy Adduci. Today is April 17th, 2025, and the time is 1:26.
MS. ALZAMLI: Thank you.
BY MS. ALZAMLI:
**Q. Okay. I am going to show you now -- what we've discussed earlier was the following unit review folder, which is based on Defendant Adduci 1 through Defendant Adduci 6. This one's for you. This is going to be Exhibit 6 of your deposition. Copy for you. So you described to me earlier that this is essentially the note sheet where you would keep any information regarding your work on this portion of this case?**
(Exhibit 6 was marked for identification.)

A. Correct.
BY MS. ALZAMLI:
**Q. Okay. And at the top where it says, start time and finish time, that indicates the time that you arrived at the police station and then finished?**
A. Yes.
**Q. Okay. And do you remember if you filled this out at the police station or at a later time?**
A. I have no idea.
**Q. Okay. And then this -- the date point of July of '01, this indicates the date that you were there and that this all -- that all of this happened?**
A. It's the day it started, so that would be the 19:30 hours. So that would be 7:30 in the evening at -- on July 22nd.
**Q. Okay. So I'm going to ask you about Defendant Adduci page 2, based on two down here, Victim Witness Number 1. This is the box about recorded Burns and on that handicap, it lists an IR number. Can you explain like what that means?**
A. It -- it -- the handicap should have been crossed out.
**Q. Okay. So this is just an IR number?**
A. Yeah. No, it was just me making notes. If you look -- if you see, it's date of birth, and then it



says DL, that's a Social Security number next to it, and then DL is below it. So I just, I'm writing and I'm just writing. So that's why it says IR number there. The handicap should be -- that's that doesn't mean anything.
**Q. Got it. And then at the bottom of that same box, it says see, what I think is HW by ASA?**
A. "See handwritten."
**Q. Okay. What does that refer to?**
A. The handwritten that I took from Mr. Ricardo Burns.
**Q. Okay.**
A. So instead of writing down what he said, I'm just going to say -- I'm not going to summarize it, I'm going to say, "See handwritten."
**Q. Okay. Got it. And then I want to ask you about on Page Defendant Adduci 4, victim witness number witness 2. This is the box about DeLong Reed. And then for handicap, it says, "See below," and there's two arrows. One is point towards VIN number. And then it says, "Doctor," is it -- well, what is this?**
A. So again, this is where I take notes. And so this -- box has is -- is a form with pre-printed vectors in it. And all those vectors are not necessarily what I'm filling out. Again, that probably should have been



scratched out. But I -- like VIN number, obviously, there's no car involved, so I'm just using that space to write down notes.
**Q. Okay. And so, just so that I understand the notes, it seems like this is -- this is a doctor, right? Is that what you're kind of doing? It says doctor or something?**
A. Yes.
**Q. Okay. And then it is a message of hospital, Haldol plus something.**
A. Respirol.
**Q. Respirol. And then it says at the bottom Witness 2 is schizophrenic.**
A. Yeah. I -- I wrote schizophrenia, but yeah.
**Q. Schizo.**
A. Or no, you may wrote schizophrenic. Okay. Yes. That's what it says. Something like that. I think I spelled it wrong.
**Q. Okay. And so, because this is in this other form and not the statement, does that mean that you, like, collected this information later? Like, did you conduct this doctor? How did you come to learn that he was schizo product?**
MS. EKL: Objection. Form.
THE WITNESS: I have no idea you. I mean,



obviously I -- I learned it from somebody, but this form doesn't tell me who I learned it from. This form, like again, it's just notes.
BY MS. ALZAMLI:
**Q. Okay. Why did you note down what he was schizophrenic?**
A. Because he told me most likely, or I knew of that fact. And when any time anyone is suffering from any type of disability whatsoever, I like to note it. Whether that be mental, physical, emotional, spiritual, whatever it is, if they tell me about it, I like to note it. Obviously, most important is he was taking medication for it. So fitness is an issue in the law, whether someone's fit can -- can factor into whether they were taking their medicine or not taking their medicine for a mental disorder. So it goes to that person's fitness, which is for someone to describe -- to figure out later if they were fit to even make this statement. If my statement can even be considered admissible, someone might want to challenge the admissibility of Mr. DeLong Reed's statement based on the fact that he has schizophrenia, therefore, that information is in there. So everybody knows everything that I know.
**Q. Got it. And is that why you provided, like,**

**the name of the doctor in the hospital?**
A. Correct.
**Q. Okay. So the other thing I want to flag here is on Page Adduci 6, Witness 5, and you identify Sean Ronan. But then you say, "Not interviewed by ASA Galassini, ran plate for Witness 1 of" --**
A. Victim 1's car.
**Q. Oh --**
A. That says, "V. 1 car."
**Q. Got it. Thank you. And so when does it work out that a witness -- so what witnesses are included in this sheet usually?**
A. Any witness that is probative to the elements of the offense.
**Q. Okay. So it's not necessarily just the witnesses that you've interviewed?**
A. Correct.
**Q. Okay. So how would you come to learn of these other witnesses? Do you think that, like -- do you go -- do you fill this out based on, like, the supplementary report that the police prepare? Would you fill it out based on conversations with the police or, like, how do you fill it out?**
A. I -- I don't -- I mean, I don't know. I -- so if you're asking me in this case, I don't remember. If



you're asking me in general, I have to get the information from somewhere, and we can get it from all the places you just said.
**Q. Okay. So you are able to take which information from GPRs reports and use that?**
A. Sure.
**Q. Okay.**
A. Yeah.
**Q. So it's not like you have to hear that information directly from a witness?**
A. No, no. I -- and -- and I think a great example is when you said I put the IR instead of handicap. I'm -- I'm I don't -- I'm getting that from some police report. I'm not pulling that off anything. Someone's giving me their rap sheet or it's in a supplemental or it's in a police report. So I'm documenting it. I'm getting that from somebody. I'm not getting that myself. Someone's giving me that information.
**Q. Okay. And if you know about this, I noticed that for all of the witnesses, there's that line that says handicap, right, where it asks you to fill in to have a handicap, which I assume in a way prompts you to ask to have a handicap. But I don't see that under, like, the defendant box. Is it somewhere that I'm**



**missing because you keep that information not?**
MS. EKL: Objection. Form.
THE WITNESS: I never noticed that. When you talk about -- so with the defendant or the accused, you have more boxes, so you're going to have the statement and you're going to have the arrest, you're going to have that information. But no, I never noticed that before. It doesn't have handicapped on any of the boxes that relate to the defendant, which would be the first box, the statement box, the arrest box.
BY MS. ALZAMLI:
**Q. Do you know why it's important to, like, ask about if the witness have any handicaps?**
MS. EKL: Objection. Form.
MS. SULLIVAN: Asked and answered.
THE WITNESS: I don't ask usually, unless it's obvious to me that I can see somebody's wheelchair bound or they have hearing or visual impairment or they have some difficulty speaking or something. Otherwise, it's a medical issue, and it's personal and private. So I tend not to inquire.
BY MS. ALZAMLI:
**Q. Okay. So up here in the charges, it says, first murder, murder armed robbery was into burglary,**



**and this is approved. And so, this is your handwriting, right?**
A. Yeah. It says it's first-degree murder.
**Q. Oh, thank you. First degree murder. And so that's approved. Does it indicate in this document, like -- well, does this document indicate like what you relied on to approve the charges?**
A. No.
**Q. Okay. Is there -- is that information documented somewhere?**
A. No.
**Q. Do you know what you relied on to put these charges?**
A. I have no independent recollection as I sit here now, no. But I can tell you from the documents I looked at, that it's -- everything that I reviewed before I testified.
**Q. So --**
A. And I'm sure there's more, but I'm sure there was more. But I don't remember.
**Q. Right. So you don't remember?**
A. Yeah.
**Q. Do you have any reason to believe that you did not rely on Carl's statement in approving these charges?**
A. So I don't remember how I parsed out the

Page 170

approval. And I -- by the way, I was approved by my supervisor. I mean, I approved it, but -- but everything's a part of the puzzle, so I can't say -- I can't say. I -- I don't -- I don't remember.

**Q. Sure. I'll ask you a slightly different question. And again, I don't know if this is something that you'd able to answer. I'm just trying -- again, I'm trying to learn what that this works. Is there, like, a process that you go through where you kind of go through all the evidence and you're like, this fits into -- this is a piece of the puzzle. This is not. This is a piece of the puzzle. This is not. Like, do you go through any -- do you corroborate the statements in any way that you've taken? Do you compare it to the physical evidence? Is that, like, something that you do?**

MS. EKL: Objection.

THE WITNESS: That's a lot.

MS. EKL: Objection. Form.

THE WITNESS: That's a lot of question. That's a compound question. So I can't answer it as you stated. If you want to break it up, I'd be -- do my best.

BY MS. ALZAMLI:

**Q. Yeah. I'll break it up for you. So as an FRU**

Page 171

**attorney, one of your responsibilities is approving charges, right?**

A. Correct.

**Q. Okay. In approving charges, is it your typical practice to a robbery the statements that you've taken?**

A. No.

**Q. Okay. Why not?**

A. So what I'm looking for, and I hopefully I can answer this by explaining. I'm looking at what the elements of the offense are. What I know what the actual elements are under the statute as well as what the jury instructions require for proofs, right? And it's kind of of like looking at the case at a motion for a directed finding, taking the evidence that light most favorable to the state has the state proved, even though if you don't take it as true or not. Are the elements there? That's kind of of why it doesn't really matter if later on, someone was lying to me and they didn't tell me anything that was the truth because we're going to figure perhaps that out later. We might dismiss charges later, or we might add new charges later. We might do more testing and testing might reveal all kinds of things. So at this point is taking everything I know, right, just as it is at face value, are the elements of

Page 172

that there, where I can say regardless of whether true or not, taking the evidence in the light most favorable to the state, are the elements all there? So corroboration is not really at this juncture, the issue credibility, it is, and it isn't, right? It's not like I'm going to base charges on something that's totally incredible and totally not corroborated and could never have happened, okay. It's not like that, but I have people telling me all these different things, Mr. Reed telling me all these different things and taking light most favorable, the elements of murder are person was killed at the hands of another and the person who performed the acts did so without lawful justification that fits.

**Q. Okay. So how do you draw the line between something, like, that's so incredulous that couldn't have happened, and then something that -- where it's like my duty here is to take these facts to the state and bring charges?**

A. Well, that's my experience. And so I hate to say it. It's like pornography. You know it when you see it, you can't necessarily define it. It's kind of like that. It's not -- not a science. And it's obviously based on me talking to my supervisor too, because they might disagree. They -- reasonable minds

Page 173

might differ on this. So I'm not saying what I say is right. I'm not saying what my bosses say is right. But it's -- it's based on just all your experience and all your knowledge and all your practice in trying to do the right thing and trying to -- to figure it out. And you're not always right. But at this point, that's not the issue.

**Q. Okay. And again, so because corroboration is not the issue at this point, is there any reason where you would go in compare the written statements, the physical evidence?**

A. So corroboration is always an issue. It's just not a -- it's not a -- you asked me, it's not something -- I'm trying to explain this. You know what? I -- I can't answer that. So can you rephrase it? Yeah.

**Q. So question is: When you're doing this process, do you look at the physical evidence?**

A. Yes.

**Q. Okay. Why do you look at the physical evidence?**

A. Because the physical evidence can be again, something that supports those elements.

**Q. Okay. So I guess how can the physical evidence support the elements of a crime?**

MS. EKL: Objection. Form, foundation.
BY MS. ALZAMLI:
**Q. Like, I -- like -- I'll try to be more clear. When you say the evidence can support -- the physical evidence can support the elements. Do you mean, for example, like, if the evidence is a gun, and the crime is a shooting, then that means either A, there was a gun there, so probably was a shooting?**
A. Yeah, that's kind of -- yes. I guess. I think a better way in this case is Ms. Soukup said she saw Mr. Reed leaving with something wrapped and there's a document that she contemporaneously noted, and it's there saying that she saw it. So that's more corroboration. But that's sort of -- that's not really physical evidence, but that's kind of the -- I think what you're asking. You don't have to have physical evidence just like you don't have to have direct evidence. Circumstantial evidence is the same weight as direct evidence. You can have a case that's fully circumstantial and is still proof beyond reasonable doubt. So defining evidence by weight, same physical evidence as one thing or another. It all becomes extraordinarily fact specific, but you don't need DNA per a case. We've had convictions for, you know, in -- in a history of -- of our country before DNA existed. So



it's not like it's a requirement, but sure. It helps. If we can have physical evidence is consistent or it can help show us that maybe we have the wrong person. It goes both ways.
**Q. If you have a situation where the physical evidence like the DNA on physical evidence went the other direction, would that impact your decision to bring charges?**
A. Right. So that's a loaded question. DNA going the other direction doesn't mean anything to me, so I can't answer that.
**Q. Okay.**
A. You know I mean?
**Q. So can you tell me why it doesn't mean anything so I can help a ask a better question?**
A. Sure.
MS. EKL: Well, I'm just going to object to the form of belatedly to the first question and then also to the second question.
THE WITNESS: So DNA, like, all it means is that something was left somewhere. I can't time it, I can't say how it was left. I can't sing with the fingerprint, right. It -- it doesn't tell you the whole story. Just like in this case, I could have Mr. Reed's DNA in Mr. Van Vo's apartment, but



that doesn't mean he didn't act in self-defense. It's not going to tell me that.
BY MS. ALZAMLI:
**Q. Okay. So maybe I'll present to you a hypothetical situation. In a hypothetical situation where the DNA testing showed that there was no DNA evidence of Carl ever being in Mr. Van Vo's apartment, and also that the alleged murder weapon excluded Carl, but had the DNA of the victim and an unknown male profile. Is that evidence if you had it at the time when you were deciding to charge? Would that impact your decision to charge?**
A. Yeah.
MS. EKL: Objection. Form.
THE WITNESS: No.
BY MS. ALZAMLI:
**Q. Well, why would it not have been appear to sign to charge?**
A. Mr. Van Vo was down for at least a day or so. So we have a contaminated crime scene. We have people coming in and out. You can -- I can touch this entire tablecloth or table -- excuse me, table. And even though you've seen me touching it right now, we could have a lab tip come in and you would not find a single print suitable comparison because of the way I touched



it, because of the oil on my hands because of whatever. Does that mean because a lab tech can't get a fingerprint suitable for comparison that you didn't see me touch this table? No, of course I did. So what you have with this case, if I had known that, it wouldn't have made a difference, in my opinion, I'm speculating because it was a contaminated crime scene and there was other evidence that indicative regardless of physical evidence that Mr. Reed may have been the perpetrator.
**Q. And what was the other evidence?**
A. That people saw him going out of the apartment, that he was trying to sell proceeds, and that he told me that he did it.
**Q. So it was the statements?**
A. The statement? Yes. It as part of it, yes.
**Q. And I'm going to ask the DNA question again. I just want to clarify it. So I think I misspoke. So in my hypothetical, it's not fingerprints. It's DNA. So it's like blood. It's like, for example, in this hypothetical, there is no DNA, like --**
A. Like so blood's biology, DNA is different.
**Q. Okay. So I guess I don't want to get into specific, but I'm not a scientist, right? So I guess what I'm going to say is, I'm not talking about physical fingerprints I'm talking about --**

A. That was an example by the way.
**Q. Okay. So yes.**
A. I'm not talking -- I was just using an example of something right in front of you I could show you, which is DNA comes from a biological source. Do we know the biological source is the first thing. Is it semen? Is a blood? Is a saliva? That's the first question. And if it's blood, we can maybe tell whose type it is or what type it is. And then we can tell whose it is from DNA. However, if we don't know what the biologic is, right, it's just some random somebody's DNA on an item. We don't know where it came from what kind of substance biologically it came from or how it got there.
**Q. You're right. So I want to present you a hypothetical, and if you need more information from me, I'll try to answer it. But just to the best of your ability answer the hypothetical, which is the same scenario. You have all of these stacks in front of you. You're making a decision to charge or not. And you have DNA testing in terms of like biological material. That's -- that shows that there was no biological material of any kind relating to Carl in the apartment of Kim Van Vo. And also, that the blade of the knife had the biological material of the victim and of an unknown male profile, but excluded Carl, that his**



**biological confirm was not on this Broadway knife. So if you had that information sign a charging, would that affect your decision to charge?**
A. No, it would not have.
**Q. Okay. Why would it not affect your decision?**
A. I don't know that's the murder weapon. I don't really think I ever believed it was. So that really doesn't matter that some random knife that I never think was used because I don't think it could have been, right? Because it sounds kind of impossible. I don't think it was a murder weapon. Having somebody else's DNA in someone's apartment is not unusual. Having the victims there, I don't know if it was his blood. It was underneath him. I -- you know, or it was in his apartment. It's going to have his DNA on it.
**Q. Okay.**
A. And -- and someone else's random DNA on what may or may not have been a murder weapon doesn't mean that they're the offender either. They could have just touched it. They could have been in there. There could have been many people going in and out of that apartment, scrounged and stuff knowing Mr. Van Vo was dead. I don't know. I wasn't there. So no, that would not have made a difference because there's many explanations for that. And the fact that Mr. Reed, and



that's why I used the fingerprint example. Mr. Carl Reed didn't leave any DNA that was -- that A, he didn't leave any, or he left it, but we couldn't retrieve it in a way that doesn't mean that they weren't there or they didn't do something.
**Q. Got it. Okay. And just my last question is, like if you never really believed that the knife was the murder weapon, why did you use the confession as a basis to charge?**
A. So it was, to me -- again, I'm not calling this --
MS. EKL: And I'm sorry, can I -- objection to form. Assumes facts not evidence. Go ahead.
THE WITNESS: I'm not -- I don't think this was a confession necessarily. I think it was an exculpatory statement that could be inculpatory depending on other factors. So I don't see it as that. The question was, who performed the acts? And the circumstantial evidence and direct evidence indicated that that was Mr. Reed.
BY MS. ALZAMLI:
**Q. Okay. Yeah. I guess just something I'm trying to understand is, if the main act you didn't believe that it occurred as stated. Was that a problem for you? I'm sorry if I'm not making sense.**



A. I -- I think I understand where you're -- where you're trying to ask, which is people mitigate when they tell you, they say things right? When you're out and felony review talking to people and it's fresh, right? Things have just happened. There are certain emotions that come in, consciousness of guilt is one of them. And it's a powerful emotion. And it's something that I've seen people wrestle with. So we have this sense of self-preservation, and it's not unheard of that people lie when they're in custody. They lie to the police. They lie to state's attorneys because they are trying to escape responsibility for perhaps an action or escape consequences. That is very common and very normal. And you have to factor that in to everything.
**Q. Okay. And so, if you don't believe that the knife was the actual murder weapon, how do you think Carl knew about the knife?**
MS. EKL: Objection. Formative speculation.
THE WITNESS: So I don't know because he was in and out of that apartment and had access to it exclusively for days. I don't know if the police told him that, Hey, we found a knife. I don't know. I have no idea.
BY MS. ALZAMLI:
**Q. All right. I'm going to switch gears a little**

Page 182

**bit. I want to ask you about your time at the Conviction Integrity Unit. You were -- you didn't leave the Conviction Integrity unit at some point, right? You testified earlier 2019 to 2023.**
A. I was the director from 2019 and 2023.
**Q. Okay. Before you were the director, did you work at the Conviction Integrity Unit?**
A. Yes.
**Q. And what was your role then?**
A. Supervisor.
**Q. What did you do as a supervisor?**
A. Well, I was -- I did all the administrative functions, so timekeeping, just housekeeping, administrative functions. I did all the intake for cases. I screened all the cases. I assigned all the cases. I had my own caseload. I also handed all the grant monitoring and all the grant applications.
**Q. And then what did you do as the director?**
A. All of that, plus teaching and outreach and trying to do -- I created protocols. I investigated on those protocols and then it was more policy. I did more policy as a director than I did as a supervisor.
**Q. Okay. And so, as a director, were you responsible for, like, screening every agent that came in and then assigning it to someone?**

Page 183

A. Not necessarily. It depends how the case came in. There's two ways -- well, there's more than two ways, but there's two main ways. One of them is if it there was a petition for 1163, which is post-trial DNA testing. That's a different unit. That's a grant funded unit. They did their own intake because that was court-based. So that would be motion practice. So they were at -- they were housed out of 26th Street. And so that was a -- it was a part of the CIU unit. They were part of CIU, but I did their own stuff. And then I did anything that came to me through letters or whatever that was the other way that things came in.
**Q. Okay. So did you know that in 2020, Mr. Carl Reed's case was brought to the CIU?**
A. No.
**Q. Okay. Did you know that it would -- that it came up again to the CIU in 2022?**
A. I found out later.
**Q. Okay. And did you not know because it just that you don't know every case that comes in or is it do you know if you were screened off from that case?**
A. So my understanding from what I learned later is when it first came in, it came in for 1163 testing. So and as soon as it came in for 1163 testing, someone flagged it as I'm conflicted because I took the

Page 184

statement. So it's off my radar 100 percent. And then the deputy director at that time, which was Adam Weber, would've been the guy that took care of it. And I'm conflicted off. So I heard nothing. I know I -- it never came across in my desk because it came in through 1163, is, in hindsight, what I've been told. I don't remember ever seeing the case.
**Q. Okay. And so, you were never involved in any way in investigating any part of Carl's case when it came to the CIU?**
A. Correct.
**Q. And again, like, if you have no -- even if -- even though you weren't involved, you also don't have any personal knowledge of the investigation the CIU did into Carl's case?**
A. Correct. The only knowledge I have about the case came by way of sort of an accident, which is somebody needed the FedEx number for us to send something to a dry down swab to somewhere. And literally someone said she can't talk about this case at all because they needed the number for the Carl Reed case. And so, they had to get the number from someone else. That was the only thing -- I just remember, why can't I give them the FedEx number? Like, it's Carl Reed. I'm like, okay. Someone else can go get it.

Page 185

That's it. That's all I've ever heard about the case.
**Q. Were there other cases that had come through the CIU at the time that you were there that you were screened off of?**
A. I think there were a few. Yeah. I tried a lot of cases when I was in the family trial division. So if they came through, I couldn't touch it.
**Q. Okay. Did you ever feel uncomfortable or nervous about cases coming through?**
A. No.
MS. ALZAMLI: I think I'm just going to stop for now. I'm going to turn it over to somebody else to ask questions, so -- I can stop for now and then --
MS. EKL: If you have more questions, then we have time. So --
MS. ALZAMLI: No, I don't have anything new. It would just, like, probably be follow-up, if you guys have any questions. I guess maybe I should take a second to think about that.
MS. EKL: You want to take five minutes?
MS. ALZAMLI: Yeah. Let me just take five minutes to think about it, but I think I'm okay.
THE VIDEOGRAPHER: We're off the record. The time is 1:51.

Page 186

(A recess was taken.)

THE VIDEOGRAPHER: We're back on the record, and the time is 1:50.

BY MS. ALZAMLI:

**Q. Okay. I know we've talked extensively about this case today. Is there anything that we've talked about today that jog any other memories of anything you want to share that hasn't come to mind already?**

A. No.

**Q. Okay. Is there anything that you didn't see today or that you haven't reviewed that could jog any memories for you?**

MS. EKL: Objection. Form. Cause or speculation.

THE WITNESS: No. I mean, I didn't review any police reports or crime scene photos, but I don't think that that would add anything to my memory regarding the witness interviews.

BY MS. ALZAMLI:

**Q. Okay. There actually is just two more questions I want to ask you. I just want to go back to Carl's confession, which is Exhibit 5. So I want to go to like page 77, CITY-REED 77, Page 47. It's a good example of this. I saw this in a few of the confessions, and I was just maybe that would be helpful**

Page 187

**to ask you about it in your process. But here on the paragraph at the bottom, it starts with, "Carl states he sees the knife without a handle." Sometimes a word will be written and then a handle is written that's crossed out and handle is written again. So what would be the reason that like the same word is crossed out and rewritten?**

A. In this specific case? I'm going to speculate, but probably because I was pregnant and tired.

**Q. Okay. So is it just like a typo? Like Oh, I misspelled it. I'm going to cross it out?**

A. I wrote a lot of handwrittens. I think -- I think -- I think -- I think I thought I spelled handle wrong and then realized no, that's right.

**Q. And when you do corrections, like, again, Page CITY-REED 79, similarly the last ones of the first paragraph, "because he had killed" crossed out kill, was that jogging?**

A. I'm -- speculating. I think killed is a strong word and maybe I wanted to use a different one. I wrote killed and then I'm like and then I'm like, okay. That's what he said. So I'm writing it. I don't know. I -- I don't know.

**Q. Okay.**

Page 188

A. Maybe I thought he said something else and I wasn't sure. So I scratched it out and then I asked him, "Did you say killed," and then, "Oh, you did. Okay." I don't know. Again, tired. A lot of handwrittens. This was a long day. That's a lot of writing.

**Q. Okay. And then just really quickly, just some technical questions. My understanding, could you tell me, like, as an FRU, like, what was your understanding, what probable cause was?**

A. So it's again, the -- the way I looked at it, I think I already defined it, which is probable cause actually was a credibly, low standard. And I like to think that the standard that felony review used and still does use with state attorney's office is a little bit, you know -- it's a little bit more than that. But we're looking for evidence of such a conclusive character that the defendant is probably the offender, and also that taking the evidence light most favorable that all the elements are there of a charge.

**Q. Okay. And are you permitted to approve charges without probable cause?**

A. No, I don't think so. I mean, it -- it's -- it's not written down that I know of a policy, but that's kind of like -- a it's inherent in the whole

Page 189

construct.

**Q. Okay. And the information that underlines underlie of finding a probable cause.**

A. Wait a minute. I -- I think I misunderstood your question. Let me go back. You mean, if there's -- there's no probable cause determinations at this point, so you're not talking about actual probable cause by a judge you're talking about like in general, the -- the idea of probable cause?

**Q. I guess maybe I don't understand the process. So at the time that you're charging, are you making a probable cause determination on your own?**

A. A court does that.

**Q. A court does?**

A. Right, but we're using something similar or akin to it, and we're evaluating, whether there's enough. So that's a non-legal way to look at it. Is there enough? And the standard's fairly low at this stage, because we have other checks and balances as it goes through the process to -- so it's -- not it's not that low, but I mean, it's not proof beyond -- I don't need to prove him guilty at this stage. He may not be. It's -- I'm approving charges and it goes into the system.

**Q. And the stuff that you're using to come to**

**that finding includes the written statements, the physical evidence? The police reports?**
A. Everything I had, yeah.
**Q. Okay. All right. And then once you decide to charge, is there any system within the prosecutor's office? Do you have to run it through people? Is it just you making the decision?**
A. No. So I make a phone call to my supervisor. The police are asking for approval. I run through an entire synopsis on the phone usually with them. And they already might have had some updates as the day went on or the night went on through my trial supervisors who are on the field or I'm talking to, and then tell them the facts, tell them what supports the elements of murder. And they say yes or no, we can approve or not approve.
**Q. Okay. And obviously, that's what you did in this case?**
A. Yes. You -- you can see it notified with an N through it. That means I notified, and that's Darren O'Brien. He was the supervisor at the time.
MS. ALZAMLI: Okay. Thank you. I have no further questions.
CROSS-EXAMINATION
BY MS. ITCHHAPORIA:



**Q. Who tried to memorialize Mr. Carl Reed's statement and his written statement?**
A. He did.
**Q. And did you tell him that the preferred method was videotaping?**
A. I did.
**Q. And what was --**
A. Again, based on my reading of my motion, I did. I don't remember that.
**Q. And what was his response to that?**
A. Based on the testimony of the motion and the fact that we have a handwritten, he chose handwritten.
**Q. And the words that are in the statement, Mr. Reed's statement that was marked as an exhibit, did those words actually come out of Mr. Reed's mouth?**
A. Not verbatim, but in summary.
**Q. Did Mr. Reed, when you were there, appear to be dizzy?**
A. I don't recall him being dizzy.
**Q. Do you recall Mr. Reed being confused?**
A. The best way for me to answer this since I don't remember, is that if those two things had occurred, I would've documented or there would've been probably something different, but I don't know. But it that would've caused me concern and I don't appear to



have had been caused any concern from the documents I've -- I've observed and the testimony I've previously given.
**Q. Did Mr. Reed inform you that he was a diabetic?**
A. I do not remember him telling me. That I have no documentation to indicate he did tell me that. And if he did, I would like to think it would've been documented.
**Q. Did Mr. Reed tell you that he needed his influence?**
A. I -- if he did, I would've documented it, and I don't have it documented.
**Q. Were you aware when you interviewed Mr. Burns that the detectives had provided and taken Mr. Burns to his home to get his insulin?**
A. Ricardo burns?
**Q. Yeah.**
A. No, I was not aware of that, that I can recall.
**Q. Okay. I may have missed this. Did you recommend to your supervisor on Mr. Burns that charges be approved?**
A. Trying to remember the way Darren used to do it, and it was basically -- I said, I've got murder



charges. They're looking for approval. What do you got? And then he kind of did the told you yes or no? I don't even know if I made a recommendation. I don't remember.
**Q. Okay. But was it your practice to make a recommendation?**
A. If he asked, yes. I would. Just don't know if he did.
**Q. You mentioned sometimes you would write a memo to your supervisor?**
A. Yes.
**Q. Do you have a memory of doing that in this case?**
A. I don't. And I haven't seen one, and it wasn't a press case that I remember or -- or it seems to be. So I don't think I did. Usually, those were only press cases.
**Q. And what kind of cases?**
A. Press or media cases.
**Q. Oh.**
A. Yeah, where they had to give something to the external ops to, you know, answer questions.
**Q. Did you, after you testified at Mr. Reed's motion to suppress, did you find out what the results were?**

A. No.
**Q. Did you follow his case after the motion to suppress?**
A. No. In fact, I just found out recently he pled guilty.
**Q. Okay.**
A. Which I was surprised to hear.
**Q. You weren't aware of that?**
A. No. No.
**Q. Okay. Do you know who else testified at Mr. Reed's motion to suppress?**
A. No. There would've been a motion to exclude, so I wouldn't have been able to know that.
**Q. Were you aware of what the allegations were in the motion to suppress at the time that you testified?**
A. No. I don't think so. I mean, against -- in general, no. I don't think I would've read the motion. I don't remember, though.
**Q. What would you have done to prepare to testify at the motion to suppress?**
A. I would've been prepped by the assistant state attorney who was handling the motion, and I would've read anything they recommended that I read. And that probably would've just been my handwritten statement.
MS. ITCHHAPORIA: Thank you.



EXAMINATION
BY MS. EKL:
**Q. I just have a few follow-ups as well. If Carl Reed had told you that he needed insulin, would it have been your practice to proceed with a statement anyway, despite the fact that he was telling you he had this medical condition that required him to use medical insulin?**
A. No.
**Q. Based on the fact that you have not seen any documentation that he mentioned needing his insulin, do you have any reason to believe that that's something that he told you?**
A. I reason to believe I -- I did not know.
**Q. As you sit here today, do you recall if there was any evidence on Carl Reed that he had been physically abused in any way?**
A. Did I observe anything?
**Q. Correct.**
A. It would've been noted. And so, therefore it's not noted, so the answer would be no.
**Q. And is it fair to say that you're fair -- you -- that you're very certain that there was no evidence of him being beaten, because you would have done something if you had seen that evidence?**



A. Yes. I would have.
**Q. Would you have taken a statement of Carl Reed if you had seen physical evidence that he'd been beaten?**
A. No.
**Q. At the conclusion of the statement with Carl Reed, do you recall whether or not you took a Polaroids -- a Polaroid photograph of him?**
A. I see that there is a Polaroid attached to one of the exhibits I reviewed before I testified. And I reviewed the testimony I gave in the motion where that came up. And the question was, who took the picture, and I didn't know then and I don't know now. But there was one taken, and typically it was the state's attorney. We -- we had the Polaroid cameras. So typically we took it, but I don't remember. And I didn't remember then, either.
**Q. As a matter of practice, what is the purpose behind taking a Polaroid photograph of a suspect after they get a statement?**
A. So just a couple of things, which is to attach a name to a face, for lack of a better term. Also to show how the person looked at the time of the statement, and to identify that person with that statement. So it's that Carl Reed, you know, if there's ever an issue. Because I don't think we put their IR numbers. We put



their birth dates, but not any other identifiers on the handwritten statement. I'm going to show you, if you could look at the Zoom? I assume I'm still connected here.
MS. EKL: Are we on -- what number are we on, 7 or 8?
THE REPORTER: This will be 7.
MS. EKL: 7.
(Exhibit 7 was marked for identification.)
BY MS. EKL:
**Q. Are you able to see what's up on the screen?**
A. Yes.
**Q. Showing you what I've marked as Deposition Exhibit Number 7. Looking at this photograph, do you recognize it today as you look at it?**
A. The actual image?
**Q. Right.**
A. No.
**Q. Is this the photograph that you reviewed in preparation for your deposition testimony?**
A. It is.
**Q. And do you see on your -- on this photograph, your handwriting there?**
A. I do.

Q. Is that on the bottom of the photograph?
A. Correct.
Q. What is the purpose of putting your -- well, is it your signature on the bottom?
A. It is.
Q. What's the purpose of signing that photograph?
A. So it's who was there when the photo was taken, who was present, who the witnesses are, and that we can attest to that being the Carl Reed -- and it's a foundational, basically. That picture was taken by one of us, and it -- it shows accurately -- truly and accurately depicts Carl Reed as he looked the day we took the statement.
Q. And this, at least as a matter of practice, the photograph would've been taken at the conclusion of the statement, correct?
A. Yes.
Q. Okay. There are two other signatures on here also, correct?
A. Yes.
Q. Do you have an independent recollection of those signatures being placed onto the Polaroid photograph?
A. No.
Q. One of the signatures appears to read, "Carl



Reed," correct?
A. Yes.
Q. Do you have any reason to believe that anyone other than Carl Reed signed that name on there?
A. No. Because I would watch this process. Because this is now my exhibit. It's my document, so I am going to take possession of it, so I would be there watching while the -- all this happens.
Q. And the other name on here is Detective Timothy Thompson, correct?
A. Yes.
Q. So based on your practice, do you have reason to believe that Timothy Thompson was also present when this photograph was taken and signed by Carl Reed?
A. Yes.
Q. Is it fair to say that during as a matter of practice, when you take a handwritten statement and also in regard to this case in particular, that sometimes you attach exhibits to those statements?
A. Yes.
Q. If you could take a look at Exhibit 1? And I think a hard copy would be -- oh. Sorry.
A. Oh. I have one right here.
Q. Okay. I -- we just -- we were sharing, so.
A. Okay.



Q. So the last page of Exhibit 1, which is Bates stamped CITY-REED 48. Do you see that document?
A. Yes.
Q. And this purports to be a security log from Lakefront SRO desk clerk, correct?
A. Yes.
Q. From your review of the statement of Dorothy Soukup, do you know why it is that this particular security log was attached to her statement?
A. It's relevant to her testimony.
Q. And does this indicate to you that at the time that she gave the handwritten statement to you, that you had in front of both of you this security log?
A. Based on her signature on the bottom, yes.
Q. And her name's on the bottom a couple of times, correct?
A. Right. Correct.
Q. Did she sign that in your presence?
A. I don't recall, but since my name and signature is underneath there, my guess is yes. But I don't recall. But it seems to be from this documentation that I would've signed right underneath her, so yes.
Q. Okay. And where is your signature on here?
A. It's right under hers. It says NA, and you



can't really see the rest, but it's -- it's over to the left. It's right above People's Exhibit Number 1, and above that looks like it's Detective Thompson. No, that's not Thompson. I can't -- I can't read it on mine, but the -- Dorothy Soukup, where they have her birthdate and -- that looks like someone else's handwriting, but I don't know. Maybe that's hers.
Q. And I believe earlier you testified that when determining whether or not charges are appropriate in a particular case that you consider -- excuse me, consider the totality of all of the information and evidence that you are made aware of, correct?
A. It's Detective Jin. I can now see it. Sorry. It just -- it's a -- my copy's really bad. I'm sorry. Say again?
Q. Sure. I think you testified earlier that when you are considering whether or not to approve charges that you take into consideration all of the evidence that's known to you, which would be in the form of, for instance, reports and witness testimony to you, or witness statements to you, suspect statements, anything that you're made aware of, you'd consider all of it, correct?
A. Yes.
Q. The fact that, for instance, in Exhibit 1 of

your deposition, Exhibit 1, there is an exhibit attached to Dorothy Reed's -- sorry. Let me start over. That was bad. The fact that there is an exhibit attached to Dorothy Soukup's statement, which is this Lakefront SRO desk clerk security log, does that indicate to you that this would be one piece of evidence that you considered in the totality of the evidence related to whether or not to charge Carl Reed?
A. Yes.
Q. One of the other statements that we talked about today that you took was the statement of Lester Garner, correct?
A. Yes.
Q. And I believe that was marked as Exhibit Number 2 to the deposition. What was provided to you is Bates stamped CITY-REED 39 through CITY-REED 32. If I could direct your attention to -- just a second. Sorry. I'm sorry. If you could take a look at Carl -- I'm sorry, at Ricardo Burns' statement, which is Deposition Exhibit Number 3.
A. The copy I have doesn't have any exhibits attached.
Q. Correct. It's Bates stamped -- the exhibit is Bates stamped CITY-REED 49 through Exhibit 56.
A. Yes.



Q. But if you look at Page 2, in the middle of that page, would you agree with me that it says, "Ricardo identified People's Exhibit 1 as the guy who said he was Chuck, and tried to sell him a car?"
A. Yes.
Q. What is that statement indicate to you in terms of whether or not there were any exhibits attached to the original handwritten statement?
A. There's -- there's an Exhibit Number 1 of a picture of somebody.
Q. I am going to apologize in advance for the quality of what I'm going to show you. We don't have the original, but --
A. Sure.
Q. I'm going to show this to you on the screen. And we'll mark this as Exhibit Number 8. I'm showing you a photocopy of what purports to be a photograph. And on the right-hand side, there's some handwriting that says, "People's Exhibit Number 1." Do you recognize that handwriting?
(Exhibit 8 was marked for identification.)
A. Yes. I do.
BY MS. EKL:
Q. And whose handwriting do you recognize that to



be?
A. It's mine.
Q. Are you -- do you know, as you sit here today, whether or not in fact this was the exhibit that was attached to Ricardo Burns' statement?
A. I don't know.
Q. Do you have any reason to doubt that it was the photograph that was attached to Ricardo Burns' statement?
A. It -- it doesn't seem to have any other signatures on it, which it -- it -- but I have no -- I have no way of knowing. Clearly I would have an exhibit, because I mentioned it in the handwritten. So I can't answer that. I don't know. I -- there is -- there is missing signatures.
Q. Okay. And if you had shown this to a witness, you would expect that you would've had them sign the photograph somewhere, correct?
A. Yes. I would expect that. Yes.
Q. Yes. I'm going to have you take a closer look. It's -- this is such a poor quality photograph. But if you look at the left-hand side, does it appear that perhaps there's some kind of handwriting, even though it can't be discerned from this particular exhibit?



A. Yeah. It looks like there's something scribbled there that looks like a hand -- like, cursive. Is there a back to this?
Q. Oh. This is Bates stamped CITY-REED 57.
A. This might be one where it was written on the back, but I don't know. It looks like perhaps there was something written there, but I would expect to see signatures. Yes.
Q. If the handwriting on the side is, if the original photograph shows that to be the signature of Ricardo Burns, would it be consistent with this being the exhibit that you showed him and it was Exhibit 1 to Ricardo Burns' statement?
A. Yes.
Q. Okay.
A. And actually, the fact that it's on the photo is consistent with making sure we're not -- we're putting it on the actual photo of the person, not realizing that you maybe can't read it 20 years later, but yes. So that actually would be consistent.
Q. It was consistent with your practice --
A. Yes.
Q. -- of how you had witnesses sign the photograph, correct?
A. Sometimes, yes. Absolutely.

**Q. So earlier, when you said sometimes when witnesses use nicknames, you show them photographs to make sure that they're identifying -- that you're aware of who it is that they're identifying, this would also be consistent with that practice, correct?**
A. Yes.
**Q. And here, Ricardo Burns was referencing a person by the name of Chuck, correct?**
A. Yes.
**Q. And so, this photograph, again assuming it was signed by Ricardo Burns, would be consistent with you showing him a photograph to say, is the person you're referring to as Chuck the person that's shown in Exhibit Number 1?**
A. Yes.
MS. EKL: I'm going to show you Exhibit Number 5, which is Carl Reed's statement.
THE REPORTER: That was my fault.
THE WITNESS: Okay.
BY MS. EKL:
**Q. Earlier you testified that Carl Reed would have signed this statement, correct?**
A. Yes.
**Q. And in fact, we see the -- it appears to be a signature of Carl Reed twice on the first page, and then**



**at the bottom of each of the subsequent pages of this exhibit, correct?**
A. Yes.
**Q. And again, even though you don't have a specific recollection of every part of taking Carl Reed's statement, would it have been consistent with your practice that you would've been present when Carl Reed signed the bottom of each of these pages?**
A. Yes.
**Q. And based on the fact that your signature is next to each of the times that it says Carl Reed, is that also consistent with you having been present and witnessed Carl Reed himself place his signature at the bottom of those pages?**
A. Yes.
**Q. Do you recall at any point in time Carl Reed telling you that he doesn't know how to spell his name?**
A. No. I mean, I don't recall because I don't recall. So I don't know. Yeah.
**Q. If Carl Reed had said, I don't know how to spell my name, would you agree with me that that would be inconsistent with the rest of what you have in the statement about him being able to read and write?**
A. Yes.
**Q. Is that something that would have caused you**



**some concern in terms of his statement and his truthfulness about being able to read and write?**
A. Yes.
**Q. So do you have any reason to believe that Carl Reed told you that he doesn't know how to spell his name?**
A. I have no reason to believe that.
MS. EKL: Okay. I don't think I have anything further. I don't know if you have any follow up? Thank you very much.
MS. ITCHHAPORIA: I do have a few, I think.
MS. ALZAMLI: Okay. You can go first.
MS. ITCHHAPORIA: Okay. Let me just -- I want to show you on Zoom another copy of that picture.
THE WITNESS: Oh.
RECROSS-EXAMINATION
BY MS. ITCHHAPORIA:
**Q. Do you --**
A. Oh.
**Q. -- what is on the Zoom that is marked as Exhibit Number 8 --**
A. Can I move this forward a little bit? It just lost it. There we go. Oh, yeah.
**Q. There we go.**
A. It says, "Ricardo Burns." It says -- it looks



like there's a detective's name underneath it, because I see it looks like a STAR number, maybe. I don't know, but I can definitely see a "Ricardo Burns." And oh. I see "DET." Where's my name? I don't know. I don't see it.
**Q. Does this indicate to you that this was the exhibit that was attached to Mr. Burns' original handwritten statement?**
A. That's -- that would tell me. Yes. That's what I expect to see. Yes.
**Q. Okay. And then I did have one more question. Sorry. Do you know what the symptoms are of high blood sugar?**
A. I do.
**Q. And do you -- when you were with Mr. Reed for those three separate occasions, did he exhibit any symptoms which included excessive thirst?**
A. Not that I recall.
**Q. What about frequent urination?**
A. Not that I recall.
**Q. Did he complain or could you tell if he was suffering from any headaches?**
A. Not that I recall.
**Q. What about fatigue?**
A. Not that I recall.

**Q. Were --**
A. Although I have to say in the motion testimony that I -- I read that he -- I did say at the end, he did seem tired and bored. I don't recall that, but I did mention that in the testimony.
**Q. Did he complain that he felt tired?**
A. No. I think that was my observation and that was my opinion.
**Q. What about symptoms of blurred vision?**
A. Not that I recall.
**Q. What about -- let me ask you about confusion. Did he complain about any stomach pain?**
A. Not that I recall.
**Q. Nausea?**
A. Not that I recall.
**Q. Vomiting?**
A. Didn't see -- not that I recall. Yeah.
MS. ITCHHAPORIA: That's until I have. Thank you.
MS. EKL: I just have a couple to follow up.
REDIRECT EXAMINATION
BY MS. ALZAMLI:
**Q. So Ms. Itchhaporia asked you some questions about symptoms Mr. Carl Reed might've been experiencing while you were interviewing him. And you answered that**



**you don't recall. But I just want to clarify. When you're saying, not that I recall, are you saying, "I don't remember that day, so I don't know," or are you saying, "No, that didn't happen"?**
MS. ITCHHAPORIA: Objection. Form.
THE WITNESS: So I -- if it had happened, I would like to think it would be documented. I also have no independent recollection of it because I don't remember. I also don't remember it being mentioned and not recorded, if that makes any sense. So I don't remember thinking, oh, well he had a headache, but no big deal, I'm just not going to mark it. I don't remember that. Like -- and I -- so that's kind of --
MS. ALZAMLI: I understand.
THE WITNESS: Yeah.
BY MS. ALZAMLI:
**Q. Was it your typical practice to be -- sorry. Strike that. Did you receive training on how to look out for signs of physical distress?**
A. No. No. No medical training. I mean, it's --
**Q. Okay.**
A. No. No. Or even just -- you -- it's again, my -- my personal experience and in my professional



experience, I've seen people who don't feel well. And it's a life experience, and so it's no more than that. He -- he didn't appear to me to have any type of distress that I needed to note or I was concerned that I was taking a statement from someone who wasn't oriented times three or wasn't feeling well, or whatever. He -- he -- all I can say is he seemed fine to me that -- because otherwise, I wouldn't have done this statement.
**Q. Is it possible that despite your memory, you did not observe -- or is it possible that despite you believing that you've not observed that there was anything physically wrong with him, that he was not feeling well?**
A. I can only tell you what I can observe. I can't tell you subjectively what was going on with him.
**Q. I guess. No. I -- well, we know for a fact that he was in there for like, 55 hours, right, without medication? So --**
MS. EKL: Objection. Form. Assumes facts not in evidence.
BY MS. ALZAMLI:
**Q. Based on this information that like, he was in this room for several days, is it possible that he wasn't feeling well, even if you did not personally observe him feeling well?**



MS. EKL: Objection. Form.
THE WITNESS: So I don't know how long he was there, so I can't say that. I don't know if he came and went. I don't know if he was there as a witness at first and then later became a suspect and he was free to go. I don't know any of that. So I can't answer the question. I just didn't notice anything that I noted.
BY MS. ALZAMLI:
**Q. That's fair. Let me rephrase it. Maybe it's not very clear. I'm going to present to you maybe this -- maybe just background, and I'm going to present to you like it's a hypothetical.**
A. Okay.
**Q. This individual was in a room for 55 hours. They were diabetic. They weren't given insulin. This room does not have a bed in it. It has a metal bench. He says that he was chained to a wall. He was fed food that does not help you regulate your blood sugar. He also is someone who is permanently disabled. Is it possible that you did not notice that something was wrong with him, but that something was wrong with him --**
MS. ITCHHAPORIA: Object to form.
BY MS. ALZAMLI:
**Q. -- given the circumstances?**

MS. ITCHHAPORIA: Sorry. Object to form.
THE WITNESS: I mean, anything's possible. So I mean, could he have been masking symptoms of diabetic ketoacidosis? I guess. I don't know how you'd do that, but I -- I suppose it's possible if it -- if his pancreas was working a little bit, and he's used to not taking care of himself with normal finger pricks and insulin use, and he wasn't regularly using it, so his body had adjusted to not being treated correctly, if you will, and those are foods that his body was used to eating, even though we might think that someone who has diabetes shouldn't eat them, but he did anyway, and so his body was accustomed to it. I just don't know. I would like to think that if he was showing any type of distress as a human being, not only as a state's attorney, but just as a person that I would've said -- stepped outside, had the watch commander call an ambulance to make sure he was okay. Let's get the paramedics in here. They love coming to visit. They don't. I'm kidding.
BY MS. ALZAMLI:
**Q. Okay.**
A. Bring them in. It's very common for people with diabetes to have low blood sugar and need just a



little boost, right? And then they're fine. So that's not a big deal. If I had seen something for me to call, I'd have someone call and bring in help. That -- that doesn't -- it's not like we had a -- we couldn't go back to where we were later on. It's not like we couldn't stop and take care of Mr. Reed and make sure he was okay. It's not like if I stopped to take care of him, everything was going to go to hell.
**Q. I totally appreciate that. I think --**
MS. EKL: I -- were you finished? I'm sorry. I just wanted to make sure she didn't cut you off.
THE WITNESS: I mean, I -- I -- it's -- it's not like if there was something wrong with him and we addressed it, it's not like we're all -- everything -- again, it's not like the case goes away. We're still - - we still have evidence. Perhaps we want to talk to him some more. We know where he is. That's it. It's -- it's not the end of the world if we'd stopped to take care of him. Therefore, I would like to think that if he complained or I noticed something, and I know if I notice something, because I've done it before. It's real easy to stop and get the paramedics to come in.
BY MS. ALZAMLI:



**Q. Okay. I totally appreciate that. I don't think -- maybe my question wasn't clear. I wasn't asking that like, did you know and not do anything? I'm not asking that question. I'm not implying that you knew and that you didn't do anything. I guess I'm just asking, is it possible you just didn't know, that you didn't observe it? You couldn't -- for whatever reason, you weren't able to ascertain how he was feeling?**
MS. ITCHHAPORIA: Object to the form.
THE WITNESS: Exactly. Because I don't know how he's feeling. He can only tell me.
BY MS. ALZAMLI:
**Q. Okay.**
A. So if he didn't tell me and I didn't see anything objectively, the subjective part, of course I couldn't know.
**Q. Okay. And my last question was: Have you ever received training when you were on FRU about how to recognize bruises on darker skinned individuals?**
A. No.
**Q. Okay.**
MS. ALZAMLI: Well, that's all my questions.
MS. EKL: I do have a -- sorry. A quick follow-up to that, unless you do. Go ahead.
MS. ITCHHAPORIA: Sorry. Real quick.



FURTHER CROSS-EXAMINATION
BY MS. ITCHHAPORIA:
**Q. Do you know if Mr. Reed was handcuffed when you were meeting with him on those three separate occasions?**
A. I don't recall, but typically when you're in the room, which is like, a locked room, there's no handcuffs. It's -- it's a safety thing.
**Q. And then what about when you guys moved to the conference room? Was he -- do you know if he was cuffed at that time?**
A. I -- personally don't like people handcuffed at all. And -- and that room is in a secure location, so I prefer no cuffs. So if -- if my preferences were respected, there would be no cuffs.
MS. ITCHHAPORIA: No other questions.
REEXAMINATION
BY MS. EKL:
**Q. Just going back to the question regarding bruises, even if you didn't actually observe bruises to Mr. Reed, if he had told you that he had bruises from something that was done to him while he was in police custody, is that something that you would have documented?**
A. Yes. Or asked him if it's not somewhere

embarrassing, you want to show me? Sure. What are you talking about? That's what that five-minute conversation is, "Are you okay," outside the presence of the police.

**Q. And based on the fact that it's not documented anywhere, and based on the fact that you did in fact take a statement from Carl Reed, do you have any reason to believe that he told you he was bruised or had received any injuries from the police?**

A. Well, the opposite is documented. I -- you were -- he was treated fine, which is indicative. He had no bruises caused by the police, so --

**Q. Okay.**

MS. EKL: Thank you.

MS. ALZAMLI: Just real quick for the record, the exhibit that I showed the witness was Plaintiff 000948, which we'll all mark as Exhibit -- I don't know what we were on, but --

THE WITNESS: 9?

MS. ALZAMLI: -- Exhibit 9.

MS. ITCHHAPORIA: 0849?

MS. ALZAMLI: Yes. This will be Exhibit -- then 9 will be 948.

(Exhibit 9 was marked for identification.)



THE REPORTER: Okay. Signature?

MS. SULLIVAN: Waive.

THE WITNESS: Waive? Sure. Waive.

THE REPORTER: Okay. Do you need a copy of the transcript?

MS. ITCHHAPORIA: Not just yet.

THE REPORTER: I'm going to go down the line. Any transcript or the video? Transcript or the video?

MS. EKL: Not at this time.

THE REPORTER: Okay. Transcript or --

MS. ALZAMLI: We'll order the transcript.

THE REPORTER: Okay. Electronic is fine regular delivery?

MS. ALZAMLI: Yes. With the exhibits. We don't need --

THE REPORTER: Perfect.

THE VIDEOGRAPHER: Okay. Awesome. Then this concludes the deposition of Nancy Adduci. Today is April 17th, and the time is 2:25.

(Deposition concluded at 2:25 p.m. CT)



CERTIFICATE OF DIGITAL REPORTER

STATE OF ILLINOIS

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Stipulation page hereof, by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded digitally by me and then reduced to typewritten form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skill and ability. I certify that I am not a relative or employee of either counsel and that I am in no way interested financially, directly or indirectly, in this action.

OFFICIAL SEAL
TALIA JACKSON
Notary Public, State of Illinois
Commission No. 981949
My Commission Expires Nov 28, 2027

TALIA JACKSON,
DIGITAL REPORTER/NOTARY
MY COMMISSION EXPIRES: 11/28/2027
SUBMITTED ON: 04/28/2025

### Exhibits

**Exhibit 1_ Adduci** 76:4,5 83:7 99:16 199:21 200:1 201:2,25 202:1 203:3,9,19 205:12 206:13, 14

**Exhibit 2_ Adduci** 88:11, 16 202:14,15

**Exhibit 3_ Adduci** 97:6,10 111:16 123:22 133:10 202:20

**Exhibit 4_ Adduci** 109:16, 19 111:3 112:5 133:10

**Exhibit 5_ Adduci** 138:15, 20 186:22 206:16,17

**Exhibit 6_ Adduci** 161:20, 24

**Exhibit 7_ Adduci** 197:9, 15

**Exhibit 8_ Adduci** 203:16, 21 208:21

**Exhibit 9_ Adduci** 218:20, 24

### $

**$250** 99:11,12

**$30** 100:4,7

**$400** 140:11,24

### 0

**0-19-** 139:11

**00054** 97:23

**000948** 218:17

**01** 82:25 101:2 112:20,22,24 114:18 162:11

**0849** 218:21

### 1

**1** 37:24 76:4,5 83:7 99:16 109:21 110:8 123:1 161:18 162:18 166:6,9 199:21 200:1 201:2,25 202:1 203:3,9,19 205:12 206:14

**1's** 166:7

**100** 117:5 149:22 184:1

**10:03** 6:7

**10:15** 18:1

**10:17** 18:5

**1163** 183:4,23, 24 184:6

**11:30** 87:16

**11:45** 87:20

**11th** 112:16

**12** 67:9

**12:33** 137:1,4

**12:58** 161:9

**12th** 112:20

**13th** 112:22

**15** 143:15

**15th** 112:24

**16th** 99:7

**17th** 6:6 18:5 87:20 161:13 219:20

**18** 8:19 10:19

**1988** 82:20

**1996** 12:19 13:3

**1997** 13:4

**1998** 13:5

**19:30** 162:14

**19th** 82:25 101:1 112:14 114:18

**1:00** 159:10

**1:26** 161:13

**1:50** 186:3

**1:51** 185:25

### 2

**2** 8:12 88:11,16 109:21 157:19 162:17 163:18 164:13 202:15 203:1

**20** 8:14 113:23 205:19

**2000** 13:5,7,21 16:5 17:16 23:6 82:25 101:2

**2001** 13:7,21 14:24 17:14 18:10 23:6 99:7

**2003** 13:7,10

**2012** 13:11,12

**2014** 13:12,14, 18

**2019** 13:18,19 182:4,5

**2020** 183:13

**2022** 183:17

**2023** 13:15,19 182:4,5

**2025** 6:6 18:5 87:20 161:13

**20s** 106:10 139:5

**21** 97:23

**21--** 139:12

**210** 113:7

**2116** 103:10

**212** 102:4

**216** 102:1 103:5

**217** 102:1 103:5,10

**2215** 82:25

**22nd** 162:15

**23** 98:25 105:15,19 106:6,11 139:10,12

**23C17186** 6:13

**24** 27:24

**24/7** 14:12

**26th** 183:8

**27th** 140:1

**28th** 82:11

**2:25** 219:20,21

### 3

**3** 76:19 97:6,10 109:21 110:8 111:16 123:22 133:10 145:5 202:20

**305** 101:23 113:9 114:8 140:2

**309** 112:16

**31** 89:8

**311** 6:8

**32** 202:16

**35** 112:14

**352** 133:9

**39** 88:12 202:16

### 4

**4** 94:17 109:16, 19 111:3 112:5 133:10 150:25 163:17

**41** 140:1

**42** 88:13 93:23

**44** 82:12

**45** 76:7 143:17

**45th** 93:12

**47** 76:19 80:12 89:8 186:23

**48** 76:8 200:2

**49** 97:7 202:24

**4946** 82:12,21 86:13 89:9 100:24 101:2, 22 112:15 133:16 140:2

**4:00** 14:7,8

### 5

**5** 116:20 138:15,20 166:4 186:22 206:17

**50** 154:14

**53** 89:9

**54** 137:15

**55** 109:4 155:10 212:17 213:15

**56** 97:8 202:24

**57** 82:11 205:4

**5:00** 14:1

**5th** 112:24

### 6

**6** 37:25 97:25 116:4,19 137:15 161:19, 20,24 166:4

**60** 140:1
**63** 109:18 112:6
**65** 112:15
**66** 13:8
**68** 116:20
**69** 109:18 112:6 122:14

**7**

**7** 109:4 116:19 122:14,19,20, 21,25 123:1 150:25 155:15 157:19,21 159:11 197:5,7, 8,9,15
**74** 138:17
**76** 105:17
**77** 186:23
**78** 99:1
**79** 187:17
**7:30** 124:12,18, 23 125:17 162:14

**8**

**8** 97:25 99:1 109:4 133:10 137:15 197:6 203:16,21 208:21
**8-hour** 27:17, 23,24 28:1
**80** 138:17 155:16 159:12
**80s** 19:12
**850** 99:2

**9**

**9** 122:14,22 218:19,20,23, 24
**948** 218:23
**98** 13:5
**9:00** 14:1
**9th** 98:25

**A**

**A-D-D-U-C-I** 7:21
**a.m.** 6:7 14:7,8
**Aberdeen** 6:8
**abilities** 95:4
**ability** 62:9 66:24 68:17,24 75:17 119:2,18 156:22 157:24 158:6,19 178:17
**absolutely** 42:16 63:17,20 72:5 120:4 205:25
**abused** 195:17
**abuser** 13:13
**accept** 11:10
**accepted** 11:12
**access** 181:20
**accident** 184:17
**account** 33:6
**accurate** 26:4, 9 77:2 83:18 93:9 94:6 104:11 115:22 119:17 143:6 155:23 160:24
**accurately** 198:11,12
**accused** 168:4
**accustomed** 214:14
**acquire** 20:5,6
**act** 61:10 151:11,20 152:24 176:1 180:23
**acted** 150:5,6
**acting** 150:21
**action** 159:5,7 181:12
**actions** 150:8, 11
**acts** 153:4 172:13 180:18
**actual** 80:4 155:1 171:12 181:16 189:7 197:17 205:18
**Adam** 184:2
**add** 39:4 68:9 171:22 186:17
**added** 102:21, 22 160:13
**addictions** 60:4
**additions** 76:24 78:13 83:15 93:7 94:3 104:8 115:19 143:3 155:20
**address** 100:24 133:16
**addressed** 215:14
**Adduci** 6:9,12, 21 7:5,16,20 18:4 37:24,25 77:25 87:19 161:12,18,19 162:17 163:17 166:4 219:19
**adjusted** 214:9
**administrative** 182:12,14
**admissibility** 165:21
**admissible** 165:20
**Aducci** 155:21
**adult** 106:11,15
**advance** 76:2 203:11
**advantage** 115:2
**advised** 82:4,5 89:3 98:20 112:9 139:19, 21
**affect** 119:18 179:3,5
**affirm** 7:8
**affirmative** 153:19,25
**afraid** 141:25 142:11
**age** 105:21 106:4
**agent** 182:24
**ages** 105:22
**aggravated** 150:10
**agitated** 28:13, 16,17,19
**agree** 52:11 203:2 207:21
**agreed** 82:9 89:6 98:23 99:13 100:4 112:12 139:24 142:22 159:13
**agreeing** 160:5,7
**ahead** 112:7 139:17 180:13 216:24
**air** 69:3 113:5,7
**akin** 189:16
**alcohol** 68:14 83:10 92:25 104:1 115:10 116:24 117:22 118:11,17,18, 25 119:4,18,24 120:6,24 142:16 145:20
**alias** 134:5,10 135:18
**allegations** 154:6 194:14
**alleged** 176:8
**alleging** 154:9
**alley** 100:9
**allowed** 93:2 104:3 115:13 142:19 143:25 153:10
**alternated** 14:6,15
**Alzamli** 6:17 7:15 9:12 10:22 12:7 17:21,23 18:6,7 20:15 21:2,15 23:24, 25 26:2 42:7 44:16 49:15 59:22,25 71:3 76:7,12,15,16 87:10,12,15,21 88:19 90:12,15, 21 91:14 92:2, 11 93:13,14 97:13 98:4,7,13 102:7,12 107:7 109:21,24 116:3,5,10 122:23 125:10 127:13 128:11, 22 129:11 130:24 137:5, 12 138:24 144:17 146:10, 17 148:19 150:16 157:14, 20 158:1,24 161:1,6,14,15 162:2 165:4 168:12,23 170:24 174:2 176:3,16 180:21 181:24 185:11,17,22 186:4,19 190:22 208:12 210:22 211:15, 17 212:21

213:9,24 214:22 215:25 216:12,22 218:15,20,22 219:12,15
**ambulance** 62:1 214:19
**amount** 120:15
**anal** 140:24 151:5
**analyzing** 129:8
**angry** 141:4
**answer's** 44:15 87:6
**answers** 8:25 25:21 32:14 132:3,5 135:11
**anymore** 56:16
**anyone's** 61:1
**anything's** 214:2
**apartment** 90:7 91:21,22 92:17,18 101:23 102:1,5, 20 103:5,6 112:16 113:4,6, 9,12,13,15,16, 19,24 114:1,2, 3,5,7,8,14,20, 25 137:20 140:2,7,13,14, 20 141:7,23 142:6,7 148:12 175:25 176:7 177:12 178:22 179:12,15,22 181:20
**apologize** 45:18 76:2 108:7 123:7 203:11
**apparently** 47:2 156:20 158:4
**appeals** 13:3
15:4
**appeared** 122:10
**appears** 111:11 198:25 206:24
**applications** 182:17
**apply** 111:13
**approach** 70:10
**approached** 99:9
**approval** 130:11 170:1 190:9 193:1
**approve** 29:6,8 34:1,18 169:7 188:21 190:15, 16 201:17
**approved** 169:1,5 170:1,2 192:23
**approving** 35:4,6 129:4 169:24 171:1,4 189:23
**approximately** 8:12,14 13:4,5, 7,11,12
**April** 6:6 18:5 87:20 161:13 219:20
**area** 18:25 145:5
**areas** 145:7
**argument** 31:19
**Argyle** 99:3
**arises** 132:5
**armed** 168:25
**arrest** 48:25 168:6,11
**arrested** 48:22 49:1,5,19 51:13
**arrive** 41:3
**arrived** 124:11, 17,22 162:5
**arrow** 102:2 137:16
**arrows** 163:20
**articulate** 60:12
**ASA** 76:25 77:11 82:6 83:11,17 89:4 93:3,8 94:4,19 98:21 104:4,9 112:10 115:15, 20 139:22 142:21 143:4 155:21 163:7 166:5
**ASA's** 61:7
**ascertain** 121:3 216:8
**asks** 141:1 167:22
**aspect** 144:11
**aspects** 16:21
**assault** 150:10,21
**assign** 15:19
**assigned** 15:8, 23 125:13,17 182:15
**assigning** 182:25
**assist** 130:5
**assistance** 18:17 66:20
**assistant** 82:6 89:4 98:21 112:10 139:22 194:21
**assume** 25:11 167:23 197:3
**Assumes** 180:13 212:19
**assuming**
135:25 206:10
**assumption** 128:6
**assured** 73:16
**attach** 54:12 196:20 199:19
**attached** 40:6 53:24 85:2 196:8 200:9 202:1,3,22 203:7 204:5,8 209:7
**attempting** 151:3
**attending** 15:25
**attends** 99:4
**attention** 76:18 93:22 202:17
**attest** 198:9
**attorney** 6:12 8:9 9:6,7,14 11:10,12 13:14, 21 14:12 18:19 21:20 29:2 34:24 35:3 57:10 61:3 62:7 70:10 82:7,9 83:25 87:1 88:21 89:5,6 98:21,23 105:20 112:11 135:12 139:23 152:2 160:3 171:1 194:22 196:14 214:17
**attorney's** 12:21 13:3 20:6 98:10 188:15
**attorneys** 14:1 19:8 112:12 181:11
**authority** 20:23
**availability** 19:21,22 43:24
**avoid** 90:4
**aware** 11:25 154:5,8 192:14, 19 194:8,14 201:12,22 206:3
**Awesome** 219:18

**B**

**back** 14:4 17:3 18:3 19:4 26:23 32:25 37:17 39:18,22 45:1,7 62:24 63:4 68:5 80:11 83:25 85:2 87:18 89:14 95:1,6 98:11 101:25 103:5,18 108:9 110:22 111:16 112:5 114:2,4, 5,8 137:3 141:8 142:6 157:21 158:3,12 161:11 186:2, 21 189:5 205:3, 6 215:4 217:19
**background** 213:12
**backpack** 37:12
**backtrack** 72:21 124:10
**bad** 90:8 114:19 201:14 202:3
**bag** 90:9 91:25 92:19
**balances** 189:19
**barrier** 69:11, 22 71:2,7
**base** 172:6
**based** 14:10, 14,25 15:23 34:14 38:19 57:22 58:5

66:12 80:13 84:4 124:14,16 127:21 129:8,16 147:1 149:20 150:19 156:5 161:18 162:17 165:21 166:20,22 172:24 173:3 191:8,11 195:10 199:12 200:14 207:10 212:22 218:5,6

**basically** 17:10 34:17 35:7 54:22 110:23 147:4 152:23 192:25 198:10

**basics** 20:3

**basis** 34:19 59:15 180:8

**Bates** 37:24 88:12 97:7 138:16 200:1 202:16,23,24 205:4

**bathroom** 68:24 87:14 93:2 94:23 104:3 112:20,21,25 113:2 114:9,10,12 115:14 142:20 144:14 145:1,3

**beaten** 195:24 196:3

**bed** 141:6 213:17

**bedroom** 54:11

**beer** 31:18 113:14

**begin** 7:13

**beginning** 35:8 95:14 126:5 143:15 157:22

**behalf** 6:17

11:11,12

**beige** 83:4

**beings** 61:24

**belatedly** 175:18

**belief** 150:7 151:11,12

**believable** 29:16

**believed** 114:21 146:14 156:10 179:7 180:7

**believing** 212:11

**bench** 213:17

**benefit** 76:1

**Beth** 93:1 98:7

**big** 38:12,16 113:24 145:5 211:12 215:2

**bigger** 38:11 140:18

**biggest** 36:23

**biologic** 178:10

**biological** 178:5,6,20,21,24 179:1

**biologically** 178:13

**biology** 177:21

**birth** 162:25 197:1

**birthdate** 82:11 98:18 112:14 201:6

**bit** 8:13 20:2 33:12 36:21 66:1 81:4 86:2 137:21 149:6,14 153:17 182:1 188:16 208:22 214:6

**bits** 10:9

**blade** 147:3 178:23

**blade's** 148:16

**blank** 39:7,14,25

**blanket** 83:5 90:8,9 92:14

**blind** 71:13,15,16,18,24 72:2

**blindness** 71:22,25

**blood** 141:22 147:2 154:21 177:19 178:7,8 179:14 209:12 213:19 214:25

**blood's** 177:21

**Blues** 77:22

**blurred** 210:9

**board** 44:12

**body** 26:11 51:1 89:12 114:22 148:7 151:9 214:9,11,14

**boo-hoo** 123:5

**boost** 215:1

**bored** 210:4

**born** 89:8 98:25 140:1

**bosses** 40:15 173:2

**bothering** 28:19,21

**bottom** 82:15 88:4 116:20,21 139:4 163:6 164:12 187:2 198:1,4 200:14,15 207:1,8,14

**bound** 168:19

**box** 105:7 162:18 163:7,18,23 167:25

168:10,11

**boxes** 168:5,9

**boy** 89:12

**Branch** 13:8

**branched** 15:13

**Braun** 9:10,11

**break** 8:4 17:19 18:8 62:3 87:10,11,22 91:4,19 159:9 161:2 170:22,25

**breaks** 148:10

**breathalyzer** 120:14

**breathe** 67:20

**briefly** 76:1

**bring** 24:7 66:21 83:25 152:9,10 172:19 175:8 214:24 215:3

**bringing** 152:7,9

**broad** 84:16

**Broadway** 179:1

**broken** 70:24 114:12

**Brothers** 77:22

**brought** 21:25 49:3 66:13 101:9,11 114:8 183:14

**bruised** 218:8

**bruises** 216:19 217:20,21 218:12

**building** 82:23 83:3 101:8,12 142:10

**buildings** 69:1

**bunch** 42:15

56:12

**burden** 129:10

**burglary** 168:25

**burns** 50:14 97:7 107:22 111:17 123:23 126:12 127:5 132:19 162:18 163:11 192:14,15,17,22 205:11 206:7,11 208:25 209:3

**Burns'** 202:19 204:5,8 205:13 209:7

**Burns's** 133:11

**burnt** 31:14

**busy** 26:19

**buy** 90:1 99:9 113:5

## C

**call** 20:23 21:8 53:11 65:10 75:14 103:20 141:25 147:24 190:8 214:18 215:2,3

**called** 13:10 21:12,25 54:19 144:16

**calling** 21:6 49:11 53:13 62:1 127:24 128:5,13 129:2 180:10

**calls** 10:15 53:12

**camera** 22:20 37:14

**cameras** 196:14

**candy** 100:17

**capacity** 152:6

**car** 31:17 32:4 37:14 89:15,16, 17,18,19 90:2, 10 99:10,12,13, 14,17,18,19,20 100:2,11,15,17, 20,22,25 101:1, 16,17 103:23 124:2 132:8,19, 25 133:13,15, 17,18 134:18 142:2,3 164:2 166:7,9 203:4

**car's** 89:16

**carbon** 38:17, 19

**card** 100:22 133:8,14,19 134:2

**cards** 100:23 133:11,15

**care** 61:20,22 184:3 214:7 215:6,7,19

**career** 12:24 22:5 26:13 30:4 31:8 71:18 160:2

**careful** 89:20 90:2 101:19 103:11

**Carl** 6:10,18 8:24 42:25 46:25 47:17 48:16 49:17 50:14,16,17,22 51:13,14 63:2 65:19 82:8 83:1,2 89:5,14, 15,25 90:3,4,6, 19,22 91:10,21 92:15,18,20 98:22 99:8,11, 13 111:17 112:11 113:8, 10,11,12,14,19, 20,22,23 114:1, 2,3,5,6,13,15, 16,24 115:1,3 116:6 126:13, 14 128:7 138:16 139:2, 16,24,25 140:1, 2,4,5,8,10,12, 13,14,16,17,19, 21,23,24 141:1, 2,3,5,6,7,9,11, 12,13,14,16,18, 19,20,21,22,23, 24,25 142:1,2, 3,4,5,7,9,10,13, 15,16,18,19,20, 21,23,24 143:1, 3,5,8 150:21,25 153:2,3,21 154:11 155:9, 17,18,21,22 158:8,15 159:12,14,16 160:11 176:7,8 178:22,25 180:1 181:17 183:13 184:21, 24 187:2 191:1 195:3,16 196:2, 5,24 198:9,12, 25 199:4,14 202:8,18 206:17,21,25 207:5,7,11,13, 16,20 208:4 210:24 218:7

**Carl's** 90:6 91:22 92:18 107:11 113:13, 15 114:1,3,5 141:10,13,19, 20 143:24 145:23 151:1 157:14 169:24 184:9,15 186:22

**carried** 113:7

**carrying** 83:3

**Carter** 113:5,6

**case** 6:13 8:22 9:17 10:5,12, 14,24 11:9,14 17:14 18:23 30:11,12 31:12 39:2,9,10,12 40:12,18 41:6 42:5,13,14,17, 22,23 43:5,16 45:5 46:14,24 47:4 51:14 61:13 63:13 65:18 66:22 75:3 78:25 86:8,19 87:24 88:13 108:4 125:3,4,14,16 127:9 128:21, 24 129:2 132:8 133:23 135:13 143:24 144:15, 23 153:6,24 154:6 160:6 161:23 166:25 171:14 174:10, 19,24 175:24 177:5 183:1,14, 20,21 184:7,9, 15,17,20,22 185:1 186:6 187:8 190:18 193:13,15 194:2 199:18 201:10 215:15

**caseload** 182:16

**cases** 13:14 18:24 35:6 67:18 96:17 125:13 182:15, 16 185:2,6,9 193:17,18,19

**category** 31:3

**caused** 153:4 191:25 192:1 207:25 218:12

**CCSAO** 15:3 137:18

**CCSAO403** 93:12

**cease** 119:24

**cell** 37:16

**Central** 6:7

**cetera** 8:25 26:23 45:24 123:11,12

**chain** 16:24

**chained** 213:18

**chair** 31:16,21

**challenge** 165:20

**chance** 76:24 83:15 93:6 94:3 104:7 115:19 143:2 155:19

**change** 27:3 59:8 80:13 83:14 96:6

**changed** 51:17

**character** 34:2 188:18

**charge** 33:12, 24,25 34:13 59:11 129:10 152:9,10,17,19 153:6,18,19,21, 24 176:11,12, 18 178:19 179:3 180:9 188:20 190:5 202:8

**charged** 128:9, 14 148:23 152:15

**charges** 29:6,8 33:6 34:1,14,18 35:4 50:4,7 127:25 128:3,5, 7 129:5 144:16 152:7 168:24 169:7,13,24 171:2,4,21,22 172:6,19 175:8 188:22 189:23 192:22 193:1 201:9,17

**charging** 33:13 34:7 59:15 153:14 179:2 189:11

**chart** 145:8

**check** 133:14

**checking** 82:22

**checks** 99:19 189:19

**Chicago** 6:8, 11,23 12:9,13, 14 20:4

**child** 56:9,14, 21 57:5

**Chinese** 101:10,11

**chips** 142:18

**choose** 15:5,7 96:2

**chose** 26:22 69:7 191:12

**Chuck** 99:15, 17 203:4 206:8, 13

**CI** 42:14

**cigarettes** 31:18 115:13

**circumstance** 58:11,13 63:22

**circumstances** 64:16 120:8, 11 213:25

**circumstantial** 174:18,20 180:19

**City** 6:11,22

**CITY-** 80:11 97:7

**CITY-REED** 76:19 88:12,13 93:23 97:8 109:18 112:6 116:20 122:14 137:15 138:17 155:16 159:12 186:23 187:17 200:2 202:16, 24 205:4

**CIU** 183:9,10, 14,17 184:10, 14 185:3

**clarification** 49:16

**clarify** 9:2 27:22 43:23 45:2,14 54:8,25 55:24 56:3 66:19 71:4 74:12 75:12 77:8 146:2 157:23 177:17 211:1

**clarifying** 20:1 22:4 46:7 95:12

**clarity** 67:4 138:11

**classroom-like** 17:6

**classroom-type** 22:15,17

**CLE** 15:25

**clean** 132:8

**cleaned** 100:21 133:13 134:19

**cleaning** 132:25

**clear** 29:22 32:17 34:3,21, 23 51:13 53:19 54:9 55:12,16 57:19 58:8 80:2 91:12 94:16,21 97:21 100:16 102:23 108:11 116:1 118:19 122:6 124:5 125:19 132:9 133:4 134:15 137:18 138:6 139:3,8,15 174:3 213:11 216:2

**cleared** 55:14

**clerk** 200:5 202:5

**close** 159:10

**closed** 92:3 113:1

**closer** 204:20

**clutching** 141:13 151:7

**coffee** 32:4 57:24 93:1

**cogent** 60:10

**cold** 68:25 69:3

**collaboration** 129:24 131:21

**collaborative** 129:22

**collected** 164:21

**College** 99:5

**color** 89:16

**comfortable** 68:10 145:1

**commander** 214:18

**commanders** 61:20

**committed** 24:17 50:2 128:14

**committee's** 91:7

**committing** 150:15

**common** 56:14,22 181:13 214:24

**communicate** 56:1,23 70:3

**communicating** 57:16 60:21

**communication** 71:2,7

**compare** 170:14 173:10

**comparison** 176:25 177:3

**compelling** 25:23 26:1

**competent** 62:4

**complain** 209:21 210:6, 12

**complained** 215:21

**complaint** 10:5,11,19,23 11:6,9,25 154:7

**completely** 71:16 80:2 130:12 150:8, 11

**completing** 39:16,17

**complexity** 42:12

**complicated** 152:13

**compound** 23:22 170:21

**comprehend** 62:10

**comprehended** 62:25

**comprehending** 60:16,22,23 61:5 62:15,19, 20

**comprehension** 66:2

**computer** 97:20 98:3

**concern** 27:2 37:6 191:25 192:1 208:1

**concerned** 11:19 212:4

**concerns** 12:3 107:3

**concluded** 219:21

**concludes** 219:19

**conclusion** 10:16 196:5 198:15

**conclusive** 34:2 188:17

**condition** 145:13 195:7

**conditioner** 113:5,7

**conditioners** 69:3

**conditions** 68:17

**conducive** 24:7

**conduct** 164:22

**conference** 126:16 217:10

**confession** 24:11,14 27:4 30:23,25 107:11,13 145:23 146:3, 14 155:15,17 180:8,15 186:22

**confessions** 25:22 186:25

**confirm** 179:1

**conflating** 110:19

**conflicted** 183:25 184:4

**confront** 58:20

**confused** 66:6,13 149:14 191:20

**confuses** 132:18

**confusing** 86:24

**confusion** 210:11

**connected** 197:3

**conning** 90:5

**consciousness** 181:6

**consent** 23:4, 8,10

**consequences** 181:13

**consideration** 201:18

**considerations** 43:18

**considered** 165:19 202:6

**consist** 22:18

**consistent** 59:14,17 66:20 175:2 205:11, 17,20,21 206:5, 11 207:6,12

**constitutional** 139:19

**construct** 189:1

**consume** 120:6

**contacted** 21:12,24

**contaminated** 176:20 177:7

**contemporaneous** 156:16

**contemporaneously** 80:23 174:12

**continue** 73:15 91:15 102:24

**continuing** 42:14

**contractors** 20:13

**contradicts** 55:22 58:8

**contribute** 129:21

**control** 27:19

**conversation** 9:23 44:7 45:16 126:13,19 218:3
**conversations** 51:24 96:23 166:22
**conviction** 13:15,17 129:10 182:2,3, 7
**convictions** 174:24
**Cook** 6:11,12
**copies** 76:12 91:5 130:6
**copy** 76:8 90:10,11,16,24 91:18 130:1,3,4 137:18 139:9 161:20 199:22 202:21 208:14 219:4
**copy's** 201:14
**copying** 90:8 123:5
**core** 119:20
**Cornell** 113:5, 10
**Cornell's** 113:12
**corner** 101:20
**correct** 9:4 14:13 47:5 53:9 55:24 64:2 74:24 75:16 78:2,10 80:15 81:3,19 84:6 88:1,2 105:8,9 108:2 111:10, 19 112:4 122:12 129:19 131:6,9 133:24 155:13 160:25 162:1 166:2,17 171:3 184:11, 16 195:19 198:2,16,19 199:1,10 200:5, 16,17 201:12, 23 202:12,23 204:18 205:24 206:5,8,22 207:2
**correctional** 19:2 35:14
**corrections** 73:3 76:24 78:11,13 79:11 80:6 83:16 93:7 94:4 95:7 104:8 110:14 115:19 143:3 155:20 187:16
**correctly** 77:2 214:10
**corroborate** 170:13
**corroborated** 172:7
**corroboration** 172:4 173:8,12 174:14
**counsel** 6:15 7:12
**country** 174:25
**County** 6:11, 12
**couple** 36:22 69:14 85:8 95:12 123:21 196:20 200:15 210:20
**court** 6:5,14 7:6 13:4 19:6,9, 11,15 20:11 21:12,13 22:6,7 24:8,12,19,25 26:24 27:1 38:12,13 52:4 69:19 72:8 75:4,9,15 142:24 189:13, 14
**court-** 69:19 159:1 160:3
**court-appointed** 71:11
**court-based** 183:7
**court-reported** 71:10 159:15, 18,22 160:12
**cover** 38:5
**crack** 113:6,10, 11,20 114:5 115:3 116:6
**crazy** 102:16
**create** 45:15 56:25
**created** 52:15 182:20
**credibility** 29:9 33:18,20 34:2,7,16 57:6 59:20 106:22 107:3 172:5
**credible** 29:14, 25 30:6 66:21
**credibly** 188:13
**credit** 100:22 133:8,14,19
**credulity** 29:19
**creep** 138:1
**crime** 24:17 33:15 34:14 50:2,16 173:25 174:6 176:20 177:7 186:16
**criminal** 27:20 34:25 150:10 152:2
**cross** 74:17 105:7 187:12
**CROSS-EXAMINATION** 190:24 217:1
**crossed** 141:15 142:12 162:22 187:4,6, 18
**crowded** 141:7
**crying** 67:19, 20
**CT** 219:21
**cuffed** 217:10
**cuffs** 217:14,15
**cup** 31:20,22, 23 32:7,18 146:21,22,23
**curb** 32:5
**curiosity** 46:3
**curious** 48:15
**cursive** 75:6 205:2
**custody** 61:19, 23 85:18 181:10 217:23
**cut** 147:3 215:11

**D**

**dark** 138:18
**darker** 109:23 216:19
**Darren** 190:20 192:24
**date** 93:12 140:5 162:10, 11,25
**dates** 197:1
**day** 6:6 27:17, 22,23 49:2 89:11 100:1 103:19 113:2,4 114:9 120:18 140:4,19 141:23 162:13 176:19 188:5 190:11 198:12 211:3
**days** 14:4,5,6, 8,17,18,19,21, 22 16:16,19 40:15 49:4 99:24 105:2 142:1,7,9 155:4 181:21 212:23
**DB** 13:14
**dead** 101:10,11 114:21 132:12 142:10 179:23
**deadly** 150:13 153:10
**deaf** 70:18 71:5
**deal** 100:8 134:22 211:12 215:2
**death** 51:5 153:1
**December** 89:9
**decide** 15:16 29:5,16 50:3,4 52:9 63:8 68:13 151:23 153:7 190:4
**decided** 15:14 71:9 103:12 140:13,14
**decides** 49:20
**deciding** 29:7 34:4 152:9,10 155:5 176:11
**decision** 33:5 43:19 44:1 52:6,10 59:11 67:17 175:7 176:12 178:19 179:3,5 190:7
**deem** 120:6
**Def** 37:24
**defendant** 6:20,25 11:14 37:24 44:3 99:20,23,25 100:2,3,4,6,7 101:1,13,14,15, 16,20,22,24,25 103:4,7,9,12, 13,14,15,16,18, 23 111:18,21,

22,24 112:2 133:18 161:18, 19 162:16 163:17 167:25 168:4,10 188:18

**defendants** 9:16 99:21

**defense** 150:22 153:10, 18,19,25

**defenses** 153:20

**deference** 105:24

**define** 24:14 172:22

**defined** 188:12

**defining** 174:21

**definition** 27:13 153:1

**degree** 150:8 151:18 153:6,8, 18,20 169:4

**delay** 26:19 27:7

**deliver** 140:7

**delivered** 100:6 140:9

**delivery** 219:14

**Delong** 50:14 51:10 65:19 109:17 112:12, 14,15,16,18,20, 21,22,23,25 113:1,2,4,6,7,8, 9,11,12,13,14, 16,18,20,21,24 114:1,2,3,4,6,8, 9,11,12,15,16, 17,18,20,21,22, 24 115:2,3,4,5, 7,9,12,14,15, 16,20 116:6,7, 14,16 122:18 123:9,10,13 140:5,8,9,10,12 141:24 142:2,4 163:18 165:21

**Delong's** 113:16 115:4

**demeanor** 25:4 26:11 28:13,16

**demonstrate** 95:1,23 109:9 110:17 122:16 123:9,14 156:9 157:24 158:5, 19

**demonstrated** 76:22 83:12 93:4 94:1 95:4 104:5 109:6 115:16 142:25 155:18 156:18, 21 157:4,5

**demonstrating** 106:13

**denial** 130:11

**Department's** 20:4

**Depaul** 12:12, 16

**depending** 15:22 28:12 180:17

**depends** 39:19 42:17,21 105:22 183:1

**depicts** 198:12

**deposition** 6:9,19 7:22 8:9, 16,21 9:1,14 18:4 76:4 87:19 88:12,21 97:6 104:15 108:12, 15 109:17 111:3 138:15 145:21 161:12, 20 197:14,21 202:1,15,19 219:19,21

**depositions** 9:3

**deputy** 184:2

**describe** 29:1 30:9 31:11 33:11 67:16 165:17

**describes** 80:12 150:14 151:10

**describing** 151:3

**deserve** 105:24

**designate** 37:23 97:5 138:15

**desk** 77:20 82:20,21 101:4 184:5 200:5 202:5

**DET** 209:4

**detachable** 38:21

**detail** 60:1

**detective** 21:14 36:14 63:25 64:2,3,23 199:9 201:3,13

**detective's** 64:24 209:1

**detectives** 41:6 103:21,22 115:6 125:2 192:15

**determination** 34:3,20 49:23, 25 71:20 121:23 189:12

**determinations** 29:9 59:20 189:6

**determine** 34:16 52:22 73:25 75:16 95:18 129:16

**determined** 66:12 137:18 155:25

**determining** 201:9

**detract** 27:4

**diabetes** 154:22 214:12, 25

**diabetic** 154:11,19 155:3,9 192:5 213:16 214:4

**died** 115:1

**differ** 173:1

**difference** 74:15 177:6 179:24

**differences** 56:24

**differently** 24:3,5 69:22 105:21 106:14

**difficult** 137:17 144:21 148:15

**difficulty** 168:20

**digging** 71:23

**diploma** 140:3

**direct** 7:14 76:18 93:22 174:17,19 180:19 202:17

**directed** 171:15

**directing** 22:18

**direction** 175:7,10

**directly** 167:10

**director** 13:19 182:5,6,18,22, 23 184:2

**dirty** 103:14

**disabilities** 70:11

**disability** 70:15 145:13 165:9

**disabled** 213:20

**disagree** 26:1 172:25

**discerned** 204:24

**discretion** 23:2

**discuss** 128:4

**discussed** 161:17

**discusses** 84:25

**discussion** 127:18

**dismiss** 171:21

**disorder** 165:16

**disorders** 117:5,9

**dispatch** 21:13

**dispatcher** 21:11

**disputing** 102:25

**distinction** 34:21 79:13

**distinction's** 34:22

**distinctions** 153:16

**distinguish** 16:7

**distress** 211:20 212:4 214:16

**district** 6:14 19:1

**disturbances** 82:24

**division** 6:15 13:6,11 15:17,

20 185:6
**divisions** 15:4
**dizzy** 191:18, 19
**DL** 163:1,2
**DNA** 174:23,25 175:6,9,20,25 176:6,9 177:16, 18,20,21 178:5, 10,11,20 179:12,15,17 180:2 183:4
**doctor** 121:13 163:21 164:5,6, 22 166:1
**document** 24:24,25 29:14 37:22,24 39:7 40:11,14,17 51:18 53:23 54:15,18 66:17, 18 80:4 85:18 119:14 145:8 169:5,6 174:12 199:6 200:2
**documentation** 51:21 125:15 136:9 192:7 195:11 200:22
**documented** 55:8 107:23 121:12,17 136:3,5,11,13 158:20 169:10 191:23 192:9, 12,13 211:7 217:24 218:5, 10
**documenting** 45:3 46:5 60:20 68:10 167:17
**documents** 8:15,19 10:19 11:1 38:6 40:9, 19 41:10,16 42:10,24 43:2,7 52:14 54:2 85:11 88:13,20 97:1 107:16 124:14,16
125:3,18,23 127:22 138:2 158:4 169:15 192:1
**dollars** 142:5
**domestic** 13:13
**donuts** 142:18
**door** 48:1 91:21 92:18 112:22,25 113:2,3,19,21 114:10 141:6 145:8
**doorknob** 114:12
**Dorothy** 50:13 76:3,21,22,25 77:9,10,24 78:4 79:2 80:12,22 82:9,10,12,13, 14,20,21,24 83:2,5,6,7,9,10, 11,13,16 84:6, 16,20,25 85:14, 22 86:9,17 93:25 126:9 130:2 200:7 201:5 202:2,4
**Dorothy's** 78:25 79:24 86:13
**doubt** 34:4,11 93:19 94:12 158:7 174:21 204:7
**downstairs** 90:1,20,22 91:11 92:16,21 113:8
**draw** 54:9,11 172:15
**drink** 93:1 104:2 115:12 120:12,19,20 142:19
**drinking** 31:18 32:8 120:18
**drinks** 120:15
**drive** 85:24 100:17 120:12
**driver's** 100:21 133:7,14,19
**driving** 100:19
**dropped** 141:22
**drug** 68:14
**drugs** 61:10 83:9 92:24 104:1 115:10 116:24 117:22, 24,25 118:11, 17,18,24 119:4, 18 142:16 145:20
**dry** 184:19
**DS38** 93:12
**duration** 46:21 65:6,7 69:6
**duress** 64:19
**duties** 18:15 35:2 65:4
**duty** 29:2 64:8 172:18

E

**eager** 47:22,23 48:6
**earlier** 22:14 25:13 43:21 55:22 86:2 94:10 107:10 109:8 126:20 145:21 160:18 161:17,21 182:4 201:8,16 206:1,21
**early** 106:10
**easily** 36:9
**Eastern** 6:15
**easy** 152:4 215:23
**eat** 115:13 142:17 214:13
**eaten** 31:25 32:1
**eating** 214:11
**Ed** 89:22
**edification** 61:11
**effects** 119:19 121:10
**eight-page** 104:10
**Ekl** 6:22 10:15 12:5 17:19,22 20:8,10 21:1,5 23:22 25:24 44:14 49:6 76:9,14 90:11, 13 91:4,7,24 92:5 93:10 98:8,17 102:3, 11 107:4 115:25 116:4 125:6 127:10 130:21 164:24 168:2,15 170:17,19 174:1 175:17 176:14 180:12 181:18 185:15, 21 186:13 195:2 197:5,8, 11 203:24 206:16,20 208:8 210:20 212:19 213:1 215:10 216:23 217:18 218:14 219:10
**elder** 105:24
**Electronic** 219:13
**elements** 33:14,16 34:14 66:22 166:13 171:11,12,17, 25 172:3,11 173:23,25 174:5 188:20 190:14
**eliciting** 117:25
**Elizabeth** 6:22
**else's** 179:12, 17 201:6
**embarrassing** 152:1 218:1
**emotion** 106:25 181:7
**emotional** 25:20 145:16 165:10
**emotionally** 67:11 68:6
**emotions** 181:6
**encapsulated** 40:8
**encountering** 26:17
**end** 39:22 46:9 109:4 135:3 210:3 215:18
**ends** 94:18
**English** 70:22, 24 74:1 75:18 76:21 82:14 83:12 89:11 93:4 94:1 99:6 104:5 109:5 112:17 115:16 122:15 123:9 140:4 142:25 155:17
**ensure** 74:22
**entire** 19:17 21:19 36:15 76:17 79:9 176:21 190:10
**entity** 40:13
**equals** 120:15
**escape** 181:12, 13
**essentially** 77:4 119:11 161:21

**establish** 72:21
**estimated** 143:17
**evaluating** 189:16
**evening** 112:24 143:16 162:14
**everyone's** 51:6
**everything's** 170:3
**evidence** 33:15,17,18,21 34:1,13,16 49:10 50:3 128:8,16 129:5, 6 170:10,15 171:15 172:2 173:11,18,21, 22,25 174:4,5, 6,15,17,18,19, 21,22 175:2,6 176:7,10 177:8, 9,10 180:13,19 188:17,19 190:2 195:16, 23,25 196:3 201:11,18 202:6,7 212:20 215:16
**evoke** 106:24
**exact** 74:9 81:1,5 140:5
**EXAMINATION** 7:14 195:1 210:21
**examiner** 51:4
**examples** 120:10
**exams** 66:3
**excessive** 209:17
**exclude** 194:12
**excluded** 176:8 178:25
**exclusively** 13:14 181:21
**exculpatory** 150:3 180:16
**excuse** 83:15 99:23 101:2,10 112:24 113:22 176:22 201:10
**excused** 150:6,9 151:12 153:5
**executive** 119:20
**exhibit** 37:23 40:7 53:25 76:4,5,7 83:7 88:11,16 97:6, 10 98:2 99:2,3, 16 109:16,19 111:3,16 112:5 123:22 133:10 137:14 138:15, 20 161:20,24 186:22 191:14 197:9,15 199:6, 21 200:1 201:2, 25 202:1,3,14, 20,23,24 203:3, 9,16,19,21 204:4,13,25 205:12 206:13, 16 207:2 208:21 209:7, 16 218:16,17, 20,22,24
**exhibits** 110:8 139:3 196:9 199:19 202:21 203:7 219:15
**exist** 54:23 122:2 153:11 156:14
**existed** 12:1 174:25
**expand** 84:8
**expect** 16:23 204:17,19 205:7 209:10
**expecting** 41:2,20
**experience** 17:7 23:19 27:9 105:19 106:1,6, 9 125:23 135:12 149:20 172:20 173:3 211:25 212:1,2
**experienced** 18:14 120:23 149:25
**experiencing** 210:24
**expertise** 121:24
**explain** 38:7 62:22,23,24 63:3 105:25 149:15 150:17 153:17 162:19 173:14
**explaining** 34:23 63:2 106:8 171:10
**explanation** 28:14,15 137:10
**explanations** 179:25
**explore** 146:1 149:10
**explored** 146:13,19 147:7
**exploring** 147:10 149:6
**extensively** 186:5
**extent** 29:18
**external** 193:22
**extra** 98:16
**extraordinarily** 174:23

**F**

**face** 171:25 196:21
**facility** 19:2 35:14
**fact** 33:22 131:16 134:4 136:18 137:8 147:25 153:7 165:8,22 174:23 179:25 191:12 194:4 195:6,10 201:25 202:3 204:4 205:16 206:24 207:10 212:16 218:5,6
**factor** 34:10 59:12,13 136:2 165:14 181:14
**factored** 62:12
**factors** 34:19 59:18 63:10 180:17
**facts** 42:17,22 55:5 129:8 130:13,22 131:12 172:18 180:13 190:14 212:19
**faded** 137:16
**failure** 56:1,23
**fair** 30:25 127:8 157:2 195:22 199:16 213:10
**fairly** 189:18
**fake** 147:25
**fall** 151:2
**falling** 146:23 151:7
**false** 147:25
**familiar** 121:9, 11 139:13
**family** 185:6
**fatigue** 209:24
**Fatima** 6:18
**fault** 206:18
**favor** 88:24
**favorable** 171:16 172:2, 11 188:19
**fed** 144:13 145:1,2 213:18
**Fedex** 184:18, 24
**feel** 18:13 30:22 34:12,13 60:15 62:14 66:5 67:10,13 68:10 106:7 121:3 131:6 146:7,11 185:8 212:1
**feeling** 60:25 61:25 97:8 107:13 212:6, 13,24,25 216:8, 11
**feelings** 106:21
**feet** 83:3,4 90:7
**fell** 114:23 141:12,13
**felony** 8:23 13:6,11,20,25 14:11 16:8,21 18:10,19 19:8, 18 21:11,19 23:6 25:2 29:2 35:2 37:13,19 40:5,6,20 45:22 51:22 57:9 61:3 150:10,14,15 152:16 153:9, 11 181:4 188:14
**felt** 11:4 30:24 62:12 69:7 100:8 107:10 115:4 116:7 146:2,4,5,12 158:22 210:6
**field** 22:15 43:21 121:23 190:13
**figure** 47:25

48:8 53:15 59:7 75:19 120:16 132:14 134:9, 10 135:25 147:11 165:18 171:21 173:5

**figured** 52:24

**file** 127:17 129:17 131:9

**filed** 11:9

**fill** 17:4 39:7 166:20,21,23 167:22

**filled** 162:7

**filling** 39:23 163:25

**final** 34:20 44:11 76:20 93:23

**find** 25:22 26:3, 9 29:14,18 30:14,16,18 31:1 32:13 46:4 62:3 103:19 135:16 176:24 193:24

**finding** 53:3,4 171:15 189:3 190:1

**fine** 82:1 117:13 121:12 122:3 125:1 138:22 212:7 215:1 218:11 219:13

**finger** 214:8

**fingerprint** 175:23 177:3 180:1

**fingerprints** 177:18,25

**finish** 39:23 162:4

**finished** 162:5 215:10

**finishing** 95:2

**fire** 31:19

**first-degree** 169:3

**fish** 140:8,9

**fit** 52:12 165:14,18

**fitness** 165:13, 17

**fits** 33:15 170:10 172:14

**five-minute** 87:11 218:2

**fix** 142:4

**flag** 147:25 166:3

**flagged** 61:12, 18 183:25

**flagging** 58:14

**flavor** 11:4

**flesh** 147:5

**floor** 89:22 141:15

**flows** 160:14

**fluid** 49:11

**folder** 8:23 17:4 37:19 38:1,4,7,8,10, 12,14,15,17,22, 23,24,25 39:4, 8,12,17,21,23, 24 40:5,6 51:22 57:16 135:22 136:12,14 137:10 161:18

**folders** 37:13 38:25 39:2

**follow** 58:22,24 74:5,6 120:2 150:18 194:2 208:9 210:20

**follow-up** 31:6 32:2,9,12,14,21 45:15 58:25 146:20 185:18 216:24

**follow-ups** 195:3

**font** 160:14

**food** 68:24 213:18

**foods** 214:11

**force** 150:13 153:10

**forcible** 150:9, 14,15 153:9,11

**forgot** 9:8 105:17 110:3 157:21,22

**form** 10:15,20 12:5 20:8 21:1, 18 23:22 25:24 39:14 41:15 42:2 44:14 49:6 59:22 70:16 73:12 80:24 81:10 107:4 125:6 127:10, 23 128:19 130:20 144:5 146:9,15 147:21 149:19 158:16 163:23 164:20,24 165:2,3 168:2, 15 170:19 174:1 175:18 176:14 180:13 186:13 201:19 211:5 212:19 213:1,23 214:1 216:9

**formal** 52:3,4 63:8,24 64:9 68:13 69:19 71:10 72:19,22 96:20 119:24 129:15 131:23 155:5

**formally** 71:10

**Formative** 181:18

**forms** 16:25 17:1

**forward** 66:14

208:22

**found** 31:21 51:1 54:10 57:25 58:2 89:12 100:21 114:22 128:16 132:24 133:14, 18 135:17 136:9 145:22 146:24 181:22 183:18 194:4

**foundation** 20:10 25:24 49:6 107:4 124:4,9 127:10 144:7 146:15 147:21 158:17 174:1

**foundational** 198:10

**four-page** 93:9 94:5

**frame** 42:19

**free** 131:6 213:6

**frequent** 209:19

**fresh** 181:4

**fresher** 156:20

**Friday** 14:20

**friend** 112:19 115:5 134:16 140:6

**friends** 56:11, 16 101:20

**front** 112:25 113:3 123:2 135:6 141:6 178:4,18 200:13

**FRU** 16:5 70:9, 14 75:13 86:25 105:20 135:12, 22 136:12,13 160:2 170:25 188:9 216:18

**fudged** 149:24

**fully** 174:19

**fulsome** 26:8 44:7

**fumes** 31:25

**fun** 27:6

**function** 119:20

**functions** 182:13,14

**funded** 183:6

**funny** 68:2 100:8

## G

**G-A-L-A-S-S-I-N-I** 7:21

**Galassini** 6:12 7:20 76:25 77:11 82:6 83:11,17 89:4 93:3,8 94:19,25 98:21 104:4,9 112:10 115:15, 20 139:22 142:21 143:4 166:6

**Galassiniread** 94:5

**games** 141:4

**gamut** 16:3

**garbage** 142:9

**Garner** 50:13 88:15 89:6 202:12

**gas** 31:20,24 32:1,3,5,7 146:22

**gasoline** 31:13 146:21

**gave** 9:3 55:23 58:9,19 100:7 103:17 113:10, 13 143:12,14 150:3 196:10 200:12

**gears** 181:25

**GED** 89:10 99:5

**general** 40:19 43:5,6 54:19 80:1,2 167:1 189:8 194:17

**generally** 46:15 80:24 95:18 128:20, 24

**generated** 129:7

**generating** 40:17,18,19

**gentleman** 31:12

**genuinely** 131:1

**give** 7:9 12:23 35:21 42:9 44:17 47:4 56:4 60:5 62:8 63:10,14,15,18 66:19 82:9 89:6,14 90:13 97:15 98:13,23 100:4 107:8 112:12 120:10 124:4,9 128:14 130:5 138:14 139:24 151:5 184:24 193:21

**giving** 24:11 55:22 57:10 59:17 132:2 146:13 153:22 154:14 167:15, 18

**glass** 31:20 113:17

**glasses** 92:7

**global** 29:4 57:22

**goal** 138:7,8 148:21

**God** 37:17

**good** 7:16,17 24:15 32:24 49:16 59:15 60:22 67:14 75:23 109:22 110:1 117:13 124:8 125:19 138:22 186:23

**GPR** 55:1,8 107:23 108:4

**GPRS** 54:20 108:13 167:5

**grabbed** 31:20

**grabbing** 151:4

**grabs** 141:10 150:24,25

**grade** 112:17

**graduate** 12:18

**graduated** 12:20,25 13:2

**grand** 13:8 45:23 66:20 69:19 149:23

**grandma's** 112:23

**grant** 182:17 183:5

**grasp** 75:24

**great** 167:11

**greatly** 63:9

**grew** 12:14

**ground** 7:25 151:8

**groups** 23:15 105:21

**grow** 12:13

**guess** 20:22 22:19 25:9 36:10 45:14 51:6,8 58:10 64:12 79:12 96:13 119:8 131:6 138:6 144:1 155:1 173:24 174:9 177:22,23 180:22 185:19 189:10 200:20 212:16 214:4 216:5

**guessing** 21:9 134:23

**guilt** 181:6

**guilty** 34:5,13 115:4 116:8 128:8 151:18 153:8 189:22 194:5

**gun** 174:6,7

**guy** 56:6 57:5 99:7,14,15,16 101:10,11 103:15 134:5 142:2 184:3 203:3

**guys** 185:19 217:9

**H**

**Haldol** 115:11 116:25 117:1,3 119:5 121:9,10 164:10

**half** 91:20 92:17 143:15

**hall** 103:9 113:18

**hallway** 89:23 103:7

**hand** 7:6 100:14 146:25 147:3,6 148:17 205:2

**handcuffed** 217:3,12

**handcuffs** 217:8

**handed** 77:16 78:17 79:1,10, 16 80:4 81:1 85:14 182:16

**handicap** 100:17 162:19, 21 163:4,19 167:13,22,23, 24

**handicapped** 133:2 168:9

**handicaps** 168:14

**handing** 79:5

**handle** 141:15 147:18 148:7, 10,16 187:3,4, 5,14

**handleless** 30:13,20 148:11

**handling** 194:22

**hands** 51:5 153:1,2,3 172:12 177:1

**handwriting** 25:16 54:6 74:4,22,23 75:1,14 88:8 93:21 94:2 97:24,25 108:22,23,25 137:16 139:7, 16 169:1 197:24 201:7 203:18,20,25 204:23 205:9

**handwritten** 8:22 19:6,15 24:9,25 25:23 26:22 27:8 39:14 40:1,7,8 45:18 46:9,17 52:4 53:17,24 65:24 69:17 72:10 73:12,21, 22,24 74:19 75:23 76:23 78:18 80:9 81:7 83:14 93:6 104:7 115:18 118:15 122:6 126:16 136:19 142:23 143:2, 17 156:14 159:14 163:8, 10,15 191:12 194:24 197:2 199:17 200:12 203:8 204:13 209:8

**handwrittens** 187:13 188:5

**happen** 18:22 55:19 66:7 75:10 211:4

**happened** 21:18 31:9 32:7,8,21 54:11,24 55:19 66:10 67:6 78:6 80:13 81:17 94:20 114:18 117:9 118:25 124:24 125:22 127:19 158:8, 13 160:15 162:12 172:8, 17 181:5 211:6

**happening** 48:1,2 62:16 63:3 77:12 147:6,7

**hard** 16:17 38:10 136:8 199:22

**hate** 21:10 172:20

**head** 55:6 79:18 92:8

**headache** 211:12

**headaches** 209:22

**hear** 105:1 167:9 194:7

**heard** 7:2 26:18,20 45:2 61:8 142:9 184:4 185:1

**hearing** 45:23 160:20 168:19

**hearings** 13:8
**held** 69:6 122:5,6 154:13 155:10
**hell** 215:8
**helpful** 35:1 81:9 95:11 154:3 186:25
**helping** 142:4
**helps** 175:1
**Hey** 65:10 128:12 134:1 135:15 181:22
**high** 82:13 140:3 209:12
**hindsight** 184:6
**history** 60:8 174:25
**hit** 123:5
**hold** 72:7,14 90:9 102:9 136:22
**holding** 58:18 147:3
**holidays** 14:22
**home** 36:5 89:22 112:23 192:16
**homicide** 13:9 51:2,4 103:22 151:15 152:10 153:1,14
**hooking** 57:23
**hope** 62:11
**horrible** 158:14
**hospital** 19:1 35:14 67:24 164:9 166:1
**hot** 68:25
**hour** 91:20 92:17 120:15, 21 143:16,18
**hours** 8:12 14:2 26:21 27:24 28:2 48:24 49:4 82:25 103:16 120:19,21 124:6 154:14 155:10 162:14 212:17 213:15
**housed** 183:8
**housekeeping** 182:13
**human** 26:6 61:24 147:4 148:15 214:16
**hurt** 146:25
**HW** 163:7
**hyphen** 139:10
**hypothetical** 147:12 176:5 177:18,20 178:15,17 213:13
**hypotheticals** 16:22

**I**

**idea** 22:24 32:6 108:5 127:18 162:9 164:25 181:23 189:9
**identification** 76:6 88:17 97:11 109:20 138:21 161:25 197:10 203:22 218:25
**identified** 83:6 203:3
**identifiers** 197:1
**identifies** 99:16
**identify** 6:16 56:8 166:4 196:23
**identifying** 206:3,4
**identity** 52:23 53:4
**illegal** 153:5
**illicit** 117:25 118:17
**Illinois** 6:9,15 120:13 152:16 154:2
**image** 197:17
**impact** 43:19, 25 68:17 119:1 175:7 176:11
**impairment** 168:19
**impeaching** 57:4
**impeachment** 55:13,21 58:14
**implausible** 32:20 145:24
**implication** 150:20
**implying** 216:4
**important** 28:8,11,12 48:22,23 52:10 57:9 59:5,10 60:15,19 70:1 72:16 119:15, 16 165:12 168:13
**impossible** 29:19 30:19 179:10
**impression** 151:19
**impressions** 127:21
**inaccurate** 47:13 149:24
**inappropriate** 69:7
**Inaudible** 86:1 102:3
**include** 43:24
**included** 8:20 84:22 166:11 209:17
**includes** 190:1
**including** 8:25
**inclusivity** 34:10
**inconsequential** 52:9
**inconsistency** 67:3
**inconsistent** 44:25 45:7 46:5 57:11 59:18 207:22
**inconvenient** 36:7
**incorporate** 131:17
**incorrect** 21:22
**incredible** 29:18 30:14,17, 18 31:1 32:6 145:25 146:1, 14 149:7 172:7
**incredulous** 30:6 31:5 32:13 107:12 145:24 149:18 172:16
**incredulousness** 33:7
**inculpatory** 24:23 150:4 180:16
**independent** 10:7 20:13 48:13 63:1,5 78:3 79:1,4 83:21 87:25 88:14 104:14 106:17 109:12 116:13 118:20 122:17 123:12 124:13 126:23 129:17 139:1 143:21 155:24 156:4 159:16 169:14 198:21 211:8
**independently** 47:16 129:6
**indicative** 177:8 218:11
**individual** 6:25 59:19 123:24 145:12 146:13 213:15
**individuals** 144:3 216:19
**infinite** 93:17
**influence** 61:15 68:14 83:9 92:24 104:1 115:10 116:23 117:17, 22 118:17,24 120:13,22,24 142:15 145:20 192:11
**inform** 41:25 127:15 192:4
**information** 10:20 38:13 39:3 41:2,21 42:5 44:6 51:19 58:7 62:5,8 64:13 121:21 135:16 155:11 161:22 164:21 165:23 167:2,5, 10,19 168:1,7 169:9 178:15 179:2 189:2 201:11 212:22
**inherent** 129:1 188:25
**initial** 73:19 110:5,12,14
**initialed** 142:13
**initially** 111:7
**initials** 91:23 92:19 99:10 112:18 115:17 140:21 160:12

**injure** 30:20
**injuries** 30:16 218:9
**injury** 67:25
**ink** 97:9 138:18
**input** 15:18
**inquire** 168:22
**inquiries** 60:3
**inquiry** 60:14 117:8
**inserted** 112:18
**inside** 38:1,4, 15,17,22,23 114:11
**insight** 44:17
**insisting** 32:17
**insists** 141:11 151:1
**instance** 201:20,25
**instances** 30:10
**instructions** 171:13
**insulin** 154:18, 20 155:3,10 192:16 195:4,8, 11 213:16 214:8
**insurance** 100:18
**intake** 182:14 183:6
**Integrity** 13:15,17 182:2, 3,7
**intend** 140:18
**intended** 140:25
**inter** 151:6
**interact** 44:10 46:15
**interaction** 44:9 46:13
**interactions** 44:19
**interchangeable** 111:25 112:1
**intercourse** 151:6
**interest** 135:2, 14
**internal** 40:14
**interpreted** 118:10
**interpreter** 69:15,18,20 70:19,23 71:11
**interpreting** 71:9
**interrogation** 155:1
**interrogatories** 11:3
**interrogatory** 8:25 154:8
**interrupt** 136:23
**interview** 19:3 46:10,16 47:17 54:14 55:7 83:21 86:16 88:14 93:17 104:14 106:9, 25 116:14 131:15,25 132:1 139:2 144:3,23 160:2
**interviewed** 51:10 66:11 70:17,21 71:5 166:5,16 192:14
**interviewing** 43:8 77:15 106:16 131:24 143:23 159:21 210:25
**interviews** 44:11 124:2 186:18
**introduced** 47:21
**investigated** 42:13 182:20
**investigating** 184:9
**investigation** 9:22 10:8 11:22 12:2,4 18:10 24:18 27:20 42:14 48:10 50:10 52:16 63:3 84:17,22 85:10 86:18,25 87:5 123:24 124:20 126:24 127:2 129:7 131:12 135:8 184:14
**investigations** 48:2
**investigative** 41:24 129:17 131:9
**investigator** 64:4
**involved** 105:2 164:2 184:8,13
**involvement** 11:21 12:3 47:17 65:14
**IR** 162:19,23 163:3 167:12 196:25
**irrelevant** 84:13
**Israa** 6:17
**issue** 25:16 33:6 61:14 62:4 165:13 168:21 172:4 173:7,9, 12 196:24
**Itchhaporia** 6:24 17:20 42:2 49:8 70:16 158:16 190:25 194:25 208:11, 13,17 210:18, 23 211:5 213:23 214:1 216:9,25 217:2, 16 218:21 219:6
**item** 178:11

**J**

**Jackson** 6:5
**Jenkins** 101:6
**Jin** 201:13
**job** 12:20 16:2, 4 18:15 29:2,5 34:15 148:24
**jog** 88:22 104:17 186:7, 11
**jogging** 106:20 187:19
**Join** 49:8 130:21
**judge** 48:25 189:8
**July** 14:24 17:14,17 18:10 82:25 99:7 101:2 112:20, 22,23,24 114:18 140:5 162:10,15
**juncture** 172:4
**June** 82:12 99:1 140:1
**jury** 13:8 34:15 45:23 66:20 69:19 149:23 153:7 171:13
**justification** 172:13
**justified** 150:5, 12 151:13 153:5
**juvenile** 15:11, 13

**K**

**ketoacidosis** 214:4
**keys** 37:14 89:15 100:5,7, 14 103:18 113:13 142:3
**kidding** 214:21
**kill** 187:18
**killed** 142:12 172:12 187:18, 20,22 188:3
**Kim** 9:22 11:22 82:8 123:24 127:2,5 178:23
**kind** 14:15 18:21 20:4 31:22 58:4 61:4 81:12 99:12 104:19 106:24 120:17 124:3 127:18,20 128:4,6 129:1 131:21 133:8 135:1,3 138:8 144:3,10,11 148:14 157:21 160:13 164:6 170:9 171:14, 18 172:22 174:9,15 178:12,22 179:10 188:25 193:2,18 204:23 211:14
**kinds** 40:2 171:23
**kitchen** 141:16
**knew** 18:14 41:18 62:11 77:17 100:9 101:13,14 103:19 123:23 125:21 126:1 127:1,5 134:24 135:23 140:22 155:6,9,11 165:7 181:17 216:5

**knife** 30:14,20 54:10 107:11 141:14,16,17, 23 146:24 147:14,15,16, 19,23 148:2,3, 10,12,16 149:13 151:9 178:23 179:1,8 180:7 181:16, 17,22 187:3

**knocked** 113:1,3 140:19

**knowing** 125:14 179:22 204:12

**knowledge** 64:14 173:4 184:14,16

**L**

**lab** 130:9 176:24 177:2

**lack** 16:24 20:13 33:13 45:21,25 52:3 61:11 95:3 106:1 196:21

**Ladha** 6:18

**lady** 101:4

**laid** 126:23

**Lakefront** 82:15 200:5 202:4

**language** 56:24 58:5,12 69:11,16,22 71:11 75:18 137:20 138:3,7, 9

**languages** 70:22

**Larry** 100:23 101:3 132:20, 22,24,25 133:6, 15,20 134:5,6, 22 135:23 136:9 137:8

**latched** 114:11

**lateral** 15:12

**law** 6:7 12:8,11, 16 23:7,10 34:25 129:8,9 151:13 152:2 165:13

**lawful** 172:13

**lawsuit** 12:1

**lawyer** 82:7 89:5 98:22 112:11 139:23

**learn** 17:5 164:22 166:18 170:8

**learned** 11:13 165:1,2 183:22

**learning** 86:19

**leave** 43:13,16, 20 83:2 86:6,9 90:6 91:22 92:18 103:12 180:2,3 182:2

**leaves** 103:7, 13

**leaving** 101:7 174:11

**led** 48:3 67:17

**left** 89:20 90:3 101:19 112:22 113:15 141:23 175:21,22 180:3 201:2

**left-hand** 204:22

**legal** 10:15 12:24 38:11,16 120:12 137:24 138:1

**legally** 71:15, 18,24 72:2

**Lester** 50:13 88:10,15 89:6, 8,9,10,11,13, 14,15,16,17,18, 20,21,23,24,25 90:2,3,4,5,6,10, 22 91:10,20 92:15,16,17,20, 21,24 93:1,2,3, 5,8,25 94:1,4, 10,18,19,23 96:20,23 97:2 101:7,9,12,14, 15,16,17,18 103:8,9,10,13 113:10 202:11

**letters** 183:11

**level** 71:25 121:3

**license** 132:20 133:2,6,8

**lie** 149:22 181:10,11

**life** 9:21 120:23 212:2

**light** 171:15 172:2,10 188:19

**lighted** 31:14

**lights** 113:16, 18

**likes** 90:4

**limitation** 62:9 145:13

**linear** 49:11

**lines** 68:21 137:19 139:5

**Ling** 100:23 101:3 132:20, 22,24 133:6,16, 20 134:6 135:23 136:9 137:9

**lists** 162:19

**literally** 184:20

**live** 134:17

**lived** 101:4,5

**lives** 82:12 89:9 99:1 101:7 103:10 112:15 113:6 140:2

**loaded** 175:9

**located** 36:6

**location** 19:1 35:14 36:13 37:10 86:18 217:13

**locations** 36:3 87:3

**lock** 114:12

**locked** 217:7

**Loevy** 6:8

**log** 83:6 85:1,4, 11,14 200:4,9, 13 202:5

**logging** 82:22

**logistical** 43:23

**logistically** 54:17

**long** 8:11 16:18 26:19 27:3,7, 12,13,14,18 28:5,8 42:8,9, 13,23 48:17,20 61:12 83:4 90:7 91:25 96:19 104:20 120:1, 17 124:7 126:12 143:8, 21 152:22 161:3 188:5 213:2

**looked** 47:20 77:22 114:23 126:10 141:16 169:16 188:11 196:22 198:12

**lost** 129:13 208:23

**lot** 16:3 17:2 20:17 42:16 75:19 104:23 135:7 152:1 170:18,20 185:6 187:13 188:4,5

**lots** 120:8 148:9

**loud** 73:25 74:5,7 75:5 76:22 77:1,11, 17 78:1,5,12,19 79:2,9,11,12, 14,21 80:5,7,18 81:3 83:13,17 93:5,9 94:1,6 96:12,13,16 104:6,10 109:6 112:7 115:16, 21 123:10 142:25 143:5 155:18,22

**love** 214:20

**low** 188:13 189:18,21 214:25

**lucid** 60:11 61:5 115:12 119:10 122:11

**lunch** 159:9 161:2

**lying** 57:7 171:19

**M**

**made** 66:7 67:17 71:20 76:13 84:18 98:9 123:5 142:13 145:15 177:6 179:24 193:3 201:12, 22

**main** 180:23 183:3

**major** 101:6

**make** 8:2 15:18 29:22 34:3 37:3,20 46:8 49:25 52:10 55:12,13,15 57:13 60:3,5,7, 14 62:15,19 68:13 72:16 73:3 76:24 78:11,12,22 80:1,6 83:14,15 93:6 94:3 95:12

96:7 104:7 115:19 119:17 121:22 131:2 134:15 135:21 138:6 139:8 143:2 144:13 148:24 155:20 165:18 190:8 193:5 206:3 214:19 215:6, 11

**makes** 85:1 148:25 211:10

**making** 24:23 29:8 34:20 59:10,19 61:21 127:21 162:24 178:19 180:25 189:11 190:7 205:17

**male** 176:9 178:25

**manila** 38:10, 16

**manslaughter** 152:18

**map** 54:5,10,12

**mark** 76:4 88:11 203:16 211:13 218:17

**marked** 76:5 88:16 97:10,23 109:19 138:20 161:24 191:14 197:9,14 202:14 203:21 208:20 218:24

**masking** 214:3

**material** 178:20,22,24

**math** 33:13

**matter** 6:10 8:24 29:17 106:5 171:18 179:8 196:17 198:14 199:16

**matters** 9:3

**Maxima** 99:19

**Mcdonald's** 115:13 142:17

**meaning** 52:4 113:25 118:17 122:5

**means** 39:1 82:22 105:8 123:18 144:15 149:9 152:8 153:3 162:20 174:7 175:20 190:20

**meant** 56:2,11, 15 57:8,17,23, 25 58:2,3

**media** 40:12,16 193:19

**medical** 51:4 60:8 61:14 68:17 145:12 168:21 195:7 211:21

**medication** 67:23,25 117:4, 13 118:18 155:11 165:13 212:18

**medications** 117:20

**medicine** 117:12,18 165:15,16

**meet** 8:8

**meeting** 8:12, 13 217:4

**meetings** 8:11 9:6

**memo** 40:12, 16 193:9

**memorialize** 19:4,5 29:5 67:1,2 80:21 159:24 191:1

**memorializing** 29:23 33:1

**memories** 10:7 84:1 88:22 104:18 106:20 126:6,7,24 139:1,2 155:19 158:12 186:7, 12

**memory** 48:13 63:1 79:1 84:3 85:13 88:14 94:8 96:19 106:17 109:12 116:13 122:17 123:12 128:23 143:21 144:20 155:1,24 156:20 186:17 193:12 212:9

**men** 140:11,22

**mental** 145:16 165:10,16

**mentally** 62:2 67:11

**mention** 110:15 210:5

**mentioned** 35:8 107:10 110:4 126:6 149:12 154:6 193:9 195:11 204:13 211:10

**mentions** 132:19

**merit** 10:14

**message** 164:9

**messy** 148:14

**met** 9:6,24 126:18

**metal** 213:17

**method** 25:3,7, 8,9 191:4

**Michele** 9:7,8

**middle** 96:3 140:4 203:1

**might've** 147:1 210:24

**militaristic** 15:7

**mind** 27:4 58:14 60:3 81:21 161:1 186:8

**minds** 172:25

**mine** 139:6 201:5 204:2

**minor** 23:16

**minute** 48:8 110:22 189:4

**minutes** 8:14 103:8 143:15, 17 185:21,23

**Miranda** 73:13, 18 74:16 105:7 110:19

**Mirandized** 105:8

**mischaracterizing** 110:11

**miscommunication** 56:25 57:22 59:8

**misdemeanor** 13:6

**Misha** 6:24

**misrepresent** 29:23

**missed** 74:13 192:21

**missing** 168:1 204:15

**misspelled** 187:12

**misspoke** 133:5 177:17

**mister** 98:19

**misunderstanding** 45:17 50:22 58:5 158:15

**misunderstandings** 55:25

**misunderstood** 189:4

**mitigate** 181:2

**mitigates** 154:1

**mix** 136:20

**Monday** 14:19

**money** 90:5 100:5 140:16, 17,23 141:2,5,8 151:5

**monitoring** 182:17

**month** 14:5,6, 15,17,24 115:11 116:25

**months** 17:17 18:11 67:9 152:3

**morning** 7:16, 17

**mother** 99:4

**motion** 8:24 47:5 143:13,14, 18,20 156:19 158:5 160:17, 19 171:14 183:7 191:8,11 193:24 194:2, 11,12,15,17,20, 22 196:10 210:2

**mouth** 191:15

**move** 88:10 109:16 138:14 208:22

**moved** 83:2 217:9

**movements** 26:11

**movie** 126:10

**moving** 105:5 141:19

**multiple** 46:18

**muni** 15:13,14

**municipal** 15:12

**murder** 49:18 123:23 127:2 128:2,9,10,14 145:22 148:6 152:15 168:25 169:3,4 172:11 176:8 179:6,11, 18 180:8 181:16 190:15 192:25

**murdered** 115:6 127:6,19

**mute** 70:18 71:5

**myriad** 65:1

**mystery** 128:1

**N**

**NA** 200:25

**name's** 200:15

**named** 11:14 123:24

**Nancy** 6:9,12, 21 7:20 18:4 65:19 87:19 155:21 161:12 219:19

**narrate** 66:25 67:15 68:7,9 119:19 121:15

**narrative** 57:15 88:25 112:7 137:10

**narrowed** 50:18,23

**natural** 51:3 115:1

**Nausea** 210:14

**necessarily** 45:19 47:20 81:4 84:7 117:23 163:24 166:15 172:22 180:15 183:1

**needed** 14:5 20:14 23:10 78:19 184:18, 21 192:10 195:4 212:4

**needing** 195:11

**neighbor** 89:22 112:19 140:6

**neighborhood** 89:12 99:8 101:8

**nervous** 185:9

**newbie** 17:8

**nickname** 52:21,23 53:10

**nicknamed** 52:19 53:4

**nicknames** 52:19 206:2

**night** 14:5 43:22 89:21 90:6 99:7 101:19 113:9 114:6 124:12, 18,23 126:6 190:12

**nights** 14:4,7, 17 15:1 40:15

**Nissan** 99:18

**non-fact** 134:25

**non-legal** 189:17

**non-starter** 134:25

**noon** 49:1

**normal** 109:7 181:14 214:7

**North** 6:8 82:12,21 86:13 89:9 100:24 101:3,22 112:15 133:16 140:2

**Northern** 6:14

**note** 80:18,19 88:10 98:1 135:21 161:22 165:5,9,11 212:4

**noted** 40:3 156:18 174:12 195:20,21 213:8

**notepad** 40:22

**notes** 10:2 14:25 40:1,3,21 49:1 54:20 85:1 87:7 97:17 126:17 143:12 162:24 163:22 164:3,5 165:3

**notice** 213:8, 21 215:22

**noticed** 112:25 114:9,11,13 139:9 167:20 168:3,8 215:21

**notified** 190:19,20

**November** 17:16 67:8,9 112:15

**number** 6:13 21:8 42:9 83:7 99:16 162:18, 19,23 163:1,3, 17,20 164:1 184:18,21,22, 24 197:5,15 201:2 202:15, 20 203:9,16,19 206:14,17 208:21 209:2

**numbers** 139:4 196:25

**O**

**O'BRIEN** 190:21

**object** 42:2 44:14 50:4 70:16 83:3 90:7 125:6 146:15 147:5 175:17 213:23 214:1 216:9

**objection** 10:15 12:5 20:8 21:1,5 23:22 25:24 49:6 59:22 107:4 127:10,23 128:19,25 130:20 144:5 146:9 147:21 149:19 158:16 164:24 168:2, 15 170:17,19 174:1 176:14 180:12 181:18 186:13 211:5 212:19 213:1

**objective** 61:2 145:17,19

**objectively** 62:6 158:23 216:15

**observation** 210:7

**observations** 60:7 61:1 66:12 67:16 106:21

**observe** 145:4 195:18 212:10, 14,25 216:7 217:20

**observed** 61:2 62:13 155:2 156:18 192:2 212:11

**observers** 132:3

**observing** 6:19 156:16 158:22

**obvious** 168:18

**occasion** 86:12

**occasions** 46:18 209:16 217:5

**occurred** 180:24 191:23

**odd** 40:11

**offender** 36:24 110:20,21,23 112:3 179:19 188:18

**offense** 166:14 171:11

**offer** 24:9,12, 19 45:9 52:8 160:3

**offered** 140:23

**office** 12:22 13:3 15:9 19:13 25:8 39:18 91:7 98:10 188:15 190:6

**officer** 103:20 132:10 135:15 143:25

**officers** 6:25 41:24 42:10,20, 24 43:3 100:11

**offices** 6:7

**oil** 177:1

**older** 47:21 105:23

**omitted** 157:8

**on-the-** 16:3

**one's** 109:22 110:1 139:11, 12 161:19

**one-** 136:8

**open** 38:14 91:21 92:18 112:22 113:19 114:10

**opening** 38:15

**opinion** 10:21 177:6 210:8

**opportunities** 67:2

**opportunity** 37:5 115:2
**opposite** 218:10
**ops** 193:22
**option** 19:20 27:8
**options** 19:14
**oral** 41:5
**order** 23:11 43:10 81:5 154:20 219:12
**oriented** 212:5
**original** 99:2 134:18 203:8, 13 205:10 209:7
**outreach** 182:19
**outward** 60:23
**overview** 12:24
**owned** 101:17 133:18
**owner** 134:18

**P**

**p.m.** 14:7 219:21
**pagers** 37:17
**pages** 38:23,24 76:23 77:9 83:13 88:4 93:5 94:2 104:6 115:18 123:11 143:1 155:19 207:1,8,14
**pain** 67:23,25 210:12
**pale** 54:24
**pancreas** 214:6
**paper** 37:13 38:17,18,21 39:15 40:2,5 57:16 67:13 74:8 78:15 79:1 81:1
**papers** 99:20, 24 100:1,6 101:21,25 102:6,22 103:6, 9,15,16,17,19
**papers.'** 99:22
**paperwork** 41:4 90:1 100:19 132:11
**paragraph** 73:14 76:20 77:4 80:11,13 81:12,16 90:18 91:2 92:4 93:24 94:18 95:2,3,4, 8 96:1,12,16 109:3,6,9 110:6,18,24 111:6,7 116:5, 20 122:15 123:8,17 133:12 155:15 156:5 187:2,18
**paragraphs** 95:23
**paramedics** 214:20 215:23
**parameters** 10:18 14:10 51:16,17
**paramour** 134:11
**parked** 100:25 133:17
**parole** 103:20
**parsed** 169:25
**part** 20:5 45:22 74:16,18,19 110:4 130:10 157:4 170:3 177:15 183:9, 10 184:9 207:5 216:15
**participate** 73:21
**participation** 135:4
**Partner** 138:5
**Partner's** 102:19
**parts** 38:8 105:5
**past** 12:15
**path** 15:9
**paths** 15:10
**pause** 95:5
**pay** 140:11 141:11 151:2
**payee** 102:8,25 137:24
**payee's** 137:19
**payees** 102:8, 10,15
**payees'** 103:6
**Payers** 138:5
**pays** 102:5
**pen** 37:13 90:17
**pending** 6:13 8:5
**pens** 90:18
**people** 8:24 15:19 16:17 22:24 23:15 26:22 27:7,11 45:10,19 48:9 50:11,15 54:20 55:3 57:22 60:7 61:1,9,21,22 62:24 68:2,6 70:17,21 71:24 72:1 74:2 75:20 90:5 105:20,23, 25 106:10 117:16,19 120:23 149:21 159:9 161:2 172:9 176:20 177:11 179:21 181:2,4,8,10 190:6 212:1 214:24 217:12
**people's** 15:9 83:6 99:16 201:2 203:3,19
**perceive** 66:24 67:15 68:8 119:19 121:16
**percent** 117:6 149:22 184:1
**perfect** 45:25 80:17 219:17
**perfectly** 55:16
**performed** 152:24 172:13 180:18
**period** 16:6 27:17,23
**permanently** 213:20
**permit** 100:21 133:14,19
**permitted** 188:21
**perpetrator** 177:9
**person** 15:2 25:4,13 26:24 27:1 29:16 34:8,12 35:10, 12,18 36:11,25 41:18 45:16 52:7,19,21,23 53:4,10 57:17 62:4 66:22 67:10,25 68:6 71:5 72:23 73:15 77:19 128:2,6,13 129:3 148:23 172:11,12 175:3 196:22, 23 205:18 206:8,12,13 214:17
**person's** 25:17 34:5 62:4 165:17
**personal** 18:23,25 19:3 25:12 35:11 39:9 58:1 61:13 120:23 125:16, 20 168:21 184:14 211:25
**personally** 11:10 29:15 37:12 212:24 217:12
**perspective** 59:10
**Peter** 53:14
**Petey** 53:11, 12,14,15,16,18, 19
**Petey's** 53:13
**petition** 183:4
**phone** 18:24 35:6,10,11 137:10 190:8, 10
**phones** 37:16
**photo** 53:3,7 198:7 205:16, 18
**photocopy** 203:17
**photograph** 53:22 54:1 196:7,18 197:15,20,23 198:1,6,15,23 199:14 203:17 204:8,18,21 205:10,24 206:10,12
**photographs** 206:2
**photos** 186:16
**phrased** 59:24
**phrases** 58:6
**physical** 145:16 165:10 170:15 173:11, 18,20,22,24

174:4,15,16,21 175:2,5,6 177:8,24 190:2 196:3 211:20

**physically** 53:7 67:11 195:17 212:12

**pic** 130:4

**picked** 141:17 146:25

**picture** 52:20, 22 53:16 54:5 196:11 198:10 203:10 208:14

**pictures** 52:17

**piece** 40:5 75:14 78:17 81:1 170:11,12 202:6

**pieces** 38:17, 21 39:15 40:2

**piecing** 125:22

**pitched** 100:2

**place** 45:1 77:22 113:17 126:9 207:13

**places** 24:7 167:3

**plain** 128:4

**plaintiff** 6:18 218:16

**plate** 132:20 133:2,6 166:6

**plates** 100:18

**played** 141:9

**playing** 141:4

**plebe** 17:8

**pled** 194:5

**point** 8:3 9:21 15:16 18:13 29:17 36:18 51:12 54:17 73:23 94:23 110:6 115:25 117:8 124:8 162:10 163:20 171:24 173:6,9 182:3 189:7 207:16

**Polaroid** 37:14 196:7,8,14,18 198:22

**Polaroids** 196:6

**police** 20:4,25 35:13,17,18,20, 23 36:2,5,7,8, 12 37:1,5,7 40:25 41:5,24 42:6,10,20,24 43:3 49:21 51:19 52:24 53:8 54:13,18, 22 55:2,4,5 57:12 58:9,18 61:18 62:8 63:25 83:11 85:10,18,21 86:3 87:1 93:3 94:24 96:23 100:9,10,15,16 104:4 107:17, 19,22 108:8 114:16,24 115:15 124:11 126:2 127:17 129:18,21 130:13,17 131:8,21 132:3, 6,15 134:1 135:2,14 137:8 141:25 142:11, 21 143:25 144:4 145:2 148:8 162:5,8 166:21,22 167:14,16 181:11,21 186:16 190:2,9 217:22 218:4,9, 12

**police's** 127:9, 18

**policy** 23:12 25:10 144:9 182:21,22 188:24

**poor** 204:21

**pornography** 172:21

**portion** 73:24 88:25 112:7 161:23

**positive** 144:2

**possession** 199:7

**possibilities** 134:12

**possibility** 18:20

**possibly** 128:9

**post-trial** 183:4

**powerful** 181:7

**practicality** 24:10

**practice** 37:9 48:19 73:6 80:1,3 111:20 125:23 144:22 159:20 171:5 173:4 183:7 193:5 195:5 196:17 198:14 199:12,17 205:21 206:5 207:7 211:18

**practitioner** 55:11

**pre-** 73:17 74:17

**pre-printed** 163:23

**prefer** 217:14

**preference** 25:12

**preferences** 217:14

**preferred** 25:3, 7,8,9,10 159:3, 4 191:4

**pregnant** 187:9

**preliminary** 13:8 45:23

**preparation** 10:2 108:12,15 197:21

**prepare** 8:9 166:21 194:19

**prepared** 8:16

**preparing** 88:21 104:15 129:14

**prepped** 194:21

**preprinted** 73:13

**prescription** 117:23

**presence** 37:1, 4 200:18 218:3

**present** 9:5 63:25 64:1,6 176:4 178:14 198:8 199:13 207:7,12 213:11,12

**presenting** 50:5

**presents** 49:10

**preserved** 25:20

**press** 193:15, 17,19

**pressured** 37:7

**presumed** 127:6

**pretend** 140:15

**pretty** 35:7 45:2 46:11 64:4 75:11 123:1 138:18 139:9 145:6

**previous** 8:23 50:22 58:19

**previously** 11:3 50:17 54:13 57:12 192:2

**pricks** 214:8

**print** 91:18 176:25

**printed** 73:18 74:17

**prior** 8:20 9:1 41:12 42:16

**private** 168:22

**probable** 188:10,12,22 189:3,6,7,9,12

**probative** 166:13

**problem** 97:9 145:16 180:24

**procedure** 94:9

**proceed** 73:22 195:5

**PROCEEDINGS** 6:1

**proceeds** 177:12

**process** 18:21 22:2 29:7 32:25 33:12 34:24 36:16 41:22 45:22 46:10 49:11 64:14 74:9,13 77:5 78:16 95:17,21 109:7 110:5 122:17 123:13, 19 126:3 129:20,22 131:1,6,20 135:4 152:22 153:15 155:24 156:6 170:9 173:18 187:1 189:10,20 199:5

**processes** 77:12

**produce** 131:12 141:3
**produced** 140:16
**producing** 141:5
**product** 164:23
**professional** 211:25
**profile** 176:10 178:25
**progress** 54:19
**progressed** 25:2
**promised** 83:8 92:22 103:24 115:8
**promises** 142:13
**prompts** 167:23
**proof** 34:4,11 174:20 189:21
**proofs** 171:13
**prosecution** 67:3
**prosecutor** 20:24 82:7 89:5 98:22 112:11 139:23 152:6 153:23
**prosecutor's** 25:8 190:5
**protecting** 106:4 150:1,2
**protocols** 182:20,21
**prove** 50:4 189:22
**proved** 171:16
**provide** 26:15 64:12
**provided** 51:19 165:25 192:15 202:15
**pry** 60:7
**psychological** 117:5,9 145:17
**psychosis** 117:5
**pulled** 68:3
**pulling** 167:14
**purports** 200:4 203:17
**purpose** 19:3 51:23 86:19 121:20 196:17 198:3,6
**purposes** 64:15
**purse** 108:10
**pushed** 141:12
**pushes** 151:2,6
**put** 32:18 33:24 39:3 52:13 55:5 67:13 91:24 92:7 93:11 97:4 109:15 121:13 122:1,8 137:7 146:23 167:12 169:12 196:25
**putting** 120:25 136:19 147:24,25 198:3 205:18
**puzzle** 52:12 137:23 170:3,11,12
**puzzled** 137:20

**Q**

**quality** 39:17 203:12 204:21
**question** 10:21 11:7,21,23 14:9 19:10,21 20:16 24:15 32:14 34:6 42:8 45:12 49:13 58:10 59:24 68:19 72:20 79:17 84:15 86:24 107:6 108:19 117:23 119:10 122:14 123:6 127:12 129:25 130:6,7,8 132:4,13 144:2 145:18 149:10 152:13 153:4,5 155:14 170:6,20,21 173:17 175:9,15,18,19 177:16 178:7 180:6,18 189:5 196:11 209:11 213:7 216:2,4,17 217:19
**questions** 8:5,6 25:21 29:20 30:7 31:6 32:9,12,15 46:13 47:24 48:3,5,7 56:13 58:23,24,25 62:21 68:20 85:9 94:22 95:12 120:3 121:2 123:22 129:16,19,21 131:2,13,18,22 132:2 135:9 144:21 145:11 146:21 152:3 185:13,15,19 186:21 188:8 190:23 193:22 210:23 216:22 217:16
**quick** 17:19 40:16 97:15 216:23,25 218:15
**quickly** 108:16 111:15 188:7

**R**

**radar** 184:1
**raise** 7:6
**ran** 90:18 132:10 166:6
**random** 178:11 179:8,17
**range** 50:25
**rap** 167:15
**rare** 55:18 64:5
**reached** 104:9
**reaction** 11:15
**read** 10:5,11,18,19,23 11:2,3,5 19:11 25:16 41:13,16 47:1 54:21 55:3,7 71:24 72:3,6,9,17,24 73:2,5,7,8,16,18,23 74:1,3,5,16,21,22,23 75:1,5,8,14,17,22 76:2,17,21,23 77:1,2,9,11,16,17,18,21,24,25 78:4,5,8,10,12,18,19 79:2,9,11,12,17,20 80:5,7,18 81:2,11,21 82:1,14,16,19 83:12,13,17,20 84:25 89:11 90:19 91:6,9,12,13 92:23 93:4,5,8,11,25 94:2 95:15,18 96:5,7,10,11,12,16 97:17,19 98:1,2 99:5 104:5,6,9,17 107:12 109:5,9,10,25 110:6,17,18 111:6 112:6,7,17 115:15,17,20 116:8 122:15 123:9,10,14 137:17 139:18 140:3 142:25 143:1,4 150:24 154:7,8 155:17,18,21 156:1,9,10,22,24 157:6 158:6,9,15,19,21 159:1 194:17,23 198:25 201:4 205:19 207:23 208:2 210:3
**reading** 30:25 41:9 42:19 47:13 56:21 74:7,17,18 76:22 79:16 83:12,22,24 88:24 93:4,15 94:1,8 95:23 103:2 104:5,12 107:2 109:6 115:16,23 118:22 122:16 123:10,14 127:17,20 133:9 137:17 142:25 143:7 146:6 155:18 157:3,20 191:8
**ready** 63:8 120:7 144:15
**real** 53:11,13 128:1 144:8 148:6 215:23 216:25 218:15
**realize** 48:8 75:22
**realized** 47:23,24 51:1,3 56:13 187:15
**realizing** 48:7 205:19
**reason** 26:15 28:19 47:14 54:16 64:22 65:7 66:17,18 72:4 84:20 85:17 87:4 88:6 93:19 94:12 97:22 106:14 108:17,20,24 117:25 119:9,22 125:1,5 138:12 147:9 149:17 156:8 158:7 160:22 169:23 173:9

187:6 195:12, 14 199:3,12 204:7 208:4,7 216:7 218:7

**reasonable** 34:4,11 150:7 151:11,12 172:25 174:20

**reasons** 43:24, 25 64:21 86:5,7 128:15 156:11

**recall** 23:17,18 28:7 40:17,18, 19 50:20 69:9 70:12 71:17 75:10 86:15 107:25 108:3,9 118:5 125:9 140:5 191:19, 20 192:20 195:15 196:6 200:19,21 207:16,18,19 209:18,20,23, 25 210:4,10,13, 15,17 211:1,2 217:6

**recalled** 156:21

**receive** 22:9 23:14 41:2 61:3 70:9 211:19

**received** 22:13 30:16 89:10 155:3,10 216:18 218:9

**receiving** 61:6

**recently** 194:4

**recess** 18:2 87:17 137:2 161:10 186:1

**reckless** 152:18,19

**recognize** 54:6 139:12 197:16 203:19,25 216:19

**recollection** 9:25 23:5 47:19 50:11 63:5 78:3 79:4 83:21 87:25 93:17 104:14 118:20 124:14 125:21 156:4 159:16 169:14 198:21 207:5 211:8

**recommend** 152:11 192:22

**recommendation** 193:3,6

**recommended** 194:23

**record** 6:3,16 7:19 17:23,25 18:4 23:11 45:15 81:22 87:16,18 93:10 136:21 137:1,3 161:5,7,8,11 185:24 186:2 218:15

**recorded** 19:9 21:20 23:16,21 24:19 26:14 41:14 71:1 111:17 162:18 211:10

**recorder** 20:5, 7 23:3

**recording** 19:18

**RECROSS-EXAMINATION** 208:16

**redacted** 99:3

**redaction** 98:9

**REDIRECT** 210:21

**reduces** 154:1

**Reed** 6:10,18 8:25 42:25 46:25 50:14,16, 17 51:10,14 63:2 65:19,20, 21 76:7,8 80:12 83:1 97:7,23 99:8 109:17 112:12 113:8, 10,11 116:14, 17 126:13,14 128:7 138:16 139:16,24 140:6 150:2,14 154:9 156:2,3 158:25 163:18 172:9 174:11 177:9 179:25 180:2,20 184:21,25 191:17,20 192:4,10 195:4, 16 196:2,6,24 198:9,12 199:1, 4,14 202:8 206:21,25 207:8,11,13,16, 20 208:5 209:15 210:24 215:6 217:3,21 218:7

**Reed's** 47:17 51:13 82:8 89:6 98:22 112:12 150:4 165:21 175:25 183:14 191:1,14,15 193:23 194:11 202:2 206:17 207:6

**REEXAMINATION** 217:17

**refer** 163:9

**referencing** 206:7

**referred** 111:17

**referring** 52:20 111:21 206:13

**reflecting** 81:16

**refresh** 50:11 94:8

**refuse** 63:15, 18,21

**regard** 199:18

**registered** 133:3

**regular** 219:14

**regularly** 154:20 214:9

**regulate** 154:20 213:19

**reject** 29:6,8

**rejecting** 35:4, 6 129:5

**relate** 168:9

**related** 22:9 41:10 202:7

**relating** 178:22

**relation** 140:7

**relative** 62:3

**relevant** 43:3 52:15 84:16,21 148:23 200:10

**relied** 169:7,12

**rely** 62:7 169:24

**relying** 41:23 49:23 130:12

**remain** 110:25

**remaining** 100:5

**remember** 10:25 11:1 13:17 16:13,15 21:6,8,14 25:10 26:17 30:24 31:9 42:23 46:24 47:1,2, 16,20,21 48:5, 6,10,11,12,15, 18 50:14,20 51:12 55:11,18 61:6 70:20 71:17,20 72:1 75:13 77:14,16, 21,23 78:16,20 79:7,8 84:12 85:6,9,12,16, 20,21,24 86:11 87:6 94:21 96:6,11,17,22 97:1 104:19,21 105:2,13 106:23 107:16, 19 110:9,10 116:16 118:14 119:19 120:17 122:1 124:17, 22,25 125:12, 14 126:8,9,11, 12,13,14,15,16, 17,19,21 134:24 135:6,7 139:6,7 143:8, 11 145:7,10 146:4,5 147:8 150:2 156:25 159:19 160:1,8 162:7 166:25 169:20,21,25 170:4 184:7,23 191:9,22 192:6, 24 193:4,15 194:18 196:15, 16 211:3,9,11, 13

**remembered** 37:17 110:16

**rendition** 67:14

**repetitive** 85:8

**rephrase** 8:3 11:24 13:24 158:10 173:15 213:10

**reply** 68:18

**report** 51:4 54:20,22 55:2, 4,5 58:18 114:16 166:21 167:14,16

**reported** 19:6, 9,11,15 22:6 24:12,19,25 75:4 132:11,13 142:24 159:2 160:4

**reporter** 6:5 7:6,8,12 21:12, 13 22:7 24:8 26:24 27:1 52:4 72:8 75:9,15 98:15 136:21 197:7 206:18 219:1,4,7,11,

13,17
**reporters** 20:12
**reporting** 82:24
**reports** 82:24 108:8 132:15 167:5 186:16 190:2 201:20
**represent** 154:19
**reputation** 90:5
**request** 19:25
**requested** 20:14 22:3 26:14
**requests** 15:19
**require** 171:13
**required** 117:12 195:7
**requirement** 175:1
**resident** 83:1
**resource** 52:6
**respected** 217:15
**Respirol** 164:11,12
**respond** 131:3
**response** 113:2 119:5 191:10
**responses** 25:21
**responsibilities** 65:4 171:1
**responsibility** 20:4,6 62:14 181:12
**responsible** 182:24
**rest** 68:23 91:13 92:23 201:1 207:22
**results** 193:24
**retrieve** 180:3
**return** 83:8 92:22 103:24 115:8 142:14
**returned** 112:23
**reveal** 171:23
**review** 8:15,18, 23 13:6,20,25 14:12 16:8,21 17:17 18:10,19 19:8,16,18 21:11,20 23:6 25:2 29:2 35:3 37:13,19 39:17 40:5,6,20 41:5 43:2 45:22 51:22 57:10 61:3 62:7 66:20 69:16 104:15 108:4 129:17 137:10 152:17 161:17 181:4 186:15 188:14 200:7
**reviewed** 8:19 47:9,12 85:11 88:13 97:2 107:16 108:8 124:15,16 125:3 169:16 186:11 196:9, 10 197:20
**reviewing** 14:25 42:10,16, 24 43:7 83:24 88:20 131:8 144:12
**rewritten** 187:7
**rewrote** 75:5
**Ricardo** 50:13 97:7 98:23,25 99:1,4,5,6,8,10, 11,14,15,18,19, 25 100:1,3,5,6, 8,10,12,13,14, 16,18,20,22,25 101:1,4,6,8,9, 12,13,14,16,18, 19,21,23,24 103:6,7,8,9,10, 11,12,13,14,17, 20,22,23,25 104:2,3,4,6,9 106:16 109:5 123:23 127:4 132:19 133:9, 10,11,12,15,17 163:10 192:17 202:19 203:3 204:5,8 205:11, 13 206:7,11 208:25 209:3
**Richard** 6:10 9:19 53:12
**Ricky** 89:13, 14,16,17,19,20, 23,24,25 90:1,2 126:11
**rid** 148:3
**right-hand** 203:18
**rights** 73:19,20 106:4 139:20, 21
**rip** 38:22
**road** 46:2 86:14
**rob** 140:14
**robbery** 168:25 171:5
**role** 53:3 60:13 86:25 182:9
**roles** 13:16
**Rollo** 147:24
**Ronan** 166:5
**rookie** 17:8
**room** 44:20 46:19 64:8 126:16 131:16 143:24,25 212:23 213:15, 17 217:7,10,13
**rotating** 15:5
**routes** 15:10
**rules** 7:25
**run** 16:1,23 80:6 100:11 128:15 140:17 190:6,9
**rundown** 41:6
**running** 130:10
**runs** 16:3

**S**

**safety** 109:5 217:8
**sale** 99:18 100:3 142:4
**saliva** 178:7
**sat** 7:22
**satisfied** 57:15
**satisfy** 32:15 46:3 148:24
**satisfying** 32:16
**Saturday** 14:20
**save** 8:1
**scenario** 36:23 178:18
**scenarios** 36:22 153:11
**scene** 176:20 177:7 186:16
**scent** 147:16 149:13
**schedule** 14:23
**schedules** 16:18
**schizo** 164:15, 23
**schizophrenia** 164:14 165:22
**schizophrenic** 164:13,16 165:6
**school** 12:8, 11,16 82:13 140:3
**schooling** 12:15
**science** 172:23
**scientist** 177:23
**scratch** 73:11, 13 99:10 115:17 140:20
**scratched** 91:22 92:19 111:4 140:6 164:1 188:2
**screen** 91:24 93:11 197:12 203:15
**screen-share** 92:5
**screened** 182:15 183:21 185:4
**screening** 182:24
**screw** 65:9
**screwed** 65:15
**screwing** 65:18
**scribbled** 205:2
**scrivener** 26:6
**scrounged** 179:22
**Sean** 166:4
**search** 28:25 29:2
**seasoned** 17:9
**secondary** 153:24

**seconds** 12:24 113:21,23

**secure** 217:13

**security** 83:6 85:1,4,11,14 163:1 200:4,9, 13 202:5

**seeking** 128:7

**sees** 82:23 141:14 151:9 187:3

**self-** 150:21

**self-defense** 150:6 151:11, 20 176:1

**self-preservation** 181:9

**sell** 99:12,17 101:15 113:5 142:2 177:12 203:4

**semen** 178:6

**send** 90:14 184:18

**sense** 8:2 34:20 131:2 148:25 180:25 181:9 211:11

**sentence** 122:8 136:9 160:11

**separate** 38:25 39:2 40:13,14 46:18 106:9 209:16 217:4

**sergeants** 61:21

**served** 11:10, 25

**service** 11:11, 12

**services** 114:19

**set** 58:10 88:9

**seven-page** 115:21

**sex** 13:9 140:11,12,15, 24,25

**sexual** 150:10

**sexually** 150:21

**shadowing** 17:10,11,15

**shape** 41:14

**share** 112:20 186:8

**sharing** 199:24

**sharp** 147:5

**sheet** 38:19,20 161:22 166:12 167:15

**sheets** 39:25

**Sheridan** 82:13,21 86:14 89:10 100:24 101:3,22 112:16 133:16 140:2

**shift** 13:22 14:14,15 39:22

**shifts** 13:25 14:3,9

**shirt** 141:10, 11,13,19 150:24 151:1,7

**shooting** 174:7,8

**short** 111:8 113:15 120:17 161:2

**Shorty** 99:22

**Shorty'** 99:21

**shoulder** 92:1, 20

**show** 42:4 52:14,17 53:7, 15,16,22 54:2, 4,5,7,14,21 55:1 73:17 99:13 131:7 161:16 175:3 178:4 196:22 197:2 203:12, 15 206:2,16 208:14 218:1

**showed** 17:1,4 126:1 176:6 205:12 218:16

**showing** 37:23 38:3 54:1 55:6 197:14 203:16 206:12 214:15

**shown** 17:5 204:16 206:13

**shows** 106:14 178:21 198:11 205:10

**shut** 113:20

**sic** 94:10 100:22

**side** 98:1 102:23 137:16 139:5 203:18 204:22 205:9

**sign** 71:11 73:19 110:18, 24 176:18 179:2 200:18 204:17 205:23

**signature** 88:3 111:8 157:1,3 198:4 200:14, 20,24 205:10 206:25 207:10, 13 219:1

**signatures** 82:15 198:18, 22,25 204:11, 15 205:8

**signed** 89:24 111:6 199:4,14 200:22 206:11, 22 207:8

**signing** 198:6

**signs** 60:23 211:20

**silent** 111:1

**silently** 78:18 79:2,17,21 80:5,19 81:2

**silly** 11:7 20:16

**similar** 15:24 22:14 41:22 107:13 122:14 155:16 189:15

**similarly** 41:19 42:18 93:24 187:17

**simply** 26:18 121:20

**sing** 175:22

**single** 149:23 159:21 176:24

**sister** 99:4

**sit** 39:20 65:24 77:18 78:17 101:24 108:1,3 113:14 146:6 169:14 195:15 204:3

**site** 39:17 86:10,16

**sitting** 28:17 31:16,19,24 55:10 89:3 107:21 134:3 148:12

**situation** 26:13 32:12 45:8 58:7 66:4 69:5 71:4 74:25 81:10 158:13,25 175:5 176:5

**situations** 27:19 54:4 67:10 69:13

**sized** 38:11,16

**skimmed** 11:2 154:7

**skinned** 216:19

**sleeve** 141:10 151:1

**slick** 47:25

**slightly** 170:5

**slung** 92:20

**small** 141:7

**smaller** 160:14

**smell** 61:10 114:9,13,19

**smelled** 142:8

**smoke** 115:13 116:6 142:19

**smoked** 113:11 114:6 115:3

**smoking** 31:18,24 32:8

**snatch** 140:17

**snitch** 114:17

**sober** 60:11 122:10

**soberness** 121:6

**Sobriety** 121:5,8

**social** 114:19 163:1

**soda** 104:2 115:12 142:18

**soft** 130:9

**sold** 140:8

**solemnly** 7:8

**somebody's** 43:12 168:18 178:11

**someone's** 36:4,5 59:14 61:14 75:17 106:2 119:10, 21 165:14 167:15,18 179:12

**something's** 54:8 62:1

**sooner** 75:19

**sort** 11:14 15:12,21 16:22 17:7 22:23 33:13 44:17 47:25 50:17 62:9 63:10 174:14 184:17

**Soukup** 50:13 82:9 87:23 174:10 200:8 201:5

**Soukup's** 76:3,19 202:4

**sound** 11:7 20:16 85:7

**sounds** 179:10

**source** 178:5,6

**sources** 136:20

**space** 164:2

**spark** 135:14

**sparked** 135:2

**speak** 9:13 51:19 65:6,7 70:21 144:1

**speaker** 113:24 114:7 115:25 116:1

**speakers** 115:4 116:7

**speaking** 9:25 46:17 124:18 168:20

**speaks** 69:16 78:7 123:20 156:12

**specific** 16:2 43:16 54:7 79:25 86:20 106:9 107:9 128:21 145:13 174:23 177:23 187:8 207:5

**specifically** 46:14 108:11 144:23

**speculate** 187:9

**speculating** 10:17 21:10 65:23 78:5 125:7 134:11 148:3 177:6 187:20

**speculation** 181:18 186:14

**speculative** 147:12

**spell** 7:18 207:17,21 208:5

**spelled** 164:18 187:14

**spend** 41:9 42:9,19

**spent** 42:24

**spiritual** 145:17 165:10

**spoke** 46:25 48:12,13 50:10 70:22,23,24

**spoken** 9:16, 19 70:25 125:2 144:4

**sponsored** 69:20

**SRO** 82:15 83:5 85:15 87:2 89:13 200:5 202:4

**stab** 30:19 148:9,15

**stabbed** 30:13 141:17,20,21, 24 152:25

**stabbing** 147:4

**stabs** 151:10

**stacked** 39:1

**stacks** 178:18

**stage** 58:11 189:19,22

**stairs** 103:13

**stamp** 88:12 97:7 109:18

**stamped** 37:24 93:12 138:17 200:2 202:16, 23,24 205:4

**stand** 27:15 64:25 121:1

**standard** 37:9 81:12 117:22 188:13,14

**standard's** 189:18

**standing** 54:9 141:6

**STAR** 209:2

**start** 15:20 18:23 19:8 20:3 24:1 41:1 43:6 44:22 76:3 81:23 82:2 92:13 95:14,17 111:21 133:12 144:2 154:10 162:3 202:2

**started** 13:3 16:5 17:16 19:11 119:13 138:25 162:13

**starts** 81:24 109:4 187:2

**state** 7:18,25 60:3 91:7 98:10,21 112:10 171:16 172:3,18 188:15 194:21

**state's** 6:11 12:21 13:2 20:6 89:4 139:22 181:11 196:13 214:16

**stated** 19:22 31:12,16 99:11, 21 100:3,6 101:21 115:5 170:22 180:24

**statement** 18:22 19:5 21:21 22:7 23:3,11,15,20 24:9,13,16,19, 24 26:14 27:3 28:5 30:4 33:1, 7 35:2,9,16,23 36:11,24 39:6, 14 40:1,25 41:12,17,20 42:25 44:9,11 45:8,9,18 46:9, 17 47:18 51:25 52:3,6 53:17, 23,25 55:22,23 57:11 58:9,19 60:6,24 63:8, 14,16,19,24 64:9,11,16,18, 20,24 65:1,8 66:5,8,9,14 67:1 68:4,13 69:8,17,18 70:4,15 71:6, 12,21 72:4,7, 10,19,22 73:2, 4,12,15,21,22, 24 74:5,10,14, 18 76:3,17,20, 23 77:1,10,25 78:1,4,7,8,25 79:25 80:10,20, 24 81:18,21,24 82:10 83:8,10, 14,17,22,24 84:18,23 85:1, 2,5,15,19 86:10,13 87:3, 23,25 88:7,10, 25 89:7 92:23, 25 93:6,9,20, 23,25 94:3,5 95:15,22 96:20, 24 97:2,6 98:24 103:25 104:2,7, 10 105:6 107:2, 15,24 108:18 109:9,17 110:19,24 111:12,16,17 112:13 115:9, 11,18,21 116:24 117:7 119:17,25 120:25 122:7, 10 123:11,18, 22 127:4 129:15 131:23 132:5,23 133:7, 11 135:21 136:12,17 138:10,13,16 139:16,24 142:14,16,22, 23,24 143:2,5, 17 144:25 146:20 148:22 150:3,4,5,19 153:12 154:15 155:5,12,22 159:2,13,14,15, 17,18,23,24 160:5,7,12 164:20 165:19, 21 168:6,11 169:24 177:15 180:16 184:1 191:2,13,14 194:24 195:5 196:2,5,19,22, 23 197:2 198:13,16 199:17 200:7,9, 12 202:4,11,19 203:6,8 204:5,9 205:13 206:17, 22 207:6,23 208:1 209:8 212:5,8 218:7

**statements** 8:22 17:14 19:4,9,12 22:8, 10 23:23 24:2,6 29:5,9,24 31:4 35:5,20 36:1 37:11 59:18 64:2 67:2 70:19,20 71:1 74:15 76:1 86:3 87:2 107:22 127:16 149:21 157:6 170:13 171:5 173:10 177:14 190:1 199:19 201:21 202:10

**states** 6:13 76:21,22,25 77:9,11 82:6, 11,12,13,14,20,

21,24 83:2,5,7, 9,12,13,16 89:8,9,10,11, 14,15,17,18,20, 21,23,24,25 90:2,3,6,10 91:20 92:16,21, 24 93:1,2,4,5,8, 24,25 94:2,4, 19,23 98:25 99:1,4,6,10,18, 25 100:8,15,20, 23,25 101:1,4, 9,12,23 103:6, 14,17,20,23,25 104:2,3,5,6,9 112:15,16,19, 21,22 113:3,4, 6,7,8,9,12,14, 17,18,20,21 114:3,4,6,8,10, 12,15,16,18,21, 23,24 115:5,7, 9,12,14,15,17, 20 123:9,10 133:9,11,13,15, 17 139:25 140:1,3,4,8,10, 12,13,15,17,19, 21,23,25 141:1, 2,4,5,7,8,9,11, 12,14,16,17,18, 19,22,23,24 142:1,3,5,7,9, 10,13,15,17,18, 19,20,21,23,24 143:1,4 150:5, 25 155:16,17, 18 159:12,14 160:11 187:2

**stating** 24:17 82:5 98:20 112:9 139:20, 21

**station** 35:13, 17,18,20,23 36:2,5,7,8,12 40:25 43:13 48:17,20 49:4 86:3 87:1 124:11,23 131:8 162:5,8

**statute** 33:14 171:12

**staying** 113:25

**stays** 113:9

**step** 32:15

**stepped** 214:18

**steps** 43:4 62:18

**stolen** 100:11, 15 124:2 132:9, 12,14,19 133:4

**stomach** 210:12

**stop** 65:20 67:19,20 185:11,13 215:6,23

**stopped** 94:22, 25 215:7,19

**stories** 61:8

**story** 25:18 59:8,9 107:11 120:17 145:22 148:25 149:18 175:24

**straight** 57:14, 15 99:21,22

**straighten** 100:19

**strange** 29:19

**street** 31:17 183:8

**strike** 24:1 36:10 144:19 211:19

**strong** 187:21

**structured** 15:25

**struggled** 75:7

**stuff** 121:15 179:22 183:10 189:25

**stump** 31:19

**Styrofoam** 31:23,25 32:1, 7,18

**subject** 24:18

**subjective** 61:2 216:15

**subjectively** 60:25 212:15

**subsequent** 207:1

**substance** 178:12

**substantively** 58:8

**suburbs** 12:14

**sudden** 9:9

**suffering** 165:8 209:22

**sufficient** 11:5

**sugar** 154:21 209:13 213:19 214:25

**suggests** 125:15

**suitable** 176:25 177:3

**Sullivan** 6:20 7:3 9:8,10 87:9, 11,13 97:19 122:20 127:23 128:19,25 130:20 144:5,7 146:9,15 147:21 149:19 157:13,16,18 161:3 168:16 219:2

**summaries** 135:6,9

**summarize** 29:21 78:22 163:14

**summarizing** 77:5

**summary** 26:7 80:21 82:10 89:7 98:24 112:13 139:25 191:16

**summer** 69:3

**super** 106:2 118:19 154:3

**supervisor** 13:18 16:1 17:10 52:11 170:2 172:24 182:10,11,22 190:8,21 192:22 193:10

**supervisors** 15:19 40:12 190:12

**supplemental** 45:15 167:16

**supplementary** 166:20

**supplemented** 45:9

**support** 34:9 129:9 173:25 174:4,5

**supports** 34:14 128:8 173:23 190:14

**suppose** 105:22 214:5

**suppress** 156:20 160:19 193:24 194:3, 11,15,20

**surprised** 194:7

**suspect** 23:4, 11,20 24:11,17 26:14 27:3 31:14 39:6 41:1,20 42:20 44:3,4,21 46:14,15,22 49:9,10,12,14, 18,21 50:4,6,18 51:6,11,15,20 62:9,15,20 63:7,18 66:2,6, 12 69:5,10,22 72:23 73:7,17, 23 74:20 80:3 105:11 111:5, 13,24 112:2 143:23 144:23 159:21 160:2 196:18 201:21 213:5

**suspect's** 26:10 74:10

**suspected** 50:1

**suspects** 24:3 46:16 49:3 50:15,25 68:12

**sustain** 129:10

**swab** 184:19

**swear** 7:7,8

**switch** 181:25

**switched** 90:18

**Sydney** 6:4

**symptoms** 209:12,17 210:9,24 214:3

**synopsis** 190:10

**system** 15:5 45:25 106:2 189:24 190:5

**systems** 17:2, 3,4

**T**

**T-** 141:10

**T-SHIRT** 151:1

**table** 66:9 176:22 177:4

**tablecloth** 176:22

**takes** 151:9

**taking** 24:16 26:7 30:23 33:6 35:1,4,9,20 36:1,23 37:11 45:18 60:24 64:2,9 65:8 66:2 70:20 72:7

95:14,22 107:15 115:1 117:10,11 118:2,3,8,12,18 119:24 148:22 151:4 158:3 161:1 165:12, 15 171:15,24 172:2,10 188:19 196:18 207:5 212:5 214:7

**Talia** 6:5

**talk** 20:2 22:24 31:3 32:25 36:25 42:11,20 43:3,10,13,14, 15,17,19 44:1, 3,4,8,18,23,24 45:5,6 47:23 48:6,16 49:17 52:10 55:20 60:2 61:7,8 67:12 68:5 85:10 103:21 168:4 184:20 215:17

**talked** 39:25 47:3 63:12 66:10 84:12 86:1 96:20 104:20,23 105:3 126:2,9, 11 143:8,13,14, 21 155:25 186:5,6 202:10

**talking** 31:15 36:19 37:20 41:7 42:10,19, 24 44:21 45:19 46:14,22 52:18 53:16,18,19 56:5 58:11 63:7 71:17 72:1,18 80:22,24 85:21 87:23 89:22 105:14 107:9 111:7 119:13 127:16 128:20, 22 130:2 132:16 140:10 157:12 161:3 172:24 177:24, 25 178:3 181:4

189:7,8 190:13 218:2

**tall** 113:24

**tank** 140:8,9

**target** 13:13

**tasks** 16:1

**teaching** 182:19

**team** 61:8

**tech** 177:2

**technical** 188:8

**teeth** 68:3

**telling** 18:9 25:18 55:10 58:19 60:21 137:8 140:12 147:13 148:8 149:2 156:14 172:9,10 192:6 195:6 207:17

**tells** 16:1 29:25 33:2 45:6 46:3 119:23 132:17 141:1

**temperature** 69:2

**tend** 168:22

**term** 16:24 20:14 33:14 45:21 46:1 52:4 61:11 95:3 102:18 137:24 196:21

**terms** 29:23 33:1 135:4 138:1 152:8 153:13 178:20 203:7 208:1

**Terrie** 6:20

**testified** 47:6 145:22 148:20 156:19 160:18, 19,23 169:17 182:4 193:23 194:10,15 196:9 201:8,16

206:21

**testify** 47:7 64:10,25 65:2 194:19

**testifying** 64:15

**testimony** 7:9 8:21 47:4,10 84:5 87:24 93:16 143:12, 14,18,20 158:5 160:16 191:11 192:2 196:10 197:21 200:10 201:20 210:2,5

**testing** 171:23 176:6 178:20 183:5,23,24

**text** 82:19

**theory** 127:9 128:4 129:2

**There'd** 120:8

**thing** 44:2 57:6 65:9 79:9 98:8 124:23 129:25 130:2 137:13 139:18 147:6 149:24 152:11 156:19 159:8, 11 166:3 173:5 174:22 178:6 184:23 217:8

**things** 16:24 26:11 30:3 35:5 45:20 55:24,25 56:16 58:14 60:9 61:11,12 62:22 65:1,18 68:2 69:14 73:25 78:9 83:25 84:9 104:24 105:25 106:8 126:22 129:18 149:12 152:23 154:4 171:24 172:9, 10 181:3,5 183:12 191:22 196:20

**thinking** 28:1

211:11

**thirst** 209:17

**Thompson** 6:11 199:10,13 201:3,4

**thought** 7:2 47:22 56:8 57:23 89:18 96:4,13 110:13, 15 114:25 135:24 142:8 148:8 187:14 188:1

**thoughts** 12:2

**threatened** 83:7 92:22 103:24 115:8 142:14

**threw** 31:21 32:19

**throw** 149:13

**throwing** 134:12

**thrown** 31:13

**Thursday** 14:20

**thwart** 150:13 153:10

**thwarting** 150:9 153:9

**tied** 124:3

**till** 51:7

**time** 6:6 8:1 16:6 17:13 18:1,5,9 19:17 21:19 23:5,10 25:1,2 26:19,20 27:18,21 30:3, 22 31:8 35:24 36:24 39:20 41:9 42:19 43:25 45:3 46:21 47:2,6 48:21 52:7 55:9 67:22 69:6 70:14 72:12 75:12,13 80:8, 25 81:17 83:10

86:17 87:16 92:25 95:10 104:1,20 105:14 113:15 115:10 116:24 117:7 120:5 126:12,17 137:1,4 142:16 143:9,15 144:18 145:20 146:3,12 151:19 154:14 156:16 160:23 161:9,13 162:4, 8 165:8 175:21 176:10 182:1 184:2 185:3,16, 25 186:3 189:11 190:21 194:15 196:22 200:11 207:16 217:11 219:10, 20

**timekeeping** 182:13

**times** 8:8 30:8 46:25 47:3 141:18,21 143:11 148:9, 21 155:25 200:16 207:11 212:6

**timing** 132:14

**Timothy** 6:10 199:10,13

**tip** 176:24

**tired** 136:1 187:10 188:4 210:4,6

**today** 6:5,6,19 8:9 9:14 10:3 18:4 20:12 47:17 78:4 84:5 87:19 107:21 108:1,7,8 143:20 146:6 158:7 161:12 186:6,7,11 195:15 197:16 202:11 204:3 219:19

**told** 15:3 25:18 32:3 50:15 69:6 78:22 81:2 84:6,12,16,21 89:17,19 90:2 99:25 100:3,15, 16,18 101:5,9, 14,15,18,21,24 103:9,10,18,21, 22 107:19 113:13,25 114:2,3,15,23 115:6,7 118:7 121:25 129:18 140:10,21,22 141:24 148:17 149:6 153:3 158:21 165:7 177:13 181:22 184:6 193:2 195:4,13 208:5 217:21 218:8

**Tomassi** 147:25

**top** 38:19 74:21 81:23 92:7 105:6 110:24 133:12 157:18 162:3

**toss** 32:9

**total** 143:10

**totality** 201:11 202:7

**totally** 125:1 129:12 131:5 148:20 172:6,7 215:9 216:1

**touch** 176:21 177:4 185:7

**touched** 176:25 179:20

**touching** 176:23

**town** 114:4

**traffic** 13:4 15:4 120:16

**trained** 16:20 23:1

**training** 15:21, 22,24 16:4,6,8, 11,12,25 17:6 22:9,12,15,16, 17 23:14 61:4,6 70:9 211:19,21 216:18

**transcript** 8:23 19:11 47:1 219:5,8,11,12

**transcripts** 8:21 9:1,2

**translation** 129:13

**translator** 69:15

**treat** 24:2,5 69:21 105:20, 23 106:14

**treated** 68:22 83:11 93:3 104:4 105:23 115:14 142:20 214:10 218:11

**treating** 61:24

**treatment** 95:6

**trial** 13:11 17:9 185:6 190:12

**tricky** 130:25

**trier** 33:22 153:7

**trouble** 75:6

**true** 77:1 83:18 93:9 94:6,24 104:11 115:22 121:8 143:6 148:1 155:23 160:20 171:17 172:1

**Truman** 99:5

**truth** 7:10 28:25 29:3 148:9 171:20

**truthful** 47:7

**truthfully** 68:18

**truthfulness** 208:2

**Tuesday** 14:20

**turn** 38:14 113:16 185:12

**turned** 56:9 113:17

**turning** 22:19

**two-part** 78:16

**two-phase** 32:25

**type** 54:18 100:22 154:19, 22 165:9 178:8, 9 212:3 214:15

**typed** 74:21

**types** 18:24

**typical** 18:21 36:2 42:18,21 44:18 46:20,21, 23 48:19 73:6 86:2 96:1 111:20 144:22 159:20 171:5 211:18

**typically** 28:4 39:16 42:9 44:8 49:3 73:10 94:20 196:13, 15 217:6

**typo** 187:11

**U**

**U.S.** 12:21

**Uh-huh** 76:14 139:17

**unanswered** 46:1

**unclear** 66:23

**uncomfortable** 69:2 185:8

**uncommon** 75:21

**underlie** 189:3

**underlines** 189:2

**underneath** 32:7 179:14 200:20,22 209:1

**understand** 11:23 13:23 15:2 20:20,22 56:2,12 57:7 70:5,6 75:20 79:22 95:13 108:19,23 110:25 111:15 119:23 122:9 127:11 129:12, 14,25 131:1,7 148:20 149:5, 16 152:7 153:13 154:22 164:4 180:23 181:1 189:10 211:15

**understanding** 23:9 24:16 37:20 46:8 49:17 58:12 60:12 66:21 73:20 78:23 80:2 118:22 123:17 149:9 156:6 183:22 188:8,9

**understood** 22:1,4 32:24 34:15 39:5 51:18 62:25 73:19 74:20 78:21 82:6 89:4 96:8 98:20 112:10 139:20, 22 158:21,22

**unheard** 181:9

**unit** 13:9,15,17 161:17 182:2,3, 7 183:5,6,9

**United** 6:13

**University** 12:12,16

**unknown** 176:9 178:25

**unnecessarily** 27:7,12

**unreasonable** 150:7

**unreliable** 60:6

**unstable** 62:2

**unsure** 66:18

**unusual** 35:24 113:1 179:12

**updates** 190:11

**upset** 11:17 141:9

**upstairs** 90:3

**urination** 209:19

**usual** 35:22

**V**

**vague** 10:9 47:19 49:7 126:6

**vaguely** 96:17 126:11

**Van** 9:22 11:22 82:8 89:12,18, 19 112:19,20, 21,25 113:3,19, 20,23 114:2,4, 7,10,14,15,20, 21,22,23,25 115:5,6,25 116:7 123:24 127:2,5 134:5 140:7,8,10,11, 13,14,16,18,20, 21,22,23,24,25 141:1,2,4,5,10, 12,13,14,15,17, 18,19,20,21,24 142:2,6,9,12 148:13 150:14, 20,24,25 151:3, 8 152:25 175:25 176:7, 19 178:23 179:22

**varied** 14:14
**varies** 15:23 42:12 63:9
**vary** 44:12
**vectors** 163:23,24
**verbatim** 191:16
**versus** 110:20
**victim** 31:13,18 133:22 162:17 163:17 166:7 176:9 178:24
**victims** 179:13
**video** 19:7,9, 15,18 20:5,7 21:20 23:3,11, 16,21 24:12,19 25:1,22 26:14 52:5 69:18 71:17,21 160:3 219:8,9
**video's** 26:8
**video-recorded** 159:2,22
**videographers** 20:11
**videos** 68:1
**viewed** 150:12
**viewer** 25:5 26:10
**VIN** 163:20 164:1
**violence** 13:13
**vision** 210:9
**visit** 86:13 214:20
**visitors** 82:22
**visual** 168:19
**Vo** 9:22 11:22 112:19,20,21 114:4,14,15,21, 23,25 115:5,6 116:7 123:24 127:2,5 134:5 140:8,10,11,16, 18,20,22,23,24, 25 141:1,2,4,5, 10,12,13,14,15, 17,18,19,20,21, 24 142:10,12 148:13 150:15, 20,24,25 151:3, 8 152:25 176:19 178:23 179:22
**Vo's** 82:8 89:12,18,19 112:25 113:3, 19,20,23 114:2, 7,10,20,22,25 115:25 140:7, 13,14,20 142:2, 6,7 175:25 176:7
**voluntary** 62:7
**volunteer** 60:8
**volunteered** 117:17
**Vomiting** 210:16

**W**

**wait** 26:21,22 27:16 57:7 65:18 114:3 189:4
**waited** 27:2 113:21
**waiting** 27:14
**Waive** 219:2,3
**walk** 16:13 18:20,21 144:3
**walks** 103:7
**wall** 213:18
**wanted** 23:20 32:25 48:1 67:12 76:25 83:16 89:14 93:7 99:9 100:14 102:21 103:21 104:8 113:5 115:20 137:14 142:20 143:3 155:21 159:11 187:21 215:11
**warnings** 73:13
**wash** 100:20 133:13
**watch** 22:21, 22,23 199:5 214:18
**watching** 17:12 199:8
**water** 37:14 113:17 144:13 145:1,2
**ways** 19:5 24:24 152:16 175:4 183:2,3
**weapon** 140:19 145:23 148:6 176:8 179:6,11,18 180:8 181:16
**Weber** 184:2
**Wednesday** 14:19,20
**weekends** 14:21
**weeks** 16:19
**weighing** 33:17
**weight** 174:18, 21
**West** 99:2
**whatsoever** 34:19 65:14 165:9
**wheelchair** 168:18
**where'd** 12:11 32:3
**white** 38:20 83:4 89:17 99:18
**who've** 22:24
**wide** 83:4
**wildly** 44:12 148:2
**willy-nilly** 34:7
**withdrawal** 61:9
**witness's** 55:6 66:21 107:3 136:17
**witnessed** 207:13
**witnesses** 19:3 24:2 39:4 41:7 43:8,11 44:22 52:14 55:6 59:17 68:12 75:8 130:15,16,23 132:4,16 137:7 166:11,16,19 167:21 198:8 205:23 206:2
**woman** 56:6 67:19
**word** 17:9 82:10 89:7 91:10,11 98:24 102:25 112:13, 18 139:25 145:24,25 187:3,6,21
**words** 25:20 62:25 63:4 67:21 74:6,7 78:14 138:3,13 149:16 191:13, 15
**work** 13:21 14:18 15:4 36:4 41:24 42:15 43:15 77:15 86:6,9 161:23 166:10 182:7
**workday** 27:25 28:1
**worked** 13:2 14:1,4,14,21 15:3 142:1
**working** 14:24, 25 31:17 32:4 40:15 77:19 79:8 82:21 144:10 214:6
**works** 38:18 39:10 82:14,20 95:13 131:2 154:2 170:8
**world** 215:19
**worry** 120:20
**would've** 31:25 32:1 84:17 94:20,22, 25 95:1 124:5 125:2 127:8 134:21 135:24 136:3,4,13 146:13 159:3,6 184:3 191:23, 25 192:8,12 194:12,17,21, 22,24 195:20 198:15 200:22 204:17 207:7 214:17
**wow** 90:8
**wrapped** 63:13 83:4 90:7,9 92:14 174:11
**wrestle** 181:8
**write** 25:16 29:24 33:2 38:20 39:20 40:16 45:10 58:21 71:24 72:3,6,9,17,24 73:14,17 74:1 77:8,10,24,25 78:8 80:20 81:10 82:14 89:11 95:2,7, 15,19 99:6 112:17,18 116:23 121:20 140:4 148:22 149:3,8 150:11 156:22,23,24, 25 157:2,6,7, 13,24,25 164:3 193:9 207:23 208:2

**writing** 32:23 58:17 139:8 156:15,16 163:2,3,13 187:23 188:6

**written** 45:8,9 54:13,18 66:5 72:4,22 73:24 74:8 80:9 84:4, 6,10,14 88:7 95:10,14,24 122:9 123:11 135:21 150:19 156:13 173:10 187:4,5 188:24 190:1 191:2 205:5,7

**wrong** 61:15 62:2 65:11,12, 17,18,21 131:5 164:18 175:3 187:15 212:12 213:22 215:13

**wrote** 30:4 40:12 83:5 96:5 118:16 148:18 164:14,16 187:13,22

**X**

**Xs** 111:4

**Y**

**year** 67:8

**years** 57:23 67:6 82:11 89:8 98:25 105:15 106:6 112:14 140:1 205:19

**yellow** 38:19

**young** 100:24 101:3 106:2,7 132:22,25 133:6,16,20 134:5,6,22 135:24 137:9 140:11 142:2

**Younger** 105:24

**Z**

**zoom** 79:24 197:3 208:14, 20

**Zuley** 6:10 9:19,23