**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CARL REED,<br><br>Plaintiff.<br><br>v.<br><br>RICHARD ZULEY, TIMOTHY THOMPSON, the CITY OF CHICAGO, NANCY GALASSINI ADDUCI, and COOK COUNTY,<br><br>Defendants. | Case No. 1:23-cv-17186<br><br>Judge John F. Kness<br><br>Magistrate Heather K. McShain |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Jon Loevy
Julia Quinn
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
(312) 243-5900

DATED: October 5, 2026

# TABLE OF CONTENTS


Introduction ........ 1

Summary of Facts ........ 2

LEGAL STANDARD ........ 12

ARGUMENT ........ 13

I. Defendant Adduci's Immunity Arguments Fail ........ 13

A. Defendant Adduci is Not Entitled to Absolute Immunity ........ 13

B. Adduci's qualified immunity argument fails ........ 16

II. A Jury Must Decide if Adduci is Liable for Due Process Violations (Count I) ........ 17

A. Applicable Law ........ 18

B. DeLong Reed ........ 19

C. Ricardo Burns ........ 20

III. A Jury Must Decide Plaintiff's Coerced Confession Claim (Count II) ........ 22

A. Applicable law ........ 22

B. There is Substantial Evidence that Adduci Fabricated Reed's Confession ........ 22

IV. Reed is Entitled to a Trial on His Conspiracy Claims ........ 24

V. A Jury Must Decide Reed's Malicious Prosecution Claims ........ 26

VI. Plaintiff Has Put Forth Sufficient Evidence on His Failure to Intervene Claim ........ 28

VII. Plaintiff's Intentional Infliction of Emotional Distress Claim ........ 28

VIII. Willful and Wanton Conduct/Aggravated Negligence ........ 29

CONCLUSION ........ 30

## TABLE OF CONTENTS

*Alexander v. United States*,
721 F.3d 418 (7th Cir. 2013)....27
*Anderson v. City of Rockford*,
932 F.3d 494 (7th Cir. 2019)....18
*Avery v. Milwaukee*,
846 F.3d 433 (7th Cir. 2017)....22
*Beaman v. Freesmeyer*, 2021 IL 125617....26
*Bell v. City of Milwaukee*,
746 F.2d 1205 (7th Cir. 1984)....25
*Brown v. City of Chicago*,
633 F. Supp. 3d 1122 (N.D. Ill. 2022)....26
*Bryant v. Whalen*,
759 F. Supp. 410 (N.D. Ill. 1991)....27
*Buckley v. Fitzsimmons*,
509 U.S. 259 (1993).... 13, 14
*Burke v. 12 Rothschild's Liquor Mart, Inc.*,
148 Ill.2d 429 (1992)....29
*Burns v. Reed*,
500 U.S. 478 (1991)....13
*Byrd v. Brishke*,
466 F.2d 6 (7th Cir. 1972)....17
*Carroccia v. Anderson*,
249 F. Supp. 2d 1016 (N.D. Ill. 2003)....29
*Celotex Corp. v. Catrett*,
477 U.S. 317, 323 (1986)....12
*Doe v. Chicago Bd. Of Ed.*,
213 Ill. 2d 19 (Ill. 2004)....30
*Etherly v. Davis*,
619 F.3d 654 (7th Cir. 2010)....22
*Fields v. Wharrie*,
740 F.3d 1107 (7th Cir. 2014).... 16, 18
*Fox v. Hayes*,
600 F.3d 819 (7th Cir. 2010).... 28, 29
*Fritz v. Johnson*,
209 Ill.2d 302 (2004)....25
*Gray v. City of Chicago*,
2022 WL 910601 (N.D. Ill. March 29, 2022)....22
*Grundhoefer v. Sorin*,
20 N.E.3d 775 (1st Dist. 2014)....27

*Hamilton v. City of Romulus*,
409 F. App'x 826 (6th Cir. 2010) .......... 25
*Hampton v. City of Chicago*,
No. 12 CV 5650, 2017 WL 2985743 (N.D. Ill. July 13, 2017) .......... 26
*Hampton v. Hanrahan*,
600 F.2d 600 (7th Cir. 1979) .......... 24, 25
*Harris v. United States*,
2017 WL 770969 (N.D. Ill. Feb. 28, 2017) .......... 20
*Hill v. City of Chicago*,
2009 WL 174994 (N.D. Ill. Jan. 26, 2009) .......... 24
*Kalina v. Fletcher*,
522 U.S. 118 (1997) .......... 14
*Kuri v. City of Chicago*,
No. 13 C 1653, 2017 WL 4882338 (N.D. Ill. Oct. 30, 2017) .......... 27
*Lawson v. Veruchi*,
637 F.3d 699 (7th Cir. 2011) .......... 15
*Lewis v. Mills*,
377 F.3d 324 (7th Cir. 2012) .......... 14
*Liggins v. City of Chicago*,
2021 WL 2894167 (N.D. Ill. July 9, 2021) .......... 16
*Logan v. City of Evanston*,
No. 20 C 1323, 2020 WL 6020487 (N.D. Ill. Oct. 12, 2020) .......... 16
*Maxwell v. Indianapolis*,
998 F.2d 431 (7th Cir. 1993) .......... 27
*McCottrell v. White,*
933 F.3d 651 (7th Cir. 2019) .......... 16
*Melongo v. Podlasek*,
2019 WL 1254913 (N.D. Ill. Mar. 19, 2019) .......... 14
*Murray v. Chicago Youth Center*,
224 Ill.2d 213 (2007) .......... 29
*Nat'l Bank & Trust Co. v. City of Chicago*,
192 Ill.2d 267 (Ill. 2000) .......... 30
*Orange v. Burge,*
2008 WL 4443280 (N.D.Ill. Sept. 29, 2008) .......... 14
*Phillips v. City of Chicago*,
2018 WL 1309881 (N.D. Ill. 2018) .......... 21
*Proffitt v. Ridgway*,
279 F.3d 503 (7th Cir. 2002) .......... 24
*Reed v. City of Chicago*,
77 F.3d 1049 (7th Cir. 1996) .......... 27

*Rosario v. City of Chicago*,
2012 WL 1319806 (N.D. Ill. Apr. 17, 2012) ....................29
*Saunders v. City of Chicago*,
No. 12 CV 9158, 2013 WL 6009933 (N.D. Ill. Nov. 13, 2013) ....................28
*Smith v. City of* Chicago,
785 F. Supp. 3d 356 (N.D. Ill. 2025)....................21
*Spierer v. Rossman*,
798 F.3d 502 (7th Cir. 2015) ....................12
*Stemler v. City of Florence,*
126 F.3d 856 (6th Cir. 1997)....................19
*Stinson v. Gauger*,
868 F.3d 516 (7th Cir. 2015)....................18
*Thompson v. City of Chicago*,
722 F.3d 963 (7th Cir. 2013)....................20
*Tillman v. Burge*,
813 F. Supp. 2d 946 (N.D. Ill. 2011)....................14
*United States v. Agurs*,
427 U.S. 97 (1976)....................17
*United States v. Barr*,
960 F.3d 906 (7th Cir. 2020)....................16
*Walker v. White*,
2021 WL 1058096 (N.D. Ill. Mar. 19, 2021)....................16
*Washington v. Boudreau*,
2022 WL 4599708 (N.D. Ill. Sept. 30, 2022) ....................29
*Watson v. DeTella*,
122 F.3d 450 (7th Cir. 1997)....................24
*White v. Rochford*,
592 F.2d 381 (7th Cir. 1979)....................22
*Whitlock v. Brueggemann*, 682 F.3d 567
(7th Cir. 2012).................... 13, 16, 17, 28
*Williams v. Valtierra*,
2001 WL 686782 (N.D.Ill. June 18, 2001) ....................15
*Zirako v. Soo Line* R.R. *Co.*,
161 Ill. 2d 267 (Ill. 1994) ....................30

**Statutes**

745 ILCS 10/2-202....................30

## Introduction

While serving as a Cook County Assistant State's Attorney (ASA), Defendant Nancy Adduci extracted a false confession from Plaintiff Carl Reed, an intellectually disabled man, regarding the murder of Kim Van Vo, a crime that DNA has since proved he did not commit. By the time Adduci procured this false confession, Reed had been interrogated for three days, during which he was denied his insulin. It was readily apparent to anyone interacting with him that Reed was rapidly descending into an incoherent diabetic coma. It was also obvious that Reed has profound intellectual disabilities and physical and mental health challenges. Reed was a special education student who dropped out of high school and has required substantial assistance to handle basic tasks for his entire life. He can neither read nor write and even misspelled his own name when affixing it to a notice of consent to search form. Reed's IQ is so low that the State's effort to seek the death penalty was thwarted.

Other than bathroom breaks, Reed remained chained to the wall of an 8x15 conference room inside Chicago Police Department Area 3 police station for days on a stainless steel bench and subjected to threats and coercion. Reed repeatedly informed Adduci that he could neither read nor write, required his insulin to function, and was innocent of whatever murder they were asking him about. But after 55 hours of interrogation, Reed, who was sick from his uncontrolled blood sugar, terrified, and unable to read or understand the "confession" put before him, agreed to sign, believing Adduci's promise that it would finally allow him to return home. Instead, Reed was booked into jail and then sent to the emergency room to treat the diabetic complications brought on by the denial of his insulin medication during the interrogation.

While ASAs generally enjoy immunity for prosecutorial acts, that immunity does not extend to situations where, as here, the ASA is acting in an investigative capacity prior to prosecution. That is this case. Adduci was acting in an investigatory capacity during Reed's marathon interrogation, after which she personally wrote out by hand the false "confession" that Reed signed, which she took despite her

acknowledgment that it was "incredible" and unbelievable – which it was. To try to bolster the case, she also fabricated two witness statements from DeLong Reed and Ricardo Burns, contravening her usual practice of videorecording statements.

After serving nearly two decades for a crime he did not commit, DNA testing proved Reed's innocence, and his conviction was vacated in 2023. Reed now seeks to hold accountable Defendant Adduci for her wrongdoing, including her violations of his rights.

## Summary of Facts[1]

## Carl Reed Has Endured Lifelong Intellectual Disabilities and Physical and Mental Health Challenges

Both Mr. Reed and Mr. Vo lived at 4946 Sheridan Road in Chicago, Illinois, a residence for low-income, elderly or disabled individuals. PSOAF ¶ 5, 6. Reed, who previously lived with his mother, was supported by supported by Social Security disability benefits (SSDI) on account of his intellectual disabilities. *Id.* ¶ 1-4; Pl.'s Response to DSOF, ¶ 65. Reed had a payee who maintained control of this money and paid most of his bills, because he could not manage the funds independently. *Id.*

Reed has never been able to read and struggles to write his own name,[2] and he was placed in special education classes at a young age. PSOAF ¶ 3. Reed struggled tremendously in school and dropped out early, around ninth grade, never earning a GED or high school diploma. *Id.* As a result of his illiteracy, Reed relied upon people such as his sister Kim to fill out paperwork, handle his correspondence, and other matters. *Id.* Reed developed a similar system in prison, and his family provided Reed money to other incarcerated individuals to handle his correspondence for him. *Id.*

[1] The record here is dense, and Plaintiff provides only a brief overview of the facts necessary to provide context to his opposition to Adduci's Motion for Summary Judgment. He incorporates his Rule 56.1 Statement of Additional Facts and Response to Defendant's Statement of Facts.

[2] Reed's inability to read is sometimes described as illiteracy or other times, particularly on testing, equated to a grade level, because that is how the tests are scored. These various descriptors refer to the same reality: Reed is unable to read and has never been able to read.

Medical records and witness testimony establish that prior to and at the time of Van Vo's murder, Reed's IQ[3] was several standard deviations below the norm. *Id.* at ¶¶ 1-2. Reed also suffered a traumatic brain injury and has experienced numerous additional physical and mental health challenges. *Id.* ¶ 4. Reed underwent a psychological evaluation and in-person interview as part of his 1993 SSDI application that revealed significant cognitive limitations, and "significantly subaverage general intellectual functioning with deficits in adaptive behavior." *Id.* at ¶¶ 1-2. The psychologist also documented that Reed scored the lowest possible score regarding reading and arithmetic skills, finding Reed read and did math "below 99 percent of others in his age range." *Id.* The evaluation noted that Reed had difficulty thinking and concentrating and that he had "significant limitation in cognitive functioning, and this applicant has significantly poorer skills than other of the same age range." *Id.* Reed's "poor concentration skills and forgetting recent information" were also noted. *Id.* The report also made note of several physical ailments, including a gunshot wound in his dominant hand when he was young, which resulted in decreased grip strength, "deformed fingers" and left him "unable to make a fist, unable to lift anything." *Id.* ¶¶1-2, 4. He was approved for SSDI benefits in August 1993, diagnosed with "mental retardation" as his primary diagnosis, with "polysubstance abuse" his secondary diagnosis. *Id.* ¶ 2.

Reed was diagnosed as diabetic at a young age which he manages via a regular schedule of daily insulin; at times, Reed has required the assistance of others to manage his medication. *Id.* ¶ 4; Pl.'s Resp. to DSOF ¶ 65. Reed's eyesight began deteriorating when he was young, and the attack he suffered when a group of men jumped him left him with decreased vision. *Id.* He is legally blind in his right eye and has poor eyesight in the left eye. *Id.* In addition to other ailments, Reed also previously was shot in the hand prior to 2001, leaving it weak and the fingers deformed. PSOAF ¶ 4.

---

[3] Reed's full-scale IQ, which measures general intelligence, was measured as 65, placing him in the bottom 1 percentile for intelligence. *See* Ex. 7 (SSDI Records).

In 2019, Dr. Jessica Pearson undertook a psychological examination of Reed and concluded, based on a records review, an in-person interview with Reed, and psychological testing, that Reed met the criteria for Intellectual Disability, Major Neurocognitive Disorder, Alcohol Use Disorder, Cocaine Use Disorder, and Schizophrenia by history, though Dr. Pearson found no current indications of Schizophrenia. *Id.* ¶¶1-2. She noted, same as the 1993 evaluation, that Reed was illiterate and therefore she was required to administer testing verbally. *Id.*

Dr. Pearson also noted that neuropsychological functioning testing measured Reed's memory, attention, visual-spatial abilities, and language in the 0.1st percentile or the "Extremely Low" range. *Id.* This indicated that Reed had "significant cognitive limitations, functioning below the overwhelming majority of other individuals," a finding that was nearly identical to the results of his 1993 evaluation. Reed also scored in the top 5th percentile for suggestibility when compared to other persons with intellectual disabilities. *Id.* ¶ 2. Dr. Pearson, noted that this suggestibility score was significant because "individuals with cognitive limitations are at greater risk for psychological coercion and have "fewer resources and weaker problem-solving capacity to use in a stress-inducing situation," which has critical implications for handling situations such an extended interrogation, heightening the risk of falsely confessing. *Id.*

Adduci would have been aware of these vulnerabilities during her interrogations of Reed. In addition to informing his interrogators of his inability to read and his diabetes, Reed's difficulty using his hand, his physical symptoms from his denial of insulin, and his significant cognitive deficits would have been obvious to anyone who observed or interacted with Reed. *Id.* ¶¶ 1-4; 11-12, 25-26, 35.

**<u>After a Neighbor is Murdered, Reed is Held at Area 3 for Three Days, During Which He is Chained to a Wall, Denied His Insulin, and Interrogated for Nearly 60 Hours</u>**

As a result of his well-documented disabilities, Reed was accepted into supportive housing at 4946 N. Sheridan in Chicago, Illinois. *Id.* ¶ 5. Reed had lived there approximately two years when on July 19, 2001, another building resident, Kim Van Vo, was discovered dead inside his apartment. *Id.* ¶ 6. The

discovery was made after another neighbor, DeLong Reed (no relation to Carl), complained of a smell coming from what he stated was a dead body in the apartment. *Id.* ¶ 7.

The Chicago Police Department responded and began a death investigation. The police noted that Van Vo's body was on the floor in the middle of his studio apartment stabbed 11 times. *Id.* His clothing, a towel across his face, and the carpet were all soaked with blood. *Id.* When Van Vo's body was moved, police recovered a five-inch steel knife blade that had been broken off from its handle—the handle was never found. Van Vo's right hand grasped numerous hairs. *Id.*

There was no sign of forced entry into Van Vo's apartment. *Id.* ¶ 8. The front door was double locked from the inside with no signs of damage to the door or frame, the windows were intact, and Van Vo's keys were in the apartment. *Id.* Tenants shared bathrooms, which were set up jack-and-jill style. *Id.* ¶ 5. Van Vo shared his bathroom with DeLong Reed. *Id.* ¶ 6. Despite the fact that Van Vo "always" left his apartment door to the bathroom open, this door was also discovered locked, with no damage reported to the bathroom door, either. *Id.* ¶¶ 6-8. Tenants had the ability to lock bathroom doors to both apartments from inside the bathroom, to enable privacy. That way, "just because you had a shared suite doesn't mean they [the person with whom the tenant shared the bathroom] had access to your unit, **unless you left it open."** *Id.* ¶ 5 (Maureen Gainer Dep.). Finally, officers observed a smudge of suspected blood on the inside of the closet door. There were three fish tanks in the apartment, one with suspected blood observed. *Id.* ¶ 7.

With no eyewitness to the crime, settled-individual Detective Timothy Thompson[4] questioned Van Vo's neighbors, including DeLong Reed, the neighbor who called about the smell and who shared a bathroom with Van Vo. *Id.* ¶¶ 7, 9. DeLong, who suffers from schizoaffective bipolar disorder and was taking the powerful antipsychotic Haldol at the time of Van Vo's death and using drugs at that time, denied knowledge of the crime. *Id.* ¶ 9. Police affirmatively raised with DeLong Reed the fact that Van Vo had a

---

[4] Individual Defendants, Detectives Richard Zuley and Timothy Thompson (via the Estate of Geri Lynn Yanow) settled with Plaintiff. *See* Dkts. 185, 186.

stereo, speakers, television, and asked about Van Vo's car. *Id.* DeLong Reed was also actively using drugs at the time. *Id.* During his first interaction with police, he stated that Van Vo was elderly, kept the door to his bathroom open at all times, and explained he last saw Van Vo around July 13, 2001, which was the same day DeLong Reed left to stay with a relative for several days. *Id.*¶¶ 6-9. DeLong Reed made no mention of Carl Reed during this conversation with detectives. *Id.* ¶¶ 9, 16-18.

In fact, police are the ones who interjected Carl Reed into the investigation when they spoke with a man named Ricardo Burns. Burns lived in the neighborhood and was discovered in possession of Van Vo's car after his murder. *Id.* ¶ 10. Burns quickly claimed that he was sold the car by a man named "Chuck." In response, police asked Burns if he was referring to Carl Reed, a name that Burns did not know. *Id.* The police then asked Burns if it was possible that he had been sold Van Vo's car by a man named Carl Reed, and they detailed their theory of how the interaction may have happened. *Id.* They also showed Burns a lineup with a single photo, of Carl Reed, and Burns again grabbed the lifelong and said that Reed was the man who sold him the car. *Id.*; Pl.'s Response to DSOF ¶¶ 9, 38.

On July 20, 2001, at approximately 8:00pm, Carl Reed was taken into custody and interrogated over several days. PSOAF at ¶ 11. Reed was subjected to threatening and profane language before being taken to Area 3. *Id.* Prior to leaving his residence, Reed asked permission to bring his insulin with him, but police refused and laughed at him. *Id.* Reed was interrogated over three days while seated on a small, stainless-steel bench in an 8x15 room without a blanket, pillow, or bed. *Id.* ¶ 12. He was handcuffed to a ring on the wall while held there, and he was unable to sleep. *Id.* ¶¶ 12, 26. During the interrogation, Reed repeatedly denied any knowledge of the crime, denied ever entering Van Vo's apartment, and denied harming or killing Van Vo. *Id.* ¶ 13. Reed was denied his insulin but fed sugary foods and drinks, which further spike his blood sugar. *Id.* ¶¶ 12-14, 25-26, 35.

After Reed had been at Area 3, chained to the wall, for over 36 hours but still professing his innocence, Detectives Richard Zuley and Thompson increased the pressure on Reed. *Id.* ¶ 16. They found

DeLong Reed—who was kicked out of the Sheridan Road building and told not to return—on the south side of Chicago and brought him to Area 3 on the morning of July 22, 2001. *Id.* They prepped the men for nearly an hour, priming them for a confrontation, then sent DeLong Reed into the tiny room Carl Reed was held in. *Id.* There, the detectives egged on a confrontation between the two men. *Id.* Carl Reed was steadfast and proclaimed his innocence; he suggested that DeLong Reed was involved in the crime. *Id.* DeLong Reed did not accuse Carl Reed of wrongdoing, and he did not elicit a confession from Carl Reed. *Id.* Instead, he became angry and "disgusted" that Carl Reed accused him of murdering Van Vo. *Id.*

DeLong Reed left the room, after which detectives asked him to take a polygraph examination. *Id.* ¶ 17. Although they did not actually hook DeLong Reed up to the machine, they put a blood pressure cuff on him and told him he was being examined for truthfulness. *Id.* DeLong Reed believed them wholeheartedly, and he became scared. *Id.* ¶¶ 17-18. He realized, with his unique access to Van Vo's apartment, he was an obvious suspect. *Id.* Detectives first asked about his involvement in Van Vo's murder, then asked if he worked with Carl Reed together. *Id.* They raised once again the items in Van Vo's house, including the stereo equipment. *Id.*

Carl Reed continued to assert his innocence after DeLong Reed left the room, and he voluntarily consented to a search of his apartment on July 22, 2001, at 4:30pm, after having been at Area 3 for over 44 hours. *Id.* ¶¶ 13-16. Notably, Reed repeatedly told officers and later Adduci while he was at Area 3 that he could neither read nor write. *Id.* ¶¶ 25-26. This was a common practice for Reed; as a coping mechanism throughout his life, he has repeatedly advised individuals that he cannot read, and Reed did several times at Area 3. *Id.* ¶ 3. Ignoring his, detectives had Reed sign the consent to search form, on which he misspelled his name as "REEb." *Id.* ¶ 15.




Detail from Ex. 9 at 36, Carl Reed's misspelling of his own name on the Consent to Search Form

Reed agreed to the search because he wanted to show that he had nothing to hide. *Id.* ¶ 15. No items from the victim's apartment or car were found in Mr. Reed's apartment or otherwise in his possession, and the keys to Van Vo's apartment were found inside. *Id.* ¶¶ 15, 38. Likewise, the police searched Reed's apartment and tested multiple items for blood but found nothing to link him to Van Vo's murder, despite finding blood evidence in Van Vo's apartment. *Id.* ¶¶ 7, 15, 38.

Failing to immediately elicit the confession they sought, the detectives pursued more aggressive tactics, falsely telling Reed that his fingerprints were found in Van Vo's apartment. *Id.* at ¶ 14. But Reed continued to proclaim his innocence. *Id.* ¶¶ 13-14.

**Defendant Adduci Arrives at Area 3 and Takes Over the Interrogations**

Shortly after the search of Reed's apartment turned up nothing and coercive interrogation tactics failed to yield results, Defendant Adduci arrived at Area 3 shortly around 7:30pm on July 22, 2001. *Id.* ¶ 19. Reed had been interrogated for approximately 48 hours by that time without having confessed to a crime he did not commit. *Id.* ¶¶ 11, 20. Defendant Adduci was brought in to extract Reed's false confession, and she ultimately succeeded, albeit after many hours of work. *Id.* ¶¶ 25-34. From this point forward, she led the investigation into Reed and directed the next steps. *Id.* ¶¶ 19-20.

Reed thought that Adduci was a police officer based on her conduct, and he believed he was only meeting with police officers throughout his interrogation. *Id.* ¶ 21. That is because Adduci worked in tandem with detectives to procure Reed's false confession and fabricated witness statements. *Id.* ¶¶ 25-26; Pl's Response to DSOF ¶ 13, 44. After arriving at Area 3, Adduci first spoke with Detectives Thompson, Jin, and Zuley for at least 30 minutes. PSOAF ¶ 20; Adduci acknowledged that she was brought in to assist ongoing police investigations as part of her job, as she did here. *Id.* ¶ 19. After conferring with detectives, she first spoke to Carl Reed at 8:00pm on July 22, 2001, after he had been interrogated for approximately 48 hours. *Id.* 11, 19-20. Detective Thompson joined Adduci during each of her interactions with Reed, except

for a five-minute period she had alone with Reed around the time she memorialized his fabricated confession. *Id.* ¶¶ 25-26; Pl's Response to DSOF ¶ 13, 44-45.

Adduci's first conversation with Reed lasted approximately 15 minutes. PSOAF ¶ 20. At 9:30pm, Adduci "had a longer conversation" with Reed, explaining that she had been "talking to other people. Other witnesses on the case." *Id.* ¶ 22. She fed details to Reed during their conversation, which lasted "over half an hour," but Reed still did not inculpate himself. *Id.*

Adduci then left Area 3 to work on obtaining witness statements that would falsely implicate Reed in having stolen Van Vo's possessions. *Id.* ¶¶ 23-241; Pl.'s Response to DSOF ¶ 23. First, she returned to Sheridan Road and obtained a statement from Dorothy Soukup, who worked the desk on July 19, 2001. Pl.'s Response to DSOF ¶¶ 23-27. She only agreed that she saw walking out of the building while carrying an object, which she did not see, and she provided no additional useable information. *Id.* After returning to Area 3, one of the witnesses Adduci obtained a statement from was Burns. PSOAF ¶ 23. He gave his statement eventually at 11:45pm on July 22, 2001, after he was kept "kind of late" at Area 3 by police, prior to giving the statement. *Id.* Ultimately, given that Burns admitted he was actively selling drugs at the time, familiar with police due to his numerous run-ins with them, and on probation at the moment, he adopted the statement that Adduci handwrote for him and immediately was allowed to leave the station. Pl.'s Response to DSOF ¶ 38.

Over the course of his 14 hours at Area 3, "shaken up" from the confrontation with Carl Reed and believing that detectives had actually subjected him to a lie detector test, DeLong Reed realized that Van Vo's murder would be blamed on either Carl Reed or on him. PSOAF ¶¶ 16-18. After speaking with Adduci, he agreed to sign a statement that inculpated Carl Reed in writing. *Id.* ¶ 24. Although DeLong Reed did not read the statement (and in fact could not read cursive or Adduci's handwriting), he agreed to sign the pages that Adduci put in front of him at 1:00am on July 23, 2001, one hour before Reed's confession was

fabricated. *Id.* As soon as DeLong Reed gave Adduci and the detectives what they wanted, they let him go, and he quickly moved out of state. *Id.*

**Defendant Adduci Fabricates Carl Reed's Confession**

Adduci still needed a confession from Reed to prosecute him for murder, given that there was no physical evidence or eyewitnesses to that crime. *Id.* ¶¶ 7, 15, 38. Adduci, along with Thompson, then returned to see Carl Reed around 2:00am on July 23, 2001. *Id.* ¶ 26. Reed was exhausted, sick, and scared, going on his 54th hour at Area 3. *Id.* ¶¶ 25-26. Despite reiterating that he could not read or write, that he did not feel well, and that he needed his insulin, Adduci told him that if he signed the papers put in front of him, he could go home. *Id.* Reed did not know what he was signing, and he insists that the "officers" (that is, Adduci and Thompson) did not explain that it was a confession. *Id.* The "confession" was never read aloud to him, and he did not understand that he was accepting responsibility for crimes he did not commit. *Id.* ¶¶25-29.

Reed did not understand that he had a choice not to sign the "confession." *Id.* Reed was also promised that things would "be all right" and he could return home if he cooperated by signing the false confession; he did not understand he was signing paperwork confessing to a crime. *Id.* Despite not being able to read or write, Reed signed the document at the end of nearly 60 hours of interrogation. *Id.*

The so-called "confession" formed the basis of Reed's prosecution, and it is full of details fed to him about Van Vo's murder. *Id.* It also makes no sense but is written in a way to conform with details about the crime that Adduci knew. *Id.* ¶ 22, 25-29. For example, Reed had no injuries to his hands and has a significantly compromised right hand due to the gunshot wound he suffered prior to Van Vo's murder, yet according to the fabricated confession, he allegedly stabbed Van Vo with the blade of a knife that had no handle with sufficient force and grip to penetrate Van Vo's body eleven (11) times, all without causing injuries or leaving any physical evidence behind. *Id.* ¶¶ 7, 15, 30-34, 38.

In fact, Adduci herself acknowledged that Reed's confession is not "particularly credible," describing the story Reed told as "incredible." *Id.* ¶¶ 30-34. Nevertheless, as she described her own process, she "always" wrote down everything an individual told her, and she did not take "into account the

incredulousness of the statement" when making charging decisions. *Id.* ¶ 34. Adduci did not consider the reliability of the confession, because she considered charging decisions to be simple "math." *Id.* So long as she had some evidence to put forth to meet the elements of the charged crime, it was her self-described practice to move forward on charging. *Id.* That is what she did in Reed's case.

**Reed is Immediately Hospitalized**

As previously noted, Mr. Reed was a diabetic who required insulin to control his blood sugar. *Id.* ¶¶ 4, 11-12, 25-26, 35. Even after police denied him the opportunity to bring insulin to Area 3, he told his interrogators at least five times that he was diabetic and needed insulin. *Id.* ¶¶ 25-26. In response, he was laughed at and denied his medication. *Id.* 11-12; 25-26. Instead, Reed was fed doughnuts, potato chips, Big Macs, cranberry juice, and diet Cokes—all of which cause fluctuations in blood sugar. *Id.* Reed felt ill at the police station and increasingly dizzy as his interrogation stretched on. *Id.* Mr. Reed's blood sugar was so uncontrolled during the interrogation that he was promptly taken to the emergency room upon his arrival at the Cook County Jail. *Id.* ¶ 35. Just five days later, on July 28, 2001, Reed was hospitalized with suicidal ideation. *Id.*

**Reed is Sentenced to 27 Years for a Crime He Did Not Commit**

Given that Reed's prosecution was predicated entirely on fabricated evidence, Thompson personally spoke with the Illinois State Police Division of Forensic Science laboratory to ensure that biological material, including blood, found on the knife blade recovered from Van Vo's apartment was **not** tested. *Id.* ¶¶ 7, 38. As a result, the DNA evidence that eventually established Reed's actual innocence remained untested for nearly two decades, as a result of his fabricated confession. *Id.* ¶ 38-39.

On April 22, 2005, a hearing on Mr. Reed's Motion to Suppress Statement commenced and proceeded over several days with lengthy delays between court dates. *Id.* ¶ 36; Pl.'s Response to DSOF ¶ 64. In addition to the testimony related to the interrogation set forth above, Mr. Reed's sisters testified that he

was illiterate and had suffered prior brain trauma. *Id.* Even though Mr. Reed's IQ is so low that he would have been ineligible for the death penalty, the state initially it. PSOAF ¶ 1-3; 36.

The judge expressed concerns about the interrogation and Reed's intellectual impairments, but having heard no specific evidence documenting Mr. Reed's IQ at the hearing or how the brain injury affected his ability to understand *Miranda*, the judge denied Mr. Reed's motion. *Id.* ¶ 36; Pl.'s Response to DSOF ¶ 64. As a result, faced with an incriminating "confession" and the threat of being put to death, Mr. Reed's attorneys encouraged him to take a plea deal. Mr. Reed acquiesced and pled guilty on December 5, 2005, after having spent 4.5 years in Cook County Jail. PSOAF ¶ 37 He was sentenced to 27 Years in IDOC. *Id.*

**<u>DNA Testing Shows Reed is Actually Innocent of Van Vo's Murder</u>**

In 2017, Reed sought DNA testing to prove his innocence. *Id.* ¶ 7, 15, 38-39. Modern DNA analysis confirmed that Mr. Reed was not present at the crime scene and demonstrates that he is actually innocent. *Id.* ¶ 39. On April 10, 2020, Governor Pritzker commuted Mr. Reed's sentence to time served, and Reed presented new evidence in 2022 of his actual innocence, including the DNA evidence exculpating him and pointing to the actual perpetrator. *Id.* The State did not oppose Reed's petition for post-conviction relief. *Id.* The State moved to *nolle prosequi* the charges, which the Court granted on May 26, 2023, vacating Reed's conviction after 19 years of wrongful incarceration. *Id.*

**<u>LEGAL STANDARD</u>**

On summary judgment, the moving party bears the initial burden of showing no genuine dispute of material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]ith the court drawing all inferences in the light most favorable to the non-moving party, the moving party must discharge its burden of showing that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law." *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015).

# ARGUMENT

Plaintiff's evidence, with all reasonable inferences drawn in his favor, establishes that Adduci was acting in an investigative capacity and working with CPD detectives when she and several CPD detectives fabricated Carl Reed's confession and statements given by DeLong Reed and Ricardo Burns. Because Adduci has not met her burden on either absolute or qualified immunity, and because Plaintiff has put forth evidence of genuine disputes of material fact as to all claims, he is entitled to a jury trial.

## I. Defendant Adduci's Immunity Arguments Fail

Contrary to Adduci's assertion, she was not responsible merely for memorializing Reed's confession and other witness statements but instead spent hours manufacturing nearly all evidence relied upon to prosecute Plaintiff. Dkt. 197 at 7.

### A. Defendant Adduci is Not Entitled to Absolute Immunity

Adduci argues for absolute immunity as to all nine claims based upon a sanitized version of the facts that does not take into account much of the record evidence in this case. She has not carried her heavy burden. "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question," *Burns v. Reed*, 500 U.S. 478, 486 (1991). The Supreme Court "ha[s] been 'quite sparing' in recognizing absolute immunity for state actors in this context." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (citation omitted); *see also id.* at 281 ("if the application of the principle is unclear, the defendant [official] simply loses.") (Scalia, J., concurring).

A prosecutor does not function as an advocate before the existence of probable cause to arrest. *Buckley*, 509 U.S. at 274; *Whitlock v. Brueggemann*, 682 F.3d 567, 579-80 (7th Cir. 2012). Thus, if a prosecutor is performing acts to build a case against an as-yet uncharged suspect, it is immaterial to the immunity analysis that the prosecutor happens to be a prosecutor rather than a police officer. *Buckley*, 509 U.S. at 273 (distinguishing between an advocate's role in evaluating evidence and interviewing witnesses as part of preparing for trial and a detective's role "in searching for the clues and corroboration that might give him probable cause…. When a prosecutor performs the investigative functions normally performed by a

detective or police officer," he is not protected by absolute immunity); *see also Kalina v. Fletcher*, 522 U.S. 118, 126 (1997). Moreover, "a determination of probable cause does not guarantee a prosecutor absolute immunity for all actions taken afterwards" that constitute "police investigative work." *Buckley*, 509 U.S. at 274 n.5.

Evidence-gathering is a typical investigative function performed by the police that is not entitled to absolute immunity. *Buckley*, 509 U.S. at 273. Numerous courts in this district and the Seventh Circuit have repeatedly confirmed that felony review prosecutors working with detectives to obtain statements and to fabricate evidence are not protected by prosecutorial immunity. *See, e.g.*, *Lewis v. Mills*, 377 F.3d 324, 331 (7th Cir. 2012); *Tillman v. Burge*, 813 F. Supp. 2d 946, 966–67 (N.D. Ill. 2011)(plaintiff's allegations that a felony review prosecutor "personally participated in his interrogation…and then suppressed the truth concerning those events" placed the prosecutor's "conduct outside the scope of a prosecutorial function, and is therefore enough to survive an absolute immunity challenge."); *Orange v. Burge,* 2008 WL 4443280, at *10 (N.D.Ill. Sept. 29, 2008)(absolute immunity unavailable where felony review prosecutor was "personally involved" in the interrogation).

Absolute immunity is unavailable to Adduci on any of Reed's claims, because a jury could easily find that Adduci acted as an investigator when she coerced and fabricated Reed's confession and the additional witness statements. In fact, Adduci herself described her conduct prior to charging Reed as investigatory. Her conduct over the course of the approximately eight hours she spent at Area 3 on July 22-23, 2001, was spent molding and then locking in fabricated statements, rather than time spent simply memorializing them after the police concluded their work. When a determination of a defendant's entitlement to absolute immunity rests on a dispute of fact, summary judgment should be denied. *Melongo v. Podlasek*, 2019 WL 1254913, at *9 (N.D. Ill. Mar. 19, 2019) (citation omitted).

There is also substantial evidence to show that Adduci was acting before the existence of probable cause. Only after Plaintiff broke down in the face of extreme physical and psychological harm,

approximately eigh hours after Adduci arrived at Area 3 and nearly 60 hours into his interrogation, did Adduci generate (falsified) probable cause to commence his prosecution. Adduci does not argue that probable cause existed prior to her coercing Reed's false confession. She argues that that Reed was "already in police custody" and that "several witnesses had already identified Plaintiff" as leaving Van Vo's apartment with objects prior to her participating in the fabrication of Reed's confession. Dkt. 197 at 10. That is insufficient, particularly without anything linking Plaintiff to the murder, when those "several witnesses" who purportedly identified Reed provided those identifications in fabricated statements that conflicted with their initial statements given to detectives.

Indeed, Adduci points almost exclusively to evidence she fabricated herself (Reed's confession, the statements of DeLong Reed and Burns) in support of her argument that probable cause existed. *Id.* at 16-17. But fabricated evidence cannot serve as the basis for probable cause. *Lawson v. Veruchi*, 637 F.3d 699, 704 (7th Cir. 2011). The DeLong Reed and Burns statements were fabricated within 75 minutes of each other, no more than two hours before Adduci extracted Reed's false confession, meaning that this purported probable cause was developed after Adduci had spent five hours with Reed and witnesses, feeding them details of the crime and exerting pressure to force compliance. There was no probable cause to initiate Reed's prosecution without this fabricated evidence.

Given Reed's repeated testimony about his diabetes and Defendant's refusal to allow him his insulin, this case is remarkably similar to the facts of *Williams v. Valtierra*, 2001 WL 686782, at *2 (N.D.Ill. June 18, 2001), in which Judge Kennelly denied prosecutors' absolute immunity argument where Plaintiff alleged that "when the prosecutors arrived, they did not evaluate information but rather forced Williams to produce inculpatory information by denying her medical care." There, the court held that where an ASA forces an individual to produce falsified inculpatory information by denying medical care, prosecutors are acting as investigators and are not entitled to absolute immunity. *Id.* The exact same situation happened here, as Cermak hospitalization records show.

Adduci's actions were investigatory and taken prior to the existence of probable cause; therefore, her absolute immunity arguments fail.

**B. <u>Adduci's qualified immunity argument fails</u>**

This Court need not reach Adduci's cursory and undeveloped qualified immunity defense, which is only four sentences long. Dkt. 197 at 12-13. This section provides no factual analysis, no discussion of applicable law, and no explanation of even which prong of qualified immunity Adduci contests. *Id.* A perfunctory string of citations of the background law on qualified immunity, without any elaboration or application to the facts at issue, is insufficient to raise the defense, therefore the argument has been forfeited. *See, e.g.*, *McCottrell v. White,* 933 F.3d 651, 670 n.12 (7th Cir. 2019); *Logan v. City of Evanston*, No. 20 C 1323, 2020 WL 6020487, at *7-*8 (N.D. Ill. Oct. 12, 2020) (citing *United States v. Barr*, 960 F.3d 906, 916 (7th Cir. 2020)).

Even if Adduci *had* raised a challenge regarding the status of the law—to be clear, she has not—that challenge would fail. By 2001, it had long been clearly established that a prosecutor who engages in the deliberate manufacture of false evidence violates the constitution and is not entitled to qualified immunity. *See Fields v. Wharrie*, 740 F.3d 1107, 1114 (7th Cir. 2014) ("[I]t was established law by 1985 (indeed long before), when the fabrication is alleged to have occurred, that a government lawyer's fabricating evidence against a criminal defendant was a violation of due process."); *Whitlock*, 682 F.3d at 585. Whether Adduci is held liable directly or on a conspiratorial basis is immaterial, as "what must be clearly established is limited to the *underlying constitutional right* that the Defendants conspired to violate." *E.g.*, *Liggins v. City of Chicago*, 2021 WL 2894167, at *6 (N.D. Ill. July 9, 2021) (emphasis in original); *see also, e.g.*, *Walker v. White*, 2021 WL 1058096, at *16 (N.D. Ill. Mar. 19, 2021).

Qualified immunity likewise does not permit a prosecutor to stand by and fail to intervene as others in the investigation trample a suspect's constitutional rights. As far back as 1972, the Seventh Circuit stated that "one who is given the badge of authority of a police officer may not ignore the duty imposed by

his person in his presence or otherwise within his knowledge." *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972). Given that Adduci was acting in a police-like investigatory manner, a reasonable official in her position would have known that a failure to intervene claim applies to her, as well. As the Seventh Circuit explained, a "prosecutor who is acting in an investigatory capacity" is "held to the same standard of liability as a police officer" and is not "subject to rules that are any different." *Whitlock*, 682 F.3d at 580, 583.

Finally, even if she had developed the argument, Adduci would not be entitled to qualified immunity on Plaintiff's malicious prosecution claim. Because a jury could reasonably infer that Adduci helped to fabricate nearly all evidence developed against Reed, no reasonable person could believe that arguable probable cause existed for Reed's prosecution. It is objectively unreasonable for a prosecutor to manufacture evidence that serves as the purported probable cause that Reed committed a crime, then turn around and rely upon that fabricated probable cause for justification of Reed's arrest. *Lawson*, 637 F.3d at 704. This would be an unacceptable "corruption of the truth-seeking function of the trial process." *United States v. Agurs*, 427 U.S. 97, 104 (1976).

## II. **A Jury Must Decide if Adduci is Liable for Due Process Violations (Count I)**[5]

Adduci violated Reed's right to a fair trial under the Due Process Clause when she fabricated witness statements from DeLong Reed and Ricardo Burns that were used to secure his conviction. Both statements, just as with Reed's confession, were handwritten by Adduci, despite her admitted practice of videotaping or using court reported statements, without explanation for why she departed from her practice for both statements.

---

[5] Adduci has forfeited her right to seek Summary Judgment on Plaintiff's *Brady* claim, including the failure to document or produce exculpatory evidence or impeachment evidence. Adduci wrote a handful of sentences and provided a cursory argument, with no specific application to the facts at hand. This failure to put forth actual argument should require Adduci to face a trial on Plaintiff's *Brady* claim, particularly because the Court afforded Adduci the opportunity to submit a memorandum up to 25 pages in length but she filed only a 22 page memorandum. She had sufficient space to develop this argument but chose not to. *See* Dkt. 197 at 16 (three sentences).

Due to the sloppy, cursory investigation into Van Vo's murder and premature fixation on Carl Reed, the prosecution required a fabricated confession, one that Defendant herself has labeled unbelievable. Supporting that fabricated confession were the two fabricated witness statements of DeLong Reed and Ricardo Burns that ensured Reed's conviction, which Adduci eventually procured after putting in hours of work alongside the settled-individual Defendant officers.

Reed has put forth evidence showing that there are material disputes of genuine fact, therefore a jury must make the ultimate determination on Count I.

**A. <u>Applicable Law</u>**

When a prosecutor fabricates evidence, due process is violated. *Fields*, 740 F.3d at 1114. Adduci is liable for fabrication because she: (1) '"created evidence that they knew to be false,"' and, (2) that the evidence was used '"in some way"' to deprive Plaintiff of liberty. *Anderson v. City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019).

Adduci argues that she had every reason to believe that the statements were reliable, therefore she cannot be held liable on Count I. Dkt. 197 at 14-16. But the context surrounding these statement matters. Proof of a defendant's intent to fabricate evidence "rarely" exists in the form of direct evidence; "knowledge and intent must often be proven by circumstantial evidence." *See, e.g.*, *Stinson v. Gauger*, 868 F.3d 516, 527 (7th Cir. 2015) (quotation omitted); *Anderson v. City of Rockford*, 932 F.3d at 511 ("admissions of wrongdoing" are "not an everyday occurrence"). Coercion can be evidence of fabrication, as it is here. *See Fields*, 740 F.3d at 1112 ("The point is not that coercion is legally irrelevant; far from it—coercion (which in an extreme case could amount to torture) may be an essential tool in 'persuading a witness to fabricate testimony."). Accordingly, where the evidence demonstrates that Defendant coached or manipulated a witness into adopting Defendant's theory of the case, a fabrication claim brought under § 1983 may proceed.

Furthermore, although Plaintiff contends that there was no probable cause to justify his prosecution, even if the Court were to find that the state had probable cause, this would not doom his fabrication claims (Count I and II). This is because a "claim of fabrication of evidence does not require a conclusion that the state did not have probable cause to prosecute the claimant." *Stemler v. City of Florence,* 126 F.3d 856, 872 (6th Cir. 1997); *see also Webb v. United States,* 789 F.3d 647, 667-72 (6th Cir. 2015) (false statements in police reports give rise to a due process fabrication of evidence claim irrespective of probable cause). "Even if independent evidence establishes probable cause against a suspect, it would still be unlawful for law-enforcement officers to fabricate evidence in order to strengthen the case against that suspect." *Clark v. Louisville Metro Gov't,* 2024 WL 56938 at *9 (W.D. Ky Jan. 4, 2024) (quoting *Webb,* 789 F.3d at 670). "Because the core of the right at issue here is not the deprivation of liberty but right to a fair trial, 'a stand-alone fabrication-of-evidence claim can survive without regard to probable cause.'" *Id.*

**B. <u>DeLong Reed</u>**

Given that Van Vo's apartment was double locked from the inside, showed no sign of forced entry, and given that Van Vo's keys were discovered inside his apartment, DeLong Reed, who shared a jack-and-jill bathroom with Van Vo that he "always kept" open, had unique, unrivaled access to Van Vo's apartment at the time of his murder. DeLong Reed admitted that he became angry at Carl Reed and that the confrontation that Zuley and Thompson orchestrated successfully "disgusted" him, leaving him open to the idea of inculpating Carl Reed. Because he was immediately taken for a (simulated) polygraph examination immediately thereafter, he also began to feel like a falsely accused suspect. Combined with the fact that he was repeatedly fed details about the crime, Carl Reed, and Van Vo's possessions, DeLong Reed decided to inculpate Carl Reed to save himself. Once he met with Adduci, he agreed to provide a statement that contradicted his initial one provided to police on July 19, 2001.

Ultimately, the statement was written for DeLong Reed; he did not read it—in fact, he could not read the statement—he simply adopted what Adduci wrote for him. His decision to adopt the statement

was the culmination of 14 hours of interrogation on July 22, 2001, during which he was fed details of the crime, experienced considerable concern about whether he would be considered a suspect if he did not inculpate Carl Reed and felt pressure to cooperate.

DeLong Reed's statement also conflicted with reality in numerous ways, including that despite his accusations that Carl Reed had items from Van Vo's apartment, a search discovered no such thing, and there was no physical evidence tying him to the crime. A reasonable inference can be drawn that they fed DeLong Reed details, including their own purported theory of why Carl Reed was involved.

**C. Ricardo Burns**

Adduci also fabricated the statement of Ricardo Burns, which contains a piece of information DeLong Reed recalled police feeding to him: that Reed purportedly had possession of Van Vo's car before selling it. This was the basis of Burns's statement, even though police found *Burns* in possession of the vehicle. A reasonable jury could find that police fed Burns Carl Reed's name and the theory of how he came into possession of the car, which Burns eventually adopted as his own story, after days of police questioning. Given that Burns had been selling drugs in the neighborhood and had numerous run-ins with the law, he knew officers personally through his previous arrests, was on probation, and found in possession of a stolen car. Burns was also read his *Miranda* rights and considered a potential "offender," giving him incentive to regurgitate details that Adduci and detectives fed him.[6] This kind of circumstantial evidence is sufficient to defeat summary judgment. *See, e.g.*, *Thompson v. City of Chicago*, 722 F.3d 963, 974 (7th Cir. 2013); *Harris v. United States*, 2017 WL 770969, at *5 (N.D. Ill. Feb. 28, 2017).

Adduci also attempts to rely upon a statement and later grand jury testimony provided by a man named Lester Garner, who also lived at 4946 N. Sheridan Road, arguing that a jury cannot reasonably infer

[6] Burns also admitted that, to prepare for his deposition, he requested and received copies of statements and his grand jury testimony he gave implicating Reed. But Burns admitted that he could not always read Adduci's handwriting and therefore "picked up what I could" from the July 22, 2001, statement he gave at 11:45pm. It showed. Burns did not testify consistently with statement he made in Reed's case or even himself, shifting his story at least three times over the course of his deposition.

that Adduci fabricated either DeLong Reed or Burns's statements because they both testified under oath that their statements were true, as did Garner and Soukup. Dkt. 197 at 16. But as set forth in Plaintiff's response to Adduci's statement of facts, there are inconsistencies between their statements and grand jury testimony, as well as their initial statement(s) to police and the statements Adduci handwrote for these witnesses.

Moreover, because Garner and Soukup are deceased, their statements statement and grand jury testimony are inadmissible hearsay that cannot be considered at summary judgment. Neither has been subject to the type of cross-examination necessary for admission under Fed.R.Evid. 804(b)(1)(B). Furthermore, the statement does not have the type of circumstantial guarantees of trustworthiness needed to admit it under Fed.R.Evid. 807. There is evidence that law enforcement raised their theory that Reed came into possession of Van Vo's car with both DeLong Reed and Ricardo Burns, long before either man made his eventual statement. Garner's statement also raises the same car theory that police affirmatively disclosed to both DeLong Reed and Burns. Coupled with the fact that Garner gave his statement to Adduci at 11:15pm on July 22, 2001, just 30 minutes before Burns, there is sufficient evidence from which a jury could reasonably infer that Garner was fed the exact same purported theory about the car, Adduci fabricated his statement first, which pressured Burns, then DeLong Reed, and eventually Carl Reed to fall into line. This is the type of "calculated effort to weave a complex narrative out of whole cloth" that courts have held is sufficient to survive summary judgment on a fabrication claim. *Phillips v. City of Chicago*, 2018 WL 1309881, at *26 (N.D. Ill. 2018).

From this evidence, a reasonable jury could find that Adduci manufactured the statements from both DeLong Reed and Burns. Where there is evidence of "a calculated effort to weave a complex narrative out of whole cloth" and leniency is promised in exchange for cooperation, a fabrication claim cannot be resolved at summary judgment. *Smith v. City of* Chicago, 785 F. Supp. 3d 356, 405 (N.D. Ill. 2025) (cleaned up).

## III. A Jury Must Decide Plaintiff's Coerced Confession Claim (Count II)

### A. Applicable law

A prosecutor, acting in an investigatory capacity, violates due process when she fabricates evidence during an investigation that is used to deprive a defendant of liberty in criminal proceedings. *Avery v. Milwaukee*, 846 F.3d 433, 441-43 (7th Cir. 2017). Determining "whether a confession was involuntary requires an examination of the 'totality of the surrounding circumstances,' including the characteristics of the person in custody and the details of the interrogation that resulted in the statement." *Etherly v. Davis*, 619 F.3d 654, 660-61 (7th Cir. 2010) (quoting *Schneckloth*, 412 U.S. at 225–26). Psychological coercion is a significant factor in evaluating fabricated confession claims. *White v. Rochford*, 592 F.2d 381, 383 (7th Cir. 1979) (a 1983 action can be sustained "even though no physical force was used in the extraction of the confession[.]"). As the Seventh Circuit explained in *Hurt v. Wise*, 880 F.3d 831, 846 (7th Cir. 2018):

> Often psychological coercion is the consequence of the cumulative effect of subtle tactics. Other times, coercion is obvious. For example, it is clearly established that police threats against the suspect or the suspect's family are a form of psychological coercion that renders a confession involuntary.

### B. There is Substantial Evidence that Adduci Fabricated Reed's Confession

Adduci contends that her only involvement was to memorialize Plaintiff's confession and that he read aloud portions of the confession to her directly. *Id.* at 8. She added that the story attributed to Reed is simply not believable, in part because Reed purportedly confessed to stabbing Van Vo repeatedly with just a knife blade without injuring himself (and despite having a damaged hand) and without getting blood on himself, his apartment, or Van Vo's apartment. This suggests that Reed's confession originated with the investigators, including Adduci, who had information about the weapon used and the evidence recovered to that point, making this a situation in which Adduci provided Reed the facts used to convict him. *See, e.g.*, *Gray v. City of Chicago*, 2022 WL 910601, at *10 (N.D. Ill. March 29, 2022). Adduci also acknowledged that the true circumstances of Reed's interrogation—having been denied his insulin for days, illiterate, and having been at Area 3 over three days—should have foreclosed any statement from being taken.

There is considerable circumstantial evidence that his confession was not freely and voluntarily given. Reed has put forth evidence supporting myriad risk factors for falsely confessing to a crime he did not commit. These include: (1) his lifelong inability to read and write; (2) he has little more than a middle school education and was in special education courses; (3) Reed's IQ, at its highest has measured at 65, placing him in the bottom percentile of general intelligence; (4) multiple evaluations and witness testimony document his difficulty or inability to think clearly, concentrate, understand even simple instructions, or retain information; (6) Reed is a diabetic was denied insulin at Area 3, and he was fed sugary food and drinks, making him increasingly ill as his three day interrogation dragged on; (7) Reed informed Adduci repeatedly of his illiteracy, his diabetes, and of his actual innocence; (8) Reed had been interrogated over the course of three days and had been in no position to sleep; (9) Reed's hand injury from a gunshot wound, rendering the already unbelievable claim that he stabbed Van Vo with just a knife blade, without causing injury or leaving behind physical evidence, even more ridiculous; (10) Reed was coerced throughout his interrogation, and he was promised he could go home if he signed the false confession, which is what Reed thought he was doing; (11) Reed had resisted all pressure to inculpate himself falsely for 55 hours, until the combination of many of the aforementioned risk factors broke him.

Adduci's Motion focuses overwhelmingly on Plaintiff's deposition, claiming that because Reed did not recall certain aspects of his interactions with Adduci, nothing can rebut her deposition testimony as to the nature of his interrogation. Dkt. 197 at 13. This is disputed, as Reed did not understand that he interacted with anyone other than police officers, according to his testimony, but he recalled the circumstances surrounding his false confession, the promises made, how ill he was, and other critical details that refute Adduci's claim. Especially given his extreme cognitive limitations, a reasonable inference can be drawn that Reed simply believed that Adduci, whose conduct was indistinguishable from Zuley and Thompson during his interrogation, was one more police officer involved in his 55 hour interrogation.

Regardless of what Reed testifies to at trial, a reasonable jury could still find Adduci's story unbelievable and undermined by the considerable evidence Reed has marshaled, nearly all of which Adduci declines to acknowledge, much less address. Dkt. 197 at 13-14. This includes the overwhelming evidence from several decades documenting Reed's longstanding inability to read, his intellectual disabilities, his low IQ, his history of repeated and significant head trauma, his difficulty understanding information, his difficulty concentrating, his hand injury, and his diabetes (which had been left untreated for days at that point). Viewing the evidence in the light most favorable to Plaintiff, taking into account the totality of the circumstances, his confession was not a "product of rational intellect" but "the result of physical abuse, psychological intimidation, or captive interrogation tactics calculated to overcome [his] free will" and take advantage of his numerous personal vulnerabilities. *Watson v. DeTella*, 122 F.3d 450, 453 (7th Cir. 1997); *Fulminante*, 499 U.S. at 287 ("coercion can be mental as well as physical, and … the blood of the accused is not the only hallmark of an unconstitutional inquisition") (cleaned up); *Hill v. City of Chicago*, 2009 WL 174994, at *7 (N.D. Ill. Jan. 26, 2009), *aff'd by Hill v. Coppelson*, 627 F.3d 601 (7th Cir. 2010).

Because there are facts from which a jury could find that Adduci participated in coercive interrogations, fabricated Reed's confession, and reduced the falsified confession to writing so that Reed would adopt those words as his own, a jury must evaluate Reed's evidence undermining every aspect of Adduci's story.

## IV. Reed is Entitled to a Trial on His Conspiracy Claims

To prove a section 1983 conspiracy, Plaintiff must point to evidence from which a jury could infer an agreement among two or more people acting in concert to commit an unlawful act, or a lawful act by unlawful means. *Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979), *rev'd in part*, 446 U.S. 754. Conspirators are liable "for the wrongful acts of the other conspirators committed within the scope of the conspiracy." *Proffitt v. Ridgway*, 279 F.3d 503, 507 (7th Cir. 2002).

To prevail on his state law civil conspiracy claim (Count X), Plaintiff must show "(1) a combination of two or more persons; (2) for the purpose of accomplishing by some concerted action either an unlawful

purpose or a lawful purpose by unlawful means; (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnson*, 209 Ill.2d 302, 317 (2004). "Circumstantial evidence may provide adequate proof of conspiracy." *Bell v. City of Milwaukee*, 746 F.2d 1205, 1256 (7th Cir. 1984).

At summary judgment, when inferences are taken in the nonmovant's favor, "[t]he question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds." *Hampton*, 600 F.2d at 621. Applying this law, a jury must resolve Reed's conspiracy claims (Counts V and X).

The record here shows a quintessential conspiracy. Each of the Defendants—Adduci and settled-individual Defendants—committed an overt act geared to accomplish a larger plot, namely, framing Plaintiff for murder. That these other Defendants have settled is not a bar to liability. Once a plaintiff establishes that more than one co-conspirator committed a constitutional violation, the fact that a plaintiff resolves claims against all but one of those co-conspirators has no bearing on the viability of his conspiracy claim against that remaining defendant. *See*, *e.g.*, *Hamilton v. City of Romulus*, 409 F. App'x 826, 836 (6th Cir. 2010) (finding "a settlement with a named co-conspirator is not a bar to introducing evidence of the settling defendant's conspiratorial acts").

Adduci response weakly that evidence of a conspiracy would be "speculative," repeating this assertion twice over the single page she dedicates to these two claims. Dkt. 197 at 19. Not so. All that is required is that Plaintiff put forth evidence that Adduci performed some act in furtherance of the group's objective, even if that act is not illegal or did not violated Reed's rights. *See Unitd States v. Caliendo*, 910 F.2d a429, 438 (7th Cir. 1990); *Smith v. Burge*, 222 F. Supp. 3d 669, 697 (N.D. Ill. 2016).

What's more, Plaintiff has marshaled evidence of "the necessary and important element of the existence of an agreement" as well as "the tortious conduct performed in furtherance of the agreement,"

which is the heart of a civil conspiracy. *Adcock v. Brakegate, Ltd.*, 164 Ill.2d 61, 62 (Ill. 1994). Specifically, he has shown that there was a common plan among Adduci and the settled-Individual Defendant Officers to fabricate evidence, including Plaintiff's false confession, to cover up their misconduct, including their decision to frame Plaintiff for Van Vo's murder, primarily by means of his fabricated confession. Adduci and the settled Defendants worked together to shield their improper actions and testify to their false version of events at hearings on the charges brought against Plaintiff. This is precisely the kind of joint action that furthers a conspiracy and entitles Reed to a trial on his federal and state civil conspiracy claims. Furthermore, Adduci herself has acknowledged that it was improper to take Plaintiff's confession given the circumstances under which it was extracted, and there is sufficient evidence from which a jury could reasonably infer Adduci would have and did know that Plaintiff was sick from having been denied his insulin, could not read, had been at Area 3 for days, without sleep, and had been threatened and coerced during that time.[7]

## V. A Jury Must Decide Reed's Malicious Prosecution Claims

To succeed on a claim of malicious prosecution pursuant to Illinois law, a plaintiff must establish five elements: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Beaman v. Freesmeyer*, 2021 IL 125617, ¶74. To succeed on his federal malicious prosecution claim under § 1983, Reed must show that he meets all five elements of the Illinois cause of action, the malicious prosecution was

[7] Assuming, *arguendo*, that it is determined that Adduci's personal involvement in extracting Reed's false confession does not rise to the level of a constitutional violation, a reasonable jury could nonetheless hold her liable here. That is because Adduci is liable for the misconduct of her co-conspirators, who denied Reed's his insulin and subjected him to threats and harassment for nearly three days of interrogation, to which he alerted her. *See, e.g.*, *Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1173–74 (N.D. Ill. 2022) (holding that even though prosecutor was not present for any physical abuse, prosecutor was aware of the general objective to get suspect to incriminate himself without regard to his constitutional rights); *Hampton v. City of Chicago*, No. 12 CV 5650, 2017 WL 2985743, at *25 (N.D. Ill. July 13, 2017).

committed by state actors, and he was deprived of his liberty. *Reed v. City of Chicago*, 77 F.3d 1049, 1051 (7th Cir. 1996).

Adduci raises a single challenge to Reed's malicious prosecutions claims, arguing that he cannot present evidence from which a jury could find an absence of probable cause. Dkt. 197 at 16-17. "Probable cause is defined as a state of facts that would lead a reasonably cautious person to believe, or to entertain an honest and strong suspicion, that the person arrested committed the offense charged" *Beaman*, 2021 IL 125617, ¶116. "In the context of an action for malicious prosecution, the assessment of probable cause depends on the totality of the circumstances existing when defendants commenced the prosecution." *Id.* ¶117. The existence of probable cause is a quintessential jury question and should not be decided as a matter of law "if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Maxwell v. Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993); *see also Bryant v. Whalen*, 759 F. Supp. 410, 417 (N.D. Ill. 1991). A jury must resolve factual disputes regarding probable cause. *Grundhoefer v. Sorin*, 20 N.E.3d 775, 781 (1st Dist. 2014).

Adduci briefly notes Reed's fabricated confession as underlying probable cause, claiming that because Reed "described" the knife "used to stab Van Vo" that was discovered under his body, this supports probable cause, rather than Plaintiff's argument that Adduci supplied this detail herself. Dkt. 197 at 17. Yet Adduci herself dismissed Reed's confession as unreliable and indeed "almost impossible," pointing to the lack of injuries to Reed's hands that would have undoubtedly resulted from using a handle-less knife to stab Van Vo eleven times. Adduci herself has undermined her ability to rely upon the knife and the fabricated confession as indicia of probable cause and reliability.

She also cannot rely on evidence she or her co-conspirators themselves manufactured to establish probable cause. *Alexander v. United States*, 721 F.3d 418, 423 (7th Cir. 2013) ("Knowingly false statements by the affiant cannot support a finding of probable cause"); *Kuri v. City of Chicago*, No. 13 C 1653, 2017 WL 4882338, at *7 (N.D. Ill. Oct. 30, 2017) ("Defendants cannot manufacture their own probable cause by

fabricating evidence") (collecting cases). This removes the DeLong Reed and Burns statements from consideration, as well as Plaintiff's confession. This is the only admissible evidence there is, given that statements from Soukup and Garner are hearsay and inadmissible, for reasons discussed *supra*.[8]

## VI. Plaintiff Has Put Forth Sufficient Evidence on His Failure to Intervene Claim

The Seventh Circuit has made clear that "[t]he only question is whether a prosecutor who is acting in an investigatory capacity is subject to the rules that are any different. We think not…prosecutors and police are subject to the same constraints" when acting in an investigatory role. *Whitlock*, 682 F.3d at 580-81. Beyond citing a single case in this district to the contrary, Adduci does not address why she should escape liability on this claim. Dkt. 197 at 18. Other courts in this district have found the same. *See, e.g.*, *Saunders v. City of Chicago*, No. 12 CV 9158, 2013 WL 6009933, at *10 (N.D. Ill. Nov. 13, 2013) (allowing failure to intervene claim to go forward against a prosecutor).

For the reasons discussed *supra*, a reasonable inference can be drawn that Adduci was aware and on notice of the abuse, coercion, and threats to which Reed was subjected. Indeed, Adduci has acknowledged that given the length of Reed's interrogation, his untreated diabetes while he was at Area 3, and his inability to read are factors that should have foreclosed taking Reed's statement; nevertheless, Adduci and Thompson did take a false confession from Reed despite these circumstances.

## VII. Plaintiff's Intentional Infliction of Emotional Distress Claim

To prevail on his Intentional Infliction of Emotional Distress Claim (IIED), Reed must show that (1) Adduci's conduct was extreme and outrageous; (2) Adduci knew there was a high probability her conduct would inflict severe emotional distress; and (3) that her conduct did, in fact, cause severe emotional distress. *Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010)

[8] Even if the Court decides to rely upon them, statements are extraordinarily weak (Soukup) or can reasonably inferred as fabricated (Garner). Most importantly, neither provides arguable probable cause for Reed's prosecution for murder. *Beaman*, 2021 IL 125617, ¶¶118-138 (jury must decide absence of probable cause because, although defendants claimed that they reasonably believed that plaintiff was "the only person who had means, motive, and opportunity to commit the crime," many of the facts they relied on were disputed, and, permitted differing inferences that, when construed in plaintiff's favor, supported a lack of probable cause).

Adduci claims that she was "merely performing [her] job functions" when she fabricated Plaintiff's confession and that there is no argument that Reed's "purported emotional distress" can be linked to her conduct. Dkt. 197 at 20. But IIED arises "not so much from what [a defendant] says or does, from the defendant's improper use of a position of power which gives [the defendant] the ability to adversely affect the plaintiff's interests." *Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010).

Adduci makes no argument that fabricating Reed's confession would not be an abuse of power or authority, which Reed argues it was. "For conduct to be extreme and outrageous it must go 'beyond all bounds of decency' and be 'considered intolerable in a civilized community.'" *Fox*, 600 F.3d at 842 (7th Cir. 2010). An important factor in deciding whether conduct is "extreme and outrageous" is whether "a defendant abused a position of authority." *Fox*, 600 F.3d at 842. Reed's allegations fit this tort precisely, and disputes of fact prevent summary judgment. If a jury finds that Adduci "fabricated false or misleading evidence of [plaintiff's] guilt or concealed exculpatory evidence from prosecutors, that behavior is sufficiently outrageous to support a claim for emotional distress." *Carroccia v. Anderson*, 249 F. Supp. 2d 1016, 1028 (N.D. Ill. 2003); *see also Washington v. Boudreau*, 2022 WL 4599708, at *25 (N.D. Ill. Sept. 30, 2022); *Rosario v. City of Chicago*, 2012 WL 1319806, at *11 (N.D. Ill. Apr. 17, 2012) ("Allegations that a state official fabricated false or misleading evidence of guilt ... would be sufficiently 'outrageous' to support an IIED claim.").

## VIII. Willful and Wanton Conduct/Aggravated Negligence

In support of her Motion, Adduci recycles the same arguments before, supported only by her own testimony, including that she received verbal assurances from Plaintiff he was well-treated by officers, that she was simply doing her job, and that she had no responsibility beyond charging and prosecuting, without further consideration. Dkt. 197 at 21.

The Illinois Supreme Court has stated that by passing the Tort Immunity Act, the legislature did not intend to shield conduct undertaken with the intention to cause harm. *Murray v. Chicago Youth Center*, 224 Ill.2d 213, 236 (2007); *Burke v. 12 Rothschild's Liquor Mart, Inc.*, 148 Ill.2d 429, 443 (1992). Instead,

Section 2-202 of the TIA provides that "[a] public employee is not liable for his act or omission in the execution or enforcement of any law **unless such act or omission constitutes willful and wanton conduct**." 745 ILCS 10/2-202 (emphasis added).

Willful and wanton conduct is regarded as an "aggravated form of negligence," of which there are two varieties: intentional and reckless. *Krywin v. Chi. Transit. Auth.*, 938 N.E.2d 440, 452 (Ill. 2010. The former is committed with deliberate or actual intent to harm, and the latter is where defendant's actions were committed with conscious disregard for the safety of others. *Zirako v. Soo Line R.R. Co.*, 161 Ill. 2d 267, (Ill. 1994); *see also Nat'l Bank & Trust Co. v. City of Chicago*, 192 Ill.2d 267, 274 (Ill. 2000). A plaintiff must plead and prove the basic elements of a negligence claim—that the defendant owed a duty to the plaintiff, the defendant breached that duty, and the breach was a proximate cause of plaintiff's injury—plus establish either deliberate intention to harm or conscious disregard to the plaintiff's welfare. *Doe v. Chicago Bd. Of Ed.*, 213 Ill. 2d 19, 28 (Ill. 2004). Critically, whether defendants' conduct was willful and wanton is a fact-specific inquiry for a jury. *Id.*

## CONCLUSION

A jury must consider Adduci's misconduct and decide Reed's claims; the Motion should be denied.

Respectfully Submitted,

/s/ *Julia T. Quinn*
*One of Plaintiff's Attorneys*

Jon Loevy
Julia T. Quinn
LOEVY & LOEVY
311 N. Aberdeen Street, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
jon@loevy.com
jquinn@loevy.com